# Progress of the New Jersey Department of Children and Families

Monitoring Period XXI
(July 1 – December 31, 2017)

*Charlie and Nadine H. v. Murphy*

July 18, 2018



**Progress of the New Jersey
Department of Children and Families**

**Monitoring Period XXI Report for**
*Charlie and Nadine H. v. Murphy*
**July 1 – December 31, 2017**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................... 1

II.     SUMMARY OF PERFORMANCE DURING JULY THROUGH DECEMBER 2017 .... 5

III.    CHILD AND FAMILY OUTCOMES AND CASE PRACTICE PERFORMANCE
MEASURES ........................................................................................ 10

IV.    FOUNDATIONAL ELEMENTS ................................................................ 36
  A.  CASE PRACTICE MODEL – SEP Section II.B ........................................ 36
  B.  APPROPRIATE PLACEMENTS – SEP Section II.D .................................... 37
  C.  SERVICE ARRAY – SEP Section II.E .................................................... 38

V.    SUSTAINABILITY AND EXIT PLAN PERFORMANCE MEASURES *TO BE
ACHIEVED* AND *TO BE MAINTAINED* .................................................... 39
  A.  INVESTIGATIONS .......................................................................... 39
  B.  FAMILY TEAM MEETINGS .............................................................. 42
  C.  QUALITY OF CASE AND SERVICE PLANNING ...................................... 48
  D.  EDUCATION ................................................................................ 51
  E.  VISITS ...................................................................................... 53
  F.  PLACEMENT ................................................................................ 58
  G.  MALTREATMENT OF CHILDREN AND YOUTH .................................... 61
  H.  TIMELY PERMANENCY .................................................................. 64
  I.  CHILD HEALTH UNITS .................................................................... 69
  J.  OLDER YOUTH ............................................................................ 70
  K.  SERVICES TO SUPPORT TRANSITION ................................................ 73
  L.  CASELOADS ................................................................................ 75
  M.  DEPUTY ATTORNEYS GENERAL STAFFING ........................................ 83

i

N.   ACCOUNTABILITY THROUGH QUALITATIVE REVIEW AND THE
PRODUCTION AND USE OF ACCURATE DATA ............................................................... 84

O.   NEEDS ASSESSMENT ....................................................................... 88

P.   FISCAL YEAR BUDGET ..................................................................... 90

APPENDIX: A ................................................................................................ 91

APPENDIX: B ................................................................................................ 92

# LIST OF TABLES

Table 1: Charlie and Nadine H. Child and Family Outcome and Case Practice Performance Measures .................................................................................................................. 11

Table 2: Number and Percentage of Children Who Entered Foster Care in CY 2016 Who Were Discharged to Permanency within 12 Months, by Permanency Outcome.................................... 65

Table 3: Number and Percentage of Children Who Entered Foster Care in CY 2015 Who Were Discharged to Permanency within 24 Months, by Permanency Outcome.................................... 66

Table 4: Number and Percentage of Children Who Entered Foster Care in CY 2014 Who Were Discharged to Permanency within 36 Months, by Permanency Outcome.................................... 67

Table 5: Number and Percentage of Children Who Entered Foster Care in CY 2013 Who Were Discharged to Permanency within 48 Months, by Permanency Outcome.................................... 68

Table 6: CP&P Individual Worker Caseload Standards ............................................................. 75

Table 7: Number of CP&P Investigations and Secondary Intake.............................................. 78

Table 8: Percentage of CP&P Investigations Assigned to Non-Caseload .................................. 80

Table 9: Percentage of CP&P Investigations Assigned to Non-Intake....................................... 80

Table 10: Qualitative Review: Gender, Age and Race/Ethnicity Demographics ........................ 85

Table 11: Qualitative Review: Child/Youth and Family Status Results..................................... 86

Table 12: Qualitative Review: Practice/System Performance Results ....................................... 87

# LIST OF FIGURES

Figure 1: Percentage of Children Who Had at least Two Family Team Meetings Held After 12 Months in Placement with a Goal other than Reunification (July – December 2017) ................. 45

Figure 2: Qualitative Review (QR) Cases Rates Acceptable on Teamwork and Coordination (CY 2016 – CY 2017)........................................................................................................................ 47

Figure 3: Qualitative Review (QR) Cases Rated Acceptable on Quality of Case Plans and Components of Placement (CY 2016 – CY 2017)....................................................................... 50

Figure 4: Qualitative Review (QR) Cases Rated Acceptable on Educational Needs (CY 2016 – CY 2017).................................................................................................................................... 52

Figure 5: Percentage of Families Who Had at Least Twice per Month Face-to-Face Contact with Caseworker when the Goal is Reunification (July – December 2017) ......................................... 55

Figure 6: Percentage of Children Who Had at Least Monthly Visits with Siblings, for Children not Placed with Siblings (July – December 2017)...................................................................... 57

Figure 7: Percentage of Children Who Re-Entered Custody within One Year of Date of Exit (CY 2007 – CY 2015).................................................................................................................... 63

Figure 8: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 12 Months of Entering Foster Care (CY 2007 – CY 2016).......................... 65

Figure 9: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 24 Months of Entering Foster Care (CY 2007 – CY 2015).......................... 66

Figure 10: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 36 Months of Entering Foster Care (CY 2007 – CY 2014)..................... 67

Figure 11: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 48 Months of Entering Foster Care (CY 2007 – CY 2013)..................... 68

Figure 12: Qualitative Review (QR) Cases Rated Acceptable on Quality of Case Planning and Services for Older Youth (CY 2016 – CY 2017) ...................................................................... 71

Figure 13: Qualitative Review (QR) Cases Rated Acceptable on Successful Transitions (CY 2016 – CY 2017)........................................................................................................................ 74

# I.      INTRODUCTION

The Center for the Study of Social Policy (CSSP) was appointed by the Honorable Stanley R. Chesler of the United States District Court for the District of New Jersey as Federal Monitor of the class action lawsuit *Charlie and Nadine H. v. Murphy*, aimed at improving outcomes for children, youth and families served through New Jersey's child welfare system. As the Monitor, CSSP has been charged with independently assessing New Jersey's compliance with the goals, principles and outcomes of the Court Order entered on December 1, 2005; the Modified Settlement Agreement (MSA) entered on July 17, 2006; and now the Sustainability and Exit Plan (SEP) entered on November 4, 2015, that supersedes the MSA. This is the fifth monitoring report measuring progress under the SEP and includes performance data for the period July 1 through December 31, 2017.[1]

## Monitoring Methodology

The Monitor's public reports cover six month periods.[2] The primary sources of information on New Jersey's progress are quantitative and qualitative aggregate data supplied by the Department of Children and Families (DCF) and independently validated by the Monitor. DCF provides access to staff at all levels to enable the Monitor to verify performance.

DCF's capacity to accurately collect and analyze data and make it regularly available to the public has significantly grown over the past several years. The Monitor first looks to the state's data for analysis and validates its accuracy. The Monitor also retains the authority to engage in independent data collection and analysis where needed. Reflecting their increased capacity, DCF continues to expand the data that it publishes on its public website.[3] DCF also now publishes data regularly on the publicly accessible New Jersey Child Welfare Data Hub, which was developed in collaboration with Rutgers University.[4] The Data Portal, launched in November 2016, allows users to create customized charts and graphs using New Jersey's child welfare data, and incorporates information from the formerly produced quarterly DCF Demographics Report.

Reports that DCF currently publishes on its website, the schedule for regular production of those reports and the addition of new reports include:

- Commissioner's Monthly Report[5] – *Current and produced monthly*. This report gives a broad data snapshot of various DCF services. The report includes information from Child Protection & Permanency (CP&P), Office of Adolescent Services (OAS), Institutional Abuse Investigation Unit (IAIU), Children's System of Care (CSOC), Family & Community Partnerships and the Division on Women.

- Screening and Investigations Report[6] – *Current and produced monthly*. This report details State Central Registry (SCR) activity, including data regarding calls to the Child Abuse and Neglect Hotline, assignments to CP&P offices and trends in Child Protective Services (CPS) Reports and Child Welfare Services (CWS) Referrals.

---

[1] Copies of all Monitoring Reports can be found at: http://www.cssp.org/publications/child-welfare?type=child_welfare_class_action_reform&title=Child%20Welfare:%20Class%20Action%20Reform
[2] The exceptions to this time frame were Monitoring Period XIII, which covered July 1, 2012 through March 31, 2013; Monitoring Period XIV, which covered April 1 through December 31, 2013; and Monitoring Period XVII, which covered January 1 through December 31, 2015.
[3] To see DCF's public website, go to: http://www.state.nj.us/dcf/about/
[4] To see the New Jersey Child Welfare Data Hub, go to: https://njchilddata.rutgers.edu/#home
[5] To see all Commissioner's Monthly Reports, go to: http://www.nj.gov/dcf/childdata/continuous/
[6] To see all Screening and Investigations Reports, go to: http://www.nj.gov/dcf/childdata/protection/screening/

- Workforce Report[7] –*To be produced annually; last report dated January 2018*. This report provides information regarding the demographics and characteristics of current workers, as well as a variety of indicators of workforce planning and development, using fiscal year (FY) (July 1 – June 30) data.

- Children's Interagency Coordinating Council Report[8] – *Current and produced monthly*. This report details referral and service activity for CSOC. It also includes demographics, referral sources, reasons, resolutions and services provided.

- New Jersey Youth Resource Spot[9] – *Ongoing and updated as relevant*. This website offers the latest resources, opportunities, news and events for young people. This site includes a list of current Youth Advisory Boards (YAB), as well as additional resources available in each county and statewide.

- DCF Needs Assessment[10] – *To be produced annually, with every county assessed at least once every three years*. DCF produces annual reports on its website and reports twice annually to the Monitor. The final report of DCF's multi-phase Needs Assessment process entitled *DCF Needs Assessment 2018 Report #3: Survey Findings and Synthesis* updates interim findings to identify the resources needed to serve families with children at risk for entering out-of-home placement and those already in placement. Reports shall evaluate the need for additional placements and services to meet the needs of children, youth and their families involved with DCF.

- Adoptions Report[11] – *To be produced annually; last report dated 2016.* This report reviews CP&P adoption data and practice related to SEP requirements. This report is based on calendar year (CY) data.

- Child Welfare Outcomes Report[12] – *Current and produced annually; last report dated May 2017*. This report focuses on longitudinal, quantitative data measuring outcomes of children served by CP&P.

- Healthcare of Children in Out-of-Home Placement[13] – *To be produced annually; first report dated December 2017.* This report reviews health indicators in the SEP and is based on state FY data.

- Our Work with Children, Youth and Families Report[14] – *To be produced annually; first report dated January 2018*. This report analyzes DCF's implementation of the Case Practice Model (CPM), largely utilizing annual data from the Qualitative Reviews (QRs) as well as selected quantitative data. This report uses qualitative data to uncover trends and provide insight into systems issues. The formerly produced annual QR report is incorporated into this report.

---

[7] To see DCF's Workforce Report: 2016-2017 Updates, go to http://www.nj.gov/dcf/childdata/exitplan/NJ.DCF.Workforce.Report-FY17.pdf. To see DCF's Workforce: Preliminary Highlights 2014-2015 Report, go to:
http://www.state.nj.us/dcf/childdata/orgdev/NJ.DCF.Workforce.Report_2015.pdf
[8] To see all Children's InterAgency Coordinating Council Reports, go to: http://www.nj.gov/dcf/childdata/interagency/
[9] To see New Jersey's Youth Resource Spot, go to: http://www.njyrs.org/
[10] To see New Jersey's CP&P Final Needs Assessment 2018 Report #3: Survey Findings and Synthesis, go to:
http://www.nj.gov/dcf/childdata/protection/DCF.Needs.Assessment.Phase.IV.Report-March2018.pdf. To see the prior CP&P Needs Assessment reports, go to: http://www.nj.gov/dcf/childdata/protection/
[11] To see New Jersey's Adoptions Report, go to: http://www.nj.gov/dcf/childdata/exitplan/AdoptionReport2016.pdf
[12] To see New Jersey's Child Welfare Outcomes Report go to: http://www.nj.gov/dcf/childdata/exitplan/Outcomes.Report.and.Executive.Summary-2017.pdf
[13] To see New Jersey's Healthcare of Children in Out-of-Home Placement 2017 report, go to:
http://www.nj.gov/dcf/news/reportsnewsletters/dcfreportsnewsletters/2017_Child.Health.Report.pdf
[14] To see DCF's Our Work with Children, Youth and Families 2017 Report, go to:
http://www.nj.gov/dcf/childdata/exitplan/Our.Work.with.Children.Young.Adults.and.Families-2017.pdf

The Monitor engaged in the following verification activities for data collected from July – December 2017.

- ***Investigations Case Record Review***

  The Monitor and DCF jointly conducted a case record review of a statistically valid random sample of 331 child abuse and neglect investigations assigned to DCF Local Offices between October 1 and October 14, 2017, involving 518 alleged child victims. Reviewers examined the quality of practice and determined whether cases met the quality standard completely, substantially, marginally or not at all. Findings from this review are discussed in Section V.A – Investigations – of this report.

- ***Caseload Data Verification***

  The Monitor conducted a telephone survey in January and February 2018 of 170 workers to verify their individual caseloads during the monitoring period. Findings from this review are discussed in Section V.L – Caseloads – of this report.

- ***Housing, Employment and Education Status Review for Older Youth Exiting Care***

  The Monitor collaborated with DCF to review case records of 65 youth age 18 to 21 who exited care between July 1 and December 31, 2017 without achieving permanency. The review focused on the housing, education and employment status of these youth. Findings from the review are discussed in Section V.J – Older Youth – of this report.

- ***Family Team Meeting Data Review***

  The Monitor reviewed 199 cases from July 1 to December 31, 2017 to look at documentation of Family Team Meetings (FTMs), specifically verifying instances in which workers determined that FTMs were not required in particular circumstances. The Monitor reviewed 86 cases in which workers documented that Initial FTMs within 45 days (SEP IV.B.16) were not required because the parent declined the meeting or was unavailable. The Monitor reviewed 82 cases in which workers documented that FTMs that should be held in the first 12 months of a child's placement (SEP IV.B.17) were also not required because the parent declined the meeting or was unavailable. The Monitor reviewed 11 cases in which workers documented that FTMs after 12 months of placement when there is a goal of reunification (SEP IV.B.18) were similarly not required. The Monitor reviewed another 20 cases in which workers documented that FTMs after 12 months of placement when there is a goal other than reunification (SEP IV.B.19) were not required for the same reasons. Further discussion of current performance on these measures is included in Section V.B – Family Team Meetings – of this report.

- ***Visits Data Review***

  The Monitor collaborated with DCF to review a statistically significant sample of 300 cases from September, October and November 2017 in which workers documented that caseworker contacts with parents with a reunification goal (SEP IV.F.28) were not required because a parent was unavailable or there were other circumstances outside of their control that prevented visits from occurring. The Monitor also collaborated with DCF to review a statistically significant sample of 253 cases from September, October and November 2017 in which workers documented that sibling visits (SEP IV.F.31) were not required because a child declined, a sibling was unavailable or there were other circumstances outside of their control. Findings are discussed in Section V.E – Visits – of this report.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 3*

- **_State Central Registry_**

  The Monitor conducted a site visit at the offices of SCR in order to review the process of receiving and coding incoming calls to the Hotline. Staff listened in on calls, spoke with some SCR workers and supervisors and met with SCR leadership.

- **_Other Monitoring Activities_**

  The Monitor interviewed and/or visited multiple internal and external New Jersey child welfare system stakeholders, including staff at all levels, contracted service providers, youth, relatives, birth parents and advocacy organizations. The Monitor also attended DCF's ChildStat meetings, as well as adolescent practice forums and Area Director meetings. The Monitor participates as reviewers in almost every scheduled statewide Qualitative Review (QR) throughout the year, and participated in the first QR Reviewer Workshop. DCF has fully cooperated with the Monitor in notifying Monitor staff of schedules and facilitating their participation in relevant activities.

**Structure of the Report**

Section II provides an overview of the state's accomplishments and challenges during this monitoring period. Section III provides summary performance data on each of the outcomes and performance measures required by the SEP in Table 1: *Charlie and Nadine H. v. Murphy* Child and Family Outcome and Case Practice Performance Measures. Section IV provides information related to the SEP Foundational Elements.[15] Section V provides more detailed data and discussion of performance on SEP Outcomes *To Be Maintained* and Outcomes *To Be Achieved* in the following areas:

- Investigations of alleged child maltreatment (Section V.A);
- Implementation of DCF's Case Practice Model; including Family Team Meetings, case planning and visits (Sections V.B, V.C & V.E);
- Educational engagement for children in out-of-home care (Section V.D);
- Placement of children in out-of-home settings (Section V.F);
- Efforts to achieve permanency for children either through reunification with family, legal guardianship or adoption (Section V.H);
- Provision of health care services to children, youth and families (Section V.I);
- Services to older youth (Section V.J);
- Caseloads (Section V.L);
- District Attorneys General Staffing (Section V.M);
- Accountability through the Qualitative Review and the production and use of accurate data (Section V.N);
- Needs Assessment (Section V.O); and
- Fiscal Year 2018 budget (Section V.P).

---

[15] The Foundational Elements requirements of the SEP intentionally recognize the state's accomplishments in early implementation of the MSA. At the Monitor's discretion, based on a concern that a Foundational Element has not been sustained, the Monitor may request additional data. If the data demonstrate a persistent problem, in the Monitor's discretion, the state will propose and implement corrective action (SEP.II).

## II.      SUMMARY OF PERFORMANCE DURING JULY THROUGH DECEMBER 2017

The election of a new Governor and transition within New Jersey government has ushered in many changes in the Department of Children and Families (DCF). The strong leadership and progress made during the almost eight year tenure of outgoing Commissioner Allison Blake has laid the groundwork for continuing work to meet the remaining requirements of the Settlement Agreement and fully ensure quality case practice for all children, youth and families that come into contact with DCF.

In early January, Governor Phil Murphy nominated Christine Norbut Beyer, formerly a senior director for Casey Family Programs (CFP), to lead DCF. Ms. Beyer began her career as an intern at the Division of Youth and Family Services, DCF's previous name, and rose to Assistant Commissioner before leaving for CFP in 2012. Her nomination was confirmed by the state senate on June 7, 2018. Other leadership changes at DCF include the appointment of Katherine Stoehr as Deputy Commissioner of Operations. Prior to her four years working as a consultant for the Annie E. Casey Foundation and other child welfare research organizations, Ms. Stoehr served in diverse leadership roles at child and family service agencies, including Senior Vice President of Performance, Strategy and Advocacy at Graham Windham and Assistant Commissioner for Program Policy and Development at New York's Administration for Children Services.

Carmen Diaz-Petti joins the DCF leadership team as Assistant Commissioner for the Division of Child Protection & Permanency (CP&P). Ms. Diaz-Petti has served as Area Director for Hunterdon, Somerset, Warren and Mercer Counties since January of 2015, and was previously the Local Office Manager (LOM) of Somerset County. Ms. Diaz-Petti is known for her work to promote the Division's Case Practice Model and several quality improvement initiatives. Lisa von Pier, the highly regarded Assistant Commissioner for CP&P for the last four years and former Assistant Commissioner for Family & Community Partnerships, will transition to the Office of Strategic Development.

The new Commissioner's stated focus, supported by the Monitor, places special emphasis on prevention of child abuse and neglect and on improving the quality of DCF's case practice. As discussed in this report, while DCF has met many critical benchmarks of the Sustainability and Exit Plan (SEP), several newly met in this monitoring period, multiple SEP quality measures lag behind, including in such key areas as case planning and teaming with families' formal and informal supports. This presents a formidable yet achievable goal. Raising the bar on the quality of case practice has challenged many jurisdictions nationwide undergoing reform efforts. DCF has built the necessary foundation, but it will take deliberate attention to the core elements of case practice that continue to require improvement, including fully engaging with youth and families, developing timely and meaningful case plans and purposeful communication among caseworkers, team members, children, youth and families to implement those plans.

The monitoring report supports the significant progress DCF made this monitoring period on key requirements of the SEP. Solid performance was maintained on each of the SEP Foundational Elements in such important areas as manageable caseloads for workers, pre- and in-service training for child welfare staff, supervisors and managers, and the provision of health care for children in out of home placement.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 5*

DCF ended the current monitoring period having met 41 of 48 SEP performance measures.[16,17] Of the seven remaining Outcomes *To Be Achieved*, three directly measure core elements of case practice (teaming, quality of case plans and services to support transitions); one measures visits between workers and parents when a child's goal is reunification; one measures visits between children and siblings when they are placed apart, and two are outcomes measures regarding reentry to placement for children who return home and timely permanency within 24 months for a cohort of children in care.[18]

Significantly, DCF newly met five SEP measures this monitoring period: the quality of investigations of alleged child abuse and neglect; completing a required multi-year Needs Assessment; achieving timely permanency with 36 and within 48 months, respectively, for two cohorts of children in care; and one of the Family Team Meeting (FTM) measures.[19]  Each of these is a significant accomplishment and, collectively, they reflect the ongoing work of many people in DCF and those with whom they work to improve child welfare services and outcomes for New Jersey's children, youth and families.

The discussion below highlights current performance within specific content areas.

### Investigations of Alleged Child Abuse and Neglect

The State Central Registry (SCR) continues to operate professionally, efficiently and effectively; reports of alleged abuse and neglect are appropriately screened and timely forwarded to the field for investigation. Investigative staff continue to be well trained. In March 2018, DCF and the Monitor assessed the quality of investigative practice in a random sample of 331 Child Protective Services (CPS) investigations assigned to DCF Local Offices between October 1 and 14, 2017. This review typically occurs every two years. Overall, reviewers found that 301 (91%) of the investigations were of acceptable quality, meeting the SEP standard for the first time. This is a significant achievement and one that clearly demonstrates the progress DCF has made over the course of the reform effort.

### Permanency

Though safe family reunification is always preferred for children in out-of-home placement, permanency for children can be achieved through a number of different avenues, including kinship/guardianship and adoption. There are four SEP measures related to permanency. As of January 2017, one measure was designated as *To Be*

---

[16] These measures include: Institutional Abuse Investigations Unit (IAIU) (III.A.1); Timeliness of Investigation Completion (60 days) (SEP IV.A.13); Timeliness of Investigation Completion (90 days) (SEP IV.A.14); Quality of Investigations (SEP IV.A.15); Initial Family Team Meeting (SEP IV.B.16); Subsequent FTMs within 12 months (SEP IV.B.17); Subsequent FTMs after 12 months – Reunification Goal (SEP IV.B.18); Subsequent FTMs after 12 months – Other than Reunification Goal (SEP IV.B.19); Needs Assessment (SEP IV.C.21); Initial Case Plans (SEP IV.D.22); Supervisor/Worker Ratio (III.B.2); IAIU Investigators Caseload (III.B.3); Permanency Workers (Local Offices) Caseload (III.B.4); Permanency Workers Caseload (III.B.5); Intake Workers (Local Offices) (SEP IV.E.24); Intake Workers (SEP IV.E.25); Adoption Local Office Caseload (SEP IV.E.26); Adoption Workers (SEP IV.E.27); Timeliness of Current Plans (III.C.6); Adequacy of DAsG Staffing (III.D.7); Child Health Units (III.E.8); Parent-Child Visits – weekly (SEP IV.F.29); Parent-Child Visits – bi-weekly (SEP IV.F.30); Caseworker Contacts with Children – New Placement/Placement Changes (III.F.9); Caseworker Contact with Children in Placement (III.F.10); Placing Siblings Together (SEP IV.G.32); Placing Siblings Together for Four or More Children (SEP IV.G.33); Recruitment of Placements for Sibling Groups of Four or More (SEP IV.G.34); Placement Stability for first 12 months in care (SEP IV.G.35); Placement Stability 13-24 Months in care (SEP IV.G.36); Educational Needs (III.G.11); Abuse and Neglect of Children in Foster Care (III.H.12); Repeat Maltreatment (In-home) (SEP IV.H.37); Maltreatment Post-Reunification (SEP IV.H.38); Permanency within 12 Months (SEP IV.I.40); Permanency within 36 months (SEP IV.I.42); Permanency within 48 months (SEP IV.I.43); Independent Living Assessments (SEP IV.K.45); Quality of Case Planning and Services (SEP IV.K.46); Housing for Older Youth Exiting to Non-Permanency (SEP IV.K.47); and Employment/Education for Older Youth Exiting to Non-Permanency (SEP IV.K.48).

[17] Initial Case Plans (SEP IV.D.22) and Placing Siblings Together (SEP IV.G.32) were not met this monitoring period, though the Monitor will wait to review data from the period January 1 through June 30, 2018 before recommending a change in categorization for these measures.

[18] These measures are: Quality of Teaming (SEP IV.B.20); Quality of Case Plans (SEP IV.D.23); Services to Support Transition (SEP IV.J.44); Re-Entry to Placement (SEP IV.H.39); Permanency within 24 Months (SEP IV.I.41); Caseworker Contacts with Family when Goal is Reunification (SEP IV.F.28); and Sibling Visits (SEP IV.F.31).

[19] These measures include: Quality Investigations (SEP IV.A.15); Subsequent FTMs after 12 months – Other than Reunification Goal (SEP IV.B.19); Needs Assessment (SEP IV.C.21); Permanency within 36 Months (SEP IV.I.42); and Permanency Within 48 Months (SEP IV.I.43).

*Maintained* – achieving permanency within 12 months (SEP IV.I.40) – and three measures were *To Be Achieved* – achieving permanency within 24 months (SEP IV.I.41), 36 months (SEP IV.I.42) and 48 months (SEP IV.I.43) respectively. According to the most recent data available, DCF for the first time achieved the SEP standards for permanency within 36 months and for permanency within 48 months for children in out-of-home placement. This is an important achievement. DCF remains close to meeting the standard for achieving permanency for the cohort of children in out-of-home care within 24 months.

DCF has not met the SEP standard for re-entry into foster care, measured for children in foster care who are reunified with their families, but who return to foster care within a year of their return home (SEP IV.H.39).

### Appropriate Placements and Services

DCF continues to maintain an adequate pool of placement resource homes and group settings to meet the needs of children in out-of-home settings, as described in more detail in Section V.F.

As of December 31, 2017, 6,191 children were in out-of-home placement: 5,608 (91%) of whom were in family-like settings (53% placed in non-kinship resource family homes and 38% in kinship homes). Eight percent of children were placed in group and residential settings and two percent were in independent living programs. Between July and December 2017, DCF recruited and licensed 583 new kinship and non-kinship resource family homes; 329 (56%) were kinship homes and 254 (44%) were non-kinship homes. As of December 31, 2017, there were a total of 4,484 licensed resource family homes in the state, 1,552 (35%) of which were kinship homes.

As described in more detail in Section V.F, DCF continues its recruitment planning and targeting processes, with a particular focus on tailoring recruitment towards homes willing and able to accommodate large sibling groups. As of December 31, 2017, there were a total of 92 large capacity Siblings in Best Placement Settings (SIBS) homes: 21 homes with a capacity to accommodate five or more children and 71 homes that could accommodate four children.

### Family Team Meetings

Family Team Meetings (FTMs) are an integral component of DCF's Case Practice Model. FTMs are used to bring families, providers, formal and informal supports together to exchange information, participate in case planning, coordinate and follow up on services and examine and track progress toward accomplishing case plan goals. Meetings are scheduled according to the family's availability in an effort to involve as many family members and supports as possible. As discussed in Section V.B, the SEP includes five performance measures pertaining to FTMs, three of which have previously been met and are designated as Outcomes *To Be Maintained*: the requirement that FTMs be held within 45 days of a child's removal (SEP IV.B.16); the requirement that for children in out-of-home placement, at least three additional FTMs after the initial FTM be held within the first 12 months of placement (SEP IV.B.17); and the requirement that children in care after 12 months with the goal of reunification have at least three FTMs each year (SEP IV.B.18).

Between July and December 2017, in response to the Monitor's request for a corrective action plan due to declines in performance on FTMs for children in placement with a goal of reunification (SEP IV.B.18), DCF's Case Practice Liaisons (CPLs) worked with Local Office staff to improve FTM case practice. CPLs also focused on documentation of FTMs that occurred, as well as instances in which they failed to occur due to the parent being unavailable or declining to attend. In addition, in October 2017, CP&P held a convening of FTM master coaches and FTM coordinators to share effective strategies to improve performance in this area. Based on verified monthly data, DCF met the performance standard for FTMs within 12 Months (SEP IV.B.17) in four

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 7*

of six months in the monitoring period, which is an improvement from the previous period. DCF also improved performance on FTMs after 12 Months with a Reunification Goal (SEP IV.B.18), exceeding the standard in four of six months, suggesting that the strategies DCF identified to diagnose and address barriers contributed to improved FTM performance overall.

For the first time this monitoring period, DCF has met the SEP target requiring that for children with a goal other than reunification, two FTMs be held each year after the first 12 months of placement (SEP IV.B.19). Further, while performance improved from the previous monitoring period, DCF needs to continue to focus on Quality of Teaming (SEP IV.B.20) as it works on behalf of children and families.

### Visits with children, parents and siblings

Purposeful visits between children in foster care and their workers, parents and siblings are fundamental to successful child welfare practice. The visits provide a means to ensuring children's safety and well-being, and to strengthening families and achieving permanency. As discussed in Section V.E, the SEP includes six performance measures related to visits, four of which have been previously met and are designated as Outcomes *To Be Maintained*. DCF maintained satisfactory performance this monitoring period with respect to these four SEP measures, exceeding requirements for caseworker visits with children in both new and ongoing placements (SEP III.F.9 and III.F.10, respectively), and both weekly and biweekly visits between children and their parents (SEP IV.F.29 and IV.F.30, respectively).

DCF improved its performance this monitoring period on caseworker visits with children in new placements (SEP III.F.9). The SEP standard was met in every month for the first time since entering into the SEP. DCF has not yet met the SEP measures that relate to caseworker contact with families with a reunification goal (SEP IV.F.28) and sibling visits (SEP IV.F.31).

### Services to Older Youth

Under the leadership of the Office of Adolescent Services (OAS), DCF has maintained its practice with respect to the older youth in its care. As discussed in Section V.J, the SEP includes four performance measures related to DCF's work with older youth, all of which were previously met and designated as Outcomes *To Be Maintained*. Between July and December 2017, DCF maintained satisfactory performance with respect to housing (SEP IV.K.47) and education and employment for youth exiting care without achieving permanency (SEP IV.K.48). DCF again met the standard for ensuring youth age 14 to 18 engage in Independent Living Assessments (SEP IV.K.45). DCF's quality work to support adolescents and older youth is also reflected in its performance with respect to the quality of case planning and services for older youth (SEP IV.K.46).

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 8*

***Accountability for Case Practice***

*Qualitative Reviews*

DCF conducts Qualitative Reviews (QRs) of a random sample of cases each year to measure the quality of its work, to hold itself accountable for practicing in accordance with its Case Practice Model and for consistently achieving results for children, youth and families. As described further in Section V.N, through the QR process, trained two-person review teams – including DCF staff at various levels, community stakeholders and Monitor staff – review CP&P records and interview as many people as possible who are involved with the children, youth and families served by DCF, whether the children remain in the home or are in placement. Randomly selected cases from each county are reviewed once every two years as part of a robust and well supported performance improvement process.

Between January and December 2017, DCF continued to use the new QR protocol created in CY 2015, in its review of 193 cases across 11 counties.[20,21] Ratings from the 2017 QR reviews showed that the status of children, youth and families served by DCF continued to be rated acceptable in the majority of cases in key areas including *physical health of the child*, *safety* and *living arrangement*. Performance in some areas of practice/system performance also continued to be rated acceptable, such as on *engagement of the child*, *engagement of the resource family*, *assessment and understanding of the child*, *assessment and understanding of the resource family* and *provision of health care services*.

In other key practice areas, such as on the indicators that measure *teamwork and coordination*, *case planning*, *plan implementation*, *engagement of the mother*, *assessment and understanding of the mother*, *assessment and understanding of the father* and *engagement of the father*, performance between January and December 2017 was rated below acceptable levels. These are areas requiring improvement, particularly given that these aspects of practice play a role in many other SEP performance measures.

---

[20] Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex and Warren counties.
[21] To read more about the changes made to the QR protocol, see Section V.N of the Progress of the New Jersey Department of Children and Families Monitoring Period XVIII (January 1 – June 30, 2016) report.

### III.   CHILD AND FAMILY OUTCOMES AND CASE PRACTICE PERFORMANCE MEASURES

The child and family outcomes and case practice performance measures are 48 measures and Foundational Elements that assess the state's performance in meeting the requirements of the SEP (see Table 1). These performance measures cover the areas of child safety, permanency, service planning, child well-being and ongoing infrastructure development pertaining to core elements such as appropriate staffing, caseloads and training.

Many of the measures are assessed through a review of data from NJ SPIRIT[22] and SafeMeasures,[23] and, in some areas, these data are independently validated by the Monitor. Data are also provided through DCF's work with Rutgers University,[24] which assists with data analysis. With few exceptions, performance data provided in this report are as of December 2017.

---

[22] NJ SPIRIT is New Jersey's State Comprehensive Child Welfare Information System (CCWIS), a case management and financial system designed to support the daily work of caseworkers and supervisors within DCF.

[23] SafeMeasures is a data warehouse and analytical tool that allows tracking of critical child welfare indicators by worker, supervisor, Local Office, county and statewide. It is used by different levels of staff to track, monitor and analyze performance and trends in case practice and targeted measures and outcomes.

[24] DCF transferred this function from Hornby Zeller Associates, Inc. to Rutgers in July 2017.

**Table 1: *Charlie and Nadine H.* Child and Family Outcome and Case Practice Performance Measures**
**(Summary of Performance as of December 31, 2017)**

| Table 1A: To Be Achieved | | | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2017 Performance** | **December 2017 Performance[25]** | **Requirement Fulfilled (Yes/No/Partially)[26]** |
| *Investigations* | | | | | |
| IV.A.15 | Quality Investigations | 85% of investigations shall meet the standards for quality investigations. The Monitor, in consultation with the parties, shall determine appropriate standards for quality investigations. | NA: quality measured through an Investigation Case Record Review, typically conducted every two years. | A review of a statistically significant sample of investigations completed in October 2017 found that 91% of investigations met quality standards.[27] | Yes |
| *Family Teaming* | | | | | |
| IV.B.19 | Subsequent FTMs after 12 months – Other than Reunification Goal | After the first 12 months of a child being in care, for those children with a goal other than reunification, 90% shall have at least two FTMs each year. | In June 2017, 94% of children with a goal other than reunification had two or more FTMs after 12 months of placement. Monthly range during January – June 2017 monitoring period: 83 to 94% (does **not** account for acceptable exceptions).[28] | In December 2017, 100% of children with a goal other than reunification had two or more FTMs after 12 months of placement. Monthly range during July – December 2017 monitoring period: 88 to 100% (accounts for acceptable exceptions).[29] | Yes |

---

[25] In some instances where the Monitor does not have December 2017 data, the most recent data available are included.

[26] "Yes" indicates that, in the Monitor's judgment, based on presently available information, DCF has fulfilled its obligations regarding the requirement under the SEP. "No" indicates that, in the Monitor's judgment, DCF has not fulfilled its obligation regarding the SEP requirement.

[27] The Monitor and DCF reviewed 331 investigations. Reviewers could select four possible responses to the question of the quality of the investigation which included completely, substantially, marginally and not at all. Completely and substantially responses are considered as having met quality standards. The results have a +/- 5% marginal error with 95% confidence.

[28] Reported performance may understate actual performance because data do not account for all instances in which a FTM was not required.

[29] Monthly performance is as follows: July, 88%; August, 88%; September, 98%; October, 97%; November, 96%; December, 100%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor reviewed all 20 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which it determined that an exception was appropriately used. Data for this period are not comparable to data reported in the previous monitoring period given that similar exclusions were not made.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 11*

| Table 1A: To Be Achieved | | | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2017 Performance** | **December 2017 Performance**[25] | **Requirement Fulfilled (Yes/No/Partially)**[26] |
| IV.B.20 | Quality of Teaming | 75% of cases involving out-of-home placements that were assessed as part of the QR process will show evidence of both acceptable team formation and acceptable functioning. The Monitor, in consultation with the parties, shall determine the standards for quality team formation and functioning. | CY 2017 data not yet available. | 59% of cases rated acceptable on QR indicator *teamwork and coordination* (CY 2017).[30,31] | No |

---

[30] Eighty-six of the 145 (59%) applicable cases reviewed for Quality of Teaming were rated acceptable on the *teamwork and coordination* indicator.
[31] All in-home cases were excluded from this measure.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 12*

| | Table 1A: To Be Achieved | | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2017 Performance | December 2017 Performance[25] | Requirement Fulfilled (Yes/No/Partially)[26] |
| | *Needs Assessment* | | | | |
| IV.C.21 | <u>Needs Assessment</u> | The state shall regularly evaluate the need for additional placements and services to meet the needs of children in custody and their families and to support intact families and prevent the need for out-of-home care. Such needs assessments shall be conducted on an annual, staggered basis that assures that every county is assessed at least once every three years. The state shall develop placements and services consistent with the findings of these needs assessments. | In May 2017, Rutgers released the Needs Assessment Report #2, which summarized Phase III of the needs assessment process. Additionally, between January and June 2017, DCF and Rutgers continued development of three surveys to assess family needs and services around 10 domains as part of Phase IV of a multi-year process. Rutgers piloted the staff survey during this monitoring period. | Between July and December 2017, DCF completed the final piece of the state's multi-year Needs Assessment process. In order to further understand the needs and potential gaps in services for children, youth and families involved or at risk of involvement with DCF, researchers at the Child Well-Being Unit at Rutgers School of Social Work conducted almost 2,000 surveys with CP&P intake and permanency unit staff, resource parents and families of origin. DCF's evaluation of these surveys is publicly available in its *DCF Needs Assessment 2018 Report #3: Survey Findings and Synthesis.* | Yes |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 13*

| | | Table 1A: To Be Achieved | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2017 Performance** | **December 2017 Performance[25]** | **Requirement Fulfilled (Yes/No/Partially)[26]** |
| | | | *Case and Service Planning* | | |
| IV.D.23 | Quality of Case Plans | 80% of case plans shall be rated acceptable as measured by the QR process. The Monitor, in consultation with the parties, shall determine that standards for quality case planning. | CY 2017 data not yet available. | 53% of cases rated acceptable on both QR indicators *child and family planning process* and *tracking and adjusting*.[32] (CY 2017) | No |
| | | | *Visits* | | |
| IV.F.28 | Caseworker Contacts with Family When Goal is Reunification | 90% of families will have at least twice-per-month, face-to-face contact with their caseworker when the permanency goal is reunification. | In June 2017, 71% of applicable parents of children in custody with a goal of reunification had at least two face-to-face visits with a caseworker. Monthly range during January – June 2017 monitoring period: 70 to 76% (does **not** account for acceptable exceptions).[33] | In December 2017, 75% of applicable parents of children in custody with a goal of reunification had at least two face-to-face visits with a caseworker. Monthly range during July – December 2017 monitoring period: 72 to 77% (accounts for acceptable exceptions).[34] | No |

---

[32] One hundred and ninety-three cases were reviewed as part of the QR conducted between January and December 2017. One hundred and two cases (53%) in and out-of-home cases were rated acceptable on both the *child and family planning process* and the *tracking and adjusting* indicators; 110 cases (57%) were rated acceptable on *child and family planning process* and 131 (68%) of cases were rated acceptable on *tracking and adjusting*.

[33] Reported performance may understate actual performance because data do not account for instances in which contact with a caseworker is not required.

[34] Monthly performance is as follows: July, 72%; August, 74%; September, 75%; October, 77%; November, 74%; December, 75%. Reported performance accounts for valid exceptions to the visits requirement. The Monitor and DCF completed a joint validation of a statistically significant sample of three months and found that exceptions were appropriately applied in 36% of cases. Therefore, these data reflect exclusions from the universe of cases of instances in which exceptions to the requirement for worker visits with parents were appropriately applied and documented. Data for this period are not comparable to data reported in the previous monitoring period given that similar exclusions were not made.

| **Table 1A: To Be Achieved** |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2017 Performance** | **December 2017 Performance[25]** | **Requirement Fulfilled (Yes/No/Partially)[26]** |
| IV.F.31 | <u>Child Visits with Siblings</u> | 85% of children in custody who have siblings with whom they are not residing will visit those siblings at least monthly, excluding those situations where a court order prohibits or regulates visits or there is supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | In June 2017, 73% of children in custody who have siblings with whom they are not residing visited their siblings within the month. Monthly range during January – June 2017 monitoring period: 73 to 75% (does **not** account for acceptable exceptions).[35] | In December 2017, 80% of children in custody who have siblings with whom they are not residing visited with their siblings within the month. Monthly range during July – December 2017 monitoring period: 74 to 80% (accounts for acceptable exceptions).[36] | No |
| *Maltreatment* |
| IV.H.39 | <u>Re-Entry to Placement</u> | Of all children who enter foster care in a 12 month period for the first time who are discharged within 12 months to reunification, living with relative(s), or guardianship, no more than 9% will re-enter foster care within 12 months of their discharge. | CY 2015 data not yet available. | For CY 2015, 11.2% of children who entered foster care for the first time who were discharged within 12 months to reunification, living with relative(s), or guardianship re-entered foster care within 12 months of their discharge. | No |

---

[35] Reported performance may understate actual performance because data do not account for instances in which a visit is not required.

[36] Monthly performance is as follows: July, 79%; August, 79%; September, 75%; October, 75%; November, 74%; December, 80%. Reported performance accounts for valid exceptions to the visits requirement. The Monitor and DCF completed a joint validation of a statistically significant sample of three months and found that exceptions were appropriately applied and documented in 60% of cases. Therefore, these data reflect the exclusions of instances in which exceptions to the requirement for sibling visits were appropriately applied and documented. Data for this period are not comparable to data reported in the previous monitoring period given that similar exclusions were not made.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 15*

| | | Table 1A: To Be Achieved | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2017 Performance | December 2017 Performance[25] | Requirement Fulfilled (Yes/No/Partially)[26] |
| | | *Timely Permanency* | | | |
| IV.I.41 | Permanency Within 24 Months | Of all children who enter foster care in a 12-month period, at least 66% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering foster care. | CY 2015 data not yet available. | For CY 2015, 64% of children who entered foster care were discharged to permanency (reunification, living with relative(s), guardianship or adoption) within 24 months of entering foster care. | No |
| IV.I.42 | Permanency Within 36 Months | Of all children who enter foster care in a 12-month period, at least 80% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care. | CY 2014 data not yet available. | For CY 2014, 80% of children who entered foster care were discharged to permanency (reunification, living with relative(s), guardianship or adoption) within 36 months of entering foster care. | Yes |
| IV.I.43 | Permanency Within 48 Months | Of all children who enter foster care in a 12-month period, at least 86% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care. | CY 2013 data not yet available. | For CY 2013, 86% of children who entered foster care were discharged to permanency (reunification, living with relative(s), guardianship or adoption) within 48 months of entering foster care. | Yes |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 16*

| Table 1A: To Be Achieved | | | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2017 Performance** | **December 2017 Performance[25]** | **Requirement Fulfilled (Yes/No/Partially)[26]** |
| *Services to Support Transition* | | | | | |
| IV.J.44 | Services to Support Transition | 80% of cases will be rated acceptable for supporting transitions as measured by the QR. The Monitor, in consultation with the parties, shall determine the standards for quality support for transitions. | CY 2017 data not yet available. | 59% of cases rated acceptable on QR indicator *successful transitions.*[37] (CY 2017) | No |

---

[37] Seventy-five of the 128 (59%) applicable cases reviewed were rated acceptable on the *successful transitions* indicator.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 17*

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2017 Performance | December 2017 Performance | Requirement Maintained (Yes/No)[38] |
| *Investigations* | | | | | |
| III.A.1 | Institutional Abuse Investigations Unit (IAIU) | 80% of IAIU investigations will be completed within 60 days. | In June 2017, 85% of IAIU investigations were completed within 60 days. | In December 2017, 82% of IAIU investigations were completed within 60 days. | Yes |
| IV.A.13 | Timeliness of Investigation Completion (60 days) | 85% of all investigations of alleged child abuse and neglect shall be completed within 60 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. | In May 2017, 84% of all investigations were completed within 60 days. Monthly range during December 2016 – May 2017 monitoring period: 84 to 86%. | In November 2017, 83% of all investigations were completed within 60 days. Monthly range during June – December 2017 monitoring period: 83 to 87%.[39] | Yes |
| IV.A.14 | Timeliness of Investigation Completion (90 days) | 95% of all investigations of alleged child abuse and neglect shall be completed within 90 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. | In May 2017, 95% of all investigations were completed within 90 days. Monthly range remained consistent at 95%. | In November 2017, 95% of all investigations were completed within 90 days. Monthly range during June – November 2017 monitoring period: 94 to 96%.[40] | Yes |

[38] "Yes" indicates that, in the Monitor's judgment based on presently available information, DCF has fulfilled its obligations regarding the requirement under the SEP. The Monitor has also designated "Yes" for a requirement where DCF has met or is within one percentage point of the SEP standard or there are a small number of cases causing the failure to meet the SEP standard.
[39] Due to the time lag of this measure, the Monitor and DCF decided to alter the period of review, so June 2017 data are included for this period and December 2017 data will be included in the next monitoring report. Monthly performance for this measure is as follows: June, 86%; July, 85%; August, 85%; September, 86%; October, 87%; November, 83%.
[40] Due to the time lag of this measure, the Monitor and DCF decided to alter the period of review, so June 2017 data are included for this period and December 2017 data will be included in the next monitoring report. Monthly performances for this measure is as follows: June, 95%; July, 94%; August, 94%; September, 96%; October; 95%; November, 95%.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 18*

| | | | | | |
|---|---|---|---|---|---|
| **Table 1B: To Be Maintained** | | | | | |
| **Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2017 Performance** | **December 2017 Performance** | **Requirement Maintained (Yes/No)[38]** |
| *Family Teaming* | | | | | |
| IV.B.16 | <u>Initial Family Team Meeting</u> | 80% of children newly entering placement shall have a family team meeting before or within 45 days of placement. | In June 2017, 84% of children newly entering placement had a FTM within 45 days of entering placement. Monthly range during January – June 2017 monitoring period: 82 to 92% (does **not** account for acceptable exceptions).[41] | In December 2017, 91% of children newly entering placement had a FTM within 45 days of entering placement. Monthly range during July – December 2017 monitoring period: 86% to 91% (accounts for acceptable exceptions).[42] | Yes |
| IV.B.17 | <u>Subsequent FTMs within 12 months</u> | 80% of children will have three additional FTMs within the first 12 months of the child coming into placement. | In June 2017, 74% of children had three or more additional FTMs within the first 12 months of placement. Monthly range during January – June 2017 monitoring period: 68 to 87%. | In December 2017, 83% of children had three or more additional FTMs within the first 12 months of placement. Monthly range during July – December 2017 monitoring period: 72 to 84%.[43] | Yes[44] |

[41] Reported performance may understate actual performance because data do not exclude all instances in which a FTM is not required.

[42] Monthly performance for this measure is as follows: July, 89%; August, 88%; September, 89%; October, 87%; November, 86%; December, 91%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor reviewed all 86 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which it determined that an exception was appropriately used. Data for this period are not comparable to data reported in the previous monitoring period given that similar exclusions were not made.

[43] Monthly performance for this measure is as follows: July, 78%; August, 72%; September, 84%; October, 82%; November, 83%; December 83%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor reviewed all 82 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which it determined that an exception was appropriately used.

[44] The Monitor considers this to be an insubstantial fluctuation in performance.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 19*

| | | | Table 1B: To Be Maintained | | |
|---|---|---|---|---|---|
| Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2017 Performance | December 2017 Performance | Requirement Maintained (Yes/No)[38] |
| IV.B.18 | Subsequent FTMs after 12 months – Reunification Goal | After the first 12 months of a child being in care, 90% of those with a goal of reunification will have at least three FTMs each year. | In June 2017, 75% of children with a goal of reunification had three or more FTMs after 12 months of placement. Monthly range during January – June 2017 monitoring period: 67 to 94%. | In December 2017, 85% of children with a goal of reunification had three or more FTMs after 12 months of placement. Monthly range during July – December 2017 monitoring period: 85 to 100%.[45] | Yes |
| | | | *Case and Service Planning* | | |
| IV.D.22 | Initial Case Plans | 95% of initial case plans for children and families shall be completed within 30 days. | In June 2017, 85% of children entering care had case plans developed within 30 days. Monthly range during January – June 2017 monitoring period: 85 to 96%. | In December 2017, 94% of children entering care had case plans developed within 30 days. Monthly range during July – December 2017 monitoring period: 89 to 95%.[46] | No[47] |
| | | | *Caseloads* | | |
| III.B.2 | Supervisor/Worker Ratio | 95% of offices will have sufficient supervisory staff to maintain a 5 worker to 1 supervisor ratio. | 100% of Local Offices have sufficient supervisory staff. | 100% of Local Offices have sufficient supervisory staff. | Yes |

[45] Monthly performance for this measure is as follows: July, 90%; August, 100%; September, 93%; October, 100%; November, 88%; December, 85%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor reviewed all 11 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which it determined that an exception was appropriately used.
[46] Monthly performance for this measure is as follow: July, 93%; August, 89%; September, 95%; October, 89%; November, 94%; December, 94%.
[47] As part of the corrective action plan requested for this measure in the prior monitoring period, DCF reviewed a random selection of cases and found that many case plans were completed just outside the 30-day window. The Central Office began clarifying the case plan deadlines with Local Office staff, and anticipates that practice will improve in the following monitoring period.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 20*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2017 Performance | December 2017 Performance | Requirement Maintained (Yes/No)[38] |
| III.B.3 | IAIU Investigators Caseload | 95% of IAIU investigators will have (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. | 100% of IAIU investigators met caseload standards. | 100% of IAIU investigators met caseload standards. | Yes |
| III.B.4 | Permanency Workers (Local Offices) Caseload | 95% of local offices will have average caseloads for permanency workers of (a) no more than 15 families, and (b) no more than 10 children in out-of-home care. | 100% of Local Offices met permanency standards. | 100% of Local Offices met permanency standards. | Yes |
| III.B.5 | Permanency Workers Caseload | 95% of permanency workers will have (a) no more than 15 families, and (b) no more than 10 children in out of home care. | 100% of Permanency workers met caseload standards. | 100% of Permanency workers met caseload standards.[48] | Yes |
| IV.E.24 | Intake workers (Local Offices) Caseload | 95% of local offices will have average caseloads for Intake workers of no more than 12 families and no more than eight new case assignments per month. | 97% of Local Offices met intake caseload standards. | 97% of Local Offices met intake caseload standards. | Yes |

---

[48] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 21*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2017 Performance | December 2017 Performance | Requirement Maintained (Yes/No)[38] |
| IV.E.25 | Intake workers Caseload | 90% of individual intake works shall have no more than 12 open cases and no more than eight new case assignments per month. No intake worker with 12 or more open cases can be given more than two secondary assignments per month. | 93% of Intake workers met caseload standards. | 96% of Intake workers met caseload standards.[49] | Yes |
| IV.E.26 | Adoption Workers (Local Offices) Caseload | 95% of Local Offices will have average caseloads for adoption workers of no more than 15 children per worker. | 99% of Local Offices met adoption standards. | 97% of Local Offices met adoption standards. | Yes |
| IV.E.27 | Adoption Workers Caseload | 95% of individual adoption worker caseloads shall be no more than 15 children per worker. | 99% of Adoption workers met caseload standards. | 98% of Adoption workers met caseload standards.[50] | Yes |
| | | *Case Plans* | | | |
| III.C.6 | Timeliness of Current Plans | 95% of case plans for children and families will be reviewed and modified no less frequently than every six months. | In June 2017, 96% of case plans were reviewed and modified as necessary at least every six months. Monthly range during January – June 2017 monitoring period: 96 to 97%. | In December 2017, 97% of case plans were reviewed and modified as necessary at least every six months. Monthly range during July – December 2017 monitoring period: 92 to 97%.[51] | Yes |

[49] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six month monitoring period.
[50] Ibid.
[51] Monthly performance on this measure is as follows: July, 92%; August, 97%; September, 94%; October, 96%; November, 97%; December, 97%.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 22*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2017 Performance | December 2017 Performance | Requirement Maintained (Yes/No)[38] |
| | | | *Deputy Attorneys General* | | |
| III.D.7 | Adequacy of DAsG Staffing | The state will maintain adequate DAsG staff positions and keep positions filled. | 129 (100%) of 129 staff positions filled with five staff on leave; 124 (96%) available DAsG. | 134 (100%) of 134 staff positions filled with four staff on leave; 130 (97%) available DAsG.[52] | Yes |
| | | | *Child Health Units* | | |
| III.E.8 | Child Health Units | The state will continue to maintain its network of child health units, adequately staffed by nurses in each local office. | As of June 2017, DCF had 173 health care case managers and 82 staff assistants. | As of December 31, 2017, DCF had 170 health care case managers and 82 staff assistants. | Yes |
| | | | *Visits* | | |
| IV.F.29 | Parent-Child Visits – Weekly | 60% of children in custody with a return home goal will have an in-person visit with their parent(s) at least weekly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | In June 2017, 80% of applicable children had weekly visits with their parents. Monthly range during January – June 2017 monitoring period: 80 to 85%. | In December 2017, 80% of applicable children had weekly visits with their parents. Monthly range during July – December 2017 monitoring period: 78 to 82%.[53,54] | Yes |

---

[52] DCF reported that during this monitoring period select DAsG outside of the DCF Practice Group have dedicated some of their time to DCF matters.

[53] Monthly performance is as follows: July, 78%; August, 79%; September, 80%; October, 82%; November, 79%; December, 80%.

[54] Based on the Monitor's review of a statistically significant sample of cases in a prior monitoring period, the Monitor determined NJ SPIRIT documentation of exceptions with respect to this measure to be reliable. As a result, these data exclude all instances in which documentation indicated that a visit was not required.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 23*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2017 Performance | December 2017 Performance | Requirement Maintained (Yes/No)[38] |
| IV.F.30 | Parent-Child Visits – Bi-Weekly | 85% of children in custody will have an in-person visit with their parent(s) or legally responsible family member at least every other week, excluding those situations where a court order prohibits or regulates visits or there is supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | In June 2017, 93% of applicable children had bi-weekly visits with their parents. Monthly range during January – June 2017 monitoring period: 93 to 97%. | In December 2017, 93% of applicable children had bi-weekly visits with their parents. Monthly range during July – December 2017 monitoring period: 90 to 93%.[55,56] | Yes |
| III.F.9 | Caseworker Contacts with Children – New Placement/Placement Change | 93% of children shall have at least twice-per-month face-to-face contact with their caseworker within the first two months of placement, with at least one contact in the placement. | In June 2017, 94% of children had two visits per month, one of which was in the placement, during the first two months of an initial or subsequent placement. Monthly range during January – June 2017 monitoring period: 91 to 95%. | In December 2017, 94% of children had two visits per month, one of which was in the placement, during the first two months of an initial or subsequent placement. Monthly range during July – December 2017 monitoring period: 93 to 97%.[57] | Yes |

[55] Monthly performance is as follows: July, 91%; August, 90%; September, 92%; October, 93%; November, 92%; December, 93%. Reported performance accounts for valid exceptions to this visits requirement.
[56] Based on the Monitor's review of a statistically significant sample of cases in a prior monitoring period, the Monitor determined NJ SPIRIT documentation of exceptions with respect to this measure to be reliable. As a result, these data exclude all instances in which documentation indicated that a visit was not required.
[57] Monthly performance is as follows: July, 97%; August, 95%; September, 96%; October, 96%; November, 93%; December, 94%.

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2017 Performance | December 2017 Performance | Requirement Maintained (Yes/No)[38] |
| III.F.10 | Caseworker Contact with Children in Placement | During the remainder of the placement, 93% of children shall have at least one caseworker visit per month, in the placement. | In June 2017, 96% of children visit per month in his/her placement. Monthly range during January – June 2017 monitoring period: 96 to 97%. | In December 2017, 96% of children had at least one caseworker visit per month in his/her placement. Monthly range during July – December 2017 monitoring period: 95 to 96%.[58] | Yes |
| | | *Placement* | | | |
| IV.G.32 | Placing Siblings Together | At least 80% of siblings groups of two or three children entering custody will be placed together. | CY 2017 data not yet available. | For CY 2017, 76% of sibling groups of two or three children entering custody were placed together. | No |
| IV.G.33 | Placing Siblings Together for Four or More Children | All children will be placed with at least one other sibling 80% of the time. | CY 2017 data not yet available. | For CY 2017, children were placed with at least one other sibling 83% of the time. | Yes |

---

[58] Monthly performance is as follows: July, 96%; August, 96%; September, 96%; October, 96%; November, 95%; December, 96%.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 25*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| **Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2017 Performance** | **December 2017 Performance** | **Requirement Maintained (Yes/No)[38]** |
| IV.G.34 | Recruitment of Placements for Sibling Groups of Four or More | DCF will continue to recruit for resource homes capable of serving sibling groups of four or more. | Between January and June 2017, DCF recruited a total of 36 new SIBS homes. As of June 2017, DCF had a total of 98 large capacity SIBS homes; 22 homes that can accommodate five or more children, and 76 homes that can accommodate four children. | Between July and December 2017, DCF recruited a total of 32 new SIBS homes. As of December 2017, DCF had a total of 92 large capacity SIBS homes; 21 homes that can accommodate five or more children, and 71 homes that can accommodate four children. | Yes |
| IV.G.35 | Placement Stability, First 12 Months in Care | At least 84% of children entering out-of-home placement for the first time in a calendar year will have no more than one placement change during the 12 months following their date of entry. | CY 2016 data not yet available. | For CY 2017, 85% of children who entered out-of-home placement for the first time had no more than one placement change during the 12 months following their date of entry. | Yes |
| IV.G.36 | Placement Stability, 13 – 24 Months in Care | At least 88% of these children will have no more than one placement change during the 13-24 months following their date of entry. | CY 2015 data not yet available. | For CY 2015, 94% of applicable children had no more than one placement change during the 13-24 months following their date of entry. | Yes |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 26*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2017 Performance | December 2017 Performance | Requirement Maintained (Yes/No)[38] |
| *Education* | | | | | |
| III.G.11 | Educational Needs | 80% of cases will be rated acceptable as measured by the QR in stability (school) and learning and development. The Monitor, in consultation with the parties, shall determine the standards for school stability and quality learning and development. | CY 2017 data not yet available. | 86% of cases rated acceptable for both QR indicators *stability in school* and *learning and development*.[59] | Yes |
| *Maltreatment* | | | | | |
| III.H.12 | Abuse and Neglect of Children in Foster Care | No more than 0.49% of children will be victims of substantiated abuse or neglect by a resource parent or facility staff member. | CY 2017 data not yet available. | For CY 2017, 0.24% of children were victims of substantiated abuse or neglect by a resource parent or facility staff member. | Yes |
| IV.H.37 | Repeat Maltreatment (In-home) | No more than 7.2% of children who remain at home after a substantiation of abuse or neglect will have another substantiation within the next 12 months. | CY 2016 data not yet available. | For CY 2016, 6.5% of children who remained at home after a substantiation of abuse or neglect had another substantiation within the next 12 months. | Yes |

---

[59] Seventy-six of the 88 applicable cases reviewed rated acceptable on both the *stability in school* and *learning and development* indicators; 93% (95 of 102) were rated acceptable for *school stability* and 92% (83 of 90) were rated acceptable for *learning and development*. All in-home cases are excluded from this measure.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 27*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2017 Performance | December 2017 Performance | Requirement Maintained (Yes/No)[38] |
| IV.H.38 | Maltreatment Post-Reunification | Of all children who enter foster care in a 12-month period for the first time who are discharged within 24 months to reunification or living with a relative(s), no more than 6.9% will be the victims of abuse or neglect within 12 months of their discharge. | CY 2014 data not yet available. | For CY 2014, 6.4% of children who entered foster care for the first time who were discharged within 24 months to reunification or living with relative(s) were the victims of abuse or neglect within 12 months of their discharge. | Yes |
| | | *Permanency* | | | |
| IV.I.40 | Permanency within 12 Months | Of all children who enter foster care in a 12-month period, at least 42% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | CY 2016 data not yet available. | For CY 2016, 42% of applicable children were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | Yes |
| | | *Older Youth* | | | |
| IV.K.45 | Independent Living Assessments | 90% of youth age 14 to 18 have an Independent Living Assessment. | In June 2017, 95% of applicable children had completed an Independent Living Assessment. Monthly range during January – June 2017 monitoring period: 87 to 95%. | In December 2017, 93% of applicable children had completed an Independent Living Assessment. Monthly range during July – December 2017 monitoring period: 92 – 94%.[60] | Yes |

---

[60] Monthly performance is as follows: July, 94%; August, 94%; September, 93%; October, 93%; November, 92%; December, 93%.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 28*

| | | | Table 1B: To Be Maintained | | |
|---|---|---|---|---|---|
| Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2017 Performance | December 2017 Performance | Requirement Maintained (Yes/No)[38] |
| IV.K.46 | Quality of Case Planning and Services | 75% of youth age 18 to 21 who have not achieved legal permanency shall receive acceptable quality case management and service planning. | CY 2017 data not yet available. | 74% of youth cases reviewed rated acceptable.[61] (CY 2017) | Yes |
| IV.K.47 | Housing | 95% of youth exiting care without achieving permanency shall have housing. | 100% of youth exiting care between January and June 2017 without achieving permanency had documentation of a housing plan upon exiting care. | 92% of youth exiting care between July and December 2017 without achieving permanency had documentation of a housing plan upon exiting care. | Yes[62] |
| IV.K.48 | Employment/Education | 90% of youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. | 94% of youth exiting care between January and June 2017 without achieving permanency were either employed or enrolled in education or vocational training programs or there was documented evidence of consistent efforts to help the youth secure employment or training. | 95% of youth exiting care between July and December 2017 without achieving permanency were either employed or enrolled in education or vocational training programs or there was documented evidence of consistent efforts to help the youth secure employment or training. | Yes |

[61] Thirty-one of the 42 (74%) cases reviewed scored acceptable for both the *child(youth)/family status* and *practice performance* indicators; 88% (37 of 42) of cases rated acceptable on the *child(youth)/family status* indicator and 74% (31 of 42) of cases rated acceptable on the *practice performance* indicator. The universe of cases to which this measure applies is small, making fluctuations more likely.

[62] The universe of cases to which this measures applies is small, making fluctuations more likely. The Monitor therefore considers this measure to be met.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 29*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| **A. Data Transparency** | DCF will continue to maintain a case management information and data collections system that allows for the assessment, tracking, posting or web-based publishing and utilization of key data indicators. | Data are currently provided directly to the Monitor and published by DCF in reports and on its website.[63]<br><br>NJ SPIRIT functionality is routinely assessed by the Monitor's use of NJ SPIRIT data for validation and through use of SafeMeasures, as well as in conducting case inquiries and case record reviews. | Yes |

---

[63] Please see list of reports in Section I (Introduction: Monitoring Methodology) to review data sources for this Foundational Element.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 30*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| **B. Case Practice Model** | Implement and sustain a Case Practice Model | QR Data<br>Data provided directly to the Monitor<br>Our Work with Children, Youth and Families Report<br>Monitor site visits and attendance at QRs, ChildStat and other meetings | Yes |
| | Quality investigation and assessment | Investigation case record review | |
| | Safety and risk assessment and risk reassessment | Data provided directly to the Monitor<br>Our Work with Children, Youth and Families Report | |
| | Engagement with youth and families | QR Data<br>Data provided directly to the Monitor<br>Our Work with Children, Youth and Families Report | |
| | Working with family teams | QR Data<br>Data provided directly to the Monitor<br>Our Work with Children, Youth and Families Report | |
| | Individualized planning and relevant services | QR Data<br>Data provided directly to the Monitor<br>Our Work with Children, Youth and Families Report | |
| | Safe and sustained transition from DCF | QR Data<br>Data provided directly to the Monito<br>Our Work with Children, Youth and Families Report | |
| | Continuous review and adaptations | Data provided directly to the Monitor<br>Our Work with Children, Youth and Families Report | |
| **C. State Central Registry** | Received by the field in a timely manner | Commissioner's Monthly Report<br>Monitor site visit | Yes |
| | Investigation commenced within required response time | Commissioner's Monthly Report<br>Monitor site visit | |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 31*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| **D. Appropriate Placements** | Appropriate placements of children | QR data<br>Data provided directly to the Monitor<br>Monitor site visits and attendance at QRs, ChildStat and other meetings<br>Our Work with Children, Youth and Families Report | Yes |
| | Resource family homes licensed and closed (kinship/non-kinship) | Commissioner's Monthly Report | |
| | Number of children in home/out of home demographic data | Quarterly Demographic Report | |
| | Placed in a family setting | Commissioner's Monthly Report | |
| | Placement proximity | Data provided directly to the Monitor<br>Our Work with Children, Youth and Families Report | |
| | No children under 13 years old in shelters | Commissioner's Monthly Report | |
| | Children over 13 in shelters no more than 30 days | Commissioner's Monthly Report | |
| | No behavioral health placements out of state without approval | Commissioner's Monthly Report | |
| | Adequate number of resource placements | CP&P Needs Assessment<br>Data provided directly to the Monitor<br>Our Work with Children, Youth and Families Report | |

*Progress of the New Jersey Department of Children and Families*<br>*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*<br>*Page 32*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| **E. Service Array** | Services for youth age 18-21, LGBTQI, mental health and domestic violence for birth parents with families involved with the child welfare system | New Jersey Youth Resource Spot[64]<br><br>New Jersey DCF Adolescent Services Website[65]<br><br>Data provided directly to the Monitor | Yes |
| | Preventive home visit programs | Commissioner's Monthly Report | |
| | Family Success Centers | Commissioner's Monthly Report<br><br>Monitor Site Visits<br><br>Data provided directly to the Monitor | |

---

[64] New Jersey's Youth Resource Spot can be found at www.NJYRS.org.
[65] DCF's Adolescent Services Website can be found at http://www.nj.gov/dcf/adolescent/.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 33*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| **F. Medical and Behavioral Health Services** | Appropriate medical assessment and treatment | Healthcare of Children in Out-of-Home Placement<br>Data provided directly to the Monitor | Yes |
| | Pre-placement and entry medical assessments | Healthcare of Children in Out-of-Home Placement<br>Commissioner's Monthly Report | |
| | Dental examinations | Healthcare of Children in Out-of-Home Placement<br>Commissioner's Monthly Report | |
| | Immunizations | Healthcare of Children in Out-of-Home Placement<br>Commissioner's Monthly Report | |
| | Follow-up care and treatment | Healthcare of Children in Out-of-Home Placement | |
| | Mental health assessment and treatment | Healthcare of Children in Out-of-Home Placement | |
| | Behavioral health | CIACC Monthly Report | |
| **G. Training** | Pre-service training | Data provided directly to the Monitor<br><br>Workforce Report | Yes |
| | Case practice model | | |
| | Permanency planning | | |
| | Concurrent planning | | |
| | Adoption | | |
| | Demonstration of competency | | |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 34*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| Reference | Additional SEP Requirements that DCF Must Sustain: | Data Source | December 2017 Fulfilled (Yes/No) |
| **H. Flexible Funding** | DCF will continue to make flexible funds available for use by workers in crafting individualized service plans for children, youth and families to meet the needs of children and families, to facilitate family preservation and reunification where appropriate and to ensure that families are able to provide appropriate care for children and to avoid the disruption of otherwise stable and appropriate placements. | Data provided directly to the Monitor<br><br>DCF Online Policy Manual<br><br>Budget Report | Yes |
| **I. Resource Family Care Support Rates** | Family care support rates | DCF Online Policy Manual<br>DCF Website[66] | Yes |
| | Independent Living Stipend | DCF Online Policy Manual<br>Youth Website | |
| **J. Permanency** | Permanency practices | Data provided directly to the Monitor<br>Our Work with Children, Youth and Families Report<br>Monitor site visits and attendance at QRs, ChildStat and other meetings | Yes |
| | Adoption practices | | |
| **K. Adoption Practice** | 5- and 10-month placement reviews | Adoption Report | Yes |
| | Child specific recruitment | Monitor site visits and attendance at QRs, ChildStat and other meetings | |

---

[66] USDA has altered its schedule for producing its Annual Report on costs of raising a child. By agreement, DCF now updates the rates within 30 days of the USDA annual report's release to meet the SEP standards and provides written confirmation to the Monitor.

## IV.    FOUNDATIONAL ELEMENTS

The Sustainability and Exit Plan (SEP) identifies a series of core organizational and practice improvements known as the "Foundational Elements" that have provided the base upon which New Jersey's reform has been built. They include a range of requirements from the 2006 Modified Settlement Agreement (MSA) that were previously met and were codified in the SEP as foundational for improved child welfare outcomes and future system improvements. These Foundational Elements remain enforceable in the SEP if performance is not sustained. The Department of Children and Families (DCF) collects and publishes data to support its continued maintenance of Foundational Elements. DCF has published several reports in this monitoring period to provide information about the Foundational Elements, primarily the *Healthcare of Children in Out-of-Home Placement* report, released on December 11, 2017. The Healthcare report demonstrates how children in out-of-home placement access healthcare services and the quality of those services. The report evaluates the medical and behavioral health assessments and services coordinated by the Child Health Units (CHUs) and identifies trends, strengths and areas needing improvement for each measure.

In January 2018, just outside of this monitoring period, DCF published the *Our Work with Children, Youth and Families* report covering calendar year (CY) 2016 and the *Workforce* report covering the state fiscal year (FY) 2017. In addition to producing these reports, DCF continued to provide data directly to the Monitor wherever necessary for the period July 1 to December 31, 2017 to assess the Foundational Elements. The Monitor also assesses maintenance of Foundational Elements through its participation in statewide Qualitative Reviews (QRs), site visits to Local Offices and attendance at monthly ChildStat presentations and meetings with stakeholders throughout the state.

As mentioned in the Summary of Performance (Section II of this monitoring report), in the Monitor's judgment, each of the SEP's Foundational Elements has been maintained during this period. The sections below provide information on new developments, significant new accomplishments or other information judged by the Monitor to be relevant for its assessment and understanding of the Foundational Elements.

### A.  CASE PRACTICE MODEL – SEP Section II.B

DCF has made significant efforts to embed its Case Practice Model in its work with children, youth and families in each of the 46 Local Offices throughout the state by providing training, coaching and mentoring to workers and supervisors and through a range of Continuous Quality Improvement (CQI) activities that focus on direct practice. A workgroup was developed in this monitoring period to finalize an updated case practice guide, and Case Practice Liaisons (CPLs) held workshops on strengthening relationships with families. Furthermore, Local Office leaders continued to be encouraged to become coaches and master coaches in DCF's teaming model. Examples of some of the efforts to bolster quality case practice included:

- Father Engagement: Essex and Gloucester counties began implementation of a father involvement and engagement improvement plan.

- Casework Supervisor Leadership Series: Casework Supervisors focused on lifting morale in Local Offices and creating more positive agency culture.
- Local Office Manager (LOM) leadership series: LOMs participated in workshops about behavior modification, coaching and application of coaching into practice.
- Field Training Unit Supervisors: Training Supervisors have been updating the Field Training Guide to continue to emphasize Transfer of Learning with more experimental learning opportunities in addition to classroom-based learning.
- Batterer's Intervention Program: Stakeholders in Burlington and Monmouth counties learned about the developmental behaviors of the offending and surviving parent and their effects on parenting.

## B. APPROPRIATE PLACEMENTS – SEP Section II.D

Section II.D of the SEP provides that "when out-of-home placement is necessary, DCF will provide the most appropriate and least restrictive placements, allowing children to remain in their own communities, be placed with or maintain contact with siblings and relatives and have their educational needs met. The State shall maintain an adequate number and array of family-based placements to appropriately place children in family settings."

### *Appropriate Placements and Services*

During this monitoring period, DCF's pool of placement resource homes and group settings continued to meet the needs of children in out-of-home care, as described in more detail in Section V.F of this report.

As of December 31, 2017, 6,191 children were in out-of-home placement: 5,608 (91%) of whom were in family-like settings (53% were placed in non-kinship resource family homes and 38% in kinship homes). Eight percent of children were placed in group and residential settings and two percent were in independent living programs. Between July and December 2017, DCF recruited and licensed 583 new kinship and non-kinship resource family homes; 329 (56%) were kinship homes and 254 (44%) were non-kinship homes. As of December 31, 2017, there were a total of 4,484 licensed resource family homes in the state, 1,552 (35%) of which were kinship homes.

Between July 1 and December 31, 2017 a total of 764 resource family homes closed, resulting in a net loss of 181 homes. Though this is a greater net loss than in the previous monitoring period, the number of newly licensed homes in CY 2017 (1,221) exceeded the number of newly licensed homes in CY 2016 (1,059). In addition, there has been a decline in the total number of children placed in out-of-home settings between 2016 and 2017 (6,663 in CY 2016; 6,191 in CY 2017). The majority of homes closed (464 homes, or 61%) were kinship homes, and the majority of those homes were closed because children were adopted. The following are some of DCF's newer recruitment and retention efforts:

- Mobile Response and Stabilization Services (MRSS): MRSS is intended to provide increased support to children and youth in placement and resource families in an attempt to avoid the trauma that results from multiple placements. Within approximately one hour of a resource or kinship home being identified – unless arrangements are made for a visit

within 24 hours – MRSS dispatches a worker to the placement for an assessment and short term stabilization services if needed. MRSS is now available in every county. DCF reports that this initiative has been largely successful in stabilizing initial youth placements and reducing the number of placement episodes youth experience.

- Respite Services: Between July and December 2017, DCF began making Children's Systems of Care (CSOC) respite services available to resource parents of youth with intellectual/developmental disabilities.
- Pre-licensure and Ongoing Training for Resource Parents: DCF continues to train resource parents on the Parent Resources for Information, Development and Education (PRIDE) and Traditions of Caring (TOC) curriculum. Between July and December 2017, PRIDE trainers learned about connecting resource families to DCF's Family Success Centers (FSCs) in their areas, in addition to strategies for supporting and working with families with transgender youth. During the monitoring period, 1,054 resource parents completed a total of 3,466 in-service training courses offered by Foster and Adoptive Family Services (FAFS).

As described in more detail in Section V.F of this report, DCF continues to focus on recruiting and retaining homes willing to accommodate large sibling groups. As of December 31, 2017, there were a total of 92 large capacity Siblings in Best Placement Settings (SIBS) homes; 21 homes with a capacity to accommodate five or more children, and 71 homes that could accommodate four children.

## C.  SERVICE ARRAY – SEP Section II.E

Section II.E of the SEP requires the state to provide comprehensive, culturally responsive services to address the identified needs of the children, youth and families it serves, and maintain an adequate statewide network of FSCs. These services are to include, but not be limited to, services for youth age 18 to 21, LGBTQI youth, birth parents who may need mental health or domestic violence supports and preventive home visit programs.

Family Success Centers: During this monitoring period, 56 FSCs provided services to families in all 21 counties. FSCs are neighborhood-based places where any community resident can access family support, information and specialized supports that vary depending on the needs and desires of the community in which they are located.

Domestic Violence Liaison Program: Between July and December 2017, Domestic Violence Liaisons (DVLs) reported working with 3,446 non-offending parents, 1,122 offending parents and 6,257 children. The goal of the program is to strengthen service coordination between New Jersey's child protection and domestic violence systems to bring about better safety and well-being outcomes for survivors and children. The DVLs offered several trainings in this content area and trained 1,036 DCF Local Office staff during this monitoring period. Additionally, 264 newly hired DCF staff completed the two-day Domestic Violence Foundational training between July and December 2017. In November 2017, DCF held a three-day "Intervening with Batterers" program for the DVLs, CPLs and DCF Professional Center staff. New Jersey's lead domestic violence agencies provided services to 1,295 men, women and children entering shelters and 5,774 men, women and children who received domestic violence services outside of shelters.

# V. SUSTAINABILITY AND EXIT PLAN PERFORMANCE MEASURES *TO BE ACHIEVED* AND *TO BE MAINTAINED*

This section of the report provides information on the Sustainability and Exit Plan (SEP) requirements that the state is focusing on achieving – designated as Outcomes *To Be Achieved* – and those requirements for which the state has satisfied the specified performance targets for at least six months and must sustain – designated as Outcomes *To Be Maintained*.

## A. INVESTIGATIONS

The SEP includes four performance measures related to investigative practice. As of July 2017, quality of investigations (SEP IV.A.15) was designated as an Outcome *To Be Achieved*, and the other three measures were designated as Outcomes *To Be Maintained*: timeliness of Institutional Abuse Investigations Unit (IAIU) investigation completion (SEP III.A.1); timeliness of alleged child abuse and neglect investigation completion within 60 days (SEP IV.A.13); and investigation completion within 90 days (SEP IV.A.14).

For the first time this monitoring period, the Department of Children and Families (DCF) has met the standard for quality of abuse and neglect investigations, a major accomplishment. Performance for all four measures during the current monitoring period are discussed below.

### Timeliness of Investigation Completion

| Quantitative or Qualitative Measure | 13. <u>Timeliness of Investigation Completion</u>: Investigations of alleged child abuse and neglect shall be completed within 60 days. |
|---|---|
| **Performance Target** | 85% of all abuse/neglect investigations shall be completed within 60 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. |

*Performance as of November 30, 2017:*[67]

In November 2017, there were 4,869 investigations of alleged child abuse and neglect, 4,018 (83%) of which were completed within 60 days. Performance from June 1 to November 31, 2017 ranged from a low of 83 percent to a high of 87 percent.[68] DCF continued to meet the SEP performance standard for timeliness of investigation completion within 60 days for the period of June through November 2017.

---

[67] December 2017 data will be included in the next monitoring report. For certain data elements that have an extended time frame built into the measurement, the Monitor and DCF decided to alter the period for data review so that six month monitoring reports can be produced more closely to the end of the monitoring period.

[68] Monthly performance for this measure is as follows: June, 86%; July, 85%; August, 85%; September, 86%; October, 87%; November, 83%. The Monitor considers this to be an insubstantial fluctuation in performance that is still within acceptable range.

| Quantitative or Qualitative Measure | 14.  <u>Timeliness of Investigation Completion</u>: Investigations of alleged child abuse and neglect shall be completed within 90 days. |
|---|---|
| **Performance Target** | 95% of all abuse/neglect investigations shall be completed within 90 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. |

*Performance as of November 30, 2017:*[69]

In November 2017, there were 4,869 investigations of child abuse and neglect and 4,601 (95%) were completed within 90 days. Performance from June to November 2017 ranged from a low of 94 percent to a high of 96 percent.[70] DCF met the SEP performance standard for the timeliness of investigation completion within 90 days for the period of June through November 2017.

## Quality of Investigations

| Quantitative or Qualitative Measure | 15.  <u>Quality of Investigations</u>: Investigations of alleged child abuse and neglect shall meet standards of quality. |
|---|---|
| **Performance Target** | 85% of all abuse/neglect investigations shall meet standards of quality. |

In March 2018, the Monitor and DCF together conducted a case record review of the quality of investigative practice of the Department of Child Protection and Permanency (CP&P). Reviewers examined the quality of practice of a statistically valid random sample of selected Child Protective Services (CPS) investigations assigned to DCF Local Offices between October 1 and October 14, 2017, involving 331 investigations and 518 alleged child victims.[71] Overall, reviewers found that 301 (91%) of the investigations were of acceptable quality,[72] meeting the SEP standard for the first time. This is a significant accomplishment and one that demonstrates the success of DCF's efforts and initiatives over the past years to improve the quality of investigative practice.

The findings from the March 2018 review reflect some clear strengths in CP&P investigative case practice, as well as areas in need of further development. Key strengths include:

- Caseworkers interviewed the mother of the alleged child victim in 98 percent of the investigations;

---

[69] December 2017 data will be included in the next monitoring report.  For certain data elements that have an extended time frame built into the measurement, the Monitor and DCF decided to alter the period for data review so that six-month monitoring reports can be produced more closely to the end of the monitoring period.

[70] Monthly performance for this measure is as follows: June, 95%; July, 94%; August, 94%; September, 96%; October; 95%; November, 95%.

[71] These results have a ± 5% margin of error with 95% confidence.

[72] Reviewers could select four possible responses to the question regarding the quality of the investigation: "completely," "substantially," "marginally" or "not at all." Investigations determined to be "completely" or "substantially" of quality were considered acceptable for the purpose of this measure.

- Caseworkers interviewed the father of the alleged child victim in 87 percent of the investigations;
- Collateral information was integrated into investigative decision making in 84 percent of the investigations; and
- Pre- and post-investigation worker/supervisor conferences took place in 99 percent of the investigations.

The March 2018 review also found that an area in need of improvement in CP&P's investigative practice includes the quality of pre- and post-investigation conferences. Reviewers determined that 78 percent of pre-investigation conferences were of acceptable quality and 76 percent of post-investigation conferences were of acceptable quality.

DCF will include the findings from this review in the next *Our Work with Children, Youth and Families* report to be released in December 2018.

### Institutional Abuse Investigations Unit

| Quantitative or Qualitative Measure | 1. <u>Timeliness of Completion</u>: IAIU investigations of child maltreatment in placements shall be completed within 60 days. |
|---|---|
| **Performance Target** | 80% of IAIU investigations shall be completed within 60 days. |

The IAIU is responsible for investigating allegations of child abuse and neglect in resource family homes and other out-of-home care settings, as well as in child care facilities, detention centers, schools and residential facilities.[73]

***Performance as of December 31, 2017:***

Performance data for July through December 2017 show that DCF continued to exceed the SEP performance standard for this measure. In December 2017, 82 percent of IAIU investigations were completed within 60 days.

---

[73] CP&P Policy Manual (4-1-2013). Introduction to IAIU, I, A, 100.

### B.  FAMILY TEAM MEETINGS

Family Team Meetings (FTMs) bring families, providers, formal and informal supports together to exchange information, participate in case planning, coordinate and follow up on services and examine and solve problems. Meetings are scheduled according to the family's availability in an effort to involve as many family members and supports as possible. Workers are trained and coached to hold FTMs at key decision and transition points in the life of a case, such as when a child enters placement, when a child has a change in placement and/or when there is a need to adjust a case plan to achieve permanency or meet a child's needs.

The SEP includes five performance measures pertaining to FTMs, three of which had been met and designated as Outcomes *To Be Maintained* as of July 2017: the requirements that FTMs be held within 45 days of a child's removal (SEP IV.B.16); that for children in out-of-home placement, at least three additional FTMs after the initial FTM be held within the first 12 months of placement (SEP IV.B.17); and that children in care with the goal of reunification have at least three FTMs each year after the first 12 months of placement (SEP IV.B.18).

For the first time this monitoring period, DCF met the FTM target that for children with a goal other than reunification, two FTMs be held each year after the first 12 months of placement (SEP IV.B.19). DCF has improved performance on all SEP measures related to holding FTMs. The process of holding FTMs, however, is a tool to create a team around the child and the family and to set the stage for purposeful, collective decision-making. DCF now must focus its work on the end goal of FTMs – the Quality of Teaming (SEP IV.B.20), where improvement is still needed. Performance for all five measures during the current monitoring period are discussed below.

### Initial FTMs Held within 45 Days of Entry

| Quantitative or Qualitative Measure | 16.  Initial Family Team Meetings: For children newly entering placement, the number/percent who have a family team meeting within 45 days of entry. |
|---|---|
| Performance Target | 80% of children newly entering placement shall have a family team meeting before or within 45 days of placement. |

*Performance as of December 31, 2017:*

In December 2017, 198 (91%) out of 218 possible FTMs occurred within 45 days of a child's removal from his or her home. Performance from July 1 to December 31, 2017 ranged from a low of 86 percent to a high of 91 percent.[74] For this measure, the Monitor verified monthly data from NJ SPIRIT for all 86 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[75] DCF's performance exceeded the SEP standard in each month of the monitoring period.

---

[74] Monthly performance for this measure is as follows: July, 89%; August, 88%; September, 89%; October, 87%; November, 86%; December, 91%. Reported performance accounts for valid exceptions to the FTM requirement. Data for this period are not comparable to data reported in the previous monitoring period given that similar exclusions were not made.

[75] Based on a review of all 86 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in December 2017, there were 223 children newly entering placement. The Monitor determined that in five of nine cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe 218 children.

**FTMs Held within the First 12 Months**

| Quantitative or Qualitative Measure | 17. Subsequent Family Team Meetings within 12 Months: For all other children in placement, the number/percent who have three additional FTMs within the first 12 months of the child coming into placement. |
|---|---|
| Performance Target | 80% of children will have three additional FTMs within the first 12 months of the child coming to placement. |

*Performance as of December 31, 2017:[76]*

In December 2017, 114 (83%) of 138 applicable children had an additional three or more FTMs within the first 12 months of entering placement. Performance from July 1 to December 31, 2017 ranged from a low of 72 percent to a high of 84 percent.[77] For this measure, the Monitor verified monthly data from NJ SPIRIT for all 82 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[78] Based on the verified data, DCF met the performance standard in four of six months in the monitoring period, which is an improvement from the previous monitoring period.

An analysis of the data for this measure by Local Office shows wide variation in performance, and while overall performance is trending upward, there are a number of counties in which performance has sharply declined or remains significantly below the SEP standard. DCF anticipates that the practice improvement strategies implemented as part of its corrective action plan for the requirement to hold subsequent FTMs after 12 months for families with a goal of reunification (SEP IV.B.18) will continue to improve performance in this area. The Monitor considers this measure to be met, and the fluctuation in performance this monitoring period to be insubstantial.

**FTMs Held After 12 Months in Placement with a Goal of Reunification**

| Quantitative or Qualitative Measure | 18. Subsequent Family Team Meetings after 12 Months: For all children in placement with a goal of reunification, the number/percent who have at least three FTMs each year after the first 12 months of placement. |
|---|---|
| Performance Target | After the first 12 months of a child being in care, 90% of those with a goal of reunification will have at least three FTMs each year. |

---

[76] Measure 17 applies to all children who have been in out-of-home placement for 12 months who entered care in the specified month. For example, performance for December 2017 is based upon the 148 children who entered care in December 2016. Compliance is based on whether at least three FTMs were held for these children during the 12-month period they were in care.
[77] Monthly performance is as follows: July, 78%; August, 72%; September, 84%; October 82%; November, 83%; December, 83%. Reported performance accounts for valid exceptions to the FTM requirement.
[78] Based on a review of all 82 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in December 2017, there were 148 children who had been in out-of-home placement for 12 months. The Monitor determined that in 10 cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe of applicable cases 138 children.

*Performance as of December 31, 2017:*[79]

In December 2017, out of 20 applicable children with a permanency goal of reunification, 17 (85%) children had three or more FTMs in the 12 months following their first year in out-of-home placement. Performance from July 1 to December 31, 2017 ranged from a low of 85 percent to a high of 100 percent.[80] For this measure, the Monitor verified monthly data from NJ SPIRIT for the 11 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[81]

Between July and December 2017, in response to the Monitor's request for a corrective action plan for this measure, DCF's Case Practice Liaisons (CPLs) worked with Local Office staff to improve FTM case practice. CPLs also focused on documentation of FTMs that occurred, as well as instances in which they failed to occur due to the parent being unavailable or declining to attend. In addition, in October 2017, CP&P held a convening of FTM master coaches and FTM coordinators to share effective strategies to improve performance in this area.

Based on the Monitor's verified data and NJ SPIRIT, DCF exceeded the SEP performance measure in four of the six months of the monitoring period, a significant improvement from the previous two monitoring periods, and likely a reflection of the impact of the strategies DCF identified to diagnose and address barriers as part of its correction action plan. Given this improvement in performance, as well as the small universe that makes the measure more susceptible to fluctuations, the Monitor considers this standard to be met.

## FTMs Held After 12 Months in Placement with a Goal Other than Reunification

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 19.  Subsequent Family Team Meetings after 12 Months: For all children in placement with a goal other than reunification, the number/percent who have at least two FTMs each year. |
| **Performance Target** | After the first 12 months of a child being in care, for those children with a goal other than reunification, 90% shall have at least two FTMs each year. |

---

[79] Measure 18 applies to all children who have been in care for at least 24 months who entered care in the specified month each year and have a goal of reunification. For example, in December 2017, a combined total of 20 children who entered care in December 2015, December 2014, December 2013, etc. and were still in placement with a goal of reunification. Compliance is based on whether at least three FTMs were held for these children during their most recent 12 months in care.

[80] Monthly performance for this measure is as follows: July, 90%; August, 100%; September, 93%; October, 100%; November, 88%; December 85%. Reported performance accounts for valid exceptions to the FTM requirement.

[81] Based on a review of all 11 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in September 2017, there were 32 children who had been in care for at least 24 months who had a goal of reunification. The Monitor determined that in five of seven cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe of applicable cases 27 children.

*Performance as of December 31, 2017:*[82]

In December 2017, all 141 applicable children in out-of-home placement with a permanency goal other than reunification (100%) had two or more FTMs after 12 months. Performance from July 1 to December 31, 2017 ranged from a low of 88 percent to a high of 100 percent (see Figure 1).[83] For this measure, the Monitor verified monthly data from NJ SPIRIT for the 20 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[84]

DCF exceeded the standard on this measure in four of the six months – performance is trending upward – and was only two percentage points from the standard in the remaining two months. Based on this data, the Monitor has determined that for the first time DCF has met this performance measure, another indication that corrective actions taken for the requirement to hold subsequent FTMs after 12 months for families with a goal of reunification (SEP IV.B.18) are likely positively influencing FTM practice overall.

**Figure 1: Percentage of Children Who Had at least Two Family Team Meetings Held After 12 Months in Placement with a Goal other than Reunification (July – December 2017)**



Source: DCF data

---

[82] Children eligible for Measure 19 are all children who have been in care for at least 12 months who entered care in the month specified each year and have a goal other than reunification. For example, in December 2017, a combined total of 145 children entered care in December 2016, December 2015, December 2014, etc. and are still in placement with a goal other than reunification. Compliance is based on whether at least two FTMs were held for these children each year in the most recent year after 12 months in care.

[83] Monthly performance is as follows: July, 88%; August, 88%; September, 98%; October, 97%; November, 96%; December, 100%. Reported performance accounts for valid exceptions to the FTM requirements.

[84] Based on a review of all 20 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in December, 2017 there were 145 children who had been in care after 12 months with a goal other than reunification. The Monitor determined that in four cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe of applicable cases 141 children.

**Quality of Teaming**

| Quantitative or Qualitative Measure | 20.  Cases involving out-of-home placement show evidence of family teamwork. |
|---|---|
| **Performance Target** | 75% of cases involving out-of-home placements that were assessed as part of the Qualitative Review (QR) process will show evidence of both acceptable team formation and acceptable functioning. The Monitor, in consultation with the parties, shall determine the standards for quality team formation and functioning. |

FTMs are only one way in which DCF staff engage with families. Teaming with families involved with DCF is a central component of New Jersey's Case Practice Model, and relies upon other foundational elements of quality case practice, such as engagement with family members, timely assessments and quality case planning, all of which are rated as part of the state's QR process. Information about the QR process and protocol are detailed in Section V.N of this report.

Results from the *teamwork and coordination* indicator in the QR are used to assess the quality of collaborative teamwork with children, youth and families. In assessing case ratings, the reviewer considers a range of questions for this indicator, including whether the family's team is composed of the appropriate constellation of providers and informal supports needed to meet the child and family's needs, and the extent to which team members, including family members, work together to meet identified goals.

***Performance as of December 31, 2017:***

Results from the 145 cases reviewed from January through December 2017 using the QR protocol showed that 59 percent (86 of 145) rated acceptable for the *teamwork and coordination* indicator.[85] Figure 2 below reflects these findings. While an improvement from DCF's performance in CY 2016 in which 49 percent of cases were rated acceptable, DCF has not yet met the SEP performance standard.[86] Key themes in case narratives in this area include (1) failure to identify key members of the team, including informal supports such as relatives or family friends, and (2) lack of consistent communication among team members. Prioritizing core case practice strategies, such as engagement, assessment and case planning will help to improve the quality of teaming with families with children in out-of-home placement.

---

[85] All in-home cases are excluded from this measure.
[86] In CY 2016, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem and Union counties. In CY 2017, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex and Warren counties.

**Figure 2: Qualitative Review (QR) Cases Rates Acceptable on Teamwork and Coordination (CY 2016 – CY 2017)**
**(n=145)**



Source: DCF data

## C.  QUALITY OF CASE AND SERVICE PLANNING

Timely and meaningful case plans at the beginning of a case, as well as throughout a family's involvement with DCF, rely on workers' assessment and engagement skills. Improvements in performance in these areas will likely have a positive effect on the quality of case plans.

The SEP includes three measures related to case planning, two of which have been previously met and designated as Outcomes *To Be Maintained*: the requirement that case plans be developed with families within 30 days of placement (SEP IV.D.22) and the requirement that case plans be reviewed and modified every six months (SEP III.C.6). The SEP measure regarding the quality of case planning (SEP IV.D.23) is designated as an Outcome *To Be Achieved*. Performance for all three measures during the current monitoring period are discussed below.

### Timeliness of Case Planning – Initial Case Plans

| Quantitative or Qualitative Measure | 22.  Timeliness of Initial Plans: For children entering care, number/percent of case plans developed within 30 days. |
|---|---|
| Performance Target | 95% of case plans for children and families are completed within 30 days. |

*Performance as of December 31, 2017:*

In December 2017, 216 (94%) out of 229 initial case plans were completed within 30 days of a child entering placement. Between July 1 and December 31, 2017, the timely development of initial case plans ranged from a low of 89 percent to a high of 95 percent.[87] In this monitoring period, DCF met this measure in only one of six months, and in the prior two monitoring periods the measure was met in only two months for each six-month period.

The Monitor's request for a corrective action plan on this measure resulted in DCF conducting a review of a random selection of case plans between July and December 2017. Reviewers determined that many of the case plans were completed just outside the SEP 30-day time frame. As a result, DCF clarified policy for staff, provided Local Offices with Central Office oversight and anticipates that practice will improve during the next monitoring period. The Monitor will continue to closely evaluate performance in this area and will wait to review data from the period January 1 through June 30, 2018 before recommending a change in categorization for this measure.

### Timeliness of Case Planning-Every Six Months

| Quantitative or Qualitative Measure | 6.  Case Plans: Case plans for children and families will be reviewed and modified no less frequently than every six months. |
|---|---|
| Performance Target | 95% of case plans for children and families will be reviewed and modified no less frequently than every six months. |

---

[87] Monthly performance for this measure is as follows: July, 93%; August, 89%; September, 95%, October, 89%; November, 94%; December, 94%.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*
*July 18, 2018*
*Page 48*

*Performance as of December 31, 2017:*

In December 2017, 97 percent of case plans had been modified no less frequently than every six months. Performance from July 1 to December 31, 2017 ranged from 92 to 97 percent.[88] DCF exceeded the required standard for this measure in three of six months, but, for the first time since the SEP was negotiated, performance fell slightly below the standard in two months. The Monitor has determined that this slight dip in performance is insignificant. However, sustained attention is required to continue to meet this measure.

### Quality of Case Plans

| Quantitative or Qualitative Measure | 23. Quality of Case Plans: The child's/family's case plan shall be developed with the family and shall be individualized and appropriately address the child's needs for safety, permanency and well-being. The case plan shall provide for the services and interventions needed by the child and family to meet identified goals, including services necessary for children and families to promote children's development and meet their educational, physical and mental health needs. The case plan and services shall be modified to respond to the changing needs of the child and family and the results of prior service efforts. |
|---|---|
| Performance Target | 80% of case plans rated acceptable as measured by the Qualitative Review (QR). |

DCF policy and the SEP require that families be involved in case planning, that plans are appropriate and individualized to the circumstances of the child or youth and family and that there is oversight of plan implementation to ensure case goals are met and plans are modified when necessary.

Results from two QR indicators, *child and family planning process* and *tracking and adjusting*, are used to assess performance on this measure. Cases rated as acceptable demonstrate that child or youth and family needs are addressed in the case plan, appropriate family members were included in the development of the plan and interventions are being tracked and adjusted when necessary. Though the QR score only consists of those two indicators, several other aspects of practice contribute to high quality case planning. Improvements made to performance on QR indicators related to the *assessment of the father* (CY 2017, 25%), *assessment of the mother* (CY 2017, 35%), e*ngagement of the father* (CY 2017, 40%), *case plan implementation* (CY 2017, 64%) and *teamwork and coordination* (CY 2017, 59%) are likely to have a significant impact on the quality of case planning. Although a small sample, QR data disaggregated by county show that counties that do better on these indicators generally also rate higher in case planning.

Information about the QR process and protocol are detailed in Section V.N of this report.

---

[88] Monthly performance on this measure is as follows: July, 92%; August, 97%; September, 94%; October, 96%; November, 97%; December, 97%.

*Performance as of December 31, 2017:*

Results from the 193 cases reviewed from January to December 2017 indicate that 53 percent (102 of 193) were rated acceptable for *both* the *child and family planning process* and *tracking and adjusting* indicators.[89] Figure 3 reflects the findings from January through December 2017. This is a slight improvement in performance from CY 2016 in which 49 percent were rated acceptable for both indicators.[90] These data, indicating continued challenges to quality case planning, are supported by three key themes in case narratives: (1) families not having a voice in case planning; (2) case plans lacking an integrated planning direction; and (3) case plans driven by court mandates rather than the needs of the child, youth and family.

DCF did not meet the SEP performance standard in CY 2017. As discussed above, this is another area for which the level of performance suggests that improvements in core case practice strategies will have a significant bearing on the quality of case planning.

**Figure 3: Qualitative Review (QR) Cases Rated Acceptable on Quality of Case Plans and Components of Placement (CY 2016 – CY 2017)**
**(n=193)**



Source: DCF data

---

[89] From January to December 2017, 53% (102 of 193) were rated acceptable for *both* the *child and family planning process* and *tracking and adjusting* indicators; 57% (110 of 193) of cases were rated acceptable for *child and family planning process*; 68% (131 of 193) of cases were rated acceptable for *tracking and adjusting.*

[90] In CY 2016, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem and Union counties. In CY 2017, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex and Warren counties.

### D. EDUCATION

SEP Section III.G.11 requires that "children will be enrolled in school and DCF will have taken appropriate actions to ensure that their educational needs are being met." The SEP requires that 80 percent of cases be rated acceptable on both the *stability in school* and *learning and development* indicators as measured by the QR.[91] The QR process and protocol are discussed in detail in Section V.N of this report. This measure is designated as Outcomes *To Be Maintained*. Performance for this measure is discussed below.

| Quantitative or Qualitative Measure | 11.  Educational Needs: Children will be enrolled in school and DCF will have taken appropriate actions to ensure that their educational needs are being met. |
|---|---|
| Performance Target | 80% of cases will be rated acceptable as measured by the Qualitative Review (QR) in stability (school) and learning and development. The Monitor, in consultation with the parties, shall determine the standards for school stability and quality learning and development. |

*Performance as of December 31, 2017:*

From January to December 2017, 86 percent (76 out of 88) of cases reviewed were rated acceptable for both *stability in school* and *learning and development, age 5 & older* (see Figure 4).[92] DCF continues to meet this SEP performance standard. Success in this area is likely due to at least in part to consistently solid QR performance on *stability in the home* and *living arrangement*, which are 84 percent and 94 percent for CY 2017, respectively.

---

[91] This measures applies to school-aged children in out-of-home placement.
[92] Seventy-six of the 88 cases reviewed rated acceptable on *both* the *stability in school* and *learning and development, age 5 & older* indicators; 93% (95 of 102) were rated acceptable for *school stability* and 92% (83 of 90) were rated acceptable for *learning and development, age 5 & older*.

**Figure 4: Qualitative Review (QR) Cases Rated Acceptable on Educational Needs
(CY 2016 – CY 2017)[93]**



Source: DCF data

[93] In CY 2016, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem and Union counties. In CY 2017, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex and Warren counties.

### E.  VISITS

Purposeful visits between children in foster care and their workers, parents and siblings are critical tools for supporting children's safety and well-being, for strengthening family connections and improving prospects for permanency. Visits also offer the opportunity for engagement and assessment of children, youth and families. Increased attention to this area is likely to offer insights into quality case practice. The SEP includes six performance measures related to visits.

As of July 2017, four measures were designated as Outcomes *To Be Maintained*, including caseworker contacts with children newly placed or after a placement change (SEP III.F.9); caseworker contacts with children in ongoing placement (SEP III.F.10); and parent-child weekly and bi-weekly visits (SEP IV.F.29 and IV.F.30). The remaining two measures, caseworker contacts with parents when the goal is reunification (SEP IV.F.28) and sibling visits (SEP IV.F.31), are designated as Outcomes *To Be Achieved*. Performance for all six measures during the current monitoring period are discussed below.

**Caseworker Visits with Children in Placement**

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 9.  <u>Caseworker Contacts with Children – New Placement/Placement Change</u>: The caseworker shall have at least twice-per-month face to face contact with the children within the first two months of placement, with at least one contact in the placement. |
| **Performance Target** | 93% of children shall have at least twice-per-month face to face contact with their caseworker during the first two months of placement, with at least one contact in the placement. |

*Performance as of December 31, 2017:*

In December 2017, 330 (94%) of the 352 children in a new placement had two visits with their caseworkers during their first two months in placement. Between July and December 2017, monthly performance ranged from 93 to 97 percent and met the standard in all months for the first time since entry into the SEP.[94] DCF has shared with the Monitor that Area Directors have continued to monitor contacts with families and were asked to address challenges staff are encountering in practice with Local Office Managers (LOMs), Casework Supervisors and Supervisors. In addition, DCF reports that it has taken steps to address issues in documentation of these visits and that Case Practice Liaisons (CPLs) have been tasked with educating Local Office staff on the importance of visiting with children in care. DCF believes these efforts have been integral to the improved performance.

---

[94] Monthly performance is as follows: July, 97%; August, 95%; September, 96%; October, 96%; November, 93%; December, 94%.

| Quantitative or Qualitative Measure | 10. Caseworker Contacts with Children in Placement: During the remainder of placement, children will have at least one caseworker visit per month, in placement. |
|---|---|
| Performance Target | 93% of children will have at least one caseworker visit per month in placement, for the remainder of placement. |

*Performance as of December 31, 2017:*

In December 2017, 5,320 (96%) of the 5,543 children in an ongoing placement were visited at least once by their caseworker. Between July and December 2017, monthly performance ranged between 95 and 96 percent, exceeding the SEP target.[95] DCF continues to meet this performance standard.

**Caseworker Visits with Parents/Family Members**

| Quantitative or Qualitative Measure | 28. Caseworker Visits with Parents/Family Members with Goal of Reunification: The caseworker shall have at least two face-to-face visits per month with the parent(s) or other legally responsible family member of children in custody with a goal of reunification. |
|---|---|
| Final Target | 90% of families will have at least twice-per-month face-to-face contact with their caseworker when the permanency goal is reunification. |

*Performance as of December 31, 2017:*

In December 2017, there were 2,555 applicable children in custody with a goal of reunification; the parents of 1,913 children (75%) were visited at least twice during the month and the parents of an additional 222 children (9%) had one contact in the same month. Between July and December 2017, a range of 72 to 77 percent of applicable parents or other legally responsible family members were visited at least two times per month by a caseworker (see Figure 5).[96] In assessing performance for this measure, the Monitor applied its finding from a review of a statistically significant sample of cases from September, October and November 2017 in which documentation indicated that a worker visit with a parent was not required because the parent was missing or otherwise unavailable.[97] Based on the findings, the Monitor excluded cases from the universe in which it determined the exceptions to the requirement were appropriately applied and documented. Current performance does not meet the level required by the SEP.

---

[95] Monthly performance is as follows: July, 96%; August, 96%; September, 96%; October, 96%; November, 95%; December, 96%.

[96] Monthly performance is as follows: July, 72%; August, 74%; September, 75%; October, 77%; November, 74%; December, 75%. Reported performance accounts for valid exceptions to the visits requirement. Data for this period are not comparable to data reported in the previous monitoring period given that similar exclusions were not made.

[97] The Monitor participated in a joint review with DCF of 300 cases from a universe of cases from September, October and November 2017 in which worker visits with parents were not held due to a documented exception to the visits requirement. The Monitor and DCF determined that 108 (36%) had utilized a valid exception. As a result, the Monitor excluded 36% of the cases of exceptions from each month from the universe. For example, in December 2017 there were 2,733 children in custody with a goal of reunification. Data from NJ SPIRIT indicated that there were 494 total cases for which the worker had determined that the parent was missing or otherwise unavailable. Based on these findings, the Monitor excluded from the universe 36% of the 494 cases, making the universe of applicable children 2,555 (2,733-178).

An analysis of the data for this measure by Local Office shows wide variation in performance, and while overall performance is trending upward, there are a number of counties in which performance has sharply declined or remains significantly below the SEP standard.

**Figure 5: Percentage of Families Who Had at Least Twice per Month Face-to-Face Contact with Caseworker when the Goal is Reunification (July – December 2017)**



Source: DCF data

**Visits between Children in Custody and their Parents**

| Quantitative or Qualitative Measure | 29. <u>Weekly Visits between Children in Custody and Their Parents</u>: Number/percent of children who have weekly visits with their parents when the permanency goal is reunification unless there is a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |
|---|---|
| **Final Target** | 60% of children in custody with a return home goal will have an in-person visit with their parent(s) or other legally responsible family member at least weekly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

*Performance as of December 31, 2017:*

In December 2017, an average of 1,760 (80%) applicable children visited weekly with their parents during the month. Between July and December 2017, a monthly range of 78 to 82

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 55*

percent of children had a weekly visit with their parents when the permanency goal was reunification.[98] This performance exceeds the SEP requirement.

| Quantitative or Qualitative Measure | 30. Bi-Weekly Visits between Children in Custody and Their Parents: Number/percent of children who have weekly visits with their parents when the permanency goal is reunification unless a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |
|---|---|
| Final Target | 85% of children in custody with a return home goal will have an in-person visit with their parent(s) or other legally responsible family member at least every other week, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

*Performance as of December 31, 2017:*

In December 2017, 2,063 (93%) applicable children had at least two visits with their parents during the month. Between July and December 2017, a monthly range of 90 to 93 percent of children had visits at least twice a month with their parents when their permanency goal was reunification.[99] This performance exceeds the SEP requirement.

**Visits between Children in Custody and Sibling Placed Apart**

| Quantitative or Qualitative Measure | 31. Visits between Children in Custody and Siblings Placed Apart: Number/percent of children in custody, who have siblings with whom they are not residing shall visit with their siblings as appropriate. |
|---|---|
| Final Target | 85% of children in custody who have siblings with whom they are not residing shall visit with those siblings at least monthly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

*Performance as of December 31, 2017:*

In December 2017, there were 1,816 applicable children in placement who had at least one sibling with whom they did not reside; 1,454 (80%) children had at least one visit with one of

---

[98] Monthly performance is as follows: July, 78%; August, 79%; September, 80%; October, 82%; November, 79%; December, 80%. Given the results of validation from a prior monitoring period, the Monitor excluded from the universe all cases in which DCF documented an exception to the parent-child visit requirement. For example, in December 2017, there was an average of 2,838 children with a goal of reunification across the four weeks of the month. Data from NJ SPIRIT indicated that in an average of 643 cases, the worker had determined that the parent was unavailable for the visits, the child declined the visit or the visit was not required. Based on these data, the Monitor excluded those cases, making the universe of applicable cases an average of 2,195.

[99] Monthly performance is as follows: July, 91%; August, 90%; September, 92%; October, 93%; November, 92%; December, 93%. Given the results of validation activities from a prior monitoring period, the Monitor excluded from the universe all cases in which DCF documented an exception to the parent-child visit requirement. For example, in December 2017, there were 2,733 children with a goal of reunification. Data from NJ SPIRIT indicated that in 515 cases, the worker had determined that the parent was unavailable for the visits or the visit was not required. Based on these data, the Monitor excluded those cases from the universe, making the universe of applicable cases 2,218.

their siblings during the month. Between July and December 2017, a range of 74 to 80 percent of children had at least monthly visits with one of their siblings with whom they were not placed (see Figure 6).[100]

In assessing performance for this measure, the Monitor applied its finding from a review of a statistically significant sample of cases from September, October and November 2017 in which documentation indicated that a sibling visit was not required due to a court order, hospitalization, or because the child was missing or otherwise unavailable.[101] Based on the findings, the Monitor excluded cases from the universe in which it determined the exceptions to the requirement were appropriately applied and documented. DCF performance does not meet the required level for visits between children in custody and siblings with whom they are not placed. DCF plans on using data collected from the review to identify barriers to improved performance in this area.

**Figure 6: Percentage of Children Who Had at Least Monthly Visits with Siblings, for Children not Placed with Siblings (July – December 2017)**



Source: DCF data

---

[100] Monthly performance is as follows: July, 79%; August, 79%; September, 75%; October, 75%; November, 74%; December, 80%. Reported performance accounts for valid exceptions to the visits requirement. Data for this period are not comparable to data reported in the previous monitoring period given that similar exclusions were not made.

[101] The Monitor participated in a joint review with DCF of 253 cases from a universe of cases from September, October and November 2017 in which sibling visits were not held due to a documented exception to the visits requirement. The Monitor and DCF determined that 153 (60%) had utilized a valid exception. As a result, the Monitor excluded 60% of the cases of exceptions from each month from the universe. For example, in December 2017 there were 1,966 children with a sibling in care with whom they were not placed. Data from NJ SPIRIT indicated that there were 250 total cases for which the worker had determined that the child was unavailable for the visit due to a court order, hospitalization, or because the child was missing. Based on these findings, the Monitor excluded from the universe 60% of the 250 cases, making the universe of applicable children 1,816 (1,966-150).

### F. PLACEMENT

Stable and appropriate placement for children in foster care is critical to safety and well-being, and maintenance of family bonds. DCF policy requires siblings to be placed together whenever possible, and that children experience as few placement changes as possible while in out-of-home placement. There are five performance measures related to placement. As of January 2017, all had been previously met and were designated as Outcomes *To Be Maintained*: sibling placements of two to three children (SEP IV.G.32); sibling placements and recruitment of placements for four or more children (SEP IV.G.33); placement stability for children in care between 13 and 24 months (SEP IV.G.36); and placement stability for children in care 12 months or less (SEP IV.G.35). All of these measures, except recruitment of placements to accommodate large sibling groups, are assessed through longitudinal cohort data on an annual basis. Performance for all five measures are discussed below.

#### Placing Siblings Together

| Quantitative or Qualitative Measure | 32. <u>Placing Siblings Together</u>: The percentage of sibling groups of two or three siblings entering custody be placed together. |
|---|---|
| Performance Target | At least 80% of siblings groups of two or three children entering placement will be placed together. |

*Performance as of CY 2017:*

In CY 2017, there were 509 sibling groups that came into custody at the same time or within 30 days of one another that were comprised of two or three children. Of these, 76 percent (388) were placed together. In CY 2016, 78 percent (501) of sibling groups of two or three were placed together. DCF has not met the SEP standard this period and performance has declined slightly from CY 2016. The Monitor will wait to review data from the period January 1 through December 30, 2018, the next available data set, before recommending a change in categorization for this measure.

#### Placing Siblings Together for Four of More Children

| Quantitative or Qualitative Measure | 33. <u>Placing Siblings Together for Four or More Children</u>: The percentage of sibling groups of four or more placed together. |
|---|---|
| Performance Target | For sibling groups of four or more 80% will be placed with at least one other sibling. |

*Performance as of CY 2017:*

In CY 2017, there were 351 children who were part of sibling groups of four or more children in placement. Of those 351 children, 291 (83%) were placed with at least one other sibling. DCF has exceeded this SEP performance standard for the second time this monitoring period.

**Recruitment of Placements for Sibling Groups of Four or More**

| Quantitative or Qualitative Measure | 34. Recruitment of Placements for Sibling Groups of Four or More |
|---|---|
| **Performance Target** | DCF will continue to recruit for resource homes capable of serving sibling groups of four or more. |

*Performance as of December 31, 2017:*

DCF staff continued to be guided by recruitment plans intended to drive their work for CY 2017. Recruitment plans require resource staff statewide to host recruitment and retention events for potential resource families willing to accept large sibling groups, adolescents and children with advanced medical needs. An ongoing effort is underway to strategically place advertisements in local publications, online websites, blogs and local sports facilities in an effort to reach potential resource families.

During this monitoring period, the Office of Resource Families (ORF) developed a sibling work group in Monmouth and Ocean counties that piloted specific retention events for resource families with capacity for three or more children. Examples of recruitment and retention activities for large sibling groups include an event at Jenkinson's Boardwalk in Point Pleasant, New Jersey for all resource homes in Ocean County with a capacity of caring for four or more children and a retention event in Monmouth County for resource parents and siblings at Good Sports Sporting Complex that featured the Siblings in Best Placement Settings (SIBS) program. A recruiter from the Gloucester/Cumberland/Salem office was invited as a guest to speak on WMIZ 1270 AM radio, *The Hispanic Voice of South Jersey* program, to highlight the need for Spanish speaking homes, and recruiters placed an advertisement in NJ Family Magazine – Raising Teens issue that reaches Passaic, Morris, Bergen, Hudson and Essex counties. Finally, Foster and Adoptive Family Services (FAFS) piloted its new Our Heart to Your Home program in Somerset County, a program that provides extra support and services to resource families.

As of December 31, 2017, DCF had a total of 92 large capacity SIBS homes, six fewer than there were at the end of June 2017. Between July and December 2017, DCF recruited 32 new SIBS homes, seven of which can accommodate five or more children. Twenty-five of the 32 new SIBS homes recruited between July and December 2017 could accommodate four children. Because 30 homes that could accommodate four children were either downgraded or closed this monitoring period, the state decreased its capacity for this size home by five since June 2017, resulting in a total of 71 SIBs homes that can accommodate four children.[102] As of December 31,

---

[102] As of December 31, 2017, 30 homes accommodating four children either downgraded or closed: five homes closed for reasons related to adoption/KLG finalization of the children in placement; ten homes closed due to reunification; two homes closed because the family could not manage the placements; one home closed upon the death of the resource parent; one home closed due to the health of the resource parent; one home closed after an IAIU investigation; three homes downgraded their capacity once siblings were reunified; four homes downgraded upon request; one home was transferred into the SIBS -5 program when an additional sibling was placed in the home; and two additional homes downgraded their capacity upon adoption finalization.

2017, DCF had a total of 21 homes that could accommodate five or more children, which is one fewer than it had at the end of June 2017.[103]

Despite a small decrease in the number of large sibling homes available, the Monitor considers DCF to have met the SEP standard for this measure between July and December 2017.

**Stability of Placement**

| Quantitative or Qualitative Measure | 35. <u>Stability of Placement</u>: The percentage of children entering out-of-home placement for the first time in a calendar year who have no more than one placement change during the 12 months following their date of entry. |
|---|---|
| **Performance Target** | At least 84% of children entering care for the first time in a calendar year will have no more than one placement change during the 12 months following their date of entry. |

*Performance as of CY 2016 (Most Recent Calendar Year Available):*

The most recent performance data assesses the 3,454 applicable children who entered care for the first time in CY 2016 and aggregates the number of placements each child experienced within one year of entry. For children entering care in CY 2016, 2,935 (85%) had no more than one placement change during the 12 months from their date of entry. DCF continued to meet the SEP performance standard for this measure this monitoring period.

| Quantitative or Qualitative Measure | 36. <u>Stability of Placement</u>: The percentage of children in out-of-home placement who have no more than one placement change during the 13 to 24 months following their date of entry. |
|---|---|
| **Performance Target** | At least 88% of children in out-of-home placement will have no more than one placement change during the 13 to 24 months following their date of entry. |

*Performance as of CY 2015 (Most Recent Calendar Year Available):*

The most recent performance data assesses the 1,770 applicable children who entered care for the first time in CY 2015 and aggregates the number of placements each child remaining in care experienced in the second year of their out-of-home placement. For children entering care in CY 2015, 1,665 (94%) children had no more than one placement change during the 13 to 24 months following their date of entry. DCF performance exceeded the SEP performance standard.

---

[103] As of December 31, 2017, eight homes accommodating five or more children either were downgraded or closed: one home closed for reasons related to adoption finalization; three homes closed due to reunification; one home downgraded their capacity upon once the children in placement were reunified; and one home downgraded their capacity upon adoption finalization; and two homes downgraded their capacity upon requesting the children be removed from the home.

## G.  MALTREATMENT OF CHILDREN AND YOUTH

A fundamental responsibility of DCF is ensuring the long-term safety of children who are receiving or have received services from CP&P. This responsibility includes ensuring the safety of children who are placed in resource family homes and congregate facilities, and preventing future maltreatment.

There are four SEP performance measures related to maltreatment of children and youth. As of January 2017, three measures were designated as Outcomes *To Be Maintained*: abuse and neglect of children in foster care (SEP III.H.12); repeat maltreatment for children remaining in their home (SEP IV.H.37); and maltreatment post-reunification (SEP IV.H.38). One was designated as an Outcome *To Be Achieved*: re-entry to placement (SEP IV.H.39). All of these measures are assessed through longitudinal cohort data on an annual basis. Performance for all four measures are discussed below.

### Abuse and Neglect of Children in Foster Care

| Quantitative or Qualitative Measure | 12.  Abuse and Neglect of Children in Foster Care: Of all children in foster care, the percentage who are victims of substantiated abuse or neglect by a resource parent or facility staff member. |
|---|---|
| Final Target | No more than 0.49% of children will be victims of substantiated abuse or neglect by a resource parent or facility staff member. |

*Performance as of CY 2017:*

In CY 2017, 25 out of 10,308 children (0.24%) were victims of a substantiated allegation of abuse and/or neglect by a resource parent or facility staff member. Performance for this measure continues to exceed the SEP performance standard and mirrors Qualitative Review (QR) data which consistently shows high performance on safety when DCF is involved.

### Repeat Maltreatment

| Quantitative or Qualitative Measure | 37.  Repeat Maltreatment (In-Home): Of all children who remain in home after substantiation of abuse or neglect, the percentage who have another substantiation within the next 12 months. |
|---|---|
| Final Target | No more than 7.2% of children who remain at home after a substantiation of abuse or neglect will have another substantiation within the next 12 months. |

*Performance as of CY 2016 (Most Recent Calendar Year Available):*

In CY 2016, there were 5,050 children who were victims of a substantiated allegation of abuse and/or neglect who were not placed in out-of-home care; 328 (6.5%) of these children were the victims of another substantiated allegation of child abuse and/or neglect within 12 months of the

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 61*

initial substantiation. While DCF seeks to insure no future maltreatment for any child, in-home repeat maltreatment rates continue to meet the SEP performance standard.

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 38.   Maltreatment Post-Reunification: Of all children who are reunified during a period, the percentage who are victims of substantiated abuse or neglect within one year after the date of reunification. |
| **Final Target** | Of all children who enter foster care in a 12-month period for the first time who are discharged within 24 months to reunification or living with relative(s), no more than 6.9% will be the victims of substantiated abuse or neglect within 12 months after reunification. |

*Performance as of CY 2014 (Most Recent Calendar Year Available):*

In CY 2014, there were 1,959 children in foster care who exited DCF custody to reunification with families. One-hundred and twenty-six (6.4%) of these children were victims of a substantiated allegation of abuse and/or neglect within 12 months of their return home. DCF met the SEP performance standard again this monitoring period.

**Re-entry to Placement**

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 39.   Re-entry to Placement: Of all children who leave custody during a period, except those whose reason for discharge is that they ran away from their placement, the percentage that re-enter custody within one year of the date of exit. |
| **Final Target** | Of all children who enter foster care in a 12 month period for the first time who are discharged within 12 months to reunification, living with relative(s), or guardianship, no more than 9% will re-enter foster care within 12 months of their discharge. |

*Performance as of CY 2015 (Most Recent Calendar Year Available):*

In CY 2015, there were 1,362 children to whom this measure applied; 152 (11.2%) children re-entered placement within 12 months of their discharge. Figure 7 shows performance from CY 2007 to CY 2015. While re-entry rates have been in decline, DCF has not yet met the SEP performance standard.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 62*

**Figure 7: Percentage of Children Who Re-Entered Custody within One Year of Date of Exit (CY 2007 – CY 2015)**



Source: DCF data analyzed by Hornby Zeller Associates and Rutgers University.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 63*

## H.  TIMELY PERMANENCY

Regardless of age, gender, race or ethnicity, all children need and deserve a safe, nurturing family to protect and guide them. Safe family reunification with families is the preferred path, but permanency for children can be achieved through a number of different avenues, including kinship/guardianship and adoption. There are four SEP measures that focus on permanency for children. As of January 2017, one measure was designated as an Outcome *To Be Maintained* – achieving permanency within 12 months (SEP IV.I.40) – and three measures were designated as Outcomes *To Be Achieved* – achieving permanency within 24 months (SEP IV.I.41), 36 months (SEP IV.I.42) and 48 months (SEP IV.I.43).

For the first time this monitoring period, the Monitor has determined that DCF met the target for children who entered care within a 12 month period being discharged to a permanent placement (reunified with their parents, living with relatives, living with legal guardians or adopted) within both 36 months and 48 months (SEP IV.I.42 and IV.I43, respectively). All of the measures discussed in this section are assessed with longitudinal cohort data on an annual basis. Performance for all four measures are discussed below.

### Timely Permanency through Reunification, Adoption or Guardianship

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 40.  Permanency Within 12 months: Of all children who entered foster care in a 12 month period, what percentage were discharged from foster care to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. |
| **Final Target** | Of all children who enter foster care in a 12 month period, at least 42% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. |

*Performance as of CY 2016 (Most Recent Calendar Year Available):*

The most recent data available for this measure are for children who entered foster care in CY 2016. Of the 3,788 children who entered foster care in CY 2016, 1,591 (42%) were discharged to permanency within 12 months of their removal from their home (see Figure 8). Of those 1,591 children, 1,365 of them were discharged to reunification with their families; as seen in Table 2, this means that 36 percent of all children who entered foster care in CY 2016 were discharged to reunification within 12 months. Current performance continues to meet the SEP performance standard.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 64*

**Figure 8: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 12 Months of Entering Foster Care (CY 2007 – CY 2016)**



Source: DCF data analyzed by Hornby Zeller Associates and Rutgers University.

**Table 2: Number and Percentage of Children Who Entered Foster Care in CY 2016 Who Were Discharged to Permanency within 12 Months, by Permanency Outcome**

| Permanency Outcome | Number | Percentage |
|---|---|---|
| Kinship guardianship | <10* | 0% |
| Adoption | 20 | 1% |
| Living with Relatives | 205 | 5% |
| Reunification | 1,365 | 36% |

Source: NJ Child Welfare Data Portal
*To protect the privacy of children represented in the data, values less than 10 are reported as zero.

| Quantitative or Qualitative Measure | 41. Permanency Within 24 months: Of all children who enter foster care in a 12 month period, what percentage were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering care. |
|---|---|
| Final Target | Of all children who enter foster care in a 12 month period, at least 66% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering care. |

*Performance as of CY 2015 (Most Recent Calendar Year Available):*

The most recent data available for this measure are for children who entered foster care in CY 2015. Of the 4,035 children who entered foster care in CY 2015, 2,566 (64%) were discharged to permanency within 24 months of removal from their homes (see Figure 9). Of those 2,566 children, 1,950 of them were discharged to reunification with their families; as seen in Table 3,

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*
*July 18, 2018*
*Page 65*

this means that 48 percent of all children who entered care in CY 2015 were discharged to reunification within 24 months. DCF performance remains close to, but does not yet meet, the SEP standard.

**Figure 9: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 24 Months of Entering Foster Care (CY 2007 – CY 2015)**



Source: DCF data analyzed by Hornby Zeller Associates and Rutgers University.

**Table 3: Number and Percentage of Children Who Entered Foster Care in CY 2015 Who Were Discharged to Permanency within 24 Months, by Permanency Outcome**

| Permanency Outcome | Number | Percentage |
|---|---|---|
| Kinship guardianship | 93 | 2% |
| Adoption | 255 | 6% |
| Living with Relatives | 268 | 7% |
| Reunification | 1,950 | 48% |

Source: NJ Child Welfare Data Portal

| Quantitative or Qualitative Measure | 42. Permanency Within 36 months: Of all children who enter foster care in a 12 month period, what percentage were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering care. |
|---|---|
| Final Target | Of all children who enter foster care in a 12 month period, at least 80% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering care. |

*Performance as of CY 2014 (Most Recent Calendar Year Available):*

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 66*

The most recent data available for this measure are for children who entered foster care in CY 2014. Of the 4,378 children who entered foster care in CY 2014, 3,503 (80%) were discharged to permanency within 36 months of removal from their homes (see Figure 10). Of those 3,503 children, 2,300 of them were discharged to reunification with their families; as seen in Table 4, this means that 53 percent of all children who entered care in CY 2014 were discharged to reunification within 36 months. DCF performance meets the SEP standard for the first time this reporting period, a significant achievement.

**Figure 10: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 36 Months of Entering Foster Care (CY 2007 – CY 2014)**



Source: DCF data analyzed by Hornby Zeller Associates and Rutgers University.

**Table 4: Number and Percentage of Children Who Entered Foster Care in CY 2014 Who Were Discharged to Permanency within 36 Months, by Permanency Outcome**

| Permanency Outcome | Number | Percentage |
|---|---|---|
| Kinship guardianship | 174 | 4% |
| Adoption | 710 | 16% |
| Living with Relatives | 319 | 7% |
| Reunification | 2,300 | 53% |

Source: NJ Child Welfare Data Portal

| Quantitative or Qualitative Measure | 43. Permanency within 48 months: Of all children who enter foster care in a 12 month period, what percentage were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering care. |
|---|---|
| **Final Target** | Of all children who enter foster care in a 12 month period, at least 86% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering care. |

*Performance as of CY 2013 (Most Recent Calendar Year Available):*

The most recent data available for this measure are for children who entered foster care in CY 2013. Of the 4,612 children who entered foster care in CY 2013, 3,943 (86%) were discharged to permanency within 48 months of removal from their homes (see Figure 11). Of those 3,943 children, 2,546 of them were discharged to reunification with their families; as seen in Table 5, this means that 55 percent of all children who entered care in CY 2013 were discharged to reunification within 48 months. Current performance meets the SEP performance standard for the first time, another notable achievement this monitoring period.

**Figure 11: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 48 Months of Entering Foster Care (CY 2007 – CY 2013)**



Source: DCF data analyzed by Hornby Zeller Associates and Rutgers University.

**Table 5: Number and Percentage of Children Who Entered Foster Care in CY 2013 Who Were Discharged to Permanency within 48 Months, by Permanency Outcome**

| Permanency Outcome | Number | Percentage |
|---|---|---|
| Kinship guardianship | 197 | 4% |
| Adoption | 878 | 19% |
| Living with Relatives | 332 | 7% |
| Reunification | 2,546 | 55% |

Source: NJ Child Welfare Data Portal

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 68*

## I. CHILD HEALTH UNITS

Early in New Jersey's child welfare reform efforts, DCF built Child Health Units (CHUs) to facilitate and ensure the timely provision of health care to children in CP&P custody. CHUs exist in each CP&P Local Office and are staffed with Regional Nurse Administrators, Nurse Health Care Case Managers (HCCMs) and staff assistants, based on the projected number of children in out-of-home placement.

Section III.E of the SEP requires the state to "maintain its network of child health units, adequately staffed by nurses in each local office." This measure has been previously met and designated as an Outcome *To Be Maintained*. In what has become a model for other child welfare systems throughout the country, each child placed in a resource home has a nurse assigned for health care case management. CHUs are recognized by staff and external partners as an effective achievement of New Jersey's child welfare reform efforts. The work of the nurses in concert with caseworkers and other team members have contributed to the consistently positive findings in New Jersey's Qualitative Reviews (QRs) regarding children's health. In the most recent QR conducted between January and December 2017, the indicator *physical health of the child* was rated acceptable 98 percent of the time. Performance for this measure is discussed below.

| Quantitative or Qualitative Measure | 8.  Child Health Units: The State will continue to maintain its network of child health units, adequately staffed by nurses in each Local Office. |
|---|---|
| Performance Target | DCF will maintain adequate staffing levels in Local Offices. |

*Performance as of December 31, 2017:*

As of December 31, 2017, DCF had 170 nurses and 82 staff assistants. Of the 170 nurses, an average of 168 were available for coverage for an average ratio of one nurse to every 37 children in out-of-home care, exceeding the standard of one nurse to 50 children in out-of-home care.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 69*

### J.  OLDER YOUTH

The SEP includes four measures related to older youth, all designated as Outcomes *To Be Maintained* – completion of Independent Living Assessments (SEP IV.K.45); quality of case planning and services (SEP IV.K.46); housing for youth who exit care without achieving permanency (SEP IV.K.47); and education/employment for youth who exit care without achieving permanency (SEP IV.K.48). Performance for all four measures during the current monitoring period are discussed below.

**Independent Living Assessments**

| Quantitative or Qualitative Measure | 45.  <u>Independent Living Assessments</u>: Percentage of youth age 14 and 18 with a completed Independent Living Assessment. |
|---|---|
| **Performance Target** | 90% of youth age 14 to 18 will have an Independent Living Assessment. |

*Performance as of December 31, 2017:*

In December 2017, there were 740 youth age 14 to 18 in out-of-home placement for at least six months; 691 (93%) had an Independent Living Assessment (ILA) completed. Monthly performance between July and December 2017 ranged from 92 to 94 percent. [104] DCF sustained performance above the level required by the SEP in all six months this monitoring period.

**Quality of Case Planning and Services**

| Quantitative or Qualitative Measure | 46.  <u>Quality of Case Planning and Services</u>: DCF shall provide case management and services to youth between the age 18 and 21 who have not achieved legal permanency. |
|---|---|
| **Performance Target** | 75% of youth age 18 to 21 who have not achieved legal permanency shall receive acceptable quality case management and service planning. |

Performance data for this measure were collected through Qualitative Reviews (QRs) of the experiences and outcomes of 42 youth age 18 to 21, conducted from January through December 2017. In rating these cases, reviewers use both the standard QR protocol and a list of additional considerations relevant to this population, such as DCF's efforts to plan and support youth who identify as LGBTQI, are victims of domestic violence, are expectant or parenting and/or are developmentally disabled. As part of DCF's efforts to support older youth, the Office of Adolescent Services (OAS) developed a plan in this monitoring period, utilizing the 2017 QR findings, to train staff on the Transition Plan for YOUth/Casey Life Skills Assessment, as well as to provide enhanced training at the 2018 Adolescent Practice Forums about identifying underlying needs, goal setting with youth, key elements of transformational relationships, and strategies to develop informal support networks.

---

[104] Monthly performance is as follows: July, 94%; August, 94%; September, 93%; October, 93%; November, 92%; December, 93%.

From January to December 2017, 31 of the 42 (74%) cases reviewed scored acceptable for both the *child(youth)/family status* and *practice performance* indicators (see Figure 12).[105] Given that the universe of cases to which this measure applies is small and therefore more susceptible to fluctuations, the Monitor considers this measure to have been met again this period.



**Figure 12: Qualitative Review (QR) Cases Rated Acceptable on Quality of Case Planning and Services for Older Youth (CY 2016 – CY 2017)[106] (n=42)**

Source: DCF data

## Housing

| Quantitative or Qualitative Measure | 47. <u>Housing</u>: Youth exiting care without achieving permanency shall have housing. |
|---|---|
| **Performance Target** | 95% of youth exiting care without achieving permanency shall have housing. |

***Performance as of December 31, 2017:***

The Monitor and DCF staff conducted a case record review of all youth who exited care between July and December 2017 without achieving permanency to assess whether they had housing

---

[105] From January to December 2017, 88 percent (37 of 42) of cases rated acceptable on the *child(youth)/family status* indicator and 74 percent (31 of 42) of cases rated acceptable on the *practice performance* indicator.

[106] In CY 2016, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem and Union counties. In CY 2017, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex and Warren counties.

upon leaving DCF custody. Of the 63 youth for which this measure was applicable,[107] there was documentation of a housing plan for 58 (92%) youth, just below the SEP standard. Given that the universe of cases to which this measure applies is small and therefore more susceptible to fluctuations, the Monitor considers this measure to have been met again this period.

### Employment/Education

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 48. <u>Employment/Education</u>: Youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. |
| **Performance Target** | 90% of youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. |

*Performance as of December 31, 2017:*

The Monitor and DCF also reviewed the case records of all youth who exited DCF custody between July and December 2017 without achieving permanency to determine whether they were employed or enrolled in school at the time of leaving care. Of the 56 youth to whom this measure applied,[108] 46 were either employed or enrolled in education or vocational training programs, and there was documentation of consistent efforts by the caseworker to help seven youth secure education or employment. Overall, there was satisfactory performance with this measure in 53 (95%) of cases, exceeding the SEP measure again this period.

---

[107] Two youth were excluded from consideration because they could not be located.
[108] Nine youth were excluded from this measure because they were incarcerated, could not be located, had relocated to a different state and were in the process of applying or enrolling, or had a significant medical or mental health impairment.

## K.  SERVICES TO SUPPORT TRANSITION

While involved with DCF, children, youth and families often face transitions, including changes in family relationships, living arrangements, service providers or schools. Some transitions are more critical than others but all require recognition and planning in order to be smooth and successful. DCF uses the Qualitative Review (QR) process to measure case practice that supports families to make successful transitions. Section IV.J of the SEP requires that 80 percent of cases be rated acceptable on the *successful transitions* indicator. This measure is designated as an Outcome *To Be Achieved*.

### Services to Support Transition

| Quantitative or Qualitative Measure | 44. <u>Services to Support Transition</u>: DCF will provide services and supports to families to support and preserve successful transitions. |
|---|---|
| **Performance Target** | 80% of cases will be plans rated acceptable for supporting transitions as measured by the Qualitative Review (QR). |

*Performance as of December 31, 2017*:

Results from 128 cases reviewed from January to December 2017 indicate that 59 percent (75 of 128) of cases were rated acceptable, a decline in performance from CY 2016, in which 66 percent of cases reviewed rated acceptable (see Figure 13).[109] DCF did not meet the SEP performance standard in either period.

Quality assessments and case plans are integral parts of good case practice, both of which can impact how well DCF supports families to make successful transitions. A key theme from case narratives is the need for clear case plans that are developed with the family and the family's informal and formal supports that are modified with the team over time as necessary.

---

[109] In CY 2016, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem and Union counties. In CY 2017, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex and Warren counties.

**Figure 13: Qualitative Review (QR) Cases Rated Acceptable on Successful Transitions (CY 2016 – CY 2017)**
**(n=128)**



Source: DCF data

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 74*

## L.  CASELOADS

One of the early successes of DCF's reform was reducing caseloads to levels where workers could do the work with children, youth and families that was expected of them. Caseload compliance is measured by assessing caseloads for individual caseworkers in each of the system's functional areas (Intake, Permanency, Adoption and IAIU) as well as office standards for each CP&P Local Office. Table 6 summarizes the SEP's caseload standards for individual workers.

The SEP includes eight performance measures related to caseloads and all are designated as Outcomes *To Be Maintained.* These eight measures include Intake office caseloads (SEP IV.E.24); Intake individual worker caseloads (SEP IV.E.25); Adoption office caseloads (SEP IV.E.26); Adoption individual worker caseloads (SEP IV.E.27); Permanency office caseloads (SEP III.B.4); Permanency individual worker caseloads (SEP III.B.5); IAIU investigators individual caseloads (SEP III.B.3); and supervisory/worker ratio (SEP III.B.2). Performance for all eight measures during the current monitoring period are discussed below.

### Table 6: CP&P Individual Worker Caseload Standards

| Caseworker Function | Responsibility | Individual Caseload Standard (SEP Sections IV.E and III.B) |
|---|---|---|
| Intake | Respond to community concerns regarding child safety and well-being. Specifically, receive referrals from the State Central Registry (SCR) and depending on the nature of the referral, respond between two hours and five days with a visit to the home and begin investigation or assessment. Complete investigation or assessment within 60 days. | Intake workers are to have no more than **12 open cases** at any one time **and** no more than **eight new referrals** assigned in a month. No Intake worker with 12 or more open cases can be given more than **two secondary assignments** per month.[110] |
| Institutional Abuse Investigations Unit (IAIU) | Respond to allegations of child abuse and neglect in settings including correctional facilities, detention facilities, treatment facilities, schools (public or private), residential schools, shelters, hospitals, camps or child care centers that are required to be licensed, resource family homes and registered family day care homes. | IAIU staff workers are to have no more than **12 open cases** at any one time **and** no more than **eight new referrals** assigned in a month. |
| Permanency | Provide services to families whose children remain at home under the protective supervision of CP&P and those families whose children are removed from home due to safety concerns. | Permanency workers are to serve no more than **15 families and 10 children in out-of-home care at any one time**. |
| Adoption | Find permanent homes for children who cannot safely return to their parents by preparing children for adoption, developing adoptive resources and performing the work needed to finalize adoptions. | Adoption workers are to serve no more than **15 children** at any one time. |

Source: DCF

---

[110] Secondary assignments refer to shared cases between Intake and Permanency workers for families who have a case open with a Permanency worker where there are new allegations of abuse or neglect that require investigation.

*Verifying Worker Caseloads*

DCF caseload data are collected and analyzed through NJ SPIRIT and SafeMeasures. As in previous monitoring periods, the Monitor verified caseload data supplied by DCF by conducting telephone interviews with randomly selected workers across the state. The caseload verification process included workers in all areas in which the SEP establishes caseload standards: Intake, Permanency and Adoption. A sample of 170 workers were selected from all active workers in December 2017. All of the 46 CP&P Local Offices were represented in the sample. For the past several years, the Monitor has weighted the sample with Intake workers to examine in more depth the impact of shared cases between Intake and Permanency workers. The interviews were conducted in January and February 2018. All 170 workers were called and information was collected from 123 workers (74% of the eligible sample).[111] Among the 123 workers who participated in the caseload verification interviews, 71 were Intake workers, 25 were Permanency workers, 15 were Adoption workers and 12 were trainees.

During the interviews, the Monitor asked each caseworker whether his or her caseload met caseload standards between July and December 2017; responses were compared to the caseload information from NJ SPIRIT and SafeMeasures for identified workers during the same period. Workers were also asked to report their specific caseload size for the month of December 2017 and their reports were compared with NJ SPIRIT and SafeMeasures data for that month.

## Intake

The SEP Intake caseload standard is that no worker should have more than eight new case assignments per month, no more than 12 open primary cases at any one time and no Intake worker with 12 or more open primary cases can be assigned more than two secondary assignments per month. In January 2017, DCF implemented a new methodology for tracking and reporting the SEP Intake caseload standard to more clearly communicate to staff and to streamline monitoring and reporting. DCF's new methodology captures secondary case assignments on the Intake worker's monthly caseload report, which tracks and reports Intake caseloads as follows: no more than eight new assignments per month; no more than 12 cases assigned as primary case assignments at any one time; and no more than 14 cases at any one time, including both primary and secondary case assignments. The methodology for the standard of no more than eight new case assignments per month, including secondary assignments, remains unchanged.

DCF continues to implement its statewide internal caseload verification process which serves as a quality assurance method where Intake workers are interviewed and their reported caseloads are compared to their caseloads as reported in SafeMeasures. During the period of July through December 2017, DCF interviewed a random sample of 225 Intake workers from 25 Local Offices throughout the state. DCF verified that 92 percent (208 of 225) of Intake worker caseloads were accurately reflected in SafeMeasures. Findings from DCF's caseload verification

---

[111] One worker was on extended leave during the period the calls were made and were removed from the sample. Three additional workers were no longer assigned to the Local Office at the time of the call were also removed from the sample. The Monitor made at least three attempts to contact each caseworker in the sample.

reviews will be shared widely with DCF staff through briefs, posted onto the Office of Quality website and presented during ChildStat meetings.

| Quantitative or Qualitative Measure | 24. Intake Local Office Caseloads: Local Offices will have an average caseloads for Intake workers of (a) no more than 12 families, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |
|---|---|
| Performance Target | 95% of Local Offices will have an average caseload of (a) no more than 12 families, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |

*Performance as of December 31, 2017:*

Performance data for July through December 2017 show that 97 percent of Local Offices met the Intake caseload standards. DCF continues to meet this SEP standard.

| Quantitative or Qualitative Measure | 25. Individual Intake Caseloads: individual Intake workers shall have (a) no more than 12 open cases, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |
|---|---|
| Performance Target | 90% of individual Intake workers shall have (a) no more than 12 open cases, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |

*Performance as of December 31, 2017:*

DCF continues to meet the individual Intake worker caseload standard this monitoring period. The state reported an average of 1,030 active Intake workers between July and December 2017. Among those active Intake workers, an average of 96 percent (990 of 1,030) of workers had caseloads that met the standard. Specifically, in December 2017, individual worker caseload compliance for Intake workers was 97 percent (1,007 of 1,042 total workers).

Data by Local Office show that during December 2017, performance ranged between 71 and 100 percent, with 41 of 46 (89%) Local Offices having all Intake workers in compliance with caseload standards.

Among the 123 workers who participated in the Monitor's interviews for caseload verification, 71 were Intake workers. Two (3%) of the 71 Intake workers reported exceeding the caseload limit of eight new assignments per month at some point between July and December 2017. Nineteen (27%) Intake workers reported having more than 14 total cases including both primary and secondary case assignments on their caseload at some point during the same period.

DCF deploys Impact Teams (a supervisor and three workers) to a unit or a Local Office in different areas when intakes are unusually high, to assist in maintaining caseload standards by taking on investigation overflow. There are nine Impact Teams, one per Area Office.

*"Shared" Cases between Intake and Permanency Workers*

As described in previous monitoring reports, Intake and Permanency workers sometimes share responsibility for families with open permanency cases when there are new allegations of abuse or neglect. According to DCF procedure, all Child Protective Services (CPS) reports are assigned to Intake workers to investigate and are reflected in caseload reporting as one of the Intake workers' eight new referrals in the month and as one of their 12 open families for that month. However, when circumstances indicate that a family with an already open permanency case is the subject of a new CPS report, the work with the family becomes the shared responsibility of both Intake and Permanency workers until the investigation is completed.

Intake workers are assigned a secondary worker designation in NJ SPIRIT for such cases with families who are already currently assigned a Permanency worker. According to DCF, this arrangement emphasizes the primary role of the Permanency worker in securing placement, facilitating visits, supporting the family to implement the case plan and coordinating services. It also reflects the Permanency worker's responsibility to provide information to the Intake worker and to link the family to appropriate services and supports identified during the course of the new investigation, thus relieving the Intake worker of the overall case management responsibility for the case. Intake workers continue to be responsible for the work required to complete investigative tasks and to reach and document an investigative finding. Thus, these secondary assignments are counted as one of the Intake worker's eight new referrals assigned in a month and as part of the total 14 open cases per month.

DCF reports that Intake supervisors in CP&P Local Offices are expected to appropriately manage the workload of staff in their units and consider an Intake worker's primary and secondary responsibilities when assigning new referrals. Table 7 provides the reported number of secondary assignments to Intake workers by month for this monitoring period.

**Table 7: Number of CP&P Investigations and Secondary Intake Assignments by Month (July – December 2017)[112]**

| Month | Total Investigations Assigned to Intake Workers for the Month | Secondary Intake Worker Assignments of CPS and CWS Investigations | |
|---|---|---|---|
| July | 4,614 | 467 | 10% |
| August | 4,746 | 454 | 10% |
| September | 5,675 | 487 | 9% |
| October | 6,749 | 581 | 9% |
| November | 6,153 | 551 | 9% |
| December | 5,881 | 529 | 9% |

Source: DCF data

---

[112] Total excludes intakes assigned to Impact, Permanency, Adoption and Advocacy Center workers and includes intakes assigned to workers on leave.

The Monitor reviewed monthly Local Office data on secondary assignments and found that on average, each Intake worker was assigned one secondary case at any given time during the time period reviewed. The Monitor also found that an average of 23 percent of Intake workers received two or more secondary case assignments and an average of five percent of Intake workers received three or more secondary assignments each month during the monitoring period. Specifically, in the month of December 2017, 267 (26%) Intake workers received two or more secondary intake assignments and 57 (5%) Intake workers received three or more secondary intake assignments.

During phone interviews with caseworkers, Monitor staff inquired about the prevalence of secondary assignments and their impact on workload. Intake workers were asked about the frequency of secondary assignments, the effect these assignments have on workload and how they are measured. Of the 71 Intake workers interviewed, 59 (83%) workers reported receiving an assignment to investigate a new report on an open permanency case as a secondary worker at least once in the six month period between July and December 2017. Of those 59 workers, 32 (54%) workers reported receiving at least one secondary assignment per month. Thirty-eight of the 59 (64%) Intake workers interviewed responded that in their opinion, the workload for an investigation on an open permanency case in which they are designated as secondary worker is equivalent to, or sometimes more than, the workload for an initial investigation. Workers explained that although Permanency workers may have completed collateral contacts or are able to provide information about the family's circumstances, every investigation must be approached in the same manner regardless of primary or secondary status.

To ensure that Intake workload is properly managed regardless of the combination of primary and secondary assignments, DCF continues to examine the processes used in Local Offices to make secondary assignments, as well as Local Office workflow management practices.

**Assignment of Investigations to Non-Caseload Carrying Staff**

On occasion, in order to handle the unpredictable flow of referrals for investigations, trained non-caseload carrying staff as well as caseload-carrying staff who are not part of Intake units (non-Intake caseload carrying staff) in Local Offices are assigned to investigations. DCF reports that policy requires all staff to complete First Responder training prior to being assigned an investigation and non-caseload carrying staff have to have been similarly trained and receive supervision by the Intake supervisor. The Monitor's review of DCF's data for the months of July through December 2017 found that approximately one percent of investigations were assigned each month to non-caseload carrying staff and that about six percent were assigned to non-Intake caseload carrying staff. DCF produces a Caseload Report Exception List that documents all instances of intakes identified as assigned to non-caseload carrying workers and closely monitors this on an ongoing basis. Table 8 shows the number and percentage of investigations assigned to non-caseload carrying staff, and Table 9 shows the number and percentage of investigations assigned to non-Intake caseload carrying staff.

As part of the phone interviews, Intake workers were asked if there were scenarios in their Local Offices in which non-caseload carrying staff could be assigned an investigation. Twenty-eight of

the 71 workers (39%) reported that they were aware of instances in which this has happened in their office. Respondents stated that non-caseload carrying staff with prior investigative experience can be assigned cases when all Intake workers in a Local Office reach their assignment limit for the month. The most frequently identified job titles for the non-caseload carrying staff who are assigned investigations are Administrative Assistant and Resource Development Specialist.

**Table 8: Percentage of CP&P Investigations Assigned to Non-Caseload Carrying Staff by Month (July – December 2017)[113]**

| Month | Total Investigations Received in the Month | Number and Percentage of Investigations Assigned to Non-Case Carrying Staff | |
|---|---|---|---|
| July | 4,965 | 47 | 1% |
| August | 5,021 | 47 | 1% |
| September | 6,005 | 59 | 1% |
| October | 7,342 | 83 | 1% |
| November | 6,696 | 73 | 1% |
| December | 6,309 | 62 | 1% |

Source: DCF data

**Table 9: Percentage of CP&P Investigations Assigned to Non-Intake Caseload Carrying Staff by Month (July – December 2017)**

| Month | Total Investigations Received in the Month | Number and Percentage of Investigations Assigned to Non- Intake Caseload Carrying Staff[114] | |
|---|---|---|---|
| July | 4,965 | 304 | 6% |
| August | 5,021 | 228 | 5% |
| September | 6,005 | 271 | 5% |
| October | 7,342 | 510 | 7% |
| November | 6,696 | 470 | 7% |
| December | 6,309 | 366 | 6% |

Source: DCF data

## Adoption

| Quantitative or Qualitative Measure | 26. Adoption Local Office Caseloads: Local offices will have an average caseloads for Adoption workers of no more than 15 children per worker. |
|---|---|
| Performance Target | 95% of Local Offices will have an average caseload of no more than 15 children per Adoption worker. |

---

[113] Data are provided for investigations assigned within five days of intake receipt date and does not reflect additional assignments to an investigation after the first five days. DCF conducted a review of assignments to non-caseload carrying staff in NJ SPIRIT and found that some investigations had been re-assigned to caseload carrying workers after the initial five days. As a result, there is potential for the percentage of investigations assigned to non-caseload carrying staff to be lower than six percent.
[114] This includes Permanency, Adoption, Impact and Advocacy Center caseload carrying workers.

| Quantitative or Qualitative Measure | 27. Individual Worker Adoption Caseloads: Individual Adoption worker caseloads shall be no more than 15 children per worker. |
|---|---|
| Performance Target | 95% of individual Adoption workers shall have a caseload of no more than 15 children per month. |

### Performance as of December 31, 2017:

Performance data for July through December 2017 show that 97 percent of Local Offices and 98 percent of individual workers[115] continued to maintain the adoption caseload standard during this period.

Among the 123 workers who participated in the phone interviews conducted by Monitor staff for caseload verification, 15 were Adoption workers. One of the 15 Adoption workers interviewed reported a caseload of 16 children exceeding caseload standards at some point during the monitoring period of July through December 2017.

### Permanency

| Quantitative or Qualitative Measure | 4. Permanency Local Office Caseloads: Local offices will have an average caseloads for Permanency workers of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |
|---|---|
| Performance Target | 95% of Local Offices will have an average caseload of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |

| Quantitative or Qualitative Measure | 5. Individual Worker Permanency Caseloads: Individual Permanency worker caseloads shall be (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |
|---|---|
| Performance Target | 95% of individual Permanency workers shall have a caseload of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |

### Performance as of December 31, 2017:

Performance data for July through December 2017 show that 100 percent of Local Offices and 100 percent of individual workers[116] continued to maintain the permanency caseload standard during this period.

Among the 123 workers who participated in telephone interviews conducted by Monitor staff for caseload verification, 25 were Permanency workers. Two (8%) of the 25 Permanency workers interviewed reported a caseload of 12 children in out-of-home placement and 16 families, exceeding the caseload standard at some point during the monitoring period of July through December 2017.

---

[115] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six month monitoring period.
[116] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six month monitoring period.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 81*

### Institutional Abuse Investigation Unit (IAIU)

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 3.  Individual Worker IAIU Caseloads: individual IAIU worker caseloads shall be (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. |
| **Performance Target** | 95% of individual IAIU workers shall have a caseload (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. |

*Performance as of December 31, 2017:*

DCF data show 100 percent of individual workers maintained the IAIU caseload standard for the period of July through December 2017.

### Supervisory Ratio

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 2.  Supervisor/Worker Ratio: Local Offices shall have sufficient supervisory staff to maintain a five worker to one supervisor ration. |
| **Performance Target** | 95% of Local Offices shall have sufficient supervisory staff to maintain a five worker to one supervisor ration. |

*Performance as of December 31, 2017:*

Performance data for July through December 2017 show that 100 percent of CP&P Local Offices had sufficient supervisors to maintain ratios of five workers to one supervisor. The Monitor verified the state's reported information about supervisor/worker ratios by asking all 123 workers who participated in the telephone interviews about the size of their units for the month of December 2017; 120 (98%) workers reported being in units of five or fewer workers with one supervisor.

## M. DEPUTY ATTORNEYS GENERAL STAFFING

| Quantitative or Qualitative Measure | 7.  DAsG Staffing: The State will maintain adequate DAsG staff potions and keep positions filled. |
|---|---|
| Performance Target | DCF will maintain adequate staffing levels at the DAsG office. |

*Performance as of December 31, 2017:*

As of December 31, 2017, 134 Deputy Attorneys General (DAsG) staff positions assigned to work with DCF were filled. Of those, four DAsG were on full time leave. Thus, there are a total of 130 (97%) available DAsG. DCF reports that in addition to these positions, DAsG outside of the DCF Practice Group have dedicated some of their time to DCF matters. DCF continues to meet the SEP standard for this measure.

## N.  ACCOUNTABILITY THROUGH QUALITATIVE REVIEW AND THE PRODUCTION AND USE OF ACCURATE DATA

### *QUALITATIVE REVIEW*

New Jersey's Qualitative Review (QR) is an assessment of the status of children, youth and families, the status of practice and the functioning of systems in each of the counties. The protocol and process used for the QR are aligned with DCF's Case Practice Model. Select QR results related to both Child/Youth and Family Status and Practice/System Performance are also used to report on several SEP requirements included in this report, three of which are designated Outcomes *To Be Achieved*: Quality of Teaming (SEP IV.B.20), Quality of Case Plans (SEP IV.D.23) and Services to Support Transition (SEP IV.J.44); and two of which are designated Outcomes *To Be Maintained*: Educational Needs (SEP III.G.11) and Quality of Case Planning and Services for Older Youth (SEP IV.K.46).

When conducting a QR involving children/youth under age 18, the legal guardian is asked to give informed consent for participation in the QR. Trained review teams of two persons including DCF staff, community stakeholders and staff from the Monitor's office review CP&P case records and interview as many people as possible who are involved with the children/youth and their families. The results from reviews provide critical qualitative data on child/youth and family status and practice/system performance. A rigorous quality review process is in place and is an important part of each review.

At the conclusion of each week of the QR, DCF's Office of Performance, Management and Accountability (OPMA) works with staff in each county, through its Office of Quality, to develop a Performance Improvement Plan (PIP) with short and long term goals to strengthen practice. The Office of Quality approves each PIP, aggregates results and shares them with leaders across DCF's divisions. Findings from the QRs are incorporated into existing training and supervisory tools and used to identify systemic opportunities for improvement. This monitoring period, the Monitor attended New Jersey's first QR Reviewer Workshop, "Sharing Information," provided to staff in order to improve documentation of the review process.

During CY 2017, using the new QR protocol developed in CY 2015, DCF reviewed 193 cases from 11 counties.[117] Table 10 provides the gender, age and racial and ethnic demographics of the 193 children/youth. Forty-eight of the children/youth were living with a parent at the time of the review and 145 of them lived with a relative or non-relative resource parent.

---

[117] DCF's QR protocol reviews cases in every county over a two year period. In CY 2017, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex and Warren counties. In CY 2016, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem and Union counties.

**Table 10: Qualitative Review: Gender, Age and Race/Ethnicity Demographics**
**(January – December 2017)**

| Gender | Number of Cases | Percentage of Cases* |
|---|---|---|
| Male | 95 | 49% |
| Female | 98 | 51% |
| **Total** | 193 | 100% |
| **Age** | **#** | **%** |
| 4 years or less | 70 | 36% |
| 5-9 years | 46 | 24% |
| 10-13 years | 31 | 16% |
| 14 -17 years | 13 | 7% |
| 18-21 years | 33 | 17% |
| **Total** | 193 | |
| **Race/Ethnicity** | **#** | **%** |
| White/Caucasian | 147 | 54% |
| African American | 62 | 23% |
| Hispanic | 59 | 22% |
| Native Hawaiian | 0 | 0% |
| American Indian | 2 | <1% |
| Asian | 4 | 1% |

Source: DCF data
*Percentages might not equal 100% due to rounding.

DCF reports that 1,839 individuals were interviewed across the state to inform the QR data for this reporting period. The informants for the QR include CP&P and Child Health Unit staff, biological parents, others who the children/youth or parents identified as supportive, relative and non-relative resource parents, education providers, mental health and legal professionals, substance abuse treatment providers and children/youth.[118]

Reviewers evaluate the child/youth and family's status on a range of indicators and rate whether the status was acceptable or unacceptable. See Table 11 for the results on each Child/Youth and Family status indicator for all cases for January through December 2017. Child/Youth and Family status indicators cover key areas of safety, stability in school, living arrangement, learning and development and physical health of the child. The *overall child and family status* was rated acceptable in 174 (90%) of cases reviewed, with separate ratings on specific child and family status indicators ranging from 62 percent (*family functioning and resourcefulness*) to 99 percent (*safety in other settings*).

---

[118] Interviews are usually conducted individually with participants, either by phone or in person. All efforts are made to see children/youth in the setting in which they reside.

**Table 11: Qualitative Review: Child/Youth and Family Status Results**
**(January – December 2017)**

| Child/Youth & Family Status Indicators | Number of Applicable Cases | Number of Acceptable Cases | Percentage of Acceptable Cases |
|---|---|---|---|
| Safety at Home | 193 | 186 | 96% |
| Safety in other Settings | 193 | 192 | 99% |
| Stability at Home | 193 | 161 | 83% |
| Stability in School | 102 | 95 | 93% |
| Living Arrangement | 193 | 182 | 94% |
| Family Functioning & Resourcefulness | 189 | 118 | 62% |
| Progress towards Permanency | 193 | 135 | 70% |
| Physical Health of the Child | 193 | 189 | 98% |
| Emotional Well-Being | 193 | 180 | 93% |
| Learning & Development, Under Age 5 | 69 | 65 | 94% |
| Learning & Development, Age 5 & older | 90 | 83 | 92% |
| **OVERALL Child & Family Status** | **193** | **174** | **90%** |

Source: DCF data

Table 12 shows the results of the QR ratings for practice and system performance indicators from reviews conducted January through December 2017. As with the child/youth and family status indicators, reviewers evaluated whether performance was acceptable or unacceptable. This is the second annual report measuring indicators under DCF's new QR process and protocol.[119]

The *overall practice/system performance* indicator was rated acceptable in 61 percent (118 of 193) of cases, with separate ratings on specific indicators ranging from 25 percent (*assessment of fathers*) to 95 percent (*provision of health care services*). Ratings for the SEP measures Quality of Teaming (SEP IV.B.20), which consists of the *family teamwork and coordination* indicator (59%), Services to Support Transition (SEP IV.J.44), which consists of the *successful transitions* indicator (59%) and Quality Case Planning (SEP IV.D.23), which consists of the *case planning* (57%) and *tracking and adjusting* (68%) indicators remain below acceptable standards.

---

[119] In CY 2015 DCF updated key portions of the state's QR process and protocol, as described in Monitoring Report XVIII. Changes to the QR protocol include: (1) combination of *team functioning* and *team formation* indicators into one indicator, *teamwork and coordination* (2) exclusion of the *overall* indicator for all practice performance indicators (3) rating mothers and fathers separately in the practice performance indicators (4) removal of the *family supports* indicator for the practice performance indicators, and (5) replacement of the *transitions and life adjustment* indicator with *successful transitions* indicator.

**Table 12: Qualitative Review: Practice/System Performance Results
(January – December 2017)**

| Practice/System Performance Indicators | | # Cases Applicable | # Cases Acceptable | % Acceptable |
|---|---|---|---|---|
| Engagement | Child/Youth | 114 | 102 | 89% |
| | Mother | 130 | 75 | 60% |
| | Father | 112 | 45 | 40% |
| | Resource Family | 114 | 101 | 89% |
| Family Teamwork | Teamwork & Coordination | 145 | 86 | 59% |
| Assessment & Understanding | Child/Youth | 193 | 154 | 78% |
| | Mother | 130 | 46 | 35% |
| | Father | 112 | 28 | 25% |
| | Resource Family | 114 | 99 | 87% |
| Case Planning Process | | 193 | 110 | 57% |
| Plan Implementation | | 193 | 123 | 64% |
| Tracking & Adjusting | | 193 | 131 | 68% |
| Provision of Health Care Services | | 192 | 182 | 95% |
| Resource Availability | | 193 | 170 | 88% |
| Family & Community Connections | Mother | 81 | 60 | 74% |
| | Father | 66 | 34 | 55% |
| | Siblings | 34 | 27 | 79% |
| Successful Transitions | | 128 | 75 | 59% |
| Long Term View | | 193 | 103 | 53% |
| **OVERALL Practice/System Performance** | | **193** | **118** | **61%** |

Source: DCF data

QR performance in CY 2017 compared to CY 2016, though based on a different cohort of counties, [120] demonstrates improvement on many Practice/System Performance indicators, such as *teamwork and coordination* moving from 49 percent to 59 percent, but declined in performance on the *successful transitions* indicator from 66 percent to 59 percent. Some Child/Youth and Family Status indicators, such as *family functioning and resourcefulness* and *learning and development under age 5* have also declined by several percentage points, though overall performance for those indicators remain high.

---

[120] DCF's QR protocol reviews cases in every county over a two year period. Thus, based on the sample plan, annual performance comparisons reflect cases pulled from two sets of counties.

## O.  NEEDS ASSESSMENT

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 21.  <u>Needs Assessment</u>: The State shall regularly evaluate the needs for additional placements and services to meet the needs of children in custody and their families, and to support intact families and prevent the needs for out-of-home care. Such needs assessments shall be conducted on an annual, staggered basis that assures that every county is assessed at least once every three years. |
| **Final Target** | The State shall develop placements and services consistent with the findings of these needs assessments. |

DCF, in partnership with the Institute for Families at Rutgers University School of Social Work (IFF), has been engaged in a multi-year Needs Assessment process to identify the strengths and needs of families with children at risk of entering out-of-home placement as well as those already in care. A detailed description of DCF's Needs Assessment process is available in previous monitoring reports, and DCF's three interim reports are available on the DCF website.[121] In sum, Phase I involved a review of DCF internal reports and assessments completed by DCF and its partners from CY 2008 to CY 2014. Phase II involved an analysis of the findings from Phase I and the identification of seven areas of need: caregiver mental health, caregiver substance abuse, child mental health, child substance abuse, poverty, housing and domestic violence.[122]

Between July and December 2017, in order to further understand the needs and potential gaps in services for children, youth and families involved or at risk of involvement with DCF experience, researchers at the Child Welfare and Well-Being Research Unit at Rutgers School of Social Work conducted almost 2,000 surveys with CP&P staff, including (a) intake workers and permanency workers (637); (b) parents from families of origin, including those with children in the home (391) and those placed out-of-home (185); and (c) resource parents providing out-of-home care (739). DCF published its report regarding these surveys in its *DCF Needs Assessment 2018 Report #3: Survey Findings and Synthesis*.[123] The survey participants were asked to evaluate the families' needs in eight major domains: housing, family poverty, domestic violence, caregiver mental health, caregiver substance use, parenting skills, child mental health and child substance use. Needs of and services used by families involved with CP&P were assessed by county for the eight domains. CP&P staff were asked to estimate the percentage of families on their caseload in the last 30 days with needs involving each of the eight domains. Parents from families of origin and resource parents were asked to describe their needs since the CP&P case was opened.

In addition to data on the referral to and use of services among parents and resource parents, data on barriers to receiving services were also collected, as well as data on whether the services received were helpful.

---

[121] To see DCF's Needs Assessment Interim Reports from January 2015, March 2016, and April 2017, go to: http://www.nj.gov/dcf/childdata/protection/

[122] During Phase III of the Needs Assessment process, Rutgers identified three additional domains: justice system-involved children and caregivers, challenging populations (defined as populations especially challenging to serve across several need domains, including low-income and undocumented families) and multi-need, frequent contact families.

[123] To see DCF's Final Needs Assessment 2018 Report #3: Survey Findings and Synthesis, go to: http://www.nj.gov/dcf/childdata/protection/DCF.Needs.Assessment.Phase.IV.Report-March2018.pdf.

DCF reported the following key findings from the surveys:

- The most common reported needs were related to poverty, caregiver substance abuse and caregiver mental health;
- The services most frequently received were related to caregiver mental health, parenting skills and caregiver substance abuse treatment;
- The most common barriers to services for families were related to poverty, eligibility for affordable housing and accessibility of housing;
- Families generally indicated that the services they received were helpful.

Information collected from the surveys raises questions concerning the alignment between needs and available services by county for families involved with CP&P. DCF recognizes that information obtained from Phase III and Phase IV of the Needs Assessment process at times offers contradictory information and poses a limitation to the state's capacity to fully document the availability of services. Further, limitations regarding the survey methodology, including the very low response rate for parents with children both in- and out-of-home, and the survey having been available only in English, present difficulties for accurately interpreting the data.

Despite some of the limitations, the Monitor agrees with DCF's conclusion that the Needs Assessment offers insight into the needs families involved with CP&P face, and that ongoing assessment will be necessary to monitor and measure progress. More work is necessary to more precisely identify whether the services offered in each county in the state adequately address the needs of families. Additional efforts to collect more data from families, including Spanish-speaking families, will be important. The SEP's Needs Assessment requirements are ongoing in that needs in each county need to be reassessed every three years.

### P.  FISCAL YEAR BUDGET

Governor Murphy's proposed FY 2019 budget, which is currently before the legislature and expected to be formalized in June 2018, maintains funding for programs and services related to the core mission of DCF. The budget, effective July 1, 2018, includes $1.15 billion in state funds. The budget includes a $3.7 million increase for Mobile Response and Stabilization Services within the Children's System of Care, as well as $750,000 for the Displaced Homemaker program, which will contribute to five new programs and a statewide expansion. Commissioner Norbut Beyer has testified in support of the proposed allocations, which include funding for all of DCF's budget requests.

Though the total allocations appear as a decrease in funding for DCF, some of this is due to technical budget adjustments. For example, there is an apparent loss of funding for treatment and prevention services related to the opioid epidemic, which has been replaced by a larger allocation of anti-opioid funding in the budget for the Department of Health, a portion of which will be allocated to support DCF programs. Even though the budget would result in a slight net state budget decrease (the FY 2018 budget included state funds of $1.19 billion), it does include a net increase of $2.2 million for CP&P Independent Living, Family Support Services, and Subsidized Adoption accounts. Of note, the budget includes an investment of $3 million to support the purchase of 550 additional state cars in order to improve the ability of staff to serve children, youth and families.

## APPENDIX: A
## Glossary of Acronyms Used in the Monitoring Report

**CHU:** Child Health Unit

**CIACC:** Children's Interagency Coordinating Council

**CP&P:** Division of Child Protection and Permanency

**CPM:** Case Practice Model

**CPS:** Child Protective Services

**CQI:** Continuous Quality Improvement

**CSOC:** Children's System of Care

**CSSP:** Center for the Study of Social Policy

**CWS:** Child Welfare Services

**DAsG:** Deputy Attorneys General

**DCF:** Department of Children and Families

**FAFS:** Foster and Adoptive Family Services

**FSC:** Family Success Centers

**FTM:** Family Team Meeting

**IAIU:** Institutional Abuse Investigative Unit

**LGBTQI:** Lesbian, Gay, Bisexual, Transgender, Questioning or Intersex

**KLG:** Kinship Legal Guardian

**LOM:** Local Office Manager

**MSA:** Modified Settlement Agreement

**OAS:** Office of Adolescent Services

**OMPA:** Office of Performance Management and Accountability

**ORF:** Office of Resource Family

**PIP:** Performance Improvement Plan

**QR:** Qualitative Review

**RFP:** Request for Proposal

**SCR:** State Central Registry

**SIBS:** Siblings in Best Placement Settings

**USDA:** United States Department of Agriculture

**YAB:** Youth Advisory Board

**APPENDIX: B**



New Jersey Department of Children and Families

November 3, 2017

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXI Report for Charlie and Nadine H. v. Murphy*

*July 18, 2018*
*Page 92*