June 19, 2019

CHARLIE AND NADINE H. V. MURPHY

PROGRESS OF THE NEW JERSEY
DEPARTMENT OF CHILDREN AND FAMILIES

MONITORING PERIOD XXIII
(JULY 1 – DECEMBER 31, 2018)

**Center** *for the*
**Study** *of*
**Social Policy**
*Ideas into Action*

1575 Eye Street NW, #500
Washington, DC 20005
www.CSSP.org

**Progress of the New Jersey
Department of Children and Families**

**Monitoring Period XXIII Report for**
*Charlie and Nadine H. v. Murphy*
**July 1 – December 31, 2018**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   SUMMARY OF PERFORMANCE DURING JULY THROUGH DECEMBER 2018 .... 5

III.  CHILD AND FAMILY OUTCOMES AND CASE PRACTICE PERFORMANCE
MEASURES .................................................................................................... 10

IV.   FOUNDATIONAL ELEMENTS ...................................................................... 34
   A.  CASE PRACTICE MODEL – SEP Section II.B.................................................. 34
   B.  APPROPRIATE PLACEMENTS – SEP Section II.D .................................... 35
   C.  SERVICE ARRAY – SEP Section II.E ........................................................ 36

V.    SUSTAINABILITY AND EXIT PLAN PERFORMANCE MEASURES *TO BE
ACHIEVED* AND *TO BE MAINTAINED* .......................................................... 37
   A.  INVESTIGATIONS ................................................................................ 37
   B.  FAMILY TEAM MEETINGS .................................................................. 40
   C.  QUALITY OF CASE AND SERVICE PLANNING ................................... 45
   D.  EDUCATION ........................................................................................ 48
   E.  MAINTAINING CONTACT THROUGH VISITS ...................................... 50
   F.  PLACEMENT ........................................................................................ 55
   G.  MALTREATMENT OF CHILDREN AND YOUTH .................................. 58
   H.  TIMELY PERMANENCY ...................................................................... 62
   I.  CHILD HEALTH UNITS ........................................................................ 67
   J.  OLDER YOUTH .................................................................................... 68
   K.  SERVICES TO SUPPORT TRANSITION ................................................ 71
   L.  CASELOADS ........................................................................................ 73
   M.  DEPUTY ATTORNEYS GENERAL STAFFING ...................................... 80

i

N.   ACCOUNTABILITY THROUGH QUALITATIVE REVIEW AND THE
PRODUCTION AND USE OF ACCURATE DATA ............................................................ 81

O.   NEEDS ASSESSMENT ...................................................................................... 86

P.   FISCAL YEAR BUDGET ................................................................................... 87

APPENDIX: A ............................................................................................................. 88

APPENDIX B ............................................................................................................... 89

# LIST OF TABLES

Table 1: Charlie and Nadine H. Child and Family Outcome and Case Practice Performance Measures ............................................................................................................................. 11

Table 2: CP&P Individual Worker Caseload Standards ............................................................. 73

Table 3: Number of CP&P Investigations and Secondary Intake ............................................... 76

Table 4: Percentage of CP&P Investigations Assigned to Non-Caseload ................................... 78

Table 5: Percentage of CP&P Investigations Assigned to Non-Intake ....................................... 78

Table 6: Qualitative Review: Gender, Age and Race/Ethnicity Demographics ......................... 82

Table 7: Qualitative Review: Child/Youth and Family Status Results ....................................... 83

Table 8: Qualitative Review: Practice/System Performance Results ......................................... 84

# LIST OF FIGURES

Figure 1: Qualitative Review (QR) Cases Rates Acceptable on Teamwork and Coordination ... 44

Figure 2: Qualitative Review (QR) Cases Rated Acceptable on Quality of Case Plans and Components of Placement ........................................................................................................... 47

Figure 3: Qualitative Review (QR) Cases Rated Acceptable on Educational Needs .................. 49

Figure 4: Percentage of Families Who Had at Least Twice per Month Face-to-Face Contact with Caseworker when the Goal is Reunification (July – December 2018) ........................................ 52

Figure 5: Percentage of Children Who Had at Least Monthly Visits with Siblings, for Children not Placed with Siblings (July – December 2018) ..................................................................... 54

Figure 6: Percentage of Children who were Victims of Second Substantiated Allegation within 12 Months of Remaining at Home after First Substantiated Allegation (CY 2009 – CY 2017) .. 59

Figure 7: Percentage of Children who were Victims of Substantiated Allegation within 12 Months after Reunification (CY 2008 – CY 2015) .................................................................... 60

Figure 8: Percentage of Children Who Re-Entered Custody within One Year of Date of Exit (CY 2009 – CY 2016) ...................................................................................................................... 61

Figure 9: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 12 Months of Entering Foster Care (CY 2010 – CY 2017) ........................ 63

Figure 10: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 24 Months of Entering Foster Care (CY 2010 – CY 2016) ..................... 64

Figure 11: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 36 Months of Entering Foster Care (CY 2010 – CY 2015) ..................... 65

Figure 12: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 48 Months of Entering Foster Care (CY 2010 – CY 2014) ..................... 66

Figure 13: Qualitative Review (QR) Cases Rated Acceptable on Quality of Case Planning and Services for Older Youth ........................................................................................................... 69

Figure 14: Qualitative Review (QR) Cases Rated Acceptable on Successful Transitions .......... 72

# I.        INTRODUCTION

The Center for the Study of Social Policy (CSSP) was appointed in 2006 by the Honorable Stanley R. Chesler of the United States District Court for the District of New Jersey as Federal Monitor of the class action lawsuit *Charlie and Nadine H. v. Murphy*, aimed at improving outcomes for children, youth and families served through New Jersey's child welfare system. As the Monitor, CSSP has been charged with independently assessing New Jersey's compliance with the goals, principles and outcomes of the Court Order entered in 2003; the Modified Settlement Agreement (MSA) entered in July 2006; and now the Sustainability and Exit Plan (SEP) entered on November 4, 2015, that supersedes the MSA. This is the seventh monitoring report measuring progress under the SEP and includes performance data for the period July 1 through December 31, 2018.[1]

**Monitoring Methodology**

The Monitor's public reports cover six-month periods.[2] The primary sources of information on New Jersey's progress are quantitative and qualitative data supplied by the Department of Children and Families (DCF) and independently validated by the Monitor. DCF provides access to staff and documents to enable the Monitor to verify performance.

DCF's capacity to accurately collect and analyze data and make it regularly available to the public has significantly grown over the past several years. In assessing progress, the Monitor first looks to the state's data and validates its accuracy. The Monitor also retains the authority to engage in independent data collection and analysis where needed. DCF's intent is to continue to expand the data that it publishes on its public website,[3] as well as on its publicly accessible New Jersey Child Welfare Data Hub, which was developed in collaboration with Rutgers University.[4] The Data Hub, launched in November 2016, allows users to create customized charts and graphs using New Jersey's child welfare data, and incorporates information from the formerly produced quarterly DCF Demographics Report.

DCF has been working to produce a comprehensive annual public report that will be made widely available, which will provide data and information about services universally accessible for families in New Jersey, as well as those designed solely for families involved with CP&P.

Reports that DCF currently publishes on its website include:

- Commissioner's Monthly Report[5] – *Current and produced monthly*. This report gives a broad data snapshot of various DCF services. The report includes information from Child Protection & Permanency (CP&P), Office of Adolescent Services (OAS), Institutional Abuse Investigation Unit (IAIU), Children's System of Care (CSOC), Family & Community Partnerships and the Division on Women.

- Screening and Investigations Report[6] – *Current and produced monthly*. This report details State Central Registry (SCR) activity, including data regarding calls to the Child Abuse and Neglect Hotline, assignments to CP&P offices and trends in Child Protective Services (CPS) Reports and Child Welfare Services (CWS) Referrals.

---

[1] Copies of all Monitoring Reports can be found at: https://cssp.org/our-work/projects/our-projects/class-action-litigation-new-jerseys-department-of-children-and-families/
[2] The exceptions to this time frame were Monitoring Period XIII, which covered July 1, 2012 through March 31, 2013; Monitoring Period XIV, which covered April 1 through December 31, 2013; and Monitoring Period XVII, which covered January 1 through December 31, 2015.
[3] To see DCF's public website, go to: http://www.state.nj.us/dcf/about/
[4] To see the New Jersey Child Welfare Data Hub, go to: https://njchilddata.rutgers.edu/#home
[5] To see all Commissioner's Monthly Reports, go to: http://www.nj.gov/dcf/childdata/continuous/
[6] To see all Screening and Investigations Reports, go to: http://www.nj.gov/dcf/childdata/protection/screening/

- Workforce Report[7] – *Last report dated January 2018*. This report provides information regarding the demographics and characteristics of current workers, as well as a variety of indicators of workforce planning and development, using fiscal year (FY) (July 1 – June 30) data. Going forward, elements of this report will be incorporated into the new comprehensive annual report described above.

- Children's Interagency Coordinating Council Report[8] – *Current and produced monthly*. This report details referral and service activity for CSOC. It also includes demographics, referral sources, reasons, resolutions and services provided.

- New Jersey Youth Resource Spot[9] – *Ongoing and updated as relevant*. This website offers the latest resources, opportunities, news and events for young people. This site includes information about the Youth Advisory Network, as well as additional resources available in each county and statewide.

- DCF Needs Assessment– *Previously produced annually. Last report dated May 2018*. During its multi-year needs assessment process, DCF produced annual reports on its website and reported twice annually to the Monitor.[10] The most recent report, entitled *DCF Needs Assessment 2018 Report #3: Survey Findings and Synthesis*, updates interim findings to identify the resources needed to serve families with children at risk for entering out-of-home placement and those already in placement.[11] The SEP requires reports to evaluate the need for additional placements and services to meet the needs of children, youth and their families involved with DCF, with each county assessed at least once every three years. During the monitoring period, DCF continued designing its new Needs Assessment process, which will become part of its new continuous quality improvement processes for each county.

The Monitor engaged in the following data verification activities for the period of July to December 2018.

- ### *Caseload Data Verification*

  The Monitor conducted a telephone survey in July, August and October 2018 of 150 randomly selected caseworkers to verify their individual caseloads during the monitoring period. Findings from this review are discussed in Section V.L – Caseloads – of this report.

- ### *Housing, Employment and Education Status Review for Older Youth Exiting Care*

  The Monitor collaborated with DCF to review case records of 61 youth age 18 to 21 who exited care between July 1 and December 31, 2018 without achieving permanency. The review focused on the housing, education and employment status of these youth. Findings from the review are discussed in Section V.J – Older Youth – of this report.

- ### *Family Team Meeting Data Review*

  The Monitor collaborated with DCF to review experiences of 210 children and families to verify instances in which workers determined that Family Team Meetings (FTMs) were not required because

---

[7] To see DCF's Workforce Report: 2016-2017 Updates, go to http://www.nj.gov/dcf/childdata/exitplan/NJ.DCF.Workforce.Report-FY17.pdf. To see DCF's Workforce: Preliminary Highlights 2014-2015 Report, go to: http://www.state.nj.us/dcf/childdata/orgdev/NJ.DCF.Workforce.Report_2015.pdf
[8] To see all Children's InterAgency Coordinating Council Reports, go to: http://www.nj.gov/dcf/childdata/interagency/
[9] To see New Jersey's Youth Resource Spot, go to: http://www.njyrs.org/
[10] To see the prior CP&P Needs Assessment reports, go to: http://www.nj.gov/dcf/childdata/protection/
[11] To see New Jersey's CP&P Final Needs Assessment 2018 Report #3: Survey Findings and Synthesis, go to: http://www.nj.gov/dcf/childdata/protection/DCF.Needs.Assessment.Phase.IV.Report-March2018.pdf

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 2*

parents were unavailable, missing, or declined the meeting. DCF and the Monitor reviewed all cases of documented exceptions to the FTM requirement in each month of the monitoring period. Further discussion of current performance on these measures is included in Section V.B – Family Team Meetings – of this report.

- **_Visits Data Review_**

The Monitor collaborated with DCF to review case records of 259 children from October and November 2018 in which workers documented that caseworker contacts with parents with a reunification goal (SEP IV.F.28) were not required because a parent was unavailable or there were other circumstances outside of their control that prevented visits from occurring. The Monitor also collaborated with DCF to review records of 189 children from October and November 2018 in which workers documented that sibling visits (SEP IV.F.31) were not required because a child declined, a sibling was unavailable or there were other circumstances outside of their control that prevented a visit. Findings are discussed in Section V.E – Visits – of this report.

- **_Other Monitoring Activities_**

The Monitor interviewed and/or visited multiple internal and external New Jersey child welfare system stakeholders, including staff at all levels, contracted service providers, birth parents and advocacy organizations. The Monitor also attended DCF's ChildStat meetings, Area Director meetings, and adolescent practice forums. The Monitor participates as reviewers in almost every scheduled statewide Qualitative Review (QR) throughout the year. DCF has fully cooperated with the Monitor in notifying Monitor staff of schedules and facilitating their participation in relevant activities.

**Structure of the Report**

Section II provides an overview of the state's accomplishments and challenges during this monitoring period. Section III provides summary performance data on each of the outcomes and performance measures required by the SEP in Table 1: *Charlie and Nadine H. v. Murphy* Child and Family Outcome and Case Practice Performance Measures. Section IV provides information related to the SEP Foundational Elements.[12] Section V provides more detailed data and discussion of performance on SEP Outcomes *To Be Maintained* and Outcomes *To Be Achieved* in the following areas:

- Investigations of alleged child maltreatment (Section V.A);
- Implementation of DCF's Case Practice Model; including Family Team Meetings, case planning and visits (Sections V.B, V.C & V.E);
- Educational engagement for children in out-of-home care (Section V.D);
- Placement of children in out-of-home settings (Section V.F);
- Efforts to achieve permanency for children either through reunification with family, legal guardianship or adoption (Section V.H);
- Provision of health care services to children, youth and families (Section V.I);
- Services to older youth (Section V.J);
- Caseloads (Section V.L);
- Deputy Attorneys General Staffing (Section V.M);
- Accountability through the Qualitative Review and the production and use of accurate data (Section V.N);
- Needs Assessment (Section V.O); and
- Fiscal Year 2019 budget (Section V.P).

---

[12] The Foundational Elements requirements of the SEP intentionally recognize the state's accomplishments in early implementation of the MSA. At the Monitor's discretion, based on a concern that a Foundational Element has not been sustained, the Monitor may request additional data. If the data demonstrate a persistent problem, in the Monitor's discretion, the state will propose and implement corrective action (SEP.II).

## II.    SUMMARY OF PERFORMANCE DURING JULY THROUGH DECEMBER 2018

This monitoring period is characterized by continued analysis and growth for the Department of Children and Families (DCF). Based on the assessments and exploration conducted in her early months in the role, Commissioner Christine Norbut Beyer and her team established a set of priorities and a new vision for DCF. These priorities include: (1) increasing placements with kin; (2) prevention of maltreatment; (3) staff health and wellness; and (4) more intentionally aligning all of the work of DCF with the Children's System of Care (CSOC) to improve mental health services and substance use treatment services to children and families in New Jersey, as well as services for youth with intellectual and developmental disabilities. Commissioner Beyer travelled across the state, engaging in town hall style meetings with approximately 500 parents and 50 youth from all 21 counties served by DCF, including biological parents; youth in care; kinship caregivers; families receiving behavioral health care, substance use treatment, or services for intellectual disabilities; resource parents; families receiving in-home and out-of-home services; and foster care alumni. Feedback from these sessions as well as data from Qualitative Reviews (QRs) and other forums informed the development of the Commissioner's new set of priorities. DCF is working with Rutgers University School of Social Work to identity themes from this listening tour and will prepare a written report of findings to be published in the summer of 2019.

Commissioner Beyer has continued to build her leadership team by naming Mollie Greene in February 2019 as Assistant Commissioner of the Children's System of Care (CSOC), the DCF division that serves children and adolescents with emotional and behavioral health care challenges and their families, children with developmental and intellectual disabilities and their families, and children with substance use challenges. Ms. Greene was formerly the DCF Director of Clinical Services where she led a broad portfolio of services connected to the health and behavioral health of children served by the Division. Also in February 2019, Niurca Louis was named the Assistant Commissioner for the Division of Family and Community Partnerships. Ms. Louis comes to DCF from Robin's Nest, Inc., a New Jersey private provider, where she served in a number of roles including Program Director for the Family Success Center, Director of Community Engagement and Vice President of Prevention Services.

DCF also created a new office – the Office of Family Voice (OFV) – in November 2018. The purpose of the OFV is to promote and facilitate the inclusion of youth and family voice in decisions involving policies and practice that impact their lives. During the monitoring period and as part of developing its strategic plan, the OFV conducted informational interviews with the DCF programs that currently collaborate with parents, youth, resource parents and kinship care providers, as well as with external stakeholders, such the Birth Parent National Network and the Parents Action Network.

In an effort to address retention and workforce development, DCF leadership is placing special emphasis on workforce well-being. During the monitoring period, Alia Innovations, Inc., a not-for-profit dedicated to re-designing systems to preserve family bonds, began meeting with senior- and middle-level managers to address workforce well-being and to create a more collaborative working environment internally and with external partners to better coordinate services for children, youth and families. Alia began offering micro-learning sessions – short stress-reducing opportunities – to all staff to promote individual and organizational well-being. In addition, in December 2018, DCF began work with Collaborative Safety, LLC, an organization that assists human service agencies in making use of human factors analysis to effectively learn from critical incidents so they are reliably prevented in the future. DCF intends to work with Collaborative Safety to create an organizational culture that supports emotional and psychological safety for workers so they can better address the needs of the families they serve.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 5*

DCF's leadership team has also expressed its commitment to analyzing and addressing racial disproportionality and disparities in New Jersey's child welfare system. In August 2018, DCF, along with New Jersey's Administrative Office of the Courts (AOC), hosted a Children in Court Race Equity Summit, which brought together DCF leadership and staff of all levels, representatives from the judiciary, the Office of the Attorney General, the Office of Parent Representation, the Office of the Law Guardian and Court Appointed Special Advocates. Topics included a review of the data on racial disproportionality and disparity of children in placement, methods other states are using to address implicit bias and institutional racism, and the Court Improvement Program's strategic plan. Going forward, DCF will be working with a consultant to identify ways to reduce disproportionality and disparities in New Jersey.

A priority for DCF leadership in the coming months will be to continue to consider opportunities through federal legislation passed in February 2018 – *The Family First Prevention Services Act* (FFPSA) – to place children with family and provide services in the community to reduce the need for out-of-home placement.[13] The legislation establishes a new federal funding structure that allows states to be reimbursed for prevention services for up to 12 months to help "candidates for foster care" safely remain with their parents or relatives. FFPSA also provides financial incentives for reducing congregate care placements and requires child welfare group homes and congregate care facilities to meet new licensing and accreditation standards. DCF is examining the extent to which FFPSA can be leveraged to provide additional resources and services to candidates for foster care, expectant and parenting youth in care, families in which a parent has a substance use disorder, and older youth transitioning out of foster care. DCF has formed multiple workgroups to address the complexities involved in implementing FFPSA.

While keeping its focus on improving the quality of case practice, DCF maintained performance on each of the SEP Foundational Elements in such important areas as manageable caseloads for workers, training, and the provision of health care for children in out-of-home placement. DCF ended the monitoring period having met 42 of 48 SEP performance measures.[14,15] As discussed in more detail below, DCF newly met one of the remaining measures – monthly visits with siblings for children placed apart (SEP IV.F.31) – during this monitoring period.

Three of the remaining six Outcomes *To Be Achieved* are measured by New Jersey's Qualitative Review (QR) process, and performance on each continue to be below acceptable standards. Despite DCF leadership's focus on emphasizing that the *quality* of case planning and teaming, which is perhaps as or even more important than meeting timelines, progress on improving performance on both Quality of Case Plans (SEP IV.D.23) and Quality of Teaming (SEP IV.B.20) has been slow and there have not been significant changes since CY 2017.

---

[13] H.R.253 - Family First Prevention Services Act of 2017

[14] These measures include: Institutional Abuse Investigations Unit (IAIU) (III.A.1); Timeliness of Investigation Completion (60 days) (SEP IV.A.13); Timeliness of Investigation Completion (90 days) (SEP IV.A.14); Quality of Investigations (SEP IV.A.15); Initial Family Team Meeting (SEP IV.B.16); Subsequent FTMs within 12 months (SEP IV.B.17); Subsequent FTMs after 12 months – Reunification Goal (SEP IV.B.18); Subsequent FTMs after 12 months – Other than Reunification Goal (SEP IV.B.19); Needs Assessment (SEP IV.C.21); Initial Case Plans (SEP IV.D.22); Supervisor/Worker Ratio (III.B.2); IAIU Investigators Caseload (III.B.3); Permanency Workers (Local Offices) Caseload (III.B.4); Permanency Workers Caseload (III.B.5); Intake Workers (Local Offices) (SEP IV.E.24); Intake Workers (SEP IV.E.25); Adoption Local Office Caseload (SEP IV.E.26); Adoption Workers (SEP IV.E.27); Timeliness of Current Plans (III.C.6); Adequacy of DAsG Staffing (III.D.7); Child Health Units (III.E.8); Parent-Child Visits – weekly (SEP IV.F.29); Parent-Child Visits – bi-weekly (SEP IV.F.30); Sibling Visits (SEP IV.F.31); Caseworker Contacts with Children – New Placement/Placement Changes (III.F.9); Caseworker Contact with Children in Placement (III.F.10); Placing Siblings Together (SEP IV.G.32); Placing Siblings Together for Four or More Children (SEP IV.G.33); Recruitment of Placements for Sibling Groups of Four or More (SEP IV.G.34); Placement Stability for first 12 months in care (SEP IV.G.35); Placement Stability 13-24 Months in Care (SEP IV.G.36); Educational Needs (III.G.11); Abuse and Neglect of Children in Foster Care (III.H.12); Repeat Maltreatment (In-home) (SEP IV.H.37); Maltreatment Post-Reunification (SEP IV.H.38); Permanency within 12 Months (SEP IV.I.40); Permanency within 36 months (SEP IV.I.42); Permanency within 48 months (SEP IV.I.43); Independent Living Assessments (SEP IV.K.45); Quality of Case Planning and Services (SEP IV.K.46); Housing for Older Youth Exiting to Non-Permanency (SEP IV.K.47); and Employment/Education for Older Youth Exiting to Non-Permanency (SEP IV.K.48).

[15] Placing Siblings Together (SEP IV.G.32) did not meet the performance standard this monitoring period. The Monitor will wait to review data from the period January 1 through December 31, 2019 before recommending a change in categorization for this measure.

Results from the QR show that only 51 percent (100 of 195) of cases reviewed were rated acceptable on the Quality of Case Plans (SEP IV.D.23) and 58 percent (84 of 145) of cases reviewed rated acceptable on Quality of Teaming (SEP IV.B.20) between January and December 2018. Results from the QR on Services to Support Transition (SEP IV.J.44) indicate that 62 percent (73 of 118) of cases were rated acceptable; this is also not a significant shift in performance from CY 2017 or CY 2016, and well below the standard of 80 percent. The lack of progress on these measure reflects the overall quality of casework issues that the Department is working to improve with a renewed focus on DCF's Case Practice Model and, in particular, consistent quality casework practice. Prioritizing core case practice strategies and working with supervisors and staff to enhance their skills and attention to engagement, assessment and case planning with families will likely help to improve the QR results for all three measures.

In addition to the three measures related to the quality of case practice, DCF has not met performance standards related to caseworker contacts with family when the child's goal is reunification (SEP IV.F.28). Between July and December 2018, a range of 74 to 81 percent of applicable parents or other legally responsible family members were visited at least twice per month by a caseworker; performance on this measure continues to be below the 90 percent standard.

The final two measures DCF has not yet achieved are annual outcome measures, though one of them, timely permanency within 24 months (SEP IV.I.41), is within one percentage point of the standard and has remained close for multiple years. The other, regarding the rate of re-entry to placement within 12 months for children who are discharged to reunification, living with relatives, or guardianship (SEP IV.H.39), has not demonstrated much movement since 2010. DCF is taking a closer look at factors that contribute to re-entry to foster care to explore barriers to performance on this measure.

DCF's work to align its CQI efforts – in particular the QRs and ChildStat, discussed in some detail in this report – and its focus on embedding New Jersey's Case Practice Model (CPM) more concretely in child welfare practice, is anticipated to have a significant, positive affect on the remaining Outcomes *To Be Achieved*.

### *Family Team Meetings*

FTMs are an integral component of DCF's case practice and are used to bring families, providers, and formal and informal supports together to exchange information, participate in case planning, coordinate and follow up on services and examine and track progress toward accomplishing case plan goals. As discussed in Section V.B, the SEP includes five performance measures pertaining to FTMs, four of which have been previously met and designated as Outcomes *To Be Maintained*. DCF maintained satisfactory performance for these four measures this period, exceeding requirements for FTMs held within 45 days of a child's removal (SEP IV.B.16); for three additional FTMs after the initial meeting held within the first 12 months of placement (SEP IV.B.17); for at least three FTMs each year for children in care after 12 months with the goal of reunification (SEP IV.B.18); and for at least two FTMs each year for children in care after 12 months with a goal other than reunification (SEP IV.B.19). As mentioned above, the overall quality of teaming (SEP IV.B.20) remains an Outcome *To Be Achieved*, and is measured through a qualitative review process and reported on an annual basis.

### *Appropriate Placements and Services*

DCF continues to maintain a solid pool of placement resource homes and group settings to meet the needs of children in out-of-home care. As of December 31, 2018, 5,586 children were in out-of-home placement (468 fewer than at the end of June 2018), of which 5,255 were children between the ages of birth and 17, and 331 were between the ages of 18 and 21. Of the 5,586 children, 5,053 (90%) were placed in family-like settings: 2,965 children (53%) in non-kinship resource family homes, and 2,088 children (37%) in kinship homes. For

those in non-family settings, 441 children (8%) were placed in group and residential settings facilities and 92 children (2%) were in independent living programs.

Between July and December 2018, DCF licensed 612 new kinship and non-kinship resource family homes; of these newly licensed resource family homes, 359 (59%) were kinship homes and 253 (41%) were non-kinship homes. As of December 31, 2018 there were a total of 4,086 licensed resource family homes in the state, with a total bed capacity for 8,946 children. Of the total number of resource family homes, 1,289 were kin homes and 2,797 were non-kin homes. DCF's focus continues to be on identifying and recruiting more kinship homes, homes for large sibling groups and adolescents as described further in Section V.F.

### *Maintaining Contact with Children, Parents and Siblings*

Visits between children in foster care and their workers, parents and siblings are an essential element of successful child welfare practice. As discussed in Section V.E, there are six performance measures in the SEP related to visits, four of which have been previously met and designated as Outcomes *To Be Maintained*. For the first time this monitoring period, DCF's performance met the requirement for visits between siblings placed apart (SEP IV.F.31), an important accomplishment. It also maintained satisfactory performance with respect to the four SEP measures that had already been met, exceeding requirements for caseworker visits with children in both new and ongoing placements (SEP III.F.9 and III.F.10, respectively) and both weekly and biweekly visits between children and their parents (SEP IV.F.29 and IV.F.30, respectively). As mentioned above, DCF has not yet met the SEP performance standard for caseworker contacts with families with a reunification goal (SEP IV.F.28).

### *Services to Older Youth*

DCF has continued its work to improve the experiences of older youth in its care through the efforts of the Office of Adolescent Services (OAS). As discussed in Section V.J, the SEP includes four performance measures related to DCF's work with older youth, all of which were previously met and designated as Outcomes *To Be Maintained*. DCF maintained satisfactory performance this period with respect to the quality of case planning and services for older youth (SEP IV.K.46), and in ensuring youth age 14 to 18 engage in Independent Living Assessments (SEP IV.K.45). The Monitor was encouraged that, after a decline in performance in the last period, DCF again met the standards with respect to housing (SEP IV.K.47) and education and employment for youth exiting care without achieving permanency (SEP IV.K.48).

### *Continuous Quality Improvement*

DCF's new leadership team finalized its plan to reshape its various continuous quality improvement (CQI) efforts, formally aligning a number of its long-standing review processes including the Qualitative Review (QR), ChildStat, county Needs Assessments, and the federal Child and Family Service Review (CFSR). While these reviews and assessments have operated on four different schedules in the past, they are now being integrated in order to improve the Department's ability to obtain important and timely feedback on what is working and what is not, leading to steps to better meet the needs of children, youth and families in New Jersey.

Beginning in January 2019, the ChildStat forum now focuses more comprehensively on county-level practice rather than featuring a single case from one Local Office. The county-level practice that is reviewed at each ChildStat meeting incorporates the results of the county's most recent QR, as well as a targeted case record review by Local Office managers in that county, conducted within 30 days of the QR debrief. The new format is designed to facilitate direct dialogue between state and county-level leadership. Practice in each county will continue to be assessed every two years, following the QR schedule. A county-level CQI team, eventually

incorporating staff from the Children's System of Care (CSOC) and the county Human Service directors, will analyze and incorporate findings from the QR and ChildStat to develop a county-level PIP within 75 days of the ChildStat meeting. The goal of these changes is to leverage and learn from practice improvement efforts across the state to more comprehensively assess challenges, identify opportunities, and advance practice improvement.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 9*

## III.      CHILD AND FAMILY OUTCOMES AND CASE PRACTICE PERFORMANCE MEASURES

The child and family outcomes and case practice performance measures are 48 measures and Foundational Elements that assess the state's performance in meeting the requirements of the SEP (see Table 1). These performance measures cover the areas of child safety, permanency, service planning, child well-being and ongoing infrastructure development pertaining to core elements such as appropriate staffing, caseloads and training.

Many of the measures are assessed through a review of data from NJ SPIRIT[16] and SafeMeasures,[17] and, in some areas, these data are independently validated by the Monitor. Data are also provided through DCF's work with Rutgers University,[18] which assists with data analysis. With few exceptions, performance data provided in this report are as of December 2018.

---

[16] NJ SPIRIT is New Jersey's Statewide Automated Child Welfare Information System (SACWIS), a case management and financial system designed to support the daily work of caseworkers and supervisors within DCF.
[17] SafeMeasures is a data warehouse and analytical tool that allows tracking of critical child welfare indicators by worker, supervisor, Local Office, county and statewide. It is used by different levels of staff to track, monitor and analyze performance and trends in case practice and targeted measures and outcomes.
[18] DCF transferred this function from Hornby Zeller Associates, Inc. to Rutgers University in July 2017.

**Table 1:** *Charlie and Nadine H.* **Child and Family Outcome and Case Practice Performance Measures**
**(Summary of Performance as of December 31, 2018)**

| Table 1A: To Be Achieved | | | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2018 Performance[19]** | **December 2018 Performance[20]** | **Requirement Fulfilled (Yes/No)[21]** |
| *Family Teaming* | | | | | |
| IV.B.20 | Quality of Teaming | 75% of cases involving out-of-home placements that were assessed as part of the QR process will show evidence of both acceptable team formation and acceptable functioning. The Monitor, in consultation with the parties, shall determine the standards for quality team formation and functioning. | 59% of cases rated acceptable for the QR indicator *teamwork and coordination* (CY 2017). | 58% of cases rated acceptable for the QR indicator *teamwork and coordination* (CY 2018).[22,23] | No |

[19] In some instances, where the Monitor did not report mid-year data, the most recent annual data are included.
[20] In some instances where the Monitor does not have December 2018 data, the most recent data available are included.
[21] "Yes" indicates that, in the Monitor's judgment, based on presently available information, DCF has fulfilled its obligations regarding the requirement under the SEP. "No" indicates that, in the Monitor's judgment, DCF has not fulfilled its obligation regarding the SEP requirement.
[22] From January to December 2018, 58% (84 of 145) of applicable cases reviewed for Quality of Teaming were rated acceptable for the *teamwork and coordination* indicator.
[23] All in-home cases were excluded from this measure.

| | | | Table 1A: To Be Achieved | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2018 Performance[19] | December 2018 Performance[20] | Requirement Fulfilled (Yes/No)[21] |
| | | | *Case and Service Planning* | | |
| IV.D.23 | Quality of Case Plans | 80% of case plans shall be rated acceptable as measured by the QR process. The Monitor, in consultation with the parties, shall determine that standards for quality case planning. | 53% of cases rated acceptable for both QR indicators *child and family planning process* and *tracking and adjusting* (CY 2017). | 51% of cases rated acceptable for both QR indicators *child and family planning process* and *tracking and adjusting* (CY 2018).[24] | No |
| | | | *Visits* | | |
| IV.F.28 | Caseworker Contacts with Family When Goal is Reunification | 90% of families will have at least twice-per-month, face-to-face contact with their caseworker when the permanency goal is reunification. | In June 2018, 77% of applicable parents of children in custody with a goal of reunification had at least two face-to-face visits with a caseworker. Monthly range during January – June 2018 monitoring period: 76 to 80%. | In December 2018, 76% of applicable parents of children in custody with a goal of reunification had at least two face-to-face visits with a caseworker. Monthly range during July – December 2018 monitoring period: 74 to 80%.[25,26] | No |

[24] From January to December 2018, 51% (100 of 195) of applicable cases reviewed were rated acceptable for both *child and family planning process* and *tracking and adjusting* indicators; 55% (107 of 195) of cases were rated acceptable for *child and family planning process*; 70% (137 of 195) of cases were rated acceptable for *tracking and adjusting*.

[25] Monthly performance is as follows: July, 79%; August, 80%; September, 78%; October, 78%; November, 74%; December, 76%. Reported performance accounts for valid exceptions to the visits requirement.

[26] The Monitor and DCF completed a joint validation of a sample of two months in the monitoring period and found that exceptions were appropriately applied and documented in 67% of cases. Therefore, these data reflect exclusions from the universe of instances in which exceptions to the requirement for worker visits with parents were appropriately applied and documented.

| Table 1A: To Be Achieved | | | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2018 Performance[19] | December 2018 Performance[20] | Requirement Fulfilled (Yes/No)[21] |
| IV.F.31 | Child Visits with Siblings | 85% of children in custody who have siblings with whom they are not residing will visit those siblings at least monthly, excluding those situations where a court order prohibits or regulates visits or there is supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | In June 2018, 75% of children in custody who have siblings with whom they are not residing visited with their siblings within the month. Monthly range during January – June 2018 monitoring period: 74 to 80%. | In December 2018, 88% of children in custody who have siblings with whom they are not residing visited with their siblings within the month. Monthly range during July – December 2018 monitoring period: 85 to 88%.[27,28] | Yes |
| | | | *Maltreatment* | | |
| IV.H.39 | Re-Entry to Placement | Of all children who enter foster care in a 12 month period for the first time who are discharged within 12 months to reunification, living with relative(s), or guardianship, no more than 9% will re-enter foster care within 12 months of their discharge. | 11.2% of children who entered foster care for the first time in CY 2015 and were discharged within 12 months to reunification, living with relative(s), or guardianship, re-entered foster care within 12 months of their discharge. | 12.2% of children who entered foster care for the first time in CY 2016 and were discharged within 12 months to reunification, living with relative(s), or guardianship, re-entered foster care within 12 months of their discharge. | No |

---

[27] Monthly performance is as follows: July, 86%; August, 86%; September, 87%; October, 87%; November, 85%; December, 88%. Reported performance accounts for valid exceptions to the visits requirement.

[28] The Monitor and DCF completed a joint validation of a sample of two months in the monitoring period and found that exceptions were appropriately applied and documented in 60% of cases. Therefore, these data reflect exclusions from the universe of instances in which exceptions to the requirement for sibling visits were appropriately applied and documented. These data also reflect inclusion of sibling visits facilitated by private providers for the first time this monitoring period. Therefore, data for this period are not comparable to data reported in previous monitoring periods.

| Table 1A: To Be Achieved | | | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2018 Performance[19] | December 2018 Performance[20] | Requirement Fulfilled (Yes/No)[21] |
| _Timely Permanency_ | | | | | |
| IV.I.41 | Permanency Within 24 Months | Of all children who enter foster care in a 12-month period, at least 66% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering foster care. | 65% of children who entered foster care in CY 2015 were discharged to permanency (reunification, living with relative(s), guardianship or adoption) within 24 months of entering foster care.[29] | 65% of children who entered foster care in CY 2016 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering foster care. | No |
| _Services to Support Transition_ | | | | | |
| IV.J.44 | Services to Support Transition | 80% of cases will be rated acceptable for supporting transitions as measured by the QR. The Monitor, in consultation with the parties, shall determine the standards for quality support for transitions. | 59% of cases rated acceptable for the QR indicator _successful transitions_ (CY 2017). | 62% of cases rated acceptable for the QR indicator _successful transitions_ (CY 2018).[30] | No |

---

[29] This data reflects an adjustment of historical data to include those in the entry cohort who were discharged to permanency between the ages of 18 and 21. DCF provided these data for the first time this monitoring period, and the Monitor has not independently verified it, but has included it here, which shows a higher level of performance than has been reported in prior monitoring periods.
[30] From January to December 2018, 62% (73 of 118) of applicable cases reviewed were rated acceptable for the _successful transitions_ indicator.

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2018 Performance**[31] | **December 2018 Performance**[32] | **Requirement Maintained (Yes/No)**[33] |
| *Investigations* | | | | | |
| III.A.1 | Institutional Abuse Investigations Unit (IAIU) | 80% of IAIU investigations will be completed within 60 days. | In June 2018, 87% of IAIU investigations were completed within 60 days. | In December 2018, 82% of IAIU investigations were completed within 60 days. | Yes |
| IV.A.13 | Timeliness of Investigation Completion (60 days) | 85% of all investigations of alleged child abuse and neglect shall be completed within 60 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. | In May 2018, 85% of all investigations were completed within 60 days. Monthly range during December – May 2018 monitoring period: 85 to 86%. | In November 2018, 81% of all investigations were completed within 60 days. Monthly range during June – November 2018 monitoring period: 81 to 85%.[34] | Yes[35] |
| IV.A.14 | Timeliness of Investigation Completion (90 days) | 95% of all investigations of alleged child abuse and neglect shall be completed within 90 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. | In May 2018, 95% of all investigations were completed within 90 days. Monthly range during December – May 2018 monitoring period remained consistent at 95%. | In November 2018, 94% of all investigations were completed within 90 days. Monthly range during June – November 2018 monitoring period: 93 to 95%.[36] | Yes |

[31] In some instances, where the Monitor did not report mid-year data, the most recent annual data are included.

[32] In some instances where the Monitor does not have December 2018 data, the most recent data available are included.

[33] "Yes" indicates that, in the Monitor's judgment based on presently available information, DCF has fulfilled its obligations regarding the requirement under the SEP. The Monitor has also designated "Yes" for a requirement where DCF has met or is within one percentage point of the SEP standard or there are a small number of cases causing the failure to meet the SEP standard.

[34] Due to the time lag of this measure, the Monitor and DCF decided to alter the period of review, so June 2018 data are included for this period and December 2018 data will be included in the next monitoring report. Monthly performance for this measure is as follows: June, 83%; July, 83%; August, 85%; September, 84%; October, 83%; November, 81%.

[35] The Monitor considers this to be a temporary decline in performance that is still within an acceptable range. The Monitor will continue to carefully track these data to determine if this decline in performance is temporary and/or insubstantial.

[36] Due to the time lag of this measure, the Monitor and DCF decided to alter the period of review, so June 2018 data are included for this period and December 2018 data will be included in the next monitoring report. Monthly performance for this measure is as follows: June, 94%; July, 94%; August, 94%; September, 95%; October, 93%; November, 94%.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 15*

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2018 Performance**[31] | **December 2018 Performance**[32] | **Requirement Maintained (Yes/No)**[33] |
| IV.A.15 | Quality Investigations | 85% of investigations shall meet the standards for quality investigations. The Monitor, in consultation with the parties, shall determine appropriate standards for quality investigations. | 91% of investigations met quality standards in a March 2018 review of a statistically significant sample of investigations completed in October 2017. | NA: quality measured through an Investigative Case Record Review, last conducted in March 2018.[37] | Not newly assessed in this period. |
| *Family Teaming* | | | | | |
| IV.B.16 | Initial Family Team Meeting | 80% of children newly entering placement shall have a family team meeting before or within 45 days of placement. | In June 2018, 85% of children newly entering placement had a FTM within 45 days of entering placement. Monthly range during January – June 2018 monitoring period: 85 to 90%. | In December 2018, 95% of children newly entering placement had a FTM within 45 days of entering placement. Monthly range during July – December 2018 monitoring period: 74 to 95%.[38] | Yes |

---

[37] The Investigation Case Record Review is typically conducted every two years.

[38] Monthly performance for this measure is as follows: July, 74%; August, 82%; September, 88%; October, 82%; November, 86%; December, 95%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF jointly reviewed all 79 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 16*

| | | | Table 1B: To Be Maintained | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2018 Performance[31] | December 2018 Performance[32] | Requirement Maintained (Yes/No)[33] |
| IV.B.17 | Subsequent FTMs within 12 months | 80% of children will have three additional FTMs within the first 12 months of the child coming into placement. | In June 2018, 78% of children had three or more additional FTMs within the first 12 months of placement. Monthly range during January – June 2018 monitoring period: 77 to 91%. | In December 2018, 84% of children had three or more additional FTMs within the first 12 months of placement. Monthly range during July – December 2018 monitoring period: 81 to 92%.[39] | Yes |
| IV.B.18 | Subsequent FTMs after 12 months – Reunification Goal | After the first 12 months of a child being in care, 90% of those with a goal of reunification will have at least three FTMs each year. | In June 2018, 95% of children with a goal of reunification had three or more FTMs after 12 months of placement. Monthly range during January – June 2018 monitoring period: 93 to 100%. | In December 2018, 95% of children with a goal of reunification had three or more FTMs after 12 months of placement. Monthly range during July – December 2018 monitoring period: 74 to 96%.[40] | Yes |
| IV.B.19 | Subsequent FTMs after 12 months – Other than Reunification Goal | After the first 12 months of a child being in care, for those children with a goal other than reunification, 90% shall have at least two FTMs each year. | In June 2018, 96% of children with a goal other than reunification had two or more FTMs after 12 months of placement. Monthly range during January – June 2018 monitoring period: 91 to 98%. | In December 2018, 89% of children with a goal other than reunification had two or more FTMs after 12 months of placement. Monthly range during July – December 2018 monitoring period: 89 to 97%.[41] | Yes |

[39] Monthly performance is as follows: July, 81%; August, 84%; September, 86%; October, 92%; November, 90%; December, 84%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF jointly reviewed all 106 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

[40] Monthly performance for this measure is as follows: July, 79%; August, 94%; September, 74%; October, 96%; November, 87%; December, 95%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF jointly reviewed all 15 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

[41] Monthly performance is as follows: July, 94%; August, 94%; September, 94%; October, 97%; November, 91%; December, 89%. Reported performance accounts for valid exceptions to the FTM requirements. The Monitor and DCF jointly reviewed all 10 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*
*June 19, 2019*
*Page 17*

| | | | Table 1B: To Be Maintained | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2018 Performance[31]** | **December 2018 Performance[32]** | **Requirement Maintained (Yes/No)[33]** |
| | | | *Needs Assessment* | | |
| IV.C.21 | Needs Assessment | The state shall regularly evaluate the need for additional placements and services to meet the needs of children in custody and their families and to support intact families and prevent the need for out-of-home care. Such needs assessments shall be conducted on an annual, staggered basis that assures that every county is assessed at least once every three years. The state shall develop placements and services consistent with the findings of these needs assessments. | In March 2018, DCF published the most recent report, *DCF Needs Assessment 2018 Report #3: Survey Findings and Synthesis*, that evaluated the information collected through surveys conducted by Rutgers School of Social Work. DCF leadership is determining how to utilize the findings to refine and improve its service array. Going forward, DCF has announced plans to redesign the Needs Assessment process. | During the monitoring period, DCF made progress on its plan to fold the state's Needs Assessment process into its Qualitative Review and ChildStat processes and presentations. | Yes |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 18*

| | | **Table 1B: To Be Maintained** | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2018 Performance**[31] | **December 2018 Performance**[32] | **Requirement Maintained (Yes/No)**[33] |
| | | *Case and Service Planning* | | | |
| IV.D.22 | Initial Case Plans | 95% of initial case plans for children and families shall be completed within 30 days. | In June 2018, 95% of children entering care had case plans developed within 30 days. Monthly range during January – June 2018 monitoring period: 94 to 99%. | In December 2018, 94% of children entering care had case plans developed within 30 days. Monthly range during July – December 2018 monitoring period: 92 to 96%.[42] | Yes[43] |
| | | *Caseloads* | | | |
| III.B.2 | Supervisor/Worker Ratio | 95% of offices will have sufficient supervisory staff to maintain a 5 worker to 1 supervisor ratio. | 100% of Local Offices have sufficient supervisory staff. | 100% of Local Offices have sufficient supervisory staff. | Yes |
| III.B.3 | IAIU Investigators Caseload | 95% of IAIU investigators will have (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. | 100% of IAIU investigators met caseload standards. | 100% of IAIU investigators met caseload standards. | Yes |
| III.B.4 | Permanency Workers (Local Offices) Caseload | 95% of Local Offices will have average caseloads for Permanency workers of (a) no more than 15 families, and (b) no more than 10 children in out-of-home care. | 100% of Local Offices met permanency standards. | 100% of Local Offices met permanency standards. | Yes |

[42] Monthly performance for this measure is as follows: July, 96%; August, 92%; September, 94%; October, 95%; November, 95%; December, 94%.
[43] The Monitor considers this to be a temporary decline in performance that is still within an acceptable range.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 19*

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2018 Performance**[31] | **December 2018 Performance**[32] | **Requirement Maintained (Yes/No)**[33] |
| III.B.5 | Permanency Workers Caseload | 95% of Permanency workers will have (a) no more than 15 families, and (b) no more than 10 children in out of home care. | 100% of Permanency workers met caseload standards. | 100% of Permanency workers met caseload standards.[44] | Yes |
| IV.E.24 | Intake workers (Local Offices) Caseload | 95% of Local Offices will have average caseloads for Intake workers of no more than 12 families and no more than eight new case assignments per month. | 96% of Local Offices met intake caseload standards. | 100% of Local Offices met intake caseload standards. | Yes |
| IV.E.25 | Intake workers Caseload | 90% of individual Intake workers shall have no more than 12 open cases and no more than eight new case assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. | 95% of Intake workers met caseload standards. | 95% of Intake workers met caseload standards.[45] | Yes |
| IV.E.26 | Adoption Workers (Local Offices) Caseload | 95% of Local Offices will have average caseloads for Adoption workers of no more than 15 children per worker. | 98% of Local Offices met adoption standards. | 99% of Local Offices met adoption standards. | Yes |

[44] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.
[45] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 20*

| | | | **Table 1B: To Be Maintained** | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2018 Performance**[31] | **December 2018 Performance**[32] | **Requirement Maintained (Yes/No)**[33] |
| IV.E.27 | Adoption Workers Caseload | 95% of individual Adoption worker caseloads shall be no more than 15 children per worker. | 98% of Adoption workers met caseload standards. | 98% of Adoption workers met caseload standards.[46] | Yes |
| | | | *Case Plans* | | |
| III.C.6 | Timeliness of Current Plans | 95% of case plans for children and families will be reviewed and modified no less frequently than every six months. | In June 2018, 98% of case plans were reviewed and modified as necessary at least every six months. Monthly range during January – June 2018 monitoring period: 94 to 98%. | In December 2018, 96% of case plans were reviewed and modified as necessary at least every six months. Monthly range during July – December 2018 monitoring period: 95 to 97%.[47] | Yes |
| | | | *Deputy Attorneys General* | | |
| III.D.7 | Adequacy of DAsG Staffing | The state will maintain adequate DAsG staff positions and keep positions filled. | 135 (100%) of 135 staff positions filled with nine staff on leave; 126 (93%) available DAsG. | 135 (100%) of 135 staff positions filled with two staff on leave; 133 (99%) available DAsG.[48] | Yes |
| | | | *Child Health Units* | | |
| III.E.8 | Child Health Units | The state will continue to maintain its network of Child Health Units, adequately staffed by nurses in each Local Office. | As of June 30, 2018, DCF had 172 Health Care Case Managers and 85 staff assistants. | As of December 31, 2018, DCF had 163 Health Care Case Managers and 84 staff assistants. | Yes |

[46] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.
[47] Monthly performance for this measure is as follows: July, 96%; August, 95%; September, 95%; October, 97%; November, 96%; December, 96%.
[48] DCF reported that during this monitoring period select DAsG outside of the DCF Practice Group have dedicated some of their time to DCF matters.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 21*

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2018 Performance[31]** | **December 2018 Performance[32]** | **Requirement Maintained (Yes/No)[33]** |
| *Visits* | | | | | |
| IV.F.29 | Parent-Child Visits – Weekly | 60% of children in custody with a return home goal will have an in-person visit with their parent(s) at least weekly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | In June 2018, 79% of applicable children had weekly visits with their parents. Monthly range during January – June 2018 monitoring period: 78 to 82%. | In December 2018, 77% of applicable children had weekly visits with their parents. Monthly range during July – December 2018 monitoring period: 76 to 79%.[49] | Yes |
| IV.F.30 | Parent-Child Visits – Bi-Weekly | 85% of children in custody will have an in-person visit with their parent(s) or legally responsible family member at least every other week, excluding those situations where a court order prohibits or regulates visits or there is supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | In June 2018, 92% of applicable children had bi-weekly visits with their parents. Monthly range during January – June 2018 monitoring period: 91 to 94%. | In December 2018, 91% of applicable children had bi-weekly visits with their parents. Monthly range during July – December 2018 monitoring period: 89 to 92%.[50] | Yes |

[49] Monthly performance for this measure is as follows: July, 79%; August, 79%; September, 77%; October, 79%; November, 76%; December, 77%.
[50] Monthly performance for this measure is as follows: July, 92%; August, 92%; September, 91%; October, 92%; November, 89%; December, 91%.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 22*

| | | | Table 1B: To Be Maintained | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2018 Performance[31] | December 2018 Performance[32] | Requirement Maintained (Yes/No)[33] |
| III.F.9 | Caseworker Contacts with Children – New Placement/Placement Change | 93% of children shall have at least twice-per-month face-to-face contact with their caseworker within the first two months of placement, with at least one contact in the placement. | In June 2018, 90% of children had two visits per month, one of which was in the placement, during the first two months of an initial or subsequent placement. Monthly range during January – June 2018 monitoring period: 90 to 96%. | In December 2018, 94% of children had two visits per month, one of which was in the placement, during the first two months of an initial or subsequent placement. Monthly range during July – December 2018 monitoring period: 89 to 94%.[51] | Yes |
| III.F.10 | Caseworker Contact with Children in Placement | During the remainder of the placement, 93% of children shall have at least one caseworker visit per month, in the placement. | In June 2018, 95% of children had at least one caseworker visit per month in his/her placement. Monthly range during January – June 2018 monitoring period: 95 to 97%. | In December 2018, 94% of children had at least one caseworker visit per month in his/her placement. Monthly range during July – December 2018 monitoring period: 93 to 95%.[52] | Yes |
| | | | Placement | | |
| IV.G.32 | Placing Siblings Together | At least 80% of siblings groups of two or three children entering custody will be placed together. | 76% of sibling groups of two or more children entering custody in CY 2017 were placed together. | 77% of sibling groups of two or three children entering custody in CY 2018 were placed together. | No |

---

[51] Monthly performance for this measure is as follows: July, 93%; August, 93%; September, 92%; October, 94%; November, 89%; December, 94%.
[52] Monthly performance for this measure is as follows: July, 95%; August, 95%; September, 94%; October, 94%; November, 93%; December, 94%.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 23*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2018 Performance[31] | December 2018 Performance[32] | Requirement Maintained (Yes/No)[33] |
| IV.G.33 | Placing Siblings Together for Four or More Children | All children will be placed with at least one other sibling 80% of the time. | Children entering custody in CY 2017 with three or more siblings were placed with at least one other sibling 83% of the time. | Children entering custody in CY 2018 with three or more siblings were placed with at least one other sibling 86% of the time. | Yes |
| IV.G.34 | Recruitment of Placements for Sibling Groups of Four or More | DCF will continue to recruit for resource homes capable of serving sibling groups of four or more. | Between January and June 2018, DCF recruited a total of 23 new SIBS homes. As of June 2018, DCF had a total of 84 large capacity SIBS homes; 20 homes that can accommodate five or more children, and 64 homes that can accommodate four children. | Between July and December 2018, DCF recruited a total of 19 new SIBs homes. As of December 2018, DCF had a total of 73 large capacity SIBS homes; 18 homes that can accommodate five or more children and 55 homes that can accommodate four children. | Yes |
| IV.G.35 | Placement Stability, First 12 Months in Care | At least 84% of children entering out-of-home placement for the first time in a calendar year will have no more than one placement change during the 12 months following their date of entry. | 85% of children who entered out-of-home placement for the first time in CY 2016 had no more than one placement change during the 12 months following their date of entry. | 85% of children who entered out-of-home placement for the first time in CY 2017 had no more than one placement change during the 12 months following their date of entry. | Yes |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 24*

| | | | Table 1B: To Be Maintained | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2018 Performance[31]** | **December 2018 Performance[32]** | **Requirement Maintained (Yes/No)[33]** |
| IV.G.36 | Placement Stability, 13 – 24 Months in Care | At least 88% of these children will have no more than one placement change during the 13-24 months following their date of entry. | 94% of children who entered care in CY 2015 had no more than one placement change during the 13-24 months following their date of entry. | 95% of children who entered care in CY 2016 had no more than one placement change during the 13-24 months following their date of entry. | Yes |
| | | | *Education* | | |
| III.G.11 | Educational Needs | 80% of cases will be rated acceptable as measured by the QR in stability (school) and learning and development. The Monitor, in consultation with the parties, shall determine the standards for school stability and quality learning and development. | 86% of cases rated acceptable for both QR indicators *stability in school* and *learning and development* (CY 2017). | 83% of cases rated acceptable for both QR indicators *stability in school* and *learning and development* (CY 2018).[53,54] | Yes |
| | | | *Maltreatment* | | |
| III.H.12 | Abuse and Neglect of Children in Foster Care | No more than 0.49% of children will be victims of substantiated abuse or neglect by a resource parent or facility staff member. | For CY 2017, 0.24% of children were victims of substantiated abuse or neglect by a resource parent or facility staff member. | For CY 2018, 0.27% of children were victims of substantiated abuse or neglect by a resource parent or facility staff member. | Yes |

[53] From January to December 2018, 83% (67 out of 81) of applicable cases reviewed rated acceptable for both *stability in school* and *learning and development, age 5 and older* indicators*;* 91% (86 out of 94) of cases were rated acceptable for *stability in school*; 91% (77 out of 85) of cases were rated acceptable for *learning and development, age 5 and older*.
[54] All in-home cases are excluded from this measure.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*
*June 19, 2019*
*Page 25*

| **Table 1B: To Be Maintained** |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2018 Performance[31]** | **December 2018 Performance[32]** | **Requirement Maintained (Yes/No)[33]** |
| IV.H.37 | Repeat Maltreatment (In-home) | No more than 7.2% of children who remain at home after a substantiation of abuse or neglect will have another substantiation within the next 12 months. | 6.5% of children who remained at home after a substantiation of abuse or neglect in CY 2016 had another substantiation within the next 12 months. | 5% of children who remained at home after a substantiation of abuse or neglect in CY 2017 had another substantiation within the next 12 months. | Yes |
| IV.H.38 | Maltreatment Post-Reunification | Of all children who enter foster care in a 12-month period for the first time who are discharged within 24 months to reunification or living with a relative(s), no more than 6.9% will be the victims of abuse or neglect within 12 months of their discharge. | 6.4% of children who entered foster care for the first time in CY 2014 and were discharged within 24 months to reunification or living with relative(s) were the victims of abuse or neglect within 12 months of their discharge. | 5.9% of children who entered foster care for the first time in CY 2015 and were discharged within 24 months to reunification or living with relative(s) were the victims of abuse or neglect within 12 months of their discharge. | Yes |
| *Permanency* |
| IV.I.40 | Permanency within 12 Months | Of all children who enter foster care in a 12-month period, at least 42% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | 43% of children who entered foster care in CY 2016 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care.[55] | 41% of children who entered foster care in CY 2017 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | Yes[56] |

[55] This data reflects an adjustment of historical data to include those in the entry cohort who were discharged to permanency between the ages of 18 and 21. DCF provided these data for the first time this monitoring period, and the Monitor has not independently verified it, but has included it here, which shows a higher level of performance than has been reported in prior monitoring periods.
[56] The Monitor considers this to be a temporary decline in performance that is still within an acceptable range.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*
*June 19, 2019*
*Page 26*

| | | | | | |
|---|---|---|---|---|---|
| **Table 1B: To Be Maintained** | | | | | |
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2018 Performance**[31] | **December 2018 Performance**[32] | **Requirement Maintained (Yes/No)**[33] |
| IV.I.42 | Permanency Within 36 Months | Of all children who enter foster care in a 12-month period, at least 80% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care. | 81% of children who entered foster care in CY 2014 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care.[57] | 81% of children who entered foster care in CY 2015 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care. | Yes |
| IV.I.43 | Permanency Within 48 Months | Of all children who enter foster care in a 12-month period, at least 86% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care. | 88% of children who entered foster care in CY 2013 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care.[58] | 89% of children who entered foster care in CY 2014 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care. | Yes |
| ***Older Youth*** | | | | | |
| IV.K.45 | Independent Living Assessments | 90% of youth age 14 to 18 have an Independent Living Assessment. | In June 2018, 91% of applicable children had completed an Independent Living Assessment. Monthly range during January – June 2018 monitoring period: 91 to 94%. | In December 2018, 86% of applicable children had completed an Independent Living Assessment. Monthly range during July – December 2018 monitoring period: 86 to 90%.[59] | Yes[60] |

[57] This data reflects an adjustment of historical data to include those in the entry cohort who were discharged to permanency between the ages of 18 and 21. DCF provided these data for the first time this monitoring period, and the Monitor has not independently verified it, but has included it here, which shows a higher level of performance than has been reported in prior monitoring periods.
[58] Ibid.
[59] Monthly performance for this measure is as follows: July, 90%; August, 88%; September, 88%; October, 89%; November, 89%; December, 86%.
[60] The Monitor considers this to be a temporary decline in performance that is still within an acceptable range.

| | Table 1B: To Be Maintained | | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2018 Performance[31]** | **December 2018 Performance[32]** | **Requirement Maintained (Yes/No)[33]** |
| IV.K.46 | Quality of Case Planning and Services | 75% of youth age 18 to 21 who have not achieved legal permanency shall receive acceptable quality case management and service planning. | 74% of cases rated acceptable for both QR indicators *child (youth)/family status* and *overall practice performance* (CY 2017). | 70% of cases rated acceptable for both QR indicators *child (youth)/family status* and *overall practice performance* (CY 2018).[61] | Yes[62] |
| IV.K.47 | Housing | 95% of youth exiting care without achieving permanency shall have housing. | 88% of youth exiting care between January and June 2018 without achieving permanency had documentation of a housing plan upon exiting care. | 96% of youth exiting care between July and December 2018 without achieving permanency had documentation of a housing plan upon exiting care.[63] | Yes |
| IV.K.48 | Employment/Education | 90% of youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. | 80% of youth exiting care between January and June 2018 without achieving permanency were either employed or enrolled in education or vocational training programs or there was documented evidence of consistent efforts to help the youth secure employment or training. | 89% of youth exiting care between July and December 2018 without achieving permanency were either employed or enrolled in education or vocational training programs or there was documented evidence of consistent efforts to help the youth secure employment or training.[64] | Yes[65] |

[61] From January to December 2018, 70% (30 of 43) cases reviewed rated acceptable for both *child (youth)/family status* and *overall practice performance* indicators. 84% (36 of 43) of cases were rated acceptable *for child (youth)/family status*; and 74% (32 of 43) of cases were rated acceptable for *overall practice performance*.

[62] Given that the universe of cases to which this measure applies is small, making fluctuations more likely, the Monitor considers this to be a temporary decline in performance that is still within an acceptable range. The Monitor will continue to carefully track these data to determine if this decline in performance is temporary and/or insubstantial.

[63] Six youth out of the universe of 61 youth exiting care to non-permanency were excluded from consideration because two youth could not be located and four were incarcerated. The universe of cases to which this measure applies is small, making fluctuations more likely.

[64] Eight youth out of the universe of 61 youth exiting care to non-permanency were excluded from consideration because they could not be located, were incarcerated, or moved out of state. Seven additional youth were considered to have met the standard because there was documentation of consistent efforts by the caseworker to help secure education or employment.

[65] The universe of cases to which this measure applies is small, making fluctuations more likely.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*
*June 19, 2019*
*Page 28*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| **A. Data Transparency** | DCF will continue to maintain a case management information and data collections system that allows for the assessment, tracking, posting or web-based publishing and utilization of key data indicators. | Data provided directly to the Monitor and published by DCF in reports and on its website.[66]<br><br>NJ SPIRIT functionality is routinely assessed by the Monitor's use of NJ SPIRIT data for validation and through use of SafeMeasures, as well as in conducting case inquiries and case record reviews. | Yes |
| **B. Case Practice Model** | Implement and sustain a Case Practice Model<br><br>Quality investigation and assessment<br><br>Safety and risk assessment and risk reassessment<br><br>Engagement with youth and families<br><br>Working with family teams<br><br>Individualized planning and relevant services<br><br>Safe and sustained transition from DCF<br><br>Continuous review and adaptations | QR Data<br><br>Monitor site visits and attendance at QRs, ChildStat and other meetings<br><br>Investigation case record review<br><br>Data provided directly to the Monitor<br><br>Our Work with Children, Youth and Families Report | Yes |

---

[66] Please see list of reports in Section I (Introduction: Monitoring Methodology) to review data sources for this Foundational Element.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 29*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| **C. State Central Registry** | Received by the field in a timely manner | Commissioner's Monthly Report | Yes |
| | Investigation commenced within required response time | Monitor site visit with SCR staff<br><br>Screening and Investigations Monthly Report | |
| **D. Appropriate Placements** | Appropriate placements of children | QR data<br><br>Monitor site visits and attendance at QRs, ChildStat and other meetings<br><br>Data provided directly to the Monitor<br><br>Our Work with Children, Youth and Families Report | Yes |
| | Resource family homes licensed and closed (kinship/non-kinship) | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor | |
| | Number of children in home/out of home demographic data | NJ Rutgers Data Portal | |
| | Placed in a family setting | Commissioner's Monthly Report | |
| | Placement proximity | Data provided directly to the Monitor<br><br>Our Work with Children, Youth and Families Report | |
| | No children under 13 years old in shelters | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor | |
| | Children over 13 in shelters no more than 30 days | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor | |
| | No behavioral health placements out of state without approval | Commissioner's Monthly Report | |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 30*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| | Adequate number of resource placements | CP&P Needs Assessment<br><br>Data provided directly to the Monitor<br><br>Our Work with Children, Youth and Families Report | |
| **E. Service Array** | Services for youth age 18-21, LGBTQI, mental health and domestic violence for birth parents with families involved with the child welfare system | New Jersey Youth Resource Spot[67]<br><br>New Jersey DCF Adolescent Services Website[68]<br><br>Data provided directly to the Monitor<br><br>Attendance at Adolescent Practice Forums<br><br>CP&P Needs Assessment | Yes |
| | Preventive home visit programs | Commissioner's Monthly Report | |
| | Family Success Centers | Commissioner's Monthly Report<br><br>Monitor site visits and attendance at QRs, ChildStat and other meetings<br><br>Data provided directly to the Monitor | |

---

[67] New Jersey's Youth Resource Spot can be found at www.NJYRS.org.
[68] DCF's Adolescent Services Website can be found at http://www.nj.gov/dcf/adolescent/.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*
*June 19, 2019*
*Page 31*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| **F. Medical and Behavioral Health Services** | Appropriate medical assessment and treatment | Healthcare of Children in Out-of-Home Placement Report<br><br>Data provided directly to the Monitor<br><br>Commissioner's Monthly Report<br><br>CIACC Monthly Report | Yes |
| | Pre-placement and entry medical assessments | | |
| | Dental examinations | | |
| | Immunizations | | |
| | Follow-up care and treatment | | |
| | Mental health assessment and treatment | | |
| | Behavioral health | | |
| **G. Training** | Pre-service training | Data provided directly to the Monitor<br><br>Workforce Report | Yes |
| | Case practice model | | |
| | Permanency planning | | |
| | Concurrent planning | | |
| | Adoption | | |
| | Demonstration of competency | | |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 32*

| **Table 1C: Foundational Elements** |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| **H. Flexible Funding** | DCF will continue to make flexible funds available for use by workers in crafting individualized service plans for children, youth and families to meet the needs of children and families, to facilitate family preservation and reunification where appropriate and to ensure that families are able to provide appropriate care for children and to avoid the disruption of otherwise stable and appropriate placements. | Data provided directly to the Monitor<br><br>DCF Online Policy Manual<br><br>Budget Report | Yes |
| **I. Resource Family Care Support Rates** | Family care support rates<br><br>Independent Living Stipend | DCF Online Policy Manual<br><br>DCF Website[69]<br><br>New Jersey Youth Resource Spot | Yes |
| **J. Permanency** | Permanency practices<br><br>Adoption practices | Data provided directly to the Monitor<br><br>Our Work with Children, Youth and Families Report<br><br>Monitor site visits and attendance at QRs, ChildStat and other meetings | Yes |
| **K. Adoption Practice** | 5- and 10-month placement reviews | Adoption Report<br><br>Monitor site visits and attendance at QRs, ChildStat and other meetings | Yes |

---

[69] USDA has altered its schedule for producing its Annual Report on costs of raising a child. By agreement, DCF now updates the rates within 30 days of the USDA annual report's release to meet the SEP standards and provides written confirmation to the Monitor.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 33*

## IV.   FOUNDATIONAL ELEMENTS

The Sustainability and Exit Plan (SEP) identifies a series of core organizational and practice improvements known as the "Foundational Elements" that became the groundwork upon which New Jersey's reform has been built. They include a range of requirements from the 2006 Modified Settlement Agreement (MSA) that were previously met and were codified in the SEP as foundational for improved child welfare outcomes and future system improvements. These Foundational Elements remain enforceable in the SEP if performance is not sustained. The Department of Children and Families (DCF) collects and publishes data to support its continued maintenance of Foundational Elements.

As part of its commitment to be a transparent, self-monitoring organization, beginning in July 2019, DCF plans to publish an annual report that will include a comprehensive analysis of agency processes, current initiatives, procedures, quality of practice and performance on key outcomes. In addition to producing these reports, DCF continued to provide data directly to the Monitor for the period July 1 to December 31, 2018 wherever necessary to assess the Foundational Elements. The Monitor also continues to assess maintenance of Foundational Elements through its participation in statewide Qualitative Reviews (QRs), site visits to Local Offices, Area Directors meetings, attendance at monthly ChildStat presentations, telephone surveys with workers and meetings with stakeholders throughout the state.

In the Monitor's judgment, *each of the SEP's Foundational Elements has been maintained during this period.* The sections below provide information on new developments, significant accomplishments or other information determined by the Monitor to be relevant for its assessment and understanding of the Foundational Elements.

### A.  CASE PRACTICE MODEL – SEP Section II.B

Section II.B of the SEP requires that "DCF will continue to implement and sustain a Case Practice Model that…emphasizes quality investigation and assessment, including safety and risk assessment and reassessment, and engagement with youth and families; working with family teams; individualized planning and relevant services; continuous review and adaptation; and safe and sustained transition from DCF."

DCF's attention to the quality of case practice as guided by New Jersey's Case Practice Model (CPM) continued this period. Between July and December 2018, DCF's Case Practice Liaisons (CPLs) worked with staff at all levels to develop and fine-tune the skills necessary to best serve children, youth and families. Statewide Local Office managers meet quarterly to discuss and improve upon supervision, documentation, and other areas needing oversight and support. During the monitoring period DCF also continued to refine its Structured Decision-Making (SDM™) tools and developed a "train the trainer" series on SDM™ for the Office of Training and Professional Development and Rutgers University trainers. The expectation is that the revised SDM™ tools will be deployed in late summer or early fall 2019.

In September 2018, DCF convened a one-day symposium, *Safe, Healthy and Connected: New Jersey Child Welfare in the 21st century*, as well as three regional forums with the same theme in

the following months, in partnership with Advocates for Children of New Jersey (ACNJ). Discussions with community partners, staff, and other stakeholders at these forums related to envisioning a child welfare system that strengthens families, prevents childhood trauma, and focuses on achieving well-being for children and families, not just physical safety. DCF is hosting additional regional forums in the following monitoring period.

## B.  APPROPRIATE PLACEMENTS – SEP Section II.D

Section II.D of the SEP provides that "when out-of-home placement is necessary, DCF will provide the most appropriate and least restrictive placements, allowing children to remain in their own communities, be placed with or maintain contact with siblings and relatives and have their educational needs met. The State shall maintain an adequate number and array of family-based placements to appropriately place children in family settings."

*Appropriate Placements and Services*

DCF continues to maintain a solid pool of resource homes and group settings to meet the needs of children in out-of-home care. As of December 31, 2018, 5,586 children were in out-of-home placement (468 fewer than at the end of June 2018), of which 5,255 were children between the ages of birth and 17, and 331 were between the ages of 18 and 21. DCF's progress in reducing the number of children overall in foster care is a reflection of the continued work occurring to provide services to children and families in their homes and communities.

Of the 5,586 children, 5,053 (90%) were placed in family-like settings: 2,965 children (53%) in non-kinship resource family homes, and 2,088 children (37%) in kinship homes. For those in non-family settings, 441 children (8%) were placed in group and residential settings facilities and 92 children (2%) were in independent living programs.

Between July and December 2018, DCF licensed 612 new kinship and non-kinship resource family homes; of these newly licensed resource family homes, 359 (59%) were kinship homes and 253 (41%) were non-kinship homes. As of December 31, 2018 there were a total of 4,086 licensed resource family homes in the state, with a total bed capacity for 8,946 children. Of the total number of resource family homes, 1,289 were kin homes and 2,797 were non-kin homes. DCF's focus has been on identifying and recruiting more kinship homes, homes for large sibling groups, and for adolescents, as described further in Section V.F. As of December 31, 2018, there were a total of 73 large capacity Siblings in Best Placement Settings (SIBS) homes: 18 homes with a capacity to accommodate five or more children and 55 homes that could accommodate four children.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 35*

### C.  SERVICE ARRAY – SEP Section II.E

Section II.E of the SEP requires the state to provide comprehensive, culturally responsive services to address the identified needs of the children, youth and families, and maintain an adequate statewide network of Family Success Centers (FSCs). These services are to include, but not be limited to, services for youth age 18 to 21, LGBTQI youth, birth parents who may need mental health or domestic violence supports and preventive home visiting programs. DCF has been engaged in assessing and fine-tuning services available through DCF and its partners to include a focus on programs that have an evidence base of effectiveness. A few of the more recent improvements are highlighted below.

In July 2018, DCF's division of Child Protection and Permanency (CP&P), along with the Children's System of Care (CSOC) and a private provider launched Family Functional Therapy for Foster Care (FFT-FC) in Cumberland, Gloucester and Salem counties. FFT-FC is an evidence-based, trauma-informed model of care aimed at supporting youth and their families in overcoming individual and relational trauma to achieve placement stability and long-term permanency. The FFT-FC treatment team trained 32 resource parents in 21 licensed FFT-FC resource homes. Of the 24 youth admitted into the program, 21 remained stable in their resource homes. DCF plans to expand the program in these three counties by training additional resource caregivers so as to enroll additional youth.

Between July and December 2018, the Office of Adolescent Services (OAS) continued to implement the Pathways to Academic and Career Exploration to Success (PACES) program statewide, aimed at supporting current and former foster youth's academic and career goals. The target population for this program is youth age 16-21 who are eligible for NJ Foster Care Scholars in order to promote college and career readiness. Piloted in September 2017, there are now six PACES programs serving almost 500 youth.

Since the beginning of New Jersey's reform efforts, DCF has expanded its use of Family Success Centers (FSCs) as one its core strategies to support children and youth in their communities. FSCs are neighborhood-based centers where families can access services and supports prior to crisis. Between July and December, 2018 DCF opened the Skyway Family Success Center in Jersey City; New Jersey now has a total of 57 operational Family Success Centers. In CY 2018, over 31,000 families were served by FSCs, providing a network of resources to support families and prevent problems that can escalate into requiring child protective services interventions.

DCF has also initiated work to address the needs to provide services that are responsive to needs of specific populations. In the spring of 2018, DCF began providing all staff – starting with leadership – with a two-day mandatory training entitled "Cultural Competency LGBTQI: Understanding Diversity in Sexual Orientation, Gender Identity and Gender Expression." This training continued throughout this monitoring period.

## V. SUSTAINABILITY AND EXIT PLAN PERFORMANCE MEASURES *TO BE ACHIEVED* AND *TO BE MAINTAINED*

This section of the report provides information on the Sustainability and Exit Plan (SEP) requirements that the state is focusing on achieving – designated as Outcomes *To Be Achieved* – and those requirements for which the state has satisfied the specified performance targets for at least six months and must sustain – designated as Outcomes *To Be Maintained*.

### A. INVESTIGATIONS

The SEP includes four performance measures related to investigative practice, all of which have been designated as Outcomes *To Be Maintained* as of July 2018. They are: quality of investigations (SEP IV.A.15), timeliness of Institutional Abuse Investigations Unit (IAIU) investigation completion (SEP III.A.1); timeliness of alleged child abuse and neglect investigation completion within 60 days (SEP IV.A.13); and investigation completion within 90 days (SEP IV.A.14). Performance for all four measures during the current monitoring period are discussed below.

**Timeliness of Investigation Completion**

| Quantitative or Qualitative Measure | 13. <u>Timeliness of Investigation Completion</u>: Investigations of alleged child abuse and neglect shall be completed within 60 days. |
|---|---|
| **Performance Target** | 85% of all abuse/neglect investigations shall be completed within 60 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. |

*Performance as of November 30, 2018:*[70]

In November 2018, there were 4,608 investigations of alleged child abuse and neglect, 3,734 (81%) of which were completed within 60 days. Performance from June to November 2018 ranged from a low of 81 percent to a high of 85 percent.[71] The Monitor considers DCF to have met this measure and will continue to carefully follow performance on timely completion of investigations within 60 days.

---

[70] December 2018 data will be included in the next monitoring report. For certain data elements that have an extended time frame built into the measurement, the Monitor and DCF decided to alter the period for data review so that six month monitoring reports can be produced more closely to the end of the monitoring period.

[71] Monthly performance for this measure is as follows: June, 83%; July, 83%; August, 85%; September, 84%; October, 83%; November, 81%.

| Quantitative or Qualitative Measure | 14. Timeliness of Investigation Completion: Investigations of alleged child abuse and neglect shall be completed within 90 days. |
|---|---|
| **Performance Target** | 95% of all abuse/neglect investigations shall be completed within 90 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. |

*Performance as of November 30, 2018:*[72]

In November 2018, 4,327 (94%) of the 4,608 investigations of child abuse and neglect were completed within 90 days. Performance from June to November 2018 ranged from a low of 93 percent to a high of 95 percent. The Monitor considers this to be an insubstantial decline. DCF continues to meet the SEP performance standard for the timeliness of investigation completion within 90 days.

## Quality of Investigations

| Quantitative or Qualitative Measure | 15. Quality of Investigations: Investigations of alleged child abuse and neglect shall meet standards of quality. |
|---|---|
| **Performance Target** | 85% of all abuse/neglect investigations shall meet standards of quality. |

The quality of investigations review is typically conducted every two years. In March 2018, DCF, together with the Monitor, conducted a case record review of the quality of CP&P's investigative practice. Reviewers examined the quality of practice of a statistically valid random sample of selected Child Protective Services (CPS) investigations assigned to DCF Local Offices between October 1 and October 14, 2017, involving 331 investigations and 518 alleged child victims.[73] Overall, reviewers found that 301 (91%) of the investigations were of acceptable quality.[74]

The Monitor anticipates conducting another case record review in collaboration with DCF on the quality of investigations in 2020.

---

[72] December 2018 data will be included in the next monitoring report. For certain data elements that have an extended time frame built into the measurement, the Monitor and DCF decided to alter the period for data review so that six-month monitoring reports can be produced more closely to the end of the monitoring period.
[73] These results have a ± 5% margin of error with 95% confidence.
[74] Reviewers could select four possible responses to the question regarding the quality of the investigation: "completely," "substantially," "marginally" or "not at all." Investigations determined to be "completely" or "substantially" of quality were considered acceptable for the purpose of this measure.

## Institutional Abuse Investigations Unit

| Quantitative or Qualitative Measure | 1. <u>Timeliness of Completion</u>: IAIU investigations of child maltreatment in placements shall be completed within 60 days. |
|---|---|
| **Performance Target** | 80% of IAIU investigations shall be completed within 60 days. |

The IAIU is responsible for investigating allegations of child abuse and neglect in resource family homes and other out-of-home care settings, as well as in child care facilities, detention centers, schools and residential facilities.[75]

***Performance as of December 31, 2018:***

Performance data for July through December 2018 show that DCF continued to exceed the SEP performance standard for this measure. In December 2018, 82 percent of IAIU investigations were completed within 60 days.

---

[75] CP&P Policy Manual (4-1-2013). Introduction to IAIU, I, A, 100.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 39*

## B.  FAMILY TEAM MEETINGS

Family Team Meetings (FTMs) bring families, providers, formal and informal supports together to exchange information, participate in case planning, coordinate and follow up on services and examine and solve problems. Meetings are intended to be scheduled according to the family's availability in an effort to involve as many family members and supports as possible. Workers are trained and coached to hold FTMs at key decision and transition points in the life of a case, such as when a child enters placement, when a child has a change in placement and/or when there is a need to adjust a case plan to achieve permanency or meet a child's needs.

The SEP includes five performance measures pertaining to FTMs, four of which had been met and designated as Outcomes *To Be Maintained*: the requirements that FTMs be held within 45 days of a child's removal (SEP IV.B.16); that for children in out-of-home placement, at least three additional FTMs after the initial FTM be held within the first 12 months of placement (SEP IV.B.17); that children with the goal of reunification have at least three FTMs each year after the first 12 months of placement (SEP IV.B.18); and that children with a goal other than reunification have at least two FTMs each year after the first 12 months of placement (SEP IV.B.19). The remaining Outcome *To Be Achieved* is Quality of Teaming (SEP IV.B.20), which is measured by the Qualitative Review (QR) process on an annual basis. Performance for all five measures during the current monitoring period are discussed below.

### Initial FTMs Held within 45 Days of Entry

| Quantitative or Qualitative Measure | 16.  Initial Family Team Meetings: For children newly entering placement, the number/percent who have a family team meeting within 45 days of entry. |
|---|---|
| Performance Target | 80% of children newly entering placement shall have a family team meeting before or within 45 days of placement. |

*Performance as of December 31, 2018:*

In December 2018, 149 (95%) out of 157 possible FTMs occurred within 45 days of a child's removal from home. Performance from July 1 to December 31, 2018 ranged from a low of 74 percent to a high of 95 percent.[76] For this measure, the Monitor and DCF jointly verified monthly data from NJ SPIRIT for the 79 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[77] For the second time this monitoring period, DCF took a primary role in this data validation process.

DCF's performance exceeded the SEP standard in all but one month of the monitoring period.

---

[76] Monthly performance for this measure is as follows: July, 74%; August, 82%; September, 88%; October, 82%; November, 86%; December, 95%. Reported performance accounts for valid exceptions to the FTM requirement.

[77] Based on a joint review with DCF of all 79 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in December 2018, there were 162 children newly entering placement. The Monitor and DCF determined that in five cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe of applicable cases 157 children.

**FTMs Held within the First 12 Months**

| Quantitative or Qualitative Measure | 17. Subsequent Family Team Meetings within 12 Months: For all other children in placement, the number/percent who have three additional FTMs within the first 12 months of the child coming into placement. |
|---|---|
| Performance Target | 80% of children will have three additional FTMs within the first 12 months of the child coming to placement. |

*Performance as of December 31, 2018:*[78]

In December 2018, 124 (84%) of 148 applicable children had an additional three or more FTMs within the first 12 months of entering placement. Performance from July 1 to December 31, 2018 ranged from a low of 81 percent to a high of 92 percent.[79] For this measure, the Monitor and DCF jointly verified monthly data from NJ SPIRIT for the 106 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[80] For the second time this monitoring period, DCF took a primary role in this data validation process.

DCF's performance exceeded the SEP standard in each month this monitoring period.

**FTMs Held After 12 Months in Placement with a Goal of Reunification**

| Quantitative or Qualitative Measure | 18. Subsequent Family Team Meetings after 12 Months: For all children in placement with a goal of reunification, the number/percent who have at least three FTMs each year after the first 12 months of placement. |
|---|---|
| Performance Target | After the first 12 months of a child being in care, 90% of those with a goal of reunification will have at least three FTMs each year. |

*Performance as of December 31, 2018:*[81]

In December 2018, 21 (95%) of 22 applicable children with a permanency goal of reunification had three or more FTMs in the 12 months following their first year in out-of-home placement. Performance from July 1 to December 31, 2018 ranged from a low of 74 percent to a high of 96 percent.[82] For this measure, the Monitor and DCF jointly verified monthly data from NJ SPIRIT

---

[78] Measure 17 applies to all children who have been in out-of-home placement for 12 months who entered care in the specified month. For example, performance for December 2018 is based upon the 159 children who entered care in December 2017. Compliance is based on whether at least three FTMs were held for these children during the 12-month period they were in care.
[79] Monthly performance is as follows: July, 81%; August, 84%; September, 86%; October, 92%; November, 90%; December, 84%. Reported performance accounts for valid exceptions to the FTM requirement.
[80] Based on a joint review of all 106 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in December 2018, there were 159 children who had been in out-of-home placement for 12 months. The Monitor and DCF determined that in 11 cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe of applicable cases 148 children.
[81] Measure 18 applies to all children who have been in care for at least 24 months who entered care in the specified month each year and have a goal of reunification. For example, in December 2018, a combined total of 22 children who entered care in December 2015, December 2014, December 2013, etc. and were still in placement with a goal of reunification. Compliance is based on whether at least three FTMs were held for these children during their most recent 12 months in care.
[82] Monthly performance for this measure is as follows: July, 79%; August, 94%; September, 74%; October, 96%; November, 87%; December, 95%. Reported performance accounts for valid exceptions to the FTM requirement.

for the 15 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[83] DCF took a primary role in this data validation process.

DCF's performance exceeds the SEP standard in three of six months during the monitoring period, and remained close to the standard in the other months. Given that the universe of cases to which this measure applies is small and therefore more susceptible to fluctuations, the Monitor considers DCF to have met the performance standard.

**FTMs Held After 12 Months in Placement with a Goal Other than Reunification**

| Quantitative or Qualitative Measure | 19. Subsequent Family Team Meetings after 12 Months: For all children in placement with a goal other than reunification, the number/percent who have at least two FTMs each year. |
|---|---|
| Performance Target | After the first 12 months of a child being in care, for those children with a goal other than reunification, 90% shall have at least two FTMs each year. |

*Performance as of December 31, 2018:*[84]

In December 2018, 127 (89%) of 143 applicable children in out-of-home placement with a permanency goal other than reunification had two or more FTMs after 12 months. Performance from July 1 to December 31, 2018 ranged from a low of 89 percent to a high of 97 percent.[85] For this measure, the Monitor verified monthly data from NJ SPIRIT for the 10 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[86] DCF took a primary role in this data validation process.

DCF exceeded the SEP standard on this measure in each month of the monitoring period.

---

[83] Based on a review of all 15 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in October 2018, there were 32 children who had been in care for at least 24 months who had a goal of reunification. The Monitor determined that in four cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded that case, making the universe of applicable cases 28 children. There were no documented exceptions to the FTM requirement in November or December 2018.

[84] Children eligible for Measure 19 are all children who have been in care for at least 12 months who entered care in the month specified each year and have a goal other than reunification. For example, in December 2018, a combined total of 143 children entered care in December 2017, December 2016, December 2015, etc. and are still in placement with a goal other than reunification. Compliance is based on whether at least two FTMs were held for these children each year in the most recent year after 12 months in care.

[85] Monthly performance is as follows: July, 94%; August, 94%; September, 94%; October, 97%; November, 91%; December, 89%. Reported performance accounts for valid exceptions to the FTM requirements.

[86] Based on a review of all 10 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in November 2018 there were 132 children who had been in care after 12 months with a goal other than reunification. The Monitor determined that in two cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded that case, making the universe of applicable cases 130 children. There were no documented exceptions to the FTM requirement in December 2018.

**Quality of Teaming**

| Quantitative or Qualitative Measure | 20.  Cases involving out-of-home placement show evidence of family teamwork. |
|---|---|
| Performance Target | 75% of cases involving out-of-home placements that were assessed as part of the Qualitative Review (QR) process will show evidence of both acceptable team formation and acceptable functioning. The Monitor, in consultation with the parties, shall determine the standards for quality team formation and functioning. |

FTMs are only one of the many ways in which DCF staff engage with families. Effective teaming is in fact much broader than just convening a meeting, and relies upon other foundational elements of quality case practice, such as engagement with family members, timely assessments and quality case planning, all of which are evaluated as part of the state's QR process. Information about the QR process and protocol are detailed in Section V.N of this report.

Results from the *teamwork and coordination* indicator in the QR are used to assess the quality of collaborative teamwork with children, youth and families. In assessing case ratings, the reviewer considers a range of questions for this indicator, including whether the family's team is composed of the appropriate constellation of providers and informal supports needed to meet the child and family's needs, and the extent to which team members, including family members, work together to meet identified goals.

***Performance as of December 31, 2018:***

Results from the 145 applicable cases reviewed from January through December 2018 using the QR protocol showed that 58 percent (84 of 145) rated acceptable for the *teamwork and coordination* indicator (Figure 2).[87] This is an improvement from DCF's performance in CY 2016 in which 49 percent of cases were rated acceptable in the same set of counties. Performance hasn't changed significantly from CY 2017, in which 59 percent of cases were rated acceptable.

DCF has not yet met the SEP performance standard and DCF leaders and managers understand that focusing on the quality of teamwork and coordination is an essential to improving outcomes overall. Prioritizing core case practice strategies and working with supervisors and staff to enhance skills and time devoted to engagement, assessment and case planning will likely help to improve the quality of teaming with families with children in out-of-home placement.

---

[87] All in-home cases are excluded from this measure.

**Figure 1: Qualitative Review (QR) Cases Rates Acceptable
on Teamwork and Coordination
(CY 2016 – CY 2018) [88]
(n=145)**



Source: DCF data

---

[88] In CY 2016 and CY 2018, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem and Union counties. In CY 2017, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex and Warren counties.

### C.  QUALITY OF CASE AND SERVICE PLANNING

Timely and meaningful case plans that are developed with the family at the beginning of a case, as well as throughout a family's involvement with DCF, rely on workers' assessment and engagement skills. During this monitoring period, Case Practice Liaisons (CPLs) continued to support staff in practice skills related to assessment, teaming, case planning and visitation between children in out-of-home care and families.

The SEP includes three measures related to case planning, two of which have been previously met and designated as Outcomes *To Be Maintained*: the requirement that case plans be developed with families within 30 days of placement (SEP IV.D.22) and the requirement that case plans be reviewed and modified every six months (SEP III.C.6). The remaining SEP measure regarding the quality of case planning (SEP IV.D.23) has not yet been achieved. Performance for all three measures during the current monitoring period are discussed below.

### Timeliness of Case Planning – Initial Case Plans

| Quantitative or Qualitative Measure | 22.  <u>Timeliness of Initial Plans</u>: For children entering care, number/percent of case plans developed within 30 days. |
|---|---|
| Performance Target | 95% of case plans for children and families are completed within 30 days. |

*Performance as of December 31, 2018:*

In December 2018, 169 (94%) of 179 initial case plans were completed within 30 days of a child entering placement. Between July 1 and December 31, 2018, the timely development of initial case plans ranged from a low of 92 percent to a high of 96 percent.[89] In this monitoring period, DCF met or exceeded this measure in three of six months, and was only slightly below the standard in the remaining three months. The Monitor considers DCF to have met this measure and will continue to carefully follow performance on timely completion of initial case plans.

### Timeliness of Case Planning – Every Six Months

| Quantitative or Qualitative Measure | 6.  <u>Case Plans</u>: Case plans for children and families will be reviewed and modified no less frequently than every six months. |
|---|---|
| Performance Target | 95% of case plans for children and families will be reviewed and modified no less frequently than every six months. |

---

[89] Monthly performance for this measure is as follows: July, 96%; August 92%; September, 94%; October, 95%; November, 95%; December, 94%.

*Progress of the New Jersey Department of Children and Families*  
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*  
*June 19, 2019*  
*Page 45*

*Performance as of December 31, 2018:*

In December, 2018, 96 percent of case plans had been modified no less frequently than every six months. Performance from July 1 to December 31, 2018 ranged from 95 to 97 percent.[90] DCF met or exceeded the required standard for this measure in each of the six months, which demonstrates improved performance from the previous monitoring period.

### Quality of Case Plans

| Quantitative or Qualitative Measure | 23. <u>Quality of Case Plans</u>: The child's/family's case plan shall be developed with the family and shall be individualized and appropriately address the child's needs for safety, permanency and well-being. The case plan shall provide for the services and interventions needed by the child and family to meet identified goals, including services necessary for children and families to promote children's development and meet their educational, physical and mental health needs. The case plan and services shall be modified to respond to the changing needs of the child and family and the results of prior service efforts. |
|---|---|
| Performance Target | 80% of case plans rated acceptable as measured by the Qualitative Review (QR). |

DCF policy and the SEP require that families be involved in case planning, that plans are appropriate and individualized to the circumstances of the child or youth and family and that there is oversight of plan implementation to ensure case goals are met and plans are modified when necessary.

Results from two QR indicators, *child and family planning process* and *tracking and adjusting*, are used to assess performance on this measure. Cases rated as acceptable demonstrate that child or youth and family needs are addressed in the case plan, appropriate family members were included in the development of the plan and interventions are being tracked and adjusted when necessary. Though the QR score only consists of those two indicators, several other aspects of practice contribute to high quality case planning.[91]

Information about the QR process and protocol are detailed in Section V.N of this report.

*Performance as of December 31, 2018:*

Results from the 195 cases reviewed from January to December 2018 indicate that 51 percent (100 of 195) were rated acceptable for both the *child and family planning process* and *tracking and adjusting* indicators (Figure 3).[92] Despite DCF leadership's focus on emphasizing that the

---

[90] Monthly performance on this measure is as follows: July, 96%; August, 95%; September, 95%; October, 97%; November, 96%; December, 96%.

[91] Improvements made to performance on QR indicators related to the *assessment of the father* (CY 2018, 22%), *assessment of the mother* (CY 2018, 40%), *engagement of the father* (CY 2018, 34%), *engagement of the mother* (CY 2018, 62%), *case plan implementation* (CY 2018, 64%) and *teamwork and coordination* (CY 2018, 58%) are likely to have a significant impact on the quality of case planning.

[92] From January to December 2018, 51% (100 of 195) of applicable cases reviewed were rated acceptable for both the *child and family planning process* and the *tracking and adjusting* indicators; 55% (107 of 195) of cases were rated acceptable for *child and family planning process*; 70% (137 of 195) of cases were rated acceptable for *tracking and adjusting*.

quality of case planning is as or more important than the transactional measures of timely completion, progress on improving performance has been slow and there has not been a significant change from CY 2017 in which 53 percent of cases were rated acceptable for both indicators.

DCF did not meet the SEP performance standard in CY 2018. As discussed above, this is another area for which the level of performance suggests that improvements in core case practice strategies can have a significant bearing on the quality of case planning.

**Figure 2: Qualitative Review (QR) Cases Rated Acceptable on Quality of Case Plans and Components of Placement (CY 2016 – CY 2018)[93]**
**(n=195)**



Source: DCF data

---

[93] In CY 2016 and CY 2018, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem and Union counties. In CY 2017, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex and Warren counties.

## D.  EDUCATION

| Quantitative or Qualitative Measure | 11. <u>Educational Needs</u>: Children will be enrolled in school and DCF will have taken appropriate actions to ensure that their educational needs are being met. |
|---|---|
| **Performance Target** | 80% of cases will be rated acceptable as measured by the Qualitative Review (QR) in stability (school) and learning and development. The Monitor, in consultation with the parties, shall determine the standards for school stability and quality learning and development. |

SEP Section III.G.11 requires that "children will be enrolled in school and DCF will have taken appropriate actions to ensure that their educational needs are being met." The SEP requires that 80 percent of cases be rated acceptable on both the *stability in school* and *learning and development* indicators as measured by the QR.[94]  The QR process and protocol are discussed in detail in Section V.N of this report. This measure is designated as an Outcome *To Be Maintained*.

***Performance as of December 31, 2018:***

From January to December 2018, 83 percent (67 out of 81) of cases reviewed were rated acceptable for both *stability in school* and *learning and development, age 5 & older* (see Figure 4).[95] Though this performance is a slight decline from CY 2017, DCF continues to meet this SEP performance standard. Success in this area is likely due at least in part to consistently solid QR performance on *stability in the home* and *living arrangement*, which are 86 percent and 98 percent for CY 2018, respectively.

---

[94] This measures applies to school-aged children in out-of-home placement.
[95] From January to December 2018, 83% (67 of 81) of the applicable cases reviewed were rated acceptable on both the *stability in school* and the *learning and development, age 5 & older* indicators; 91% (86 of 94) were rated acceptable for *stability in school* and 91% (77 of 85) were rated acceptable for *learning and development, age 5 & older.*

**Figure 3: Qualitative Review (QR) Cases Rated Acceptable on Educational Needs
(CY 2016 – CY 2018)[96]
(n=81)**



Source: DCF data

[96] In CY 2016 and CY 2018, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem and Union counties. In CY 2017, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex and Warren counties.

## E.  MAINTAINING CONTACT THROUGH VISITS

Visits between children in foster care and their workers, parents and siblings are critical to children's safety and well-being, and are essential tools for strengthening family connections and improving prospects for permanency. Visits also offer the opportunity for engagement and assessment of children, youth and families. From the perspective of a child in foster care, the loss of the ability to see their parents and siblings is a source of great pain, so the department's efforts to preserve opportunities for those contacts is essential.

The SEP includes six performance measures related to visits. As of July 2018, four measures were designated as Outcomes *To Be Maintained*, including caseworker contacts with children newly placed or after a placement change (SEP III.F.9); caseworker contacts with children in ongoing placement (SEP III.F.10); and parent-child weekly and bi-weekly visits (SEP IV.F.29 and IV.F.30). Notably, during this monitoring period, DCF met the performance standard for sibling visits (SEP IV.F.31) for the first time. Caseworker contacts with parents when the goal is reunification (SEP IV.F.28) has not yet met the performance standard and remains designated an Outcome *To Be Achieved*. Performance for all six measures during the current monitoring period are discussed below.

### Caseworker Visits with Children in Placement

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 9.  <u>Caseworker Contacts with Children – New Placement/Placement Change</u>: The caseworker shall have at least twice-per-month face to face contact with the children within the first two months of placement, with at least one contact in the placement. |
| **Performance Target** | 93% of children shall have at least twice-per-month face to face contact with their caseworker during the first two months of placement, with at least one contact in the placement. |

*Performance as of December 31, 2018:*

In December 2018, 249 (94%) of the 264 children in a new placement had two visits with their caseworkers during their first two months in placement. Between July and December 2018, monthly performance ranged from 89 percent to 94 percent.[97] This represents a slight decline in performance slightly below the SEP standard during two months this monitoring period.  DCF reports that it has continued to take steps to address issues in documentation of these visits and that Case Practice Liaisons (CPLs) have been tasked with reinforcing with Local Office staff on the importance of visiting with children in care.

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 10.  <u>Caseworker Contacts with Children in Placement</u>: During the remainder of placement, children will have at least one caseworker visit per month, in placement. |
| **Performance Target** | 93% of children will have at least one caseworker visit per month in placement, for the remainder of placement. |

---

[97] Monthly performance is as follows: July, 93%; August, 93%; September, 92%; October, 94%; November, 89%; December, 94%.

*Performance as of December 31, 2018:*

In December 2018, 4,711 (94%) of the 4,998 children in an ongoing placement were visited at least once by their caseworker. Between July and December 2018, monthly performance ranged between 93 percent and 95 percent.[98] DCF continues to meet this performance standard.

### Caseworker Visits with Parents/Family Members

| Quantitative or Qualitative Measure | 28. Caseworker Visits with Parents/Family Members with Goal of Reunification: The caseworker shall have at least two face-to-face visits per month with the parent(s) or other legally responsible family member of children in custody with a goal of reunification. |
|---|---|
| Final Target | 90% of families will have at least twice-per-month face-to-face contact with their caseworker when the permanency goal is reunification. |

*Performance as of December 31, 2018:*

In December 2018, 1,678 (76%) of 2,208 applicable children in custody with a goal of reunification had parents who were visited at least twice during the month by caseworkers. Between July and December 2018, a range of 74 percent to 80 percent of applicable parents or other legally responsible family members were visited at least two times per month by a caseworker (see Figure 1).[99] In assessing performance for this measure, the Monitor applied the findings from DCF's review of children for whom case documentation indicated that a worker visit with a parent was not required because the parent was missing or otherwise unavailable.[100] DCF took a primary role in this data validation process again this monitoring period.

Current performance does not meet the level required by the SEP.

---

[98] Monthly performance is as follows: July, 95%; August, 95%; September, 94%; October, 94%; November, 93%; December, 94%.

[99] Monthly performance is as follows: July, 79%; August, 80%; September, 78%; October, 78%; November, 74%; December, 76%. Reported performance accounts for valid exceptions to the visits requirement.

[100] During each month of the monitoring period, workers documented an average of approximately 400 cases in which there was believed to be an exception to the applicable visits requirement. In an effort to assess the validity of these exceptions, DCF reviewed 259 cases from a universe of cases from October and November 2018 in which worker visits with parents were not held due to a documented exception to the visits requirement. The Monitor and DCF determined that a valid exception was utilized in 173 (67%) of the 259 cases reviewed. As a result, the Monitor excluded 67% of all cases with documented exceptions from each month from the universe. For example, in December 2018 there were 2,526 children in custody with a goal of reunification. Data from NJ SPIRIT indicated that there were 475 documented cases that month for which the worker had determined that the parent was missing or otherwise unavailable. Based on the sample, the Monitor excluded from the universe 318 (67%) of the 475 cases in December, making the universe of applicable children 2,208 (2,526-318).

*Progress of the New Jersey Department of Children and Families*  
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*  
*June 19, 2019*  
*Page 51*

**Figure 4: Percentage of Families Who Had at Least Twice per Month Face-to-Face Contact with Caseworker when the Goal is Reunification (July – December 2018)**



Source: DCF data

## Visits between Children in Custody and their Parents

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 29. <u>Weekly Visits between Children in Custody and Their Parents</u>: Number/percent of children who have weekly visits with their parents when the permanency goal is reunification unless a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |
| **Final Target** | 60% of children in custody with a return home goal will have an in-person visit with their parent(s) or other legally responsible family member at least weekly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

*Performance as of December 31, 2018:*

In December 2018, an average of 1,563 (77%) of 2,020 applicable children visited weekly with their parents during the month. Between July and December 2018, a monthly range of 76 percent

to 79 percent of children had a weekly visit with their parents when the permanency goal was reunification.[101] This performance exceeds the SEP requirement.

| Quantitative or Qualitative Measure | 30. Bi-Weekly Visits between Children in Custody and Their Parents: Number/percent of children who have weekly visits with their parents when the permanency goal is reunification unless a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |
|---|---|
| Final Target | 85% of children in custody with a return home goal will have an in-person visit with their parent(s) or other legally responsible family member at least every other week, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

*Performance as of December 31, 2018:*

In December 2018, 1,818 (91%) of 2,008 applicable children had at least two visits with their parents during the month. Between July and December 2018, a monthly range of 89 percent to 92 percent of children had visits at least twice a month with their parents when their permanency goal was reunification.[102] This performance exceeds the SEP requirement.

**Visits between Children in Custody and Sibling Placed Apart**

| Quantitative or Qualitative Measure | 31. Visits between Children in Custody and Siblings Placed Apart: Number/percent of children in custody, who have siblings with whom they are not residing shall visit with their siblings as appropriate. |
|---|---|
| Final Target | 85% of children in custody who have siblings with whom they are not residing shall visit with those siblings at least monthly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

*Performance as of December 31, 2018:*

In December 2018, 1,360 (88%) of 1,553 applicable children in placement who had at least one sibling with whom they did not reside had at least one visit with one of their siblings during the

---

[101] Monthly performance for this measure is as follows: July, 79%; August, 79%; September, 77%; October, 79%; November, 76%; December, 77%. Given the results of validation from a prior monitoring period, the Monitor excluded from the universe all cases in which DCF documented an exception to the parent-child visit requirement. For example, in December 2018, there was an average of 2,624 children with a goal of reunification across the four weeks of the month. Data from NJ SPIRIT indicated that in an average of 604 cases that month, the worker had determined that the parent was unavailable for the visit, the child declined the visit or the visit was not required. Based on these data, the Monitor excluded those cases from the universe, making the universe of applicable children an average of 2,020 in December.

[102] Monthly performance for this measure is as follows: July, 92%; August, 92%; September, 91%; October, 92%; November, 89%; December, 91%. Given the results of validation activities from a prior monitoring period, the Monitor excluded from the universe all cases in which DCF documented an exception to the parent-child visit requirement. For example, in December 2018, there were 2,526 children with a goal of reunification. Data from NJ SPIRIT indicated that in 518 cases that month, the worker had determined that the parent was unavailable for the visit, the child declined the visit or the visit was not required. Based on these data, the Monitor excluded those cases from the universe, making the universe of applicable children 2,008 in December.

month. Between July and December 2018, a range of 85 percent to 88 percent of children had at least monthly visits with one of their siblings with whom they were not placed (see Figure 2).[103]

In assessing performance for this measure, the Monitor applied the findings from a joint review with DCF of children for which case documentation indicated that a sibling visit was not required due to a court order, hospitalization, or because the child was missing or otherwise unavailable.[104] DCF again took a primary role in this validation process.

For the first time this monitoring period, DCF provided data to the Monitor about sibling visits facilitated by private providers. After validating these data, the Monitor included those visits in DCF's performance for maintaining contacts between siblings through visits. As a result of this data adjustment and reported improvements in performance in many Local Offices, DCF's performance exceeds the SEP standard in this area for the first time this monitoring period.

**Figure 5: Percentage of Children Who Had at Least Monthly Visits with Siblings, for Children not Placed with Siblings (July – December 2018)**



Source: DCF data

---

[103] Monthly performance is as follows: July, 86%; August, 86%; September, 87%; October, 87%; November, 85%; December, 88%. Reported performance accounts for valid exceptions to the visits requirement.

[104] During each month of the monitoring period, workers documented an average of approximately 250 cases in which there was believed to be an exception to the applicable visits requirement. In an effort to assess the validity of these exceptions, DCF reviewed 189 cases from a universe of eligible children in October and November 2018 in which children were not able to visit their sibling due to a documented exception to the visits requirement. The Monitor and DCF determined that a valid exception was utilized in 114 (60%) of 189 cases reviewed. As a result, the Monitor excluded 60% of the exceptions from each month from the universe. For example, in the month of December 2018, there were 1,700 children in custody with a sibling in care with whom they were not placed. Data from NJ SPIRIT indicated that there were 245 documented cases that month for which the worker had determined the visit was not required or the child was unavailable. Based on the sample, the Monitor excluded from the universe 147 (60%) the 245 cases, making the universe of applicable children 1,553 (1,700 -147).

*Progress of the New Jersey Department of Children and Families*  
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*  
*Page 54*

## F.  PLACEMENT

Stable and appropriate placement for children in foster care is critical to safety and well-being, and maintenance of family bonds. DCF policy requires siblings to be placed together whenever possible, and that children experience as few placement changes as possible while in out-of-home placement. There are five performance measures related to placement. As of January 2018, all had been previously met and were designated as Outcomes *To Be Maintained*: sibling placements of two to three children (SEP IV.G.32); sibling placements and recruitment of placements for four or more children (SEP IV.G.33); placement stability for children in care between 13 and 24 months (SEP IV.G.36); and placement stability for children in care 12 months or less (SEP IV.G.35). All of these measures, except recruitment of placements to accommodate large sibling groups, are assessed through longitudinal cohort data on an annual basis. Performance for all five measures are discussed below.

### Placing Siblings Together

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 32.  <u>Placing Siblings Together</u>: The percentage of sibling groups of two or three siblings entering custody be placed together. |
| **Performance Target** | At least 80% of siblings groups of two or three children entering placement will be placed together. |

*Performance as of CY 2018:*

In CY 2018, there were 480 sibling groups that came into custody at the same time or within 30 days of one another that were comprised of two or three children. Of these, 77 percent (371) were placed together. DCF approached, but did not meet, the SEP standard for this measure for the third consecutive year. CSSP has asked DCF to review data on this measure to identify barriers to performance. The Monitor will wait to review data from the period January 1 through December 30, 2019, the next available data set, before recommending a change in categorization for this measure.

### Placing Siblings Together for Four of More Children

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 33.  <u>Placing Siblings Together for Four or More Children</u>: The percentage of sibling groups of four or more placed together. |
| **Performance Target** | For sibling groups of four or more 80% will be placed with at least one other sibling. |

*Performance as of CY 2018:*

In CY 2018, there were 286 children who were part of sibling groups of four or more children in placement. Of those, 246 (86%) were placed with at least one other sibling. DCF has exceeded this SEP performance standard again this monitoring period.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*
*June 19, 2019*
*Page 55*

## Recruitment of Placements for Sibling Groups of Four or More

| Quantitative or Qualitative Measure | 34.  Recruitment of Placements for Sibling Groups of Four or More |
|---|---|
| Performance Target | DCF will continue to recruit for resource homes capable of serving sibling groups of four or more. |

***Performance as of December 31, 2018:***

DCF staff continued to develop recruitment strategies that focus efforts on local needs, with a special emphasis on families willing to care for large sibling groups and adolescents.

Recruitment efforts include partnering with community groups and businesses that offer opportunities to speak at professional organizations and events, local sports facilities and movie theaters, and strategically place advertisements in local publications and in online websites to reach potential resource families.

During this monitoring period, DCF continued to host recruitment and retention events for families willing and able to accommodate large sibling groups. For example, the Hudson County recruiter presented at the Hudson PRIDE Day to LGTBQI families about the need for families willing to care for large sibling groups, Essex County recruiters presented at the Harriet Tubman School in Newark on the same topic, and the Ocean County recruiter held a retention event at Skyzone.

As of December 31, 2018, DCF had a total of 73 large capacity Siblings in Best Placement Settings (SIBs) homes, 11 fewer than at the end of June 30, 2018. Of the 73 large capacity SIBs homes, 55 homes can accommodate four children – a decrease of 9 homes from the previous monitoring period – and 18 can accommodate five or more children, a decrease of two homes from the first half of the year. Between July and December 2018, DCF recruited and licensed a total of 19 new SIBs homes; 14 SIBS homes that can accommodate four children and five SIBS homes that can accommodate five children. During the same period, 23 homes that can accommodate four children and seven homes that can accommodate five children closed or downgraded their capacity.[105]

The Monitor considers DCF to have met the SEP standard for this measure between July and December 2018.

---

[105] As of December 31, 2018, 23 homes accommodating four children either downgraded or closed: five homes closed or downgraded upon reunification of siblings with their biological parents, seven homes downgraded or closed upon adoption or kinship legal guardianship, six homes downgraded after requesting removal of sibling(s) from the home, one home was closed due to the death of the provider, two homes downgraded after the sibling groups were moved to the home of a relative or family friend, one home was downgraded after an Institutional Abuse Investigations Unit investigation and one home closed after obtaining custody of the sibling group. During the same period, seven homes that could accommodate five or more children downgraded their capacity: five homes downgraded after adoption finalization, one home downgraded after reunification of siblings with their biological parents, and one home downgraded after the sibling group was moved to the home of a relative.

**Stability of Placement**

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 35.  <u>Stability of Placement</u>: The percentage of children entering out-of-home placement for the first time in a calendar year who have no more than one placement change during the 12 months following their date of entry. |
| **Performance Target** | At least 84% of children entering care for the first time in a calendar year will have no more than one placement change during the 12 months following their date of entry. |

*Performance as of CY 2017 (Most Recent Calendar Year Available):*

The most recent performance data assesses the 2,966 applicable children who entered care for the first time in CY 2017 and aggregates the number of placements each child experienced within one year of entry. For children entering care in CY 2017, 2,508 (85%) had no more than one placement change (two total placements) during the 12 months from their date of entry. DCF continued to meet the SEP performance standard for this measure this monitoring period.

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 36.  <u>Stability of Placement</u>: The percentage of children in out-of-home placement who have no more than one placement change during the 13 to 24 months following their date of entry. |
| **Performance Target** | At least 88% of children in out-of-home placement will have no more than one placement change during the 13 to 24 months following their date of entry. |

*Performance as of CY 2016 (Most Recent Calendar Year Available):*

The most recent performance data assesses the 1,653 applicable children who entered care for the first time in CY 2016 and aggregates the number of placements each child remaining in care experienced in the second year of their out-of-home placement. For children entering care in CY 2016, 1,578 (95%) children had no more than one placement change (two total placements) during the 13 to 24 months following their date of entry. DCF performance exceeded the SEP performance standard.

## G.  MALTREATMENT OF CHILDREN AND YOUTH

A fundamental responsibility of DCF is ensuring the long-term safety of children who are receiving or have received services from CP&P. This responsibility includes ensuring the safety of children who are placed in resource family homes and congregate facilities, and preventing future maltreatment.

There are four SEP performance measures related to maltreatment of children and youth. As of January 2018, three measures were designated as Outcomes *To Be Maintained*: abuse and neglect of children in foster care (SEP III.H.12); repeat maltreatment for children remaining in their home (SEP IV.H.37); and maltreatment post-reunification (SEP IV.H.38). One was designated as an Outcome *To Be Achieved*: re-entry to placement (SEP IV.H.39). All of these measures are assessed through longitudinal cohort data on an annual basis. Performance for all four measures are discussed below.

### Abuse and Neglect of Children in Foster Care

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 12.  <u>Abuse and Neglect of Children in Foster Care</u>: Of all children in foster care, the percentage who are victims of substantiated abuse or neglect by a resource parent or facility staff member. |
| **Final Target** | No more than 0.49% of children will be victims of substantiated abuse or neglect by a resource parent or facility staff member. |

*Performance as of CY 2018:*

In CY 2018, 25 out of 9,423 children (0.27%) were victims of a substantiated allegation of abuse and/or neglect by a resource parent or facility staff member. Performance for this measure continues to exceed the SEP performance standard, and mirrors Qualitative Review (QR) data which consistently shows high performance on child safety.

### Repeat Maltreatment

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 37.  <u>Repeat Maltreatment (In-Home)</u>: Of all children who remain in home after substantiation of abuse or neglect, the percentage who have another substantiation within the next 12 months. |
| **Final Target** | No more than 7.2% of children who remain at home after a substantiation of abuse or neglect will have another substantiation within the next 12 months. |

*Performance as of CY 2017 (Most Recent Calendar Year Available):*

In CY 2017, there were 3,767 children who were victims of a substantiated allegation of abuse and/or neglect who were not placed in out-of-home care but instead served through in-home services. Of the 3,767 children, 189 (5%) of these children were the victims of another substantiated allegation of child abuse and/or neglect within 12 months of the initial

substantiation. Figure 6 shows performance from CY 2009 to CY 2017. While DCF seeks to insure no future maltreatment for any child, in-home repeat maltreatment rates have impressively declined in since CY 2013, and DCF performance continues to meet the SEP standard.

**Figure 6: Percentage of Children who were Victims of Second Substantiated Allegation within 12 Months of Remaining at Home after First Substantiated Allegation (CY 2009-CY 2017)**



Source: DCF data analyzed by Hornby Zeller Associates and Rutgers University

| Quantitative or Qualitative Measure | 38. Maltreatment Post-Reunification: Of all children who are reunified during a period, the percentage who are victims of substantiated abuse or neglect within one year after the date of reunification. |
|---|---|
| Final Target | Of all children who enter foster care in a 12-month period for the first time who are discharged within 24 months to reunification or living with relative(s), no more than 6.9% will be the victims of substantiated abuse or neglect within 12 months after reunification. |

***Performance as of CY 2015 (Most Recent Calendar Year Available):***

In CY 2015, there were 1,826 children in foster care who exited DCF custody to reunification with families. Of those, 107 (5.9%) of these children were victims of a substantiated allegation of abuse and/or neglect within 12 months of their return home. Figure 7 shows performance from CY 2008 to CY 2015. While DCF seeks to insure no future maltreatment for any child, post-reunification maltreatment rates have dropped since CY 2012, and DCF continues to meet the SEP performance standard.

**Figure 7: Percentage of Children who were Victims of Substantiated Allegation within 12 Months after Reunification (CY 2008-CY 2015)**



Source: DCF data analyzed by Hornby Zeller Associates and Rutgers University

### Re-entry to Placement

| Quantitative or Qualitative Measure | 39. Re-entry to Placement: Of all children who leave custody during a period, except those whose reason for discharge is that they ran away from their placement, the percentage that re-enter custody within one year of the date of exit. |
|---|---|
| **Final Target** | Of all children who enter foster care in a 12 month period for the first time who are discharged within 12 months to reunification, living with relative(s), or guardianship, no more than 9% will re-enter foster care within 12 months of their discharge. |

***Performance as of CY 2016 (Most Recent Calendar Year Available):***

In CY 2016, there were 1,291 children to whom this measure applied; 158 (12.2%) children re-entered placement within 12 months of their discharge to reunification, living with relatives, or guardianship. Figure 8 shows performance from CY 2009 to CY 2016. These rates have not changed significantly since 2009, and DCF has not yet met the SEP performance standard.[106]

---

[106] The methodology for calculating this measure changed between the Modified Settlement Agreement (MSA) and the Sustainability and Exit Plan (SEP), wherein Re-entry to Care was initially measured using exit cohorts, and in recent years has been measured using entry cohorts. As reflected in Figure 8, CSSP has adjusted the historical trend data to account for changes in reporting over time.

DCF is taking a closer look at factors that contribute to re-entry to foster care to explore barriers to performance on this measure.

**Figure 8: Percentage of Children Who Re-Entered Custody within One Year of Date of Exit (CY 2009 – CY 2016)**



Source: DCF data analyzed by Hornby Zeller Associates and Rutgers University.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 61*

## H.  TIMELY PERMANENCY

Regardless of age, gender, race or ethnicity, all children need and deserve a safe, nurturing family to protect and guide them. Safe family reunification with families is the preferred path, but permanency for children can be achieved through a number of different avenues, including kindship/guardianship and adoption. There are four SEP measures that focus on permanency for children. As of January 2018, three measures were designated as Outcomes *To Be Maintained* – achieving permanency within 12 months (SEP IV.I.40), 36 months (SEP IV.I.42) and 48 months (SEP IV.I.43) – and one measure was designated as an Outcome *To Be Achieved* – achieving permanency within 24 months (SEP IV.I.41). All of the measures discussed in this section are assessed with longitudinal cohort data on an annual basis. Performance for all four measures are discussed below.

**Timely Permanency through Reunification, Adoption or Guardianship**

| Quantitative or Qualitative Measure | 40.  Permanency Within 12 months: Of all children who entered foster care in a 12 month period, what percentage were discharged from foster care to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. |
|---|---|
| Final Target | Of all children who enter foster care in a 12 month period, at least 42% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. |

*Performance as of CY 2017 (Most Recent Calendar Year Available):*

The most recent data available for this measure are for children who entered foster care in CY 2017. Of the 3,382 children who entered foster care in CY 2017, 1,401 (41%) were discharged to permanency within 12 months of their removal from their home (see Figure 9). Of those 1,401 children, 1,193 of them were discharged to reunification with their families; this means that 35 percent of all children who entered foster care in CY 2017 were discharged to reunification within 12 months. Current performance has dipped slightly but the Monitor has determined that DCF continues to meet the SEP performance standard for permanency within 12 months.

**Figure 9: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 12 Months of Entering Foster Care (CY 2010 – CY 2017)**



Source: DCF data analyzed by Hornby Zeller Associates and Rutgers University.

| Quantitative or Qualitative Measure | 41. Permanency Within 24 months: Of all children who enter foster care in a 12 month period, what percentage were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering care. |
|---|---|
| **Final Target** | Of all children who enter foster care in a 12 month period, at least 66% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering care. |

*Performance as of CY 2016 (Most Recent Calendar Year Available):*

The most recent data available for this measure are for children who entered foster care in CY 2016. Of the 3,786 children who entered foster care in CY 2016, 2,466 (65%) were discharged to permanency within 24 months of removal from their homes (see Figure 10). Of those 2,466 children, 1,913 of them were discharged to reunification with their families; this means that 51 percent of all children who entered care in CY 2015 were discharged to reunification within 24 months. DCF performance remains close to, but does not yet meet, the SEP standard.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 63*

**Figure 10: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 24 Months of Entering Foster Care (CY 2010 – CY 2016)[107]**



Source: DCF data analyzed by Hornby Zeller Associates and Rutgers University.

| Quantitative or Qualitative Measure | 42. Permanency Within 36 months: Of all children who enter foster care in a 12 month period, what percentage were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering care. |
|---|---|
| Final Target | Of all children who enter foster care in a 12 month period, at least 80% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering care. |

*Performance as of CY 2015 (Most Recent Calendar Year Available):*

The most recent data available for this measure are for children who entered foster care in CY 2015. Of the 4,037 children who entered foster care in CY 2015, 3,281 (81%) were discharged to permanency within 36 months of removal from their homes (see Figure 11). Of those 3,281 children, 2,106 of them were discharged to reunification with their families; this means that 52 percent of all children who entered care in CY 2014 were discharged to reunification within 36 months. DCF performance meets the SEP standard again this reporting period.

---

[107] DCF provided the Monitor with new data this monitoring period that included permanency rates for those in the entry cohort between the ages of 18 and 21. The Monitor has not independently verified this data but has included it in the figures, which shows a higher level of performance than has been historically reported in prior monitoring periods.

**Figure 11: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 36 Months of Entering Foster Care (CY 2010 – CY 2015)**



Source: DCF data analyzed by Hornby Zeller Associates and Rutgers University.

| Quantitative or Qualitative Measure | 43. <u>Permanency within 48 months</u>: Of all children who enter foster care in a 12 month period, what percentage were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering care. |
|---|---|
| **Final Target** | Of all children who enter foster care in a 12 month period, at least 86% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering care. |

*Performance as of CY 2014 (Most Recent Calendar Year Available):*

The most recent data available for this measure are for children who entered foster care in CY 2014. Of the 4,379 children who entered foster care in CY 2014, 3,895 (89%) were discharged to permanency within 48 months of removal from their homes (see Figure 12). Of those 4,379 children, 2,354 of them were discharged to reunification with their families; this means that 54 percent of all children who entered care in CY 2013 were discharged to reunification within 48 months. Current performance meets the SEP performance standard for the second time, another notable achievement.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 65*

**Figure 12: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 48 Months of Entering Foster Care (CY 2010 – CY 2014)**



Source: DCF data analyzed by Hornby Zeller Associates and Rutgers University.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 66*

## I.   CHILD HEALTH UNITS

Early in New Jersey's child welfare reform efforts, DCF developed Child Health Units (CHUs) to facilitate and ensure the timely provision of health care to children in CP&P custody. CHUs are located in each CP&P Local Office and are staffed with Regional Nurse Administrators, Nurse Health Care Case Managers (HCCMs) and staff assistants, based on the projected number of children in out-of-home placement.

Section III.E of the SEP requires the state to "maintain its network of child health units, adequately staffed by nurses in each Local Office." This measure has been previously met and designated as an Outcome *To Be Maintained*. In what continues to be a model for other child welfare systems throughout the country, each child placed in a resource home has a nurse assigned for health care case management. CHUs are recognized by staff and external partners as an effective achievement of New Jersey's child welfare reform efforts. The work of the nurses in concert with staff and other team members continue to contribute to the consistently positive findings in New Jersey's Qualitative Reviews (QRs) regarding children's health. Performance for this measure is discussed below.

| Quantitative or Qualitative Measure | 8.   Child Health Units: The State will continue to maintain its network of child health units, adequately staffed by nurses in each Local Office. |
|---|---|
| **Performance Target** | DCF will maintain adequate staffing levels in Local Offices. |

*Performance as of December 31, 2018:*

As of December 31, 2018, DCF had 163 nurses and 84 staff assistants. Of the 163 nurses, an average of 161 were available for coverage for an average ratio of one nurse to every 36 children in out-of-home care, exceeding the standard of one nurse to 50 children in out-of-home care.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 67*

### J.  OLDER YOUTH

The SEP includes four measures related to older youth, all designated as Outcomes *To Be Maintained* – completion of Independent Living Assessments (SEP IV.K.45); quality of case planning and services (SEP IV.K.46); housing for youth who exit care without achieving permanency (SEP IV.K.47); and education/employment for youth who exit care without achieving permanency (SEP IV.K.48). Performance for all four measures during the current monitoring period are discussed below.

**Independent Living Assessments**

| Quantitative or Qualitative Measure | 45.  Independent Living Assessments: Percentage of youth age 14 and 18 with a completed Independent Living Assessment. |
|---|---|
| **Performance Target** | 90% of youth age 14 to 18 will have an Independent Living Assessment. |

*Performance as of December 31, 2018:*

In December 2018, there were 696 youth age 14 to 18 in out-of-home placement for at least six months; 599 (86%) had an Independent Living Assessment (ILA) completed. Monthly performance between July and December 2018 ranged from 86 to 90 percent.[108] DCF performance met the SEP standard in one of six months this monitoring period, and remains close to the standard in the other months. The Monitor considers this performance to have met the SEP standard, but will continue to closely review data regarding ILAs during the monitoring period January through June 2019.

**Quality of Case Planning and Services**

| Quantitative or Qualitative Measure | 46.  Quality of Case Planning and Services: DCF shall provide case management and services to youth between the age 18 and 21 who have not achieved legal permanency. |
|---|---|
| **Performance Target** | 75% of youth age 18 to 21 who have not achieved legal permanency shall receive acceptable quality case management and service planning. |

*Performance as of December 31, 2018:*

Performance data for this measure were collected through Qualitative Reviews (QRs) of the experiences and outcomes of 43 youth age 18 to 21, conducted from January through December 2018. In rating these cases, reviewers use both the standard QR protocol and a list of additional considerations relevant to this population, such as DCF's efforts to plan and support youth who identify as LGBTQI, those who are victims of domestic violence, those who are expectant or parenting, and those who have developmental disabilities.

---

[108] Monthly performance is as follows: July, 90%; August, 88%; September, 88%; October, 89%; November, 89%; December, 86%.

From January to December 2018, 30 of the 43 (70%) cases reviewed scored acceptable for both the *child (youth)/family status* and *overall practice performance* indicators (see Figure 13).[109] There has not been a significant change from CY 2017, in which 74 percent of cases reviewed were rated acceptable on both indicators. Given that the universe of cases to which this measure applies is small and therefore more susceptible to fluctuations, the Monitor considers DCF to have met the performance standard, but will continue to closely track progress in this area of practice.

**Figure 13: Qualitative Review (QR) Cases Rated Acceptable on Quality of Case Planning and Services for Older Youth (CY 2016 – CY 2018)[110] (n=43)**



Source: DCF data

---

[109] From January to December 2018, 70% (30 of 43) of the applicable cases reviewed were rated acceptable on both the *overall child (youth)/family status* and the *overall practice performance* indicators; 84% (36 of 43) of cases were rated acceptable for *child (youth)/family status* and 74% (32 of 43) of cases were rated acceptable for *overall practice performance*.
[110] In both CY 2016 and CY 2018, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem and Union counties. In CY 2017, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex and Warren counties.

**Housing**

| Quantitative or Qualitative Measure | 46.  Housing: Youth exiting care without achieving permanency shall have housing. |
|---|---|
| **Performance Target** | 95% of youth exiting care without achieving permanency shall have housing. |

*Performance as of December 31, 2018:*

The Monitor and DCF staff conducted a case record review of all youth who exited care between July and December 2018 without achieving permanency to assess whether they had housing upon leaving DCF custody. Of the 55 youth for which this measure was applicable,[111] there was documentation of a housing plan for 53 (96%) youth, exceeding the SEP standard. This is an improvement in performance from the previous monitoring period.

**Employment/Education**

| Quantitative or Qualitative Measure | 47.  Employment/Education: Youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. |
|---|---|
| **Performance Target** | 90% of youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. |

*Performance as of December 31, 2018:*

The Monitor and DCF also reviewed the case records of all youth who exited DCF custody between July and December 2018 without achieving permanency to determine whether they were employed or enrolled in school at the time of leaving care. Of the 53 youth to whom this measure applied,[112] 47 (89%) were either employed or enrolled in education or vocational training programs, or there was documentation of consistent efforts by the caseworker to help youth secure education or employment.[113] This is an improvement in performance from the prior monitoring period, and the Monitor considers this SEP measure to be met again this period.

---

[111] Six youth out of the universe of 61 youth exiting care to non-permanency were excluded from consideration because two youth could not be located and four were incarcerated.

[112] Eight youth out of the universe of 61 youth exiting care to non-permanency were excluded from consideration because they could not be located, were incarcerated, or moved out of state.

[113] Seven youth were considered to have met the standard because there was documentation of consistent efforts by the caseworker to help secure education or employment.

### K.  SERVICES TO SUPPORT TRANSITION

While involved with DCF, children, youth and families often face transitions, including changes in family relationships, living arrangements, service providers or schools. Some transitions are more critical than others but all require recognition and planning in order to be smooth and successful. DCF uses the Qualitative Review (QR) process to measure case practice that supports families to make successful transitions. Section IV.J of the SEP requires that 80 percent of cases be rated acceptable on the *successful transitions* indicator. This measure is designated as an Outcome *To Be Achieved*. The QR process and protocol are discussed in detail in Section V.N of this report.

### Services to Support Transition

| Quantitative or Qualitative Measure | 44.  Services to Support Transition: DCF will provide services and supports to families to support and preserve successful transitions. |
|---|---|
| Performance Target | 80% of cases will be plans rated acceptable for supporting transitions as measured by the Qualitative Review (QR). |

*Performance as of December 31, 2017*:

Results from 118 applicable cases reviewed from January to December 2018 indicate that 62 percent (73 of 118) of cases were rated acceptable, which is not a significant shift in performance from CY 2017 or CY 2016 (see Figure 14). The lack of improvement on this measure reflects the overall quality of casework issues that the Department is working to improve with renewed focus on the Case Practice Model (CPM) and solution-based case planning. DCF has also been making efforts to identify barriers to access to services.

DCF did not meet the SEP performance standard in CY 2018. Multiple integral parts of best case practice, including case planning, teaming and assessments, can impact how well DCF supports families to make successful transitions.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 71*

**Figure 14: Qualitative Review (QR) Cases Rated Acceptable on Successful Transitions (CY 2016 – CY 2018)[114]**

**(n=118)**



Source: DCF data

---

[114] In CY 2016 and CY 2018, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem and Union counties. In CY 2017, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex and Warren counties.

## L.  CASELOADS

One of the successes of DCF's reform was reducing and now maintaining caseloads at levels where workers can do the work with children, youth and families that was expected of them. Caseload compliance is measured by assessing caseloads for individual caseworkers in each of the system's functional areas (Intake, Permanency, Adoption and IAIU) as well as office standards for each CP&P Local Office. Table 2 summarizes the SEP's caseload standards for individual workers.

The SEP includes eight performance measures related to caseloads. As of July 2018, all were designated as Outcomes *To Be Maintained.* These eight measures include Intake office caseloads (SEP IV.E.24); Intake individual worker caseloads (SEP IV.E.25); Adoption office caseloads (SEP IV.E.26); Adoption individual worker caseloads (SEP IV.E.27); Permanency office caseloads (SEP III.B.4); Permanency individual worker caseloads (SEP III.B.5); IAIU investigators individual caseloads (SEP III.B.3); and supervisory/worker ratio (SEP III.B.2). Performance for all eight measures during the current monitoring period are discussed below.

### Table 2: CP&P Individual Worker Caseload Standards

| Caseworker Function | Responsibility | Individual Caseload Standard (SEP IV.E and III.B) |
|---|---|---|
| Intake | Respond to community concerns regarding child safety and well-being. Specifically, receive referrals from the State Central Registry (SCR) and depending on the nature of the referral, respond between two hours and five days with a visit to the home and begin investigation or assessment. Complete investigation or assessment within 60 days. | Intake workers are to have no more than **12 open cases** at any one time **and** no more than **eight new referrals** assigned in a month. No Intake worker with 12 or more open cases can be given more than **two secondary assignments** per month.[115] |
| Institutional Abuse Investigations Unit (IAIU) | Respond to allegations of child abuse and neglect in settings including correctional facilities, detention facilities, treatment facilities, schools (public or private), residential schools, shelters, hospitals, camps or child care centers that are required to be licensed, resource family homes and registered family day care homes. | IAIU staff workers are to have no more than **12 open cases** at any one time **and** no more than **eight new referrals** assigned in a month. |
| Permanency | Provide services to families whose children remain at home under the protective supervision of CP&P and those families whose children are removed from home due to safety concerns. | Permanency workers are to serve no more than **15 families and 10 children in out-of-home care at any one time**. |
| Adoption | Find permanent homes for children who cannot safely return to their parents by preparing children for adoption, developing adoptive resources and performing the work needed to finalize adoptions. | Adoption workers are to serve no more than **15 children** at any one time. |

Source: DCF

---

[115] Secondary assignments refer to shared cases between Intake and Permanency workers for families who have a case open with a Permanency worker where there are new allegations of abuse or neglect that require investigation.

*Verifying Worker Caseloads*

DCF caseload data are collected and analyzed through NJ SPIRIT and SafeMeasures. As in previous monitoring periods, the Monitor verified caseload data supplied by DCF by conducting telephone interviews with randomly selected workers across the state, and inquiring about caseloads during site visits and when doing QR reviews. The formal caseload verification process included workers in all areas in which the SEP establishes caseload standards: Intake, Permanency and Adoption. A sample of 150 workers[116] were selected from all active workers in the months of July, August and October 2018.  For the past several years, the Monitor has weighted the sample with Intake workers to examine in more depth the impact of shared cases between Intake and Permanency workers. All 150 workers were called and information was collected from 62 workers (41% of the eligible sample). Among the 62 workers who participated in the caseload verification interviews, 32 were Intake workers, 14 were Permanency workers, eight were Adoption workers and eight were trainees.

During the interviews, the Monitor asked caseworkers whether their current caseloads met caseload standards during the months of July, August and October 2018; responses were compared to the caseload information from NJ SPIRIT and SafeMeasures for identified workers during the same period.

## Intake

The SEP Intake caseload standard is that no worker should have more than eight new case assignments per month, no more than 12 open primary cases at any one time and no Intake worker with 12 or more open primary cases can be assigned more than two secondary assignments per month. In January 2017, DCF implemented a new methodology for tracking and reporting the SEP Intake caseload standard to more clearly communicate to staff and to streamline monitoring and reporting. DCF's new methodology captures secondary case assignments on the Intake worker's monthly caseload report, which tracks and reports Intake caseloads as follows: no more than eight new assignments per month; no more than 12 cases assigned as primary case assignments at any one time; and no more than 14 cases at any one time, including both primary and secondary case assignments. The methodology for the standard of no more than eight new case assignments per month, including secondary assignments, remains unchanged.

DCF continues to implement an internal caseload verification process which serves as a quality assurance method where Intake workers are interviewed and their reported caseloads are compared to their caseloads as reported in SafeMeasures. During the period of July through December 2018, DCF interviewed a random sample of 221 Intake workers from 23 Local Offices throughout the state. DCF verified that 95 percent (211 of 221) of Intake worker caseloads were accurately reflected in SafeMeasures. Findings from DCF's caseload verification reviews are shared widely with DCF staff through briefs, posted onto the Office of Quality website, DCF-wide "DID YOU KNOW" emails, and during statewide leadership meetings.

---

[116] The new caseload verification methodology consists of conducting a survey of a random selection of 50 workers per selected months throughout the monitoring period that includes questions about their current caseload and workload.

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 24. <u>Intake Local Office Caseloads:</u> Local Offices will have an average caseload for Intake workers of (a) no more than 12 families, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |
| **Performance Target** | 95% of Local Offices will have an average caseload of (a) no more than 12 families, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |

***Performance as of December 31, 2018:***

Performance data for July through December 2018 show that 100 percent of Local Offices met the Intake caseload standards. DCF continues to exceed the SEP standard.

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 25. <u>Individual Intake Caseloads</u>: individual Intake workers shall have (a) no more than 12 open cases, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |
| **Performance Target** | 90% of individual Intake workers shall have (a) no more than 12 open cases, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |

***Performance as of December 31, 2018:***

The state reported an average of 1,065 active Intake workers between July and December 2018. Among those 1,065 active Intake workers, and average of 1,013 (95%) had caseloads that met the standard. Specifically, in December 2018, 988 (91%) of 1,082 active Intake workers were in compliance with individual worker standards. DCF continues to meet the individual Intake worker caseload standard.

Data by Local Office show that during December 2018, performance ranged from 45 percent to 100 percent, with 33 of 46 (72%) Local Offices having all Intake workers in compliance with caseload standards.

Among the 62 workers who participated in the Monitor's interviews for caseload verification, 32 were Intake workers. Two of the 32 Intake workers reported exceeding the caseload limit of eight new assignments per month during the months of July, August and October 2018. Six (19%) Intake workers reported having more than 14 total cases including both primary and secondary case assignments on their caseload during the months of July, August and October 2018. The Monitor staff spot check this data in NJ SPIRIT on a regular basis.

DCF deploys Impact Teams (a supervisor and three workers) to a unit or a Local Office in different areas when intakes are unusually high, to assist in maintaining caseload standards by taking on investigation overflow. There are nine Impact Teams, one per Area Office.

**"Shared" Cases between Intake and Permanency Workers**

As described in previous monitoring reports, Intake and Permanency workers sometimes share responsibility for families with open permanency cases when there are new allegations of abuse or neglect. According to DCF procedure, all Child Protective Services (CPS) reports are assigned to Intake workers to investigate and are reflected in caseload reporting as one of the Intake workers' eight new referrals in the month and as one of their 12 open families for that month. However, when circumstances indicate that a family with an already open permanency case is the subject of a new CPS report, the work with the family becomes the shared responsibility of both Intake and Permanency workers until the investigation is completed.

Intake workers are assigned a secondary worker designation in NJ SPIRIT for such cases with families who are already currently assigned a Permanency worker. According to DCF, this arrangement emphasizes the primary role of the Permanency worker in securing placement, facilitating visits, supporting the family to implement the case plan and coordinating services. It also reflects the Permanency worker's responsibility to provide information to the Intake worker and to link the family to appropriate services and supports identified during the course of the new investigation, thus relieving the Intake worker of the overall case management responsibility for the case. Intake workers continue to be responsible for the work required to complete investigative tasks and to reach and document an investigative finding. Thus, these secondary assignments are counted as one of the Intake worker's eight new referrals assigned in a month and as part of the total 14 open cases per month.

DCF reports that Intake supervisors in CP&P Local Offices are expected to appropriately manage the workload of staff in their units and consider an Intake worker's primary and secondary responsibilities when assigning new referrals. Table 3 provides the reported number of secondary assignments to Intake workers by month for this monitoring period.

**Table 3: Number of CP&P Investigations and Secondary Intake Assignments by Month (July – December 2018)[117]**

| Month | Total Investigations Assigned to Intake Workers for the Month | Secondary Intake Worker Assignments of CPS and CWS Investigations | |
|---|---|---|---|
| July | 4,858 | 471 | 10% |
| August | 4,926 | 512 | 10% |
| September | 5,521 | 509 | 9% |
| October | 6,935 | 585 | 8% |
| November | 5,838 | 491 | 8% |
| December | 5,770 | 546 | 9% |

Source: DCF data

The Monitor reviewed monthly Local Office data on secondary assignments and found that on average, each Intake worker was assigned one secondary case at any given time during the period reviewed. The Monitor also found that an average of 24 percent of Intake workers

---

[117] Total excludes intakes assigned to Impact, Permanency, Adoption and Advocacy Center workers and includes intakes assigned to workers on leave.

received two or more secondary case assignments and an average of six percent of Intake workers received three or more secondary assignments each month during the monitoring period. Specifically, in the month of December 2018, 280 (26%) Intake workers received two or more secondary intake assignments and 71 (7%) Intake workers received three or more secondary intake assignments.

During phone interviews with caseworkers, Monitor staff inquired about the prevalence of secondary assignments and their impact on workload. Intake workers were asked about the frequency of secondary assignments, how these assignments affect workload and how they are measured. Of the 32 Intake workers interviewed, 13 (41%) workers reported receiving an assignment to investigate a new report on an open permanency case as a secondary worker at least once during the months of July, August and October 2018.

To ensure that Intake workload is properly managed regardless of the combination of primary and secondary assignments, DCF continues to examine the processes used in Local Offices to make secondary assignments, as well as Local Office workflow management practices.

**Assignment of Investigations to Non-Caseload Carrying Staff**

On occasion, in order to handle the unpredictable flow of referrals for investigations, trained non-caseload carrying staff as well as caseload-carrying staff who are not part of Intake units (non-Intake caseload carrying staff) in Local Offices are assigned to investigations. DCF reports that all staff are required to complete First Responder training prior to being assigned an investigation and non-caseload carrying staff must have been similarly trained and receive supervision by the Intake supervisor. The Monitor's review of DCF's data for the months of July through December 2018 found that approximately one percent of investigations were assigned each month to non-caseload carrying staff and that about six percent were assigned to non-Intake caseload carrying staff. DCF produces a Caseload Report Exception List that documents all instances of intakes identified as assigned to non-caseload carrying workers and closely monitors this on an ongoing basis. Table 4 shows the number and percentage of investigations assigned to non-caseload carrying staff, and Table 5 shows the number and percentage of investigations assigned to non-Intake caseload carrying staff.

As part of the phone interviews, Intake workers were asked if there were scenarios in their Local Offices in which non-caseload carrying staff could be assigned an investigation. Eight of the 32 Intake workers (25%) reported that they were aware of instances in which this has happened in their office in July, August and October 2018. Respondents stated that non-caseload carrying staff with prior investigative experience can be assigned cases when all Intake workers in a Local Office reach their assignment limit for the month. The most frequently identified job titles for the non-caseload carrying staff who are assigned investigations are Administrative Assistant and Litigation Specialist.

**Table 4: Percentage of CP&P Investigations Assigned to Non-Caseload
Carrying Staff by Month (July – December 2018)[118]**

| Month | Total Investigations Received in the Month | Number and Percentage of Investigations Assigned to Non-Case Carrying Staff | |
|---|---|---|---|
| July | 5,177 | 39 | 1% |
| August | 5,286 | 56 | 1% |
| September | 5,901 | 39 | 1% |
| October | 7,667 | 90 | 1% |
| November | 6,302 | 49 | 1% |
| December | 6,197 | 65 | 1% |

Source: DCF data

**Table 5: Percentage of CP&P Investigations Assigned to Non-Intake
Caseload Carrying Staff by Month (July – December 2018)**

| Month | Total Investigations Received in the Month | Number and Percentage of Investigations Assigned to Non- Intake Caseload Carrying Staff[119] | |
|---|---|---|---|
| July | 5,177 | 280 | 5% |
| August | 5,286 | 304 | 6% |
| September | 5,901 | 341 | 6% |
| October | 7,667 | 642 | 8% |
| November | 6,302 | 415 | 7% |
| December | 6,197 | 362 | 6% |

Source: DCF data

## Adoption

| Quantitative or Qualitative Measure | 26.  Adoption Local Office Caseloads: Local offices will have an average caseloads for Adoption workers of no more than 15 children per worker. |
|---|---|
| Performance Target | 95% of Local Offices will have an average caseload of no more than 15 children per Adoption worker. |

| Quantitative or Qualitative Measure | 27.  Individual Worker Adoption Caseloads: Individual Adoption worker caseloads shall be no more than 15 children per worker. |
|---|---|
| Performance Target | 95% of individual Adoption workers shall have a caseload of no more than 15 children per month. |

---

[118] Data are provided for investigations assigned within five days of intake receipt date and do not reflect additional assignments to an investigation after the first five days. DCF conducts monthly reviews of assignments to non-caseload carrying staff in NJ SPIRIT and has found that some investigations had been re-assigned to caseload carrying workers after the initial five days. As a result, the reported percentage of investigations assigned to non-caseload carrying staff may be lower than six percent.
[119] This includes Permanency, Adoption, Impact and Advocacy Center caseload carrying workers.

*Performance as of December 31, 2018:*

Performance data for July through December 2018 show that 99 percent of Local Offices and 98 percent of individual workers continued to maintain the adoption caseload standard during this period.[120]

Among the 62 workers who participated in the phone interviews conducted by Monitor staff for caseload verification, eight were Adoption workers. All eight adoption workers interviewed reported caseloads within the standard during the months of July, August and October 2018.

## Permanency

| Quantitative or Qualitative Measure | 4. Permanency Local Office Caseloads: Local offices will have an average caseloads for Permanency workers of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |
|---|---|
| Performance Target | 95% of Local Offices will have an average caseload of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |

| Quantitative or Qualitative Measure | 5. Individual Worker Permanency Caseloads: Individual Permanency worker caseloads shall be (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |
|---|---|
| Performance Target | 95% of individual Permanency workers shall have a caseload of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |

*Performance as of December 31, 2018:*

Performance data for July through December 2018 show that 100 percent of Local Offices and 100 percent of individual workers continued to maintain the permanency caseload standard during this period.[121]

Among the 62 workers who participated in telephone interviews conducted by Monitor staff for caseload verification, 14 were Permanency workers. All 14 permanency workers interviewed reported caseloads within the standard during the months of July, August and October 2018.

## Institutional Abuse Investigation Unit (IAIU)

| Quantitative or Qualitative Measure | 3. Individual Worker IAIU Caseloads: individual IAIU worker caseloads shall be (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. |
|---|---|
| Performance Target | 95% of individual IAIU workers shall have a caseload (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. |

---

[120] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six month monitoring period.
[121] ibid.

*Performance as of December 31, 2018:*

DCF data show 100 percent of individual workers maintained the IAIU caseload standard for the period of July through December 2018.

### Supervisory Ratio

| Quantitative or Qualitative Measure | 2. Supervisor/Worker Ratio: Local Offices shall have sufficient supervisory staff to maintain a five worker to one supervisor ration. |
|---|---|
| Performance Target | 95% of Local Offices shall have sufficient supervisory staff to maintain a five worker to one supervisor ration. |

*Performance as of December 31, 2018:*

Performance data for July through December 2018 show that 100 percent of CP&P Local Offices had sufficient supervisors to maintain ratios of five workers to one supervisor.

## M. DEPUTY ATTORNEYS GENERAL STAFFING

| Quantitative or Qualitative Measure | 7. DAsG Staffing: The State will maintain adequate DAsG staff potions and keep positions filled. |
|---|---|
| Performance Target | DCF will maintain adequate staffing levels at the DAsG office. |

*Performance as of December 31, 2018:*

As of December 31, 2018, 135 Deputy Attorneys General (DAsG) staff positions assigned to work with DCF were filled. Of those, two DAsG were on full time leave. Thus, there were a total of 133 (99%) available DAsG. DCF reports that in addition to these positions, DAsG outside of the DCF Practice Group have dedicated some of their time to DCF matters. DCF continues to meet the SEP standard for this measure.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 80*

## N.  ACCOUNTABILITY THROUGH QUALITATIVE REVIEW AND THE PRODUCTION AND USE OF ACCURATE DATA

### *QUALITATIVE REVIEW*

New Jersey's Qualitative Review (QR) is an assessment of the status of children, youth and families, the status of practice and the functioning of systems in each of the counties. The protocol and process used for the QR are aligned with DCF's Case Practice Model. Select QR results related to both Child/Youth and Family Status and Practice/System Performance are also used to report on several SEP requirements included in this report, three of which are designated Outcomes *To Be Achieved*: Quality of Teaming (SEP IV.B.20), Quality of Case Plans (SEP IV.D.23) and Services to Support Transition (SEP IV.J.44); and two of which are designated Outcomes *To Be Maintained*: Educational Needs (SEP III.G.11) and Quality of Case Planning and Services for Older Youth (SEP IV.K.46).

When conducting a QR involving children/youth under age 18, the legal guardian is asked to give informed consent for participation in the QR. Trained review teams of two persons including DCF staff, community stakeholders and staff from the Monitor's office review CP&P case records and interview as many people as possible who are involved with the children/youth and their families. QRs take place during a single week and, over the course of two years, occur in 21 counties and involve almost 400 cases across the state. The results from reviews provide critical qualitative data on child/youth and family status and practice/system performance.

At the conclusion of each week of the QR, the Case Practice Liaison (CPL) assigned to each Local Office through DCF's Office of Performance, Management and Accountability (OPMA) works with staff in the county to develop a county-level Performance Improvement Plan (PIP) with short and long term goals to strengthen practice. The PIP is designed to address areas needing improvement identified during the QR debrief. The Office of Quality approves each PIP, aggregates results and shares them with leaders across DCF's divisions. Findings from the QRs are incorporated into existing training and supervisory tools and used to identify systemic opportunities for improvement.

DCF has developed a rigorous continuous quality improvement process that incorporates the QR results and now interfaces with DCF's ChildStat meetings. ChildStat is a comprehensive review and discussion of system performance at a local level. While ChildStat previously focused on one case presentation in a particular Local Office, the new ChildStat format expands the scope to include discussions of county needs and an assessment of county-level strengths and areas needing improvement based on a review of quantitative data, QR results, and other county-level reviews. The format includes both CP&P and Children's System of Care (CSOC) staff, and allows the DCF leadership team to ask questions of and explore solutions directly with county-level leadership. DCF is using ChildStat as an opportunity to build upon the QR to assess challenges and areas in need of improvement in case practice on a county level. Going forward, each county will be assessed at ChildStat every two years, following the QR schedule, and will report on progress on their county-level PIP every 12 months. The Monitor will report more details on the new continuous quality improvement process in the next monitoring report.

During CY 2018, using the QR protocol that DCF developed in CY 2015, DCF reviewed 195 cases from 10 counties.[122] Table 6 provides the gender, age and racial and ethnic demographics of the 195 children/youth. Fifty of the children/youth were living with a parent at the time of the review and 145 of them lived with a relative or non-relative resource parent.

**Table 6: Qualitative Review: Gender, Age and Race/Ethnicity Demographics (January – December 2018)**

| Gender | Number of Cases | Percentage of Cases* |
|---|---|---|
| Male | 89 | 44% |
| Female | 106 | 56% |
| **Total** | 195 | 100% |
| **Age** | **#** | **%** |
| 4 years or less | 64 | 33 |
| 5-9 years | 50 | 26 |
| 10-13 years | 27 | 14 |
| 14 -17 years | 22 | 11 |
| 18-21 years | 32 | 16 |
| **Total** | 195 | 100% |
| **Race** | **#** | **%** |
| White/Caucasian | 94 | |
| African American | 105 | |
| Native Hawaiian | 2 | |
| American Indian | 1 | |
| Asian | 2 | |
| **Ethnicity** | **#** | **%** |
| Hispanic | 57 | 29 |

Source: DCF data
*The calculation of percentage of cases by race are not reflected here because some youth are counted in multiple categories.

DCF reports that 2,015 individuals were interviewed across the state to inform the QR data for this reporting period. The informants for the QR include CP&P and Child Health Unit staff, biological parents, others who the children/youth or parents identified as supportive, relative and non-relative resource parents, education providers, mental health and legal professionals, substance abuse treatment providers and children/youth.[123]

Reviewers evaluate the child/youth and family's status on a range of indicators and rate whether the status was acceptable or unacceptable. See Table 7 for the results on each Child/Youth and Family status indicator for all cases reviewed from January through December 2018. Child/Youth and Family status indicators cover key areas of safety, stability in school, living

---

[122] DCF's QR protocol reviews cases in every county over a two year period. In both CY 2016 and CY 2018, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem and Union counties.
[123] Interviews are usually conducted individually with participants, either by phone or in person. All efforts are made to see children/youth in the setting in which they reside.

arrangement, learning and development and physical health of the child. The *overall child and family status* was rated acceptable in 173 (89%) of cases reviewed, with separate ratings on specific child and family status indicators ranging from 67 percent (*family functioning and resourcefulness*) to 99 percent (*safety of the child at home*).

**Table 7: Qualitative Review: Child/Youth and Family Status Results**
**(January – December 2018)**

| Child/Youth & Family Status Indicators | Number of Applicable Cases | Number of Acceptable Cases | Percentage of Acceptable Cases |
|---|---|---|---|
| Safety at Home | 195 | 194 | 99% |
| Safety in other Settings | 195 | 191 | 98% |
| Stability at Home | 195 | 168 | 86% |
| Stability in School | 94 | 86 | 91% |
| Living Arrangement | 195 | 192 | 98% |
| Family Functioning & Resourcefulness | 190 | 128 | 67% |
| Progress towards Permanency | 195 | 133 | 68% |
| Physical Health of the Child | 195 | 186 | 95% |
| Emotional Well-Being | 195 | 179 | 92% |
| Learning & Development, Under Age 5 | 64 | 60 | 94% |
| Learning & Development, Age 5 & older | 85 | 77 | 91% |
| **OVERALL Child & Family Status** | 195 | 173 | 89% |

Source: DCF data

Table 8 shows the results of the QR ratings for practice and system performance indicators from reviews conducted January through December 2018. As with the child/youth and family status indicators, reviewers evaluated whether performance was acceptable or unacceptable. This is the third annual report measuring indicators under DCF's new QR process and protocol.[124]

The *overall practice/system performance* indicator was rated acceptable in 62 percent (121 of 195) of cases, which represents a global judgement from reviewers after considering the case as a whole. Performance on Practice/System indicators ranges from 22 percent (*assessment of fathers*) to 95 percent (*provision of health care services*).

Ratings for the SEP measures Educational Needs (SEP III.G.11), which consists of both the *stability in school* and *learning and development, age 5 and older* indicators, and Quality of Case

---

[124] In CY 2015 DCF updated key portions of the state's QR process and protocol, as described in Monitoring Report XVIII. Changes to the QR protocol include: (1) combination of *team functioning* and *team formation* indicators into one indicator, *teamwork and coordination* (2) exclusion of the *overall* indicator for all practice performance indicators (3) rating mothers and fathers separately in the practice performance indicators (4) removal of the *family supports* indicator for the practice performance indicators, and (5) replacement of the *transitions and life adjustment* indicator with *successful transitions* indicator.

Planning and Services for Older Youth (SEP IV.K.46), consists of both the *overall child and family status* and *overall practice performance* indicators, continue to meet SEP standards.

Ratings for the SEP measures Quality of Teaming (SEP IV.B.20), which consists of the *family teamwork and coordination* indicator, Services to Support Transition (SEP IV.J.44), which consists of the *successful transitions* indicator, and Quality Case Planning (SEP IV.D.23), which consists of the *case planning* and *tracking and adjusting* indicators, all remain below acceptable standards.

**Table 8: Qualitative Review: Practice/System Performance Results
(January – December 2018)**

| Practice/System Performance Indicators | | # Cases Applicable | # Cases Acceptable | % Acceptable |
|---|---|---|---|---|
| Engagement | Child/Youth | 122 | 109 | 89% |
| | Mother | 128 | 79 | 62% |
| | Father | 117 | 40 | 34% |
| | Resource Family | 118 | 106 | 90% |
| Family Teamwork | Teamwork & Coordination | 145 | 84 | 58% |
| Assessment & Understanding | Child/Youth | 195 | 151 | 77% |
| | Mother | 128 | 51 | 40% |
| | Father | 117 | 26 | 22% |
| | Resource Family | 118 | 106 | 90% |
| Case Planning Process | | 195 | 107 | 55% |
| Plan Implementation | | 195 | 125 | 64% |
| Tracking & Adjusting | | 195 | 137 | 70% |
| Provision of Health Care Services | | 195 | 185 | 95% |
| Resource Availability | | 195 | 164 | 84% |
| Family & Community Connections | Mother | 78 | 60 | 77% |
| | Father | 67 | 41 | 61% |
| | Siblings | 43 | 40 | 93% |
| Successful Transitions | | 118 | 73 | 62% |
| Long Term View | | 195 | 96 | 49% |
| **OVERALL Practice/System Performance** | | **195** | **121** | **62%** |

Source: DCF data

QR performance in CY 2018 compared to CY 2017, though based on a different cohort of counties,[125] demonstrates improvement on a few Practice/System Performance indicators, but most indicators have not moved beyond one or two percentage points. The indicators *engagement of the father* declined slightly from 40 percent rated acceptable to 34 percent, and performance on *long term view* declined slightly from 53 percent rated acceptable to 49 percent.

---

[125] DCF's QR protocol reviews cases in every county over a two year period. Thus, based on the sample plan, annual performance comparisons reflect cases pulled from two sets of counties.

However, performance on *assessment of the mother* improved slightly from 35 percent rated acceptable to 40 percent.

When comparing QR results in CY 2018 to the same cohort of counties from the last time they were reviewed in CY 2016, there still has not been significant changes in performance in two years. There have been some improvements since CY 2016 in *teamwork and coordination* (increased acceptable ratings from 49% to 58%), *plan implementation* (increased acceptable ratings from 59% to 64%), and *tracking and adjusting* (increased acceptable ratings from 63% to 70%).

## O. NEEDS ASSESSMENT

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 21. <u>Needs Assessment</u>: The State shall regularly evaluate the needs for additional placements and services to meet the needs of children in custody and their families, and to support intact families and prevent the needs for out-of-home care. Such needs assessments shall be conducted on an annual, staggered basis that assures that every county is assessed at least once every three years. |
| **Final Target** | The State shall develop placements and services consistent with the findings of these needs assessments. |

In 2014, DCF engaged Rutgers University School of Social Work to conduct a multi-year Needs Assessment to identify the strengths and needs of families with children at risk of entering out-of-home placement as well as those already in care. A detailed description of DCF's Needs Assessment process is available in previous monitoring reports, and DCF's three interim reports are available on the DCF website.[126] In sum, Phase I involved a review of DCF internal reports and assessments completed by DCF and its partners from CY 2008 to CY 2014. Phase II involved an analysis of the findings from Phase I and the identification of seven areas of need: caregiver mental health, caregiver substance abuse, child mental health, child substance abuse, poverty, housing and domestic violence. During Phase III of the Needs Assessment process, Rutgers identified three additional domains: justice system-involved children and caregivers, challenging populations (defined as populations especially challenging to serve across several need domains, including low-income and undocumented families) and multi-need, frequent contact families.

During Phase III, researchers at the Child Welfare and Well-Being Research Unit at Rutgers School of Social Work conducted almost 2,000 surveys with CP&P staff, including (a) intake workers and permanency workers (637); (b) parents from families of origin, including those with children in the home (391) and those placed out-of-home (185); and (c) resource parents providing out-of-home care (739). In March 2018, DCF published its final report regarding these surveys in its *DCF Needs Assessment 2018 Report #3: Survey Findings and Synthesis*.[127]

During the monitoring period, DCF made progress on its plan to fold the state's needs assessment process into its Qualitative Review and ChildStat processes and presentations, described in Section V.N. The review of existing county-specific needs will include a combination of internal and external quantitative and qualitative data sources, including information provided by the Human Services Advisory Council (HSAC) that is informed by focus groups and stakeholder interviews conducted in each county. This process will also be part of federal and state improvement plans.

---

[126] To see DCF's Needs Assessment Interim Reports from January 2015, March 2016, and April 2017, go to: http://www.nj.gov/dcf/childdata/protection/
[127] To see DCF's Final Needs Assessment 2018 Report #3: Survey Findings and Synthesis, go to: http://www.nj.gov/dcf/childdata/protection/DCF.Needs.Assessment.Phase.IV.Report-March2018.pdf.

## P.  FISCAL YEAR BUDGET

Governor Murphy's FY 2019 budget, effective July 1, 2018, included $1.15 billion in state funds. Commissioner Beyer testified in May 2018 in support of the proposed allocations, which included funding to continue DCF's operations in accordance with the SEP. DCF received a supplemental appropriation in FY 2018 for $5.477 million to support utilization trends in the CP&P out-of-home placement, family support services, and subsidized adoption accounts.

DCF's FY 2019 appropriation includes an increase of $2.2 million over the adjusted FY 2018 appropriation to support projected increases in utilization trends in CP&P independent living, family support services and subsidized adoption accounts. Additionally, $3 million was added to the budget to support debt service payments for new vehicles for CP&P.

The requested FY 2020 budget, to be approved by the legislature in June 2019, totals $1.153 billion, a decrease of $22 million or 1.9% under the FY 2019 adjusted appropriation of $1.175 billion. The final FY 2020 budget will be reported in the next monitoring report.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 87*

**APPENDIX: A**
**Glossary of Acronyms Used in the Monitoring Report**

**AQC:** Area Quality Coordinators

**CFSR:** Child and Family Services Review

**CHU:** Child Health Unit

**CIACC:** Children's Interagency Coordinating Council

**CP&P:** Division of Child Protection and Permanency

**CPL:** Case Practice Liaisons

**CPM:** Case Practice Model

**CPS:** Child Protective Services

**CQI:** Continuous Quality Improvement

**CSOC:** Children's System of Care

**CSSP:** Center for the Study of Social Policy

**CWS:** Child Welfare Services

**DAsG:** Deputy Attorneys General

**DCF:** Department of Children and Families

**FAFS:** Foster and Adoptive Family Services

**FFT-FC:** Family Functional Therapy – Foster Care

**FSC:** Family Success Centers

**FTM:** Family Team Meeting

**HCCM:** Health Care Case Manager

**IAIU:** Institutional Abuse Investigative Unit

**ILA:** Independent Living Assessment

**LGBTQI:** Lesbian, Gay, Bisexual, Transgender, Questioning/Intersex

**KLG:** Kinship Legal Guardian

**LOM:** Local Office Manager

**MSA:** Modified Settlement Agreement

**OAS:** Office of Adolescent Services

**OFV:** Office of Family Voice

**OPMA:** Office of Performance Management and Accountability

**PIP:** Performance Improvement Plan

**PPFs:** Protective and Promotive Factors

**QR:** Qualitative Review

**SACWIS:** Statewide Automated Child Welfare Information System

**SEP:** Sustainability and Exit Plan

**SCR:** State Central Registry

**SDM:** Standard Decision Making tool

**SIBS:** Siblings in Best Placement Settings

**USDA:** United States Department of Agriculture

**YAB:** Youth Advisory Board

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 88*

# APPENDIX B

## New Jersey Department of Children and Families



Updated June 2019

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIII Report for Charlie and Nadine H. v. Murphy*

*June 19, 2019*
*Page 89*