January 23, 2020

CHARLIE AND NADINE H. V. MURPHY

PROGRESS OF THE NEW JERSEY
DEPARTMENT OF CHILDREN AND FAMILIES

MONITORING PERIOD XXIV
(JANUARY 1 – JUNE 30, 2019)

**Center** *for the*
**Study** *of*
**Social Policy**
Ideas into Action

1575 Eye Street NW, #500
Washington, DC 20005
www.CSSP.org

**Progress of the New Jersey
Department of Children and Families**

**Monitoring Period XXIII Report for**
*Charlie and Nadine H. v. Murphy*
**January 1 – June 30, 2019**

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 1

II.  SUMMARY OF PERFORMANCE DURING JANUARY THROUGH JUNE 2019........ 5

III. CHILD AND FAMILY OUTCOMES AND
     CASE PRACTICE PERFORMANCE MEASURES ........................................................ 10

IV.  FOUNDATIONAL ELEMENTS ............................................................................ 35

V.   SUSTAINABILITY AND EXIT PLAN PERFORMANCE MEASURES
     *TO BE ACHIEVED* AND *TO BE MAINTAINED* .............................................. 38

     A.  INVESTIGATIONS ................................................................................. 38

     B.  FAMILY TEAM MEETINGS ................................................................... 41

     C.  QUALITY OF CASE AND SERVICE PLANNING ....................................... 45

     D.  EDUCATION ........................................................................................ 47

     E.  MAINTAINING CONTACT THROUGH VISITS ......................................... 48

     F.  PLACEMENT ......................................................................................... 53

     G.  MALTREATMENT OF CHILDREN AND YOUTH ...................................... 55

     H.  TIMELY PERMANENCY ........................................................................ 55

     I.   CHILD HEALTH UNITS ......................................................................... 56

     J.   OLDER YOUTH ..................................................................................... 57

     K.  SERVICES TO SUPPORT TRANSITION ................................................... 60

     L.  CASELOADS ......................................................................................... 61

     M.  DEPUTY ATTORNEYS GENERAL STAFFING .......................................... 68

     N.  ACCOUNTABILITY THROUGH QUALITATIVE REVIEW
         AND THE PRODUCTION AND USE OF ACCURATE DATA ........................ 69

     O.  NEEDS ASSESSMENT ............................................................................ 70

     P.  FISCAL YEAR BUDGET ........................................................................ 71

APPENDIX A ........................................................................................................................... 72

APPENDIX B ........................................................................................................................... 73

## LIST OF TABLES

Table 1:     Charlie and Nadine H. Child and Family Outcome
             and Case Practice Performance Measures ................................................................ 11
Table 2:     CP&P Individual Worker Caseload Standards ........................................................ 61
Table 3:     Number of CP&P Investigations and Secondary Intake Assignments by Month
             (January – June 2019) ............................................................................................. 64
Table 4:     Percentage of CP&P Investigations Assigned to Non-Caseload ............................. 66
Table 5:     Percentage of CP&P Investigations Assigned to Non-Intake ................................. 66

## LIST OF FIGURES

Figure 1: Percentage of Abuse and Neglect Investigations Completed within 90 days ............... 39
Figure 2: Percentage of Families Who Had at Least Twice per Month Face-to-Face Contact with
Caseworker when the Goal is Reunification (January – June 2019) ............................................ 50
Figure 3: Percentage of Families Who Had at Least Twice per Month Face-to-Face Contact with
Caseworker when the Goal is Reunification (June 2017 – June 2019) ........................................ 50

# I.      INTRODUCTION

The Center for the Study of Social Policy (CSSP) was appointed in 2006 by the Honorable Stanley R. Chesler of the United States District Court for the District of New Jersey as Federal Monitor of the class action lawsuit *Charlie and Nadine H. v. Murphy*, aimed at improving outcomes for children, youth and families served through New Jersey's child welfare system. As Monitor, CSSP has been charged with independently assessing New Jersey's compliance with the goals, principles and outcomes of the Court Order entered in 2003; the Modified Settlement Agreement (MSA) entered in July 2006; and now the Sustainability and Exit Plan (SEP) entered on November 4, 2015, that supersedes the MSA. This monitoring report includes performance data and measures progress under the SEP for the period January 1 through June 30, 2019.[1]

**Monitoring Methodology**

The Monitor's public reports cover six-month periods.[2] The primary sources of information on New Jersey's progress are quantitative and qualitative data supplied by the Department of Children and Families (DCF) and independently validated by the Monitor. DCF provides access to staff and documents to enable the Monitor to verify performance.

In assessing progress, the Monitor first looks to the state's data and validates its accuracy. The Monitor also retains the authority to engage in independent data collection and analysis where needed. DCF's intent is to continue to expand the data that it publishes on its public website,[3] as well as on its publicly accessible New Jersey Child Welfare Data Hub, which was developed in collaboration with Rutgers University.[4,5]

DCF published a comprehensive Annual Report in September 2019, which provides summary demographic and in some cases outcome data and information about all of the services DCF offers to families in New Jersey, including those designed solely for families involved with the Department of Child Protection and Permanency (CP&P).[6] It intends to produce and make available an updated version of this report to the public annually.

Reports that DCF currently publishes on its website include:

- Commissioner's Monthly Report[7] – *Current and produced monthly*. This report gives a broad data snapshot of various DCF services. The report includes information from Child Protection & Permanency (CP&P), Office of Adolescent Services (OAS), Institutional Abuse Investigation Unit (IAIU), Children's System of Care (CSOC), Family & Community Partnerships and the Division on Women.

- Screening and Investigations Report[8] – *Current and produced monthly*. This report details State Central Registry (SCR) activity, including data regarding calls to the Child Abuse and Neglect Hotline,

---

[1] Copies of all Monitoring Reports can be found at: https://cssp.org/our-work/projects/our-projects/class-action-litigation-new-jerseys-department-of-children-and-families/
[2] The exceptions to this time frame were Monitoring Period XIII, which covered July 1, 2012 through March 31, 2013; Monitoring Period XIV, which covered April 1 through December 31, 2013; and Monitoring Period XVII, which covered January 1 through December 31, 2015.
[3] To see DCF's public website, go to: http://www.state.nj.us/dcf/about/
[4] To see the New Jersey Child Welfare Data Hub, go to: https://njchilddata.rutgers.edu/#home
[5] The Data Hub, launched in November 2016, allows users to create customized charts and graphs using New Jersey's child welfare data, and incorporates information from the formerly produced quarterly DCF Demographics Report.
[6] To see the Safe, Healthy & Connected 2018 Annual Report, go to: https://www.nj.gov/dcf/news/reportsnewsletters/dcfreportsnewsletters/FY18-DCF.Annual.Report.pdf
[7] To see all Commissioner's Monthly Reports, go to: http://www.nj.gov/dcf/childdata/continuous/
[8] To see all Screening and Investigations Reports, go to: http://www.nj.gov/dcf/childdata/protection/screening/

assignments to CP&P offices and trends in Child Protective Services (CPS) Reports and Child Welfare Services (CWS) Referrals.

- Workforce Report[9] – *Last report dated January 2018*. This report provides information regarding the demographics and characteristics of DCP&P workers, as well as a variety of indicators of workforce planning and development, using fiscal year (FY) (July 1 – June 30) data. Going forward, elements of this report will be incorporated into the new comprehensive annual report described above.

- Children's Interagency Coordinating Council Report[10] – *Current and produced monthly*. This report details referral and service activity for CSOC. It includes demographic data, referral sources, reasons for and resolutions of calls to CSOC, information on substance use and school attendance, as well as authorized services provided.

- New Jersey Youth Resource Spot[11] – *Ongoing and updated periodically*. This website offers the latest resources, opportunities, news and events for young people served by DCF. This site includes information about the Youth Advisory Network, as well as additional resources available in each county and statewide.

- DCF Needs Assessment– *Previously produced annually. Last report dated March 2018*. The SEP requires reports to evaluate the need for additional placements and services to meet the needs of children, youth and their families involved with DCF, with each county assessed at least once every three years. During its multi-year needs assessment process, DCF produced annual reports on its website and reported twice annually to the Monitor.[12] The most recent report, entitled *DCF Needs Assessment 2018 Report #3: Survey Findings and Synthesis*, updates interim findings to identify the resources needed to serve families with children at risk for entering out-of-home placement and those already in placement.[13] During the monitoring period, DCF continued its redesign of the Needs Assessment process, which will be incorporated into the new continuous quality improvement processes in each county as reported in Section V.O.

The Monitor engaged in the following data verification activities for the period of January to June 2019.

- ***Caseload Data Verification***

  The Monitor conducted a telephone survey in January and March 2019 of 43 randomly selected caseworkers to verify their individual caseloads during the monitoring period. Findings from this review are discussed in Section V.L – Caseloads – of this report.

- ***Family Team Meeting Data Review***

  The Monitor collaborated with DCF to review experiences of 143 children and families to verify all instances in which workers determined that Family Team Meetings (FTMs) were not required because

---

[9] To see DCF's Workforce Report: 2016-2017 Updates, go to http://www.nj.gov/dcf/childdata/exitplan/NJ.DCF.Workforce.Report-FY17.pdf. To see DCF's Workforce: Preliminary Highlights 2014-2015 Report, go to:
http://www.state.nj.us/dcf/childdata/orgdev/NJ.DCF.Workforce.Report_2015.pdf
[10] To see all Children's InterAgency Coordinating Council Reports, go to: http://www.nj.gov/dcf/childdata/interagency/
[11] To see New Jersey's Youth Resource Spot, go to: http://www.njyrs.org/
[12] To see the prior CP&P Needs Assessment reports, go to: http://www.nj.gov/dcf/childdata/protection/
[13] To see New Jersey's CP&P Final Needs Assessment 2018 Report #3: Survey Findings and Synthesis, go to:
http://www.nj.gov/dcf/childdata/protection/DCF.Needs.Assessment.Phase.IV.Report-March2018.pdf

parents were unavailable, missing, or declined the meeting. DCF and the Monitor reviewed all cases of documented exceptions to the FTM requirement in each month from January 1 to June 30, 2019. Further discussion of current performance on these measures is included in Section V.B – Family Team Meetings – of this report.

- ***Visits Data Review***

   The Monitor collaborated with DCF to review case records of 185 children in which workers documented that caseworker contacts with parents with a reunification goal (SEP IV.F.28) were not required during March 2019 because a parent was unavailable or there were other circumstances outside of their control that prevented visits from occurring. Findings are discussed in Section V.E – Visits – of this report.

- ***Other Monitoring Activities***

   The Monitor interviewed and/or visited multiple internal and external New Jersey child welfare system stakeholders, including staff at all levels, contracted service providers, and advocacy organizations. The Monitor also attended DCF's ChildStat meetings, Area Director meetings, and adolescent practice forums. The Monitor participates as reviewers in almost every scheduled statewide Qualitative Review (QR) throughout the year. DCF has fully cooperated with the Monitor in notifying Monitor staff of schedules and facilitating their participation in relevant activities.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 3*

**Structure of the Report**

Section II provides an overview of the state's accomplishments and challenges during this monitoring period. Section III provides summary performance data on each of the outcomes and performance measures required by the SEP in Table 1: *Charlie and Nadine H. v. Murphy* Child and Family Outcome and Case Practice Performance Measures. Section IV provides information related to the SEP Foundational Elements.[14] Section V provides more detailed data and discussion of performance on SEP Outcomes *To Be Maintained* and Outcomes *To Be Achieved* in the following areas:

- Investigations of alleged child maltreatment (Section V.A);
- Implementation of DCF's Case Practice Model; including Family Team Meetings, case planning and visits (Sections V.B, V.C & V.E);
- Educational engagement for children in out-of-home care (Section V.D);
- Placement of children in out-of-home settings (Section V.F);
- Efforts to achieve permanency for children either through reunification with family, legal guardianship or adoption (Section V.H);
- Provision of health care services to children and youth (Section V.I);
- Services to older youth (Section V.J);
- Caseloads (Section V.L);
- Deputy Attorneys General Staffing (Section V.M);
- Accountability through the Qualitative Review and the production and use of accurate data (Section V.N);
- Needs Assessment (Section V.O); and
- Fiscal Year 2019 budget (Section V.P).

---

[14] The Foundational Elements requirements of the SEP intentionally recognize the state's accomplishments in early implementation of the MSA. At the Monitor's discretion, based on a concern that a Foundational Element has not been sustained, the Monitor may request additional data. If the data demonstrate a persistent problem, in the Monitor's discretion, the state will propose and implement corrective action (SEP.II).

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 4*

## II.    SUMMARY OF PERFORMANCE DURING JANUARY THROUGH JUNE 2019

The performance of New Jersey's Department and Children and Families (DCF) with respect to children and families served through its child welfare system continues to be strong. The improvements and progress made over many years pursuant to the *Charlie and Nadine H.* lawsuit continue to be sustained in important ways and deliberate efforts are underway to achieve the Sustainability and Exit Plan (SEP) performance targets for those outcomes that have not yet been achieved.

During this monitoring period, DCF continued its work to meet the remaining requirements of the Court's Order and sustain progress already achieved. New Jersey's work is appropriately focused on ensuring a high-quality child welfare response for New Jersey's children and families consistent with its vision that every resident of New Jersey be safe, healthy, and connected. DCF began and ended the current monitoring period having met 42 of 48 SEP performance measures.[15] DCF also maintained performance with respect to each of the SEP Foundational Elements in such important areas as training, manageable caseloads for workers, and the provision of health care for children in out-of-home care.

There remain six Outcomes *To Be Achieved* under the SEP. Five of the six remaining outcomes require data for determining performance that are collected and reported annually[16] and thus are not newly addressed in this report. The sixth outstanding requirement – that workers visit parents twice monthly when a child is in the state's custody with a permanency goal of reunification (SEP IV.F.28) – is assessed in this report and performance this period remained below the SEP's standard, though improved from previous reporting periods. The range in performance has increased by 10 percentage points since the period of July to December 2017.

In the body of the report, we provide specific data and the Monitor's observations and conclusions with respect to each of the requirements of the SEP. Below we briefly highlight some of the new practice, policy, and resource creation initiatives underway within DCF and the areas of progress and remaining challenges.

### *DCF's Strategic Plan*

Informed by a listening tour conducted in the fall of 2018 and with input from qualitative reviews, needs assessments, and other public forums and events, DCF finalized a Strategic Plan in early 2019.[17] To familiarize

---

[15] These measures include: Institutional Abuse Investigations Unit (IAIU) (III.A.1); Timeliness of Investigation Completion (60 days) (SEP IV.A.13); Timeliness of Investigation Completion (90 days) (SEP IV.A.14); Quality of Investigations (SEP IV.A.15); Initial Family Team Meeting (SEP IV.B.16); Subsequent FTMs within 12 months (SEP IV.B.17); Subsequent FTMs after 12 months – Reunification Goal (SEP IV.B.18); Subsequent FTMs after 12 months – Other than Reunification Goal (SEP IV.B.19); Needs Assessment (SEP IV.C.21); Initial Case Plans (SEP IV.D.22); Supervisor/Worker Ratio (III.B.2); IAIU Investigators Caseload (III.B.3); Permanency Workers (Local Offices) Caseload (III.B.4); Permanency Workers Caseload (SEP III.B.5); Intake Workers (Local Offices) (SEP IV.E.24); Intake Workers (SEP IV.E.25); Adoption Local Office Caseload (SEP IV.E.26); Adoption Workers (SEP IV.E.27); Timeliness of Current Plans (III.C.6); Adequacy of DAsG Staffing (III.D.7); Child Health Units (III.E.8); Parent-Child Visits – weekly (SEP IV.F.29); Parent-Child Visits – bi-weekly (SEP IV.F.30); Sibling Visits (SEP IV.F.31); Caseworker Contacts with Children – Monthly (SEP IV.F.9); Caseworker Contact with Children in Placement (III.F.10); Placing Siblings Together (SEP IV.G.32); Placing Siblings Together for Four or More Children (SEP IV.G.33); Recruitment of Placements for Sibling Groups of Four or More (SEP IV.G.34); Placement Stability – New Placement/Placement Changes (SEP IV.F.9); Caseworker Contact with Children in Placement (III.H.12); Repeat Maltreatment (In-home) (SEP IV.G.36); Educational Needs (III.G.11); Abuse and Neglect of Children in Foster Care (III.H.12); Repeat Maltreatment (In-home) (SEP IV.H.37); Maltreatment Post-Reunification (SEP IV.H.38); Permanency within 12 Months (SEP IV.I.40); Permanency within 36 months (SEP IV.I.42); Permanency within 48 months (SEP IV.I.43); Independent Living Assessments (SEP IV.K.45); Quality of Case Planning and Services (SEP IV.K.46); Housing for Older Youth Exiting to Non-Permanency (SEP IV.K.47); and Employment/Education for Older Youth Exiting to Non-Permanency (SEP IV.K.48).

[16] These measures are: Quality of Teaming (SEP IV.B.20); Quality of Case Plans (SEP IV.D.23); Services to Support Transition (SEP IV.J.44); Re-Entry to Placement (SEP IV.H.39); Permanency within 24 Months (SEP IV.I.41). The Monitor will report on updated data for these measures in the next monitoring report.

[17] To see DCF's Strategic Plan, *Safe, Healthy, Connected: DCF in the 21st Century*, go to: https://www.nj.gov/dcf/about/strategic.html

stakeholders with the plan, DCF held a number of events in partnership with Advocates for Children of New Jersey, including statewide regional forums, and a webinar with the Administrative Office of the Courts (AOC). DCF also published a written summary and PowerPoint presentation about the plan on its website.

DCF's Strategic Plan includes goals, strategies and activities that DCF will pursue to achieve its vision. It identifies five core values to serve as its "professional compass":

- collaboration in teams;
- equity;
- evidence;
- family focus; and
- integrity.

The Strategic Plan also identifies the approaches that DCF expects to embed as part of practice: advancing race equity; establishing healing-centered practice; incorporating the protective factors framework and family voice; and practicing a collaborative safety model. DCF identified four major focuses of its work to support families that are consistent with the goals and expectations of the *Charlie and Nadine H.* lawsuit: (1) the prevention of child maltreatment; (2) an increase in the use of kinship placement settings for children and youth in foster care; (3) attention to the DCF workforce through the promotion of staff health and wellness; and (4) the full integration of health and behavioral health into DCF's scope of services, including enhancing the Children's System of Care's (CSOC) capacity to ensure equitable access to care.

*Focus on Race Equity*

New Jersey, like most states across the country, has identified disparities in outcomes for children in the child welfare system based on race and ethnicity, among other factors. Between January and June 2019, with the support of the national Casey Family Programs foundation, DCF began working with a consultant to develop and implement its race equity strategy. The consultant held two sessions with senior leadership that addressed the history of race equity in child welfare and ways in which DCF can improve practice and outcomes in this area. DCF also established a race equity steering committee that is co-facilitated by senior staff. In addition, DCF examines outcome data by race throughout its county-based ChildStat process.

*Prioritizing Safety*

DCF has continued to prioritize safety, both for families with children in DCF custody and for its staff. DCF is partnering with Collaborative Safety, LLC, a national organization that implements "safety science" in child welfare and provides tools, training, and support to systems to reduce the frequency of critical and life-threatening incidents and helps to establish a culture of safety for staff. Between January and June 2019, DCF held a two-day training on Collaborative Safety for managerial staff, and forums are planned for case-carrying staff that will feature national experts in safety science and critical review processes. In order to reinforce its focus on staff safety, DCF has continued its partnership with Alia Innovations, Inc., a not-for-profit dedicated to re-designing child welfare systems to preserve family bonds. Alia supported ten monthly workforce well-being groups and learning sessions to promote workforce well-being and self-care strategies. As a next step, DCF plans to launch a new Office of Staff Health and Wellness in Spring 2020.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 6*

*Creating a new Office of Family Voice*

As mentioned above, between October 2018 and January 2019,  DCF Commissioner Beyer led a statewide Listening Tour in 22 locations across 15 counties that engaged approximately 550 constituents, including youth in foster care, biological and foster families, kinship families, survivors of domestic violence, parents of youth with behavioral needs and/or intellectual or developmental disabilities, unemployed or underemployed parents,[18] and new parents participating in home visiting services.[19] An outgrowth of DCF's Listening Tour was the creation of a new Office of Family Voice (OFV) in November 2018 to promote and facilitate the inclusion of authentic youth and family voice in decisions involving DCF policy and practice.

*New Leadership at Children's System of Care*

In February 2019, DCF appointed Mollie Green as Assistant Commissioner of the Children's System of Care (CSOC). Assistant Commissioner Green is leading DCF's work with the Center for Health Care Strategies (CHCS) to develop a comprehensive service model anticipated to improve performance on key outcome measures, with an emphasis on screening and early identification of children and youth requiring assistance, as well as improved access to in-home and community-based services for children with multiple challenges.

*Increasing Kinship Placement*

To help advance the goal of increasing kinship placements for children and youth in foster care, DCF has set a target of placing 60 percent of children who enter care with kin within the first seven days of removal from their homes, and 80 percent placed with kin by the first 30 days. This is an ambitious goal which would make New Jersey a national leader in promoting kinship placement, and one that DCF hopes to achieve by developing a department-wide strategy to be fully implemented in the next monitoring period. DCF began a pilot in the Ocean/Monmouth area this period to examine why those counties lead the state in kinship placements, and to provide greater support to Resource staff to better assist relative resource parents.

*Enhancing Case Practice Model*

During the monitoring period, DCF also finalized plans to implement Solution Based Casework™ (SBC) statewide, a strategy that helps staff work with families to develop case plans that are customized to address the root cause of behavior that is creating risk to a child and ensure that families have more agency in developing solutions. Through its Case Practice Liaisons (CPLs), DCF continued to support staff in practice skills related to assessment, teaming, case planning, and visitation between children in out-of-home care and families, all of which relate to fundamental SEP measures yet to be achieved.

**Accomplishments and Challenges in Specific Areas of Practice**

Described below are DCF's accomplishments and challenges in specific areas of practice during this monitoring period:

---

[18] "Displaced Homemaker" programs serve parents who, after working in the home providing unpaid services for family members, are re-joining the workforce due to separation, divorce, disability, or death of a spouse.
[19] To see the DCF Commissioner's Listening Tour 2019 Summary Report, go to:
https://www.nj.gov/dcf/news/reportsnewsletters/dcfreportsnewsletters/ListeningTourReport.pdf

*Family Team Meetings*

The SEP includes five performance measures pertaining to FTMs, four of which have been previously met and designated as Outcomes *To Be Maintained*. FTMs are an integral component of DCF's case practice and are used to bring families, providers, and formal and informal supports together to exchange information, participate in case planning, coordinate and follow up on services, and examine and track progress toward accomplishing case plan goals.

DCF maintained satisfactory performance for these four measures this period, exceeding requirements for FTMs held within 45 days of a child's removal (SEP IV.B.16); for holding three additional FTMs after the initial meeting within the first 12 months of a child's placement (SEP IV.B.17); for holding at least three FTMs each year for children in care after 12 months with the goal of reunification (SEP IV.B.18); and for holding at least two FTMs each year for children in care after 12 months with a goal other than reunification (SEP IV.B.19). The fifth measure on the overall quality of teaming (SEP IV.B.20) remains an Outcome *To Be Achieved* and is assessed through a Qualitative Review process and reported on an annual basis. The Monitor will report on the data for quality of teaming for the period January 1 through December 31, 2019 in the next monitoring report.

*Appropriate Placements and Services*

DCF continues to maintain an adequate pool of placement resource homes and group settings to meet the needs of children in out-of-home care. As of June 30, 2019, 5,115 children were in out-of-home placement. Of all children in out-of-home placement, 4,628 (90%) were placed in family-like settings: 2,668 children (52%) in non-kinship resource family homes, and 1,960 children (38%) in kinship homes. The ten percent of children not residing in family-like settings consisted of 397 children (8%) in group and residential settings facilities and 90 children (2%) in independent living programs.

Between January and June 2019, DCF licensed 611 new kinship and non-kinship resource family homes; of these newly licensed resource family homes, 353 (58%) were kinship homes and 258 (42%) were non-kinship homes. As of June 30, 2019, there were a total of 4,167 licensed resource family homes in the state, with a total bed capacity for 9,348 children. Of the total number of resource family homes, 1,375 were kin homes and 2,792 were non-kin homes. DCF is in the process of strengthening its kinship practice to further increase the number of kinship homes available in the state. DCF also continues to focus on recruiting homes for large sibling groups as described further in Section V.F.

*Maintaining Contact with Children, Parents and Siblings*

There are six performance measures in the SEP related to visits, five of which have been previously met and designated as Outcomes *To Be Maintained*. Maintaining bonds and contact through visits between children in foster care and their workers, parents, and siblings are an essential element of successful child welfare practice.

DCF has maintained satisfactory performance for all five previously met measures this monitoring period, exceeding requirements for caseworker visits with children in both new and ongoing placements (SEP III.F.9 and III.F.10, respectively), both weekly and biweekly visits between children and their parents (SEP IV.F.29 and IV.F.30, respectively), and visits between siblings placed apart (SEP IV.F.31), which was designated as *To Be Maintained* in the prior monitoring period. DCF has not yet met the SEP performance standard for the sixth measure of visits – caseworker contacts with families with a reunification goal (SEP IV.F.28) as detailed in Section V.E.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 8*

*Services to Older Youth*

DCF has continued its work to improve the experiences of older youth in its care through the efforts of the Office of Adolescent Services (OAS). As discussed in Section V.J, the SEP includes four performance measures related to DCF's work with older youth, all of which were previously met and designated as Outcomes *To Be Maintained*. Three of these measures were not assessed in this period: quality of case planning and services for older youth (SEP IV.K.46) (measured through the Qualitative Review process); and housing (SEP IV.K.47) and education and employment for youth exiting care without achieving permanency (SEP IV.K.48).[20] The Monitor considers DCF to have met the performance standard for the completion of Independent Living Assessments for youth ages 14 to 18 (SEP IV.K.45).

*Continuous Quality Improvement*

Beginning in January 2019, DCF began to implement its new continuous quality improvement (CQI) structure. New Jersey's ChildStat process now incorporates results from its Qualitative Reviews (QRs), Needs Assessments, the federal Child and Family Review (CFSR), along with input and participation from the Children's System of Care (CSOC). More specifically, the county-level practice that is reviewed at each ChildStat meeting incorporates the results of the county's most recent QR, as well as a targeted case record review by Local Office managers in that county, conducted within 30 days of the QR debrief. The new format is designed to facilitate direct dialogue between state- and county-level leadership about practice and system strengths as well as barriers to meeting the needs of children and families. Quality of practice in each county will continue to be assessed every two years, following the QR schedule. In addition, a county-level CQI team now analyzes and incorporates findings from the QR and ChildStat and develops a county-level performance improvement plan (PIP) within 75 days of the ChildStat meeting. DCF leaders hope to leverage the ChildStat process as a management tool that incorporates quantitative and qualitative information to form a comprehensive assessment of challenges and practice improvement efforts in order to achieve improved service delivery.

DCF's Child and Family Services Review Round 3 Performance Improvement Plan (PIP) was approved by the federal Children's Bureau as of June 1, 2019.[21] The Monitor reported on DCF's PIP in the previous monitoring period. New Jersey's CFSR review consisted of a week-long onsite review in which federal and state employees analyzed 65 cases (40 foster care and 25 in-home) in Essex, Monmouth, and Warren counties. The period of review was April 2016 through July 2017. In sum, while the Children's Bureau found many strengths in New Jersey's system and identified that improvement is needed in areas such as ongoing safety and risk assessments, engagement and case planning with parents, and availability of services – especially services related to substance abuse. The federal agency also commended the state for its commitment to a robust CQI process.

---

[20] Due to the reduced number of older youth exiting foster care without achieving permanency, and therefore small sample size, the Monitor and DCF have agreed to conduct the case record review to assess housing (SEP IV.K.47) and education and employment for youth exiting care without achieving permanency (SEP IV.K.48) annually instead of each monitoring period. The Monitor will report on performance data for these measures for the period January 1 through December 31, 2019 in the next monitoring report.

[21] To see New Jersey's approved Performance Improvement Plan, go to: https://www.nj.gov/dcf/childdata/njfederal/NJ_CFSR_FinalReport_2017.pdf

### III.     CHILD AND FAMILY OUTCOMES AND CASE PRACTICE PERFORMANCE MEASURES

The child and family outcomes and case practice performance measures include 48 standards and Foundational Elements that assess the state's performance in meeting the requirements of the SEP (see Table 1). These performance measures cover the areas of child safety, permanency, service planning, child well-being, and ongoing infrastructure development pertaining to core elements such as appropriate staffing, caseloads, and training.

Many of the measures are assessed through a review of data from NJ SPIRIT[22] and SafeMeasures,[23] and, in some areas, these data are independently validated by the Monitor. Data are also provided through DCF's work with Rutgers University,[24] which assists with data analysis. With few exceptions, performance data provided in this report are as of June 2019.

---

[22] NJ SPIRIT is New Jersey's Statewide Automated Child Welfare Information System (SACWIS), a case management and financial system designed to support the daily work of caseworkers and supervisors within DCF.
[23] SafeMeasures is a data warehouse and analytical tool that allows tracking of critical child welfare indicators by worker, supervisor, Local Office, county and statewide. It is used by different levels of staff to track, monitor and analyze performance and trends in case practice and targeted measures and outcomes.
[24] DCF transferred this function from Hornby Zeller Associates, Inc. to Rutgers University in July 2017.

**Table 1: Charlie and Nadine H. Child and Family Outcome and Case Practice Performance Measures**
**(Summary of Performance as of June 30, 2019)**

| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | December 2018 Performance | June 2019 Performance[25] | Requirement Fulfilled (Yes/No)[26] |
|---|---|---|---|---|---|
| **Table 1A: To Be Achieved** | | | | | |
| *Family Teaming* | | | | | |
| IV.B.20 | Quality of Teaming | 75% of cases involving out-of-home placements that were assessed as part of the QR process will show evidence of both acceptable team formation and acceptable functioning. The Monitor, in consultation with the parties, shall determine the standards for quality team formation and functioning. | 58% of cases rated acceptable for the QR indicator *teamwork and coordination* (CY 2018).[27,28] | CY 2019 data not yet available.[29] | Not reported in this period. |

---

[25] In some instances where the Monitor does not have June 2019 data, the most recent data available are included.

[26] "Yes" indicates that, in the Monitor's judgment, based on presently available information, DCF has fulfilled its obligations regarding the requirement under the SEP. "No" indicates that, in the Monitor's judgment, DCF has not fulfilled its obligation regarding the SEP requirement.

[27] From January to December 2018, 58% (84 of 145) of applicable cases reviewed for Quality of Teaming were rated acceptable for the *teamwork and coordination* indicator.

[28] All in-home cases were excluded from this measure.

[29] Qualitative Review data are reported by the Monitor on an annual basis and will be included in the next monitoring report.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 11*

| | | **Table 1A: To Be Achieved** | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **December 2018 Performance** | **June 2019 Performance[25]** | **Requirement Fulfilled (Yes/No)[26]** |
| | | *Case and Service Planning* | | | |
| IV.D.23 | <u>Quality of Case Plans</u> | 80% of case plans shall be rated acceptable as measured by the QR process. The Monitor, in consultation with the parties, shall determine that standards for quality case planning. | 51% of cases rated acceptable for both QR indicators *child and family planning process* and *tracking and adjusting* (CY 2018).[30] | CY 2019 data not yet available.[31] | Not reported in this period. |
| | | *Visits* | | | |
| IV.F.28 | <u>Caseworker Contacts with Family When Goal is Reunification</u> | 90% of families will have at least twice-per-month, face-to-face contact with their caseworker when the permanency goal is reunification. | In December 2018, 76% of applicable parents of children in custody with a goal of reunification had at least two face-to-face visits with a caseworker. Monthly range during July – December 2018 monitoring period: 74 to 80%. | In June 2019, 83% of applicable parents of children in custody with a goal of reunification had at least two face-to-face visits with a caseworker. Monthly range during January – June 2019 monitoring period: 83 to 86%.[32,33] | No |

---

[30] From January to December 2018, 51% (100 of 195) of applicable cases reviewed were rated acceptable for both *child and family planning process* and *tracking and adjusting* indicators; 55% (107 of 195) of cases were rated acceptable for *child and family planning process*; 70% (137 of 195) of cases were rated acceptable for *tracking and adjusting*.

[31] Qualitative Review data are reported by the Monitor on an annual basis and will be included in the next monitoring report.

[32] Monthly performance is as follows: January, 85%; February, 83%; March, 86%; April, 86%; May, 86%; June, 83%. Reported performance accounts for valid exceptions to the visits requirement.

[33] The Monitor and DCF completed a joint validation of a sample of two months in the monitoring period and found that exceptions were appropriately applied and documented in 66% of cases. Therefore, these data reflect exclusions from the universe of instances in which exceptions to the requirement for worker visits with parents were appropriately applied and documented.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 12*

| **Table 1A: To Be Achieved** | | | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **December 2018 Performance** | **June 2019 Performance[25]** | **Requirement Fulfilled (Yes/No)[26]** |
| *Maltreatment* | | | | | |
| IV.H.39 | Re-Entry to Placement | Of all children who enter foster care in a 12-month period for the first time who are discharged within 12 months to reunification, living with relative(s), or guardianship, no more than 9% will re-enter foster care within 12 months of their discharge. | 12.2% of children who entered foster care for the first time in CY 2016 and were discharged within 12 months to reunification, living with relative(s), or guardianship, re-entered foster care within 12 months of their discharge. | CY 2017 data not yet available. | Not reported in this period. |
| *Timely Permanency* | | | | | |
| IV.I.41 | Permanency Within 24 Months | Of all children who enter foster care in a 12-month period, at least 66% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering foster care. | 65% of children who entered foster care in CY 2016 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering foster care. | CY 2017 data not yet available. | Not reported in this period. |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 13*

| Table 1A: To Be Achieved | | | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | December 2018 Performance | June 2019 Performance[25] | Requirement Fulfilled (Yes/No)[26] |
| *Services to Support Transition* | | | | | |
| IV.J.44 | Services to Support Transition | 80% of cases will be rated acceptable for supporting transitions as measured by the QR. The Monitor, in consultation with the parties, shall determine the standards for quality support for transitions. | 62% of cases rated acceptable for the QR indicator *successful transitions* (CY 2018).[34] | CY 2019 data not yet available.[35] | Not reported in this period. |

---

[34] From January to December 2018, 62% (73 of 118) of applicable cases reviewed were rated acceptable for the *successful transitions* indicator.
[35] Qualitative Review data are reported by the Monitor on an annual basis and will be included in the next monitoring report.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 14*

| | | | **Table 1B: To Be Maintained** | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **December 2018 Performance** | **June 2019 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| | | | *Investigations* | | |
| III.A.1 | Institutional Abuse Investigations Unit (IAIU) | 80% of IAIU investigations will be completed within 60 days. | In December 2018, 82% of IAIU investigations were completed within 60 days. | In June 2019, 86% of IAIU investigations were completed within 60 days. | Yes |
| IV.A.13 | Timeliness of Investigation Completion (60 days) | 85% of all investigations of alleged child abuse and neglect shall be completed within 60 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. | In November 2018, 81% of all investigations were completed within 60 days. Monthly range during June – November 2018 monitoring period: 81 to 85%. | In May 2019, 84% of all investigations were completed within 60 days. Monthly range during December 2018 – May 2019 monitoring period: 82 to 86%.[38] | Yes |
| IV.A.14 | Timeliness of Investigation Completion (90 days) | 95% of all investigations of alleged child abuse and neglect shall be completed within 90 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. | In November 2018, 94% of all investigations were completed within 90 days. Monthly range during June – November 2018 monitoring period: 93 to 95%. | In May 2019, 95% of all investigations were completed within 90 days. Monthly range during December 2018 – May 2019 monitoring period: 94 to 96%.[39] | Yes |

[36] In some instances where the Monitor does not have June 2019 data, the most recent data available are included.

[37] "Yes" indicates that, in the Monitor's judgment based on presently available information, DCF has fulfilled its obligations regarding the requirement under the SEP. The Monitor has also designated "Yes" for a requirement where DCF has met or is within one percentage point of the SEP standard or there are a small number of cases causing the failure to meet the SEP standard.

[38] Due to the time lag of this measure, the Monitor and DCF decided to alter the period of review, so December 2018 data are included for this period and June 2019 data will be included in the next monitoring report. Monthly performance for this measure is as follows: December, 82%; January, 86%; February, 86%; March, 85%; April, 84%; May, 84%.

[39] Due to the time lag of this measure, the Monitor and DCF decided to alter the period of review, so December 2018 data are included for this period and June 2019 data will be included in the next monitoring report. Monthly performance for this measure is as follows: December, 94%; January, 95%; February, 96%; March, 95%; April, 95%; May, 95%.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 15*

| | | | **Table 1B: To Be Maintained** | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **December 2018 Performance** | **June 2019 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| IV.A.15 | <u>Quality Investigations</u> | 85% of investigations shall meet the standards for quality investigations. The Monitor, in consultation with the parties, shall determine appropriate standards for quality investigations. | 91% of investigations met quality standards in a March 2018 review of a statistically significant sample of investigations completed in October 2017. | NA: quality measured through an Investigative Case Record Review, last conducted in March 2018.[40] | Not reported in this period. |
| | | | ***Family Teaming*** | | |
| IV.B.16 | <u>Initial Family Team Meeting</u> | 80% of children newly entering placement shall have a family team meeting before or within 45 days of placement. | In December 2018, 95% of children newly entering placement had a FTM within 45 days of entering placement. Monthly range during July – December 2018 monitoring period: 74 to 95%. | In June 2019, 87% of children newly entering placement had a FTM within 45 days of entering placement. Monthly range during January – June 2019 monitoring period: 83 to 94%.[41] | Yes |
| IV.B.17 | <u>Subsequent FTMs within 12 months</u> | 80% of children will have three additional FTMs within the first 12 months of the child coming into placement. | In December 2018, 84% of children had three or more additional FTMs within the first 12 months of placement. Monthly range during July – December 2018 monitoring period: 81 to 92%. | In June 2019, 75% of children had three or more additional FTMs within the first 12 months of placement. Monthly range during January – June 2019 monitoring period: 75 to 90%.[42] | Yes |

---

[40] The Investigation Case Record Review is typically conducted every two years.

[41] Monthly performance is as follows: January, 94%; February, 91%; March, 87%; April, 83%; May, 89%; June, 87%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF jointly reviewed all 52 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

[42] Monthly performance is as follows: January, 86%; February, 90%; March, 84%; April, 87%; May, 88%; June, 75%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF jointly reviewed all 64 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 16*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **December 2018 Performance** | **June 2019 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| IV.B.18 | <u>Subsequent FTMs after 12 months – Reunification Goal</u> | After the first 12 months of a child being in care, 90% of those with a goal of reunification will have at least three FTMs each year. | In December 2018, 95% of children with a goal of reunification had three or more FTMs after 12 months of placement. Monthly range during July – December 2018 monitoring period: 74 to 96%. | In June 2019, 84% of children had three or more additional FTMs within the first 12 months of placement. Monthly range during January – June 2019 monitoring period: 84 to 100%.[43] | Yes |
| IV.B.19 | <u>Subsequent FTMs after 12 months – Other than Reunification Goal</u> | After the first 12 months of a child being in care, for those children with a goal other than reunification, 90% shall have at least two FTMs each year. | In December 2018, 89% of children with a goal other than reunification had two or more FTMs after 12 months of placement. Monthly range during July – December 2018 monitoring period: 89 to 97%. | In June 2019, 89% of children with a goal other than reunification had two or more FTMs after 12 months of placement. Monthly range during January – June 2019 monitoring period: 89 to 93%.[44] | Yes |

[43] Monthly performance for this measure is as follows: January, 97%; February, 100%; March, 90%; April, 93%; May, 87%; June, 84%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF jointly reviewed all 7 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

[44] Monthly performance is as follows: January, 93%; February, 90%; March, 93%; April, 91%; May, 92%; June, 89%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF jointly reviewed all 20 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 17*

| | | | Table 1B: To Be Maintained | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | December 2018 Performance | June 2019 Performance[36] | Requirement Maintained (Yes/No)[37] |
| *Needs Assessment* | | | | | |
| IV.C.21 | Needs Assessment | The state shall regularly evaluate the need for additional placements and services to meet the needs of children in custody and their families and to support intact families and prevent the need for out-of-home care. Such needs assessments shall be conducted on an annual, staggered basis that assures that every county is assessed at least once every three years. The state shall develop placements and services consistent with the findings of these needs assessments. | In March 2018, DCF published the most recent report, *DCF Needs Assessment 2018 Report #3: Survey Findings and Synthesis*, that evaluated the information collected through surveys conducted by Rutgers School of Social Work. DCF leadership is determining how to utilize the findings to refine and improve its service array. Going forward, DCF has announced plans to redesign the Needs Assessment process. | DCF completed a comprehensive meta-analysis of previous needs assessments in the state, findings of which were shared with stakeholders in statewide meetings in May 2019. DCF will prioritize assessments collected routinely by county Human Services Advisory Councils (HSACs) and incorporate them into county level Qualitative Reviews (QRs), ChildStat and local Performance Improvement Plan (PIP) processes, discussed in Section V.N. | Yes |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 18*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | December 2018 Performance | June 2019 Performance[36] | Requirement Maintained (Yes/No)[37] |
| | | | *Case and Service Planning* | | |
| IV.D.22 | Initial Case Plans | 95% of initial case plans for children and families shall be completed within 30 days. | In December 2018, 94% of children entering care had case plans developed within 30 days. Monthly range during July – December 2018 monitoring period: 92 to 96%. | In June 2019, 94% of children entering care had case plans developed within 30 days. Monthly range during January – June 2019 monitoring period: 93 to 98%.[45] | Yes |
| III.C.6 | Timeliness of Current Plans | 95% of case plans for children and families will be reviewed and modified no less frequently than every six months. | In December 2018, 96% of case plans were reviewed and modified as necessary at least every six months. Monthly range during July – December 2018 monitoring period: 95 to 97%. | In June 2019, 93% of case plans were reviewed and modified as necessary at least every six months. Monthly range during January – June 2019 monitoring period: 93 to 98%.[46] | Yes |
| | | | *Caseloads* | | |
| III.B.2 | Supervisor/Worker Ratio | 95% of offices will have sufficient supervisory staff to maintain a 5 worker to 1 supervisor ratio. | 100% of Local Offices have sufficient supervisory staff. | 100% of Local Offices have sufficient supervisory staff. | Yes |
| III.B.3 | IAIU Investigators Caseload | 95% of IAIU investigators will have (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. | 100% of IAIU investigators met caseload standards. | 100% of IAIU investigators met caseload standards. | Yes |

[45] Monthly performance for this measure is as follows: January, 95%; February, 98%; March, 97%; April, 94%; May, 93%; June, 94%.
[46] Monthly performance for this measure is as follows: January, 98%; February, 96%; March, 96%; April, 98%; May, 95%; June, 93%.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 19*

| | | **Table 1B: To Be Maintained** | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **December 2018 Performance** | **June 2019 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| III.B.4 | Permanency Workers (Local Offices) Caseload | 95% of Local Offices will have average caseloads for Permanency workers of (a) no more than 15 families, and (b) no more than 10 children in out-of-home care. | 100% of Local Offices met permanency standards. | 100% of Local Offices met permanency standards. | Yes |
| III.B.5 | Permanency Workers Caseload | 95% of Permanency workers will have (a) no more than 15 families, and (b) no more than 10 children in out of home care. | 100% of Permanency workers met caseload standards. | 100% of Permanency workers met caseload standards.[47] | Yes |
| IV.E.24 | Intake workers (Local Offices) Caseload | 95% of Local Offices will have average caseloads for Intake workers of no more than 12 families and no more than eight new case assignments per month. | 100% of Local Offices met intake caseload standards. | 100% of Local Offices met intake caseload standards. | Yes |
| IV.E.25 | Intake workers Caseload | 90% of individual Intake workers shall have no more than 12 open cases and no more than eight new case assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. | 95% of Intake workers met caseload standards. | 94% of Intake workers met caseload standards.[48] | Yes |

[47] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.
[48] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 20*

| | | | Table 1B: To Be Maintained | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | December 2018 Performance | June 2019 Performance[36] | Requirement Maintained (Yes/No)[37] |
| IV.E.26 | Adoption Workers (Local Offices) Caseload | 95% of Local Offices will have average caseloads for Adoption workers of no more than 15 children per worker. | 99% of Local Offices met adoption standards. | 99% of Local Offices met adoption standards. | Yes |
| IV.E.27 | Adoption Workers Caseload | 95% of individual Adoption worker caseloads shall be no more than 15 children per worker. | 98% of Adoption workers met caseload standards. | 98% of Adoption workers met caseload standards.[49] | Yes |
| *Deputy Attorneys General* | | | | | |
| III.D.7 | Adequacy of DAsG Staffing | The state will maintain adequate DAsG staff positions and keep positions filled. | 135 staff positions filled with two staff on leave; 133 (99%) available DAsG. | 136 staff positions were filled with five staff on leave; 131 (96%) available DAsG.[50] | Yes |
| *Child Health Units* | | | | | |
| III.E.8 | Child Health Units | The state will continue to maintain its network of Child Health Units, adequately staffed by nurses in each Local Office. | As of December 31, 2018, DCF had 163 Health Care Case Managers and 84 staff assistants. | As of June 30, 2019, DCF had 154 Health Care Case Managers and 85 staff assistants. | Yes |

[49] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.
[50] DCF reported that during this monitoring period select DAsG outside of the DCF Practice Group have dedicated some of their time to DCF matters.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*
*January 23, 2020*
*Page 21*

| | | | Table 1B: To Be Maintained | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **December 2018 Performance** | **June 2019 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| | | | *Visits* | | |
| III.F.9 | Caseworker Contacts with Children – New Placement/Placement Change | 93% of children shall have at least twice-per-month face-to-face contact with their caseworker within the first two months of placement, with at least one contact in the placement. | In December 2018, 94% of children had two visits per month, one of which was in the placement, during the first two months of an initial or subsequent placement. Monthly range during July – December 2018 monitoring period: 89 to 94%. | In June 2019, 90% of children had two visits per month, one of which was in the placement, during the first two months of an initial or subsequent placement. Monthly range during January – June 2019 monitoring period: 89 to 95%.[51] | Yes[52] |
| III.F.10 | Caseworker Contact with Children in Placement | During the remainder of the placement, 93% of children shall have at least one caseworker visit per month, in the placement. | In December 2018, 94% of children had at least one caseworker visit per month in his/her placement. Monthly range during July – December 2018 monitoring period: 93 to 95%. | In June 2019, 93% of children had at least one caseworker visit per month in his/her placement. Monthly range during January – June 2019 monitoring period: 93 to 95%.[53] | Yes |

---

[51] Monthly performance for this measure is as follows: January, 91%; February, 95%; March, 94%; April, 93%; May, 89%; June, 90%.
[52] The Monitor considers this to be a temporary decline in performance that is still within acceptable range.
[53] Monthly performance for this measure is as follows: January, 94%; February, 94%; March, 95%; April, 94%; May, 94%; June, 93%.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 22*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | December 2018 Performance | June 2019 Performance[36] | Requirement Maintained (Yes/No)[37] |
| IV.F.29 | Parent-Child Visits – Weekly | 60% of children in custody with a return home goal will have an in-person visit with their parent(s) at least weekly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | In December 2018, 77% of applicable children had weekly visits with their parents. Monthly range during July – December 2018 monitoring period: 76 to 79%. | In June 2019, 76% of applicable children had weekly visits with their parents. Monthly range during January – June 2019 monitoring period: 76 to 80%.[54,55] | Yes |
| IV.F.30 | Parent-Child Visits – Bi-Weekly | 85% of children in custody will have an in-person visit with their parent(s) or legally responsible family member at least every other week, excluding those situations where a court order prohibits or regulates visits or there is supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | In December 2018, 91% of applicable children had bi-weekly visits with their parents. Monthly range during July – December 2018 monitoring period: 89 to 92%. | In June 2019, 90% of applicable children had bi-weekly visits with their parents. Monthly range during January – June 2019 monitoring period: 89 to 92%.[56,57] | Yes |

[54] Monthly performance for this measure is as follows: January, 76%; February, 77%; March, 80%; April, 79%; May, 77%; June, 76%. Reported performance accounts for valid exceptions to this visits requirement.

[55] Based on the Monitor's review of a statistically significant sample of cases in a prior monitoring period, the Monitor determined NJ SPIRIT documentation of exceptions with respect to this measure to be reliable. As a result, these data exclude all instances in which documentation indicated that a visit was not required.

[56] Monthly performance for this measure is as follows: January, 90%; February, 91%; March, 92%; April, 91%; May, 89%; June, 90%. Reported performance accounts for valid exceptions to this visits requirement.

[57] Based on the Monitor's review of a statistically significant sample of cases in a prior monitoring period, the Monitor determined NJ SPIRIT documentation of exceptions with respect to this measure to be reliable. As a result, these data exclude all instances in which documentation indicated that a visit was not required.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 23*

| | | | Table 1B: To Be Maintained | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | December 2018 Performance | June 2019 Performance[36] | Requirement Maintained (Yes/No)[37] |
| IV.F.31 | Child Visits with Siblings | 85% of children in custody who have siblings with whom they are not residing will visit those siblings at least monthly, excluding those situations where a court order prohibits or regulates visits or there is supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | In December 2018, 88% of children in custody who have siblings with whom they are not residing visited with their siblings within the month. Monthly range during July – December 2018 monitoring period: 85 to 88%. | In June 2019, 84% of children in custody who have siblings with whom they are not residing visited with their siblings within the month. Monthly range during January – June 2019 monitoring period: 84 to 87%.[58,59] | Yes |
| | | | *Placement* | | |
| IV.G.32 | Placing Siblings Together | At least 80% of siblings groups of two or three children entering custody will be placed together. | 77% of sibling groups of two or three children entering custody in CY 2018 were placed together. | CY 2019 data not yet available. | Not reported in this period. |
| IV.G.33 | Placing Siblings Together for Four or More Children | All children will be placed with at least one other sibling 80% of the time. | Children entering custody in CY 2018 with three or more siblings were placed with at least one other sibling 86% of the time. | CY 2019 data not yet available. | Not reported in this period. |

[58] Monthly performance is as follows: January, 85%; February, 84%; March, 86%; April, 87%; May, 86%; June, 84%. Reported performance accounts for valid exceptions to the visits requirement.
[59] Based on the Monitor and DCF's joint review of a statistically significant sample of cases for children in care in October and November 2018, it was determined that exceptions to this visits requirement were appropriately applied and documented in 60% of cases. The universe of cases utilized for the purposes of calculating performance has been adjusted accordingly.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 24*

| | | | | | |
|---|---|---|---|---|---|
| **Table 1B: To Be Maintained** | | | | | |
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **December 2018 Performance** | **June 2019 Performance**[36] | **Requirement Maintained (Yes/No)**[37] |
| IV.G.34 | Recruitment of Placements for Sibling Groups of Four or More | DCF will continue to recruit for resource homes capable of serving sibling groups of four or more. | Between July and December 2018, DCF recruited a total of 19 new SIBS homes. As of December 2018, DCF had a total of 73 large capacity SIBS homes; 18 homes that can accommodate five or more children and 55 homes that can accommodate four children. | Between January and June 2019, DCF recruited a total of 26 new SIBS homes. As of June 2019, DCF had a total of 69 large capacity SIBS homes; 11 homes that can accommodate five or more children and 58 homes that can accommodate four children. | Yes |
| IV.G.35 | Placement Stability, First 12 Months in Care | At least 84% of children entering out-of-home placement for the first time in a calendar year will have no more than one placement change during the 12 months following their date of entry. | 85% of children who entered out-of-home placement for the first time in CY 2017 had no more than one placement change during the 12 months following their date of entry. | CY 2018 data not yet available. | Not reported in this period. |
| IV.G.36 | Placement Stability, 13 – 24 Months in Care | At least 88% of these children will have no more than one placement change during the 13-24 months following their date of entry. | 95% of children who entered care in CY 2016 had no more than one placement change during the 13-24 months following their date of entry. | CY 2017 data not yet available. | Not reported in this period. |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 25*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **December 2018 Performance** | **June 2019 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| | | | *Education* | | |
| III.G.11 | Educational Needs | 80% of cases will be rated acceptable as measured by the QR in stability (school) and learning and development. The Monitor, in consultation with the parties, shall determine the standards for school stability and quality learning and development. | 83% of cases rated acceptable for both QR indicators *stability in school* and *learning and development* (CY 2018).[60],[61] | CY 2019 data not yet available.[62] | Not reported in this period. |
| | | | *Maltreatment* | | |
| III.H.12 | Abuse and Neglect of Children in Foster Care | No more than 0.49% of children will be victims of substantiated abuse or neglect by a resource parent or facility staff member. | For CY 2018, 0.27% of children were victims of substantiated abuse or neglect by a resource parent or facility staff member. | CY 2019 data not yet available. | Not reported in this period. |
| IV.H.37 | Repeat Maltreatment (In-home) | No more than 7.2% of children who remain at home after a substantiation of abuse or neglect will have another substantiation within the next 12 months. | 5% of children who remained at home after a substantiation of abuse or neglect in CY 2017 had another substantiation within the next 12 months. | CY 2018 data not yet available. | Not reported in this period. |

[60] From January to December 2018, 83% (67 out of 81) of applicable cases reviewed rated acceptable for both *stability in school* and *learning and development, age 5 and older* indicators; 91% (86 of 94) of cases were rated acceptable for *stability in school*; 91% (77 of 85) of cases were rated acceptable for *learning and development, age 5 and older*.

[61] All in-home cases are excluded from this measure.

[62] Qualitative Review data are reported by the Monitor on an annual basis and will be included in the next monitoring report.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 26*

| | Table 1B: To Be Maintained | | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **December 2018 Performance** | **June 2019 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| IV.H.38 | Maltreatment Post-Reunification | Of all children who enter foster care in a 12-month period for the first time who are discharged within 24 months to reunification or living with a relative(s), no more than 6.9% will be the victims of abuse or neglect within 12 months of their discharge. | 5.9% of children who entered foster care for the first time in CY 2015 and were discharged within 24 months to reunification or living with relative(s) were the victims of abuse or neglect within 12 months of their discharge. | CY 2016 data not yet available. | Not reported in this period. |
| | | | *Permanency* | | |
| IV.I.40 | Permanency within 12 Months | Of all children who enter foster care in a 12-month period, at least 42% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | 41% of children who entered foster care in CY 2017 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | CY 2018 data not yet available. | Not reported in this period. |
| IV.I.42 | Permanency Within 36 Months | Of all children who enter foster care in a 12-month period, at least 80% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care. | 81% of children who entered foster care in CY 2015 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care. | CY 2016 data not yet available. | Not reported in this period. |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 27*

| | Table 1B: To Be Maintained | | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | December 2018 Performance | June 2019 Performance[36] | Requirement Maintained (Yes/No)[37] |
| IV.I.43 | Permanency Within 48 Months | Of all children who enter foster care in a 12-month period, at least 86% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care. | 89% of children who entered foster care in CY 2014 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care. | CY 2015 data not yet available. | Not reported in this period. |
| | | | *Older Youth* | | |
| IV.K.45 | Independent Living Assessments | 90% of youth age 14 to18 have an Independent Living Assessment. | In December 2018, 86% of applicable children had completed an Independent Living Assessment. Monthly range during July – December 2018 monitoring period: 86 to 90%. | In June 2019, 87% of applicable children had completed an Independent Living Assessment. Monthly range during January – June 2019 monitoring period: 83 to 89%.[63] | Yes[64] |
| IV.K.46 | Quality of Case Planning and Services | 75% of youth age 18 to 21 who have not achieved legal permanency shall receive acceptable quality case management and service planning. | 70% of cases rated acceptable for both QR indicators *child (youth)/family status* and *overall practice performance* (CY 2018).[65] | CY 2019 data not yet available.[66] | Not reported in this period. |

[63] Monthly performance for this measure is as follows: January, 87%; February, 84%; March, 84%; April, 85%; May, 83%; June, 89%.
[64] The Monitor considers this to be a temporary decline in performance that is still within an acceptable range.
[65] From January to December 2018, 70% (30 of 43) cases reviewed rated acceptable for both *child (youth)/family status* and *overall practice performance* indicators. 84% (36 of 43) of cases were rated acceptable *for child (youth)/family) status*; and 74% (32 of 43) of cases were rated acceptable for *overall practice performance*.
[66] Qualitative Review data are reported by the Monitor on an annual basis and will be included in the next monitoring report.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 28*

| | Table 1B: To Be Maintained | | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **December 2018 Performance** | **June 2019 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| IV.K.47 | Housing | 95% of youth exiting care without achieving permanency shall have housing. | 96% of youth exiting care between July and December 2018 without achieving permanency had documentation of a housing plan upon exiting care.[67] | CY 2019 data not yet available.[68] | Not reported in this period. |
| IV.K.48 | Employment/Education | 90% of youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. | 89% of youth exiting care between July and December 2018 without achieving permanency were either employed or enrolled in education or vocational training programs or there was documented evidence of consistent efforts to help the youth secure employment or training.[69] | CY 2019 data not yet available.[70] | Not reported in this period. |

---

[67] Six youth out of the universe of 61 youth exiting care to non-permanency were excluded from consideration because two youth could not be located and four were incarcerated. The universe of cases to which this measure applies is small, making fluctuations more likely.
[68] This jointly-conducted case record review will now be conducted on an annual basis. The Monitor anticipates conducting another case record review in collaboration with DCF in early spring 2020.
[69] Eight youth out of the universe of 61 youth exiting care to non-permanency were excluded from consideration because they could not be located, were incarcerated, or moved out of state. Seven additional youth were considered to have met the standard because there was documentation of consistent efforts by the caseworker to help secure education or employment. The universe of cases to which this measure applies is small, making fluctuations more likely.
[70] This jointly-conducted case record review will now be conducted on an annual basis. The Monitor anticipates conducting another case record review in collaboration with DCF in early spring 2020.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 29*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| **A. Data Transparency** | DCF will continue to maintain a case management information and data collections system that allows for the assessment, tracking, posting or web-based publishing and utilization of key data indicators. | Data provided directly to the Monitor and published by DCF in reports and on its website.[71]<br><br>NJ SPIRIT functionality is routinely assessed by the Monitor's use of NJ SPIRIT data for validation and through use of SafeMeasures, as well as in conducting case inquiries and case record reviews. | Yes |
| **B. Case Practice Model** | Implement and sustain a Case Practice Model<br><br>Quality investigation and assessment<br><br>Safety and risk assessment and risk reassessment<br><br>Engagement with youth and families<br><br>Working with family teams<br><br>Individualized planning and relevant services<br><br>Safe and sustained transition from DCF<br><br>Continuous review and adaptations | QR Data<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings<br><br>Investigation case record review<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | Yes |

---

[71] Please see list of reports in Section I (Introduction: Monitoring Methodology) to review data sources for this Foundational Element.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 30*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| **C. State Central Registry** | Received by the field in a timely manner | Commissioner's Monthly Report<br><br>Monitor site visit with SCR staff<br><br>Screening and Investigations Monthly Report | Yes |
| | Investigation commenced within required response time | | |
| **D. Appropriate Placements** | Appropriate placements of children | QR data<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | Yes |
| | Resource family homes licensed and closed (kinship/non-kinship) | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor | |
| | Number of children in home/out of home demographic data | NJ Rutgers Data Portal | |
| | Placed in a family setting | Commissioner's Monthly Report | |
| | Placement proximity | Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | |
| | No children under 13 years old in shelters | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor | |
| | Children over 13 in shelters no more than 30 days | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor | |
| | No behavioral health placements out of state without approval | Commissioner's Monthly Report | |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 31*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| | Adequate number of resource placements | CP&P Needs Assessment<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | |
| **E. Service Array** | Services for youth age 18-21, LGBTQI, mental health and domestic violence for birth parents with families involved with the child welfare system | New Jersey Youth Resource Spot[72]<br><br>New Jersey DCF Adolescent Services Website[73]<br><br>Data provided directly to the Monitor<br><br>Attendance at Adolescent Practice Forums<br><br>CP&P Needs Assessment<br><br>Safe, Healthy, and Connected Annual Report | Yes |
| | Preventive home visit programs | Commissioner's Monthly Report<br><br>Safe, Healthy, and Connected Annual Report | |
| | Family Success Centers | Commissioner's Monthly Report<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | |

[72] New Jersey's Youth Resource Spot can be found at www.NJYRS.org.
[73] DCF's Adolescent Services Website can be found at http://www.nj.gov/dcf/adolescent/.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 32*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| **F. Medical and Behavioral Health Services** | Appropriate medical assessment and treatment | Data provided directly to the Monitor<br><br>Commissioner's Monthly Report<br><br>CIACC Monthly Report<br><br>Safe, Healthy, and Connected Annual Report | Yes |
| | Pre-placement and entry medical assessments | | |
| | Dental examinations | | |
| | Immunizations | | |
| | Follow-up care and treatment | | |
| | Mental health assessment and treatment | | |
| | Behavioral health | | |
| **G. Training** | Pre-service training | Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | Yes |
| | Case practice model | | |
| | Permanency planning | | |
| | Concurrent planning | | |
| | Adoption | | |
| | Demonstration of competency | | |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 33*

## Table 1C: Foundational Elements

| SEP Reference | Additional SEP Requirements that DCF Must Sustain: | Data Source | December 2017 Fulfilled (Yes/No) |
|---|---|---|---|
| **H. Flexible Funding** | DCF will continue to make flexible funds available for use by workers in crafting individualized service plans for children, youth and families to meet the needs of children and families, to facilitate family preservation and reunification where appropriate and to ensure that families are able to provide appropriate care for children and to avoid the disruption of otherwise stable and appropriate placements. | Data provided directly to the Monitor<br><br>DCF Online Policy Manual<br><br>Budget Report | Yes |
| **I. Resource Family Care Support Rates** | Family care support rates<br><br>Independent Living Stipend | DCF Online Policy Manual<br><br>DCF Website[74]<br><br>New Jersey Youth Resource Spot | Yes |
| **J. Permanency** | Permanency practices<br><br>Adoption practices | Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings | Yes |
| **K. Adoption Practice** | 5- and 10-month placement reviews | Adoption Report<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings | Yes |

---

[74] USDA has altered its schedule for producing its Annual Report on costs of raising a child. By agreement, DCF now updates the rates within 30 days of the USDA annual report's release to meet the SEP standards and provides written confirmation to the Monitor.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 34*

## IV.    FOUNDATIONAL ELEMENTS

The Sustainability and Exit Plan (SEP) identifies a series of core organizational and practice improvements known as the "Foundational Elements" that became the groundwork upon which New Jersey's reform has been built. They include a range of requirements from the 2006 Modified Settlement Agreement (MSA) that were previously met and were codified in the SEP as foundational for improved child welfare outcomes and future system improvements. These Foundational Elements remain enforceable in the SEP if performance is not sustained. The Department of Children and Families (DCF) collects and publishes relevant performance data in these areas.

The Monitor has continued to assess maintenance of Foundational Elements through analysis of DCF's data – for this report data from the period January 1 to June 30, 2019 – as well as through participation in statewide Qualitative Reviews (QRs), site visits to Local Offices and other stakeholders, Area Director meetings, attendance at monthly ChildStat presentations, and telephone surveys with workers. In October 2019, DCF released its *2018 Annual Report: Safe Healthy, and Connected*, which provides a comprehensive analysis of agency processes, current initiatives and procedures, quality of practice, and performance on key outcomes as of calendar year 2018.

In the Monitor's judgment, *each of the SEP's Foundational Elements has been maintained during this period,* and some have been enhanced with new initiatives championed by Commissioner Beyer. The sections below provide information on new developments, significant accomplishments, or other information determined by the Monitor to be relevant for its assessment and understanding of the Foundational Elements.

### A.  CASE PRACTICE MODEL – SEP Section II.B

Section II.B of the SEP requires that "DCF will continue to implement and sustain a Case Practice Model that…emphasizes quality investigation and assessment, including safety and risk assessment and reassessment, and engagement with youth and families; working with family teams; individualized planning and relevant services; continuous review and adaptation; and safe and sustained transition from DCF."

DCF's case practice has been guided by New Jersey's Case Practice Model (CPM) since 2007. DCF is providing texture to the CPM through its Strategic Plan, finalized during the monitoring period and discussed in Section II of this report, which seeks to ensure that all New Jersey children and families are, or become, safe, healthy, and connected.

During the monitoring period DCF finalized its Structured Decision-Making (SDM™) tools and training on the management of safety and risk throughout the life of a case. Training for all caseworkers on the SDM™ tool began in October 2019.

### B.  APPROPRIATE PLACEMENTS – SEP Section II.D

Section II.D of the SEP provides that "when out-of-home placement is necessary, DCF will provide the most appropriate and least restrictive placements, allowing children to remain in their own communities, be placed with or maintain contact with siblings and relatives and have their educational needs met. The State shall maintain an adequate number and array of family-based placements to appropriately place children in family settings."

#### Appropriate Placements and Services

DCF continues to maintain a solid pool of resource homes and group settings to meet the needs of children in out-of-home care. As of June 30, 2019, 5,115 children were in out-of-home placement, 471 fewer than at the end of December 2018. This continued reduction in the number of children overall in foster care reflects ongoing solid case practice occurring to provide services to children and families in their homes and communities. As reported in Section II of this report, 90 percent of children in out-of-home care were placed in family-like settings, with over a third in kinship homes and only eight percent in group and residential settings. Two percent were in independent living programs. Between January and June 2019, DCF licensed 611 new kinship and non-kinship resource family homes; of these newly licensed resource family homes, 353 (58%) were kinship homes and 258 (42%) were non-kinship homes. As of June 30, 2019, there were a total of 4,167 licensed resource family homes in the state, with a total bed capacity for 9,348 children. Of the total number of resource family homes, 1,375 were kin homes and 2,792 were non-kin homes. DCF is pursuing new strategies to increase the number of kinship homes available in the state.

DCF continues to seek homes for large sibling groups and adolescents, as described further in Section V.F of this report.

### C.  SERVICE ARRAY – SEP Section II.E

Section II.E of the SEP requires the state to provide comprehensive, culturally responsive services to address the identified needs of the children, youth, and families, and maintain an adequate statewide network of Family Success Centers (FSCs). These services are to include, but not be limited to, services for youth age 18 to 21, LGBTQI youth, birth parents who may need mental health or domestic violence supports, and preventive home visiting programs. Under the new administration, DCF has been working to establish a systemic process to identify effective services available internally and through its external partners that are available, accessible, and of high quality. Some of the more recent improvements are highlighted below.

Between January and June 2019, DCF expanded its innovative Keeping Families Together (KFT) program, a model of supportive housing designed to help families involved in child welfare be safe, permanently reunify, and become stabilized in their own homes. Services include assistance in selecting and obtaining housing, budgeting, and other household needs, as well as clinical and case management services, which can involve weekly home visits and individual and family counseling for mental health and substance use treatment and assistance in working towards treatment plan goals. Families are also offered peer support groups for

participants with similar challenges. DCF's KFT program – one of the largest in the country – now has the capacity to provide supportive housing to over 600 families annually. As of June 2019, 590 families were housed through KFT and 27 were part of the program and in the process of seeking housing. During the monitoring period, the Monitor staff visited a KFT site, spoke to a family using the KFT voucher, and noted strong collaboration between CP&P and the KFT provider.

The federal Comprehensive Addiction and Recovery Act of 2016 (CARA) addresses the need for a continuum of care for addiction treatment, from primary prevention to recovery support. In response to CARA, DCF developed a policy, now implemented in all 21 counties, requiring plans for infants identified at birth and affected by substance use. These "Plans of Safe Care" are developed with parents, caregivers, and hospital staff in consultation with a multi-disciplinary team consisting of CP&P supervisors, a certified alcohol and drug counselor, a nurse, a domestic violence liaison (DVL), a mental health clinician, and an early childhood expert. Between January and June 2019, DCF developed Plans of Safe Care for 483 children.

In July 2018, DCF's division of Child Protection and Permanency (CP&P), along with the Children's System of Care (CSOC) and a private provider, launched Family Functional Therapy for Foster Care (FFT-FC) in Cumberland, Gloucester, and Salem counties. FFT-FC is an evidence-based, trauma-informed model of care aimed at supporting youth and their families in overcoming individual and relational trauma to achieve placement stability and long-term permanency. Between January 1 and June 30, 2019, the FFT-FC treatment team trained 22 resource caregivers in 15 licensed FFT-FC resource homes, with promising results. Of the 22 youth admitted into the program, 19 remained stable with their initial FFT-FC caregiver and three youth were re-placed within the program.

DCF continued rolling out its mandatory LGBTQI cultural competence training. Currently, all CP&P managers and supervisory staff have been trained, and front-line caseworkers began receiving training during the monitoring period. DCF's role on the Governor's Transgender Equality Task Force affords DCF input into statewide recommendations, including supports and services regarding housing, health, family support, and higher education.

As of June 2019, DCF, through its Division on Women (DOW), funded thirty agencies statewide that operate domestic violence programs. These programs range from a 24-hour hotline to children's domestic violence programs, including Peace: A Learned Solution (PALS), which uses a research-based therapeutic program model to reduce the effects of trauma on children ages four to twelve and their non-offending parent. DCF also funds batterer intervention programs in six counties and three programs. Between January and June 2019, DCF allocated additional funding to agencies that specifically serve underserved populations, including domestic violence services for South Asian and Latinx survivors and legal organizations assisting low-income residents.

DCF continues its support of Family Success Centers (FSCs) as one its core strategies to support children and youth in their communities. FSCs are neighborhood-based centers where families can access services and supports prior to crisis. New Jersey has a total of 57 operational Family Success Centers that serve approximately 2,600 families per month.

# V. SUSTAINABILITY AND EXIT PLAN PERFORMANCE MEASURES *TO BE ACHIEVED* AND *TO BE MAINTAINED*

This section of the report provides information on the Sustainability and Exit Plan (SEP) requirements that the state is focusing on achieving – designated as Outcomes *To Be Achieved* – and those requirements for which the state has satisfied the specified performance targets for at least six months and must sustain – designated as Outcomes *To Be Maintained*.

## A. INVESTIGATIONS

The SEP includes four performance measures related to investigative practice, all of which have been designated as Outcomes *To Be Maintained* as of January 2019: quality of investigations (SEP IV.A.15); timeliness of Institutional Abuse Investigations Unit (IAIU) investigation completion (SEP III.A.1); timeliness of alleged child abuse and neglect investigation completion within 60 days (SEP IV.A.13); and investigation completion within 90 days (SEP IV.A.14). Performance for all four measures during the current monitoring period are discussed below.

**Timeliness of Investigation Completion**

| Quantitative or Qualitative Measure | 13. <u>Timeliness of Investigation Completion</u>: Investigations of alleged child abuse and neglect shall be completed within 60 days. |
|---|---|
| **Performance Target** | 85% of all abuse/neglect investigations shall be completed within 60 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. |

*Performance as of May 31, 2019:*[75]

In May 2019, there were 5,421 investigations of alleged child abuse and neglect, 4,562 (84%) of which were completed within 60 days. Performance from December 2018 to May 2019 ranged from a low of 83 percent to a high of 86 percent.[76] The Monitor considers DCF to have met this measure and will continue to carefully follow performance on timely completion of investigations within 60 days.

---

[75] June 2019 data will be included in the next monitoring report. For certain data elements that have an extended time frame built into the measurement, the Monitor and DCF decided to alter the period for data review so that six month monitoring reports can be produced more closely to the end of the monitoring period.

[76] Monthly performance for this measure is as follows: December, 83%; January, 86%; February, 86%; March, 85%; April, 84%; May, 84%.

| Quantitative or Qualitative Measure | 14. <u>Timeliness of Investigation Completion</u>: Investigations of alleged child abuse and neglect shall be completed within 90 days. |
|---|---|
| **Performance Target** | 95% of all abuse/neglect investigations shall be completed within 90 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. |

***Performance as of May 31, 2019:***[77]

In May 2019, 5,158 (95%) of the 5,421 investigations of child abuse and neglect were completed within 90 days. Performance from December 2018 to May 2019 ranged from a low of 94 percent to a high of 96 percent.[78] DCF continues to meet the SEP performance standard for the timeliness of investigation completion within 90 days.

**Figure 1: Percentage of Abuse and Neglect Investigations Completed within 90 days (June 2015 – May 2019)**



Source: DCF Data

---

[77] June 2019 data will be included in the next monitoring report.  For certain data elements that have an extended time frame built into the measurement, the Monitor and DCF decided to alter the period for data review so that six-month monitoring reports can be produced more closely to the end of the monitoring period.
[78] Monthly performance for this measure is as follows: December, 94%; January, 95%; February, 96%; March, 95%; April, 95%; May, 95%.

**Quality of Investigations**

| Quantitative or Qualitative Measure | 15. Quality of Investigations: Investigations of alleged child abuse and neglect shall meet standards of quality. |
|---|---|
| **Performance Target** | 85% of all abuse/neglect investigations shall meet standards of quality. |

The quality of investigations review is typically conducted every two years. In March 2018, DCF, together with the Monitor, conducted a case record review of the quality of CP&P's investigative practice. Reviewers examined the quality of practice of a statistically valid random sample of selected Child Protective Services (CPS) investigations assigned to DCF Local Offices between October 1 and October 14, 2017, involving 331 investigations and 518 alleged child victims.[79] Overall, reviewers found that 301 (91%) of the investigations were of acceptable quality.[80]

The Monitor anticipates conducting another case record review in collaboration with DCF on the quality of investigations in 2020.

---

[79] These results have a ± 5% margin of error with 95% confidence.

[80] Reviewers could select four possible responses to the question regarding the quality of the investigation: "completely," "substantially," "marginally" or "not at all." Investigations determined to be "completely" or "substantially" of quality were considered acceptable for the purpose of this measure.

## B. FAMILY TEAM MEETINGS

Family Team Meetings (FTMs) bring families, providers, formal and informal supports together to exchange information, participate in case planning, coordinate and follow up on services, and examine and solve problems. Meetings are intended to be scheduled according to the family's availability in an effort to involve as many family members and supports as possible. Workers are trained and coached to hold FTMs at key decision and transition points in the life of a case, such as when a child enters placement, when a child has a change in placement, and/or when there is a need to adjust a case plan to achieve permanency or meet a child's needs.

The SEP includes five performance measures pertaining to FTMs, four of which had been met and designated as Outcomes *To Be Maintained*: the requirements that FTMs be held within 45 days of a child's removal (SEP IV.B.16); that for children in out-of-home placement, at least three additional FTMs after the initial FTM be held within the first 12 months of placement (SEP IV.B.17); that children with the goal of reunification have at least three FTMs each year after the first 12 months of placement (SEP IV.B.18); and that children with a goal other than reunification have at least two FTMs each year after the first 12 months of placement (SEP IV.B.19).

The remaining Outcome *To Be Achieved* is Quality of Teaming (SEP IV.B.20), which is measured by the Qualitative Review (QR) process on an annual basis, and therefore not included in this report. Performance for the other four measures during the current monitoring period are discussed below.

### Initial FTMs Held within 45 Days of Entry

| Quantitative or Qualitative Measure | 16.  Initial Family Team Meetings: For children newly entering placement, the number/percent who have a family team meeting within 45 days of entry. |
|---|---|
| Performance Target | 80% of children newly entering placement shall have a family team meeting before or within 45 days of placement. |

*Performance as of June 30, 2019:*

In June 2019, 122 (87%) out of 140 possible FTMs occurred within 45 days of a child's removal from home. Performance from January 1 to June 30, 2019 ranged from a low of 83 percent to a high of 94 percent.[81] For this measure, the Monitor and DCF jointly verified monthly data from NJ SPIRIT for the 52 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[82]

DCF's performance exceeded the SEP standard in each month this monitoring period.

---

[81] Monthly performance for this measure is as follows: January, 94%; February, 91%; March, 87%; April, 83%; May, 89%; June, 87%. Reported performance accounts for valid exceptions to the FTM requirement.

[82] Based on a joint review with DCF of all 52 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in June 2019, there were 146 children newly entering placement. The Monitor and DCF determined that in six cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe of applicable cases 140 children.

**FTMs Held within the First 12 Months**

| Quantitative or Qualitative Measure | 17. Subsequent Family Team Meetings within 12 Months: For all other children in placement, the number/percent who have three additional FTMs within the first 12 months of the child coming into placement. |
|---|---|
| Performance Target | 80% of children will have three additional FTMs within the first 12 months of the child coming to placement. |

*Performance as of June 30, 2019:*[83]

In June 2019, 87 (75%) of 116 applicable children had an additional three or more FTMs within the first 12 months of entering placement. Performance from January 1 to June 30, 2019 ranged from a low of 75 percent to a high of 90 percent.[84] For this measure, the Monitor and DCF jointly verified monthly data from NJ SPIRIT for the 64 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[85]

DCF's performance exceeded the SEP standard in all but one month this monitoring period.

**FTMs Held After 12 Months in Placement with a Goal of Reunification**

| Quantitative or Qualitative Measure | 18. Subsequent Family Team Meetings after 12 Months: For all children in placement with a goal of reunification, the number/percent who have at least three FTMs each year after the first 12 months of placement. |
|---|---|
| Performance Target | After the first 12 months of a child being in care, 90% of those with a goal of reunification will have at least three FTMs each year. |

*Performance as of June 30, 2019:*[86]

In June 2019, 16 (84%) of 19 applicable children with a permanency goal of reunification had three or more FTMs in the 12 months following their first year in out-of-home placement. Performance from January 1 to June 30, 2019 ranged from a low of 84 percent to a high of 100 percent.[87] For this measure, the Monitor and DCF jointly verified monthly data from NJ SPIRIT

---

[83] Measure 17 applies to all children who have been in out-of-home placement for 12 months who entered care in the specified month. For example, performance for June 2019 is based upon the 118 children who entered care in June 2018. Compliance is based on whether at least three FTMs were held for these children during the 12-month period they were in care.

[84] Monthly performance is as follows: January, 86%; February, 90%; March, 84%; April, 87%; May, 88%; June, 75%. Reported performance accounts for valid exceptions to the FTM requirement.

[85] Based on a joint review of all 64 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in June 2018, there were 118 children who had been in out-of-home placement for 12 months. The Monitor and DCF determined that in two cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe of applicable cases 116 children.

[86] Measure 18 applies to all children who have been in care for at least 24 months who entered care in the specified month each year and have a goal of reunification. For example, in June 2019, a combined total of 19 children who entered care in June 2017, June 2016, June 2015, etc. and were still in placement with a goal of reunification. Compliance is based on whether at least three FTMs were held for these children during their most recent 12 months in care.

[87] Monthly performance for this measure is as follows: January, 97%; February, 100%; March, 90%; April, 93%; May, 87%; June, 84%. Reported performance accounts for valid exceptions to the FTM requirement.

for the seven applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[88]

DCF's performance exceeds the SEP standard in four of six months during the monitoring period and remained close to the standard in the other two months. Given that the universe of cases to which this measure applies is small and therefore more susceptible to fluctuations, the Monitor considers DCF to have continued to maintain the performance standard.

**FTMs Held After 12 Months in Placement with a Goal Other than Reunification**

| Quantitative or Qualitative Measure | 19. Subsequent Family Team Meetings after 12 Months: For all children in placement with a goal other than reunification, the number/percent who have at least two FTMs each year. |
|---|---|
| Performance Target | After the first 12 months of a child being in care, for those children with a goal other than reunification, 90% shall have at least two FTMs each year. |

*Performance as of June 30, 2019:[89]*

In June 2019, 119 (89%) of 134 applicable children in out-of-home placement with a permanency goal other than reunification had two or more FTMs after 12 months. Performance from January 1 to June 30, 2019 ranged from a low of 89 percent to a high of 93 percent.[90] For this measure, the Monitor verified monthly data from NJ SPIRIT for the 20 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[91]

DCF continues to meet the SEP standard on this measure.

---

[88] Based on a review of all seven cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in May 2019, there were 33 children who had been in care for at least 24 months who had a goal of reunification. The Monitor determined that in two cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe of applicable cases 31 children. There were no documented exceptions to the FTM requirement in June 2019.

[89] Children eligible for Measure 19 are all children who have been in care for at least 24 months who entered care in the month specified each year and have a goal other than reunification. For example, in June 2019, a combined total of 135 children entered care in June 2017, June 2016, June 2015, etc. and are still in placement with a goal other than reunification. Compliance is based on whether at least two FTMs were held for these children each year in the most recent year after 12 months in care.

[90] Monthly performance is as follows: January, 93%; February, 90%; March, 93%; April, 91%; May, 92%; June, 89%. Reported performance accounts for valid exceptions to the FTM requirements.

[91] Based on a review of all 20 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in June 2019 there were 135 children who had been in care after 12 months with a goal other than reunification. The Monitor determined that in one case, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded that case, making the universe of applicable cases 134 children.

## Quality of Teaming

| Quantitative or Qualitative Measure | 20.  Cases involving out-of-home placement show evidence of family teamwork. |
|---|---|
| Performance Target | 75% of cases involving out-of-home placements that were assessed as part of the Qualitative Review (QR) process will show evidence of both acceptable team formation and acceptable functioning. The Monitor, in consultation with the parties, shall determine the standards for quality team formation and functioning. |

FTMs are just one way in which DCF staff engage with families. Teaming with families involved with DCF is a central component of New Jersey's Case Practice Model (CPM) and relies upon other foundational elements of quality case practice, such as engagement with family members, timely assessments, and quality case planning, all of which are rated as part of the state's QR process. Information about the QR process and protocol are detailed in Section V.N of this report.

Results from the *teamwork and coordination* indicator in the QR are used to assess the quality of collaborative teamwork with children, youth and families. In assessing case ratings, the reviewer considers a range of questions for this indicator, including whether the family's team is composed of the appropriate constellation of providers and informal supports needed to meet the child and family's needs, and the extent to which team members, including family members, work together to meet identified goals.

This QR measure is reported by the Monitor on an annual basis. The Monitor will report on the data for Quality of Teaming for the period of January 1 through December 31, 2019 in the next monitoring report.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 44*

### C.  QUALITY OF CASE AND SERVICE PLANNING

Timely and meaningful case plans that are developed with the family at the beginning of a case, and throughout a family's involvement with DCF, rely on workers' assessment and engagement skills. During the monitoring period DCF finalized plans to implement behavior-based case planning statewide, a strategy that helps staff work with families to develop case plans that are customized, behavior-focused and family centered. While that process was ongoing, Case Practice Liaisons (CPLs) continued to support staff in practice skills related to assessment, teaming, case planning, and visitation between children in out-of-home care and families.

The SEP includes three measures related to case planning, two of which have been previously met and designated as Outcomes *To Be Maintained*: the requirement that case plans be developed with families within 30 days of placement (SEP IV.D.22) and the requirement that case plans be reviewed and modified every six months (SEP III.C.6). The remaining SEP measure regarding the quality of case planning (SEP IV.D.23) has not yet been achieved. Performance for all three measures during the current monitoring period are discussed below.

**Timeliness of Case Planning – Initial Case Plans**

| Quantitative or Qualitative Measure | 22.  Timeliness of Initial Plans: For children entering care, number/percent of case plans developed within 30 days. |
|---|---|
| **Performance Target** | 95% of case plans for children and families are completed within 30 days. |

*Performance as of June 30, 2019:*

In June 2019, 147 (94%) of 157 initial case plans were completed within 30 days of a child entering placement. Between January 1 and June 30, 2019, the timely development of initial case plans ranged from a low of 93 percent to a high of 98 percent.[92] In this monitoring period, consistent with the previous monitoring period, DCF met or exceeded this measure in three of six months, and was only slightly below the standard in the remaining three months. The Monitor considers DCF to have met this measure and will continue to carefully follow performance on timely completion of initial case plans.

**Timeliness of Case Planning – Every Six Months**

| Quantitative or Qualitative Measure | 6.  Case Plans: Case plans for children and families will be reviewed and modified no less frequently than every six months. |
|---|---|
| **Performance Target** | 95% of case plans for children and families will be reviewed and modified no less frequently than every six months. |

---

[92] Monthly performance for this measure is as follows: January, 95%; February, 98%; March, 97%; April, 94%; May, 93%; June, 94%.

***Performance as of June 30, 2019:***

In June 2019, 598 (93%) of 641 case plans had been modified no less frequently than every six months. Performance from January 1 to June 30, 2019 ranged from 93 to 98 percent.[93] DCF met or exceeded the required standard for this measure in each month except June, where performance was very close to the standard. The monitor considers DCF to have met this measure.

### Quality of Case Plans

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 23. <u>Quality of Case Plans</u>: The child's/family's case plan shall be developed with the family and shall be individualized and appropriately address the child's needs for safety, permanency and well-being. The case plan shall provide for the services and interventions needed by the child and family to meet identified goals, including services necessary for children and families to promote children's development and meet their educational, physical and mental health needs. The case plan and services shall be modified to respond to the changing needs of the child and family and the results of prior service efforts. |
| **Performance Target** | 80% of case plans rated acceptable as measured by the Qualitative Review (QR). |

DCF policy and the SEP require that families be involved in case planning, that plans are appropriate and individualized to the circumstances of the child or youth and family and that there is oversight of plan implementation to ensure case goals are met and plans are modified when necessary.

Results from two QR indicators, *child and family planning process* and *tracking and adjusting*, are used to assess performance on this measure. Cases rated as acceptable demonstrate that child or youth and family needs are addressed in the case plan, appropriate family members were included in the development of the plan, and interventions are being tracked and adjusted when necessary. The QR process and protocol are discussed in detail in Section V.N of this report.

This QR measure is reported by the Monitor on an annual basis. The Monitor will report on the data for Quality of Case Plans for the period January 1 through December 31, 2019 in the next monitoring report.

---

[93] Monthly performance on this measure is as follows: January, 98%; February, 96%; March, 96%; April, 98%; May, 95%; June, 93%.

### D. EDUCATION

| Quantitative or Qualitative Measure | 11.  Educational Needs: Children will be enrolled in school and DCF will have taken appropriate actions to ensure that their educational needs are being met. |
|---|---|
| Performance Target | 80% of cases will be rated acceptable as measured by the Qualitative Review (QR) in stability (school) and learning and development. The Monitor, in consultation with the parties, shall determine the standards for school stability and quality learning and development. |

SEP Section III.G.11 requires that "children will be enrolled in school and DCF will have taken appropriate actions to ensure that their educational needs are being met." The SEP requires that 80 percent of cases be rated acceptable on both the *stability in school* and *learning and development* indicators as measured by the QR.[94] The QR process and protocol are discussed in detail in Section V.N of this report. This measure is designated as an Outcome *To Be Maintained*.

This QR measure is reported by the Monitor on an annual basis. The Monitor will report on the data for Educational Needs for the period January 1 through December 31, 2019 in the next monitoring report.

---

[94] This measures applies to school-aged children in out-of-home placement.

## E.  MAINTAINING CONTACT THROUGH VISITS

Visits between children in foster care and their workers, parents and siblings are critical to children's safety and well-being, and are essential tools for strengthening family connections and improving prospects for permanency. Visits also offer the opportunity for engagement and assessment of children, youth, and families. From the perspective of a child in foster care, the loss of the ability to see their parents and siblings is a source of great pain, so the department's efforts to preserve opportunities for those contacts is essential.

The SEP includes six performance measures related to visits. As of January 2019, five measures were designated as Outcomes *To Be Maintained*, including caseworker contacts with children newly placed or after a placement change (SEP III.F.9); caseworker contacts with children in ongoing placement (SEP III.F.10); parent-child weekly and bi-weekly visits (SEP IV.F.29 and IV.F.30); and sibling visits (SEP IV.F.31).

Caseworker contacts with parents when the goal is reunification (SEP IV.F.28) has not yet met the performance standard and remains designated an Outcome *To Be Achieved*. Performance for all six measures during the current monitoring period are discussed below.

### Caseworker Visits with Children in Placement

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 9.  Caseworker Contacts with Children – New Placement/Placement Change: The caseworker shall have at least twice-per-month face to face contact with the children within the first two months of placement, with at least one contact in the placement. |
| **Performance Target** | 93% of children shall have at least twice-per-month face to face contact with their caseworker during the first two months of placement, with at least one contact in the placement. |

*Performance as of June 30, 2019:*

In June 2019, 222 (90%) of the 246 children in a new placement had two visits with their caseworkers during their first two months in placement. Between January and June 2019, monthly performance ranged from 89 percent to 95 percent.[95] This represents a slight decline in performance below the SEP standard during three months of the monitoring period.

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 10.  Caseworker Contacts with Children in Placement: During the remainder of placement, children will have at least one caseworker visit per month, in placement. |
| **Performance Target** | 93% of children will have at least one caseworker visit per month in placement, for the remainder of placement. |

---

[95] Monthly performance is as follows: January, 91%; February, 95%; March, 94%; April, 93%; May, 89%; June, 90%.

*Performance as of June 30, 2019:*

In June 2019, 4,243 (93%) of the 4,544 children in an ongoing placement were visited at least once by their caseworker. Between January and June 2019, monthly performance ranged between 93 percent and 95 percent.[96] DCF continues to meet this performance standard.

**Caseworker Visits with Parents/Family Members**

| Quantitative or Qualitative Measure | 28. Caseworker Visits with Parents/Family Members with Goal of Reunification: The caseworker shall have at least two face-to-face visits per month with the parent(s) or other legally responsible family member of children in custody with a goal of reunification. |
|---|---|
| **Final Target** | 90% of families will have at least twice-per-month face-to-face contact with their caseworker when the permanency goal is reunification. |

*Performance as of June 30, 2019:*

In June 2019, 1,603 (83%) of 1,939 applicable children in custody with a goal of reunification had parents who were visited at least twice during the month by caseworkers. Between January and June 2019, a range of 83 percent to 86 percent of applicable parents or other legally responsible family members were visited at least two times per month by a caseworker (see Figure 4).[97] In assessing performance for this measure, the Monitor applied the findings from DCF's review of children for whom case documentation indicated that a worker visit with a parent was not required because the parent was missing or otherwise unavailable.[98]

Current performance does not meet the level required by the SEP.

---

[96] Monthly performance for this measure is as follows: January, 94%; February, 94%; March, 95%; April, 94%; May, 94%; June, 93%.

[97] Monthly performance is as follows: January, 85%; February, 83%; March, 86%; April, 86%; May, 86%; June, 83%. Reported performance accounts for valid exceptions to the visits requirement.

[98] During each month of the monitoring period, workers documented an average of approximately 430 cases in which there was believed to be an exception to the applicable visits requirement. In an effort to assess the validity of these exceptions, DCF reviewed 185 cases from a universe of cases from March 2019 in which worker visits with parents were not held due to a documented exception to the visits requirement. The Monitor and DCF determined that a valid exception was utilized in 123 (66%) of the 185 cases reviewed. As a result, the Monitor excluded 66% of all cases with documented exceptions from each month from the universe. For example, in June 2018 there were 2,191 children in custody with a goal of reunification. Data from NJ SPIRIT indicated that there were 382 documented cases that month for which the worker had determined that the parent was missing or otherwise unavailable. Based on the sample, the Monitor excluded from the universe 252 (66%) of the 382 cases in December, making the universe of applicable children 1,939 (2,191-252).

*Progress of the New Jersey Department of Children and Families*  
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*  
*January 23, 2020*  
*Page 49*

**Figure 2: Percentage of Families Who Had at Least Twice per Month Face-to-Face Contact with Caseworker when the Goal is Reunification (January – June 2019)**



Source: DCF data

**Figure 3: Percentage of Families Who Had at Least Twice per Month Face-to-Face Contact with Caseworker when the Goal is Reunification (June 2017 – June 2019)**



Source: DCF data

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 50*

**Visits between Children in Custody and their Parents**

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 29. Weekly Visits between Children in Custody and Their Parents: Number/percent of children who have weekly visits with their parents when the permanency goal is reunification unless a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |
| **Final Target** | 60% of children in custody with a return home goal will have an in-person visit with their parent(s) or other legally responsible family member at least weekly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

*Performance as of June 30, 2019:*

In June 2019, an average of 1,385 (76%) of 1,831 applicable children visited weekly with their parents during the month. Between January and June 2019, a monthly range of 76 percent to 80 percent of children had a weekly visit with their parents when the permanency goal was reunification.[99] This performance exceeds the SEP requirement.

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 30. Bi-Weekly Visits between Children in Custody and Their Parents: Number/percent of children who have weekly visits with their parents when the permanency goal is reunification unless a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |
| **Final Target** | 85% of children in custody with a return home goal will have an in-person visit with their parent(s) or other legally responsible family member at least every other week, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

*Performance as of June 30, 2019:*

In June 2019, 1,605 (90%) of 1,785 applicable children had at least two visits with their parents during the month. Between January and June 2019, a monthly range of 89 percent to 92 percent of children had visits at least twice a month with their parents when their permanency goal was reunification.[100] This performance exceeds the SEP requirement.

---

[99] Monthly performance for this measure is as follows: January, 76%; February, 77%; March, 80%; April, 79%; May, 77%; June, 76%. Reported performance accounts for valid exceptions to this visits requirement. Given the results of validation from a prior monitoring period, the Monitor excluded from the universe all cases in which DCF documented an exception to the parent-child visit requirement. For example, in June 2019, there was an average of 2,332 children with a goal of reunification across the four weeks of the month. Data from NJ SPIRIT indicated that in an average of 501 cases that month, the worker had determined that the parent was unavailable for the visit, the child declined the visit or the visit was not required. Based on these data, the Monitor excluded those cases from the universe, making the universe of applicable children an average of 1,831 in June.

[100] Monthly performance for this measure is as follows: Monthly performance for this measure is as follows: January, 90%; February, 91%; March, 92%; April, 91%; May, 89%; June, 90%. Given the results of validation activities from a prior monitoring period, the Monitor excluded the universe all cases in which DCF documented an exception to the parent-child visit requirement. For example, in June 2019, there were 2,204 children with a goal of reunification. Data from NJ SPIRIT

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*
*January 23, 2020*
*Page 51*

**Visits between Children in Custody and Sibling Placed Apart**

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 31. <u>Visits between Children in Custody and Siblings Placed Apart</u>: Number/percent of children in custody, who have siblings with whom they are not residing shall visit with their siblings as appropriate. |
| **Final Target** | 85% of children in custody who have siblings with whom they are not residing shall visit with those siblings at least monthly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

*Performance as of June 30, 2019:*

In June 2019, 1,129 (84%) of 1,347 applicable children in placement who had at least one sibling with whom they did not reside had at least one visit with one of their siblings during the month. Between January and June 2019, a range of 84 percent to 87 percent of children had at least monthly visits with one of their siblings with whom they were not placed.[101] This data includes sibling visits facilitated by private providers.

In assessing performance for this measure, the Monitor applied the findings from a joint review with DCF of children in care in October and November 2018 for which case documentation indicated that a sibling visit was not required due to a court order, hospitalization, or because the child was missing or otherwise unavailable.[102]

The Monitor considers DCF performance to have met the SEP standard this monitoring period.

---

indicated that in 419 cases that month, the worker had determined that the parent was unavailable for the visit, the child declined the visit or the visit was not required. Based on these data, the Monitor excluded those cases from the universe, making the universe of applicable children 1,785 in June.

[101] Monthly performance is as follows: January, 85%; February, 84%; March, 86%; April, 87%; May, 86%; June, 84%. Reported performance accounts for valid exceptions to the visits requirement. Performance also includes data from visits facilitated by private providers.

[102] During each month of the monitoring period, workers documented an average of approximately 250 cases in which there was believed to be an exception to the applicable visits requirement. In an effort to assess the validity of these exceptions, DCF conducted in a case record review in March 2019 of 189 cases from a universe of eligible children in October and November 2018 in which children were not able to visit their sibling due to a documented exception to the visits requirement. As a result of that review, the Monitor and DCF determined that a valid exception was utilized in 114 (60%) of 189 cases reviewed. The Monitor has decided to apply the results of that March 2019 review to the exceptions cases from January through June 2019. As a result, the Monitor excluded 60% of the exceptions from each month from the universe. For example, in the month of June 2019, there were 1,501 children in custody with a sibling in care with whom they were not placed. Data from NJ SPIRIT indicated that there were 257 documented cases that month for which the worker had determined the visit was not required or the child was unavailable. Based on the sample, the Monitor excluded from the universe 154 (60%) the 257 cases, making the universe of applicable children 1,347 (1,501 -154).

## F.  PLACEMENT

Stable and appropriate placement for children in foster care is essential to safety, well-being, and maintenance of family bonds. DCF policy requires siblings to be placed together whenever possible, and that children experience as few placement changes as possible while in out-of-home placement. There are five performance measures related to placement. As of January 2019, all had been previously met and were designated as Outcomes *To Be Maintained*: sibling placements of two to three children (SEP IV.G.32); sibling placements and recruitment of placements for four or more children (SEP IV.G.33); placement stability for children in care between 13 and 24 months (SEP IV.G.36); and placement stability for children in care 12 months or less (SEP IV.G.35). The state's performance with respect to placement stability is not newly assessed in this report as performance for the stability standards is measured annually at the end of each calendar year. Updated data will be included in the next monitoring report when these data are available. The most recent performance data can be found in Table 1B of this report. Data for recruitment of placements for sibling groups of four or more (SEP IV.G.34) is discussed below.

### Recruitment of Placements for Sibling Groups of Four or More

| Quantitative or Qualitative Measure | 34.  Recruitment of Placements for Sibling Groups of Four or More |
|---|---|
| Performance Target | DCF will continue to recruit for resource homes capable of serving sibling groups of four or more. |

*Performance as of June 30, 2019:*

DCF staff continued to develop recruitment strategies that focus efforts on reaching families willing to accept adolescents and large sibling groups into their homes. At various events during the monitoring period, including events at community organizations, schools, and businesses, recruiters encouraged resource parents who have adolescents and/or large siblings groups in their homes as well as former youth in care to speak to prospective resource parents from their perspectives.

During this monitoring period, DCF continued to host recruitment and retention events for families willing and able to accommodate adolescents and large sibling groups. For example, the Sussex County recruiter partnered with a former foster youth in care at the Newton Public School Parent Teacher Organization meeting, where the youth presented on the need for families willing to accept adolescents. The Cape May recruiter spoke to Coast Guard families on the need for more Siblings in Best Placement Settings (SIBS) homes. The Passaic County recruiter hosted a retention event for three SIBS homes at Medieval Times, and the Camden County recruiters delivered a presentation to faculty at the Octavius V. Catto Community Family School on the importance of siblings bonds and DCF's need for more families who accept large siblings groups.

As of June 30, 2019, DCF had a total of 69 large capacity SIBS homes, 4 homes fewer than at the end of June 2018.

Of the 69 large capacity SIBs homes, 58 homes can accommodate four children – an increase of 3 homes from the previous monitoring period – and 11 homes can accommodate five or more children, a decrease of seven homes from the end of June 2018. Between January and June 2019 DCF recruited and licensed a total of 26 new SIBs homes; 23 SIBS homes that can accommodate four children and three SIBS homes that can accommodate five or more children. During the same period, 19 homes that could accommodate four children and ten homes that could accommodate five or more children closed or downgraded their capacity.[103]

The Monitor considers DCF to have met the SEP standard for this measure between January and June 2019.

---

[103] As of June 30, 2019, 19 homes accommodating four children either downgraded or closed: six homes closed or downgraded upon reunification of the sibling group; five homes downgraded or closed upon adoption finalizations of the sibling groups, five homes downgraded or closed due to personal circumstances in the family, two homes downgraded upon accepting non-sibling placements; and one home downgraded upon the request of the sibling group's removal. During the same period, ten homes that could accommodate five or more children downgraded their capacity: four homes downgraded after adoption finalization of the sibling group, three homes downgraded upon reunification of the sibling group, two homes downgraded or closed due to difficulty managing the sibling placement, and one home closed upon the children being moved to a relative's home.

## G.  MALTREATMENT OF CHILDREN AND YOUTH

A fundamental responsibility of DCF is ensuring the long-term safety of children who are receiving or have received services from CP&P. This responsibility includes ensuring the safety and preventing future maltreatment of children who are placed in resource family homes and congregate facilities.

There are four SEP performance measures related to maltreatment of children and youth. As of January 2019, three measures were designated as Outcomes *To Be Maintained*: abuse and neglect of children in foster care (SEP III.H.12); repeat maltreatment for children remaining in their home (SEP IV.H.37); and maltreatment post-reunification (SEP IV.H.38). One was designated as an Outcome *To Be Achieved*: re-entry to placement (SEP IV.H.39).

The state's performance is not newly assessed in this report as performance is measured at the end of each calendar year. Updated data will be included in the next monitoring report when these data are available. The most recent performance data can be found in Table 1B of this report.

## H.  TIMELY PERMANENCY

Regardless of age, gender, race, or ethnicity, all children need and deserve a safe, nurturing family to protect and guide them. Safe family reunification is the preferred path, but permanency for children can be achieved through a number of different avenues, including kindship/guardianship and adoption.

There are four SEP measures that focus on permanency for children. As of January 2019, three measures were designated as Outcomes *To Be Maintained*: achieving permanency within 12 months (SEP IV.I.40), 36 months (SEP IV.I.42) and 48 months (SEP IV.I.43). One measure was designated as an Outcome *To Be Achieved*, achieving permanency within 24 months (SEP IV.I.41), though it remains very close to meeting the performance standard.

The state's performance on these permanency measures is not newly assessed in this report as performance is measured annually at the end of each calendar year. Updated data will be included in the next monitoring report when these data are available. The most recent performance data can be found in Table 1B of this report.

## I.   CHILD HEALTH UNITS

Early in New Jersey's child welfare reform efforts, DCF developed Child Health Units (CHUs) to facilitate and ensure the timely provision of health care to children in CP&P custody. CHUs are located in each CP&P Local Office and are staffed with Regional Nurse Administrators, Nurse Health Care Case Managers (HCCMs), and staff assistants, based on the projected number of children in out-of-home placement.

Section III.E of the SEP requires the state to "maintain its network of child health units, adequately staffed by nurses in each Local Office." This measure has been previously met and designated as an Outcome *To Be Maintained*. In what continues to be a model for other child welfare systems throughout the country, each child placed in a resource home has a nurse assigned for health care case management. CHUs are recognized by staff and external partners as an effective achievement of New Jersey's child welfare reform efforts. The nurses continue to team closely with staff to serve children and families, which contributes to the consistently positive findings in New Jersey's Qualitative Reviews (QRs) regarding children's health. Performance for this measure is discussed below.

| Quantitative or Qualitative Measure | 8. <u>Child Health Units</u>: The State will continue to maintain its network of child health units, adequately staffed by nurses in each Local Office. |
|---|---|
| **Performance Target** | DCF will maintain adequate staffing levels in Local Offices. |

*Performance as of June 30, 2019:*

On June 30, 2019, DCF employed 154 nurses, of which 147 were available for coverage, and 85 staff assistants, of which 84 were available for coverage. Between January 1 and June 30, 2019 there was an average of 154 nurses available for coverage, for an average ratio of one nurse to every 35 children in out-of-home care, exceeding the standard of one nurse to 50 children in out-of-home care.

### J.  OLDER YOUTH

The SEP includes four measures related to older youth, all designated as Outcomes *To Be Maintained* – completion of Independent Living Assessments (ILA) (SEP IV.K.45); quality of case planning and services (SEP IV.K.46); housing for youth who exit care without achieving permanency (SEP IV.K.47); and education/employment for youth who exit care without achieving permanency (SEP IV.K.48). Performance for all four measures during the current monitoring period are discussed below.

#### Independent Living Assessments

| Quantitative or Qualitative Measure | 45.  <u>Independent Living Assessments</u>: Percentage of youth age 14 and 18 with a completed Independent Living Assessment. |
|---|---|
| Performance Target | 90% of youth age 14 to 18 will have an Independent Living Assessment. |

*Performance as of June 30, 2019:*

In June 2019, there were 664 youth age 14 to 18 in out-of-home placement for at least six months; 591 (89%) had an Independent Living Assessment (ILA) completed. Monthly performance between January and June 2019 ranged from 83 to 89 percent.[104] The Monitor considers DCF to have met this measure and will continue to carefully follow performance. During the monitoring period, CP&P, the Office of Adolescent Services (OAS) and the Office of Research, Evaluation and Reporting (RER) reviewed ILA data and practice as a strategy to improve performance.

#### Quality of Case Planning and Services

| Quantitative or Qualitative Measure | 46.  <u>Quality of Case Planning and Services</u>: DCF shall provide case management and services to youth between the age 18 and 21 who have not achieved legal permanency. |
|---|---|
| Performance Target | 75% of youth age 18 to 21 who have not achieved legal permanency shall receive acceptable quality case management and service planning. |

Performance data for this measure are collected through Qualitative Reviews (QRs) of the experiences and outcomes of youth age 18 to 21. In rating these cases, reviewers use both the standard QR protocol and a list of additional considerations relevant to this population, such as DCF's efforts to plan and support youth who identify as LGBTQI, are victims of domestic violence, are expectant or parenting, and/or are developmentally disabled.

---

[104] Monthly performance for this measure is as follows: January, 87%; February, 84%; March, 84%; April, 85%; May, 83%; June, 89%.

This QR measure is reported by the Monitor on an annual basis. The Monitor will report on the data for Quality of Case Planning and Services for the period January 1 through December 31, 2019 in the next monitoring report.

## Housing

| Quantitative or Qualitative Measure | 47.  Housing: Youth exiting care without achieving permanency shall have housing. |
|---|---|
| Performance Target | 95% of youth exiting care without achieving permanency shall have housing. |

***Performance as of June 30, 2019:***

Going forward, this measure will be assessed annually. The Monitor and DCF believe that, given the declining number of youth exiting care without achieving permanency, this will enable DCF to better extract and understand practice in this area, and will give the Department time to integrate its learning into practice. The Monitor anticipates conducting another case record review in collaboration with DCF in early spring 2020.

In March 2019, the Monitor and DCF reviewed the case records of all youth who exited DCF custody between July and December 2018 without achieving permanency to assess whether they had housing at the time of leaving care. Of the 55 youth for which this measure was applicable, there was documentation of a housing plan for 53 (96%) youth, exceeding the SEP standard.

## Employment/Education

| Quantitative or Qualitative Measure | 48.  Employment/Education: Youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. |
|---|---|
| Performance Target | 90% of youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. |

***Performance as of June 30, 2019:***

Going forward, this measure will be assessed annually. As mentioned above, the Monitor and DCF believe that, given the declining number of youth exiting care without achieving permanency, this will enable DCF to better extract and understand practice in this area, and will give the Department time to integrate its learning into practice. The Monitor anticipates conducting another case record review in collaboration with DCF in early spring 2020.

In March 2019, the Monitor and DCF reviewed the case records of all youth who exited DCF custody between July and December 2018 without achieving permanency to determine whether they were employed or enrolled in school at the time of leaving care. Of the 53 youth to whom this measure applied, 47 (89%) were either employed or enrolled in education or vocational training programs, or there was documentation of consistent efforts by the caseworker to help youth secure education or employment.

### K.  SERVICES TO SUPPORT TRANSITION

While involved with DCF, children, youth, and families often face transitions, including changes in family relationships, living arrangements, service providers, or schools. Some transitions are more critical than others but all require recognition and planning in order to be smooth and successful. DCF uses the Qualitative Review (QR) process to measure case practice that supports families to make successful transitions. Section IV.J of the SEP requires that 80 percent of cases be rated acceptable on the *successful transitions* indicator. This measure is designated as an Outcome *To Be Achieved*. The QR process and protocol are discussed in detail in Section V.N of this report.

**Services to Support Transition**

| Quantitative or Qualitative Measure | 44.  <u>Services to Support Transition</u>: DCF will provide services and supports to families to support and preserve successful transitions. |
| --- | --- |
| **Performance Target** | 80% of cases will be plans rated acceptable for supporting transitions as measured by the Qualitative Review (QR). |

This QR measure is reported by the Monitor on an annual basis. The Monitor will report on the data for Services to Support Transition from January 1 to December 31, 2019 in the next monitoring report.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 60*

### L.  CASELOADS

One of the successes of DCF's reform was reducing and now maintaining caseloads at levels where workers can do the work with children, youth, and families that was expected of them. Caseload compliance is measured by assessing caseloads for individual caseworkers in each of the system's functional areas (Intake, Permanency, Adoption, and IAIU) as well as office standards for each CP&P Local Office. Table 2 summarizes the SEP's caseload standards for individual workers.

The SEP includes eight performance measures related to caseloads. As of January 2019, all were designated as Outcomes *To Be Maintained.* These eight measures include Intake office caseloads (SEP IV.E.24); Intake individual worker caseloads (SEP IV.E.25); Adoption office caseloads (SEP IV.E.26); Adoption individual worker caseloads (SEP IV.E.27); Permanency office caseloads (SEP III.B.4); Permanency individual worker caseloads (SEP III.B.5); IAIU investigators individual caseloads (SEP III.B.3); and supervisory/worker ratio (SEP III.B.2). Performance for all eight measures during the current monitoring period are discussed below.

#### Table 2: CP&P Individual Worker Caseload Standards

| Caseworker Function | Responsibility | Individual Caseload Standard (SEP IV.E and III.B) |
|---|---|---|
| Intake | Respond to community concerns regarding child safety and well-being. Specifically, receive referrals from the State Central Registry (SCR) and depending on the nature of the referral, respond between two hours and five days with a visit to the home and begin investigation or assessment. Complete investigation or assessment within 60 days. | Intake workers are to have no more than **12 open cases** at any one time **and** no more than **eight new referrals** assigned in a month. No Intake worker with 12 or more open cases can be given more than **two secondary assignments** per month.[105] |
| Institutional Abuse Investigations Unit (IAIU) | Respond to allegations of child abuse and neglect in settings including correctional facilities, detention facilities, treatment facilities, schools (public or private), residential schools, shelters, hospitals, camps or child care centers that are required to be licensed, resource family homes, and registered family day care homes. | IAIU staff workers are to have no more than **12 open cases** at any one time **and** no more than **eight new referrals** assigned in a month. |
| Permanency | Provide services to families whose children remain at home under the protective supervision of CP&P and those families whose children are removed from home due to safety concerns. | Permanency workers are to serve no more than **15 families and 10 children in out-of-home care at any one time**. |
| Adoption | Find permanent homes for children who cannot safely return to their parents by preparing children for adoption, developing adoptive resources, and performing the work needed to finalize adoptions. | Adoption workers are to serve no more than **15 children** at any one time. |

Source: DCF

---

[105] Secondary assignments refer to shared cases between Intake and Permanency workers for families who have a case open with a Permanency worker where there are new allegations of abuse or neglect that require investigation.

*Verifying Worker Caseloads*

DCF caseload data are collected and analyzed through NJ SPIRIT and SafeMeasures. As in previous monitoring periods, the Monitor verified caseload data supplied by DCF by conducting telephone interviews with randomly selected workers across the state and inquiring about caseloads during site visits and when doing QR reviews. The formal caseload verification process included workers in all areas in which the SEP establishes caseload standards: Intake, Permanency, and Adoption. A sample of 100 workers[106] were selected from all active workers in the months of January and March 2019. For the past several years, the Monitor has weighted the sample with Intake workers to examine in more depth the impact of shared cases between Intake and Permanency workers. All 100 workers were called, and information was collected from 43 workers (43% of the eligible sample). Among the 43 workers who participated in the caseload verification interviews, 17 were Intake workers, eight were Permanency workers, seven were Adoption workers and 11 were trainees.

During the interviews, the Monitor asked caseworkers whether their current caseloads met caseload standards during the months of January and March 2019; responses were compared to the caseload information from NJ SPIRIT and SafeMeasures for identified workers during the same period.

## Intake

The SEP Intake caseload standard is that no worker should have more than eight new case assignments per month, no more than 12 open primary cases at any one time, and no Intake worker with 12 or more open primary cases can be assigned more than two secondary assignments per month. In January 2017, DCF implemented a new methodology for tracking and reporting the SEP Intake caseload standard to more clearly communicate to staff and to streamline monitoring and reporting. DCF's new methodology captures secondary case assignments on the Intake worker's monthly caseload report, which tracks and reports Intake caseloads as follows: no more than eight new assignments per month; no more than 12 cases assigned as primary case assignments at any one time; and no more than 14 cases at any one time, including both primary and secondary case assignments. The methodology for the standard of no more than eight new case assignments per month, including secondary assignments, remains unchanged.

DCF continues to implement an internal caseload verification process which serves as a quality assurance method where Intake workers are interviewed and their reported caseloads are compared to their caseloads as reported in SafeMeasures. During the period of January through June 2019, DCF interviewed a random sample of 223 Intake workers from 24 Local Offices throughout the state. DCF verified that 95 percent (212 of 223) of Intake worker caseloads were accurately reflected in SafeMeasures. Findings from DCF's caseload verification reviews are shared widely with DCF staff through briefs, posted onto the Office of Quality website, DCF-wide "DID YOU KNOW" emails, and during statewide leadership meetings.

---

[106] The new caseload verification methodology consists of conducting a survey of a random selection of 50 workers per selected months throughout the monitoring period that includes questions about their current caseload and workload.

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 24. <u>Intake Local Office Caseloads:</u> Local Offices will have an average caseload for Intake workers of (a) no more than 12 families, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |
| **Performance Target** | 95% of Local Offices will have an average caseload of (a) no more than 12 families, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |

*Performance as of June 30, 2019:*

Performance data for January through June 2019 show that 100 percent of Local Offices met the Intake caseload standards. DCF continues to exceed the SEP standard.

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 25. <u>Individual Intake Caseloads:</u> individual Intake workers shall have (a) no more than 12 open cases, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |
| **Performance Target** | 90% of individual Intake workers shall have (a) no more than 12 open cases, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |

*Performance as of June 30, 2019:*

The state reported an average of 1,092 active Intake workers between January and June 2019. Among those 1,092 active Intake workers, an average of 1,021 (94%) had caseloads that met the standard. Specifically, in June 2019, 1,041 (95%) of 1,097 active Intake workers were in compliance with individual worker standards. DCF continues to meet the individual Intake worker caseload standard.

Data by Local Office show that during June 2019, performance ranged from 57 percent to 100 percent, with 38 of 46 (83%) Local Offices having all Intake workers in compliance with caseload standards.

Among the 43 workers who participated in the Monitor's interviews for caseload verification, 17 were Intake workers. None of the 17 Intake workers reported exceeding the caseload limit of eight new assignments per month during the months of January and March 2019. Two (12%) Intake workers reported having more than 14 total cases including both primary and secondary case assignments on their caseload during the months of January and March 2019. The Monitor staff spot check this data in NJ SPIRIT on a regular basis.

DCF deploys Impact Teams (a supervisor and three workers) to a unit or a Local Office in different areas when intakes are unusually high, to assist in maintaining caseload standards by taking on investigation overflow. There are nine Impact Teams, one per Area Office.

**"Shared" Cases between Intake and Permanency Workers**

As described in previous monitoring reports, Intake and Permanency workers sometimes share responsibility for families with open permanency cases when there are new allegations of abuse or neglect. According to DCF procedure, all Child Protective Services (CPS) reports are assigned to Intake workers to investigate and are reflected in caseload reporting as one of the Intake workers' eight new referrals in the month and as one of their 12 open families for that month. However, when circumstances indicate that a family with an already open permanency case is the subject of a new CPS report, the work with the family becomes the shared responsibility of both Intake and Permanency workers until the investigation is completed.

Intake workers are assigned a secondary worker designation in NJ SPIRIT for such cases with families who are already currently assigned a Permanency worker. According to DCF, this arrangement emphasizes the primary role of the Permanency worker in securing placement, facilitating visits, supporting the family to implement the case plan, and coordinating services. It also reflects the Permanency worker's responsibility to provide information to the Intake worker and to link the family to appropriate services and supports identified during the course of the new investigation, thus relieving the Intake worker of the overall case management responsibility for the case. Intake workers continue to be responsible for the work required to complete investigative tasks and to reach and document an investigative finding. Thus, these secondary assignments are counted as one of the Intake worker's eight new referrals assigned in a month and as part of the total 14 open cases per month.

DCF reports that Intake supervisors in CP&P Local Offices are expected to appropriately manage the workload of staff in their units and consider an Intake worker's primary and secondary responsibilities when assigning new referrals. Table 3 provides the reported number of secondary assignments to Intake workers by month for this monitoring period.

**Table 3: Number of CP&P Investigations and Secondary Intake Assignments by Month (January – June 2019)[107]**

| Month | Total Investigations Assigned to Intake Workers for the Month | Secondary Intake Worker Assignments of CPS and CWS Investigations | |
|---|---|---|---|
| January | 6,433 | 527 | 8% |
| February | 5,794 | 438 | 8% |
| March | 6,544 | 470 | 7% |
| April | 6,479 | 563 | 9% |
| May | 6,795 | 529 | 8% |
| June | 5,690 | 451 | 8% |

Source: DCF data

The Monitor reviewed monthly Local Office data on secondary assignments and found that on average, each Intake worker was assigned one secondary case at any given time during the period reviewed. The Monitor also found that an average of 22 percent of Intake workers

---

[107] Total excludes intakes assigned to Impact, Permanency, Adoption and Advocacy Center workers and includes intakes assigned to workers on leave.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*
*January 23, 2020*
*Page 64*

received two or more secondary case assignments and an average of five percent of Intake workers received three or more secondary assignments each month during the monitoring period. Specifically, in the month of June 2019, 231 (21%) Intake workers received two or more secondary intake assignments and 48 (4%) Intake workers received three or more secondary intake assignments.

During phone interviews with caseworkers, Monitor staff inquired about the prevalence of secondary assignments and their impact on workload. Intake workers were asked about the frequency of secondary assignments, how these assignments affect workload, and how they are measured. Of the 17 Intake workers interviewed, 10 (59%) workers reported receiving an assignment to investigate a new report on an open permanency case as a secondary worker at least once during the months of January and March 2019.

To ensure that Intake workload is properly managed regardless of the combination of primary and secondary assignments, DCF continues to examine the processes used in Local Offices to make secondary assignments, as well as Local Office workflow management practices.

**Assignment of Investigations to Non-Caseload Carrying Staff**

On occasion, in order to handle the unpredictable flow of referrals for investigations, trained non-caseload carrying staff as well as caseload-carrying staff who are not part of Intake units (non-Intake caseload carrying staff) in Local Offices are assigned to investigations. DCF reports that all staff are required to complete First Responder training prior to being assigned an investigation and non-caseload carrying staff must have been similarly trained and receive supervision by the Intake supervisor. The Monitor's review of DCF's data for the months of January through June 2019 found that approximately one percent of investigations were assigned each month to non-caseload carrying staff and that about five percent were assigned to non-Intake caseload carrying staff. DCF produces a Caseload Report Exception List that documents all instances of intakes identified as assigned to non-caseload carrying workers and closely monitors the list on an ongoing basis. Table 4 shows the number and percentage of investigations assigned to non-caseload carrying staff, and Table 5 shows the number and percentage of investigations assigned to non-Intake caseload carrying staff.

As part of the Monitor's phone interviews, Intake workers were asked if there were scenarios in their Local Offices in which non-caseload carrying staff could be assigned an investigation. Two of the 17 Intake workers (12%) reported that they were aware of instances in which this has happened in their office in January and March 2019. Respondents stated that non-caseload carrying staff with prior investigative experience can be assigned cases when all Intake workers in a Local Office reach their assignment limit for the month. The most frequently identified job titles for the non-caseload carrying staff who are assigned investigations are Administrative Assistant and Resource Development Specialist.

**Table 4: Percentage of CP&P Investigations Assigned to Non-Caseload
Carrying Staff by Month (January – June 2019)[108]**

| Month | Total Investigations Received in the Month | Number and Percentage of Investigations Assigned to Non-Case Carrying Staff | |
|---|---|---|---|
| January | 6,963 | 56 | 1% |
| February | 6,166 | 43 | 1% |
| March | 6,950 | 57 | 1% |
| April | 6,844 | 46 | 1% |
| May | 7,258 | 90 | 1% |
| June | 5,991 | 38 | 1% |

Source: DCF data

**Table 5: Percentage of CP&P Investigations Assigned to Non-Intake
Caseload Carrying Staff by Month (January – June 2019)**

| Month | Total Investigations Received in the Month | Number and Percentage of Investigations Assigned to Non- Intake Caseload Carrying Staff[109] | |
|---|---|---|---|
| January | 6,963 | 474 | 7% |
| February | 6,166 | 329 | 5% |
| March | 6,950 | 349 | 5% |
| April | 6,844 | 319 | 5% |
| May | 7,258 | 373 | 5% |
| June | 5,991 | 263 | 4% |

Source: DCF data

## Adoption

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 26.  Adoption Local Office Caseloads: Local offices will have an average caseloads for Adoption workers of no more than 15 children per worker. |
| **Performance Target** | 95% of Local Offices will have an average caseload of no more than 15 children per Adoption worker. |

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 27.  Individual Worker Adoption Caseloads: Individual Adoption worker caseloads shall be no more than 15 children per worker. |
| **Performance Target** | 95% of individual Adoption workers shall have a caseload of no more than 15 children per month. |

---

[108] Data are provided for investigations assigned within five days of intake receipt date and do not reflect additional assignments to an investigation after the first five days. DCF conducts monthly reviews of assignments to non-caseload carrying staff in NJ SPIRIT and has found that some investigations had been re-assigned to caseload carrying workers after the initial five days. As a result, the reported percentage of investigations assigned to non-caseload carrying staff may be lower than six percent.
[109] This includes Permanency, Adoption, Impact and Advocacy Center caseload carrying workers.

*Performance as of June 30, 2019:*

Performance data for January through June 2019 show that 99 percent of Local Offices and 98 percent of individual workers continued to maintain the adoption caseload standard during this period.[110]

Among the 43 workers who participated in the phone interviews conducted by Monitor staff for caseload verification, seven were Adoption workers. All seven Adoption workers interviewed reported caseloads within the standard during the months of January and March 2019.

### Permanency

| Quantitative or Qualitative Measure | 4. <u>Permanency Local Office Caseloads:</u> Local offices will have an average caseloads for Permanency workers of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |
|---|---|
| Performance Target | 95% of Local Offices will have an average caseload of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |

| Quantitative or Qualitative Measure | 5. <u>Individual Worker Permanency Caseloads:</u> Individual Permanency worker caseloads shall be (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |
|---|---|
| Performance Target | 95% of individual Permanency workers shall have a caseload of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |

*Performance as of June 30, 2019:*

Performance data for January through June 2019 show that 100 percent of Local Offices and 100 percent of individual workers continued to maintain the permanency caseload standard during this period.[111]

Among the 43 workers who participated in telephone interviews conducted by Monitor staff for caseload verification, eight were Permanency workers. All eight Permanency workers interviewed reported caseloads within the standard during the months of January and March 2019.

---

[110] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six month monitoring period.
[111] Ibid.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 67*

## Institutional Abuse Investigation Unit (IAIU)

| Quantitative or Qualitative Measure | 3. Individual Worker IAIU Caseloads: individual IAIU worker caseloads shall be (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. |
|---|---|
| Performance Target | 95% of individual IAIU workers shall have a caseload (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. |

*Performance as of June 30, 2019:*

DCF data show 100 percent of individual workers maintained the IAIU caseload standard for the period of January through June 2019.

## Supervisory Ratio

| Quantitative or Qualitative Measure | 2. Supervisor/Worker Ratio: Local Offices shall have sufficient supervisory staff to maintain a five worker to one supervisor ration. |
|---|---|
| Performance Target | 95% of Local Offices shall have sufficient supervisory staff to maintain a five worker to one supervisor ration. |

*Performance as of June 30, 2019:*

Performance data for January through June 2019 show that 100 percent of CP&P Local Offices had sufficient supervisors to maintain ratios of five workers to one supervisor.

## M. DEPUTY ATTORNEYS GENERAL STAFFING

| Quantitative or Qualitative Measure | 7. DAsG Staffing: The State will maintain adequate DAsG staff potions and keep positions filled. |
|---|---|
| Performance Target | DCF will maintain adequate staffing levels at the DAsG office. |

*Performance as of June 30, 2019:*

As of June 30, 2019, 136 Deputy Attorneys General (DAsG) staff positions assigned to work with DCF were filled. Of those, five DAsG were on full time leave. Thus, there were a total of 131 (96%) available DAsG. DCF reports that in addition to these positions, DAsG outside of the DCF Practice Group have dedicated some of their time to DCF matters. DCF continues to meet the SEP standard for this measure.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 68*

### N.  ACCOUNTABILITY THROUGH QUALITATIVE REVIEW AND THE PRODUCTION AND USE OF ACCURATE DATA

New Jersey's Qualitative Review (QR) is an assessment of the status of children, youth, and families, the status of practice and the functioning of systems in each of the counties. The protocol and process used for the QR are aligned with DCF's Case Practice Model. Select QR results related to both Child/Youth and Family Status and Practice/System Performance are also used to report on several SEP requirements included in this report, three of which are designated Outcomes *To Be Achieved*: Quality of Teaming (SEP IV.B.20), Quality of Case Plans (SEP IV.D.23) and Services to Support Transition (SEP IV.J.44); and two of which are designated Outcomes *To Be Maintained*: Educational Needs (SEP III.G.11) and Quality of Case Planning and Services for Older Youth (SEP IV.K.46). Given the small sample size of cases from each county, SEP measures based on the QR scores are reported by the Monitor on an annual basis. The Monitor will report on the data for all QR measures for the period January 1 through December 31, 2019 in the next monitoring report.

When conducting a QR involving children/youth under age 18, the legal guardian is asked to give informed consent for participation in the QR. Trained review teams of two persons including DCF staff, community stakeholders, and staff from the Monitor's office review CP&P case records and interview as many people as possible who are involved with the child(ren)/youth and their families. QRs take place during a single week and, over the course of two years, occur in 21 counties and involve almost 400 cases across the state. The results provide critical qualitative data on child/youth and family status and practice/system performance.

At the conclusion of each week of the QR, the Case Practice Liaison (CPL) assigned to each Local Office through DCF's Office of Performance, Management and Accountability (OPMA) works with staff in the county to develop a county-level Performance Improvement Plan (PIP) with short and long term goals to strengthen practice. The PIP is designed to address areas needing improvement identified during the QR debrief. The Office of Quality approves each PIP, aggregates results, and shares them with leaders across DCF's divisions. Findings from the QRs are incorporated into existing training and supervisory tools and used to identify opportunities for improvement.

DCF has developed a rigorous continuous quality improvement process that incorporates the QR results and now interfaces with DCF's ChildStat meetings. ChildStat is a comprehensive review and discussion of system performance at a local level. While ChildStat previously focused on one case presentation in a particular Local Office, the new ChildStat format expands the scope to include discussions of county needs and an assessment of county-level strengths and areas needing improvement based on a review of quantitative data, QR results, and other county-level reviews. The format includes both CP&P and Children's System of Care (CSOC) staff and allows the DCF leadership team to ask questions of and explore solutions directly with county-level leadership. Each county will be assessed at ChildStat every two years, following the QR schedule, and will report on progress on their county-level PIP every 12 months. During this monitoring period, DCF rolled out its new ChildStat format and the Monitor attended several of these presentations. The new format promises to provide the state with a more nuanced and comprehensive assessment of case practice and service delivery by county.

## O.  NEEDS ASSESSMENT

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 21. <u>Needs Assessment</u>: The State shall regularly evaluate the needs for additional placements and services to meet the needs of children in custody and their families, and to support intact families and prevent the needs for out-of-home care. Such needs assessments shall be conducted on an annual, staggered basis that assures that every county is assessed at least once every three years. |
| **Final Target** | The State shall develop placements and services consistent with the findings of these needs assessments. |

In 2014, DCF engaged Rutgers University School of Social Work to conduct a multi-year Needs Assessment to identify the strengths and needs of families with children at risk of entering out-of-home placement as well as those already in care. A description of DCF's Needs Assessment process is available in previous monitoring reports, and DCF's interim reports are available on the DCF website.[112] In sum, Phase I involved a review of DCF internal reports and assessments completed by DCF and its partners from CY 2008 to CY 2014. Phase II involved an analysis of the findings from Phase I and the identification of seven areas of need: caregiver mental health, caregiver substance abuse, child mental health, child substance abuse, poverty, housing, and domestic violence. During Phase III, researchers at the Child Welfare and Well-Being Research Unit at Rutgers School of Social Work conducted almost 2,000 surveys with CP&P staff, including (a) intake workers and permanency workers (637); (b) parents from families of origin, including those with children in the home (391) and those placed out-of-home (185); and (c) resource parents providing out-of-home care (739). In March 2018, DCF published its report of findings in its *DCF Needs Assessment 2018 Report #3: Survey Findings and Synthesis*.[113]

During the monitoring period, using a World Health Organization public health framework,[114] DCF completed a comprehensive meta-analysis of previous needs assessments in the state, findings of which were shared with stakeholders in statewide meetings in May 2019. DCF determined that it will prioritize assessments collected routinely by county Human Services Advisory Councils (HSACs) and incorporate them into county level Qualitative Reviews (QRs), ChildStat, and local Performance Improvement Plan (PIP) processes, discussed in Section V.N.

Between January and June 2019, DCF established a workgroup with statewide Human Service Directors (HSDs) and met monthly to outline methodology and develop guidance, focus group protocols, a survey, and a report template that the HSACs will use as they collect data. The goal of the workgroup is to capture county-specific qualitative information regarding the scope, nature, and local context of community needs to enhance the new quality improvement processes. DCF plans to finalize the methodology and tools developed by the workgroup in the coming months. The new Needs Assessment process is scheduled to begin in ten counties during the next monitoring period.

---

[112] To see DCF's Needs Assessment Interim Reports from January 2015, March 2016, and April 2017, go to: http://www.nj.gov/dcf/childdata/protection/
[113] To see DCF's Final Needs Assessment 2018 Report #3: Survey Findings and Synthesis, go to: http://www.nj.gov/dcf/childdata/protection/DCF.Needs.Assessment.Phase.IV.Report-March2018.pdf.
[114] To see the World Health Organization's "Availability, Accessibility, Acceptability, Quality" Infographic, go to: https://www.who.int/gender-equity-rights/knowledge/aaaq-infographic/en/

### P.  FISCAL YEAR BUDGET

Governor Murphy's FY 2019 budget, which became effective July 1, 2018, included $1.16 billion in state funds, covering the monitoring period from January 1 through June 30, 2019. Commissioner Beyer testified in May 2018 in support of the proposed allocations. While DCF received a supplemental appropriation in FY 2018 for $5.477 million to support utilization trends in the CP&P out-of-home placement, family support services, and subsidized adoption accounts, a supplemental appropriation was not required in FY 2019.

DCF's FY 2019 appropriation included an increase of $2.2 million over the adjusted FY 2018 appropriation to support projected increases in utilization trends in CP&P independent living, family support services, and subsidized adoption accounts. Additionally, $3 million was added to the budget to support debt service payments for new vehicles for CP&P.

The FY 2020 budget, approved June 30, 2019, totals $1.156 billion for DCF. The $19 million decrease from the FY 2019 adjusted appropriation of $1.175 billion is largely due to the downward trend in the utilization of CSOC out-of-home treatment services. DCF reports that during the monitoring period there were no changes to the state's approved budget or spending authority.

**APPENDIX: A**
**Glossary of Acronyms Used in the Monitoring Report**

| | | | |
|---|---|---|---|
| **AQC:** | Area Quality Coordinators | **IAIU:** | Institutional Abuse Investigative Unit |
| **CFSR:** | Child and Family Services Review | **ILA:** | Independent Living Assessment |
| **CHU:** | Child Health Unit | **LGBTQI:** | Lesbian, Gay, Bisexual, Transgender, Questioning/Intersex |
| **CIACC:** | Children's Interagency Coordinating Council | **KLG:** | Kinship Legal Guardian |
| **CMO:** | Care Management Organization | **LOM:** | Local Office Manager |
| **CP&P:** | Division of Child Protection and Permanency | **MSA:** | Modified Settlement Agreement |
| **CPL:** | Case Practice Liaisons | **OAS:** | Office of Adolescent Services |
| **CPM:** | Case Practice Model | **OFV:** | Office of Family Voice |
| **CPS:** | Child Protective Services | **OPMA:** | Office of Performance Management and Accountability |
| **CQI:** | Continuous Quality Improvement | **PIP:** | Performance Improvement Plan |
| **CSOC:** | Children's System of Care | **PPFs:** | Protective and Promotive Factors |
| **CSSP:** | Center for the Study of Social Policy | **QR:** | Qualitative Review |
| **CWS:** | Child Welfare Services | **RER:** | Office of Research, Evaluation and Reporting |
| **DAsG:** | Deputy Attorneys General | | |
| **DCF:** | Department of Children and Families | **SACWIS:** | Statewide Automated Child Welfare Information System |
| **FAFS:** | Foster and Adoptive Family Services | **SEP:** | Sustainability and Exit Plan |
| **FFPSA:** | Family First Prevention Services Act | **SCR:** | State Central Registry |
| **FFT-FC:** | Family Functional Therapy – Foster Care | **SDM:** | Standard Decision Making tool |
| **FSC:** | Family Success Centers | **SIBS:** | Siblings in Best Placement Settings |
| **FTM:** | Family Team Meeting | **USDA:** | United States Department of Agriculture |
| **HCCM:** | Health Care Case Manager | **YAB:** | Youth Advisory Board |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 72*

# APPENDIX B

## New Jersey Department of Children and Families



Updated June 2019

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXIV Report for Charlie and Nadine H. v. Murphy*

*January 23, 2020*
*Page 73*