July 13, 2020

CHARLIE AND NADINE H. V. MURPHY

PROGRESS OF THE NEW JERSEY
DEPARTMENT OF CHILDREN AND FAMILIES

MONITORING PERIOD XXV
(JULY 1 – DECEMBER 31, 2019)

**Center** *for the*
**Study** *of*
**Social Policy**
**Ideas into Action**

1575 Eye Street NW, #500
Washington, DC 20005
www.CSSP.org

**Progress of the New Jersey**
**Department of Children and Families**

**Monitoring Period XXV Report for**
***Charlie and Nadine H. v. Murphy***
**July 1 – December 31, 2019**

### TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 1

II.   SUMMARY OF PERFORMANCE DURING JULY THROUGH DECEMBER 2019 .... 5

III.   CHILD AND FAMILY OUTCOMES AND CASE PRACTICE PERFORMANCE
MEASURES ........................................................................................... 13

IV.   FOUNDATIONAL ELEMENTS ................................................................ 38

V.   SUSTAINABILITY AND EXIT PLAN PERFORMANCE MEASURES *TO BE
ACHIEVED* AND *TO BE MAINTAINED* ..................................................... 39

  A.   INVESTIGATIONS ........................................................................... 39
  B.   FAMILY TEAM MEETINGS ............................................................... 42
  C.   QUALITY OF CASE AND SERVICE PLANNING ................................... 47
  D.   EDUCATION ................................................................................... 50
  E.   MAINTAINING CONTACT THROUGH VISITS ...................................... 52
  F.   PLACEMENT ................................................................................... 57
  G.   MALTREATMENT OF CHILDREN AND YOUTH .................................. 62
  H.   TIMELY PERMANENCY .................................................................. 67
  I.   CHILD HEALTH UNITS .................................................................... 72
  J.   OLDER YOUTH .............................................................................. 73
  K.   SERVICES TO SUPPORT TRANSITION .............................................. 76
  L.   CASELOADS ................................................................................... 78
  M.   DEPUTY ATTORNEYS GENERAL STAFFING ..................................... 85
  N.   ACCOUNTABILITY THROUGH QUALITATIVE REVIEW AND THE
PRODUCTION AND USE OF ACCURATE DATA ........................................ 86
  O.   NEEDS ASSESSMENT ...................................................................... 91
  P.   FISCAL YEAR BUDGET ................................................................... 92

APPENDIX: A ........................................................................................................... 93

APPENDIX B ........................................................................................................... 94

## LIST OF TABLES

Table 1: Charlie and Nadine H. Child and Family Outcome and Case Practice Performance Measures .................................................................................................................. 14
Table 2: CP&P Individual Worker Caseload Standards ................................................... 78
Table 3: Number of CP&P Investigations and Secondary Intake Assignments by Month (July – December 2019) ......................................................................................................... 81
Table 4: Percentage of CP&P Investigations Assigned to Non-Caseload ................................... 82
Table 5: Percentage of CP&P Investigations Assigned to Non-Intake ....................................... 82
Table 6: Qualitative Review: Gender, Age and Race/Ethnicity Demographics ......................... 87
Table 7: Qualitative Review: Child/Youth and Family Status Results ........................................ 88
Table 8: Qualitative Review: Practice/System Performance Results ........................................... 89

## LIST OF FIGURES

Figure 1: Qualitative Review (QR) Cases Rates Acceptable  on Teamwork and Coordination (CY 2016 – CY 2019) ......................................................................................................... 45
Figure 2: Qualitative Review (QR) Cases Rated Acceptable on Quality of Case Plans  (CY 2016 – CY 2019) ......................................................................................................... 49
Figure 3: Qualitative Review (QR) Cases Rated Acceptable on Educational Needs  (CY 2016 – CY 2019) ......................................................................................................... 51
Figure 4: Percentage of Families Who Had at Least Twice per Month Face-to-Face Contact with Caseworker when the Goal is Reunification  (December 2017 – December 2019) ..................... 54
Figure 5: Percentage of Sibling Groups of Two or Three Children Placed Together  (CY 2013 – CY 2019) ......................................................................................................... 58
Figure 6: Number of Placements for Children within 12 Months of Entering Care (CY 2018) .. 60
Figure 7: Number of Placements for Children within 13-24 Months of Entering Care (CY 2017) ................................................................................................................................... 61
Figure 8:Percentage of Children who were Victims of a Substantiated Allegation of Abuse and/or Neglect in Out-of-Home Care  (CY 2013-CY 2019) ....................................................... 63
Figure 9: Percentage of Children who were Victims of Second Substantiated Allegation within 12 Months of Remaining at Home after First Substantiated Allegation  (CY 2009-CY 2018) ... 64
Figure 10: Percentage of Children who were Victims of Substantiated Allegation within 12 Months after Reunification  (CY 2008-CY 2016) ....................................................................... 65
Figure 11: Percentage of Children Who Re-Entered Custody within One Year of Exit  (CY 2009 – CY 2017) ......................................................................................................... 66
Figure 12: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 12 Months of Entering Foster Care  (CY 2010 – CY 2018) ..................... 68
Figure 13: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 24 Months of Entering Foster Care  (CY 2010 – CY 2017) ..................... 69
Figure 14: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 36 Months of Entering Foster Care  (CY 2010 – CY 2016) ..................... 70

Figure 15: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 48 Months of Entering Foster Care  (CY 2010 – CY 2015)..................... 71
Figure 16: Qualitative Review (QR) Cases Rated Acceptable on Quality of Case Planning and Services for Older Youth  (CY 2016 – CY 2019) ...................................................................... 74
Figure 17: Qualitative Review (QR) Cases Rated Acceptable on Successful Transitions  (CY 2016 – CY 2019)........................................................................................................................ 77

# I.        INTRODUCTION

The Center for the Study of Social Policy (CSSP) was appointed in 2006 by the Honorable Stanley R. Chesler of the United States District Court for the District of New Jersey as Federal Monitor of the class action lawsuit *Charlie and Nadine H. v. Murphy*, aimed at improving outcomes for children, youth and families served through New Jersey's child welfare system. As Monitor, CSSP has been charged with independently assessing New Jersey's compliance with the goals, principles and outcomes of the Court Order entered in 2003; the Modified Settlement Agreement (MSA) entered in July 2006; and now the Sustainability and Exit Plan (SEP) entered on November 4, 2015, that supersedes the MSA. This monitoring report includes performance data and measures progress under the SEP for the period July 1 through December 31, 2019.[1]

**Monitoring Methodology**

The Monitor's public reports cover six-month periods.[2] The primary sources of information on New Jersey's progress are quantitative and qualitative data supplied by the Department of Children and Families (DCF) and independently validated by the Monitor. DCF provides access to staff and documents to enable the Monitor to verify performance.

In assessing progress, the Monitor first looks to the state's data and validates its accuracy. The Monitor also retains the authority to engage in independent data collection and analysis where needed. DCF's intent is to continue to expand the data that it publishes on its public website,[3] as well as on its publicly accessible New Jersey Child Welfare Data Hub, which was developed in collaboration with Rutgers University.[4] The Data Hub, launched in November 2016, allows users to create customized charts and graphs using New Jersey's child welfare data, and incorporates information from the formerly produced quarterly DCF Demographics Report. During the monitoring period, the Children's System of Care (CSOC) and the Department of Child Protection and Permanency (CP&P) collaborated with Rutgers to create, test, and verify the first five reports of the CSOC data map for the Data Hub.[5]

DCF published a comprehensive Annual Report for 2018 in September 2019, which provides summary demographic and in some cases outcome data and information about all of the services DCF offers to families in New Jersey, including those designed solely for families involved with the CP&P.[6] It intends to produce and make available an updated version of this report to the public annually.

Reports that DCF currently publishes on its website include:

- Commissioner's Monthly Report[7] – *Current and produced monthly*. This report gives a broad data snapshot of various DCF services. The report includes information from CP&P, Office of Adolescent Services (OAS), Institutional Abuse Investigation Unit (IAIU), CSOC, Family & Community Partnerships and the Division on Women (DOW).

---

[1] Copies of all Monitoring Reports can be found at: https://cssp.org/our-work/projects/our-projects/class-action-litigation-new-jerseys-department-of-children-and-families/
[2] The exceptions to this time frame were Monitoring Period XIII, which covered July 1, 2012 through March 31, 2013; Monitoring Period XIV, which covered April 1 through December 31, 2013; and Monitoring Period XVII, which covered January 1 through December 31, 2015.
[3] To see DCF's public website, go to: http://www.state.nj.us/dcf/about/
[4] To see the New Jersey Child Welfare Data Hub, go to: https://njchilddata.rutgers.edu/#home
[5] To see the data map reports, go to: https://njchilddata.rutgers.edu/map#
[6] To see the Safe, Healthy & Connected 2018 Annual Report, go to: https://www.nj.gov/dcf/news/reportsnewsletters/dcfreportsnewsletters/FY18-DCF.Annual.Report.pdf
[7] To see all Commissioner's Monthly Reports, go to: http://www.nj.gov/dcf/childdata/continuous/

- Screening and Investigations Report[8] – *Current and produced monthly*. This report details State Central Registry (SCR) activity, including data regarding calls to the Child Abuse and Neglect Hotline, assignments to CP&P offices and trends in Child Protective Services (CPS) Reports and Child Welfare Services (CWS) Referrals.

- Workforce Report[9] – *Last report dated January 2018*. This report provides information regarding the demographics and characteristics of DCP&P workers, as well as a variety of indicators of workforce planning and development, using fiscal year (FY) (July 1 – June 30) data. Going forward, elements of this report will be incorporated into the new comprehensive annual report described above.

- Children's Interagency Coordinating Council Report[10] – *Current and produced monthly*. This report details referral and service activity for CSOC. It includes demographic data, referral sources, reasons for and resolutions of calls to CSOC, information on substance use and school attendance, as well as authorized services provided.

- New Jersey Youth Resource Spot[11] – *Ongoing and updated periodically*. This website offers the latest resources, opportunities, news, and events for young people served by DCF. It includes information about the Youth Advisory Network, as well as additional resources available in each county and statewide.

- DCF Needs Assessment– *Previously produced annually. Last report dated March 2018*. The SEP requires reports to evaluate the need for additional placements and services to meet the needs of children, youth and their families involved with DCF, with each county assessed at least once every three years. During its multi-year needs assessment process, DCF produced annual reports on its website and reported twice annually to the Monitor.[12] The most recent report, entitled *DCF Needs Assessment 2018 Report #3: Survey Findings and Synthesis*, updates interim findings to identify the resources needed to serve families with children at risk for entering out-of-home placement and those already in placement.[13] During the monitoring period, DCF continued its redesign of the Needs Assessment process, which will be incorporated into the new continuous quality improvement processes as reported in Section V.O.[14]

The Monitor engaged in the following data verification activities for the period of July to December 2019.

- ***Investigations Case Record Review***

    The Monitor and DCF jointly conducted a case record review of a statistically valid random sample of 326 child abuse and neglect investigations assigned to DCF Local Offices between October 1 and October 14, 2019, involving 510 alleged child victims. Reviewers examined the quality of investigative practice and determined whether cases met the quality standard completely, substantially, marginally, or not at all. Findings from this review are discussed in Section V.A – Investigations – of this report.

---

[8] To see all Screening and Investigations Reports, go to: http://www.nj.gov/dcf/childdata/protection/screening/
[9] To see DCF's Workforce Report: 2016-2017 Updates, go to http://www.nj.gov/dcf/childdata/exitplan/NJ.DCF.Workforce.Report-FY17.pdf. To see DCF's Workforce: Preliminary Highlights 2014-2015 Report, go to:
http://www.state.nj.us/childdata/orgdev/NJ.DCF.Workforce.Report_2015.pdf
[10] To see all Children's InterAgency Coordinating Council Reports, go to: http://www.nj.gov/dcf/childdata/interagency/
[11] To see New Jersey's Youth Resource Spot, go to: http://www.njyrs.org/
[12] To see the prior CP&P Needs Assessment reports, go to: http://www.nj.gov/dcf/childdata/protection/
[13] To see New Jersey's CP&P Final Needs Assessment 2018 Report #3: Survey Findings and Synthesis, go to:
http://www.nj.gov/dcf/childdata/protection/DCF.Needs.Assessment.Phase.IV.Report-March2018.pdf
[14] To see DCF's description of its Needs Assessment process, go to: https://www.nj.gov/dcf/about/divisions/opma/hsac_needs_assessment.html

- ***Family Team Meeting Data Review***

  The Monitor collaborated with DCF to review experiences of 125 children and families to verify all instances in which workers determined that Family Team Meetings (FTMs) were not required because parents were unavailable, missing, or declined the meeting. DCF and the Monitor completed a joint review of all cases of documented exceptions to the FTM requirement in each month from July 1 to December 31, 2019. Further discussion of current performance on these measures is included in Section V.B – Family Team Meetings – of this report.

- ***Visits Data Review***

  The Monitor collaborated with DCF to review case records of 167 children in which workers documented that caseworker contacts with parents with a reunification goal (SEP IV.F.28) were not required during October 2019 because a parent was unavailable or there were other circumstances outside of their control that prevented visits from occurring. Findings are discussed in Section V.E – Visits – of this report.

- ***Older Youth Exiting Care to Non-Permanency Case Record Review***

  The Monitor collaborated with DCF to review case records of 175 youth age 18 to 21 who exited care between January 1 and December 31, 2019 without achieving permanency. The review focused on the housing, education, and employment status of these youth. Findings from the review are discussed in Section V.J – Older Youth – of this report.

- ***Other Monitoring Activities***

  The Monitor interviewed and/or visited multiple New Jersey child welfare system stakeholders, including staff, contracted service providers, and advocacy organizations. The Monitor also attended DCF's ChildStat meetings, Area Director meetings, and adolescent practice forums. The Monitor participates as reviewers in almost every scheduled statewide Qualitative Review (QR) throughout the year. DCF has cooperated with the Monitor in notifying Monitor staff of schedules and facilitating their participation in relevant activities.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 3*

**Structure of the Report**

Section II provides an overview of the state's accomplishments and challenges during this monitoring period. Section III provides summary performance data on each of the outcomes and performance measures required by the SEP in Table 1: *Charlie and Nadine H. v. Murphy* Child and Family Outcome and Case Practice Performance Measures. Section IV provides information related to the SEP Foundational Elements.[15] Section V provides more detailed data and discussion of performance on SEP Outcomes *To Be Maintained* and Outcomes *To Be Achieved* in the following areas:

- Investigations of alleged child maltreatment (Section V.A);
- Implementation of DCF's Case Practice Model; including Family Team Meetings, case planning and visits (Sections V.B, V.C & V.E);
- Educational engagement for children in out-of-home care (Section V.D);
- Placement of children in out-of-home settings (Section V.F);
- Efforts to achieve permanency for children either through reunification with family, legal guardianship or adoption (Section V.H);
- Provision of health care services to children and youth (Section V.I);
- Services to older youth (Section V.J);
- Caseloads (Section V.L);
- Deputy Attorneys General Staffing (Section V.M);
- Accountability through the Qualitative Review and the production and use of accurate data (Section V.N);
- Needs Assessment (Section V.O); and
- Fiscal Year 2020 budget (Section V.P).

---

[15] The Foundational Elements requirements of the SEP intentionally recognize the state's accomplishments in early implementation of the MSA. At the Monitor's discretion, based on a concern that a Foundational Element has not been sustained, the Monitor may request additional data. If the data demonstrate a persistent problem, in the Monitor's discretion, the state will propose and implement corrective action (SEP.II).

## II.     SUMMARY OF PERFORMANCE DURING JULY THROUGH DECEMBER 2019

While the period of review for this report ended on December 31, 2019, it is not possible to issue a report now without acknowledging and discussing the impact of the COVID-19 pandemic on the children and families of New Jersey and on its Department of Children and Families (DCF). Like other child welfare systems around the country, DCF has faced significant challenges and has had to rapidly amend its work processes in recent months as a result of the pandemic. To safeguard the health of staff, children, and families, the Department is performing most essential functions remotely, including visits with families and court hearings. Continuous quality improvement measures, including ChildStat and Qualitative Reviews, have been temporarily suspended. At this difficult time, DCF has had the benefit of a strong leadership team, a committed workforce, and the solid infrastructure it has built over the past decade. There is no doubt that, even with this benefit, the virus has and will continue to present challenges to DCF's work and case progress in multiple areas, including measures related to the SEP. However, both DCF leaders and the Monitor are hopeful that the important practice and system improvements made during this reform, along with DCF's historical expertise in managing through crises such as the 2012 Superstorm Sandy, will buffer the impact of the pandemic on New Jersey's children, youth, and families.

The pandemic impacted New Jersey at a time when performance with respect to children and families served by DCF has never been more promising. Not only has the progress the state has made over the past decade pursuant to the *Charlie and Nadine H.* lawsuit continued to be sustained, but also, during this monitoring period, DCF met two additional Sustainability and Exit Plan (SEP) performance targets that it had been working toward but had not yet previously achieved.

Between July and December 2019, consistent with its mission that every resident of New Jersey be safe, healthy, and connected, DCF continued its focus on improving the quality of case practice and sustaining progress already achieved. As discussed in Section IV, DCF maintained performance on each of the SEP Foundational Elements in such important areas as manageable caseloads for workers, training, and the provision of health care for children in out-of-home placement. DCF ended the monitoring period having met 44 of 48 SEP performance measures.[16,17] As discussed in more detail below, this includes two newly met measures – Re-entry to Placement (SEP IV.H.39) and Permanency Within 24 Months (SEP IV.I.41). These are significant accomplishments.

Three of the remaining four SEP Outcomes *To Be Achieved* are measured by New Jersey's Qualitative Review (QR) process: Quality of Case Plans (SEP IV.D.23); Quality of Teaming (SEP IV.B.20); and Services to Support Transitions (SEP IV.J.44). While DCF still has more work to do to meet these measures, performance

---

[16] These measures include: Institutional Abuse Investigations Unit (IAIU) (III.A.1); Timeliness of Investigation Completion (60 days) (SEP IV.A.13); Timeliness of Investigation Completion (90 days) (SEP IV.A.14); Quality of Investigations (SEP IV.A.15); Initial Family Team Meeting (SEP IV.B.16); Subsequent FTMs within 12 months (SEP IV.B.17); Subsequent FTMs after 12 months – Reunification Goal (SEP IV.B.18); Subsequent FTMs after 12 months – Other than Reunification Goal (SEP IV.B.19); Needs Assessment (SEP IV.C.21); Initial Case Plans (SEP IV.D.22); Supervisor/Worker Ratio (III.B.2); IAIU Investigators Caseload (III.B.3); Permanency Workers (Local Offices) Caseload (III.B.4); Permanency Workers Caseload (III.B.5); Intake Workers (Local Offices) (SEP IV.E.24); Intake Workers (SEP IV.E.25); Adoption Local Office Caseload (SEP IV.E.26); Adoption Workers (SEP IV.E.27); Timeliness of Current Plans (III.C.6); Adequacy of DAsG Staffing (III.D.7); Child Health Units (III.E.8); Parent-Child Visits – weekly (SEP IV.F.29); Parent-Child Visits – bi-weekly (SEP IV.F.30); Sibling Visits (SEP IV.F.31); Caseworker Contacts with Children – New Placement/Placement Changes (III.F.9); Caseworker Contact with Children in Placement (III.F.10); Placing Siblings Together (SEP IV.G.32); Placing Siblings Together for Four or More Children (SEP IV.G.33); Recruitment of Placements for Sibling Groups of Four or More (SEP IV.G.34); Placement Stability for first 12 months in care (SEP IV.G.35); Placement Stability 13-24 Months in Care (SEP IV.G.36); Educational Needs (III.G.11); Abuse and Neglect of Children in Foster Care (III.H.12); Repeat Maltreatment (In-home) (SEP IV.H.37); Maltreatment Post-Reunification (SEP IV.H.38); Re-entry to Placement (SEP IV.H.39); Permanency within 12 Months (SEP IV.I.40); Permanency Within 24 Months (SEP IV.I.41); Permanency within 36 months (SEP IV.I.42); Permanency within 48 Months (SEP IV.I.43); Independent Living Assessments (SEP IV.K.45); Quality of Case Planning and Services (SEP IV.K.46); Housing for Older Youth Exiting to Non-Permanency (SEP IV.K.47); and Employment/Education for Older Youth Exiting to Non-Permanency (SEP IV.K.48).

[17] Subsequent FTMs after 12 months – Reunification Goal (SEP IV.B.18) and Quality of Case Planning and Services (SEP IV.K.46) did not meet the performance standard this monitoring period.

is trending in the right direction and each improved slightly in 2019. This improved performance is an indication of DCF's purposeful and directed efforts with staff at all levels and throughout the Division to prioritize the provision of quality case practice to the children and families it serves. The fourth outstanding Outcome *To Be Achieved* – that workers visit parents twice monthly when a child is in the state's custody with a permanency goal of reunification (SEP IV.F.28) – continues to remain below the SEP's standard.

In the body of the report, we provide specific data and the Monitor's observations and conclusions with respect to each of the requirements of the SEP. Below we briefly highlight some of the new practice, policy, and resource creation initiatives underway within DCF and the areas of progress and remaining challenges.

### *DCF's Strategic Plan*

DCF continues to pursue the strategies set out in its *Strategic Plan 2019 – 2021*, finalized in early 2019.[18] The *Strategic Plan* identifies four priorities – each consistent with the goals and expectations of the *Charlie and Nadine H.* lawsuit – to achieve its vision of safe, healthy and connected families: (1) the prevention of child maltreatment; (2) an increase in the use of kinship placement settings for children and youth in foster care; (3) attention to the DCF workforce through the promotion of staff health and wellness; and (4) the full integration of health and behavioral health into DCF's scope of services, including enhancing the Children's System of Care's (CSOC) capacity to ensure equitable access to care. Between July and December 2019, DCF held another series of three Regional Forums across the state with approximately 400 attendees to update a wide cross-section of stakeholders on progress made on the *Strategic Plan,* and to discuss whether DCF's purchased service array sufficiently meets the needs of families.

### *Focus on Race Equity*

DCF's *Strategic Plan* recognizes that racial bias plays a role in work with families involved in public systems like child welfare, and that disparities in outcomes for children in placement is a challenge in New Jersey as it is across the country. DCF has focused on race equity issues directly, first by contracting with a national consultant to develop and implement a race equity strategy, and by working with a steering committee co-facilitated by senior staff. During the monitoring period, the steering committee began reviewing the Department's policies and practices to identify areas in which implicit bias and racism may have an impact on the work. The committee also developed its goals for the next two years: (1) to identify and inform racial disparities in the use of short-stays in foster care; (2) to identify and inform racial disparities affecting time to permanency and re-entries into care; (3) to promote strategies that prevent maltreatment and family separation; and (4) to assist in the development of a race equity decision-point analysis for the Children's System of Care (CSOC). Additionally, DCF's county-based Child Stat process now includes an explicit focus on outcomes data by race, and the race equity dimensions of practice.

### *Designing a Primary Prevention Model*

Between July and December 2019, DCF continued to work with Predict Align Prevent (PAP), a program that uses strategic alignment of community initiatives and programs to design primary prevention models. DCF and PAP began this work in Camden and Cumberland counties while building capacity to expand the program to other parts of the state.

---

[18] To see DCF's Strategic Plan, *Safe, Healthy, Connected: DCF in the 21st Century*, go to: https://www.nj.gov/dcf/about/strategic.html

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 6*

DCF continued its participation in the Substance Exposed Infants (SEI) Project ECHO. Managed by Rutgers University/Robert Wood Johnson Medical School, and funded by the Nicholson Foundation, Project ECHO uses telecommunications technology and case-based learning to foster mentoring partnerships among child welfare and community social service providers, alongside an interdisciplinary team of SEI medical specialists and substance misuse experts, to manage the needs of infants and their parents involved in substance use disorder treatment and recovery. Between July and December 2019, DCF participated in nine "hub" sessions with DCF and CP&P staff, therapists, nurses, and physicians. Each hub session involved a confidential case study review and an opportunity for participants to address questions and frame practice recommendations.

In fall of 2019, DCF published Plans of Safe Care booklets for use by medication-assisted treatment (MAT) substance use disorder service providers.[19] MAT involves the combined use of medications and behavioral therapies. It is one of the only evidence-based treatments in helping to sustain substance misuse recovery. The Plans for Safe Care booklets are intended to help providers better message information about MAT, and to inform and prepare expectant parents who may be considering it as a treatment option.

### *Prioritizing Safety*

One of DCF's core approaches to child welfare practice is an emphasis on safety for both families and staff. DCF is continuing to partner with Collaborative Safety, LLC, a national organization that, borrowing from the fields of aviation and health science, helps states implement a "safety science" approach to child welfare. The approach aims to guide agencies to address systemic issues that can expose staff and clients to risk of harm by providing tools, training, and support to reduce the frequency of critical and life-threatening incidents. Collaborative Safety, LLC uses a case review process to analyze how safety decisions are made and to help establish a culture of safety for staff and to promote safe outcomes for children, youth, and families.

During the monitoring period, DCF continued to train leadership and managerial staff on Collaborative Safety. DCF and Collaborative Safety, LLC conducted eight statewide presentations to familiarize DCF staff and union (Communication Workers of America [CWA]) leadership with the approach. In September 2019, DCF began to pilot new technology – Safe Signal – a messaging system that can alert law enforcement to critical or dangerous situations.

DCF also continued to develop its new Office of Staff Health and Wellness during the monitoring period, and appointed Nancy Carre-Lee, the former Deputy Director of Central Operations of DCP&P, as its Executive Director. DCF, with its consultant partner Alia Innovations, Inc., continued its monthly workforce well-being groups and learning sessions with managers to promote workforce well-being and self-care strategies.

### *Integrating Family Voice*

DCF's Office of Family Voice (OFV), launched in November 2018, developed a Youth Council during the monitoring period. The purpose of the Youth Council is to facilitate the inclusion of youth voice to improve programs and help identify and evaluate necessary supports and services. Throughout the summer of 2019, OFV met with groups of young people to gather their input on the structure and operations of the planned Youth Council. The Council will include 24 youth between the ages of 14 and 23 with experience in foster care who will meet regularly in the northern and southern regions of New Jersey. In addition, the OFV relaunched a Fatherhood Engagement Committee with stakeholders from New Jersey's Division of Labor, Office of

---

[19] https://www.nj.gov/dcf/about/divisions/dcsc/Plans-of-Safe-Care-Brochure.pdf

Probation, Office of Child Support, Office of Faith-Based Initiatives, and the Division of Family Development. A subcommittee consisting of fathers with lived expertise in the foster care system was established and met in August and October 2019.

Between July and December 2019, Commissioner Beyer continued to seek input from stakeholders across the state, meeting with approximately 170 people, including parents receiving in-home and out-of-home services, families of children with intellectual and developmental disabilities, members of Family Support Organizations, biological fathers, domestic violence survivors, parents and relatives involved with Family Success Centers, mothers participating in a Mommy & Me program, and inmates at the Edna Mahan Correctional Facility for Women. Between October and November 2019, Commissioner Beyer also conducted six listening sessions with approximately 500 CP&P caseworkers and supervisors to discuss progress on DCF's *Strategic Plan* and to listen to staff priorities and concerns.

### Re-designing New Jersey's Children's System of Care

DCF is in the process of re-structuring its Children's System of Care (CSOC) to better integrate its behavioral and physical health services. Between July and December 2019, CSOC program and service management responsibilities were reorganized and the Office of Clinical Services was converted into the new Office of Health and Wellness, which now manages other key DCF departments, including the Office of Residential Services, the Office of Community Services for Intellectual and Development Disabilities, the Office of Constituent Relations, and the Office of Community Partnerships and Behavioral Health Services. During the monitoring period, DCF engaged the Center for Health Care Strategies (CHCS) to assist in developing a set of service model, policy, and financing recommendations to improve performance and to make CSOC more responsive to the needs of children, youth, and their families.

Between July and December 2019, CSOC convened a Task Force of 16 stakeholders from across New Jersey to help design the state's behavioral and physical health integration model. The Task Force developed a framework in order to better screen and identify children and youth needing assistance, improve performance on key outcome measures, build capacity to deliver evidence-based and best practice interventions, and promote equitable access to in-home and community-based services. A final Task Force report is forthcoming; additional information about the Task Force and its work can be found on DCF's website.[20]

In 2015, the Substance Abuse and Mental Health Services Administration (SAMHSA) awarded DCF a four-year grant – the Promising Path to Success (PPS) program – to assist with mental health services for youth with complex behavioral health challenges. This grant, which was initially funded only through 2019, provided training to over 21,500 partners in two different trauma-informed interventions – the Nurtured Heart Approach and the Six Core Strategies. In September 2019, SAMHSA awarded a PPS expansion grant – the Promising Path to Success 2.0 – which will fund additional training across multiple DCF divisions and community-based partners through 2023. This grant is aimed at improving engagement with at least 60,000 youth and young adults over the course of the four-year grant period. In November 2019, CSOC held a conference to highlight the achievements of the PPS initiative and the Nurturing Heart and Six Core Strategies approach.

---

[20] To find out more about the work of the Task Force, go to: https://www.nj.gov/dcf/about/divisions/dcsc/csoc_taskforce.html.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 8*

*Increasing Kinship Placement*

Based on sound evidence that children in the care of relatives experience increased stability and better well-being and permanency outcomes, DCF remains committed to its goal of dramatically increasing kinship placements for children and youth in foster care. The Department has set an ambitious target of placing 60 percent of children who enter care with kin within the first seven days of removal from their homes, and 80 percent placed with kin by the first 30 days. DCF began a pilot in the Ocean/Monmouth area that established new processes intended to more effectively recruit and retain relative resource parents. These include restructuring DCF's Resource Units to improve the efficiency and efficacy of licensing, training, and ongoing support of relative care providers, and an ongoing examination of existing policies that may present barriers to placing children with kinship families. During the monitoring period, DCF also worked to strengthen the culture in the Local Offices to support kinship placements by clarifying misconceptions, addressing staff bias, and reinforcing the value of placing children with relatives.

Given the effects of the COVID-19 pandemic, it will be more important than ever for child welfare systems to seek out and support relative caregivers, and to be vigilant about finding relative homes to provide safety and assistance for older youth who may have lost supports due to the crisis.

*Enhancing DCF's Case Practice Model*

During the monitoring period, DCF continued to finalize plans to implement Solution Based Casework™(SBC) statewide, a case management approach to assessment, case planning, and ongoing casework consistent with New Jersey's Case Practice Model (CPM). SBC is intended to help the caseworker focus on the family, and the root causes of struggles they might face, in order to support the safety and well-being of their children. The SBC approach uses research on family development, clinical behavioral change, and child welfare outcomes to help staff stay focused on (1) creating a partnership with the family to come to a consensus on strengths and challenges, (2) focus on the patterns of everyday life that may pose threats to safety, and (3) target solutions specific to prevention skills families can learn to reduce risk in those situations.[21] Between July and December 2019, DCF leaders approved the SBC model and formed a workgroup that meets monthly to identify and execute changes necessary to integrate the model into DCF operations (including training, forms and policies, quality assurance, and general DCF culture). DCP&P's Case Practice Liaisons (CPLs), continue to support staff in practice skills related to teaming, case planning, and visitation between children in out-of-home care and families, all of which relate to fundamental SEP measures yet to be achieved.

In an effort to improve its assessment of children and families, DCF recently refined its Structured Decision-Making (SDM™) tools used to assess safety and risk in families. Together with the National Council on Crime and Delinquency's Children's Research Center (NCCD), DCF developed a "train the trainer" series on the SDM™ tools for the Office of Training and Professional Development and Rutgers University trainers. Between July and December 2019, staff were in the process of being trained on the revisions to the tools. Notable changes include a refined safety assessment process to include a review of factors influencing child vulnerability; an increased specificity of safety protection plans to include protective actions and safety interventions; the discontinued use of the family strengths and needs assessment; and the revision of the risk assessment, risk reassessment, and risk reunification tools. DCF continues to develop additional tools and resources to support staff and supervisors with implementation.

---

[21] To learn more about Solution Based Casework™, go to: https://www.solutionbasedcasework.com/

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 9*

**Accomplishments and Challenges in Specific Areas of Practice Related to SEP Outcomes**

Described below are DCF's accomplishments and challenges in specific areas of practice during this monitoring period:

*Family Team Meetings*

FTMs remain an integral component of DCF's case practice and are essential for bringing families, providers, and formal and informal supports together to exchange information, participate in case planning, coordinate and follow up on services, and examine and track progress toward accomplishing case plan goals. The SEP includes five performance measures pertaining to FTMs, four of which have been previously met and designated as Outcomes *To Be Maintained*.

DCF maintained satisfactory performance for three of these four previously achieved measures this period, exceeding requirements for FTMs held within 45 days of a child's removal (SEP IV.B.16); for holding three additional FTMs after the initial meeting within the first 12 months of a child's placement (SEP IV.B.17); and for holding at least two FTMs each year for children in care after 12 months with a goal other than reunification (SEP IV.B.19). The requirement to hold at least three FTMs each year for children in care with a permanency goal of reunification after 12 months (SEP IV.B.18) has been previously met but did not meet the SEP standard in any month this monitoring period.

The fifth measure on the overall quality of teaming (SEP IV.B.20) remains an Outcome *To Be Achieved* and is assessed through the Qualitative Review process. Results from the *teamwork and coordination* indicator in the QR are used to assess the quality of collaborative teamwork with children, youth, and families. Results from the 145 applicable cases reviewed from January through December 2019 using the QR protocol showed that 62 percent (90 of 145) rated acceptable for the *teamwork and coordination* indicator, compared to 58 percent rated acceptable in CY 2018 and 59 percent rated acceptable in CY 2017, when the QR was assessed in the same set of counties. More details about the measures pertaining to FTMs can be found in Section V.B.

*Appropriate Placements and Services*

DCF continues to maintain an adequate pool of placement resource homes and group settings to meet the needs of children in out-of-home care. As of December 31, 2109, 4,507 children were in out-of-home placement. Of all children in out-of-home placement, 4,053 (90%) were placed in family-like settings: 2,268 children (50%) in non-kinship resource family homes, and 1,785 children (40%) in kinship homes. The ten percent of children not residing in family-like settings consisted of 366 children (8%) in group and residential settings facilities and 88 children (2%) in independent living programs.

Between July and December 2019, DCF licensed 545 new kinship and non-kinship resource family homes; of these newly licensed resource family homes, 296 (54%) were kinship homes and 249 (46%) were non-kinship homes. During the same period, 681 resource family home were closed (of those closed, 366 were kin homes and 315 were non-kin homes). The primary reasons for resource home closure were adoption finalization (33%), health or age circumstances (24%), and reunification (20%). As of December 31, 2019, there were a total of 4,036 licensed resource family homes in the state, with a total bed capacity for 9,147 children. Of the total number of resource family homes, 1,295 (32%) were kin homes and 2,741 (68%) were non-kin homes. As described above, DCF has set a target of placing 60 percent of children who enter care with kin within the first seven days of removal from their homes, and 80 percent placed with kin by the first 30 days, a goal which will undoubtably increase the number of kinship homes available in the state. This is an ambitious leap from current practice, in

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 10*

which 40 percent of children are placed with kin caregivers. DCF also continues to focus on recruiting homes for adolescents and large sibling groups as described further in Section V.F.

### Maintaining Contact with Children, Parents and Siblings

There are six performance measures in the SEP related to visits, five of which have been previously met and designated as Outcomes *To Be Maintained*. Maintaining bonds and contact through visits between children in foster care and their workers, parents, and siblings are an essential element of successful child welfare practice.

DCF has maintained satisfactory performance for all five previously met measures this monitoring period, exceeding requirements for caseworker visits with children in both new and ongoing placements (SEP III.F.9 and III.F.10, respectively), weekly and biweekly visits between children and their parents (SEP IV.F.29 and IV.F.30, respectively), and visits between siblings placed apart (SEP IV.F.31). DCF has not yet met the SEP performance standard for the sixth measure of visits – caseworker contacts with families with a reunification goal (SEP IV.F.28). In December 2019, 80 percent of applicable children in custody had parents who were visited at least twice during the month by caseworkers. More details about the measures related to maintaining contact with children, parents, and siblings can be found in Section V.E.

### Improved Performance on Maltreatment and Timely Permanency

For the first time this period, DCF met the final two measures regarding maltreatment and permanency. These outcomes, Re-entry to Placement (SEP IV.H.39) and Permanency Within 24 Months (SEP IV.I.41), are assessed through annual cohort data. Regarding re-entry to placement, for children who entered foster care for the first time in calendar year (CY) 2017, 8.6 percent of those who were discharged within 12 months re-entered foster care within 12 months of their discharge (the SEP standard is 12.2%). Regarding the measure that 66 percent of children are to achieve permanency within 24 months of entering foster care (SEP IV.I.41), DCF exceeded the SEP standard – 67 percent of children who entered foster care in CY 2017 were discharged to permanency (reunification, living with relatives, guardianship, or adoption) within 24 months of entering foster care. Achievement of each of these outcome measures is a notable accomplishment.

### Services to Older Youth

DCF has continued its work to improve the experiences of older youth in its care through the efforts of the Office of Adolescent Services (OAS). As discussed in Section V.J, the SEP includes four performance measures related to DCF's work with older youth, all of which were previously met and are currently designated as Outcomes *To Be Maintained*: Independent Living Assessments for youth ages 14 to 18 (SEP IV.K.45); quality of case planning and services for older youth (SEP IV.K.46); housing for youth exiting care without achieving permanency (SEP IV.K.47); and education and employment for youth exiting care without achieving permanency (SEP IV.K.48).

Performance continued to meet or exceed SEP standards this monitoring period for three of the four measures. DCF exceeded SEP standards on housing, education, and employment for older youth exiting care without achieving permanency, with high performance. Of the 162 youth age 18 to 21 to whom the housing measure applied, 160 (99%) had a housing plan upon case closure. Of the 160 youth to whom the education and employment measure applied, 155 (97%) were either employed or enrolled in education or vocational training programs, or there was documentation of consistent efforts by the caseworker to help youth secure education or employment. The fourth measure, regarding the quality of case planning and services for older youth (SEP IV.K.46), had been previously met but did not meet SEP standards in this monitoring period. The size of the

universe is small, which makes performance more susceptible to fluctuations, but performance on this measure has not improved for the last two QR cycles.

During the monitoring period, OAS, in partnership with the Division on Women (DOW), organized a series of listening sessions and focus groups focused on the creation of protective environments for the LGBTQI+ community. These sessions, which took place in August 2019, were facilitated by LGBTQI+ service providers. Throughout the fall, OAS coordinated Safe Space liaison meetings to discuss pamphlets about speaking to youth about gender, sex, and sexuality. In addition, there were major enhancements to the internal intranet site of the New Jersey Youth Resource Spot to support staff to better navigate practice resources and available services.

DCF was awarded matching funds through Youth Villages, a national non-profit, to implement the evidence-based LifeSet program, an intensive case management and life skills service for older youth in foster care. OAS will be planning during this and the next monitoring period for the LifeSet pilot which will begin in July 2020.

### *Continuous Quality Improvement*

Between July and December 2019, DCF continued to enhance its continuous quality improvement (CQI) structure. In addition to incorporating results from its Qualitative Reviews (QRs), the federal Child and Family Review (CFSR), and participation and data from the Children's System of Care (CSOC), DCF's ChildStat process now includes direct input from each county's Human Services Advisory Council (HSACs), which are local human services councils comprised of local officials and service providers. The format is designed to facilitate direct dialogue between state- and county-level leadership about practice and system strengths as well as barriers to meeting the needs of children and families. Key themes emerge and deliberate attention is paid to major departmental priorities articulated in the Department's Strategic Plan, the federal Child and Family Services Review Round 3 Performance Improvement Plan (PIP), and the major components of the SEP. Due to the COVID-19 emergency, Child Stat and Qualitative Reviews have been suspended as of March 2020.

### *The Family First Prevention Services Act*

In February 2018, the federal *Family First Prevention Services Act* (FFPSA) was passed to promote placement of children in family foster care settings as opposed to congregate care settings, and to provide funding to assist states to provide evidence-based prevention services in the community to reduce the need for out-of-home placement.[22] New Jersey, in contrast to many other states, does not currently rely heavily on congregate care placement for children and youth, and thus does not have to make substantial changes in its placement array to comply with the new law. DCF has also created much of the prevention programming envisioned by FFPSA: three evidence-based home-visiting programs and several evidence-based treatment interventions are already in place in New Jersey. During the monitoring period, DCF completed programmatic and fiscal analyses related to the congregate care and prevention service provisions. DCF shared the results of these analyses with stakeholders during its Fall regional forums.

---

[22] H.R.253 - Family First Prevention Services Act of 2017

III.     CHILD AND FAMILY OUTCOMES AND CASE PRACTICE PERFORMANCE MEASURES

The child and family outcomes and case practice performance measures include 48 measures and Foundational Elements that assess the state's performance in meeting the requirements of the SEP (see Table 1). These performance measures cover the areas of child safety, permanency, service planning, child well-being and ongoing infrastructure development pertaining to core elements such as appropriate staffing, caseloads and training.

Many of the measures are assessed through a review of data from NJ SPIRIT[23] and SafeMeasures,[24] and, in some areas, these data are independently validated by the Monitor. Data are also provided through DCF's work with Rutgers University, which assists with data analysis. With few exceptions, performance data provided in this report are as of December 2019.

---

[23] NJ SPIRIT is New Jersey's Statewide Automated Child Welfare Information System (SACWIS), a case management and financial system designed to support the daily work of caseworkers and supervisors within DCF.
[24] SafeMeasures is a data warehouse and analytical tool that allows tracking of critical child welfare indicators by worker, supervisor, Local Office, county and statewide. It is used by different levels of staff to track, monitor and analyze performance and trends in case practice and targeted measures and outcomes.

**Table 1:** *Charlie and Nadine H.* **Child and Family Outcome and Case Practice Performance Measures**
**(Summary of Performance as of December 31, 2019)**

| Table 1A: To Be Achieved | | | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2019 Performance[25] | December 2019 Performance[26] | Requirement Fulfilled (Yes/No)[27] |
| *Family Teaming* | | | | | |
| IV.B.20 | Quality of Teaming | 75% of cases involving out-of-home placements that were assessed as part of the QR process will show evidence of both acceptable team formation and acceptable functioning. The Monitor, in consultation with the parties, shall determine the standards for quality team formation and functioning. | 58% of cases rated acceptable for the QR indicator *teamwork and coordination* (CY 2018). | 62% of the cases rated acceptable for the QR indicator *teamwork and coordination* (CY 2019).[28,29] | No |

---

[25] In some instances where the Monitor did not report mid-year data, the most recent annual data available are included.

[26] In some instances where the Monitor does not have December 2019 data, the most recent data available are included.

[27] "Yes" indicates that, in the Monitor's judgment, based on presently available information, DCF has fulfilled its obligations regarding the SEP standard. "No" indicates that, in the Monitor's judgment, DCF has not fulfilled its obligation regarding the SEP standard..

[28] From January to December 2019, 62% (90 of 145) of applicable cases reviewed for Quality of Teaming were rated acceptable for the *teamwork and coordination* indicator.

[29] All in-home cases were excluded from this measure.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 14*

| | | | Table 1A: To Be Achieved | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2019 Performance[25] | December 2019 Performance[26] | Requirement Fulfilled (Yes/No)[27] |
| | | | *Case and Service Planning* | | |
| IV.D.23 | <u>Quality of Case Plans</u> | 80% of case plans shall be rated acceptable as measured by the QR process. The Monitor, in consultation with the parties, shall determine that standards for quality case planning. | 51% of cases rated acceptable for both QR indicators *child and family planning process* and *tracking and adjusting* (CY 2018). | 58% of cases rated acceptable for both QR indicators *child and family planning process* and *tracking and adjusting* (CY 2019).[30] | No |
| | | | *Visits* | | |
| IV.F.28 | <u>Caseworker Contacts with Family When Goal is Reunification</u> | 90% of families will have at least twice-per-month, face-to-face contact with their caseworker when the permanency goal is reunification. | In June 2019, 83% of applicable parents of children in custody with a goal of reunification had at least two face-to-face visits with a caseworker. Monthly range during January – June 2019 monitoring period: 83 to 86%. | In December 2019, 80% of applicable parents of children in custody with a goal of reunification had at least two face-to-face visits with a caseworker. Monthly range during July – December 2019 monitoring period: 80 to 85%.[31,32] | No |

[30] From January to December 2019, 58% (112 of 193) of applicable cases reviewed were rated acceptable for both the *child and family planning process* and the *tracking and adjusting* indicators; 62% (120 of 193) of cases were rated acceptable for *child and family planning process*; 73% (141 of 193) of cases were rated acceptable for *tracking and adjusting*.
[31] Monthly performance is as follows: July, 83%; August, 85%; September, 84%; October, 84%; November, 81%; December, 80%. Reported performance accounts for valid exceptions to the visits requirement.
[32] The Monitor and DCF completed a joint validation of a sample of cases from October 2019 and found that exceptions were appropriately applied and documented in 69% of cases. Therefore, these data reflect exclusions from the universe of instances in which exceptions to the requirement for worker visits with parents were appropriately applied and documented.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*
*July 13, 2020*
*Page 15*

| | | Table 1A: To Be Achieved | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2019 Performance[25] | December 2019 Performance[26] | Requirement Fulfilled (Yes/No)[27] |
| | | *Maltreatment* | | | |
| IV.H.39 | Re-Entry to Placement | Of all children who enter foster care in a 12-month period for the first time who are discharged within 12 months to reunification, living with relative(s), or guardianship, no more than 9% will re-enter foster care within 12 months of their discharge. | 12.2% of children who entered foster care for the first time in CY 2016 and were discharged within 12 months to reunification, living with relative(s), or guardianship, re-entered foster care within 12 months of their discharge. | 8.6% of children who entered foster care for the first time in CY 2017 and were discharged within 12 months to reunification, living with relative(s), or guardianship, re-entered foster care within 12 months of their discharge. | Yes |
| | | *Timely Permanency* | | | |
| IV.I.41 | Permanency Within 24 Months | Of all children who enter foster care in a 12-month period, at least 66% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering foster care. | 65% of children who entered foster care in CY 2016 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering foster care. | 67% of children who entered foster care in CY 2017 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering foster care. | Yes |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 16*

| Table 1A: To Be Achieved | | | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance**[25] | **December 2019 Performance**[26] | **Requirement Fulfilled (Yes/No)**[27] |
| *Services to Support Transition* | | | | | |
| IV.J.44 | Services to Support Transition | 80% of cases will be rated acceptable for supporting transitions as measured by the QR. The Monitor, in consultation with the parties, shall determine the standards for quality support for transitions. | 62% of cases rated acceptable for the QR indicator *successful transitions* (CY 2018). | 74% of cases rated acceptable for the QR indicator *successful transitions* (CY 2019).[33] | No |

---

[33] From January to December 2019, 74% (63 of 85) of applicable cases reviewed were rated acceptable for the *successful transitions* indicator.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*
*July 13, 2020*
*Page 17*

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2019 Performance[34] | December 2019 Performance[35] | Requirement Maintained (Yes/No)[36] |
| *Investigations* | | | | | |
| III.A.1 | Institutional Abuse Investigations Unit (IAIU) | 80% of IAIU investigations will be completed within 60 days. | In June 2019, 86% of IAIU investigations were completed within 60 days. | In December 2019, 81% of IAIU investigations were completed within 60 days. | Yes |
| IV.A.13 | Timeliness of Investigation Completion (60 days) | 85% of all investigations of alleged child abuse and neglect shall be completed within 60 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. | In May 2019, 84% of all investigations were completed within 60 days. Monthly range during December 2018 – May 2019 monitoring period: 82 to 86%. | In November 2019, 83% of all investigations were completed within 60 days. Monthly range during June – November 2019 monitoring period: 83 to 87%.[37] | Yes |
| IV.A.14 | Timeliness of Investigation Completion (90 days) | 95% of all investigations of alleged child abuse and neglect shall be completed within 90 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. | In May 2019, 95% of all investigations were completed within 90 days. Monthly range during December 2018 – May 2019 monitoring period: 94 to 96%. | In November 2019, 95% of all investigations were completed within 90 days. Monthly range during June– November 2019 monitoring period: 94 to 95%.[38] | Yes |

[34] In some instances where the Monitor did not report mid-year data, the most recent annual data available are included.
[35] In some instances where the Monitor does not have December 2019 data, the most recent data available are included.
[36] "Yes" indicates that, in the Monitor's judgment based on presently available information, DCF has fulfilled its obligations regarding the requirement under the SEP. The Monitor has also designated "Yes" for a requirement where DCF has met or is within one percentage point of the SEP standard or there are a small number of cases causing the failure to meet the SEP standard.
[37] Due to the time lag of this measure, the Monitor and DCF decided to alter the period of review, so June 2019 data are included for this period and December 2019 data will be included in the next monitoring report. Monthly performance for this measure is as follows: June, 85%; July, 85%; August, 85%; September, 87%; October, 83%; November, 83%.
[38] Due to the time lag of this measure, the Monitor and DCF decided to alter the period of review, so June 2019 data are included for this period and December 2019 data will be included in the next monitoring report. Monthly performance for this measure is as follows: June, 95%; July, 95%; August, 95%; September, 95%; October, 94%; November, 95%.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*
*July 13, 2020*
*Page 18*

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[34]** | **December 2019 Performance[35]** | **Requirement Maintained (Yes/No)[36]** |
| IV.A.15 | Quality Investigations | 85% of investigations shall meet the standards for quality investigations. The Monitor, in consultation with the parties, shall determine appropriate standards for quality investigations. | 91% of investigations met quality standards in a March 2018 review of a statistically significant sample of investigations completed in October 2017. | 91% of investigations met quality standards in a February 2020 review of a statistically significant sample of investigations completed in October 2019.[39,40] | Yes |
| *Family Teaming* | | | | | |
| IV.B.16 | Initial Family Team Meeting | 80% of children newly entering placement shall have a family team meeting before or within 45 days of placement. | In June 2019, 87% of children newly entering placement had a FTM within 45 days of entering placement. Monthly range during January – June 2019 monitoring period: 83 to 94%. | In December 2019, 91% of children newly entering placement had a FTM within 45 days of entering placement. Monthly range during July – December 2019 monitoring period: 81 to 92%.[41] | Yes |
| IV.B.17 | Subsequent FTMs within 12 months | 80% of children will have three additional FTMs within the first 12 months of the child coming into placement. | In June 2019, 75% of children had three or more additional FTMs within the first 12 months of placement. Monthly range during January – June 2019 monitoring period: 75 to 90%. | In December 2019, 93% of children had three or more additional FTMs within the first 12 months of placement. Monthly range during July – December 2019 monitoring period: 81 to 93%.[42] | Yes |

[39] The Monitor and DCF reviewed 326 investigations. Reviewers could select one of four possible responses to describe the quality of the investigation: completely, substantially, marginally and not at all. Completely and substantially responses are considered to have met quality standards. Results have a +/- 5% margin of error with a 95% confidence interval.

[40] DCF's Investigation Case Record Review is typically conducted every two years.

[41] Monthly performance for this measure is as follows: July, 87%; August, 92%; September, 85%; October, 81%; November, 88%; December, 91%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF jointly reviewed all 46 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

[42] Monthly performance is as follows: July, 83%; August, 91%; September, 84%; October, 81%; November, 90%; December, 93%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF jointly reviewed all 60 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 19*

| | | | | Table 1B: To Be Maintained | | |
|---|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[34]** | **December 2019 Performance[35]** | **Requirement Maintained (Yes/No)[36]** |
| IV.B.18 | Subsequent FTMs after 12 months – Reunification Goal | After the first 12 months of a child being in care, 90% of those with a goal of reunification will have at least three FTMs each year. | In June 2019, 84% of children had three or more additional FTMs within the first 12 months of placement. Monthly range during January – June 2019 monitoring period: 84 to 100%. | In December 2019, 83% of children had three or more additional FTMs within the first 12 months of placement. Monthly range during July – December 2019 monitoring period: 48 to 89%.[43,44] | No |
| IV.B.19 | Subsequent FTMs after 12 months – Other than Reunification Goal | After the first 12 months of a child being in care, for those children with a goal other than reunification, 90% shall have at least two FTMs each year. | In June 2019, 89% of children with a goal other than reunification had two or more FTMs after 12 months of placement. Monthly range during January – June 2019 monitoring period: 89 to 93%. | In December 2019, 94% of children with a goal other than reunification had two or more FTMs after 12 months of placement. Monthly range during July – December 2019 monitoring period: 88 to 95%.[45] | Yes |

[43] Monthly performance for this measure is as follows: July, 69%; August, 48%; September, 89%; October, 58%; November, 78%; December, 83%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF jointly reviewed all 8 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

[44] The low performance in August appears to be an outlier; the Monitor reviewed FTM data closely and was unable to determine what accounts for the large drop in performance in that month.

[45] Monthly performance is as follows: July, 95%; August, 94%; September, 92%; October, 88%; November, 88%; December, 94%. Reported performance accounts for valid exceptions to the FTM requirements. The Monitor and DCF jointly reviewed all 11 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 20*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[34]** | **December 2019 Performance[35]** | **Requirement Maintained (Yes/No)[36]** |
| | | | *Needs Assessment* | | |
| IV.C.21 | Needs Assessment | The state shall regularly evaluate the need for additional placements and services to meet the needs of children in custody and their families and to support intact families and prevent the need for out-of-home care. Such needs assessments shall be conducted on an annual, staggered basis that assures that every county is assessed at least once every three years. The state shall develop placements and services consistent with the findings of these needs assessments. | DCF completed a comprehensive meta-analysis of previous needs assessments in the state, findings of which were shared with stakeholders in statewide meetings in May 2019. DCF plans to prioritize assessments collected routinely by county Human Services Advisory Councils (HSACs) and incorporate them into county level Qualitative Reviews (QRs), ChildStat and local Performance Improvement Plan (PIP) processes. | Between July and December 2019, the DCF workgroup finalized tools and established a uniform reporting method for the counties to ensure that biennial reports are standardized. DCF also worked with Rutgers University to design county-based data profiles to provide HSACs with county population data and the most recent administrative data. In November 2019, the first of two groups of New Jersey counties began implementing the revised needs assessment process. | Yes |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 21*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2019 Performance[34] | December 2019 Performance[35] | Requirement Maintained (Yes/No)[36] |
| *Case and Service Planning* | | | | | |
| IV.D.22 | Initial Case Plans | 95% of initial case plans for children and families shall be completed within 30 days. | In June 2019, 94% of children entering care had case plans developed within 30 days. Monthly range during January – June 2019 monitoring period: 93 to 98%. | In December 2019, 97% of children entering care had case plans developed within 30 days. Monthly range during July – December 2019 monitoring period: 88 to 98%.[46] | Yes |
| III.C.6 | Timeliness of Current Plans | 95% of case plans for children and families will be reviewed and modified no less frequently than every six months. | In June 2019, 93% of case plans were reviewed and modified as necessary at least every six months. Monthly range during January – June 2019 monitoring period: 93 to 98%. | In December 2019, 97% of case plans were reviewed and modified as necessary at least every six months. Monthly range during July – December 2019 monitoring period: 94 to 97%.[47] | Yes |
| *Caseloads* | | | | | |
| III.B.2 | Supervisor/Worker Ratio | 95% of offices will have sufficient supervisory staff to maintain a 5 worker to 1 supervisor ratio. | 100% of Local Offices have sufficient supervisory staff. | 100% of Local Offices have sufficient supervisory staff. | Yes |
| III.B.3 | IAIU Investigators Caseload | 95% of IAIU investigators will have (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. | 100% of IAIU investigators met caseload standards. | 100% of IAIU investigators met caseload standards. | Yes |

[46] Monthly performance for this measure is as follows: July, 89%; August, 98%; September, 95%; October, 88%; November, 94%; December, 97%.
[47] Monthly performance for this measure is as follows: July, 94%; August, 95%; September, 97%; October, 97%; November, 96%; December, 97%.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 22*

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2019 Performance[34] | December 2019 Performance[35] | Requirement Maintained (Yes/No)[36] |
| III.B.4 | Permanency Workers (Local Offices) Caseload | 95% of Local Offices will have average caseloads for Permanency workers of (a) no more than 15 families, and (b) no more than 10 children in out-of-home care. | 100% of Local Offices met permanency standards. | 100% of Local Offices met permanency standards. | Yes |
| III.B.5 | Permanency Workers Caseload | 95% of Permanency workers will have (a) no more than 15 families, and (b) no more than 10 children in out of home care. | 100% of Permanency workers met caseload standards. | 100% of Permanency workers met caseload standards.[48] | Yes |
| IV.E.24 | Intake workers (Local Offices) Caseload | 95% of Local Offices will have average caseloads for Intake workers of no more than 12 families and no more than eight new case assignments per month. | 100% of Local Offices met intake caseload standards. | 98% of Local Offices met intake caseload standards. | Yes |
| IV.E.25 | Intake workers Caseload | 90% of individual Intake workers shall have no more than 12 open cases and no more than eight new case assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. | 95% of Intake workers met caseload standards. | 94% of Intake workers met caseload standards.[49] | Yes |

[48] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.
[49] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 23*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2019 Performance[34] | December 2019 Performance[35] | Requirement Maintained (Yes/No)[36] |
| IV.E.26 | Adoption Workers (Local Offices) Caseload | 95% of Local Offices will have average caseloads for Adoption workers of no more than 15 children per worker. | 99% of Local Offices met adoption standards. | 100% of Local Offices met adoption standards. | Yes |
| IV.E.27 | Adoption Workers Caseload | 95% of individual Adoption worker caseloads shall be no more than 15 children per worker. | 98% of Adoption workers met caseload standards. | 99% of Adoption workers met caseload standards.[50] | Yes |
| *Deputy Attorneys General* | | | | | |
| III.D.7 | Adequacy of DAsG Staffing | The state will maintain adequate DAsG staff positions and keep positions filled. | 136 staff positions were filled with five staff on leave; 131 (96%) available DAsG. | 128 staff positions were filled with seven staff on leave; 121 (95%) available DAsG.[51] | Yes |
| *Child Health Units* | | | | | |
| III.E.8 | Child Health Units | The state will continue to maintain its network of Child Health Units, adequately staffed by nurses in each Local Office. | As of June 30, 2019, DCF had 154 Health Care Case Managers and 85 staff assistants. | As of December 31, 2019, DCF had 155 Health Care Case Managers and 85 staff assistants. | Yes |

[50] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.
[51] DCF reported that during this monitoring period select DAsG outside of the DCF Practice Group have dedicated some of their time to DCF matters.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 24*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2019 Performance[34] | December 2019 Performance[35] | Requirement Maintained (Yes/No)[36] |
| | | *Visits* | | | |
| III.F.9 | Caseworker Contacts with Children – New Placement/Placement Change | 93% of children shall have at least twice-per-month face-to-face contact with their caseworker within the first two months of placement, with at least one contact in the placement. | In June 2019, 90% of children had two visits per month, one of which was in the placement, during the first two months of an initial or subsequent placement. Monthly range during January – June 2019 monitoring period: 89 to 95%. | In December 2019, 89% of children had two visits per month, one of which was in the placement, during the first two months of an initial or subsequent placement. Monthly range during July – December 2019 monitoring period: 89 to 96%.[52] | Yes |
| III.F.10 | Caseworker Contact with Children in Placement | During the remainder of the placement, 93% of children shall have at least one caseworker visit per month, in the placement. | In June 2019, 93% of children had at least one caseworker visit per month in his/her placement. Monthly range during January – June 2019 monitoring period: 93 to 95%. | In December 2019, 97% of children had at least one caseworker visit per month in his/her placement. Monthly range during July – December 2019 monitoring period: 94 to 97%.[53] | Yes |

[52] Monthly performance for this measure is as follows: July, 95%; August, 91%; September, 96%; October, 96%; November, 93%; December, 89%.
[53] Monthly performance for this measure is as follows: July, 94%; August, 96%; September, 94%; October, 94%; November, 94%; December, 97%.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 25*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2019 Performance[34] | December 2019 Performance[35] | Requirement Maintained (Yes/No)[36] |
| IV.F.29 | Parent-Child Visits – Weekly | 60% of children in custody with a return home goal will have an in-person visit with their parent(s) at least weekly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | In June 2019, 76% of applicable children had weekly visits with their parents. Monthly range during January – June 2019 monitoring period: 76 to 80%. | In December 2019, 79% of applicable children had weekly visits with their parents. Monthly range during July – December 2019 monitoring period: 75 to 79%.[54,55] | Yes |
| IV.F.30 | Parent-Child Visits – Bi-Weekly | 85% of children in custody will have an in-person visit with their parent(s) or legally responsible family member at least every other week, excluding those situations where a court order prohibits or regulates visits or there is supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | In June 2019, 90% of applicable children had bi-weekly visits with their parents. Monthly range during January – June 2019 monitoring period: 89 to 92%. | In December 2019, 93% of applicable children had bi-weekly visits with their parents. Monthly range during July – December 2019 monitoring period: 88 to 93%.[56,57] | Yes |

[54] Monthly performance for this measure is as follows: July, 76%; August, 77%; September, 77%; October, 77%; November, 75%; December, 79%. Reported performance accounts for valid exceptions to this visits requirement.
[55] Based on the Monitor's review of a statistically significant sample of cases in a prior monitoring period, the Monitor determined NJ SPIRIT documentation of exceptions with respect to this measure to be reliable. As a result, these data exclude all instances in which documentation indicated that a visit was not required.
[56] Monthly performance for this measure is as follows: July, 90%; August, 91%; September, 88%; October, 90%; November, 89%; December, 93%. Reported performance accounts for valid exceptions to this visits requirement.
[57] Based on the Monitor's review of a statistically significant sample of cases in a prior monitoring period, the Monitor determined NJ SPIRIT documentation of exceptions with respect to this measure to be reliable. As a result, these data exclude all instances in which documentation indicated that a visit was not required.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 26*

| | | | | | |
|---|---|---|---|---|---|
| **Table 1B: To Be Maintained** | | | | | |
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[34]** | **December 2019 Performance[35]** | **Requirement Maintained (Yes/No)[36]** |
| IV.F.31 | <u>Child Visits with Siblings</u> | 85% of children in custody who have siblings with whom they are not residing will visit those siblings at least monthly, excluding those situations where a court order prohibits or regulates visits or there is supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | In June 2019, 84% of children in custody who have siblings with whom they are not residing visited with their siblings within the month. Monthly range during January – June 2019 monitoring period: 84 to 87%. | In December 2019, 86% of children in custody who have siblings with whom they are not residing visited with their siblings within the month. Monthly range during July – December 2019 monitoring period: 86 to 87.[58,59] | Yes |
| *Placement* | | | | | |
| IV.G.32 | <u>Placing Siblings Together</u> | At least 80% of sibling groups of two or three children entering custody will be placed together. | 77% of sibling groups of two or three children entering custody in CY 2018 were placed together. | 80% of sibling groups of two or three children entering custody in CY 2019 were placed together. | Yes |
| IV.G.33 | <u>Placing Siblings Together for Four or More Children</u> | All children will be placed with at least one other sibling 80% of the time. | Children entering custody in CY 2018 with three or more siblings were placed with at least one other sibling 86% of the time. | Children entering custody in CY 2019 with three or more siblings were placed with at least one other sibling 83% of the time. | Yes |

---

[58] Monthly performance is as follows: July, 86%; August, 87%; September, 87%; October, 87%; November, 86%; December, 86%. Reported performance accounts for valid exceptions to the visits requirement.

[59] Based on the Monitor and DCF's joint review of a statistically significant sample of cases for children in care in October and November 2018, it was determined that exceptions to this visits requirement were appropriately applied and documented in 60% of cases. The universe of cases utilized for the purposes of calculating performance has been adjusted accordingly.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*
*July 13, 2020*
*Page 27*

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2019 Performance[34] | December 2019 Performance[35] | Requirement Maintained (Yes/No)[36] |
| IV.G.34 | Recruitment of Placements for Sibling Groups of Four or More | DCF will continue to recruit for resource homes capable of serving sibling groups of four or more. | Between January and June 2019, DCF recruited a total of 26 new SIBs homes. As of June 2019, DCF had a total of 69 large capacity SIBS homes; 11 homes that can accommodate five or more children and 58 homes that can accommodate four children. | Between July and December 2019, DCF recruited a total of 16 new SIBs homes. As of December 2019, DCF had a total of 78 large capacity SIBS homes; 16 homes that can accommodate five or more children and 62 homes that can accommodate four children. | Yes |
| IV.G.35 | Placement Stability, First 12 Months in Care | At least 84% of children entering out-of-home placement for the first time in a calendar year will have no more than one placement change during the 12 months following their date of entry. | 85% of children who entered out-of-home placement for the first time in CY 2017 had no more than one placement change during the 12 months following their date of entry. | 85% of children who entered out-of-home placement for the first time in CY 2018 had no more than one placement change during the 12 months following their date of entry. | Yes |
| IV.G.36 | Placement Stability, 13 – 24 Months in Care | At least 88% of these children will have no more than one placement change during the 13-24 months following their date of entry. | 95% of children who entered care in CY 2016 had no more than one placement change during the 13-24 months following their date of entry. | 95% of children who entered care in CY 2017 had no more than one placement change during the 13-24 months following their date of entry. | Yes |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 28*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[34]** | **December 2019 Performance[35]** | **Requirement Maintained (Yes/No)[36]** |
| | | *Education* | | | |
| III.G.11 | Educational Needs | 80% of cases will be rated acceptable as measured by the QR in stability (school) and learning and development. The Monitor, in consultation with the parties, shall determine the standards for school stability and quality learning and development. | 83% of cases rated acceptable for both QR indicators *stability in school* and *learning and development* (CY 2018). | 86% of cases rated acceptable for both QR indicators *stability in school* and *learning and development* (CY 2019).[60,61] | Yes |
| | | *Maltreatment* | | | |
| III.H.12 | Abuse and Neglect of Children in Foster Care | No more than 0.49% of children will be victims of substantiated abuse or neglect by a resource parent or facility staff member. | For CY 2018, 0.27% of children were victims of substantiated abuse or neglect by a resource parent or facility staff member. | For CY 2019, 0.24% of children were victims of substantiated abuse or neglect by a resource parent or facility staff member. | Yes |
| IV.H.37 | Repeat Maltreatment (In-home) | No more than 7.2% of children who remain at home after a substantiation of abuse or neglect will have another substantiation within the next 12 months. | 5% of children who remained at home after a substantiation of abuse or neglect in CY 2017 had another substantiation within the next 12 months. | 4.5% of children who remained at home after a substantiation of abuse or neglect in CY 2018 had another substantiation within the next 12 months. | Yes |

[60] From January to December 2019, 86% (63 of 73) of the applicable cases reviewed were rated acceptable on both the *stability in school* and the *learning and development, age 5 & older* indicators; 91% (74 of 81) were rated acceptable for *stability in school* and 89% (68 of 76) were rated acceptable for *learning and development, age 5 & older.*
[61] All in-home cases are excluded from this measure.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 29*

| | | | Table 1B: To Be Maintained | | |
|---|---|---|---|---|---|
| SEP Reference | Quantitative or Qualitative Measure | Sustainability and Exit Plan Standard | June 2019 Performance[34] | December 2019 Performance[35] | Requirement Maintained (Yes/No)[36] |
| IV.H.38 | Maltreatment Post-Reunification | Of all children who enter foster care in a 12-month period for the first time who are discharged within 24 months to reunification or living with a relative(s), no more than 6.9% will be the victims of abuse or neglect within 12 months of their discharge. | 5.9% of children who entered foster care for the first time in CY 2015 and were discharged within 24 months to reunification or living with relative(s) were the victims of abuse or neglect within 12 months of their discharge. | 6.3% of children who entered foster care for the first time in CY 2016 and were discharged within 24 months to reunification or living with relative(s) were the victims of abuse or neglect within 12 months of their discharge. | Yes |
| | | | *Permanency* | | |
| IV.I.40 | Permanency within 12 Months | Of all children who enter foster care in a 12-month period, at least 42% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | 41% of children who entered foster care in CY 2017 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | 42% of children who entered foster care in CY 2018 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | Yes |
| IV.I.42 | Permanency Within 36 Months | Of all children who enter foster care in a 12-month period, at least 80% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care. | 81% of children who entered foster care in CY 2015 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care. | 82% of children who entered foster care in CY 2016 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care. | Yes |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 30*

| **Table 1B: To Be Maintained** | | | | | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance**[34] | **December 2019 Performance**[35] | **Requirement Maintained (Yes/No)**[36] |
| IV.I.43 | Permanency Within 48 Months | Of all children who enter foster care in a 12-month period, at least 86% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care. | 89% of children who entered foster care in CY 2014 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care. | 88% of children who entered foster care in CY 2015 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care. | Yes |
| *Older Youth* | | | | | |
| IV.K.45 | Independent Living Assessments | 90% of youth age 14 to18 have an Independent Living Assessment. | In June 2019, 87% of applicable children had completed an Independent Living Assessment. Monthly range during January – June 2019 monitoring period: 83 to 89%. | In December 2019, 93% of applicable children had completed an Independent Living Assessment. Monthly range during July – December 2019 monitoring period: 93 to 96%.[62] | Yes |
| IV.K.46 | Quality of Case Planning and Services | 75% of youth age 18 to 21 who have not achieved legal permanency shall receive acceptable quality case management and service planning. | 70% of cases rated acceptable for both QR indicators *child (youth)/family status* and *overall practice performance* (CY 2018). | 67% of cases rated acceptable for both QR indicators *child (youth)/family status* and *overall practice performance* (CY 2019).[63] | No |

---

[62] Monthly performance for this measure is as follows: July, 95%; August, 95%; September, 96%; October, 95%; November, 94%; December, 93%.
[63] From January to December 2019, 67% (29 of 43) of the applicable cases reviewed were rated acceptable on both *overall child (youth)/family status* and the *overall practice performance* indicators; 95% (41 of 43) of cases were rated acceptable for *child (youth)/family status* and 67% (29 of 43) of cases were rated acceptable for *overall practice performance*.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 31*

| | | | | Table 1B: To Be Maintained | |
|---|---|---|---|---|---|
| **SEP Reference** | **Quantitative or Qualitative Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance**[34] | **December 2019 Performance**[35] | **Requirement Maintained (Yes/No)**[36] |
| IV.K.47 | Housing | 95% of youth exiting care without achieving permanency shall have housing. | 96% of youth exiting care between July and December 2018 without achieving permanency had documentation of a housing plan upon exiting care. | 99% of youth exiting care between January and December 2019 without achieving permanency had documentation of a housing plan upon exiting care.[64] | Yes |
| IV.K.48 | Employment/Education | 90% of youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. | 89% of youth exiting care between July and December 2018 without achieving permanency were either employed or enrolled in education or vocational training programs, or there was documented evidence of consistent efforts to help the youth secure employment or training. | 97% of youth exiting care between January and December 2019 without achieving permanency were either employed or enrolled in education or vocational training programs, or there was documented evidence of consistent efforts to help the youth secure employment or training.[65] | Yes |

---

[64] The cases of 13 youth out of the universe of 175 youth exiting care to non-permanency were excluded from consideration because they could not be located (8) or they were incarcerated (5).
[65] The cases of 15 youth out of the universe of 175 youth exiting care to non-permanency because they could not be located (8), were incarcerated (5), or moved out of state (2). The circumstances of 7 additional youth were considered to have met the standard because there was documentation of consistent efforts by the caseworker to help secure education or employment.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 32*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| **A. Data Transparency** | DCF will continue to maintain a case management information and data collections system that allows for the assessment, tracking, posting or web-based publishing and utilization of key data indicators. | Data provided directly to the Monitor and published by DCF in reports and on its website.[66]<br><br>NJ SPIRIT functionality is routinely assessed by the Monitor's use of NJ SPIRIT data for validation and through use of SafeMeasures, as well as in conducting case inquiries and case record reviews. | Yes |
| **B. Case Practice Model** | Implement and sustain a Case Practice Model<br><br>Quality investigation and assessment<br><br>Safety and risk assessment and risk reassessment<br><br>Engagement with youth and families<br><br>Working with family teams<br><br>Individualized planning and relevant services<br><br>Safe and sustained transition from DCF<br><br>Continuous review and adaptations | QR Data<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings<br><br>Quality of Investigations case record review<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report<br><br>Older Youth Exiting Care to Non-Permanency case record review | Yes |

---

[66] Please see list of reports in Section I (Introduction: Monitoring Methodology) to review data sources for this Foundational Element.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 33*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| **C. State Central Registry** | Received by the field in a timely manner | Commissioner's Monthly Report | Yes |
| | Investigation commenced within required response time | Monitor site visit with SCR staff<br><br>Screening and Investigations Monthly Report | |
| **D. Appropriate Placements** | Appropriate placements of children | QR data<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | Yes |
| | Resource family homes licensed and closed (kinship/non-kinship) | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor | |
| | Number of children in home/out of home demographic data | NJ Rutgers Data Portal | |
| | Placed in a family setting | Commissioner's Monthly Report | |
| | Placement proximity | Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | |
| | No children under 13 years old in shelters | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor | |
| | Children over 13 in shelters no more than 30 days | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor | |
| | No behavioral health placements out of state without approval | Commissioner's Monthly Report | |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 34*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| | Adequate number of resource placements | CP&P Needs Assessment<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | |
| **E. Service Array** | Services for youth age 18-21, LGBTQI, mental health and domestic violence for birth parents with families involved with the child welfare system | New Jersey Youth Resource Spot[67]<br><br>New Jersey DCF Adolescent Services Website[68]<br><br>Data provided directly to the Monitor<br><br>Attendance at Adolescent Practice Forums<br><br>CP&P Needs Assessment<br><br>Safe, Healthy, and Connected Annual Report<br><br>Older Youth Exiting Care to Non-Permanency case record review | Yes |
| | Preventive home visit programs | Commissioner's Monthly Report<br><br>Safe, Healthy, and Connected Annual Report | |
| | Family Success Centers | Commissioner's Monthly Report<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | |

[67] New Jersey's Youth Resource Spot can be found at www.NJYRS.org.
[68] DCF's Adolescent Services Website can be found at http://www.nj.gov/dcf/adolescent/.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 35*

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **December 2017 Fulfilled (Yes/No)** |
| **F. Medical and Behavioral Health Services** | Appropriate medical assessment and treatment | Data provided directly to the Monitor<br><br>Commissioner's Monthly Report<br><br>CIACC Monthly Report<br><br>Safe, Healthy, and Connected Annual Report | Yes |
| | Pre-placement and entry medical assessments | | |
| | Dental examinations | | |
| | Immunizations | | |
| | Follow-up care and treatment | | |
| | Mental health assessment and treatment | | |
| | Behavioral health | | |
| **G. Training** | Pre-service training | Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | Yes |
| | Case practice model | | |
| | Permanency planning | | |
| | Concurrent planning | | |
| | Adoption | | |
| | Demonstration of competency | | |

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 36*

| | Table 1C: Foundational Elements | | |
|---|---|---|---|
| SEP Reference | Additional SEP Requirements that DCF Must Sustain: | Data Source | December 2017 Fulfilled (Yes/No) |
| **H. Flexible Funding** | DCF will continue to make flexible funds available for use by workers in crafting individualized service plans for children, youth and families to meet the needs of children and families, to facilitate family preservation and reunification where appropriate and to ensure that families are able to provide appropriate care for children and to avoid the disruption of otherwise stable and appropriate placements. | Data provided directly to the Monitor<br><br>DCF Online Policy Manual<br><br>Budget Report | Yes |
| **I. Resource Family Care Support Rates** | Family care support rates<br><br>Independent Living Stipend | DCF Online Policy Manual<br><br>DCF Website[69]<br><br>New Jersey Youth Resource Spot | Yes |
| **J. Permanency** | Permanency practices<br><br>Adoption practices | Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings<br><br>Older Youth Exiting Care to Non-Permanency case record review | Yes |
| **K. Adoption Practice** | 5- and 10-month placement reviews | Adoption Report<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings | Yes |

[69] USDA has altered its schedule for producing its Annual Report on costs of raising a child. By agreement, DCF now updates the rates within 30 days of the USDA annual report's release to meet the SEP standards and provides written confirmation to the Monitor.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*
*July 13, 2020*
*Page 37*

## IV.     FOUNDATIONAL ELEMENTS

The Sustainability and Exit Plan (SEP) identifies a series of core organizational and practice improvements known as the "Foundational Elements" that became the groundwork upon which New Jersey's reform has been built. They include a range of requirements from the 2006 Modified Settlement Agreement (MSA) that were previously met and were codified in the SEP as foundational for improved child welfare outcomes and future system improvements. These Foundational Elements remain enforceable in the SEP if performance is not sustained. The Department of Children and Families (DCF) collects and publishes relevant performance data in these areas.

The Monitor has continued to assess maintenance of Foundational Elements through analysis of DCF's data – for this report, data from the period July 1 to December 31, 2019 – as well as through participation in statewide Qualitative Reviews (QRs), Area Director meetings, site visits with service providers, attendance at monthly ChildStat and other DCF presentations and meetings. In October 2019, DCF released its *2018 Annual Report: Safe Healthy, and Connected*, which provides a comprehensive analysis of agency processes, current initiatives and procedures, quality of practice, and performance on key outcomes as of calendar year 2018. DCF anticipates releasing another report with a similar analysis of calendar year 2019 in late 2020.

In the Monitor's judgment, *each of the SEP's Foundational Elements has been maintained during this period,* and many have been strengthened through new initiatives and developments – some of which are discussed herein in Section II – determined by the Monitor to be relevant for the assessment and understanding of the Foundational Elements.

## V.  SUSTAINABILITY AND EXIT PLAN PERFORMANCE MEASURES *TO BE ACHIEVED* AND *TO BE MAINTAINED*

This section of the report provides information on the Sustainability and Exit Plan (SEP) requirements that the state is focusing on achieving – designated as Outcomes *To Be Achieved* – and those requirements for which the state has satisfied the specified performance targets for at least six months and must sustain – designated as Outcomes *To Be Maintained*.

### A.  INVESTIGATIONS

The SEP includes four performance measures related to investigative practice, all of which have been designated as Outcomes *To Be Maintained* as of January 2019: quality of investigations (SEP IV.A.15); timeliness of Institutional Abuse Investigations Unit (IAIU) investigation completion (SEP III.A.1); timeliness of alleged child abuse and neglect investigation completion within 60 days (SEP IV.A.13); and investigation completion within 90 days (SEP IV.A.14). Performance for all four measures during the current monitoring period is discussed below.

**Timeliness of Investigation Completion**

| Quantitative or Qualitative Measure | 13. <u>Timeliness of Investigation Completion</u>: Investigations of alleged child abuse and neglect shall be completed within 60 days. |
|---|---|
| **Performance Target** | 85% of all abuse/neglect investigations shall be completed within 60 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. |

*Performance as of November 30, 2019:*[70]

In November 2019, there were 4,719 investigations of alleged child abuse and neglect, 3,909 (83%) of which were completed within 60 days. Performance from June to November 2019 ranged from a low of 83 percent to a high of 87 percent.[71] In this monitoring period, DCF met or exceeded this measure in four of the six months, and was just shy of the standard in the two remaining months. The Monitor considers DCF to have met this measure and will continue to carefully follow performance on timely completion of investigations within 60 days.

---

[70] December 2019 data will be included in the next monitoring report. For certain data elements that have an extended time frame built into the measurement, the Monitor and DCF decided to alter the period for data review so that six-month monitoring reports can be produced more closely to the end of the monitoring period.

[71] Monthly performance for this measure is as follows: June, 85%; July, 85%; August 85%; September, 87%; October, 83%; November, 83%.

| Quantitative or Qualitative Measure | 14. Timeliness of Investigation Completion: Investigations of alleged child abuse and neglect shall be completed within 90 days. |
|---|---|
| Performance Target | 95% of all abuse/neglect investigations shall be completed within 90 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. |

*Performance as of November 30, 2019:*[72]

In November 2019, 4,482 (95%) of the 4,719 investigations of child abuse and neglect were completed within 90 days. Performance from June to November 2019 ranged from a low of 94 percent to a high of 95 percent.[73] DCF continues to meet the SEP performance standard for the timeliness of investigation completion within 90 days.

## Quality of Investigations

| Quantitative or Qualitative Measure | 15. Quality of Investigations: Investigations of alleged child abuse and neglect shall meet standards of quality. |
|---|---|
| Performance Target | 85% of all abuse/neglect investigations shall meet standards of quality. |

In February 2020, the Monitor and DCF together conducted a case record review of the quality of investigative practice of the Department of Child Protection and Permanency (CP&P). Reviewers examined the quality of practice of a statistically valid random sample of 326 selected Child Protective Services (CPS) investigations assigned to DCF Local Offices between October 1 and October 14, 2019, involving 510 alleged child victims.[74] Overall, reviewers found that 296 (91%) of 326 of the investigations were of acceptable quality,[75] exceeding the SEP standard for the second time, with the same impressive percentage of investigations rated acceptable in the 2018 review.

The findings from the February 2020 review reflect some clear strengths in CP&P investigative case practice. Key strengths include:

---

[72] November 2019 data will be included in the next monitoring report. For certain data elements that have an extended time frame built into the measurement, the Monitor and DCF decided to alter the period for data review so that six-month monitoring reports can be produced more closely to the end of the monitoring period.
[73] Monthly performance for this measure is as follows: June, 95%; July, 95%; August, 95%; September, 95%; October 94%; November, 95%.
[74] These results have a ± 5% margin of error with a 95% confidence interval.
[75] Reviewers could select four possible responses to the question regarding the quality of the investigation: "completely," "substantially," "marginally" or "not at all." Investigations determined to be "completely" or "substantially" of quality were considered acceptable for the purpose of this measure.

- Alleged child victims were seen, assessed and interviewed timely in 91 percent of the investigations;
- Caseworkers interviewed the mother of the alleged child victim in 100 percent of the investigations;
- Caseworkers interviewed the father of the alleged child victim in 90 percent of the investigations;
- Collateral information was integrated into investigative decision making in 89 percent of the investigations;
- Pre--investigation worker/supervisor conferences took place in 95 percent of the investigations; and
- Post-investigation worker/supervisor conferences took place in 99 percent of the investigations.

## B.  FAMILY TEAM MEETINGS

Family Team Meetings (FTMs) bring families, providers, formal and informal supports together to exchange information, participate in case planning, coordinate and follow up on services, and examine and solve problems. Meetings are intended to be scheduled according to the family's availability in an effort to involve as many family members and supports as possible. Workers are trained and coached to hold FTMs at key decision and transition points in the life of a case, such as when a child enters placement, when a child has a change in placement, and/or when there is a need to adjust a case plan to achieve permanency or meet a child's needs.

The SEP includes five performance measures pertaining to FTMs. As of the beginning of the monitoring period, four had been met and designated as Outcomes *To Be Maintained*: the requirements that FTMs be held within 45 days of a child's removal (SEP IV.B.16); that for children in out-of-home placement, at least three additional FTMs after the initial FTM be held within the first 12 months of placement (SEP IV.B.17); that children with the goal of reunification have at least three FTMs each year after the first 12 months of placement (SEP IV.B.18); and that children with a goal other than reunification have at least two FTMs each year after the first 12 months of placement (SEP IV.B.19). The remaining Outcome *To Be Achieved* is Quality of Teaming (SEP IV.B.20). Performance for all five measures is discussed below.

### Initial FTMs Held within 45 Days of Entry

| Quantitative or Qualitative Measure | 16.  Initial Family Team Meetings: For children newly entering placement, the number/percent who have a family team meeting within 45 days of entry. |
|---|---|
| **Performance Target** | 80% of children newly entering placement shall have a family team meeting before or within 45 days of placement. |

*Performance as of December 31, 2019:*

In December 2019, 120 (91%) out of 132 possible FTMs occurred within 45 days of a child's removal from home. Performance from July 1 to December 31, 2019 ranged from a low of 81 percent to a high of 92 percent.[76] For this measure, the Monitor and DCF jointly verified monthly data from NJ SPIRIT for the 46 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[77]

DCF's performance exceeded the SEP standard in each month this monitoring period.

---

[76] Monthly performance for this measure is as follows: July, 87%; August, 92%; September, 85%; October, 81%; November, 88%; December, 91%. Reported performance accounts for valid exceptions to the FTM requirement.
[77] Based on a joint review with DCF of all 46 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in December 2019, there were 133 children newly entering placement. The Monitor and DCF determined that in one case, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded that case, making the universe of applicable cases 132 children.

**FTMs Held within the First 12 Months**

| Quantitative or Qualitative Measure | 17. <u>Subsequent Family Team Meetings within 12 Months</u>: For all other children in placement, the number/percent who have three additional FTMs within the first 12 months of the child coming into placement. |
|---|---|
| Performance Target | 80% of children will have three additional FTMs within the first 12 months of the child coming to placement. |

*Performance as of December 31, 2019:[78]*

In December 2019, 102 (93%) of 110 applicable children had an additional three or more FTMs within the first 12 months of entering placement. Performance from July 1 to December 31, 2019 ranged from a low of 81 percent to a high of 93 percent.[79] For this measure, the Monitor and DCF jointly verified monthly data from NJ SPIRIT for the 60 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[80]

DCF's performance exceeded the SEP standard in every month this monitoring period.

**FTMs Held After 12 Months in Placement with a Goal of Reunification**

| Quantitative or Qualitative Measure | 18. <u>Subsequent Family Team Meetings after 12 Months:</u> For all children in placement with a goal of reunification, the number/percent who have at least three FTMs each year after the first 12 months of placement. |
|---|---|
| Performance Target | After the first 12 months of a child being in care, 90% of those with a goal of reunification will have at least three FTMs each year. |

*Performance as of December 31, 2019:[81]*

In December 2019, 19 (83%) of 23 applicable children with a permanency goal of reunification had three or more FTMs in the 12 months following their first year in out-of-home placement. Performance from July 1 to December 31, 2019 ranged from a low of 48 percent to a high of 89 percent.[82] For this measure, the Monitor and DCF jointly verified monthly data from NJ SPIRIT

---

[78] Measure 17 applies to all children who have been in out-of-home placement for 12 months who entered care in the specified month. For example, performance for December 2019 is based upon the 114 children who entered care in December 2018. Compliance is based on whether at least three FTMs were held for these children during the 12-month period they were in care.
[79] Monthly performance is as follows: July, 83%; August, 91%; September, 84%; October, 81%; November, 90%; December, 93%. Reported performance accounts for valid exceptions to the FTM requirement.
[80] Based on a joint review of all 60 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in December 2019, there were 114 children who had been in out-of-home placement for 12 months. The Monitor and DCF determined that in four cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe of applicable cases 110 children.
[81] Measure 18 applies to all children who have been in care for at least 24 months who entered care in the specified month each year and have a goal of reunification. For example, in December 2019, a combined total of 23 children who entered care in December 2017, December 2016, December 2015, etc. and were still in placement with a goal of reunification. Compliance is based on whether at least three FTMs were held for these children during their most recent 12 months in care.
[82] Monthly performance for this measure is as follows: July, 69%; August, 48%; September, 89%; October, 58%; November, 78%; December, 83%. Reported performance accounts for valid exceptions to the FTM requirement.

for the eight applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[83]

DCF did not meet the performance standard in any month this monitoring period. Noting that the universe of cases to which this measure applies is small and therefore more susceptible to fluctuations, particularly when siblings are included in the cohort, the Monitor will continue to carefully examine performance on this measure.

**FTMs Held After 12 Months in Placement with a Goal Other than Reunification**

| Quantitative or Qualitative Measure | 19. <u>Subsequent Family Team Meetings after 12 Months:</u> For all children in placement with a goal other than reunification, the number/percent who have at least two FTMs each year. |
|---|---|
| Performance Target | After the first 12 months of a child being in care, for those children with a goal other than reunification, 90% shall have at least two FTMs each year. |

*Performance as of December 31, 2019:*[84]

In December 2019, 116 (94%) of 124 applicable children in out-of-home placement with a permanency goal other than reunification had two or more FTMs after 12 months in care. Performance from July 1 to December 31, 2019 ranged from a low of 88 percent to a high of 95 percent.[85] For this measure, the Monitor verified monthly data from NJ SPIRIT for the 11 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[86]

DCF continues to meet the SEP standard on this measure.

---

[83] Based on a review of all eight cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in September 2019, there were 29 children who had been in care for at least 24 months who had a goal of reunification. The Monitor determined that in two cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe of applicable cases 27 children.

[84] Children eligible for Measure 19 are all children who have been in care for at least 24 months who entered care in the month specified each year and have a goal other than reunification. For example, in December 2019, a combined total of 125 children entered care in December 2017, December 2016, December 2015, etc. and are still in placement with a goal other than reunification. Compliance is based on whether at least two FTMs were held for these children each year in the most recent year after 12 months in care.

[85] Monthly performance is as follows: July, 95%; August, 94%; September, 92%; October, 88%; November, 88%; December, 94%. Reported performance accounts for valid exceptions to the FTM requirements.

[86] Based on a review of all 11 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in December 2019 there were 125 children who had been in care for at least 24 months with a goal other than reunification. The Monitor determined that in one case, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded that case, making the universe of applicable cases 124 children.

**Quality of Teaming**

| Quantitative or Qualitative Measure | 20.  Cases involving out-of-home placement show evidence of family teamwork. |
|---|---|
| **Performance Target** | 75% of cases involving out-of-home placements that were assessed as part of the Qualitative Review (QR) process will show evidence of both acceptable team formation and acceptable functioning. The Monitor, in consultation with the parties, shall determine the standards for quality team formation and functioning. |

FTMs are only one of the many ways in which DCF staff engage with families. Effective teaming is much broader than just convening a meeting, and relies upon other foundational elements of quality case practice, such as engagement with family members, timely assessments and quality case planning, all of which are evaluated as part of the state's QR process. Information about the QR process and protocol are detailed in Section V.N of this report.

Results from the *teamwork and coordination* indicator in the QR are used to assess the quality of collaborative teamwork with children, youth, and families. In assessing case ratings, the reviewer considers a range of questions for this indicator, including whether the family's team is composed of the appropriate constellation of providers and informal supports needed to meet the child and family's needs, and the extent to which team members, including family members, work together to meet identified goals.

***Performance as of December 31, 2019:***

Results from the 145 applicable cases reviewed from January through December 2019 using the QR protocol showed that 62 percent (90 of 145) rated acceptable for the *teamwork and coordination* indicator (Figure 1).[87] This is a slight improvement from DCF's performance in CY 2018 in which 58 percent of cases were rated acceptable. As shown in the figure, performance in the same set of counties in CY 2017 had 59 percent of cases rated acceptable.

DCF has not yet met the SEP performance standard. DCF leaders and managers understand that focusing on the quality of teaming is essential to improving outcomes overall. Prioritizing core case practice strategies and working with supervisors and staff to enhance engagement skills, assessment and case planning, as is planned with Solution Based Casework™, will likely help to improve the quality of teaming with families with children in out-of-home placement.

**Figure 1: Qualitative Review (QR) Cases Rates Acceptable
on Teamwork and Coordination
(CY 2016 – CY 2019) [88]**

[87] All in-home cases are excluded from this measure.
[88] In CY 2016 and CY 2018, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem, and Union counties. In CY 2017 and CY 2019, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex, and Warren counties.



Source: DCF data

### C. QUALITY OF CASE AND SERVICE PLANNING

Timely and meaningful case plans that are developed with the family at the beginning of a case, and throughout a family's involvement with DCF, rely on workers' assessment and engagement skills. During the monitoring period, DCF finalized plans to implement behavior-based case planning statewide, a strategy that helps staff work with families to develop case plans that are customized, behavior-focused and family centered. While that process was ongoing, Case Practice Liaisons (CPLs) continued to support staff in practice skills related to assessment, teaming, case planning, and visitation between children in out-of-home care and families.

The SEP includes three measures related to case planning, two of which have been previously met and designated as Outcomes *To Be Maintained*: the requirement that case plans be developed with families within 30 days of placement (SEP IV.D.22) and the requirement that case plans be reviewed and modified every six months (SEP III.C.6). The SEP measure regarding the quality of case planning (SEP IV.D.23) remains an Outcome *To Be Achieved*. Performance for all three measures during the current monitoring period is discussed below.

**Timeliness of Case Planning – Initial Case Plans**

| Quantitative or Qualitative Measure | 22. Timeliness of Initial Plans: For children entering care, number/percent of case plans developed within 30 days. |
|---|---|
| Performance Target | 95% of case plans for children and families are completed within 30 days. |

*Performance as of December 31, 2019:*

In December 2019, 132 (97%) of 136 initial case plans were completed within 30 days of a child entering placement. Between July and December 2019, the timely development of initial case plans ranged from a low of 88 percent to a high of 98 percent.[89] In this monitoring period, consistent with the previous two monitoring periods, DCF met or exceeded this measure in three of six months, and was just shy of the standard in one of the remaining three months. The Monitor considers DCF to have met this measure and continues to carefully follow performance on timely completion of initial case plans.

**Timeliness of Case Planning – Every Six Months**

| Quantitative or Qualitative Measure | 6. Case Plans: Case plans for children and families will be reviewed and modified no less frequently than every six months. |
|---|---|
| Performance Target | 95% of case plans for children and families will be reviewed and modified no less frequently than every six months. |

---

[89] Monthly performance for this measure is as follows: July, 89%; August, 98%; September, 95%; October, 88%; November, 94%; December, 97%.

*Performance as of December 31, 2019:*

In December 2019, 538 (97%) of 552 case plans had been modified no less frequently than every six months. Performance from July to December 2019 ranged from 94 to 97 percent.[90] DCF met or exceeded the required standard for this measure in each month except July, where performance was very close to the SEP standard. The Monitor considers DCF to have met this measure.

### Quality of Case Plans

| Quantitative or Qualitative Measure | 23. Quality of Case Plans: The child's/family's case plan shall be developed with the family and shall be individualized and appropriately address the child's needs for safety, permanency and well-being. The case plan shall provide for the services and interventions needed by the child and family to meet identified goals, including services necessary for children and families to promote children's development and meet their educational, physical and mental health needs. The case plan and services shall be modified to respond to the changing needs of the child and family and the results of prior service efforts. |
|---|---|
| Performance Target | 80% of case plans rated acceptable as measured by the Qualitative Review (QR). |

DCF policy and the SEP require that families be involved in case planning, that plans are appropriate and individualized to the circumstances of the child or youth and family and that there is oversight of plan implementation to ensure case goals are met and plans are modified when necessary.

Results from two QR indicators, *child and family planning process* and *tracking and adjusting*, are used to assess performance on this measure. Cases rated as acceptable demonstrate that child or youth and family needs are addressed in the case plan, appropriate family members were included in the development of the plan and interventions are being tracked and adjusted when necessary. Though the QR score only consists of those two indicators, several other aspects of practice contribute to high quality case planning.[91]

Information about the QR process and protocol are detailed in Section V.N of this report.

*Performance as of December 31, 2019:*

Results from the 193 cases reviewed from January to December 2019 indicate that 58 percent (112 of 193) were rated acceptable for both the *child and family planning process* and *tracking*

---

[90] Monthly performance on this measure is as follows: July, 94%; August, 95%; September, 97%; October, 97%; November, 96%; December, 97%.
[91] Improvements made to performance on QR indicators related to the *assessment of the father* (CY 2019, 33%), *assessment of the mother* (CY 2019, 46%), *engagement of the father* (CY 2019, 49%), *engagement of the mother* (CY 2019, 60%), *case plan implementation* (CY 2019, 68%) and *teamwork and coordination* (CY 2019, 62%) are likely to have a significant impact on the quality of case planning.

*and adjusting* indicators (see the circled portion of Figure 2).[92] This is an improvement from previous monitoring periods, but DCF still did not meet the SEP performance standard in CY 2019. As shown in the figure, each indicator that contributes to this measure experienced improvement, in addition to the increase in cases that were rated acceptable on both indicators. As discussed above, this is another area for which the level of performance suggests that improvements in core case practice strategies can have a significant bearing on the quality of case planning.

**Figure 2: Qualitative Review (QR) Cases Rated Acceptable on Quality of Case Plans (CY 2016 – CY 2019)[93]**



Source: DCF data

---

[92] From January to December 2019, 58% (112 of 193) of applicable cases reviewed were rated acceptable for both the *child and family planning process* and the *tracking and adjusting* indicators; 62% (120 of 193) of cases were rated acceptable for *child and family planning process*; 73% (141 of 193) of cases were rated acceptable for *tracking and adjusting*.

[93] In CY 2016 and CY 2018, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem, and Union counties. In CY 2017 and CY 2019, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex, and Warren counties.

## D. EDUCATION

| Quantitative or Qualitative Measure | 11. <u>Educational Needs</u>: Children will be enrolled in school and DCF will have taken appropriate actions to ensure that their educational needs are being met. |
|---|---|
| **Performance Target** | 80% of cases will be rated acceptable as measured by the Qualitative Review (QR) in stability (school) and learning and development. The Monitor, in consultation with the parties, shall determine the standards for school stability and quality learning and development. |

SEP Section III.G.11 requires that "children will be enrolled in school and DCF will have taken appropriate actions to ensure that their educational needs are being met." The SEP requires that 80 percent of cases be rated acceptable on both the *stability in school* and *learning and development* indicators as measured by the QR.[94]  The QR process and protocol are discussed in detail in Section V.N of this report. This measure is designated as an Outcome *To Be Maintained*.

***Performance as of December 31, 2019:***

From January to December 2019, 86 percent (63 of 73) of cases reviewed were rated acceptable for both *stability in school* and *learning and development, age 5 & older* (see Figure 3).[95] DCF continues to exceed this SEP performance standard. As shown in the circled portion of Figure 3: Qualitative Review (QR) Cases Rated Acceptable on Educational Needs
(CY 2016 – CY 2019)Figure 3, this performance is slightly higher than that of CY 2018, and the same as CY 2017, when the QR was measured in the same set of counties.

---

[94] This measure applies to school-aged children in out-of-home placement.
[95] From January to December 2019, 86% (63 of 73) of the applicable cases reviewed were rated acceptable on both the *stability in school* and the *learning and development, age 5 & older* indicators; 91% (74 of 81) were rated acceptable for *stability in school* and 89% (68 of 76) were rated acceptable for *learning and development, age 5 & older*.

**Figure 3: Qualitative Review (QR) Cases Rated Acceptable on Educational Needs
(CY 2016 – CY 2019)[96]**



Source: DCF data

[96] In CY 2016 and CY 2018, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem and Union counties. In CY 2017 and CY 2019, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex and Warren counties.

### E.  MAINTAINING CONTACT THROUGH VISITS

Visits between children in foster care and their workers, parents and siblings are critical to children's safety and well-being, and are essential tools for strengthening family connections and improving prospects for permanency. Visits also offer the opportunity for engagement and assessment of children, youth and families. The department's efforts to preserve regular contacts are critical to quality case practice.

The SEP includes six performance measures related to visits. As of the beginning of this reporting period, five measures were designated as Outcomes *To Be Maintained*, including caseworker contacts with children newly placed or after a placement change (SEP III.F.9); caseworker contacts with children in ongoing placement (SEP III.F.10); parent-child weekly and bi-weekly visits (SEP IV.F.29 and IV.30); and visits with siblings (SEP IV.F.31). Caseworker contacts with parents when the goal is reunification (SEP IV.F.28) remains designated an Outcome *To Be Achieved*. Performance for all six measures during the current monitoring period is discussed below.

### Caseworker Visits with Children in Placement

| Quantitative or Qualitative Measure | 9.  Caseworker Contacts with Children – New Placement/Placement Change: The caseworker shall have at least twice-per-month face to face contact with the children within the first two months of placement, with at least one contact in the placement. |
|---|---|
| Performance Target | 93% of children shall have at least twice-per-month face to face contact with their caseworker during the first two months of placement, with at least one contact in the placement. |

***Performance as of December 31, 2019:***

In December 2019, 195 (89%) of the 218 children in a new placement had two visits with their caseworkers during their first two months in placement. Between July and December 2019, monthly performance ranged from 89 to 96 percent.[97] Performance was slightly below the SEP standard for two months during this monitoring period.

| Quantitative or Qualitative Measure | 10.  Caseworker Contacts with Children in Placement: During the remainder of placement, children will have at least one caseworker visit per month, in placement. |
|---|---|
| Performance Target | 93% of children will have at least one caseworker visit per month in placement, for the remainder of placement. |

---

[97] Monthly performance is as follows: July, 95%; August, 91%; September, 96%; October, 96%; November, 93%; December, 89%.

*Performance as of December 31, 2019:*

In December 2019, 3,878 (97%) of the 4,012 children in an ongoing placement were visited at least once by their caseworker. Between July and December 2019, monthly performance ranged from 94 to 97 percent.[98] DCF continues to meet this performance standard.

### Caseworker Visits with Parents/Family Members

| Quantitative or Qualitative Measure | 28. <u>Caseworker Visits with Parents/Family Members with Goal of Reunification</u>: The caseworker shall have at least two face-to-face visits per month with the parent(s) or other legally responsible family member of children in custody with a goal of reunification. |
|---|---|
| Final Target | 90% of families will have at least twice-per-month face-to-face contact with their caseworker when the permanency goal is reunification. |

*Performance as of December 31, 2019:*

In December 2019, 1,298 (80%) of 1,618 applicable children in custody with a goal of reunification had parents who were visited at least twice during the month by caseworkers. Between July and December 2019, a range of 80 to 85 percent of applicable parents or other legally responsible family members were visited at least two times per month by a caseworker.[99] Figure 4 depicts performance on this measure over the course of the past two years. In assessing performance for this measure, the Monitor applied the findings from DCF's review of children for whom case documentation indicated that a worker visit with a parent was not required because the parent was missing or otherwise unavailable.[100] DCF continued to take a primary role in this data validation process again this monitoring period.

Current performance does not meet the level required by the SEP and remains an Outcome *To Be Achieved*.

---

[98] Monthly performance is as follows: July, 94%; August, 96%; September, 94%; October, 94%; November, 94%; December, 97%.

[99] Monthly performance is as follows: July, 83%; August, 85%; September, 84%; October, 84%; November, 81%; December, 80%. Reported performance accounts for valid exceptions to the visits requirement.

[100] During each month of the monitoring period, workers documented an average of approximately 400 cases where one contact was made and an exception was applied to the second contact of the visits requirement. In an effort to assess the validity of exceptions, DCF reviewed 167 cases from a universe of cases from October 2019 in which worker visits with parents were not held due to a documented exception to the visits requirement. The Monitor and DCF determined that a valid exception was utilized in 115 (69%) of the 167 cases reviewed. As a result, the Monitor excluded 69% of cases with one documented contact and one exception. For example, in December 2019 there were 1,926 children in custody with a goal of reunification. Data from NJ SPIRIT indicated that there were 446 documented cases that month with at least one documented contact and one exception. Based on the sample, the Monitor excluded from the universe 308 (69%) of the 446 cases in December, making the universe of applicable children 1,618 (1,926-308).

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 53*

**Figure 4: Percentage of Families Who Had at Least Twice per Month Face-to-Face Contact with Caseworker when the Goal is Reunification (December 2017 – December 2019)**



Source: DCF data

**Visits between Children in Custody and their Parents**

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 29. <u>Weekly Visits between Children in Custody and Their Parents</u>: Number/percent of children who have weekly visits with their parents when the permanency goal is reunification unless a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |
| **Final Target** | 60% of children in custody with a return home goal will have an in-person visit with their parent(s) or other legally responsible family member at least weekly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

***Performance as of December 31, 2019:***

In December 2019, an average of 1,171 (79%) of 1,491 applicable children visited weekly with their parents during the month. Between July and December 2019, a range of 75 to 79 percent of

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 54*

children had a weekly visit with their parents when the permanency goal was reunification.[101] This performance exceeds the SEP standard.

| Quantitative or Qualitative Measure | 30. Bi-Weekly Visits between Children in Custody and Their Parents: Number/percent of children who have weekly visits with their parents when the permanency goal is reunification unless a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |
|---|---|
| Final Target | 85% of children in custody with a return home goal will have an in-person visit with their parent(s) or other legally responsible family member at least every other week, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

*Performance as of December 31, 2019:*

In December 2019, 1,376 (93%) of 1,487 applicable children had at least two visits with their parents during the month. Between July and December 2019, a monthly range of 88 to 93 percent of children had visits at least twice a month with their parents when their permanency goal was reunification.[102] This performance continues to exceed the SEP requirement.

**Visits between Children in Custody and Sibling Placed Apart**

| Quantitative or Qualitative Measure | 31. Visits between Children in Custody and Siblings Placed Apart: Number/percent of children in custody, who have siblings with whom they are not residing shall visit with their siblings as appropriate. |
|---|---|
| Final Target | 85% of children in custody who have siblings with whom they are not residing shall visit with those siblings at least monthly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

*Performance as of December 31, 2019:*

In December 2019, 1,072 (86%) of 1,241 applicable children in placement who had at least one sibling with whom they did not reside had at least one visit with one of their siblings during the

---

[101] Monthly performance for this measure is as follows: July, 76%; August, 77%; September, 77%; October, 77%; November, 75%; December, 79%. Given the results of validation from a prior monitoring period, the Monitor excluded from the universe all cases in which DCF documented an exception to the parent-child visit requirement. For example, in December 2019, there was an average of 2,036 children with a goal of reunification across the four weeks of the month. Data from NJ SPIRIT indicated that in an average of 545 cases that month, the worker had determined that the parent was unavailable for the visit, the child declined the visit or the visit was not required. Based on these data, the Monitor excluded those cases from the universe, making the universe of applicable children an average of 1,491in December (2,036-545).

[102] Monthly performance for this measure is as follows: July, 90%; August, 91%; September, 88%; October, 90%; November, 89%; December, 93%. Given the results of validation activities from a prior monitoring period, the Monitor excluded from the universe all cases in which DCF documented an exception to the parent-child visit requirement. For example, in December 2019, there were 1,937 children with a goal of reunification. Data from NJ SPIRIT indicated that in 450 cases that month, the worker had determined that the parent was unavailable for the visit, the child declined the visit or the visit was not required. Based on these data, the Monitor excluded those cases from the universe, making the universe of applicable children 1,487 in December.

month. Between July and December 2019, a range of 86 to 87 percent of children had at least monthly visits with one of their siblings with whom they were not placed.[103]

In assessing performance for this measure, the Monitor applied the findings from a joint review with DCF of children for which case documentation indicated that a sibling visit was not required due to a court order, hospitalization, or because the child was missing or otherwise unavailable.[104] DCF continues to meet the SEP performance standard in this area.

---

[103] Monthly performance is as follows: July, 86%; August, 87%; September, 87%; October, 87%; November, 86%; December, 86%. Reported performance accounts for valid exceptions to the visits requirement.

[104] During each month of the monitoring period, workers documented an average of approximately 233 cases in which there was believed to be an exception to the applicable visits requirement. In an effort to assess the validity of these exceptions, DCF reviewed 189 cases from a universe of eligible children in October and November 2018 in which children were not able to visit their sibling due to a documented exception to the visits requirement. The Monitor and DCF determined that a valid exception was utilized in 114 (60%) of 189 cases reviewed. As a result, the Monitor excluded 60% of the exceptions from each month from the universe. For example, in the month of December 2019, there were 1,365 children in custody with a sibling in care with whom they were not placed. Data from NJ SPIRIT indicated that there were 206 documented cases that month for which the worker had determined the visit was not required or the child was unavailable. Based on the sample, the Monitor excluded from the universe 124 (60%) the 206 cases, making the universe of applicable children 1,241 (1,365-124).

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 56*

### F.  PLACEMENT

Stable and appropriate placement for children in foster care is critical to safety and well-being, and maintenance of family bonds. DCF policy requires siblings to be placed together whenever possible, and that children experience as few placement changes as possible while in out-of-home placement. There are five performance measures related to placement. As of January 2019, all had been previously met and were designated as Outcomes *To Be Maintained*: sibling placements of two to three children (SEP IV.G.32); sibling placements and recruitment of placements for four or more children (SEP IV.G.33); placement stability for children in care between 13 and 24 months (SEP IV.G.36); and placement stability for children in care 12 months or less (SEP IV.G.35). All of these measures, except recruitment of placements to accommodate large sibling groups, are assessed through longitudinal cohort data on an annual basis. Performance for all five measures is discussed below.

**Placing Siblings Together**

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 32.  <u>Placing Siblings Together</u>: The percentage of sibling groups of two or three siblings entering custody be placed together. |
| **Performance Target** | At least 80% of sibling groups of two or three children entering placement will be placed together. |

***Performance as of CY 2019:***

In CY 2019, there were 342 sibling groups of two or three children that entered DCF custody at the same time or within 30 days of one another. Of these, 80 percent (275) were placed together. As shown in Figure 5, DCF met the SEP standard for this measure for the first time in 2014, but performance had dipped in recent years, and now has improved to meet the SEP standard again. DCF reports that this is due, at least in part, to its analysis of barriers to performance and follow-up with Local Office supervisors and managers.

**Figure 5: Percentage of Sibling Groups of Two or Three Children Placed Together (CY 2013 – CY 2019)**



Source: DCF data analyzed by Rutgers University[105]

## Placing Siblings Together for Four of More Children

| Quantitative or Qualitative Measure | 33. <u>Placing Siblings Together for Four or More Children</u>: The percentage of sibling groups of four or more placed together. |
|---|---|
| Performance Target | For sibling groups of four or more 80% will be placed with at least one other sibling. |

*Performance as of CY 2019:*

In CY 2019, there were 174 children who were part of sibling groups of four or more children in placement. Of those, 145 (83%) were placed with at least one other sibling. DCF continues to exceed the SEP performance standard in this area.

## Recruitment of Placements for Sibling Groups of Four or More

| Quantitative or Qualitative Measure | 34. <u>Recruitment of Placements for Sibling Groups of Four or More</u> |
|---|---|
| Performance Target | DCF will continue to recruit for resource homes capable of serving sibling groups of four or more. |

---

[105] DCF transferred the function of analyzing annual outcome measures related to placement, timely permanency, and maltreatment from Hornby Zeller Associates, Inc. to Rutgers University in July 2017.

*Performance as of December 31, 2019:*

DCF staff continued to develop recruitment strategies that focus on efforts to retain existing resource families and on reaching new families willing to accept adolescents and large sibling groups into their homes.

During this monitoring period, DCF continued to host recruitment and retention events for families willing and able to accommodate adolescents and large sibling groups. For example, the Bergen County recruiter hosted a sibling group retention event that included bowling, arcade games, laser tag, and pizza. This event provided siblings who live in different homes the opportunity to visit with each other, other children, and resource families. The Morris/Sussex recruiter attended the 47th Anniversary Dinner of the Morris County Gay Activist Alliance and provided information about the need for foster and adoptive homes for LGBTQI youth and large siblings groups. The Gloucester County recruiter and the resource development specialist hosted a roller-skating event for current resource families at the Deptford Skate and Fun Center, and the Union County recruiter gave a presentation to the Union County Council for Young Children on DCF's need for homes for large sibling groups.

As of December 31, 2019, DCF had a total of 78 large capacity SIBS homes, nine more homes than at the end of June 2019.Of the 78 large capacity SIBS homes, 62 homes can accommodate four children – an increase of four homes from the previous period – and 16 homes can accommodate five or more children, an increase of five homes from the end of June 2019. Between July and December 2019, DCF recruited and licensed a total of 16 new homes; 10 SIBS homes that can accommodate four children and six that can accommodate five or more children. During the same period, six homes that could accommodate four children and two that could accommodate five or more children closed or downgraded their capacity.[106]

The Monitor considers DCF to have met the SEP standard for this measure between July and December 2019.

### Stability of Placement

| Quantitative or Qualitative Measure | 35. Stability of Placement: The percentage of children entering out-of-home placement for the first time in a calendar year who have no more than one placement change during the 12 months following their date of entry. |
|---|---|
| Performance Target | At least 84% of children entering care for the first time in a calendar year will have no more than one placement change during the 12 months following their date of entry. |

---

[106]As of December 31, 2019, eight homes accommodating large sibling groups either upgraded, downgraded, or closed: one home was upgraded due to accepting a fifth sibling into their home, five homes downgraded capacity due to reunification of the sibling groups with their biological parents, and two homes downgraded capacity due to the adoption finalization of the sibling group.

*Performance as of CY 2018 (Most Recent Calendar Year Available):*

The most recent performance data assesses the 2,672 applicable children who entered care for the first time in CY 2018 and aggregates the number of placements each child experienced within one year of entry. As shown in the green and blue sections of Figure 6, for children entering care in CY 2018, 2,267 (85%) had no more than one placement change (two total placements) during the 12 months from their date of entry. DCF continued to meet the SEP performance standard for this measure this monitoring period.

**Figure 6: Number of Placements for Children within 12 Months of Entering Care (CY 2018)**



Source: DCF data analyzed by Rutgers University

| **Quantitative or Qualitative Measure** | 36. <u>Stability of Placement</u>: The percentage of children in out-of-home placement who have no more than one placement change during the 13 to 24 months following their date of entry. |
|---|---|
| **Performance Target** | At least 88% of children in out-of-home placement will have no more than one placement change during the 13 to 24 months following their date of entry. |

*Performance as of CY 2017 (Most Recent Calendar Year Available):*

The most recent performance data assesses the 1,453 applicable children who entered care for the first time in CY 2017 and aggregates the number of placements each child remaining in care experienced in the second year of their out-of-home placement. As shown in Figure 7, for children entering care in CY 2017, 1,195 (95%) children had no more than one placement change (two total placements) during the 13 to 24 months following their date of entry. Eighty two percent of children did not experience a placement change in their second year of out-of-home placement. DCF performance continues to exceed the SEP performance standard.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 60*

**Figure 7: Number of Placements for Children within 13-24 Months of Entering Care (CY 2017)**



Source: DCF data analyzed by Rutgers University

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 61*

## G.  MALTREATMENT OF CHILDREN AND YOUTH

A fundamental responsibility of DCF is ensuring the long-term safety of children who are receiving or have received services from CP&P. This responsibility includes ensuring the safety of children who are placed in resource family homes and congregate facilities, and preventing future maltreatment.

There are four SEP performance measures related to maltreatment of children and youth. As of January 2019, three measures were designated as Outcomes *To Be Maintained*: abuse and neglect of children in foster care (SEP III.H.12); repeat maltreatment for children remaining in their home (SEP IV.H.37); and maltreatment post-reunification (SEP IV.H.38). The last remaining Outcome *To Be Achieved*: re-entry to placement (SEP IV.H.39) has now been met for the first time this monitoring period, a notable achievement. All of these measures are assessed through longitudinal cohort data on an annual basis. Performance for all four measures is discussed below.

### Abuse and Neglect of Children in Foster Care

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 12.  Abuse and Neglect of Children in Foster Care: Of all children in foster care, the percentage who are victims of substantiated abuse or neglect by a resource parent or facility staff member. |
| **Final Target** | No more than 0.49% of children will be victims of substantiated abuse or neglect by a resource parent or facility staff member. |

*Performance as of CY 2019:*

In CY 2019, 19 out of 8,018 children (0.24%) were victims of a substantiated allegation of abuse and/or neglect by a resource parent or facility staff member. As shown in Figure 8, performance for this measure continues to exceed the SEP performance standard, and mirrors Qualitative Review (QR) data which consistently shows high performance on child safety.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 62*

**Figure 8: Percentage of Children who were Victims of a Substantiated Allegation of Abuse and/or Neglect in Out-of-Home Care**
**(CY 2013-CY 2019)**



Source: DCF data analyzed by Rutgers University

**Repeat Maltreatment**

| Quantitative or Qualitative Measure | 37.  Repeat Maltreatment (In-Home): Of all children who remain in home after substantiation of abuse or neglect, the percentage who have another substantiation within the next 12 months. |
|---|---|
| **Final Target** | No more than 7.2% of children who remain at home after a substantiation of abuse or neglect will have another substantiation within the next 12 months. |

*Performance as of CY 2018 (Most Recent Calendar Year Available):*

In CY 2018, there were 3,519 children who were victims of a substantiated allegation of abuse and/or neglect who were not placed in out-of-home care but instead served through in-home services. Of the 3,519 children, 158 (4.5%) of these children were the victims of another substantiated allegation of child abuse and/or neglect within 12 months of the initial substantiation. Figure 9 shows performance from CY 2009 to CY 2018. While DCF seeks to insure no future maltreatment for any child, in-home repeat maltreatment rates have continued to sharply decline in since CY 2013, and DCF performance continues to exceed the SEP standard.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 63*

**Figure 9: Percentage of Children who were Victims of Second Substantiated Allegation within 12 Months of Remaining at Home after First Substantiated Allegation (CY 2009-CY 2018)**



Source: DCF data analyzed by Rutgers University

| Quantitative or Qualitative Measure | 38. <u>Maltreatment Post-Reunification</u>: Of all children who are reunified during a period, the percentage who are victims of substantiated abuse or neglect within one year after the date of reunification. |
|---|---|
| **Final Target** | Of all children who enter foster care in a 12-month period for the first time who are discharged within 24 months to reunification or living with relative(s), no more than 6.9% will be the victims of substantiated abuse or neglect within 12 months after reunification. |

*Performance of CY 2016 Cohort (Most Recent Entry Cohort Available):*

Of the children who entered care in CY 2016, 1,754 exited DCF custody to reunification with their families. Of those, 111 (6.3%) of these children were victims of a substantiated allegation of abuse and/or neglect within 12 months of their return home. Figure 10 shows performance from CY 2008 to CY 2016. While DCF seeks to ensure no future maltreatment for any child, post-reunification maltreatment rates have dropped since CY 2012, and DCF continues to meet the SEP performance standard.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 64*

**Figure 10: Percentage of Children who were Victims of Substantiated Allegation within 12 Months after Reunification (CY 2008-CY 2016)**



Source: DCF data analyzed by Rutgers University

### Re-entry to Placement

| Quantitative or Qualitative Measure | 39. Re-entry to Placement: Of all children who leave custody during a period, except those whose reason for discharge is that they ran away from their placement, the percentage that re-enter custody within one year of the date of exit. |
|---|---|
| Final Target | Of all children who enter foster care in a 12 month period for the first time who are discharged within 12 months to reunification, living with relative(s), or guardianship, no more than 9% will re-enter foster care within 12 months of their discharge. |

*Performance of CY 2017 Cohort (Most Recent Entry Cohort Available):*

Of the children who entered care for the first time in CY 2017, 1,105 children were discharged to reunification, living with relatives or guardianship. Of those, 95 (8.6%) children re-entered placement within 12 months. As reflected in Figure 11, re-entry rates dropped below nine percent this reporting period, meeting the performance standard for the first time. Prior to this

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 65*

year, the re-entry rate had not changed significantly since 2009.[107] This is a significant achievement.

**Figure 11: Percentage of Children Who Re-Entered Custody within One Year of Exit (CY 2009 – CY 2017)**

16%
14%
12%
10%
8%
6%
4%
2%
0%
Percentage of Children
11.0%
11.1%
12.7%
11.5%
11.5%
12.0%
11.2%
12.2%
8.6%
Performance Target (Below 9%)
CY 2009
CY 2010
CY 2011
CY 2012
CY 2013
CY 2014
CY 2015
CY 2016
CY 2017
Calendar Year

Source: DCF data analyzed by Rutgers University.

[107] The methodology for calculating this measure changed between the Modified Settlement Agreement (MSA) and the Sustainability and Exit Plan (SEP), wherein Re-entry to Care was initially measured using exit cohorts, and since 2015 has been measured using entry cohorts. The historical trend data has been adjusted to account for changes in reporting over time.

## H.  TIMELY PERMANENCY

Regardless of age, gender, race or ethnicity, all children need and deserve a safe, nurturing family to protect and guide them. Safe family reunification with families is the preferred path, but permanency for children can be achieved through multiple avenues, including kinship/guardianship and adoption. There are four SEP measures that focus on permanency for children. As of January 2019, three measures were designated as Outcomes *To Be Maintained* – achieving permanency within 12 months (SEP IV.I.40), 36 months (SEP IV.I.42) and 48 months (SEP IV.I.43). The remaining Outcome *To Be Achieved* – achieving permanency within 24 months (SEP IV.I.41) – has now been met for the first time this year, another notable achievement. All of the measures discussed in this section are assessed with longitudinal cohort data on an annual basis. Performance for all four measures is discussed below.

**Timely Permanency through Reunification, Adoption or Guardianship**

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 40.  <u>Permanency Within 12 months</u>: Of all children who entered foster care in a 12-month period, what percentage were discharged from foster care to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. |
| **Final Target** | Of all children who enter foster care in a 12-month period, at least 42% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. |

*Performance of CY 2018 Cohort (Most Recent Entry Cohort Available):*

The most recent data available for this measure are for children who entered foster care in CY 2018. Of the 2,960 children who entered foster care in CY 2018, 1,235 (42%) were discharged to permanency within 12 months of their removal from their home (see

**Figure 12**). Of those 1,235 children, 1,046 of them were discharged to reunification with their families; this means that 35 percent of all children who entered foster care in CY 2017 were discharged to reunification within 12 months. After falling slightly below the performance standard in the previous monitoring period, DCF again met the SEP standard this monitoring period.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 67*

**Figure 12: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 12 Months of Entering Foster Care (CY 2010 – CY 2018)**



Source: DCF data analyzed by Rutgers University.

| Quantitative or Qualitative Measure | 41. Permanency Within 24 months: Of all children who enter foster care in a 12 month period, what percentage were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering care. |
|---|---|
| **Final Target** | Of all children who enter foster care in a 12 month period, at least 66% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering care. |

*Performance of CY 2017 Cohort (Most Recent Entry Cohort Available):*

The most recent data available for this measure are for children who entered foster care in CY 2017. Of the 3,385 children who entered foster care in CY 2017, 2,275 (67%) were discharged to permanency within 24 months of removal from their homes (see Figure 13). Of those 2,275 children, 1,732 of them were discharged to reunification with their families; this means that 51 percent of all children who entered care in CY 2017 were discharged to reunification within 24 months. This performance represents the first time that DCF has met the SEP standard on this

measure. This is a significant achievement, bringing all timely permanency measures in line with their benchmarks.

**Figure 13: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 24 Months of Entering Foster Care (CY 2010 – CY 2017)**[108]



Source: DCF data analyzed by Rutgers University.

| Quantitative or Qualitative Measure | 42. Permanency Within 36 months: Of all children who enter foster care in a 12 month period, what percentage were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering care. |
|---|---|
| Final Target | Of all children who enter foster care in a 12 month period, at least 80% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering care. |

***Performance of CY 2016 Cohort (Most Recent Entry Cohort Available):***

The most recent data available for this measure are for children who entered foster care in CY 2016. Of the 3,786 children who entered foster care in CY 2016, 3,116 (82%) were discharged to permanency within 36 months of removal from their homes (see

**Figure 14**). Of those 3,116 children, 2,051 of them were discharged to reunification with their families; this means that 54 percent of all children who entered care in CY 2016 were discharged

---

[108] DCF has provided the Monitor with data that includes permanency rates for those in the entry cohort between the ages of 18 and 21. The Monitor has included this data in the figures, which in some cases shows a higher level of performance than has been historically reported.

to reunification within 36 months. DCF's performance meets the SEP standard again this reporting period.

**Figure 14: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 36 Months of Entering Foster Care (CY 2010 – CY 2016)**



Source: DCF data analyzed by Rutgers University.

| Quantitative or Qualitative Measure | 43. Permanency within 48 months: Of all children who enter foster care in a 12 month period, what percentage were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering care. |
|---|---|
| Final Target | Of all children who enter foster care in a 12 month period, at least 86% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering care. |

***Performance of CY 2015 Cohort (Most Recent Entry Cohort Available):***

The most recent data available for this measure are for children who entered foster care in CY 2015. Of the 4,037 children who entered foster care in CY 2015, 3,567 (88%) were discharged to permanency within 48 months of removal from their homes (see

**Figure 15**). Of those 4,037 children, 2,142 of them were discharged to reunification with their families; this means that 53 percent of all children who entered care in CY 2013 were discharged

to reunification within 48 months. Current performance meets the SEP performance standard for the second time, another notable achievement.

**Figure 15: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 48 Months of Entering Foster Care (CY 2010 – CY 2015)**



Source: DCF data analyzed by Rutgers University.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*
*July 13, 2020*
*Page 71*

## I.  CHILD HEALTH UNITS

Early in New Jersey's child welfare reform efforts, DCF developed Child Health Units (CHUs) to facilitate and ensure the timely provision of health care to children in CP&P custody. CHUs are located in each CP&P Local Office and are staffed with Regional Nurse Administrators, Nurse Health Care Case Managers (HCCMs), and staff assistants, based on the projected number of children in out-of-home placement.

Section III.E of the SEP requires the state to "maintain its network of child health units, adequately staffed by nurses in each Local Office." This measure has been previously met and designated as an Outcome *To Be Maintained*. In what continues to be a model for other child welfare systems throughout the country, each child placed in a resource home has a nurse assigned for health care case management. CHUs are recognized by staff and external partners as a notable achievement of New Jersey's child welfare reform efforts. The nurses continue to team closely with staff to serve children and families, which contributes to be reflected in the consistently positive findings in New Jersey's Qualitative Reviews (QRs) regarding children's health and safety. Performance for this measure is discussed below.

| Quantitative or Qualitative Measure | 8.  Child Health Units: The State will continue to maintain its network of child health units, adequately staffed by nurses in each Local Office. |
|---|---|
| **Performance Target** | DCF will maintain adequate staffing levels in Local Offices. |

### *Performance as of December 31, 2019:*

On December 31, 2019, DCF employed 155 nurses, of which 152 were available for coverage, and 85 staff assistants, of which 85 were available for coverage. Between July and December 2019, there was an average of 151 nurses available for coverage, for an average ratio of one nurse to every 31 children in out-of-home care, exceeding the standard of one nurse to 50 children in out-of-home care. DCF performance in this area continues to meet the SEP standard.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 72*

### J.  OLDER YOUTH

The SEP includes four measures related to older youth. As of the beginning of the monitoring period, all were designated as Outcomes *To Be Maintained* – completion of Independent Living Assessments (SEP IV.K.45); quality of case planning and services (SEP IV.K.46); housing for youth who exit care without achieving permanency (SEP IV.K.47); and education/employment for youth who exit care without achieving permanency (SEP IV.K.48). Performance for all four measures during the current monitoring period is discussed below.

#### Independent Living Assessments

| Quantitative or Qualitative Measure | 45.  Independent Living Assessments: Percentage of youth age 14 and 18 with a completed Independent Living Assessment. |
|---|---|
| Performance Target | 90% of youth age 14 to 18 will have an Independent Living Assessment. |

*Performance as of December 31, 2019:*

In December 2019, there were 620 youth age 14 to 18 in out-of-home placement for at least six months; 578 (93%) had an Independent Living Assessment (ILA) completed. Monthly performance between July and December 2019 ranged from 93 to 96 percent.[109] DCF performance met the SEP standard in each of the six months of the monitoring period, an improvement from the last monitoring period, during which performance had fallen slightly.

#### Quality of Case Planning and Services

| Quantitative or Qualitative Measure | 46.  Quality of Case Planning and Services: DCF shall provide case management and services to youth between the age 18 and 21 who have not achieved legal permanency. |
|---|---|
| Performance Target | 75% of youth age 18 to 21 who have not achieved legal permanency shall receive acceptable quality case management and service planning. |

*Performance as of December 31, 2019:*

Performance data for this measure were collected through Qualitative Reviews (QRs) of the experiences and outcomes of 43 youth age 18 to 21, conducted from January through December 2019. In rating these cases, reviewers use both the standard QR protocol and a list of additional considerations relevant to this population, such as DCF's efforts to plan and support youth who identify as LGBTQI, and those who are victims of domestic violence, are expectant or parenting, or who have developmental disabilities.

From January to December 2019, 67 percent (29 of 43) of cases reviewed scored acceptable for both the *child (youth)/family status* and *overall practice performance* indicators (see Figure

---

[109] Monthly performance is as follows: July, 95%; August, 95%; September, 96%; October, 95%; November, 94%; December, 93%.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 73*

16).[110] This is a slight decline in performance from both CY 2018 and CY 2017, when the QR was measured in the same set of counties. The universe of cases to which this measure applies is small and therefore more susceptible to fluctuations, but performance did not meet the SEP standard this monitoring period. The Monitor will continue to closely track progress in this area of practice.

**Figure 16: Qualitative Review (QR) Cases Rated Acceptable on Quality of Case Planning and Services for Older Youth (CY 2016 – CY 2019)[111]**



Source: DCF data

**Housing**

| Quantitative or Qualitative Measure | 46. Housing: Youth exiting care without achieving permanency shall have housing. |
|---|---|
| Performance Target | 95% of youth exiting care without achieving permanency shall have housing. |

---

[110] From January to December 2019, 67% (29 of 43) of the applicable cases reviewed were rated acceptable on both the *overall child (youth)/family status* and the *overall practice performance* indicators; 95% (41 of 43) of cases were rated acceptable for *child (youth)/family status* and 67% (29 of 43) of cases were rated acceptable for *overall practice performance*.

[111] In CY 2016 and CY 2018, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem, and Union counties. In CY 2017 and CY 2019, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex, and Warren counties.

*Performance as of December 31, 2019:*

The Monitor and DCF staff conducted a case record review of all youth who exited care between January and December 2019 without achieving permanency to assess whether they had housing upon leaving DCF custody. The Monitor and DCF decided last year that conducting this review annually rather than bi-annually would enable DCF to better analyze and understand practice in this area, and would give the Department time to integrate its learning into practice. Of the 162 youth for which this measure was applicable,[112] there was documentation of a housing plan for 160 (99%) youth, exceeding the SEP standard. DCF's improved performance in this area reflects its commitment to ensuring that youth exiting care have a place to live, demonstrating some of the highest performance it has ever reached in this area.

**Employment/Education**

| Quantitative or Qualitative Measure | 47. Employment/Education: Youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. |
|---|---|
| Performance Target | 90% of youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. |

*Performance as of December 31, 2019:*

The Monitor and DCF also reviewed the case records of all youth who exited DCF custody between January and December 2019 without achieving permanency to determine whether they were employed or enrolled in school at the time of leaving care. Of the 160 youth to whom this measure applied,[113] 155 (97%) were either employed or enrolled in education or vocational training programs, or there was documentation of consistent efforts by the caseworker to help youth secure education or employment.[114] This performance exceeds the SEP standard, and shows improvement from prior monitoring periods, with the highest performance DCF has ever reached in this area.

---

[112] The cases of 13 youth out of the universe of 175 youth exiting care to non-permanency were excluded from performance calculations for this measure because the youth could not be located (8) or were incarcerated (5).

[113] The cases of 15 youth out of the universe of 175 youth exiting care to non-permanency were excluded from performance calculations for this measure because the youth could not be located (8), were incarcerated (5), or moved out of state (2).

[114] The circumstances of 7 additional youth were considered to have met the standard because there was documentation of consistent efforts by the caseworker to help secure education or employment.

### K.  SERVICES TO SUPPORT TRANSITION

While involved with DCF, children, youth and families often face transitions, including changes in family relationships, living arrangements, service providers or schools. Some transitions are more critical than others, but all require recognition and planning in order to be smooth and successful. DCF uses the Qualitative Review (QR) process to measure case practice that supports families to make successful transitions. Section IV.J of the SEP requires that 80 percent of cases be rated acceptable on the *successful transitions* indicator. This measure is designated as an Outcome *To Be Achieved*. The QR process and protocol are discussed in detail in Section V.N of this report.

#### Services to Support Transition

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 44.  <u>Services to Support Transition</u>: DCF will provide services and supports to families to support and preserve successful transitions. |
| **Performance Target** | 80% of cases will be plans rated acceptable for supporting transitions as measured by the Qualitative Review (QR). |

*Performance as of December 31, 2019*:

From January to December 2019, 74 percent (63 of 85) of cases were rated acceptable on the *successful transitions* indicator, which demonstrates improved performance from prior monitoring periods (see Figure 17). DCF has been making efforts to identify barriers to access to services, which has potentially contributed to the increase in cases rated acceptable in the QR.

Although DCF did not meet the SEP performance standard in CY 2019, there was significant improvement in this area, after two years of declining performance. Multiple integral aspects of case practice, including case planning, teaming, and assessments, can impact how well DCF supports families to make successful transitions.

**Figure 17: Qualitative Review (QR) Cases Rated Acceptable on Successful Transitions (CY 2016 – CY 2019)[115]**



Source: DCF data

[115] In CY 2016 and CY 2018, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem, and Union counties. In CY 2017 and CY 2019, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex, and Warren counties.

## L.  CASELOADS

One of the successes of DCF's reform was reducing and now maintaining caseloads at levels where workers can do the work with children, youth, and families that was expected of them. Caseload compliance is measured by assessing caseloads for individual caseworkers in each of the system's functional areas (Intake, Permanency, Adoption, and IAIU) as well as standards for each CP&P Local Office. Table 2 summarizes the SEP's caseload standards for individual workers.

The SEP includes eight performance measures related to caseloads. As of January 2019, all were designated as Outcomes *To Be Maintained.* These eight measures include Intake office caseloads (SEP IV.E.24); Intake individual worker caseloads (SEP IV.E.25); Adoption office caseloads (SEP IV.E.26); Adoption individual worker caseloads (SEP IV.E.27); Permanency office caseloads (SEP III.B.4); Permanency individual worker caseloads (SEP III.B.5); IAIU investigators individual caseloads (SEP III.B.3); and supervisory/worker ratio (SEP III.B.2). Performance for all eight measures during the current monitoring period is discussed below.

### Table 2: CP&P Individual Worker Caseload Standards

| Caseworker Function | Responsibility | Individual Caseload Standard (SEP IV.E and III.B) |
|---|---|---|
| Intake | Respond to community concerns regarding child safety and well-being. Specifically, receive referrals from the State Central Registry (SCR) and depending on the nature of the referral, respond between two hours and five days with a visit to the home and begin investigation or assessment. Complete investigation or assessment within 60 days. | Intake workers are to have no more than **12 open cases** at any one time **and** no more than **eight new referrals** assigned in a month. No Intake worker with 12 or more open cases can be given more than **two secondary assignments** per month.[116] |
| Institutional Abuse Investigations Unit (IAIU) | Respond to allegations of child abuse and neglect in settings including correctional facilities, detention facilities, treatment facilities, schools (public or private), residential schools, shelters, hospitals, camps or child care centers that are required to be licensed, resource family homes, and registered family day care homes. | IAIU staff workers are to have no more than **12 open cases** at any one time **and** no more than **eight new referrals** assigned in a month. |
| Permanency | Provide services to families whose children remain at home under the protective supervision of CP&P and those families whose children are removed from home due to safety concerns. | Permanency workers are to serve no more than **15 families and 10 children in out-of-home care at any one time**. |
| Adoption | Find permanent homes for children who cannot safely return to their parents by preparing children for adoption, developing adoptive resources, and performing the work needed to finalize adoptions. | Adoption workers are to serve no more than **15 children** at any one time. |

Source: DCF

---

[116] Secondary assignments refer to shared cases between Intake and Permanency workers for families who have a case open with a Permanency worker where there are new allegations of abuse or neglect that require investigation.

## Intake

The SEP Intake caseload standard is that no worker should have more than eight new case assignments per month, no more than 12 open primary cases at any one time, and no Intake worker with 12 or more open primary cases can be assigned more than two secondary assignments per month. In January 2017, DCF implemented a new methodology for tracking and reporting the SEP Intake caseload standard to more clearly communicate to staff and to streamline monitoring and reporting. DCF's new methodology captures secondary case assignments on the Intake worker's monthly caseload report, which tracks and reports Intake caseloads as follows: no more than eight new assignments per month; no more than 12 cases assigned as primary case assignments at any one time; and no more than 14 cases at any one time, including both primary and secondary case assignments. The methodology for the standard of no more than eight new case assignments per month, including secondary assignments, remains unchanged.

DCF continues to implement an internal caseload verification process which serves as a quality assurance method where Intake workers are interviewed and their reported caseloads are compared to their caseloads as reported in SafeMeasures. During the period of July through December 2019, DCF interviewed a random sample of 216 Intake workers from 22 Local Offices throughout the state. DCF verified that 96 percent (208 of 216) of Intake worker caseloads were accurately reflected in SafeMeasures. Findings from DCF's caseload verification reviews are shared widely with DCF staff through briefs, posted onto the Office of Quality website, DCF-wide "DID YOU KNOW" emails, and during statewide leadership meetings.

| Quantitative or Qualitative Measure | 24. Intake Local Office Caseloads: Local Offices will have an average caseload for Intake workers of (a) no more than 12 families, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |
|---|---|
| Performance Target | 95% of Local Offices will have an average caseload of (a) no more than 12 families, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |

*Performance as of December 31, 2019:*

Performance data for July through December 2019 show that 98 percent of Local Offices met the Intake caseload standards. DCF continues to exceed the SEP standard.

| Quantitative or Qualitative Measure | 25. Individual Intake Caseloads: individual Intake workers shall have (a) no more than 12 open cases, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |
|---|---|
| Performance Target | 90% of individual Intake workers shall have (a) no more than 12 open cases, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |

*Performance as of December 31, 2019:*

The state reported an average of 1,096 active Intake workers between July and December 2019. Among those 1,096 active Intake workers, an average of 1,035 (94%) had caseloads that met the standard. Specifically, in December 2019, 1,039 (94%) of 1,109 active Intake workers were in compliance with individual worker standards. DCF continues to meet the individual Intake worker caseload standard.

Data by Local Office show that during December 2019, performance ranged from 50 percent to 100 percent, with 34 of 46 (74%) Local Offices having all Intake workers in compliance with caseload standards.

DCF deploys Impact Teams (a supervisor and three workers) to a unit or a Local Office in different areas when intakes are unusually high, to assist in maintaining caseload standards by taking on investigation overflow. There are nine Impact Teams, one per Area Office.

### *"Shared" Cases between Intake and Permanency Workers*

As described in previous monitoring reports, Intake and Permanency workers sometimes share responsibility for families with open permanency cases when there are new allegations of abuse or neglect. According to DCF procedure, all Child Protective Services (CPS) reports are assigned to Intake workers to investigate and are reflected in caseload reporting as one of the Intake workers' eight new referrals in the month and as one of their 12 open families for that month. However, when circumstances indicate that a family with an already open permanency case is the subject of a new CPS report, the work with the family becomes the shared responsibility of both Intake and Permanency workers until the investigation is completed.

Intake workers are assigned a secondary worker designation in NJ SPIRIT for such cases with families who are already currently assigned a Permanency worker. According to DCF, this arrangement emphasizes the primary role of the Permanency worker in securing placement, facilitating visits, supporting the family to implement the case plan, and coordinating services. It also reflects the Permanency worker's responsibility to provide information to the Intake worker and to link the family to appropriate services and supports identified during the course of the new investigation, thus relieving the Intake worker of the overall case management responsibility for the case. Intake workers continue to be responsible for the work required to complete investigative tasks and to reach and document an investigative finding. Thus, these secondary assignments are counted as one of the Intake worker's eight new referrals assigned in a month and as part of the total 14 open cases per month.

DCF reports that Intake supervisors in CP&P Local Offices are expected to appropriately manage the workload of staff in their units and consider an Intake worker's primary and secondary responsibilities when assigning new referrals. Table 3 provides the reported number of secondary assignments to Intake workers by month for this monitoring period.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 80*

**Table 3: Number of CP&P Investigations and Secondary Intake Assignments by Month (July – December 2019)[117]**

| Month | Total Investigations Assigned to Intake Workers for the Month | Secondary Intake Worker Assignments of CPS and CWS Investigations | |
|---|---|---|---|
| July | 6,433 | 511 | 8% |
| August | 5,794 | 472 | 8% |
| September | 6,544 | 495 | 8% |
| October | 6,479 | 507 | 8% |
| November | 6,795 | 438 | 6% |
| December | 5,690 | 458 | 8% |

Source: DCF data

The Monitor reviewed monthly Local Office data on secondary assignments and found that on average, each Intake worker was assigned one secondary case at any given time during the period reviewed. The Monitor also found that an average of 20 percent of Intake workers received two or more secondary case assignments and an average of five percent of Intake workers received three or more secondary assignments each month during the monitoring period. Specifically, in the month of July 2019, 227 (21%) Intake workers received two or more secondary intake assignments and 59 (5%) Intake workers received three or more secondary intake assignments.

To ensure that Intake workload is properly managed, regardless of the combination of primary and secondary assignments, DCF continues to examine the processes used in Local Offices to make secondary assignments, as well as Local Office workflow management practices.

**Assignment of Investigations to Non-Caseload Carrying Staff**

On occasion, in order to handle the unpredictable flow of referrals for investigations, trained non-caseload carrying staff as well as caseload-carrying staff who are not part of Intake units (non-Intake caseload carrying staff) in Local Offices are assigned to investigations. DCF reports that all staff are required to complete First Responder training prior to being assigned an investigation and non-caseload carrying staff must have been similarly trained and receive supervision by the Intake supervisor. The Monitor's review of DCF's data for the months of July through December 2019 found that approximately one percent of investigations were assigned each month to non-caseload carrying staff and that about five percent were assigned to non-Intake caseload carrying staff. DCF produces a Caseload Report Exception List that documents all instances of intakes identified as assigned to non-caseload carrying workers, and closely monitors the list on an ongoing basis. Table 4 shows the number and percentage of investigations assigned to non-caseload carrying staff, and Table 5 shows the number and percentage of investigations assigned to non-Intake caseload carrying staff.

---

[117] Total excludes intakes assigned to Impact, Permanency, Adoption and Advocacy Center workers and includes intakes assigned to workers on leave.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 81*

**Table 4: Percentage of CP&P Investigations Assigned to Non-Caseload Carrying Staff by Month (July – December 2019)[118]**

| Month | Total Investigations Received in the Month | Number and Percentage of Investigations Assigned to Non-Case Carrying Staff | |
|---|---|---|---|
| July | 6,763 | 51 | 1% |
| August | 6,064 | 29 | 1% |
| September | 6,861 | 40 | 1% |
| October | 7,082 | 85 | 1% |
| November | 7,135 | 45 | 1% |
| December | 6,024 | 45 | 1% |

Source: DCF data

**Table 5: Percentage of CP&P Investigations Assigned to Non-Intake Caseload Carrying Staff by Month (July – December 2019)**

| Month | Total Investigations Received in the Month | Number and Percentage of Investigations Assigned to Non- Intake Caseload Carrying Staff[119] | |
|---|---|---|---|
| July | 6,763 | 279 | 4% |
| August | 6,064 | 241 | 4% |
| September | 6,861 | 277 | 4% |
| October | 7,082 | 518 | 7% |
| November | 7,135 | 295 | 4% |
| December | 6.024 | 289 | 5% |

Source: DCF data

## Adoption

| Quantitative or Qualitative Measure | 26.  Adoption Local Office Caseloads: Local offices will have an average caseloads for Adoption workers of no more than 15 children per worker. |
|---|---|
| Performance Target | 95% of Local Offices will have an average caseload of no more than 15 children per Adoption worker. |

---

[118] Data are provided for investigations assigned within five days of intake receipt date and do not reflect additional assignments to an investigation after the first five days. DCF conducts monthly reviews of assignments to non-caseload carrying staff in NJ SPIRIT and has found that some investigations had been re-assigned to caseload carrying workers after the initial five days. As a result, the reported percentage of investigations assigned to non-caseload carrying staff may be lower than six percent.
[119] This includes Permanency, Adoption, Impact and Advocacy Center caseload carrying workers.

| Quantitative or Qualitative Measure | 27. <u>Individual Worker Adoption Caseloads:</u> Individual Adoption worker caseloads shall be no more than 15 children per worker. |
|---|---|
| Performance Target | 95% of individual Adoption workers shall have a caseload of no more than 15 children per month. |

*Performance as of December 31, 2019:*

Performance data for July through December 2019 show that 100 percent of Local Offices and 99 percent of individual workers continued to maintain the adoption caseload standard during this period.[120]

**Permanency**

| Quantitative or Qualitative Measure | 4. <u>Permanency Local Office Caseloads:</u> Local offices will have an average caseloads for Permanency workers of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |
|---|---|
| Performance Target | 95% of Local Offices will have an average caseload of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |

| Quantitative or Qualitative Measure | 5. <u>Individual Worker Permanency Caseloads:</u> Individual Permanency worker caseloads shall be (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |
|---|---|
| Performance Target | 95% of individual Permanency workers shall have a caseload of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |

*Performance as of December 31, 2019:*

Performance data for July through December 2019 show that 100 percent of Local Offices and 100 percent of individual workers continued to maintain the permanency caseload standard during this period.[121]

**Institutional Abuse Investigation Unit (IAIU)**

| Quantitative or Qualitative Measure | 3. <u>Individual Worker IAIU Caseloads:</u> individual IAIU worker caseloads shall be (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. |
|---|---|
| Performance Target | 95% of individual IAIU workers shall have a caseload (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. |

*Performance as of December 31, 2019:*

DCF data show 100 percent of individual workers maintained the IAIU caseload standard for the period of July through December 2019.

---

[120] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six month monitoring period.
[121] Ibid.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 83*

**Supervisory Ratio**

| Quantitative or Qualitative Measure | 2.  Supervisor/Worker Ratio: Local Offices shall have sufficient supervisory staff to maintain a five worker to one supervisor ration. |
|---|---|
| Performance Target | 95% of Local Offices shall have sufficient supervisory staff to maintain a five worker to one supervisor ration. |

*Performance as of December 31, 2019:*

Performance data for July through December 2019 show that 100 percent of CP&P Local Offices had sufficient supervisors to maintain ratios of five workers to one supervisor.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 84*

## M. DEPUTY ATTORNEYS GENERAL STAFFING

| Quantitative or Qualitative Measure | 7.   DAsG Staffing: The State will maintain adequate DAsG staff potions and keep positions filled. |
|---|---|
| Performance Target | DCF will maintain adequate staffing levels at the DAsG office. |

*Performance as of December 31, 2019:*

As of December 31, 2019, 128 Deputy Attorneys General (DAsG) staff positions assigned to work with DCF were filled. Of those, seven DAsG were on full time leave. Thus, there were a total of 121 (95%) available DAsG. DCF reports that in addition to these positions, DAsG outside of the DCF Practice Group have dedicated some of their time to DCF matters. DCF continues to meet the SEP standard for this measure.

### N.  ACCOUNTABILITY THROUGH QUALITATIVE REVIEW AND THE PRODUCTION AND USE OF ACCURATE DATA

New Jersey's Qualitative Review (QR) is an assessment of the status of children, youth and families, the status of practice and the functioning of systems in each of the counties. The protocol and process used for the QR are aligned with DCF's Case Practice Model. Select QR results related to both Child/Youth and Family Status and Practice/System Performance are also used to report on several SEP requirements included in this report, three of which are designated Outcomes *To Be Achieved*: Quality of Teaming (SEP IV.B.20), Quality of Case Plans (SEP IV.D.23) and Services to Support Transition (SEP IV.J.44); and two of which are designated Outcomes *To Be Maintained*: Educational Needs (SEP III.G.11) and Quality of Case Planning and Services for Older Youth (SEP IV.K.46).

When conducting a QR involving children/youth under age 18, the legal guardian is asked to give informed consent for participation in the QR. Trained teams of two reviewers,  including DCF staff, community stakeholders and staff from the Monitor's office, review CP&P case records and interview as many people as possible who are involved with the children/youth and their families. QRs take place during a single week and, over the course of two years, occur in 21 counties and involve almost 400 cases across the state. The results from reviews provide critical qualitative data on child/youth and family status and practice/system performance.

At the conclusion of each week-long QR, the Area Quality Coordinator assigned to the county works with staff in the county to develop a county-level Performance Improvement Plan (PIP) with short and long term goals to strengthen practice. The PIP is designed to address areas needing improvement identified during the QR debrief. A review team, consisting of CP&P Central Office leadership and the Office of Quality, makes recommendations for approval and the Assistant Commissioner of CP&P approves each PIP. Findings from the QRs are incorporated into existing training and supervisory tools and used to identify systemic opportunities for improvement.

DCF has developed a rigorous continuous quality improvement process that incorporates the QR results and now interfaces with DCF's ChildStat meetings. ChildStat is a comprehensive review and discussion of system performance at a local level. While ChildStat previously focused on one case presentation in a Local Office, the new ChildStat format expands the scope to include discussions of county needs and an assessment of county-level strengths and areas needing improvement based on a review of quantitative data, QR results, and other county-level reviews. The format includes both CP&P and Children's System of Care (CSOC) staff and allows the DCF leadership team to ask questions of and explore solutions directly with county-level leadership. DCF is using ChildStat as an opportunity to build upon the QR to assess challenges and areas in need of improvement in case practice on a county level. Each county will be assessed at ChildStat every two years, following the QR schedule, and will report on progress on their county-level PIP every 12 months.

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 86*

During CY 2019, using the QR protocol that DCF developed in CY 2015, DCF reviewed 193 cases from 11 counties.[122] Table 6 provides the gender, age and racial and ethnic demographics of the 193 children/youth. Forty-eight of the children/youth were living with a parent at the time of the review and 145 of them lived with a relative or non-relative resource parent.

**Table 6: Qualitative Review: Gender, Age and Race/Ethnicity Demographics**
**(January – December 2019)**

| Gender | Number of Cases | Percentage of Cases* |
|---|---|---|
| Male | 94 | 49% |
| Female | 99 | 51% |
| **Total** | 193 | 100% |
| **Age** | **#** | **%** |
| 4 years or less | 79 | 41 |
| 5-9 years | 43 | 22 |
| 10-13 years | 25 | 13 |
| 14 -17 years | 13 | 7 |
| 18-21 years | 33 | 17 |
| **Total** | 193 | 100% |
| **Race** | **#** | **%*** |
| White/Caucasian | 135 | |
| African American | 71 | |
| Native Hawaiian | 0 | |
| American Indian | 1 | |
| Asian | 1 | |
| **Ethnicity** | **#** | **%** |
| Hispanic | 56 | 29 |

Source: DCF data
*The calculation of percentage of cases by race are not reflected here because some youth are counted in multiple categories.

DCF reports that 2,004 individuals were interviewed across the state to inform the QR data for this reporting period. The informants for the QR include CP&P and Child Health Unit staff, biological parents, others who the children/youth or parents identified as supports, relative and non-relative resource parents, education providers, mental health and legal professionals, substance abuse treatment providers and children/youth.[123]

Reviewers evaluate the child/youth and family's status on a range of indicators and rate whether the status was acceptable or unacceptable. See Table 7 for the results on each Child/Youth and Family status indicator for all cases reviewed from January through December 2019.

---

[122] DCF's QR protocol reviews cases in every county over a two-year period. In CY 2016 and CY 2018, Qualitative Reviews were conducted in Burlington, Essex, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Passaic, Salem and Union counties. In CY 2017 and CY 2019, Qualitative Reviews were conducted in Atlantic, Bergen, Camden, Cape May, Cumberland, Middlesex, Morris, Ocean, Somerset, Sussex, and Warren counties.
[123] Interviews are usually conducted individually with participants, either by phone or in person. All efforts are made to see children/youth in the setting in which they reside.

Child/Youth and Family status indicators cover key areas of safety, stability in school, living arrangement, learning and development and physical health of the child. The *overall child and family status* was rated acceptable in 183 (95%) of cases reviewed, with separate ratings on specific child and family status indicators ranging from 73 percent acceptable ratings (*family functioning and resourcefulness*) to 100 percent acceptable ratings (*safety of the child at home*).

**Table 7: Qualitative Review: Child/Youth and Family Status Results**
**(January – December 2019)**

| Child/Youth & Family Status Indicators | Number of Applicable Cases | Number of Acceptable Cases | Percentage of Acceptable Cases |
|---|---|---|---|
| Safety at Home | 193 | 193 | 100% |
| Safety in other Settings | 193 | 192 | 99% |
| Stability at Home | 193 | 164 | 85% |
| Stability in School | 109 | 102 | 94% |
| Living Arrangement | 193 | 190 | 98% |
| Family Functioning & Resourcefulness | 183 | 133 | 73% |
| Progress towards Permanency | 193 | 146 | 73% |
| Physical Health of the Child | 193 | 190 | 98% |
| Emotional Well-Being | 193 | 182 | 94% |
| Learning & Development, Under Age 5 | 81 | 76 | 94% |
| Learning & Development, Age 5 & older | 106 | 89 | 84% |
| **OVERALL Child & Family Status** | 193 | 183 | 94% |

Source: DCF data

Table 8 shows the results of the QR ratings for practice and system performance indicators from reviews conducted January through December 2019. As with the child/youth and family status indicators, reviewers evaluated whether performance was acceptable or unacceptable. This is the fourth annual report measuring indicators under DCF's new QR process and protocol.[124]

The *overall practice/system performance* indicator, which represents a comprehensive judgment from reviewers after considering the case as a whole, was rated acceptable in 65 percent (125 of 193) of cases. Performance on Practice/System indicators ranges from 32 percent (*assessment of fathers*) to 97 percent (*provision of health care services*).

Ratings for the SEP measures Educational Needs (SEP III.G.11), which consists of both the *stability in school* and *learning and development, age 5 and older* indicators, continues to meet

---

[124] In CY 2015 DCF updated key portions of the state's QR process and protocol, as described in Monitoring Report XVIII. Changes to the QR protocol include: (1) combination of *team functioning* and *team formation* indicators into one indicator, *teamwork and coordination* (2) exclusion of the *overall* indicator for all practice performance indicators (3) rating mothers and fathers separately in the practice performance indicators (4) removal of the *family supports* indicator for the practice performance indicators, and (5) replacement of the *transitions and life adjustment* indicator with *successful transitions* indicator.

SEP standards. Quality of Case Planning and Services for Older Youth (SEP IV.K.46), which consists of both the *overall child and family status* and *overall practice performance* indicators, and has been previously met, did not meet SEP standards this monitoring period.

Ratings for the SEP measures Quality of Teaming (SEP IV.B.20), which consists of the *family teamwork and coordination* indicator, Services to Support Transition (SEP IV.J.44), which consists of the *successful transitions* indicator, and Quality Case Planning (SEP IV.D.23), which consists of the *case planning* and *tracking and adjusting* indicators, all remain below acceptable standards as Outcomes *To Be Achieved*, though each demonstrated improvement this year.

**Table 8: Qualitative Review: Practice/System Performance Results**
**(January – December 2019)**

| Practice/System Performance Indicators | | # Cases Applicable | # Cases Acceptable | % Acceptable |
|---|---|---|---|---|
| Engagement | Child/Youth | 107 | 100 | 93% |
| | Mother | 128 | 77 | 60% |
| | Father | 104 | 51 | 49% |
| | Resource Family | 118 | 112 | 95% |
| Family Teamwork | Teamwork & Coordination | 145 | 90 | 62% |
| Assessment & Understanding | Child/Youth | 193 | 163 | 84% |
| | Mother | 128 | 59 | 46% |
| | Father | 104 | 34 | 33% |
| | Resource Family | 118 | 107 | 91% |
| Case Planning Process | | 193 | 120 | 62% |
| Plan Implementation | | 193 | 131 | 68% |
| Tracking & Adjusting | | 193 | 141 | 73% |
| Provision of Health Care Services | | 193 | 188 | 97% |
| Resource Availability | | 193 | 157 | 81% |
| Family & Community Connections | Mother | 78 | 63 | 81% |
| | Father | 57 | 34 | 60% |
| | Siblings | 30 | 25 | 83% |
| Successful Transitions | | 85 | 63 | 74% |
| Long Term View | | 193 | 104 | 54% |
| **OVERALL Practice/System Performance** | | **193** | **125** | **65%** |

Source: DCF data

QR performance in CY 2019 compared to CY 2018, though based on a different cohort of counties,[125] demonstrates improvement on several Practice/System Performance indicators, which is even more encouraging compared to the percentage change from CY 2017 to CY 2018, during which several indicators did not move. The indicator *engagement of the father* increased from 34 percent rated acceptable to 49 percent, and *assessment of the father* increased from 22 to

---

[125] DCF's QR protocol reviews cases in every county over a two-year period. Thus, based on the sample plan, annual performance comparisons reflect cases pulled from two sets of counties.

33 percent of applicable cases rated acceptable. The *successful transitions* indicator, which informs the Services to Support Transition measure (SEP IV.J.44), showed an increase of 12 percentage points.

When comparing QR results in CY 2019 to the same cohort of counties from the last time they were reviewed in CY 2017, there are modest improvements on almost every indicator, though *engagement of the mother*, *provision of health care services*, and *long-term view* remained largely the same. The only notable decrease since CY 2017 was in *resource availability*, from 88 to 81 percent. The indicators for *assessment and understanding* of all parties (the child/youth, the mother, the father, and the resource family) improved by between four and 11 percentage points. Though not all QR indicators are directly measured by the SEP, the improvements in these areas of practice continue to support the work of the reform and contribute to positive change on the other process and outcome measures.

### O. NEEDS ASSESSMENT

| Quantitative or Qualitative Measure | 21. Needs Assessment: The State shall regularly evaluate the needs for additional placements and services to meet the needs of children in custody and their families, and to support intact families and prevent the needs for out-of-home care. Such needs assessments shall be conducted on an annual, staggered basis that assures that every county is assessed at least once every three years. |
|---|---|
| Final Target | The State shall develop placements and services consistent with the findings of these needs assessments. |

County Human Service Advisory Councils (HSACs) are charged with gathering information related to local service needs, the impact of those needs on its population, and key barriers to improved service delivery. Using a World Health Organization public health framework,[126] DCF completed a comprehensive meta-analysis of previous needs assessments in the state, findings of which were shared with stakeholders in statewide meetings in May 2019. DCF's new needs assessment process will involve HSACs undertaking a county-based needs assessment biennially, which will be incorporated into county-level Qualitative Reviews (QRs), ChildStat, and local Performance Improvement Plan (PIP) processes, as discussed in Section V.N. To support implementation and to align these continuous quality improvement measures, DCF divided counties into two groups, each of which will be reporting every two years.

During the previous monitoring period, DCF established a workgroup with statewide Human Service Directors (HSDs) that met monthly to outline methodology and develop guidance, focus group protocols, a survey, and a report template that the HSACs will use as they collect data. Between July and December 2019, the DCF workgroup finalized these tools and established a uniform reporting method for the counties to ensure that reports are standardized. DCF also worked with Rutgers University School of Social Work to design county-based data profiles to provide the HSACs with county population data and the most recently available administrative data. These profiles are intended to help support HSACs in identifying, prioritizing, and addressing county needs, services, and resources. In November 2019 implementation of the revised needs assessment process began for the first group of New Jersey counties.[127] Within two years, HSACs in all 21 counties will be using the standardized reporting methodology and tools. In addition to their work with DCF to standardize needs assessments, HSACS are currently participating in DCF's Child Stat process described herein in Section V.N. More information about DCF's needs assessment process can be found on DCF's website.[128]

---

[126] To see the World Health Organization's "Availability, Accessibility, Acceptability, Quality" Infographic, go to: https://www.who.int/gender-equity-rights/knowledge/aaaq-infographic/en/

[127] The counties in the first group are: Sussex, Burlington, Passaic, Salem, Hudson, Monmouth, Hunterdon, Union, Gloucester, and Essex.

[128] To see all related tools and documents to DCF's Needs Assessment, go to: https://www.nj.gov/dcf/about/divisions/opma/hsac_needs_assessment.html

### P.  FISCAL YEAR BUDGET

Governor Murphy's FY 2020 budget, approved June 30, 2019 and effective July 1, 2019, included $1.156 billion in state funds. Commissioner Beyer testified in April 2019 in support of the proposed allocations, which included funding to continue DCF's operations in accordance with the SEP. The appropriation represented a decrease of 1.6% under the FY 2019 adjusted appropriation of $1.175 billion, which is largely due to the downward trend in utilization of CSOC out-of-home treatment services.[129]

---

[129] To read the Department of Children and Families appropriation in the FY2020 State Budget, go to:
https://www.njleg.state.nj.us/2018/Bills/AL19/150_.PDF

## APPENDIX: A
## Glossary of Acronyms Used in the Monitoring Report

**AQC:**     Area Quality Coordinators

**CFSR:**   Child and Family Services Review

**CHU:**     Child Health Unit

**CIACC:**  Children's Interagency Coordinating Council

**CP&P:**   Division of Child Protection and Permanency

**CPL**:       Case Practice Liaisons

**CPM:**     Case Practice Model

**CPS:**      Child Protective Services

**CQI:**      Continuous Quality Improvement

**CSOC:**   Children's System of Care

**CSSP:**    Center for the Study of Social Policy

**CWS:**     Child Welfare Services

**DAsG:**    Deputy Attorneys General

**DCF:**      Department of Children and Families

**DOW:**     Department on Women

**FFT-FC:** Family Functional Therapy – Foster Care

**FSC:**      Family Success Centers

**FTM:**      Family Team Meeting

**HCCM:** Health Care Case Manager

**IAIU:**     Institutional Abuse Investigative Unit

**ILA:**       Independent Living Assessment

**LGBTQI:** Lesbian, Gay, Bisexual, Transgender, Questioning/Intersex

**KLG:**      Kinship Legal Guardian

**LOM:**      Local Office Manager

**MSA:**      Modified Settlement Agreement

**OAS:**       Office of Adolescent Services

**OFV:**      Office of Family Voice

**OPMA:** Office of Performance Management and Accountability

**PIP:**       Performance Improvement Plan

**PPFs:**     Protective and Promotive Factors

**QR:**        Qualitative Review

**SACWIS:** Statewide Automated Child Welfare Information System

**SEP:**      Sustainability and Exit Plan

**SCR:**      State Central Registry

**SDM:**      Standard Decision Making tool

**SIBS:**     Siblings in Best Placement Settings

**USDA:**    United States Department of Agriculture

**YAB:**      Youth Advisory Board

*Progress of the New Jersey Department of Children and Families*
*Monitoring Period XXV Report for Charlie and Nadine H. v. Murphy*

*July 13, 2020*
*Page 93*

**APPENDIX B**

## New Jersey Department of Children and Families



Updated June 2020