January 2021

CHARLIE AND NADINE H. V. MURPHY

PROGRESS OF THE NEW JERSEY
DEPARTMENT OF CHILDREN AND FAMILIES

JANUARY 1 – JUNE 30, 2020

**Center** *for the*
**Study** *of*
**Social Policy**
**Ideas into Action**

1575 Eye Street NW, #500
Washington, DC 20005
www.CSSP.org

**New Jersey Department of Children and Families**
**Progress Report for *Charlie and Nadine H. v. Murphy***
**For the Monitoring Period January 1 – June 30, 2020**

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.   SUMMARY OF PERFORMANCE DURING JANUARY THROUGH JUNE 2020 ........4

III.   CHILD AND FAMILY OUTCOMES AND CASE PRACTICE PERFORMANCE
MEASURES ...................................................................................................17

IV.   FOUNDATIONAL ELEMENTS............................................................................ 46

V.   SUSTAINABILITY AND EXIT PLAN PERFORMANCE MEASURES *TO BE
ACHIEVED* AND *TO BE MAINTAINED* ...............................................................47

   A.   INVESTIGATIONS .......................................................................................47

   B.   FAMILY TEAM MEETINGS ........................................................................... 50

   C.   QUALITY OF CASE AND SERVICE PLANNING ............................................... 56

   D.   EDUCATION............................................................................................... 59

   E.   MAINTAINING CONTACT THROUGH VISITS ................................................. 60

   F.   PLACEMENT .............................................................................................. 66

   G.   MALTREATMENT OF CHILDREN AND YOUTH ............................................... 68

   H.   TIMELY PERMANENCY............................................................................... 68

   I.   CHILD HEALTH UNITS ............................................................................... 69

   J.   OLDER YOUTH........................................................................................... 70

   K.   SERVICES TO SUPPORT TRANSITION ..........................................................74

   L.   CASELOADS............................................................................................... 75

   M.   DEPUTY ATTORNEYS GENERAL STAFFING .................................................. 84

   N.   ACCOUNTABILITY THROUGH QUALITATIVE REVIEW AND THE
PRODUCTION AND USE OF ACCURATE DATA ............................................... 85

   O.   NEEDS ASSESSMENT .................................................................................87

   P.   FISCAL YEAR BUDGET ............................................................................... 89

APPENDIX A:................................................................................................... 90

APPENDIX B:.................................................................................................... 91

APPENDIX C:................................................................................................... 94

APPENDIX D:................................................................................................... 96

## LIST OF TABLES

Table 1: *Charlie and Nadine H.* Child and Family Outcome and Case Practice Performance Measures.................................................................................. 18

Table 2: CP&P Individual Worker Caseload Standards ............................................ 75

Table 3: Number of CP&P Investigations and Secondary Intake Assignments by Month (January – June 2020) ................................................................... 79

Table 4: Percentage of CP&P Investigations Assigned to Non-Caseload .................. 80

Table 5: Percentage of CP&P Investigations Assigned to Non-Intake.......................... 81

Table 6: Qualitative Review: Practice/System Performance Results ........................... 94

Table 7: Qualitative Review: Child/Youth and Family Status Results................................ 95

## LIST OF FIGURES

Figure 1: Percentage of Families Who Had at Least Twice per Month Face-to-Face Contact with Caseworker when the Goal is Reunification  (December 2017 – June 2020) ........................................................................................................ 63

# I.    INTRODUCTION

The Center for the Study of Social Policy (CSSP) was appointed in 2006 by the Honorable Stanley R. Chesler of the United States District Court for the District of New Jersey as Federal Monitor of the class action lawsuit *Charlie and Nadine H. v. Murphy*, aimed at improving outcomes for children, youth and families served through New Jersey's child welfare system. As Monitor, CSSP has been charged with independently assessing New Jersey's compliance with the goals, principles and outcomes of the Court Order entered in 2003; the Modified Settlement Agreement (MSA) entered in July 2006; and now the Sustainability and Exit Plan (SEP) entered on November 4, 2015, that supersedes the MSA. This monitoring report includes performance data and measures progress under the SEP for the period January 1 through June 30, 2020 and has been prepared by court-appointed independent Monitor Judith Meltzer, with assistance from Monitor staff Martha L. Raimon, Elissa Gelber, Lisa Mishraky, and Ali Jawetz.[1] It is presented to U. S. District Judge Chesler, parties to the lawsuit, and the public.

The SEP's requirements pertain to the approximately 4,400 children and youth who have been placed into foster care and 40,000 families and children served through New Jersey's in-home child protective services.

The Monitor's public reports cover six-month periods.[2] The primary sources of information on New Jersey's progress are quantitative and qualitative data supplied by the Department of Children and Families (DCF) and independently validated by the Monitor. DCF provides access to staff and documents to enable the Monitor to verify performance.

In assessing progress, the Monitor first looks to the state's data and validates its accuracy. The Monitor also retains the authority to engage in independent data collection and analysis where needed. In the past several years, DCF has expanded the data available on its public website,[3] as well as on its publicly accessible New

---

[1] Copies of all Monitoring Reports can be found at: https://cssp.org/our-work/projects/our-projects/class-action-litigation-new-jerseys-department-of-children-and-families/

[2] The exceptions to this time frame were Monitoring Period XIII, which covered July 1, 2012 through March 31, 2013; Monitoring Period XIV, which covered April 1 through December 31, 2013; and Monitoring Period XVII, which covered January 1 through December 31, 2015.

[3] To see DCF's public website, go to: http://www.state.nj.us/dcf/about/

Jersey Child Welfare Data Hub[4], which was developed in collaboration with Rutgers University.[5] During the monitoring period, the Children's System of Care (CSOC) and the Office of Research, Evaluation and Reporting (RER) collaborated with Rutgers to create, test, and verify the first five reports of the CSOC data map for the Data Hub.[6]

Please see Appendix B for a list of other reports DCF publishes on its website, as well as specific activities undertaken by the Monitor to assess DCF's progress this monitoring period.

**Structure of the Report**

Section II provides an overview of the state's accomplishments and challenges during this monitoring period, a time that was especially challenging due to the onset of the COVID-19 pandemic. Section III provides summary performance data on each of the outcomes and performance measures required by the SEP. Section IV provides information related to the SEP Foundational Elements.[7] Section V provides more detailed data and discussion of performance on SEP Outcomes *To Be Maintained* and Outcomes *To Be Achieved* in the following areas:

- Investigations of alleged child maltreatment (Section V.A);
- Implementation of DCF's Case Practice Model; including Family Team Meetings, case planning and visits (Sections V.B, V.C & V.E);
- Educational engagement for children in out-of-home care (Section V.D);
- Placement of children in out-of-home settings (Section V.F);
- Rates of maltreatment and re-entry to placement (Section V.G);
- Efforts to achieve permanency for children either through reunification with family, legal guardianship, or adoption (Section V.H);
- Provision of health care services to children and youth (Section V.I);
- Services to older youth (Section V.J);
- Services to support transitions (Section V.K);
- Caseloads (Section V.L);

---

[4] The Data Hub, launched in November 2016, allows users to create customized charts and graphs using New Jersey's child welfare data, and incorporates information from the formerly produced quarterly DCF Demographics Report.

[5] To see the New Jersey Child Welfare Data Hub, go to: https://njchilddata.rutgers.edu/#home

[6] To see the data map reports, go to: https://njchilddata.rutgers.edu/map#

[7] The Foundational Elements requirements of the SEP intentionally recognize the state's accomplishments in early implementation of the MSA. At the Monitor's discretion, based on a concern that a Foundational Element has not been sustained, the Monitor may request additional data. If the data demonstrate a persistent problem, in the Monitor's discretion, the state will propose and implement corrective action (SEP.II).

- Deputy Attorneys General Staffing (Section V.M);
- Accountability through the Qualitative Review and the production and use of accurate data (Section V.N);
- Needs Assessment (Section V.O); and
- Fiscal Year 2020 budget (Section V.P).

## II.    SUMMARY OF PERFORMANCE DURING JANUARY THROUGH JUNE 2020

On March 9, 2020, less than three months into the period of review for this report, which ended June 30, 2020, Governor Phil Murphy responded to the COVID-19 pandemic by issuing an Executive Order directing all New Jersey residents to stay home, closing schools and non-essential businesses and cancelling all gatherings.[8] The state's child welfare system was significantly impacted by the shut-down order: at the onset of the public health crisis DCF temporarily closed its 46 Local Offices, restricted access to nine Area Offices, and moved 16 regional schools and two DCF-operated, hospital-based satellite schools to remote learning. Practices and policies that guide daily contact with children and families, staff, and providers were modified, and 6,700 staff members were abruptly transitioned to work remotely. DCF immediately established COVID-19 emergency response teams that enabled them to continue to respond to child protective service investigations and to complete necessary home visits on priority cases. Plans were developed to establish telephone and video conferencing access in lieu of in-person visits between parents and children, children and their siblings, and caseworkers and families. Requirements to conduct critical activities such as case plans and family team meetings within certain timeframes were suspended. The Children's System of Care (CSOC), which serves children and youth with emotional and behavioral health care challenges and their families, also temporarily suspended intake to its out-of-home settings. Once it was permitted by state legislation, DCF authorized the use of telemedicine and telehealth services by many outpatient, in-home, and community-based programs. Family courts were initially closed but began to transition to virtual operations within one week. Throughout, DCF leadership was in regular contact with legal stakeholders to assess operations and timing of the safe re-opening of the courts.

While managing these necessary changes to operations, the Department was also attempting to ensure the safety of families, staff, and service providers by securing Personal Protective Equipment (PPE), contacting group care providers to monitor the incidence of COVID-19 among residents and staff, and disseminating emergency COVID-19 guidance.[9] DCF also issued a moratorium on youth aging out of foster care through December 2020, so they could continue to receive services and funding even after they turn 21. Additionally, in mid-November 2020, through the

---

[8] To see Governor Murphy's March 9, 2020 Executive Order 103, go to:
https://nj.gov/infobank/eo/056murphy/pdf/EO-103.pdf
[9] To see New Jersey DCF's Coronavirus Resources page, go to: https://www.nj.gov/dcf/coronavirus.html

Coronavirus Relief Fund,[10] DCF began a process to distribute $2.2 million in direct financial aid to youth transitioning from New Jersey's foster care system to adulthood. Approximately 1,200 eligible young adults will receive a one-time payment of $1,850 to assist with economic hardships such as homelessness, lack of transportation, decreased employment, and increased debt.

In June 2020, Governor Murphy lifted the stay-at-home order, and DCF began taking steps to resume in-person contact with children and families. In July 2020, DCF released a guide for CP&P staff and providers on in-person parent-child and sibling visits.[11] In mid-October 2020, the Department of Human Services and DCF announced that federal Coronavirus Relief Fund resources of up to $25 million would be provided to critical home-based and community-based services by reimbursing providers for increased costs incurred in response to the pandemic.[12]

As previously reported, the pandemic impacted New Jersey at a time when DCF's performance serving children and families had dramatically improved and the state had achieved and was sustaining significant progress that had been made over the past decade pursuant to the *Charlie and Nadine H.* lawsuit. They had not yet achieved every outcome but were moving toward achievement in many of the remaining areas of the lawsuit. Building on those achievements, between January and June 2020, despite the enormous challenges presented by the pandemic, DCF was able to sustain the previous years' progress and again ended the monitoring period having met 44 of 48 SEP performance measures.[13] DCF also maintained performance with

---

[10] To see the text of H.R. 6201 Families First Coronavirus Response Act, go to: https://www.congress.gov/bill/116th-congress/house-bill/6201/text

[11] To see New Jersey DCF's July 6, 2020 Guide for Supporting In-Person Visitation during the COVID-19 Pandemic, go to: https://www.nj.gov/dcf/news/COVID19-Guidance.for.CPP.and.Providers.on.Family.Visits.pdf

[12] To see the October 19, 2020 press release, go to: https://www.nj.gov/humanservices/news/pressreleases/2020/approved/20201019.html

[13] These measures include: Institutional Abuse Investigations Unit (IAIU) (III.A.1); Supervisor/Worker Ratio (III.B.2); IAIU Investigators Caseload (III.B.3); Permanency Workers (Local Offices) Caseload (III.B.4); Permanency Workers Caseload (III.B.5); Timeliness of Current Plans (III.C.6); Adequacy of DAsG Staffing (III.D.7); Child Health Units (III.E.8); Caseworker Contacts with Children – New Placement/Placement Changes (III.F.9); Caseworker Contact with Children in Placement (III.F.10); Educational Needs (III.G.11); Abuse and Neglect of Children in Foster Care (III.H.12); Timeliness of Investigation Completion (60 days) (SEP IV.A.13); Timeliness of Investigation Completion (90 days) (SEP IV.A.14); Quality of Investigations (SEP IV.A.15); Initial Family Team Meeting (SEP IV.B.16); Subsequent FTMs within 12 months (SEP IV.B.17); Subsequent FTMs after 12 months – Reunification Goal (SEP IV.B.18); Subsequent FTMs after 12 months – Other than Reunification Goal (SEP IV.B.19); Needs Assessment (SEP IV.C.21); Initial Case Plans (SEP IV.D.22); Intake Workers (Local Offices) (SEP IV.E.24); Intake Workers (SEP IV.E.25); Adoption Local Office Caseload (SEP IV.E.26); Adoption Workers (SEP IV.E.27); Parent-Child Visits – weekly (SEP IV.F.29); Parent-Child Visits – bi-weekly (SEP IV.F.30); Sibling Visits (SEP IV.F.31); Placing Siblings Together (SEP IV.G.32); Placing Siblings Together for Four or More Children (SEP IV.G.33); Recruitment of Placements for Sibling Groups of Four or More (SEP IV.G.34); Placement Stability for first 12 months in care (SEP IV.G.35); Placement Stability 13-24 Months in Care (SEP IV.G.36); Repeat Maltreatment (In-home) (SEP IV.H.37); Maltreatment Post-Reunification (SEP IV.H.38); Re-entry to Placement (SEP IV.H.39); Permanency within 12

respect to each of the SEP Foundational Elements in such important areas as training, services for domestic violence survivors, and manageable caseloads for workers. As discussed in more detail below, the data contained in this report reflect declines in performance associated with processes that were suspended during the pandemic, most notably measures related to in-person visits and family team meetings. The Monitor considers these declines to be temporary.

Three of the remaining four SEP Outcomes *To Be Achieved* are measured by New Jersey's Qualitative Review (QR) process: Quality of Case Plans (SEP IV.D.23); Quality of Teaming (SEP IV.B.20); and Services to Support Transitions (SEP IV.J.44). The data required for determining performance for these three SEP Outcomes are collected and reported annually and thus are not newly addressed in this report. Reporting this information will also be difficult going forward as the reviews were suspended due to COVID and have not yet been resumed. The fourth outstanding Outcome *To Be Achieved* – that workers visit parents twice monthly when a child is in the state's custody with a permanency goal of reunification (SEP IV.F.28) – continues to remain below the SEP's standard, even in the two months before the pandemic and continuing during the remaining months when in-person visits were drastically curtailed.

In the body of the report, we provide specific data and the Monitor's observations and conclusions with respect to each of the requirements of the SEP. In general, however, the strong leadership, infrastructure, and quality staffing that New Jersey has created within DCF has enabled it to respond to the crisis quickly and effectively and continue to operate to protect children and support families during this pandemic. This is no small accomplishment.

Below we briefly highlight and/or update some of the new policy, practice, and initiatives underway within DCF – occurring despite the pandemic.  The Department has moved forward with several important initiatives that had been planned or underway while dealing with the disruptions and uncertainties caused by the pandemic. At the same time, progress in some areas has been predictably slowed by the pandemic, and new challenges are on the horizon as New Jersey and other states around the nation deal with the economic, public health, and budgetary impacts of the pandemic.

---

Months (SEP IV.I.40); Permanency Within 24 Months (SEP IV.I.41); Permanency within 36 months (SEP IV.I.42); Permanency within 48 months (SEP IV.I.43); Independent Living Assessments (SEP IV.K.45); Quality of Case Planning and Services (SEP IV.K.46); Housing for Older Youth Exiting to Non-Permanency (SEP IV.K.47); and Employment/Education for Older Youth Exiting to Non-Permanency (SEP IV.K.48).

*Focus on Race Equity*

During this period, DCF has maintained and moved forward with its commitment to address Race Equity. At the request of DCF's Executive Management Team and in recognition of the disparities in the outcomes by race and the toll that the pandemic is taking on people of color, DCF's Race Equity Committee worked to develop a set of priority areas for the Department to address as the public health emergency continues. The Race Equity Committee also built linkages with the Administrative Office of the Courts (AOC) and its work under the leadership of Acting Administrative Director of the New Jersey Courts Judge Glenn A. Grant to identify and begin to address racial inequities in outcomes for children and families in New Jersey. DCF also continued its collaboration with the Children in Court Improvement Committee's work to examine data that reflect disproportionate outcomes based on race and ethnicity.

*Designing a Primary Prevention Model*

DCF has prioritized efforts to increase the availability and accessibility of prevention services with a goal of reducing the number of children, youth and families that are involved with them due to abuse or neglect. Part of this work is building out a Primary Prevention Model for the state. Between January and June 2020, DCF continued its work with Predict Align Prevent (PAP), a program that uses strategic alignment of community initiatives and programs to design primary prevention models. DCF assembled PAP teams in Camden and Cumberland counties to finalize data collection and plan for the community engagement portion of the project, involving the Camden Coalition for Healthcare Providers and the Cumberland County Human Services Director. Simultaneously, in an effort to build capacity to sustain the work independently, DCF's data team collected data from various New Jersey municipalities related to child maltreatment, zoning, and infrastructure.

DCF's Division of Family and Community Partnerships (FCP) continued work towards expanding its continuum of evidence-based home visiting programs. With funding from the Burke Foundation and Family Connects International, DCF is developing an evidence-based home visitation pilot in Mercer County that will address the postpartum needs of families. FCP's Intake Hubs, serving as resources for pregnant women and families with young children, added Early Childhood Specialists with strong backgrounds in early childhood development to each Intake Hub.

During the monitoring period, DCF also made improvements to its Peer Recovery Support Services (PRSS), including plans to expand access to all Local Offices. Certified PRSS staff provide non-clinical assistance and support to parents and caregivers throughout all stages of substance use disorder recovery and rehabilitation. In January 2020, three provider agencies began to train CP&P staff on PRSS and its goals. Although PRSS continued to serve parents and caregivers through a combination of in-person and virtual services, additional expansion of the program had to be suspended due to the COVID-19 pandemic. PRSS received 853 referrals in FY 2020, and, as of June 2020, PRSS had served a total of 192 individuals.

### *Prioritizing Safety*

DCF continues to prioritize safety for both staff and families as foundational to its child welfare practice. The COVID-19 pandemic presented new challenges to efforts to ensure the safety of children, youth and families given the closing of child care facilities and schools. Like states across the nation, calls to DCF's child abuse hotline were dramatically reduced in the early months of the pandemic. DCF partnered with New Jersey's Department of Education to raise awareness of the signs of child abuse among educators. It also promoted the use of Quick Response (QR) codes for young people to use while on video calls to access supports like "2nd Floor," a youth helpline in New Jersey. DCF also collaborated with the New Jersey Education Association, physician groups, and law enforcement to encourage community responsiveness to signs of maltreatment.

DCF also continued to partner with Collaborative Safety, LLC, a national organization that, borrowing from the fields of aviation and health science, helps states implement a "safety science" approach to child welfare in order to more efficiently reduce the frequency of critical and life-threatening incidences and reduce risk of harm. Between January and June 2020, Collaborative Safety staff provided technical assistance to DCF's Critical Incident Review Unit of the Office of Quality (OOQ), including case record reviews of critical incidents, completing case narratives, and other system processes and tools. In January and February 2020, DCF's newly established statewide multidisciplinary team and three regional teams held orientations sessions. These were suspended but were resumed virtually in June 2020.

Between January and June 2020, DCF continued its work to improve staff wellness by supporting twice monthly micro-learning sessions with Alia Innovations, Inc. on self-care strategies. Responding to staff needs during the current public health crisis, DCF also launched a COVID-19 mindfulness webpage that offers videos, articles, and other resources to help workers cope with the stress of the pandemic.[14] The website supplements the Mindfulness Toolkit previously made available to staff.  In addition, to better understand and inform its response to staff's challenges and experiences related to remote work during COVID-19, DCF conducted a staff survey, the results, which were published on its website in June 2020, indicate that overall staff had access to needed hardware and software, and felt they were able to work from home effectively, though there were some reported challenges related to the adjustment to new technological methods, balancing caregiving responsibilities for workers' own children, and adapting to new ways of working with families.[15]

### *Integrating Family Voice*

In January 2020, DCF's Youth Council, part of the Office of Family Voice (OFV), elected and finalized its membership body. The Youth Council was established to provide feedback and expertise to improve programs and help identify and evaluate supports and services for young people. It currently consists of 24 young people between ages 15 and 23 who experienced the foster care system. Throughout the monitoring period, first in person and then virtually, DCF Commissioner Beyer met with Council members on a bimonthly basis to obtain feedback on the impacts of the pandemic and resulting needs. The Youth Council created a "Youth COVID-19 Resource Guide," and assisted DCF as they developed COVID-19 communications for adolescents and young adults.[16] The Youth Council also created three subcommittees: Aging Out and Communications, Resource and Kin Parent training, and Sibling and Advocacy.

To add the voices of birth parents, relative caregivers, and foster parents, OFV also began reviewing national models and conducting interviews with various informants about the next phase of the work to establish a Parent Council. Additionally, DCF's Fatherhood Engagement Committee convened in early 2020 to strengthen its efforts to better engage and include fathers in planning for their children; a

---

[14] To see DCF's Mindfulness Webpage, go to: https://www.nj.gov/dcf/mindfulness.html
[15] To see results from DCF's Work From Home survey, go to:
https://www.nj.gov/dcf/news/DCF_WFH_SurveyResults_June2020.pdf
[16] To see the Office of Family Voice Youth Resource Guide, go to:
https://www.nj.gov/dcf/news/publications/Family.Voice-Youth.Guidance.During.COVID.pdf

subcommittee of the group continued to meet virtually throughout the monitoring period.

Finally, the County Councils for Young Children (CCYC), which were funded by the federal Improving Head Start for School Readiness Act, continued to function in all 21 counties in New Jersey to strengthen local program collaboration and integration among parents, families, and local stakeholders. The CCYCs transitioned to virtual activities in April 2020 but continued to host events throughout the monitoring period. In June 2020, DCF hosted a statewide virtual meeting for grantee administrators and staff to discuss successful engagement strategies as well as COVID-19 challenges.

### *Re-designing New Jersey's Children's System of Care*

DCF is in the process of re-structuring its Children's System of Care (CSOC) to better integrate behavioral and physical health services for children and youth. This process involved convening a task force of 16 stakeholders from across New Jersey, facilitated by the Center for Healthcare Strategies (CHCS), to develop a framework to better screen and identify children and youth needing assistance, improve performance on key outcome measures, build capacity to deliver evidence-based and best practice interventions, and promote equitable access to in-home and community-based services. In January 2020, CSOC leadership and CHCS drafted a final report with recommendations to improve CSOC's programs and services. This report was based on participant survey responses, which indicated challenges such as poor communication between service providers, lack of substance use treatment for youth, and need for support for youth with developmental and intellectual disabilities. The report was about to be finalized at the onset of the pandemic; DCF Leadership intends to reconvene the stakeholder group in early 2021 to review and update the report's recommendations in light of the current health and economic climate.[17]

During the monitoring period, DCF worked with a consultant to develop a new rate structure to support providers in improving the quality of and access to critical mental health services for children, youth, and their families. Changing the rate structure had been advocated by CSOC providers for some time, but still requires approval by Centers for Medicare and Medicaid Services (CMS). The goal of the new rate

---

[17] To see additional information on the task force, including meeting agendas and summaries, go to: https://www.nj.gov/dcf/about/divisions/dcsc/csoc_taskforce.html

structure is to reflect the cost of providing high quality behavioral healthcare in New Jersey more accurately and ensure the long-term sustainability of CSOC. In September 2020, as part of the delayed FY 2021 budget, the legislature importantly invested $45 million for this rate re-balancing.

Last fall, the federal Substance Abuse and Mental Health Services Administration (SAMHSA) awarded DCF and CSOC a Promising Path to Success expansion grant for ongoing training in the Nurtured Heart Approach (NHA) and its Six Core Strategies.[18] The goal of the grant is to improve engagement with at least 60,000 youth and young adults over the course of the four-year grant period by providing training to community-based partners and staff across DCF divisions. Between December 2019 and February 2020, all CP&P's resource unit staff were trained in NHA; 60 resource staff were selected to become certified NHA trainers through a 5-day course originally scheduled to take place in the spring, but was postponed to the pandemic. This training took place in October 2020 and included approximately 55 CP&P staff.

DCF is currently implementing training called "Connections Matter" to address Adverse Child Experiences (ACEs) and their impact on children, youth, and families. The training, scheduled to be offered to all DCF staff, community network providers, stakeholders, and families using a train-the-trainer model, will stress the importance of healthy relationships to prevent and heal from the effects of ACES and to strengthen communities. In March 2020, the curriculum was adapted to a virtual training; 389 people participated, including 207 community providers and 182 DCF staff. Additionally, in June 2020, the New Jersey's ACEs Funders Collaborative funded a national expert in ACEs as an Executive-on-Loan, housed within DCF, to assist in coordinating a statewide strategy to prevent and heal from ACEs.[19]

### *Maintaining Adequate Pool of Resource Homes and Increasing Kinship Placement*

A key part of DCF's Strategic Plan, *Safe, Healthy, Connected: DCF in the 21st Century,* involves a recognition that children fare best when they remain with family, and an associated commitment to dramatically increase kinship placement for children and youth in foster care.[20] During the monitoring period, DCF continued to pursue its

---

[18] To read about the Nurtured Heart Approach, go to: https://childrenssuccessfoundation.com/about-nurtured-heart-approach/
[19] The ACES Funders Collaborative consists of The Burke Foundation, The Nicholas Foundation, and the Turrell Fund. To read the press release on the Executive on Loan, go to: https://www.thenicholsonfoundation.org/news-and-resources/nj-funders-aces-collaborative-seeking-executive-loan-lead-statewide-aces-efforts
[20] To see DCF's Strategic Plan, go to: https://www.nj.gov/dcf/about/strategic.html

ambitious target of placing 60 percent of children who enter care with kin within the first seven days of removal from their homes, and 80 percent placed with kin by the first 30 days. DCF's pilot in Ocean and Monmouth counties to increase placement with kin and strengthen supports to resource and kin parents was affected by the COVID-19 pandemic; in March 2020 in-person visits between resource parents and caseworkers and concurrent home study/licensing processes were suspended. These efforts were resumed in August, and the Ocean/Monmouth pilot will now continue until February 2021.

In February 2020, leadership from the Office of Resource Families and the Office of Resource Licensing began a series of presentations to staff about the value of kinship care for children, youth, and families and supports available for kin placements. Additionally, to better understand and explore the workforce's beliefs about kinship foster care, including the impact of a child's race on perceived barriers to kinship placement, DCF conducted a statewide survey of staff in February 2020. Findings from the survey were provided to leadership and staff at nine area-level presentations held in September 2020.

DCF continues to maintain an adequate pool of placement resource homes and group settings to meet the needs of children in out-of-home care. As of June 30, 2020, 4,208 children ages birth to 21 were in out-of-home placement. Of all children in out-of-home placement, 3,809 (91%) were placed in family-like settings: 2,122 children (50%) in non-kinship resource family homes, and 1,687 children (40%) in kinship homes. The ten percent of children not residing in family-like settings consisted of 322 children (8%) in group and residential settings facilities and 77 children (2%) in independent living programs.

Despite the challenges of licensing and supporting resource homes during COVID-19, DCF continues to report the availability of enough resource homes to meet needs, although there remain challenges with finding homes for adolescents and children with autism. As of June 30, 2020, there were a total of 4,397 licensed resource family homes in the state, with a total bed capacity for 8,541 children. Of the total number of resource family homes, 1,482 (34%) were kin homes and 2,915 (66%) were non-kin homes. As described above, DCF continues to be committed to dramatically increasing the number of kinship homes available in the state.

Between January and June 2020, despite resource family recruitment and licensing activities being suspended in March, DCF licensed 299 new kinship and non-kinship

resource family homes; this is compared with 545 newly licensed resource homes in the previous monitoring period. Of these newly licensed resource family homes, 121 (40%) were kin homes and 178 (60%) were non-kinship homes. During the same period, 490 resource family homes were closed; of those closed, 266 (54%) were kin homes and 224 (46%) were non-kin homes. The primary reasons for resource home closures were: adoption finalization (37%), provider's health or age circumstances (25%), reunification (13%), and kinship legal guardianship (6%).

DCF also continues to focus on recruiting homes for large sibling groups as described further in Section V.F *Placement*.

### *Accomplishments and Challenges in Specific Areas of Practice Related to SEP Outcomes*

*Family Team Meetings*

Family Team Meetings (FTMs) remain an integral component of DCF's case practice and are an essential process for bringing families, youth, providers, and formal and informal supports together to exchange information, participate in case planning, coordinate and follow up on services, and examine and track progress toward accomplishing case plan goals. FTMs continued to be held during the COVID-19 pandemic, although virtually, because in-person contact with families was suspended between mid-March and early July. DCF also suspended the timeframes required for completing FTMs to grant more flexibility to staff due to the pandemic. For purposes of SEP monitoring, virtual FTMs were considered and counted as if they were in-person. Even so, performance on all SEP measures related to FTMs dipped below the standard in at least two months of the monitoring period. Performance on the requirement to hold at least three FTMs in the most recent 12 months for children who have been care for at least two years with a permanency goal of reunification (SEP IV.B.18) did not meet the standard in any month for the second consecutive monitoring period. Most measures have seen improved performance as of June 2020.

*Maintaining Contact with Family Through Visits*

Maintaining bonds and contact through visits between children in foster care and their workers, parents, and siblings, an essential element of successful child welfare practice, was made more challenging during this period. In-person visits were

suspended for most of the monitoring period due to the COVID-19 pandemic. Although mechanisms were rapidly put in place to allow for visits to continue by video and telephone, performance on most visit measures fell below the standard in at least two months of the monitoring period. Documented phone and virtual visits were counted as meeting the requirements, based on federal Children's Bureau guidelines. As reported above, the requirement that workers visit parents twice monthly when a child is in the state's custody with a permanency goal of reunification (SEP IV.F.28) continues to remain below the SEP's standard as an Outcome *To Be Achieved*. The requirement that workers visit children twice per month in the first two months of placement or after a placement change (SEP III.F.9) also did not meet the standard in any month.

*Services to Older Youth*

As reported above, in response to the COVID-19 pandemic, DCF issued a moratorium through December 31, 2020 on closing cases of youth when they age out of the foster care system at age 21 and extended contracted adolescent services for those youth for the same timeframe. As of October 2020, approximately 110 youth benefitted from this policy. This was an important policy decision designed to provide safety and stability for older youth in foster care during this crisis.

Between January and June 2020, DCF has continued its work to improve the experiences of older youth in its care through the efforts of the Office of Adolescent Services (OAS). In partnership with the Division of Women, OAS began implementing some activities outlined in its 2018-2020 LGBTQI Priority Plan, including actions intended to create safe and protective environments for the LGTBQI community. DCF's Safe Space Liaisons and staff from New Jersey's Juvenile Justice Commission participated in a four-day training entitled *Transgender Training of Trainers: Expanding Content Delivery Skills Towards Highly Impactful Trainings,* conducted by Dr. Eli Green of the Transgender Training Institute, Inc. The Safe Space Liaisons are adapting the training for DCF staff and stakeholders.

In 2019, DCF was awarded matching funds through Youth Villages, a national non-profit, to implement the evidence-based LifeSet program, an intensive case management and life skills service for older youth in foster care. Beginning in January 2020, OAS and Youth Villages initiated a certification process, after which four agencies – Acenda, Care Plus, Catholic Charities Diocese of Metuchen, and Preferred Behavioral Health – were approved to implement the program in New Jersey. Services began in October 2020; DCF plans to enroll two youth LifeSet Specialists

each week until each agency enrolls 32 youth; as of December 3, 2020, 99 youth are enrolled across the four contracted providers. The randomized control trial portion of the contract will begin in the spring.[21]

As part of the federal John H. Chafee Foster Care Program for Successful Transition to Adulthood, DCF convened an advisory group to develop the next stage of the five-year cycle of planning for older youth.[22] The advisory group devised 11 strategies to align with the priorities of the department. Some of the identified strategies include: continuing to elevate youth voice, creating a statewide Chafee Advisory Group, and marketing Chafee services to eligible youth. New Jersey also began evaluating after care programs and housing models to determine the viability and effectiveness of current contracts. It was hoped that funding for the changes would have been made available in the FY 2021 budget. Unfortunately, due to the state budget cuts as a result of the COVID-19 pandemic, most programs identified to be revamped were not included in the Governor's FY 2021 budget, approved by the legislature in September 2020.

*Continuous Quality Improvement*
As a direct consequence of the pandemic, DCF suspended many of its Continuous Quality Improvement (CQI) activities in order to redeploy staff to handling the emergencies of the pandemic, including developing data collection tools and practices necessary for the safe and effective management of the pandemic. As a result, no Quality Reviews (QRs) or ChildStat sessions were held after March 2020.

*Budget*
The budget process for FY2021 was delayed due to the COVID-19 pandemic, resulting in an allocation for the nine-month period from October 1, 2020 – June 20, 2021. Given the state's significant revenue shortfall – estimated at $5.6 billion for FY2021 – the final budget reflects the difficult economic realities New Jersey is experiencing as a result of the pandemic. As a result of the shortfall, Governor Murphy requested all departments propose a model of eliminating roughly 15 percent from the state-funded portion of their total budgets. In response to those proposals, the State worked with each department to develop the Governor's final proposed FY 2021 budget, which was presented to the legislature on August 25, 2020. The legislature passed an amended budget on September 22, 2020. In the final

---

[21] To learn more about New Jersey's LifeSet program, go to: https://www.nj.gov/dcf/adolescent/LifeSet-CAG-Presentation-852020.pdf
[22] To see New Jersey's 2020-2024 John H. Chafee Foster Care Program for Successful Transition to Adulthood Plan, go to: https://www.nj.gov/dcf/adolescent/NJ-Chafee-Plan-final.pdf

budget, DCF sustained approximately $42.3 million in cuts to select programs and services, many of which it deemed no longer essential, or were able to be adjusted as a result of the decrease in New Jersey's foster care population over the past several years, including a repurposing of funding that had previously been needed for Child Health Unit nurses. Prior to the pandemic, DCF had planned to re-invest these savings in prevention services, but COVID-19 required those plans to be suspended. However, in recognition of the impact that the COVID-19 pandemic is having on children, youth and families, Governor Murphy's budget includes a $45 million investment in the Children's System of Care (CSOC), the DCF division that serves children and adolescents with emotional and behavioral health care challenges and their families. Given this investment, the DCF budget reflects an increase from last year's budget.

In the final budget, DCF was able to preserve many key programs and services and was forced to cut others, as described further in Section V.P *Budget*.

To avoid layoffs, over 5,000 DCF employees were furloughed for 10 days between June 29 and July 24, though the COVID Response teams and most State Central Registry (SCR) staff were exempted.[23]

---

[23] To read the Memorandum of Agreement between the State of New Jersey and the Communications Workers of America, AFL-CIO, go to: https://cwanj.org/wp-content/uploads/2020/06/Signed-MOA.pdf

## III.  CHILD AND FAMILY OUTCOMES AND CASE PRACTICE PERFORMANCE MEASURES

The child and family outcomes and case practice performance measures include 48 measures and Foundational Elements that assess the state's performance in meeting the requirements of the SEP (see Table 1). These performance measures cover the areas of child safety, permanency, service planning, child well-being and ongoing infrastructure development pertaining to core elements such as appropriate staffing, caseloads, and training.

Many of the measures are assessed through a review of data from NJ SPIRIT[24] and SafeMeasures,[25] and, in some areas, these data are independently validated by the Monitor. Data are also provided through DCF's work with Rutgers University, which assists with data analysis. With few exceptions, performance data provided in this report are as of June 2020.

It is important to note that due to challenges related to COVID-19, some of the reported data – particularly data related to visits, case plans, and family team meetings – may reflect temporary declines in performance or, in some instances, may understate actual performance.  The time needed to disseminate technology to both workers and families and update DCF's case management system to capture virtual contacts in the early months of the pandemic may have, in some instances, resulted in an inability to timely document full performance.

---

[24] NJ SPIRIT is New Jersey's Statewide Automated Child Welfare Information System (SACWIS), a case management and financial system designed to support the daily work of caseworkers and supervisors within DCF.
[25] SafeMeasures is a data warehouse and analytical tool that allows tracking of critical child welfare indicators by worker, supervisor, Local Office, county and statewide. It is used by different levels of staff to track, monitor and analyze performance and trends in case practice and targeted measures and outcomes.

**Table 1:** *Charlie and Nadine H.* **Child and Family Outcome and Case Practice Performance Measures**
**(Summary of Performance as of June 30, 2020)**

| Table 1A: To Be Achieved | | | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[26]** | **December 2019 Performance[27]** | **June 2020 Performance** | **Requirement Fulfilled (Yes/No)[28]** |
| *Family Teaming* | | | | | |
| Quality of Teaming (IV.B.20) | 75% of cases involving out-of-home placements that were assessed as part of the QR process will show evidence of both acceptable team formation and acceptable functioning. The Monitor, in consultation with the parties, shall determine the standards for quality team formation and functioning. | 58% of cases rated acceptable for the QR indicator *teamwork and coordination* (CY 2018). | 62% of the cases rated acceptable for the QR indicator *teamwork and coordination* (CY 2019).[29,30] | CY 2020 data not yet available. | No |

---

[26] In some instances where the Monitor did not report mid-year data, the most recent annual data available are included.
[27] In some instances where the Monitor does not have December 2019 data, the most recent data available are included.
[28] "Yes" indicates that, in the Monitor's judgment, based on presently available information, DCF has fulfilled its obligations regarding the SEP standard. "No" indicates that, in the Monitor's judgment, DCF has not fulfilled its obligation regarding the SEP standard.
[29] From January to December 2019, 62% (90 of 145) of applicable cases reviewed for Quality of Teaming were rated acceptable for the *teamwork and coordination* indicator.
[30] All in-home cases were excluded from this measure.

*Charlie and Nadine H. v. Murphy*
*Progress Report of New Jersey DCF for the Period January-June 2020*
*January 2021*
*Page 18*

| | | | | Table 1A: To Be Achieved | | |
|---|---|---|---|---|---|---|

| SEP Measure | Sustainability and Exit Plan Standard | June 2019 Performance[26] | December 2019 Performance[27] | June 2020 Performance | Requirement Fulfilled (Yes/No)[28] |
|---|---|---|---|---|---|
| | | *Case and Service Planning* | | | |
| Quality of Case Plans<br><br>(IV.D.23) | 80% of case plans shall be rated acceptable as measured by the QR process. The Monitor, in consultation with the parties, shall determine that standards for quality case planning. | 51% of cases rated acceptable for both QR indicators *child and family planning process* and *tracking and adjusting* (CY 2018). | 58% of cases rated acceptable for both QR indicators *child and family planning process* and *tracking and adjusting* (CY 2019).[31] | CY 2020 data not yet available. | No |
| | | *Visits* | | | |
| Caseworker Contacts with Family When Goal is Reunification<br><br>(IV.F.28) | 90% of families will have at least twice-per-month, face-to-face contact with their caseworker when the permanency goal is reunification. | 83% of applicable parents of children in custody with a goal of reunification had at least two face-to-face visits with a caseworker in June. Monthly range during January – June 2019 monitoring period: 83 to 86%. | 80% of applicable parents of children in custody with a goal of reunification had at least two face-to-face visits with a caseworker in December. Monthly range during July – December 2019 monitoring period: 80 to 85%. | 46% of applicable parents of children in custody with a goal of reunification had at least two face-to-face visits with a caseworker in June. Monthly range during January – June 2020 monitoring period: 27 to 82%.[32,33] | No |

---

[31] From January to December 2019, 58% (112 of 193) of applicable cases reviewed were rated acceptable for both the *child and family planning process* and the *tracking and adjusting* indicators; 62% (120 of 193) of cases were rated acceptable for *child and family planning process*; 73% (141 of 193) of cases were rated acceptable for *tracking and adjusting*.

[32] Monthly performance for this measure is as follows: January, 82%; February, 78%; March, 38%; April, 27%; May, 47%; June, 46%. Reported performance accounts for valid exceptions to the visits requirement.

[33] The Monitor and DCF completed a joint validation of a sample of cases from February 2020 and found that exceptions were appropriately applied and documented in 69% of cases. Therefore, these data reflect exclusions from the universe of instances in which exceptions to the requirement for worker visits with parents were appropriately applied and documented.

| Table 1A: To Be Achieved | | | | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | June 2019 Performance[26] | December 2019 Performance[27] | June 2020 Performance | Requirement Fulfilled (Yes/No)[28] |
| *Services to Support Transition* | | | | | |
| Services to Support Transition (IV.J.44) | 80% of cases will be rated acceptable for supporting transitions as measured by the QR. The Monitor, in consultation with the parties, shall determine the standards for quality support for transitions. | 62% of cases rated acceptable for the QR indicator *successful transitions* (CY 2018). | 74% of cases rated acceptable for the QR indicator *successful transitions* (CY 2019).[34] | CY 2020 data not yet available. | No |

[34] From January to December 2019, 74% (63 of 85) of applicable cases reviewed were rated acceptable for the *successful transitions* indicator.

| | | | Table 1B: To Be Maintained | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | June 2019 Performance[35] | December 2019 Performance | June 2020 Performance[36] | Requirement Maintained (Yes/No)[37] |
| *Investigations* | | | | | |
| Institutional Abuse Investigations Unit (IAIU)<br><br>(III.A.1) | 80% of IAIU investigations will be completed within 60 days. | 86% of IAIU investigations in June were completed within 60 days. | 81% of IAIU investigations in December were completed within 60 days. | 85% of IAIU investigations in June were completed within 60 days. | Yes |
| Timeliness of Investigation Completion (60 days)<br><br>(IV.A.13) | 85% of all investigations of alleged child abuse and neglect shall be completed within 60 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. | 84% of all investigations in May were completed within 60 days. Monthly range during December 2018 – May 2019 monitoring period: 82 to 86%. | 83% of all investigations in November were completed within 60 days. Monthly range during June – November 2019 monitoring period: 83 to 87%. | 81% of all investigations in May were completed within 60 days. Monthly range during December 2019 – May 2020 monitoring period: 81 to 93%.[38] | Yes |

---

[35] In some instances where the Monitor did not report mid-year data, the most recent annual data available are included.

[36] In some instances where the Monitor does not have June 2020 data, the most recent data available are included.

[37] "Yes" indicates that, in the Monitor's judgment based on presently available information, DCF has fulfilled its obligations regarding the requirement under the SEP. The Monitor has also designated "Yes" for a requirement where DCF has met or is within one percentage point of the SEP standard or there are a small number of cases causing the failure to meet the SEP standard.

[38] Due to the time lag of this measure, the Monitor and DCF have altered the period of review, so December 2019 data are included for this period and June 2020 data will be included in the next monitoring report. Monthly performance for this measure is as follows: December, 85%; January, 84%; February, 86%; March, 89%; April, 93%; May, 81%.

| | | | Table 1B: To Be Maintained | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[35]** | **December 2019 Performance** | **June 2020 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| Timeliness of Investigation Completion (90 days) (IV.A.14) | 95% of all investigations of alleged child abuse and neglect shall be completed within 90 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. | 95% of all investigations in May were completed within 90 days. Monthly range during December 2018 – May 2019 monitoring period: 94 to 96%. | 95% of all investigations in November were completed within 90 days. Monthly range during June–November 2019 monitoring period: 94 to 95%. | 94% of all investigations in May were completed within 90 days. Monthly range during December 2019– May 2020 monitoring period: 94 to 97%.[39] | Yes |
| Quality Investigations (IV.A.15) | 85% of investigations shall meet the standards for quality investigations. The Monitor, in consultation with the parties, shall determine appropriate standards for quality investigations. | 91% of investigations met quality standards in a March 2018 review of a statistically significant sample of investigations completed in October 2017. | 91% of investigations met quality standards in a February 2020 review of a statistically significant sample of investigations completed in October 2019. | The next review will be conducted in early 2022 for investigations completed in October 2021.[40] | Yes |

[39] Due to the time lag of this measure, the Monitor and DCF have altered the period of review, so December 2019 data are included for this period and June 2020 data will be included in the next monitoring report. Monthly performance for this measure is as follows: December, 95%; January, 96%; February, 96%; March, 96%; April, 97%; May, 94%.

[40] DCF's Investigation Case Record Review is typically conducted every two years.

| | | | | | |
|---|---|---|---|---|---|
| **Table 1B: To Be Maintained** | | | | | |
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance**[35] | **December 2019 Performance** | **June 2020 Performance**[36] | **Requirement Maintained (Yes/No)**[37] |
| *Family Teaming* | | | | | |
| Initial Family Team Meeting (IV.B.16) | 80% of children newly entering placement shall have a family team meeting before or within 45 days of placement. | 87% of children newly entering placement in June 2019 had a FTM within 45 days. Monthly range during January – June 2019 monitoring period: 83 to 94%. | 91% of children newly entering placement in December 2019 had a FTM within 45 days. Monthly range during July – December 2019 monitoring period: 81 to 92%. | 64% of children newly entering placement in June 2020 had a FTM within 45 days. Monthly range during January – June 2020 monitoring period: 58 to 94%.[41] | Yes[42] |
| Subsequent FTMs within 12 months (IV.B.17) | 80% of children will have three additional FTMs within the first 12 months of the child coming into placement. | 75% of children who entered placement in June 2018 had three or more additional FTMs within the first 12 months. Monthly range during January – June 2019 monitoring period: 75 to 90%. | 93% of children who entered placement in December 2018 had three or more additional FTMs within the first 12 months. Monthly range during July – December 2019 monitoring period: 81 to 93%. | 72% of children who entered placement in June 2019 had three or more additional FTMs within the first 12 months. Monthly range during January – June 2020 monitoring period: 65 to 93%.[43] | Yes[44] |

---

[41] Monthly performance for this measure is as follows: January, 87%; February, 58%; March, 65%; April, 94%; May, 76%; June, 64%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF jointly reviewed all 29 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

[42] Given the extenuating circumstances presented by the COVID-19 pandemic and the time it took for DCF to get alternative means of safe FTMs in place, the Monitor considers this a temporary decline and anticipates that performance will increase to prior levels in the next monitoring period.

[43] Monthly performance for this measure is as follows: January, 93%; February, 93%; March, 75%; April, 65%; May, 76%; June, 72%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF jointly reviewed all 62 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

[44] Given the extenuating circumstances presented by the COVID-19 pandemic and the time it took for DCF to get alternative means of safe FTMs in place, the Monitor considers this a temporary decline and anticipates that performance will increase to prior levels in the next monitoring period.

| | Table 1B: To Be Maintained | | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance**[35] | **December 2019 Performance** | **June 2020 Performance**[36] | **Requirement Maintained (Yes/No)**[37] |
| Subsequent FTMs after 12 months – Reunification Goal (IV.B.18) | After the first 12 months of a child being in care, 90% of those with a goal of reunification will have at least three FTMs each year. | 84% of children who entered placement before June 2018 (but still have a goal of reunification) had three or more additional FTMs in the most recent 12 months. Monthly range during January – June 2019 monitoring period: 84 to 100%. | 83% of children who entered placement before December 2018 (but still have a goal of reunification) had three or more additional FTMs in the most recent 12 months. Monthly range during July – December 2019 monitoring period: 48 to 89%. | 74% of children who entered placement before June 2019 (but still have a goal of reunification) had three or more additional FTMs in the most recent 12 months. Monthly range during January – June 2020 monitoring period: 63 to 87%.[45] | No[46] |
| Subsequent FTMs after 12 months – Other than Reunification Goal (IV.B.19) | After the first 12 months of a child being in care, for those children with a goal other than reunification, 90% shall have at least two FTMs each year. | 89% of children who entered placement before June 2018 (and have a goal other than reunification) had two or more FTMs in the most recent 12 months of placement. Monthly range during January – June 2019 monitoring period: 89 to 93%. | 94% of children who entered placement before December 2018 (and have a goal other than reunification) had two or more FTMs in the most recent 12 months of placement. Monthly range during July – December 2019 monitoring period: 88 to 95%. | 89% of children who entered placement before June 2019 (and have a goal other than reunification) had two or more FTMs in the most recent 12 months of placement. Monthly range during January – June 2020 monitoring period: 81 to 96%.[47] | Yes |

---

[45] Monthly performance for this measure is as follows: January, 87%; February, 76%; March, 70%; April, 68%; May, 63%; June, 74%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF jointly reviewed all 12 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

[46] Though there are extenuating circumstances presented by the COVID-19 pandemic, and the universe of cases to which this measure applies is small and therefore more susceptible to fluctuations, DCF did not meet the performance standard in any month and thus the Monitor does not consider the measure to be met.

[47] Monthly performance for this measure is as follows: January, 96%; February, 94%; March, 90%; April, 84%; May, 87%; June, 81%. Reported performance accounts for valid exceptions to the FTM requirements. The Monitor and DCF jointly reviewed all 10 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance**[35] | **December 2019 Performance** | **June 2020 Performance**[36] | **Requirement Maintained (Yes/No)**[37] |
| *Needs Assessment* | | | | | |
| Needs Assessment (IV.C.21) | The state shall regularly evaluate the need for additional placements and services to meet the needs of children in custody and their families and to support intact families and prevent the need for out-of-home care. Such needs assessments shall be conducted on an annual, staggered basis that assures that every county is assessed at least once every three years. The state shall develop placements and services consistent with the findings of these needs assessments. | DCF completed a comprehensive meta-analysis of previous needs assessments in the state, findings of which were shared with stakeholders in statewide meetings in May 2019. DCF plans to prioritize assessments collected routinely by county Human Services Advisory Councils (HSACs) and incorporate them into county level Qualitative Reviews (QRs), ChildStat and local Performance Improvement Plan (PIP) processes. | Between July and December 2019, the DCF workgroup finalized tools and established a uniform reporting method for the counties to ensure that biennial reports are standardized. DCF also worked with Rutgers University to design county-based data profiles to provide HSACs with county population data and the most recent administrative data. In November 2019, the first of two groups of New Jersey counties began implementing the revised needs assessment process. | DCF received the first group of New Jersey counties' reports using the new needs assessment process in September and October 2020. The second group of reports are due by the end of 2020. | Yes |

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | June 2019 Performance[35] | December 2019 Performance | June 2020 Performance[36] | Requirement Maintained (Yes/No)[37] |
| *Case and Service Planning* | | | | | |
| Initial Case Plans (IV.D.22) | 95% of initial case plans for children and families shall be completed within 30 days. | 94% of children entering care in June 2019 had case plans developed within 30 days. Monthly range during January – June 2019 monitoring period: 93 to 98%. | 97% of children entering care in December 2019 had case plans developed within 30 days. Monthly range during July – December 2019 monitoring period: 88 to 98%. | 84% of children entering care in June 2020 had case plans developed within 30 days. Monthly range during January – June 2020 monitoring period: 84 to 96%.[48] | Yes[49] |
| Timeliness of Current Plans (III.C.6) | 95% of case plans for children and families will be reviewed and modified no less frequently than every six months. | 93% of case plans in June 2019 were reviewed and modified as necessary at least every six months. Monthly range during January – June 2019 monitoring period: 93 to 98%. | 97% of case plans in December 2019 were reviewed and modified as necessary at least every six months. Monthly range during July – December 2019 monitoring period: 94 to 97%. | 97% of case plans in June 2020 were reviewed and modified as necessary at least every six months. Monthly range during January – June 2020 monitoring period: 92 to 97%.[50] | Yes |
| *Caseloads* | | | | | |
| Supervisor/ Worker Ratio (III.B.2) | 95% of offices will have sufficient supervisory staff to maintain a 5 worker to 1 supervisor ratio. | 100% of Local Offices have sufficient supervisory staff. | 100% of Local Offices have sufficient supervisory staff. | 100% of Local Offices have sufficient supervisory staff. | Yes |

[48] Monthly performance for this measure is as follows: January, 96%; February, 90%; March, 92%; April, 94%; May, 95%; June, 84%.
[49] Given the extenuating circumstances presented by the COVID-19 pandemic and the time it took for DCF to get alternative means of safe planning with families in place, the Monitor considers this a temporary decline and anticipates that performance will increase to prior levels in the next monitoring period.
[50] Monthly performance on this measure is as follows: January, 92%; February, 97%; March, 97%; April, 92%; May, 97%; June, 97%.

*Charlie and Nadine H. v. Murphy*
*Progress Report of New Jersey DCF for the Period January-June 2020*
*January 2021*
*Page 26*

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[35]** | **December 2019 Performance** | **June 2020 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| IAIU Investigators Caseload (III.B.3) | 95% of IAIU investigators will have (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. | 100% of IAIU investigators met caseload standards. | 100% of IAIU investigators met caseload standards. | 100% of IAIU investigators met caseload standards. | Yes |
| Permanency Workers (Local Offices) Caseload (III.B.4) | 95% of Local Offices will have average caseloads for Permanency workers of (a) no more than 15 families, and (b) no more than 10 children in out-of-home care. | 100% of Local Offices met permanency standards. | 100% of Local Offices met permanency standards. | 100% of Local Offices met permanency standards. | Yes |
| Permanency Workers Caseload (III.B.5) | 95% of Permanency workers will have (a) no more than 15 families, and (b) no more than 10 children in out of home care. | 100% of Permanency workers met caseload standards. | 100% of Permanency workers met caseload standards. | 100% of Permanency workers met caseload standards.[51] | Yes |
| Intake workers (Local Offices) Caseload (IV.E.24) | 95% of Local Offices will have average caseloads for Intake workers of no more than 12 families and no more than eight new case assignments per month. | 100% of Local Offices met intake caseload standards. | 98% of Local Offices met intake caseload standards. | 100% of Local Offices met intake caseload standards. | Yes |

[51] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[35]** | **December 2019 Performance** | **June 2020 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| Intake workers Caseload (IV.E.25) | 90% of individual Intake workers shall have no more than 12 open cases and no more than eight new case assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. | 95% of Intake workers met caseload standards. | 94% of Intake workers met caseload standards. | 97% of Intake workers met caseload standards.[52] | Yes |
| Adoption Workers (Local Offices) Caseload (IV.E.26) | 95% of Local Offices will have average caseloads for Adoption workers of no more than 15 children per worker. | 99% of Local Offices met adoption standards. | 100% of Local Offices met adoption standards. | 100% of Local Offices met adoption standards. | Yes |
| Adoption Workers Caseload (IV.E.27) | 95% of individual Adoption worker caseloads shall be no more than 15 children per worker. | 98% of Adoption workers met caseload standards. | 99% of Adoption workers met caseload standards. | 99% of Adoption workers met caseload standards.[53] | Yes |

[52] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.
[53] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.

| | Table 1B: To Be Maintained | | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[35]** | **December 2019 Performance** | **June 2020 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| *Deputy Attorneys General* | | | | | |
| Adequacy of DAsG Staffing (III.D.7) | The state will maintain adequate DAsG staff positions and keep positions filled. | 136 staff positions were filled with five staff on leave; 131 (96%) available DAsG. | 128 staff positions were filled with seven staff on leave; 121 (95%) available DAsG. | 133 staff positions were filled with four staff on leave; 129 (97%) available DAsG.[54] | Yes |
| *Child Health Units* | | | | | |
| Child Health Units (III.E.8) | The state will continue to maintain its network of Child Health Units, adequately staffed by nurses in each Local Office. | As of June 30, 2019, DCF had 154 Health Care Case Managers and 85 staff assistants. | As of December 31, 2019, DCF had 155 Health Care Case Managers and 85 staff assistants. | As of June 30, 2020, DCF had 154 Health Care Case Managers and 86 staff assistants. | Yes |
| *Visits* | | | | | |
| Caseworker Contacts with Children – New Placement/ Placement Change (III.F.9) | 93% of children shall have at least twice-per-month face-to-face contact with their caseworker within the first two months of placement, with at least one contact in the placement. | 90% of children had two visits per month, one of which was in their placement, during the first two months of an initial or subsequent placement in June 2019. Monthly range during January – June 2019 monitoring period: 89 to 95%. | 89% of children had two visits per month, one of which was in their placement, during the first two months of an initial or subsequent placement in December 2019. Monthly range during July – December 2019 monitoring period: 89 to 96%. | 82% of children had two visits per month, one of which was in their placement, during the first two months of an initial or subsequent placement in June 2020. Monthly range during January – June 2020 monitoring period: 50 to 92%.[55] | No[56] |

---

[54] DCF reported that during this monitoring period select DAsG outside of the DCF Practice Group have dedicated some of their time to DCF matters.
[55] Monthly performance for this measure is as follows: January, 76%; February, 50%; March, 75%; April, 92%; May, 74%; June, 82%.
[56] Though there are extenuating circumstances presented by the COVID-19 pandemic, DCF did not meet the performance standard in any month and thus the Monitor does not consider the measure to be met.

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[35]** | **December 2019 Performance** | **June 2020 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| Caseworker Contact with Children in Placement (III.F.10) | During the remainder of the placement, 93% of children shall have at least one caseworker visit per month, in the placement. | 93% of children had at least one caseworker visit in June 2019 in their placement. Monthly range during January – June 2019 monitoring period: 93 to 95%. | 97% of children had at least one caseworker visit in December 2019 in their placement. Monthly range during July – December 2019 monitoring period: 94 to 97%. | 89% of children had at least one caseworker visit in June 2020 in their placement. Monthly range during January – June 2020 monitoring period: 71 to 97%.[57] | Yes[58] |
| Parent-Child Visits – Weekly (IV.F.29) | 60% of children in custody with a return home goal will have an in-person visit with their parent(s) at least weekly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | 76% of applicable children had weekly visits with their parents in June 2019. Monthly range during January – June 2019 monitoring period: 76 to 80%. | 79% of applicable children had weekly visits with their parents in December 2019. Monthly range during July – December 2019 monitoring period: 75 to 79%. | 63% of applicable children had weekly visits with their parents in June 2020. Monthly range during January – June 2020 monitoring period: 50 to 79%.[59] | Yes[60] |

---

[57] Monthly performance for this measure is as follows: January, 97%; February, 96%; March, 71%; April, 82%; May, 92%; June, 89%.

[58] Given the extenuating circumstances presented by the COVID-19 pandemic and the time it took for DCF to get alternative means of safe visitation in place, the Monitor considers this a temporary decline and anticipates that performance will increase to prior levels in the next monitoring period.

[59] Monthly performance for this measure is as follows: January, 79%; February, 77%; March, 51%; April, 50%; May, 64%; June, 63%. Reported performance accounts for valid exceptions to this visits requirement.

[60] Given the extenuating circumstances presented by the COVID-19 pandemic and the time it took for DCF to get alternative means of safe visitation in place, the Monitor has assessed performance for this measure based on the months of January, February, May, and June 2020.

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[35]** | **December 2019 Performance** | **June 2020 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| Parent-Child Visits – Bi-Weekly<br><br>(IV.F.30) | 85% of children in custody will have an in-person visit with their parent(s) or legally responsible family member at least every other week, excluding those situations where a court order prohibits or regulates visits or there is supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | 90% of applicable children had bi-weekly visits with their parents in June 2019. Monthly range during January – June 2019 monitoring period: 89 to 92%. | 93% of applicable children had bi-weekly visits with their parents in December 2019. Monthly range during July – December 2019 monitoring period: 88 to 93%. | 76% of applicable children had bi-weekly visits with their parents in June 2020. Monthly range during January – June 2020 monitoring period: 56 to 94%.[61] | Yes[62] |

---

[61] Monthly performance for this measure is as follows: January, 94%; February, 90%; March, 56%; April, 64%; May, 79%; June, 76%. Reported performance accounts for valid exceptions to this visits requirement.

[62] Given the extenuating circumstances presented by the COVID-19 pandemic and the time it took for DCF to get alternative means of safe visitation in place, the Monitor considers this a temporary decline and anticipates that performance will increase to prior levels in the next monitoring period.

| | | | | Table 1B: To Be Maintained | |
| SEP Measure | Sustainability and Exit Plan Standard | June 2019 Performance[35] | December 2019 Performance | June 2020 Performance[36] | Requirement Maintained (Yes/No)[37] |
| --- | --- | --- | --- | --- | --- |
| Child Visits with Siblings (IV.F.31) | 85% of children in custody who have siblings with whom they are not residing will visit those siblings at least monthly, excluding those situations where a court order prohibits or regulates visits or there is supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | 84% of children in custody who have siblings with whom they are not residing visited with their siblings in June 2019. Monthly range during January – June 2019 monitoring period: 84 to 87%. | 86% of children in custody who have siblings with whom they are not residing visited with their siblings in December 2019. Monthly range during July – December 2019 monitoring period: 86 to 87. | 68% of children in custody who have siblings with whom they are not residing visited with their siblings in June 2020. Monthly range during January – June 2020 monitoring period: 61 to 88%.[63,64] | Yes[65] |
| | | | Placement | | |
| Placing Siblings Together (IV.G.32) | At least 80% of sibling groups of two or three children entering custody will be placed together. | 77% of sibling groups of two or three children entering custody in CY 2018 were placed together. | 80% of sibling groups of two or three children entering custody in CY 2019 were placed together. | CY 2020 data not yet available. | Yes |

[63] Monthly performance for this measure is as follows: January, 88%; February, 85%; March, 66%; April, 61%; May, 75%; June, 68%. Reported performance accounts for valid exceptions to the visits requirement.

[64] Based on the Monitor and DCF's joint review of a statistically significant sample of cases for children in care in October and November 2018, it was determined that exceptions to this visits requirement were appropriately applied and documented in 60% of cases. The universe of cases utilized for the purposes of calculating performance has been adjusted accordingly.

[65] Given the extenuating circumstances presented by the COVID-19 pandemic and the time it took for DCF to get alternative means of safe visitation in place, the Monitor considers this a temporary decline and anticipates that performance will increase to prior levels in the next monitoring period.

*Charlie and Nadine H. v. Murphy*
*Progress Report of New Jersey DCF for the Period January-June 2020*
*January 2021*
*Page 32*

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance**[35] | **December 2019 Performance** | **June 2020 Performance**[36] | **Requirement Maintained (Yes/No)**[37] |
| Placing Siblings Together for Four or More Children (IV.G.33) | All children will be placed with at least one other sibling 80% of the time. | 86% of children entering custody in CY 2018 with three or more siblings were placed with at least one other sibling. | 83% of children entering custody in CY 2019 with three or more siblings were placed with at least one other sibling. | CY 2020 data not yet available. | Yes |
| Recruitment of Placements for Sibling Groups of Four or More (IV.G.34) | DCF will continue to recruit for resource homes capable of serving sibling groups of four or more. | DCF recruited a total of 26 new SIBs homes in the monitoring period. As of June 2019, DCF had a total of 69 large capacity SIBS homes; 11 homes that can accommodate five or more children and 58 homes that can accommodate four children. | DCF recruited a total of 16 new SIBs homes in the monitoring period. As of December 2019, DCF had a total of 78 large capacity SIBS homes; 16 homes that can accommodate five or more children and 62 homes that can accommodate four children. | DCF recruited a total of 18 new SIBs homes in the monitoring period. As of June 2020, DCF had a total of 82 large capacity SIBS homes; 19 homes that can accommodate five or more children and 63 homes that can accommodate four children. | Yes |
| Placement Stability, First 12 Months in Care (IV.G.35) | At least 84% of children entering out-of-home placement for the first time in a calendar year will have no more than one placement change during the 12 months following their date of entry. | 85% of children who entered out-of-home placement for the first time in CY 2017 had no more than one placement change during the 12 months following their date of entry. | 85% of children who entered out-of-home placement for the first time in CY 2018 had no more than one placement change during the 12 months following their date of entry. | CY 2020 data not yet available. | Yes |

| | Table 1B: To Be Maintained | | | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | June 2019 Performance[35] | December 2019 Performance | June 2020 Performance[36] | Requirement Maintained (Yes/No)[37] |
| Placement Stability, 13 – 24 Months in Care (IV.G.36) | At least 88% of these children will have no more than one placement change during the 13-24 months following their date of entry. | 95% of children who entered care in CY 2016 had no more than one placement change during the 13-24 months following their date of entry. | 95% of children who entered care in CY 2017 had no more than one placement change during the 13-24 months following their date of entry. | CY 2020 data not yet available. | Yes |
| | *Education* | | | | |
| Educational Needs (III.G.11) | 80% of cases will be rated acceptable as measured by the QR in stability (school) and learning and development. The Monitor, in consultation with the parties, shall determine the standards for school stability and quality learning and development. | 83% of cases rated acceptable for both QR indicators *stability in school* and *learning and development* (CY 2018). | 86% of cases rated acceptable for both QR indicators *stability in school* and *learning and development* (CY 2019).[66,67] | CY 2020 data not yet available. | Yes |

---

[66] From January to December 2019, 86% (63 of 73) of the applicable cases reviewed were rated acceptable on both the *stability in school* and the *learning and development, age 5 & older* indicators; 91% (74 of 81) were rated acceptable for *stability in school* and 89% (68 of 76) were rated acceptable for *learning and development, age 5 & older*.
[67] All in-home cases are excluded from this measure.

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[35]** | **December 2019 Performance** | **June 2020 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| | | *Maltreatment* | | | |
| Abuse and Neglect of Children in Foster Care (III.H.12) | No more than 0.49% of children will be victims of substantiated abuse or neglect by a resource parent or facility staff member. | 0.27% of children in CY 2018 were victims of substantiated abuse or neglect by a resource parent or facility staff member. | 0.24% of children in CY 2019 were victims of substantiated abuse or neglect by a resource parent of facility staff member. | CY 2020 data not yet available. | Yes |
| Repeat Maltreatment (In-home) (IV.H.37) | No more than 7.2% of children who remain at home after a substantiation of abuse or neglect will have another substantiation within the next 12 months. | 5% of children who remained at home after a substantiation of abuse or neglect in CY 2017 had another substantiation within the next 12 months. | 4.5% of children who remained at home after a substantiation of abuse or neglect in CY 2018 had another substantiation within the next 12 months. | CY 2020 data not yet available. | Yes |
| Maltreatment Post-Reunification (IV.H.38) | Of all children who enter foster care in a 12-month period for the first time who are discharged within 24 months to reunification or living with a relative(s), no more than 6.9% will be the victims of abuse or neglect within 12 months of their discharge. | 5.9% of children who entered foster care for the first time in CY 2015 and were discharged within 24 months to reunification or living with relative(s) were the victims of abuse or neglect within 12 months of their discharge. | 6.3% of children who entered foster care for the first time in CY 2016 and were discharged within 24 months to reunification or living with relative(s) were the victims of abuse or neglect within 12 months of their discharge. | CY 2020 data not yet available. | Yes |

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance**[35] | **December 2019 Performance** | **June 2020 Performance**[36] | **Requirement Maintained (Yes/No)**[37] |
| Re-Entry to Placement<br><br>(IV.H.39) | Of all children who enter foster care in a 12-month period for the first time who are discharged within 12 months to reunification, living with relative(s), or guardianship, no more than 9% will re-enter foster care within 12 months of their discharge. | 12.2% of children who entered foster care for the first time in CY 2016 and were discharged within 12 months to reunification, living with relative(s), or guardianship, re-entered foster care within 12 months of their discharge. | 8.6% of children who entered foster care for the first time in CY 2017 and were discharged within 12 months to reunification, living with relative(s), or guardianship, re-entered foster care within 12 months of their discharge. | CY 2020 data not yet available. | Yes |
| | | *Permanency* | | | |
| Permanency within 12 Months<br><br>(IV.I.40) | Of all children who enter foster care in a 12-month period, at least 42% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | 41% of children who entered foster care in CY 2017 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | 42% of children who entered foster care in CY 2018 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | CY 2020 data not yet available. | Yes |

|  |
|---|

| **Table 1B: To Be Maintained** | | | | |
|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[35]** | **December 2019 Performance** | **June 2020 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| Permanency Within 24 Months (IV.I.41) | Of all children who enter foster care in a 12-month period, at least 66% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering foster care. | 65% of children who entered foster care in CY 2016 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering foster care. | 67% of children who entered foster care in CY 2017 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering foster care. | CY 2020 data not yet available. | Yes |
| Permanency Within 36 Months (IV.I.42) | Of all children who enter foster care in a 12-month period, at least 80% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care. | 81% of children who entered foster care in CY 2015 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care. | 82% of children who entered foster care in CY 2016 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care. | CY 2020 data not yet available. | Yes |

| | | | | **Table 1B: To Be Maintained** | | |
|---|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[35]** | **December 2019 Performance** | **June 2020 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| Permanency Within 48 Months<br><br>(IV.I.43) | Of all children who enter foster care in a 12-month period, at least 86% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care. | 89% of children who entered foster care in CY 2014 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care. | 88% of children who entered foster care in CY 2015 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care. | CY 2020 data not yet available. | Yes |
| | | | ***Older Youth*** | | |
| Independent Living Assessments<br><br>(IV.K.45) | 90% of youth age 14 to18 have an Independent Living Assessment. | 87% of applicable children had completed an Independent Living Assessment in June 2019. Monthly range during January – June 2019 monitoring period: 83 to 89%. | 93% of applicable children had completed an Independent Living Assessment in December 2019. Monthly range during July – December 2019 monitoring period: 93 to 96%. | 89% of applicable children had completed an Independent Living Assessment in June 2020. Monthly range during January – June 2020 monitoring period: 88 to 93%.[68] | Yes |

---

[68] Monthly performance for this measure is as follows: January, 93%; February, 93%; March, 90%; April, 90%; May, 88%; June, 89%.

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **June 2019 Performance[35]** | **December 2019 Performance** | **June 2020 Performance[36]** | **Requirement Maintained (Yes/No)[37]** |
| Quality of Case Planning and Services (IV.K.46) | 75% of youth age 18 to 21 who have not achieved legal permanency shall receive acceptable quality case management and service planning. | 70% of cases rated acceptable for both QR indicators *child (youth)/family status* and *overall practice performance* (CY 2018). | 67% of cases rated acceptable for both QR indicators *child (youth)/family status* and *overall practice performance* (CY 2019).[69] | CY 2020 data not yet available. | No |
| Housing (IV.K.47) | 95% of youth exiting care without achieving permanency shall have housing. | 96% of youth exiting care between July and December 2018 without achieving permanency had documentation of a housing plan upon exiting care. | 99% of youth exiting care between January and December 2019 without achieving permanency had documentation of a housing plan upon exiting care. | CY 2020 data not yet available. | Yes |
| Employment/ Education (IV.K.48) | 90% of youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. | 89% of youth exiting care between July and December 2018 without achieving permanency were either employed or enrolled in education or vocational training programs, or there was documented evidence of consistent efforts to help the youth secure employment or training. | 97% of youth exiting care between January and December 2019 without achieving permanency were either employed or enrolled in education or vocational training programs, or there was documented evidence of consistent efforts to help the youth secure employment or training. | CY 2020 data not yet available. | Yes |

[69] From January to December 2019, 67% (29 of 43) of the applicable cases reviewed were rated acceptable on both the *overall child (youth)/family status* and the *overall practice performance* indicators; 95% (41 of 43) of cases were rated acceptable for *child (youth)/family status* and 67% (29 of 43) of cases were rated acceptable for *overall practice performance*.

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **Requirement Maintained as of June 2020 (Yes/No)** |
| **A. Data Transparency** | DCF will continue to maintain a case management information and data collections system that allows for the assessment, tracking, posting or web-based publishing and utilization of key data indicators. | Data provided directly to the Monitor and published by DCF in reports and on its website.[70]<br><br>NJ SPIRIT functionality is routinely assessed by the Monitor's use of NJ SPIRIT data for validation and through use of SafeMeasures, as well as in conducting case inquiries and case record reviews. | Yes |
| **B. Case Practice Model** | Implement and sustain a Case Practice Model<br><br>Quality investigation and assessment<br><br>Safety and risk assessment and risk reassessment<br><br>Engagement with youth and families<br><br>Working with family teams<br><br>Individualized planning and relevant services<br><br>Safe and sustained transition from DCF<br><br>Continuous review and adaptations | QR Data<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings<br><br>Quality of Investigations case record review<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report<br><br>Older Youth Exiting Care to Non-Permanency case record review | Yes— although some activities suspended or postponed during this monitoring period due to COVID-19 |

---

[70] Please see list of reports in Appendix B to review data sources for this Foundational Element.

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **Requirement Maintained as of June 2020 (Yes/No)** |
| **C. State Central Registry** | Received by the field in a timely manner | Commissioner's Monthly Report<br><br>Monitor site visit with SCR staff<br><br>Screening and Investigations Monthly Report | Yes |
| | Investigation commenced within required response time | | |
| **D. Appropriate Placements** | Appropriate placements of children | QR data<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | Yes |
| | Resource family homes licensed and closed (kinship/non-kinship) | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor | |
| | Number of children in home/out of home demographic data | NJ Rutgers Data Portal | |
| | Placed in a family setting | Commissioner's Monthly Report | |
| | Placement proximity | Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | |
| | No children under 13 years old in shelters | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor | |
| | Children over 13 in shelters no more than 30 days | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor | |
| | No behavioral health placements out of state without approval | Commissioner's Monthly Report | |

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **Requirement Maintained as of June 2020 (Yes/No)** |
| | Adequate number of resource placements | CP&P Needs Assessment<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | |
| **E. Service Array** | Services for youth age 18-21, LGBTQI, mental health and domestic violence for birth parents with families involved with the child welfare system | New Jersey Youth Resource Spot[71]<br><br>New Jersey DCF Adolescent Services Website[72]<br><br>Data provided directly to the Monitor<br><br>Attendance at Adolescent Practice Forums<br><br>CP&P Needs Assessment<br><br>Safe, Healthy, and Connected Annual Report<br><br>Older Youth Exiting Care to Non-Permanency case record review | Yes |
| | Preventive home visit programs | Commissioner's Monthly Report<br><br>Safe, Healthy, and Connected Annual Report | |

---

[71] New Jersey's Youth Resource Spot can be found at www.NJYRS.org.
[72] DCF's Adolescent Services Website can be found at http://www.nj.gov/dcf/adolescent/.

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **Requirement Maintained as of June 2020 (Yes/No)** |
| | Family Success Centers | Commissioner's Monthly Report<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | |
| **F. Medical and Behavioral Health Services** | Appropriate medical assessment and treatment | Data provided directly to the Monitor<br><br>Commissioner's Monthly Report<br><br>CIACC Monthly Report<br><br>Safe, Healthy, and Connected Annual Report | Yes |
| | Pre-placement and entry medical assessments | | |
| | Dental examinations | | |
| | Immunizations | | |
| | Follow-up care and treatment | | |
| | Mental health assessment and treatment | | |
| | Behavioral health | | |
| **G. Training** | Pre-service training | Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | Yes |
| | Case practice model | | |
| | Permanency planning | | |

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **Requirement Maintained as of June 2020 (Yes/No)** |
| | Concurrent planning | | |
| | Adoption | | |
| | Demonstration of competency | | |
| **H. Flexible Funding** | DCF will continue to make flexible funds available for use by workers in crafting individualized service plans for children, youth and families to meet the needs of children and families, to facilitate family preservation and reunification where appropriate and to ensure that families are able to provide appropriate care for children and to avoid the disruption of otherwise stable and appropriate placements. | Data provided directly to the Monitor<br><br>DCF Online Policy Manual<br><br>Budget Report | Yes |
| **I. Resource Family Care Support Rates** | Family care support rates | DCF Online Policy Manual<br><br>DCF Website[73]<br><br>New Jersey Youth Resource Spot | Yes |
| | Independent Living Stipend | | |
| **J. Permanency** | Permanency practices | Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings<br><br>Older Youth Exiting Care to Non-Permanency | Yes |
| | Adoption practices | | |

[73] USDA has altered its schedule for producing its Annual Report on costs of raising a child. By agreement, DCF now updates the rates within 30 days of the USDA annual report's release to meet the SEP standards and provides written confirmation to the Monitor.

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **Requirement Maintained as of June 2020 (Yes/No)** |
| **K. Adoption Practice** | 5- and 10-month placement reviews | Adoption Report<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings | Yes |

## IV.    FOUNDATIONAL ELEMENTS

The Sustainability and Exit Plan (SEP) identifies a series of core organizational and practice improvements known as the "Foundational Elements" that became the groundwork upon which New Jersey's reform has been built. They include a range of requirements from the 2006 Modified Settlement Agreement (MSA) that were previously met and were codified in the SEP as essential to be maintained and foundational for improved child welfare outcomes and future system improvements. These Foundational Elements remain enforceable in the SEP if performance is not sustained. The Department of Children and Families (DCF) collects and publishes relevant performance data in these areas.

The Monitor has continued to assess maintenance of Foundational Elements through analysis of DCF's data as well as through participation in statewide Qualitative Reviews (QRs), Area Director meetings, site visits with service providers, attendance at monthly ChildStat and other DCF presentations and meetings. Given the COVID-19 pandemic, the Monitor staff were unable to complete site visits in person. However, the Monitor held video interviews with groups of staff and other stakeholders across the state. DCF's ChildStat meetings and Qualitative Reviews (QRs) have been suspended during the pandemic. During this period, the Monitor has continued to meet virtually with DCF leadership to receive updates on the Foundational Elements and DCF's responses to the COVID-19 pandemic.

In the Monitor's judgment, *each of the SEP's Foundational Elements has been maintained during this period, which is an important accomplishment given the circumstances.* Additionally, many have been strengthened through new initiatives and developments – some of which are discussed herein in Section II – determined by the Monitor to be relevant for the assessment and understanding of the Foundational Elements.

## V. SUSTAINABILITY AND EXIT PLAN PERFORMANCE MEASURES *TO BE ACHIEVED* AND *TO BE MAINTAINED*

This section of the report provides information on the Sustainability and Exit Plan (SEP) requirements that the state is focusing on achieving – designated as Outcomes *To Be Achieved* – and those requirements for which the state has satisfied the specified performance targets for at least six months and must sustain – designated as Outcomes *To Be Maintained*.

### A. INVESTIGATIONS

The SEP includes four performance measures related to investigative practice, all of which were designated as Outcomes *To Be Maintained* as of the beginning of the monitoring period: quality of investigations (SEP IV.A.15); timeliness of Institutional Abuse Investigations Unit (IAIU) investigation completion (SEP III.A.1); timeliness of alleged child abuse and neglect investigation completion, within 60 days (SEP IV.A.13); and timeliness of alleged child abuse and neglect investigation completion, within 90 days (SEP IV.A.14). Performance for all four measures during the current monitoring period is discussed below.

**Timeliness of Investigation Completion**

| Quantitative or Qualitative Measure | 13. <u>Timeliness of Investigation Completion</u>: Investigations of alleged child abuse and neglect shall be completed within 60 days. |
|---|---|
| **Performance Target** | 85% of all abuse/neglect investigations shall be completed within 60 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. |

*Performance as of May 31, 2020:*[74]

In May 2020, there were 2,811 investigations of alleged child abuse and neglect, 2,283 (81%) of which were completed within 60 days. Performance from December 2019 to May 2020 ranged from a low of 81 percent to a high of 93 percent.[75] In this

---

[74] June 2020 data will be included in the next monitoring report. For certain data elements that have an extended time frame built into the measurement, the Monitor and DCF decided to alter the period for data review so that six-month monitoring reports can be produced more closely to the end of the monitoring period.

[75] Monthly performance for this measure is as follows: December, 85%; January, 84%; February 86%; March, 89%; April, 93%; May, 81%.

*Charlie and Nadine H. v. Murphy*
*Progress Report of New Jersey DCF for the Period January-June 2020*
*January 2021*
*Page 47*

monitoring period, DCF met or exceeded this measure in four of the six months, and was just shy of the standard in the two remaining months. The Monitor considers DCF to have met this measure.

| Quantitative or Qualitative Measure | 14. <u>Timeliness of Investigation Completion</u>: Investigations of alleged child abuse and neglect shall be completed within 90 days. |
|---|---|
| Performance Target | 95% of all abuse/neglect investigations shall be completed within 90 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. |

**Performance as of May 31, 2020:**[76]

In May 2020, 2,652 (94%) of the 2,811 investigations of child abuse and neglect were completed within 90 days. Performance from December 2019 to May 2020 ranged from a low of 94 percent to a high of 97 percent.[77] DCF continues to meet the SEP performance standard for the timeliness of investigation completion within 90 days.

## Quality of Investigations

| Quantitative or Qualitative Measure | 15. <u>Quality of Investigations</u>: Investigations of alleged child abuse and neglect shall meet standards of quality. |
|---|---|
| Performance Target | 85% of all abuse/neglect investigations shall meet standards of quality. |

The quality of investigations case record review is typically conducted every two years. In February 2020, DCF, together with the Monitor, conducted a case record review of the quality of CP&P's investigative practice. Reviewers examined the quality of practice of a statistically valid random sample of 326 selected Child Protective Services (CPS) investigations assigned to DCF Local Offices between October 1 and October 14, 2019, involving 510 alleged child victims.[78] Overall,

---

[76] June 2020 data will be included in the next monitoring report. For certain data elements that have an extended time frame built into the measurement, the Monitor and DCF decided to alter the period for data review so that six-month monitoring reports can be produced more closely to the end of the monitoring period.

[77] Monthly performance for this measure is as follows: December, 95%; January, 96%; February, 96%; March, 96%; April 97%; May, 94%

[78] These results have a ± 5% margin of error with a 95% confidence interval.

reviewers found that 296 (91%) of 326 of the investigations were of acceptable quality,[79] exceeding the SEP standard for the second time, with the same impressive percentage of investigations rated acceptable in the 2018 review.

---

[79] Reviewers could select four possible responses to the question regarding the quality of the investigation: "completely," "substantially," "marginally" or "not at all." Investigations determined to be "completely" or "substantially" of quality were considered acceptable for the purpose of this measure.

## B. FAMILY TEAM MEETINGS

Family Team Meetings (FTMs) bring families, providers, formal and informal supports together to exchange information, participate in case planning, coordinate and follow up on services, and examine and address challenges  Meetings are intended to be scheduled according to the family's availability in an effort to involve as many family members and supports as possible. Workers are trained and coached to hold FTMs at key decision and transition points in the life of a case, such as when a child enters placement, when a child has a change in placement, and/or when there is a need to adjust a case plan to achieve permanency or meet a child's needs.

The SEP includes five performance measures pertaining to FTMs. As of the beginning of the monitoring period, four measures had been met and designated as Outcomes *To Be Maintained*: the requirements that FTMs be held within 45 days of a child's removal (SEP IV.B.16); that for children in out-of-home placement, at least three additional FTMs after the initial FTM be held within the first 12 months of placement (SEP IV.B.17); that children with the goal of reunification have at least three FTMs each year after the first 12 months of placement (SEP IV.B.18); and that children with a goal other than reunification have at least two FTMs each year after the first 12 months of placement (SEP IV.B.19). The remaining Outcome *To Be Achieved* is Quality of Teaming (SEP IV.B.20).

Performance for all five measures is discussed below. Almost immediately after the onset of the pandemic, these meetings transitioned from in-person to almost entirely virtual. Although clear guidance was shared to ensure an understanding of this expectation, it took some time – as it did in states across the country – to make the technological updates necessary to support and capture these meetings.  This included the dissemination of appropriate devices to workers and families, and training in the  use of virtual platforms.  As a result, data for these measures may not reflect full DCF performance during the period, and the Monitor has indicated where low performance is likely to be temporary and a consequence of the pandemic.

### Initial FTMs Held within 45 Days of Entry

| Quantitative or Qualitative Measure | 16. Initial Family Team Meetings: For children newly entering placement, the number/percent who have a family team meeting within 45 days of entry. |
| --- | --- |

| Performance Target | 80% of children newly entering placement shall have a family team meeting before or within 45 days of placement. |
|---|---|

### Performance as of June 30, 2020:

In June 2020, 65 (64%) out of 101 possible FTMs occurred within 45 days of a child's removal from home. Performance from January 1 to June 30, 2020 ranged from a low of 58 percent to a high of 94 percent.[80] For this measure, the Monitor and DCF jointly verified monthly data from NJ SPIRIT for the 29 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[81]

DCF's performance during this monitoring period demonstrated a wider range than is typical for this measure; performance exceeded the SEP standard in two months but remained below the standard in the other four. Given the extenuating circumstances presented by the COVID-19 pandemic and the time it took for DCF to get alternative means of safe FTMs in place, the Monitor considers this a temporary decline and anticipates that performance will increase to prior levels in the next monitoring period.

### FTMs Held within the First 12 Months

| Quantitative or Qualitative Measure | 17. Subsequent Family Team Meetings within 12 Months: For all other children in placement, the number/percent who have three additional FTMs within the first 12 months of the child coming into placement. |
|---|---|
| Performance Target | 80% of children will have three additional FTMs within the first 12 months of the child coming to placement. |

### Performance as of June 30, 2020:[82]

In June 2020, 68 (72%) of 94 applicable children had three or more FTMs within the first 12 months of entering placement, after the initial FTM. Performance from

---

[80] Monthly performance for this measure is as follows: January, 87%; February, 58%; March, 65%; April, 94%; May, 76%; June, 64%. Reported performance accounts for valid exceptions to the FTM requirement.

[81] Based on a joint review with DCF of all 29 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in June 2020, there were 103 children newly entering placement. The Monitor and DCF determined that in two cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe of applicable cases 101 children.

[82] Measure 17 applies to all children who have been in out-of-home placement for 12 months who entered care in the specified month. For example, performance for June 2020 is based upon the 98 children who entered care in June 2019. Compliance is based on whether at least three FTMs were held for these children during the 12-month period they were in care.

January 1 to June 30, 2020 ranged from a low of 65 percent to a high of 93 percent.[83] For this measure, the Monitor and DCF jointly verified monthly data from NJ SPIRIT for the 62 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[84]

DCF's performance during this monitoring period demonstrated a wider range than is typical for this measure; performance exceeded the SEP standard in two months but remained below the standard in the other four. Given the extenuating circumstances presented by the COVID-19 pandemic and the time it took for DCF to get alternative means of safe FTMs in place, the Monitor considers this a temporary decline and anticipates that performance will increase to prior levels in the next monitoring period.

**FTMs Held After 12 Months in Placement with a Goal of Reunification**

| Quantitative or Qualitative Measure | 18. Subsequent Family Team Meetings after 12 Months: For all children in placement with a goal of reunification, the number/percent who have at least three FTMs each year after the first 12 months of placement. |
|---|---|
| Performance Target | After the first 12 months of a child being in care, 90% of those with a goal of reunification will have at least three FTMs each year. |

*Performance as of June 30, 2020:[85]*

In June 2020, 20 (74%) of 27 applicable children with a permanency goal of reunification had three or more FTMs in the most recent 12 months, if they had been in out-of-home placement for two or more years. Performance from January 1 to June 30, 2020 ranged from a low of 63 percent to a high of 87 percent.[86] For this measure, the Monitor and DCF jointly verified monthly data from NJ SPIRIT for the 12 applicable

---

[83] Monthly performance for this measure is as follows: January, 93%; February, 93%; March, 75%; April, 65%; May, 76%; June, 72%. Reported performance accounts for valid exceptions to the FTM requirement.

[84] Based on a joint review of all 62 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in June 2020, there were 98 children who had been in out-of-home placement for 12 months. The Monitor and DCF determined that in four cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe of applicable cases 94 children.

[85] Measure 18 applies to all children who have been in care for at least 24 months who entered care in the specified month each year and have a goal of reunification. For example, in June 2020, a combined total of 28 children entered care in June 2018, June 2017, June 2016, etc. and were still in placement with a goal of reunification. Compliance is based on whether at least three FTMs were held for these children during their most recent 12 months in care.

[86] Monthly performance for this measure is as follows: January, 87%; February, 76%; March, 70%; April, 68%; May, 63%; June, 74%. Reported performance accounts for valid exceptions to the FTM requirement.

cases to determine whether exceptions to FTM policy were appropriately applied and documented.[87]

DCF did not meet the performance standard in any month this monitoring period, though the range – despite the COVID-19 pandemic – remains slightly higher than the prior monitoring period, in which DCF also did not meet the performance standard in any month. The universe of cases to which this measure applies is small and therefore more susceptible to fluctuations, particularly when siblings are included in the cohort. The Monitor does not consider this measure to have met the standard this monitoring period and will continue to closely track performance.

### FTMs Held After 12 Months in Placement with a Goal Other than Reunification

| Quantitative or Qualitative Measure | 19. <u>Subsequent Family Team Meetings after 12 Months:</u> For all children in placement with a goal other than reunification, the number/percent who have at least two FTMs each year. |
|---|---|
| Performance Target | After the first 12 months of a child being in care, for those children with a goal other than reunification, 90% shall have at least two FTMs each year. |

*Performance as of June 30, 2020:[88]*

In June 2020, 89 (81%) of 110 applicable children in out-of-home placement with a permanency goal other than reunification had two or more FTMs in the most recent 12 months, if they had been in out-of-home placement for two or more years. Performance from January 1 to June 30, 2020 ranged from a low of 81 percent to a high of 96 percent.[89] For this measure, the Monitor verified monthly data from NJ SPIRIT for the 10 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[90]

---

[87] Based on a review of all 12 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in June 2020, there were 28 children who had been in care for at least 24 months who had a goal of reunification. The Monitor determined that in one case, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded that case, making the universe of applicable cases 27 children.

[88] Children eligible for Measure 19 are all children who have been in care for at least 24 months who entered care in the month specified each year and have a goal other than reunification. For example, in June 2020, a combined total of 110 children entered care in June 2018, June 2017, June 2016, etc. and are still in placement with a goal other than reunification. Compliance is based on whether at least two FTMs were held for these children each year in the most recent year after 12 months in care.

[89] Monthly performance for this measure is as follows: January, 96%; February, 94%; March, 90%; April, 84%; May, 87%; June, 81%. Reported performance accounts for valid exceptions to the FTM requirements.

[90] Based on a review of all 10 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in May 2029 there were 175 children who had been in care for at least 24 months with a goal other than reunification. The Monitor determined that in one case, the worker had appropriately

DCF met the SEP standard on this measure in three months and came close to meeting the standard in the remaining three months; the Monitor therefore considers the standard to be met.

### Quality of Teaming

| Quantitative or Qualitative Measure | 20. Cases involving out-of-home placement show evidence of family teamwork. |
|---|---|
| Performance Target | 75% of cases involving out-of-home placements that were assessed as part of the Qualitative Review (QR) process will show evidence of both acceptable team formation and acceptable functioning. The Monitor, in consultation with the parties, shall determine the standards for quality team formation and functioning. |

FTMs are only one of the many ways in which DCF staff engage with families. Effective teaming is much broader than just convening a meeting and relies upon other foundational elements of quality case practice, such as engagement with family members, timely assessments and quality case planning, all of which are evaluated as part of the state's QR process. Information about the QR process and protocol are detailed in Section V.N *Accountability Through Qualitative Review* of this report.

Results from the *teamwork and coordination* indicator in the QR are used to assess the quality of collaborative teamwork with children, youth, and families. In assessing case ratings, the reviewer considers a range of questions for this indicator, including whether the family's team is composed of the appropriate constellation of providers and informal supports needed to meet the child and family's needs, and the extent to which team members, including family members, work together to meet identified goals.

This QR measure is reported by the Monitor on an annual basis. The Monitor will report on the data for Quality of Teaming for the period of January 1 through December 31, 2020 in the next monitoring report. However, due to the COVID-19 pandemic, QRs were suspended and data will be limited to a smaller selection of counties.

---

determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded that case, making the universe of applicable cases 174 children.

The most recent data on this measure indicate that from January to December 2019, 62 percent (90 of 145) of cases reviewed were rated acceptable for the *teamwork and coordination* indicator.[91] This is a slight improvement from DCF's performance in CY 2018 in which 58 percent of cases were rated acceptable. DCF has not yet met the SEP performance standard.

---

[91] All in-home cases are excluded from this measure.

## C.  QUALITY OF CASE AND SERVICE PLANNING

Meaningful case plans that are authentically developed with the family are the foundation of quality child welfare work. Timely and meaningful case plans that are developed with the family at the beginning of a case, and throughout a family's involvement with DCF, rely on workers' assessment and engagement skills. Although delayed by the pandemic, DCF plans to implement Solution Based Casework (SBC)™ statewide, a case management approach to assessment, case planning, and ongoing casework, a strategy that helps staff work with families to develop case plans that are customized, behavior-focused and family centered, consistent with New Jersey's Case Practice Model (CPM).

The SEP includes three measures related to case planning, two of which have been previously met and designated as Outcomes *To Be Maintained*: the requirement that case plans be developed with families within 30 days of placement (SEP IV.D.22) and the requirement that case plans be reviewed and modified every six months (SEP III.C.6). The SEP measure regarding the quality of case planning (SEP IV.D.23) remains an Outcome *To Be Achieved,* which is measured by the Qualitative Review (QR) process on an annual basis and therefore not included in this report. Performance for the other two measures during the current monitoring period that address case plans are discussed below. As stated elsewhere in this report, in the initial months of the pandemic NJ Spirit was not yet adjusted to fully account for virtual case planning meetings with families. Additionally, accurate and timely documentation may have been complicated by the delay in dissemination of technology to both workers and families. As a result, data for these measures may not reflect full DCF performance during the period, and the Monitor has indicated where low performance is likely to be temporary and a consequence of the pandemic.

### Timeliness of Case Planning – Initial Case Plans

| Quantitative or Qualitative Measure | 22. <u>Timeliness of Initial Plans</u>: For children entering care, number/percent of case plans developed within 30 days. |
|---|---|
| **Performance Target** | 95% of case plans for children and families are completed within 30 days. |

***Performance as of June 30, 2020:***

In June 2020, 87 (84%) of 104 initial case plans were completed within 30 days of a child entering placement. Between January and June 2020, the timely development of initial case plans ranged from a low of 84 percent to a high of 96 percent.[92] In this monitoring period, DCF met or exceeded this measure in two of six months and came close to meeting the standard in three additional months. Performance on initial case plans for children who entered foster care in June may have been affected by staff furloughs at the end of June and into July.

The Monitor considers DCF to have met this measure.

### Timeliness of Case Planning – Every Six Months

| Quantitative or Qualitative Measure | 6. Case Plans: Case plans for children and families will be reviewed and modified no less frequently than every six months. |
|---|---|
| Performance Target | 95% of case plans for children and families will be reviewed and modified no less frequently than every six months. |

*Performance as of June 30, 2020:*

In June 2020, 628 (97%) of 651 case plans had been modified no less frequently than every six months. Performance from January to June 2020 ranged from 92 to 97 percent, similar to the range of performance in the previous monitoring period.[93] DCF met or exceeded the required standard for this measure in four of six months and was close to the SEP standard in the remaining two months. The Monitor considers DCF to have met this measure.

### Quality of Case Plans

| Quantitative or Qualitative Measure | 23. Quality of Case Plans: The child's/family's case plan shall be developed with the family and shall be individualized and appropriately address the child's needs for safety, permanency and well-being. The case plan shall provide for the services and interventions needed by the child and family to meet identified goals, including services necessary for children and families to promote children's development and meet their educational, physical and |
|---|---|

---

[92] Monthly performance for this measure is as follows: January, 96%; February, 90%; March, 92%; April, 94%; May, 95%; June, 84%.
[93] Monthly performance on this measure is as follows: January, 92%; February, 97%; March, 97%; April, 92%; May, 97%; June, 97%.

| | mental health needs. The case plan and services shall be modified to respond to the changing needs of the child and family and the results of prior service efforts. |
|---|---|
| **Performance Target** | 80% of case plans rated acceptable as measured by the Qualitative Review (QR). |

DCF policy and the SEP require that families be involved in case planning, that plans are appropriate and individualized to the circumstances of the child or youth and family, and that there is oversight of plan implementation to ensure case goals are met and plans are modified when necessary.

Results from two QR indicators, *child and family planning process* and *tracking and adjusting*, are used to assess performance on this measure. Cases rated as acceptable demonstrate that child or youth and family needs are addressed in the case plan, appropriate family members were included in the development of the plan, and interventions are being tracked and adjusted when necessary. Though the QR score only consists of those two indicators, several other aspects of practice contribute to high quality case planning.[94]

Information about the QR process and protocol are detailed in Section V.N *Accountability Through Qualitative Review* of this report. This QR measure is reported by the Monitor on an annual basis. The Monitor will report on the data for Quality of Case Plans for the period January 1 through December 31, 2020 in the next monitoring report. However, due to the COVID-19 pandemic, QRs were suspended and data will be limited to a smaller selection of counties.

The most recent data on this measure indicate that from January to December 2019, 58 percent (112 of 193) of cases reviewed were rated acceptable for both the *child and family planning process* and *tracking and adjusting* indicators.[95] This is an improvement from previous monitoring periods, but DCF still did not meet the SEP performance standard in CY 2019.

---

[94] Improvements made to performance on QR indicators related to the *assessment of the father* (CY 2019, 33%), *assessment of the mother* (CY 2019, 46%), *engagement of the father* (CY 2019, 49%), *engagement of the mother* (CY 2019, 60%), *case plan implementation* (CY 2019, 68%) and *teamwork and coordination* (CY 2019, 62%) are likely to have a significant impact on the quality of case planning.

[95] From January to December 2019, 58% (112 of 193) of applicable cases reviewed were rated acceptable for both the *child and family planning process* and the *tracking and adjusting* indicators; 62% (120 of 193) of cases were rated acceptable for *child and family planning process*; 73% (141 of 193) of cases were rated acceptable for *tracking and adjusting*.

## D. EDUCATION

| Quantitative or Qualitative Measure | 11. <u>Educational Needs</u>: Children will be enrolled in school and DCF will have taken appropriate actions to ensure that their educational needs are being met. |
|---|---|
| **Performance Target** | 80% of cases will be rated acceptable as measured by the Qualitative Review (QR) in stability (school) and learning and development. The Monitor, in consultation with the parties, shall determine the standards for school stability and quality learning and development. |

SEP Section III.G.11 requires that "children will be enrolled in school and DCF will have taken appropriate actions to ensure that their educational needs are being met." The SEP requires that 80 percent of cases be rated acceptable on both the *stability in school* and *learning and development* indicators as measured by the QR.[96] The QR process and protocol are discussed in detail in Section V.N *Accountability Through Qualitative Review* of this report. This measure is designated as an Outcome *To Be Maintained*.

This QR measure is reported by the Monitor on an annual basis. The Monitor will report on the data for Educational Needs for the period January 1 through December 31, 2020 in the next monitoring report. However, due to the COVID-19 pandemic, QRs were suspended and data will be limited to a smaller selection of counties.

The most recent data on this measure indicate that from January to December 2019, 86 percent (63 of 73) of cases reviewed were rated acceptable for both *stability in school* and *learning and development, age 5 & older*.[97] DCF continues to exceed this SEP performance standard.

---

[96] This measure applies to school-aged children in out-of-home placement.
[97] From January to December 2019, 86% (63 of 73) of the applicable cases reviewed were rated acceptable on both the *stability in school* and the *learning and development, age 5 & older* indicators; 91% (74 of 81) were rated acceptable for *stability in school* and 89% (68 of 76) were rated acceptable for *learning and development, age 5 & older*.

### E.  MAINTAINING CONTACT THROUGH VISITS

Due to the COVID-19 pandemic, the definition of a visit was markedly altered during this period. However, visits, even virtual ones, between children in foster care and their workers, parents and siblings are critical to children's safety and well-being, and are essential tools for strengthening family connections and improving prospects for permanency. Visits also offer the opportunity for engagement and assessment of children, youth, and families. The department's efforts to preserve regular contacts are critical to quality case practice.

The SEP includes six performance measures related to visits. As of the beginning of this reporting period, five measures were designated as Outcomes *To Be Maintained*, including caseworker contacts with children newly placed or after a placement change (SEP III.F.9); caseworker contacts with children in ongoing placement (SEP III.F.10); parent-child weekly and bi-weekly visits (SEP IV.F.29 and IV.F.30); and visits with siblings (SEP IV.F.31). Caseworker contacts with parents when the goal is reunification (SEP IV.F.28) remains designated an Outcome *To Be Achieved*. Performance for all six measures during the current monitoring period is discussed below.

As discussed with respect to FTMs above, visits transitioned from in-person to almost entirely virtual right after the onset of the pandemic. Although clear guidance was shared in mid-March to ensure an understanding of this expectation, it took some time to make the technological updates necessary to support and capture these visits. This included the dissemination of appropriate devices to workers and families, and training in the use of virtual platforms. As a result, data for these measures may not reflect full DCF performance during the period, and the Monitor has indicated where low performance is likely to be temporary and a consequence of the pandemic.

### Caseworker Visits with Children in Placement

| Quantitative or Qualitative Measure | 9.  Caseworker Contacts with Children – New Placement/Placement Change: The caseworker shall have at least twice-per-month face to face contact with the children within the first two months of placement, with at least one contact in the placement. |
|---|---|
| Performance Target | 93% of children shall have at least twice-per-month face to face contact with their caseworker during the first two months of placement, with at least one contact in the placement. |

*Performance as of June 30, 2020:*

In June 2020, 162 (82%) of the 197 children in a new placement had two virtual visits per month with their caseworkers during their first two months in placement, with at least one contact per month in the child's placement. Between January and June 2020, monthly performance ranged from 50 to 92 percent.[98]

DCF performance did not meet the standard in any month. It is important to note that the low performance on this measure in February, which counts visits that occurred in February and March between caseworkers and children who entered foster care in February, was likely affected by the difficulty of holding and recording visits in the early weeks of the pandemic as workers and families were transitioning to remote platforms.

| Quantitative or Qualitative Measure | 10. Caseworker Contacts with Children in Placement: During the remainder of placement, children will have at least one caseworker visit per month, in placement. |
|---|---|
| Performance Target | 93% of children will have at least one caseworker visit per month in placement, for the remainder of placement. |

*Performance as of June 30, 2020:*

In June 2020, 3,316 (89%) of the 3,712 children in an ongoing placement were visited virtually at least once by their caseworker. Between January and June 2020, monthly performance ranged from 71 to 97 percent.[99] DCF's performance during this monitoring period demonstrated a wider range than is typical for this measure; performance exceeded the SEP standard in two months but remained below the standard in the other four. Given the extenuating circumstances presented by the COVID-19 pandemic and the time it took for DCF to get alternative means of safe visits in place, the Monitor considers this a temporary decline and anticipates that performance will increase to prior levels in the next monitoring period.

---

[98] Monthly performance for this measure is as follows: January, 76%; February, 50%; March, 75%; April, 92%; May, 74%; June, 82%.
[99] Monthly performance for this measure is as follows: January, 97%; February, 96%; March, 71%; April, 82%; May, 92%; June, 89%.

*Charlie and Nadine H. v. Murphy*
*Progress Report of New Jersey DCF for the Period January-June 2020*
*January 2021*
*Page 61*

**Caseworker Visits with Parents/Family Members**

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 28. <u>Caseworker Visits with Parents/Family Members with Goal of Reunification</u>: The caseworker shall have at least two face-to-face visits per month with the parent(s) or other legally responsible family member of children in custody with a goal of reunification. |
| **Final Target** | 90% of families will have at least twice-per-month face-to-face contact with their caseworker when the permanency goal is reunification. |

***Performance as of June 30, 2020:***

In June 2020, 747 (46%) of 1,633 applicable children in custody with a goal of reunification had parents who were visited at least twice during the month by caseworkers (the majority of these visits occurred virtually). Between January and June 2020, a range of 27 to 82 percent of applicable parents or other legally responsible family members were visited at least two times per month by a caseworker.[100]

Figure 1 depicts performance on this measure over the course of the past two years. In assessing performance for this measure, the Monitor applied the findings from DCF's review of children for whom case documentation indicated that a worker visit with a parent was not required because the parent was missing or otherwise unavailable.[101] DCF continued to take a primary role in this data validation process again this monitoring period.

Current performance does not meet the level required by the SEP and remains an Outcome *To Be Achieved.*

---

[100] Monthly performance for this measure is as follows: January, 82%; February, 78%; March, 38%; April, 27%; May, 47%; June, 46%. Reported performance accounts for valid exceptions to the visits requirement.

[101] In an effort to assess the validity of exceptions, DCF reviewed 156 cases from a universe of cases from February 2020 in which worker visits with parents were not held due to a documented exception to the visits requirement. The Monitor and DCF determined that a valid exception was utilized in 108 (69%) of the 156 cases reviewed. During each month of the monitoring period, workers documented an average of approximately 250 exceptions to the visits requirement. As a result, the Monitor excluded 69% of exceptions in each month. For example, in June 2020 there were 1,780 children in custody with a goal of reunification. Data from NJ SPIRIT indicated that there were 213 documented cases that month in which workers documented that parents were missing or otherwise unavailable. Based on the sample, the Monitor excluded from the universe 147 (69%) of the 213 cases in June, making the universe of applicable children 1,633 (1,780-147).

**Figure 1: Percentage of Families Who Had at Least Twice per Month Face-to-Face Contact with Caseworker when the Goal is Reunification (December 2017 – June 2020)**



Source: DCF data

## Visits between Children in Custody and their Parents

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 29. Weekly Visits between Children in Custody and Their Parents: Number/percent of children who have weekly visits with their parents when the permanency goal is reunification unless a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |
| **Final Target** | 60% of children in custody with a return home goal will have an in-person visit with their parent(s) or other legally responsible family member at least weekly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

*Performance as of June 30, 2020:*

In June 2020, an average of 978 (63%) of 1,559 applicable children visited virtually weekly with their parents during the month. Between January and June 2020, a range

of 50 to 79 percent of children had a weekly visit with their parents when the permanency goal was reunification.[102] This performance exceeds the SEP standard in four months of the monitoring period, and the Monitor considers this measure to be met.

| Quantitative or Qualitative Measure | 30. <u>Bi-Weekly Visits between Children in Custody and Their Parents</u>: Number/percent of children who have weekly visits with their parents when the permanency goal is reunification unless a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |
|---|---|
| Final Target | 85% of children in custody with a return home goal will have an in-person visit with their parent(s) or other legally responsible family member at least every other week, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

***Performance as of June 30, 2020:***

In June 2020, 1,100 (76%) of 1,451 applicable children had at least two visits (either virtual or in person) with their parents during the month. Between January and June 2020, a monthly range of 56 to 94 percent of children had visits at least twice a month with their parents when their permanency goal was reunification.[103] DCF's performance during this monitoring period demonstrated a wider range than is typical for this measure; performance exceeded the SEP standard in two months but remained below the standard in the other four. Given the extenuating circumstances presented by the COVID-19 pandemic and the time it took for DCF to get alternative means of safe visits in place in some months, the Monitor considers this a temporary

---

[102] Monthly performance for this measure is as follows: January, 79%; February, 77%; March, 51%; April, 50%; May, 64%; June, 63%. Given the results of validation from a prior monitoring period, the Monitor excluded from the universe all cases in which DCF documented an exception to the parent-child visit requirement. For example, in June 2020, there was an average of 1,892 children with a goal of reunification across the four weeks of the month. Data from NJ SPIRIT indicated that in an average of 333 cases that month, the worker had determined that the parent was unavailable for the visit, the child declined the visit, or the visit was not required. Based on these data, the Monitor excluded those cases from the universe, making the universe of applicable children an average of 1,559 in June (1,892-333).

[103] Monthly performance for this measure is as follows: January, 94%; February, 90%; March, 56%; April, 64%; May, 79%; June, 76%. Given the results of validation activities from a prior monitoring period, the Monitor excluded from the universe all cases in which DCF documented an exception to the parent-child visit requirement. For example, in June 2020, there were 1,778 children with a goal of reunification. Data from NJ SPIRIT indicated that in 327 cases that month, the worker had determined that the parent was unavailable for the visit, the child declined the visit, or the visit was not required. Based on these data, the Monitor excluded those cases from the universe, making the universe of applicable children 1,451 in June (1,778-327).

decline and anticipates that performance will increase to prior levels in the next monitoring period.

**Visits between Children in Custody and Sibling Placed Apart**

| Quantitative or Qualitative Measure | 31. <u>Visits between Children in Custody and Siblings Placed Apart</u>: Number/percent of children in custody, who have siblings with whom they are not residing shall visit with their siblings as appropriate. |
|---|---|
| **Final Target** | 85% of children in custody who have siblings with whom they are not residing shall visit with those siblings at least monthly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

*Performance as of June 30, 2020:*

In June 2020, 794 (68%) of 1,163 applicable children in placement who had at least one sibling with whom they did not reside had at least one virtual visit with one of their siblings during the month.[104] Between January and June 2020, a range of 61 to 88 percent of children had at least monthly visits, primarily virtual during the latter months of the monitoring period, with one of their siblings with whom they were not placed.[105]

DCF's performance during this monitoring period demonstrated a wider range than is typical for this measure; performance exceeded the SEP standard in two months but remained below the standard in the other four. Given the extenuating circumstances presented by the COVID-19 pandemic and the time it took for DCF to get alternative means of safe visits in place, the Monitor considers this a temporary decline and anticipates that performance will increase to prior levels in the next monitoring period.

---

[104] Given results of validation activities from a prior monitoring period, the Monitor excluded 60% of the exceptions from each month from the universe. For example, in the month of June 2020, there were 1,244 children in custody with a sibling in care with whom they were not placed. Data from NJ SPIRIT indicated that there were 135 documented cases that month for which the worker had determined the visit was not required or the child was unavailable. Based on these data, the Monitor excluded from the universe 81 (60%) the 135 cases, making the universe of applicable children 1,163 (1,244-81).

[105] Monthly performance for this measure is as follows: January, 88%; February, 85%; March, 66%; April, 61%; May, 75%; June, 68%. Reported performance accounts for valid exceptions to the visits requirement.

## F.  PLACEMENT

Stable and appropriate placement for children in foster care is critical to safety and well-being, and maintenance of family bonds. DCF policy requires siblings to be placed together whenever possible, and that children experience as few placement changes as possible while in out-of-home placement. There are five performance measures related to placement. As of the beginning of the reporting period, all had been previously met and were designated as Outcomes *To Be Maintained*: sibling placements of two to three children (SEP IV.G.32); sibling placements and recruitment of placements for four or more children (SEP IV.G.33); placement stability for children in care between 13 and 24 months (SEP IV.G.36); and placement stability for children in care 12 months or less (SEP IV.G.35). The state's performance with respect to placement stability is not newly assessed in this report as performance for the stability standards is measured annually at the end of each calendar year. Updated data will be included in the next monitoring report when these data are available. The most recent performance data can be found in Table 1B of this report. Data for recruitment of placements for sibling groups of four or more (SEP IV.G.34) is discussed below.

### Recruitment of Placements for Sibling Groups of Four or More

| Quantitative or Qualitative Measure | 34. Recruitment of Placements for Sibling Groups of Four or More |
|---|---|
| Performance Target | DCF will continue to recruit for resource homes capable of serving sibling groups of four or more. |

**Performance as of June 30, 2020:**

Between January and mid-March 2020, DCF staff continued to host recruitment and retention events for large sibling groups. As of March 9, 2020, due to the COVID-19 pandemic, all recruitment and retention events were suspended and remained suspended for the duration of the monitoring period.

Before the suspension, for example, the Bergen County recruiter gave a presentation to the Hackensack Chamber of Commerce Women's Networking meeting and the Hackensack Charter High School staff on the need for homes with large sibling

groups. The Camden County recruiter honored a resource family who not only adopted a large sibling group, but has also been a strong advocate for locating homes for sibling groups in foster care. The family and the recruiter presented together at Children of America Childcare Service in Clementon, New Jersey about their experience as resource parents and the need for large sibling homes. The Camden County recruiter also hosted a recruitment event at the Deptford Skating & Fun Center in Deptford Township, New Jersey. In addition, the area recruiter for Cumberland, Gloucester, and Salem, the Essex County recruiter, and the Monmouth County recruiter each gave presentations at local churches and at a local rotary club about the importance of resource homes for large sibling groups.

As of June 30, 2020, DCF had a total of 82 large capacity SIBS homes, four more homes than at the end of December 2019. Of the 82 large capacity SIBS homes, 51 are kinship and 31 are non-kinship resource homes. Sixty-three of the 82 homes can accommodate four children – an increase of one home from the previous period – and 19 homes can accommodate five or more children, an increase of three homes from the end of December 2019. Between January and June 2020, DCF recruited and licensed a total of 18 new capacity SIBS homes; 14 SIBS homes that can accommodate four children and four that can accommodate five or more children. During the same period, 13 homes that could accommodate four children and one home that could accommodate five or more children closed or downgraded their capacity.[106]

The Monitor considers DCF to have met the SEP standard for this measure between January and June 2020.

---

[106] Of the 14 homes that were removed from the SIBs program, 1 home closed that could accommodate 5 siblings when the family reunited. Of the 13 homes that closed that could accommodate 4 siblings, a total of 2 homes downgraded their capacity due to reunification or placement with a relative; 2 homes downgraded due to the family's request to remove of a sibling, and 1 home downgraded capacity upon the adoption finalization of the sibling group in their care. In addition, 4 homes closed upon the adoption finalization of the sibling group; 3 homes closed upon reunification; and 1 home closed once upon the family's request for the siblings to be removed.

## G.  MALTREATMENT OF CHILDREN AND YOUTH

A fundamental responsibility of DCF is ensuring the long-term safety of children who are receiving or have received services from CP&P. This responsibility includes ensuring the safety of children who are placed in resource family homes and congregate facilities, and preventing future maltreatment.

There are four SEP performance measures related to maltreatment of children and youth. As of the beginning of the reporting period, all four measures were designated as Outcomes *To Be Maintained*: abuse and neglect of children in foster care (SEP III.H.12); repeat maltreatment for children remaining in their home (SEP IV.H.37); maltreatment post-reunification (SEP IV.H.38); and re-entry to placement (SEP IV.H.39). The state's performance is not newly assessed in this report as performance is measured at the end of each calendar year. Updated data will be included in the next monitoring report when these data are available. The most recent performance data can be found in Table 1B of this report.

## H.  TIMELY PERMANENCY

Regardless of age, gender, race or ethnicity, all children need and deserve a safe, nurturing family to protect and guide them. Safe family reunification is the preferred path, but permanency for children can be achieved in multiple ways, including kinship/guardianship and adoption. There are four SEP measures that focus on permanency for children. As of the beginning of the reporting period, all four measures were designated as Outcomes *To Be Maintained* – achieving permanency within 12 months (SEP IV.I.40), 24 months (SEP IV.I.41), 36 months (SEP IV.I.42), and 48 months (SEP IV.I.43). The state's performance on these permanency measures is not newly assessed in this report as performance is measured annually at the end of each calendar year. Updated data will be included in the next monitoring report when these data are available. The most recent performance data can be found in Table 1B of this report.

## I.  CHILD HEALTH UNITS

| Quantitative or Qualitative Measure | 8.  Child Health Units: The State will continue to maintain its network of child health units, adequately staffed by nurses in each Local Office. |
|---|---|
| Performance Target | DCF will maintain adequate staffing levels in Local Offices. |

Early in New Jersey's child welfare reform efforts, DCF developed Child Health Units (CHUs) to facilitate and ensure the timely provision of health care to children in CP&P custody. CHUs are located in each CP&P Local Office and are staffed with Regional Nurse Administrators, Nurse Health Care Case Managers (HCCMs), and staff assistants, based on the projected number of children in out-of-home placement.

Section III.E of the SEP requires the state to "maintain its network of child health units, adequately staffed by nurses in each Local Office." This measure has been previously met and designated as an Outcome *To Be Maintained*. New Jersey's Child Health Units, which provide each child placed in a resource home with a nurse assigned for health care case management, continue to be recognized by staff and external partners as a notable achievement of the state's child welfare reform efforts. Although budget cuts required a reduction in Child Health Unit staff during the monitoring period owing to the COVID-19 pandemic, DCF was able to maintain staffing ratios required by the SEP due to the steady decline in the number of children in foster care since 2017.

### *Performance as of June 30, 2020:*

On June 30, 2020, DCF employed 154 nurses, of which 154 were available for coverage, and 86 staff assistants, of which 85 were available for coverage. Between January and June 2020, there was an average of 155 nurses available for coverage, for an average ratio of one nurse to every 28 children in out-of-home care, exceeding the standard of one nurse to 50 children in out-of-home care. DCF performance in this area continues to meet the SEP standard.

## J.  OLDER YOUTH

Older youth in foster care often benefit from specialized support to prepare them for adulthood when they age out of the foster care system at age 21, or if they decide to sign themselves out of care beforehand. DCF offers many services to transition-age youth who have not been able to reunify with their families or find another permanent home with relatives or adoptive families. Measures related to older youth reinforce the vital opportunity to build Protective and Promotive Factors (PPFs) and promote healthy development and well-being for this age group.

The SEP includes four measures related to older youth. As of the beginning of the reporting period, all were designated as Outcomes *To Be Maintained* – completion of Independent Living Assessments (SEP IV.K.45); quality of case planning and services (SEP IV.K.46); housing for youth who exit care without achieving permanency (SEP IV.K.47); and education/employment for youth who exit care without achieving permanency (SEP IV.K.48). Quality of Case Planning and Services for Older Youth is a QR measure which is reported by the monitor on an annual basis. Since 2019, performance on housing, education, and employment for older youth has been assessed annually. Performance for all four measures is discussed below.

### Independent Living Assessments

| Quantitative or Qualitative Measure | 45. <u>Independent Living Assessments</u>: Percentage of youth age 14 and 18 with a completed Independent Living Assessment. |
|---|---|
| **Performance Target** | 90% of youth age 14 to 18 will have an Independent Living Assessment. |

***Performance as of June 30, 2020:***

In June 2020, there were 599 youth age 14 to 18 in out-of-home placement for at least six months; 534 (89%) had an Independent Living Assessment (ILA) completed. Monthly performance between January and June 2020 ranged from 88 to 93 percent.[107] DCF performance met the SEP standard in four of the six months of the monitoring period, and the Monitor considers this measure to be met.

---

[107] Monthly performance for this measure is as follows: January, 93%; February, 93%; March, 90%; April, 90%; May, 88%; June, 89%.

## Quality of Case Planning and Services

| Quantitative or Qualitative Measure | 46. Quality of Case Planning and Services: DCF shall provide case management and services to youth between the age 18 and 21 who have not achieved legal permanency. |
|---|---|
| Performance Target | 75% of youth age 18 to 21 who have not achieved legal permanency shall receive acceptable quality case management and service planning. |

Performance data for this measure is collected through Qualitative Reviews (QRs) of the experiences and outcomes of a selection of youth age 18 to 21. In rating these cases, reviewers use both the standard QR protocol and a list of additional considerations relevant to this population, such as DCF's efforts to plan and support youth who identify as LGBTQI, and those who are victims of domestic violence, are expectant or parenting, or who have developmental disabilities.

This QR measure is reported by the Monitor on an annual basis. The Monitor will report on the data for Quality of Case Planning and Services for Older Youth for the period January 1 through December 31, 2020 in the next monitoring report. However, due to the COVID-19 pandemic, QRs were suspended and data will be limited to a smaller selection of counties.

The most recent data on this measure indicate that from January to December 2019, 67 percent (29 of 43) of cases reviewed scored acceptable for both the *child (youth)/family status* and *overall practice performance* indicators.[108] This represented a slight decline in performance from both CY 2018 and CY 2017, when the QR was measured in the same set of counties. The universe of cases to which this measure applies is small and therefore more susceptible to fluctuations, but performance did not meet the SEP standard.

---

[108] From January to December 2019, 67% (29 of 43) of the applicable cases reviewed were rated acceptable on both the *overall child (youth)/family status* and the *overall practice performance* indicators; 95% (41 of 43) of cases were rated acceptable for *child (youth)/family status* and 67% (29 of 43) of cases were rated acceptable for *overall practice performance*.

## Housing

| Quantitative or Qualitative Measure | 46. Housing: Youth exiting care without achieving permanency shall have housing. |
|---|---|
| Performance Target | 95% of youth exiting care without achieving permanency shall have housing. |

Stable housing is a critical, concrete support that older youth need to thrive as they transition to adulthood. With the help of specialized caseworkers, DCF works to ensure that all older youth exiting DCF custody have a housing plan in place.

### Performance as of June 30, 2020:

This measure is assessed annually. The Monitor will report on the data related to housing outcomes for older youth who exited foster care between January 1 through December 31, 2020 without achieving permanency in the next monitoring report.

The most recent data on this measure indicate that, of the 162 youth for which this measure was applicable,[109] there was documentation of a housing plan for 160 (99%) youth, exceeding the SEP standard. DCF's improved performance in this area reflects its commitment to ensuring that youth exiting care have a place to live, demonstrating some of the highest performance it has ever reached in this area.

## Employment/Education

| Quantitative or Qualitative Measure | 47. Employment/Education: Youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. |
|---|---|
| Performance Target | 90% of youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. |

---

[109] The cases of 13 youth out of the universe of 175 youth exiting care to non-permanency were excluded from performance calculations for this measure because the youth could not be located (8) or were incarcerated (5).

It is also important that older youth exiting foster care have an opportunity to further their education and develop employment skills prior to their transition out of foster care.

***Performance as of June 30, 2020:***

This measure is assessed annually. The Monitor will report on the data related to education and employment outcomes for older youth who exited foster care between January 1 through December 31, 2020 without achieving permanency in the next monitoring report.

The most recent data indicate that, of the 160 youth to whom this measure applied,[110] 155 (97%) were either employed or enrolled in education or vocational training programs, or there was documentation of consistent efforts by the caseworker to help youth secure education or employment.[111] This performance exceeds the SEP standard, and shows improvement from prior monitoring periods, with the highest performance DCF has ever reached in this area.

---

[110] The cases of 15 youth out of the universe of 175 youth exiting care to non-permanency were excluded from performance calculations for this measure because the youth could not be located (8), were incarcerated (5), or moved out of state (2).
[111] The circumstances of 7 additional youth were considered to have met the standard because there was documentation of consistent efforts by the caseworker to help secure education or employment.

*Charlie and Nadine H. v. Murphy*
*Progress Report of New Jersey DCF for the Period January-June 2020*
*January 2021*
*Page 73*

## K. SERVICES TO SUPPORT TRANSITION

| Quantitative or Qualitative Measure | 44. <u>Services to Support Transition</u>: DCF will provide services and supports to families to support and preserve successful transitions. |
|---|---|
| **Performance Target** | 80% of cases will be plans rated acceptable for supporting transitions as measured by the Qualitative Review (QR). |

While involved with DCF, children, youth and families often face transitions, including changes in family relationships, living arrangements, service providers or schools. Some transitions are more critical than others, but all require recognition and planning in order to be smooth and successful. DCF uses the Qualitative Review (QR) process to measure case practice that supports families to make successful transitions. Section IV.J of the SEP requires that 80 percent of cases be rated acceptable on the *successful transitions* indicator. This measure is designated as an Outcome *To Be Achieved*. The QR process and protocol are discussed in detail in Section V.N *Accountability Through Qualitative Review* of this report. This QR measure is reported by the Monitor on an annual basis. The Monitor will report on the data for Services to Support Transition from January 1 to December 31, 2020 in the next monitoring report. However, due to the COVID-19 pandemic, QRs were suspended and data will be limited to a smaller selection of counties.

The most recent data on this measure indicate that from January to December 2019, 74 percent (63 of 85) of cases reviewed were rated acceptable on the *successful transitions* indicator, which demonstrates improved performance from prior monitoring periods. DCF has been making efforts to identify barriers to access to services, which has potentially contributed to the increase in cases rated acceptable in the QR. Although DCF did not meet the SEP performance standard in CY 2019, there was significant improvement in this area, after two years of declining performance.

## L. CASELOADS

One of the successes of DCF's reform was reducing and now maintaining caseloads at levels where workers can do the work with children, youth, and families that was expected of them. Caseload compliance is measured by assessing caseloads for individual caseworkers in each of the system's functional areas (Intake, Permanency, Adoption, and IAIU) as well as standards for each CP&P Local Office. Table 2 summarizes the SEP's caseload standards for individual workers.

The SEP includes eight performance measures related to caseloads. As of the beginning of the monitoring period, all were designated as Outcomes *To Be Maintained.* These eight measures include Intake office caseloads (SEP IV.E.24); Intake individual worker caseloads (SEP IV.E.25); Adoption office caseloads (SEP IV.E.26); Adoption individual worker caseloads (SEP IV.E.27); Permanency office caseloads (SEP III.B.4); Permanency individual worker caseloads (SEP III.B.5); IAIU investigators individual caseloads (SEP III.B.3); and supervisory/worker ratio (SEP III.B.2). Performance for all eight measures during the current monitoring period is discussed below.

**Table 2: CP&P Individual Worker Caseload Standards**

| Caseworker Function | Responsibility | Individual Caseload Standard (SEP IV.E and III.B) |
|---|---|---|
| Intake | Respond to community concerns regarding child safety and well-being. Specifically, receive referrals from the State Central Registry (SCR) and depending on the nature of the referral, respond between two hours and five days with a visit to the home and begin investigation or assessment. Complete investigation or assessment within 60 days. | Intake workers are to have no more than **12 open cases** at any one time **and** no more than **eight new referrals** assigned in a month. No Intake worker with 12 or more open cases can be given more than **two secondary assignments** per month.[112] |
| Institutional Abuse Investigations Unit (IAIU) | Respond to allegations of child abuse and neglect in settings including correctional facilities, detention facilities, treatment facilities, schools (public or private), residential schools, shelters, hospitals, camps or child care centers that are required to be licensed, resource family homes, and registered family day care homes. | IAIU staff workers are to have no more than **12 open cases** at any one time **and** no more than **eight new referrals** assigned in a month. |

---

[112] Secondary assignments refer to shared cases between Intake and Permanency workers for families who have a case open with a Permanency worker where there are new allegations of abuse or neglect that require investigation.

| | | |
|---|---|---|
| Permanency | Provide services to families whose children remain at home under the protective supervision of CP&P and those families whose children are removed from home due to safety concerns. | Permanency workers are to serve no more than **15 families and 10 children in out-of-home care at any one time**. |
| Adoption | Find permanent homes for children who cannot safely return to their parents by preparing children for adoption, developing adoptive resources, and performing the work needed to finalize adoptions. | Adoption workers are to serve no more than **15 children** at any one time. |

Source: DCF

## Intake

The SEP Intake caseload standard is that no worker should have more than eight new case assignments per month, no more than 12 open primary cases at any one time, and no Intake worker with 12 or more open primary cases can be assigned more than two secondary assignments per month. In January 2017, DCF implemented a new methodology for tracking and reporting the SEP Intake caseload standard to more clearly communicate to staff and to streamline monitoring and reporting. DCF's new methodology captures secondary case assignments on the Intake worker's monthly caseload report, which tracks and reports Intake caseloads as follows: no more than eight new assignments per month; no more than 12 cases assigned as primary case assignments at any one time; and no more than 14 cases at any one time, including both primary and secondary case assignments. The methodology for the standard of no more than eight new case assignments per month, including secondary assignments, remains unchanged.

DCF continues to implement an internal caseload verification process which serves as a quality assurance method where Intake workers are interviewed, and their reported caseloads are compared to their caseloads as reported in SafeMeasures. However, due to the COVID-19 pandemic, DCF suspended the process during the months of March through June 2020. Between January and February 2020, DCF interviewed a random sample of 38 Intake workers from eight Local Offices throughout the state. DCF verified that 95 percent (36 of 38) of Intake worker caseloads were accurately reflected in SafeMeasures. Findings from DCF's caseload verification reviews are shared widely with DCF staff through briefs, posted onto the Office of Quality website, DCF-wide "DID YOU KNOW" emails, and during statewide leadership meetings.

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 24. <u>Intake Local Office Caseloads:</u> Local Offices will have an average caseload for Intake workers of (a) no more than 12 families, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |
| **Performance Target** | 95% of Local Offices will have an average caseload of (a) no more than 12 families, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |

***Performance as of June 30, 2020:***

Performance data for January through June 2020 show that 100 percent of Local Offices met the Intake caseload standards. DCF continues to exceed the SEP standard.

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 25. <u>Individual Intake Caseloads:</u> individual Intake workers shall have (a) no more than 12 open cases, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |
| **Performance Target** | 90% of individual Intake workers shall have (a) no more than 12 open cases, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |

***Performance as of June 30, 2020:***

The state reported an average of 1,091 active Intake workers between January and June 2020. Among those 1,091 active Intake workers, an average of 1,053 (97%) had caseloads that met the standard. Specifically, in June 2020, 1,044 (98%) of 1,069 active Intake workers were following individual worker standards. DCF continues to meet the individual Intake worker caseload standard.

Data by Local Office show that during June 2020, performance ranged from 77 percent to 100 percent, with 43 of 46 Local Offices having all Intake workers in compliance with caseload standards.

DCF deploys Impact Teams (a supervisor and three workers) to a unit or a Local Office in different areas when intakes are unusually high, to assist in maintaining caseload standards by taking on investigation overflow. There are nine Impact Teams, one per Area Office.

### *"Shared" Cases between Intake and Permanency Workers*

As described in previous monitoring reports, Intake and Permanency workers sometimes share responsibility for families with open permanency cases when there are new allegations of abuse or neglect. According to DCF procedure, all Child Protective Services (CPS) reports are assigned to Intake workers to investigate and are reflected in caseload reporting as one of the Intake workers' eight new referrals in the month and as one of their 12 open families for that month. However, when circumstances indicate that a family with an already open permanency case is the subject of a new CPS report, the work with the family becomes the shared responsibility of both Intake and Permanency workers until the investigation is completed.

Intake workers are assigned a secondary worker designation in NJ SPIRIT for such cases with families who are already currently assigned a Permanency worker. According to DCF, this arrangement emphasizes the primary role of the Permanency worker in securing placement, facilitating visits, supporting the family to implement the case plan, and coordinating services. It also reflects the Permanency worker's responsibility to provide information to the Intake worker and to link the family to appropriate services and supports identified during the new investigation, thus relieving the Intake worker of the overall case management responsibility for the case. Intake workers continue to be responsible for the work required to complete investigative tasks and to reach and document an investigative finding. Thus, these secondary assignments are counted as one of the Intake worker's eight new referrals assigned in a month and as part of the total 14 open cases per month.

DCF reports that Intake supervisors in CP&P Local Offices are expected to appropriately manage the workload of staff in their units and consider an Intake worker's primary and secondary responsibilities when assigning new referrals. Table 3 provides the reported number of secondary assignments to Intake workers by month for this monitoring period.

**Table 3: Number of CP&P Investigations and Secondary Intake Assignments by Month (January – June 2020)[113]**

| Month | Total Investigations Assigned to Intake Workers for the Month | Secondary Intake Worker Assignments of CPS and CWS Investigations | |
|---|---|---|---|
| January | 6,757 | 481 | 7% |
| February | 6, 217 | 443 | 7% |
| March | 4,561 | 404 | 9% |
| April | 2,159 | 391 | 18% |
| May | 2,718 | 643 | 24% |
| June | 3,306 | 555 | 17% |

Source: DCF data

The Monitor reviewed monthly Local Office data on secondary assignments and found that on average, each Intake worker was assigned one secondary case at any given time during the period reviewed. The Monitor also found that an average of 15 percent of Intake workers received two or more secondary case assignments and an average of five percent of Intake workers received three or more secondary assignments each month during the monitoring period. Specifically, in the month of June 2020, 160 (15%) Intake workers received two or more secondary intake assignments and 91 (9%) Intake workers received three or more secondary intake assignments. To ensure that Intake workload is properly managed, regardless of the combination of primary and secondary assignments, DCF continues to examine the processes used in Local Offices to make secondary assignments, as well as Local Office workflow management practices.

**Assignment of Investigations to Non-Caseload Carrying Staff**

On occasion, to handle the unpredictable flow of referrals for investigations, trained non-caseload carrying staff as well as caseload-carrying staff who are not part of Intake units (non-Intake caseload carrying staff) in Local Offices are assigned to investigations. DCF reports that all staff are required to complete First Responder training prior to being assigned an investigation and non-caseload carrying staff must have been similarly trained and receive supervision by the Intake supervisor. The Monitor's review of DCF's data for the months of January through June 2020 found that an average of four percent of investigations were assigned each month to non-

---

[113] Total excludes intakes assigned to Impact, Permanency, Adoption and Advocacy Center workers and includes intakes assigned to workers on leave.

caseload carrying staff, and an average of seven percent were assigned to non-Intake caseload carrying staff, reflecting a slight increase from previous monitoring periods that is related to the availability of case carrying staff and adjustments made during the pandemic. The Monitor considers this a temporary increase and anticipates that assignments to non-case carrying staff will return to prior levels in the next monitoring period.

DCF produces a Caseload Report Exception List that documents all instances of intakes identified as assigned to non-caseload carrying workers, and closely monitors the list on an ongoing basis. Table 4 shows the number of investigations assigned to non-caseload carrying staff, and Table 5 shows the number of investigations assigned to non-Intake caseload carrying staff.

### Table 4: Percentage of CP&P Investigations Assigned to Non-Caseload Carrying Staff by Month (January– June 2020)[114]

| Month | Total Investigations Received in the Month | Number and Percentage of Investigations Assigned to Non-Case Carrying Staff | |
|---|---|---|---|
| January | 7,214 | 53 | 1% |
| February | 6,642 | 51 | 1% |
| March | 5,000 | 248 | 5% |
| April | 2,554 | 157 | 6% |
| May | 3,217 | 177 | 6% |
| June | 3,725 | 136 | 4% |

Source: DCF data

[114] Data are provided for investigations assigned within five days of intake receipt date and do not reflect additional assignments to an investigation after the first five days. DCF conducts monthly reviews of assignments to non-caseload carrying staff in NJ SPIRIT and has found that some investigations had been re-assigned to caseload carrying workers after the initial five days. As a result, the reported percentage of investigations assigned to non-caseload carrying staff may be lower than six percent.

**Table 5: Percentage of CP&P Investigations Assigned to Non-Intake Caseload Carrying Staff by Month (January – June 2020)**

| Month | Total Investigations Received in the Month | Number and Percentage of Investigations Assigned to Non- Intake Caseload Carrying Staff[115] | |
|---|---|---|---|
| January | 7,214 | 404 | 6% |
| February | 6,642 | 374 | 6% |
| March | 5,000 | 191 | 4% |
| April | 2,554 | 238 | 9% |
| May | 3,217 | 322 | 10% |
| June | 3,725 | 283 | 8% |

Source: DCF data

## Adoption

| Quantitative or Qualitative Measure | 26. Adoption Local Office Caseloads: Local offices will have an average caseloads for Adoption workers of no more than 15 children per worker. |
|---|---|
| Performance Target | 95% of Local Offices will have an average caseload of no more than 15 children per Adoption worker. |

| Quantitative or Qualitative Measure | 27. Individual Worker Adoption Caseloads: Individual Adoption worker caseloads shall be no more than 15 children per worker. |
|---|---|
| Performance Target | 95% of individual Adoption workers shall have a caseload of no more than 15 children per month. |

**Performance as of June 30, 2020:**

Performance data for January through June 2020 show that 100 percent of Local Offices and 99 percent of individual workers continued to maintain the adoption caseload standard during this period.[116]

---

[115] This includes Permanency, Adoption, Impact and Advocacy Center caseload carrying workers.
[116] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six month monitoring period.

**Permanency**

| Quantitative or Qualitative Measure | 4. Permanency Local Office Caseloads: Local offices will have an average caseload for Permanency workers of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |
|---|---|
| Performance Target | 95% of Local Offices will have an average caseload of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |

| Quantitative or Qualitative Measure | 5. Individual Worker Permanency Caseloads: Individual Permanency worker caseloads shall be (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |
|---|---|
| Performance Target | 95% of individual Permanency workers shall have a caseload of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |

*Performance as of June 30, 2020:*

Performance data for January through June 2020 show that 100 percent of Local Offices and 100 percent of individual workers continued to maintain the permanency caseload standard during this period.[117]

### Institutional Abuse Investigation Unit (IAIU)

| Quantitative or Qualitative Measure | 3. Individual Worker IAIU Caseloads: individual IAIU worker caseloads shall be (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. |
|---|---|
| Performance Target | 95% of individual IAIU workers shall have a caseload (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. |

*Performance as of June 30, 2020:*

DCF data show 100 percent of individual workers maintained the IAIU caseload standard for the period of January through June 2020.

---

[117] Ibid.

**Supervisory Ratio**

| Quantitative or Qualitative Measure | 2. <u>Supervisor/Worker Ratio:</u> Local Offices shall have sufficient supervisory staff to maintain a five worker to one supervisor ration. |
|---|---|
| Performance Target | 95% of Local Offices shall have sufficient supervisory staff to maintain a five worker to one supervisor ration. |

*Performance as of June 30, 2020:*

Performance data for January through June 2020 show that 100 percent of CP&P Local Offices had sufficient supervisors to maintain ratios of five workers to one supervisor.

## M. DEPUTY ATTORNEYS GENERAL STAFFING

| Quantitative or Qualitative Measure | 7. <u>DAsG Staffing</u>: The State will maintain adequate DAsG staff potions and keep positions filled. |
|---|---|
| Performance Target | DCF will maintain adequate staffing levels at the DAsG office. |

*Performance as of June 30, 2020:*

As of June 30, 2020, 133 Deputy Attorneys General (DAsG) staff positions assigned to work with DCF were filled. Of those, four DAsG were on full time leave. Thus, there were a total of 129 (97%) available DAsG. DCF reports that in addition to these positions, DAsG outside of the DCF Practice Group have dedicated some of their time to DCF matters. DCF continues to meet the SEP standard for this measure.

## N.  ACCOUNTABILITY THROUGH QUALITATIVE REVIEW AND THE PRODUCTION AND USE OF ACCURATE DATA

Although DCF continued many of its quality assurance data processes this monitoring period, the hallmarks of its continuous quality improvement efforts, the Qualitative Reviews (QRs) and ChildStat forums, were suspended in March due to the COVID-19 pandemic.

New Jersey's QR is an assessment of the status of children, youth and families, the status of practice, and the functioning of systems in each of the counties. The protocol and process used for the QR are aligned with DCF's Case Practice Model. Select QR results related to both Child/Youth and Family Status and Practice/System Performance are also used to report on several SEP requirements included in this report, three of which are designated Outcomes *To Be Achieved*: Quality of Teaming (SEP IV.B.20), Quality of Case Plans (SEP IV.D.23) and Services to Support Transition (SEP IV.J.44); and two of which are designated Outcomes *To Be Maintained*: Educational Needs (SEP III.G.11) and Quality of Case Planning and Services for Older Youth (SEP IV.K.46). Given the small sample size of cases from each county, SEP measures based on the QR scores are reported by the Monitor on an annual basis. The Monitor will report on the data for all QR measures for the period January 1 through December 31, 2020 in the next monitoring report. However, due to the COVID-19 pandemic, QRs were suspended and data will be limited to a smaller selection of counties.

When conducting a QR involving children/youth under age 18, the legal guardian is asked to give informed consent for participation in the QR. Trained teams of two reviewers, including DCF staff, community stakeholders and staff from the Monitor's office, review CP&P case records and interview as many people as possible who are involved with the children/youth and their families. QRs take place during a single week and, over the course of two years, occur in 21 counties and typically involve almost 400 cases across the state. The results from reviews provide critical qualitative data on child/youth and family status and practice/system performance.

At the conclusion of each week-long QR, the Area Quality Coordinator assigned to the county works with staff in the county to develop a county-level Performance Improvement Plan (PIP) with short- and long-term goals to strengthen practice. The PIP is designed to address areas needing improvement identified during the QR debrief. A review team, consisting of CP&P Central Office leadership and the Office

of Quality, makes recommendations for approval and the Assistant Commissioner of CP&P approves each PIP. Findings from the QRs are incorporated into existing training and supervisory tools and used to identify systemic opportunities for improvement.

DCF has developed a rigorous continuous quality improvement process that incorporates the QR results and interfaces with DCF's ChildStat meetings. ChildStat is a comprehensive review and discussion of system performance at a local level. Since January 2019, the ChildStat format include discussions of county needs and an assessment of county-level strengths and areas needing improvement based on a review of quantitative data, QR results, and other county-level reviews. The format includes both CP&P and Children's System of Care (CSOC) staff and allows the DCF leadership team to ask questions of and explore solutions directly with county-level leadership. This process has begun to incorporate county-level Human Services Advisory Councils (HSACs), who conduct needs assessments in each county. DCF is using ChildStat as an opportunity to build upon the QR to assess challenges and areas in need of improvement in case practice on a county level. Each county will be assessed at ChildStat every two years, following the QR schedule, and will report on progress on their county-level PIP every 12 months.

The ChildStat process has also been suspended due to the COVID-19 pandemic. The Monitor will be closely tracking DCF's adjustments to its continuous quality improvement processes this year.

The most recent results from CY 2019 on all QR indicators can be found in Appendix C.

## O.  NEEDS ASSESSMENT

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 21. <u>Needs Assessment</u>: The State shall regularly evaluate the needs for additional placements and services to meet the needs of children in custody and their families, and to support intact families and prevent the needs for out-of-home care. Such needs assessments shall be conducted on an annual, staggered basis that assures that every county is assessed at least once every three years. |
| **Final Target** | The State shall develop placements and services consistent with the findings of these needs assessments. |

County Human Service Advisory Councils (HSACs) are charged with gathering information related to local service needs, the impact of those needs on its population, and key barriers to improved service delivery. Previous monitoring reports describe the meta-analysis DCF undertook of previous state needs assessment processes. Going forward, DCF's new needs assessment process will involve HSACs undertaking a county-based needs assessment biennially, which will be incorporated into county-level Qualitative Reviews (QRs), ChildStat, and local Performance Improvement Plan (PIP) processes. To support implementation and to align these continuous quality improvement measures, DCF divided counties into two groups, each of which were scheduled to report to DCF every two years, following the QR schedule.

In 2019, DCF had established a workgroup with statewide Human Service Directors (HSDs) that met monthly to outline methodology and develop guidance, focus group protocols, a survey, and a report template that the HSACs will use as they collect data. Between July and December 2019, the DCF workgroup finalized these tools and established a uniform reporting method for the counties. DCF also worked with Rutgers University School of Social Work to design county-based data profiles to provide the HSACs with population data and the most recent administrative data. These profiles are intended to help support HSACs in identifying, prioritizing, and addressing county needs, services, and resources.

In November 2019, implementation of the revised needs assessment process began for the first group of New Jersey counties, which continued throughout the monitoring period.[118] DCF received the first group of reports in September and October 2020, and the second group of reports are due by the end of 2020.[119] Additional information about DCF's needs assessment process can be found on DCF's website.[120]

---

[118] The counties in the first group are: Sussex, Burlington, Passaic, Salem, Hudson, Monmouth, Hunterdon, Union, Gloucester, and Essex.
[119] The counties in the second group are: Warren, Bergen, Morris, Somerset, Middlesex, Mercer, Ocean, Camden, Atlantic, Cumberland, and Cape May.
[120] To see all related tools and documents to DCF's Needs Assessment, go to:
https://www.nj.gov/dcf/about/divisions/opma/hsac_needs_assessment.html

## P.  FISCAL YEAR BUDGET

The budget process for FY2021 was delayed due to the COVID-19 pandemic, resulting in an allocation for the nine-month period from October 1, 2020 – June 20, 2021.  Given the state's significant revenue shortfall – estimated at $5.6 billion for FY2021 – the final budget reflects the difficult economic realities New Jersey is experiencing as a result of the pandemic.

As a result of the shortfall, Governor Murphy requested all departments to propose a model of eliminating roughly 15 percent from their total budgets. In response to those proposals, the State worked with each department to develop the Governor's final proposed FY 2021 budget, which was presented to the legislature on August 25, 2020. The legislature passed an amended budget on September 22, 2020. In the final budget, DCF sustained approximately $42.3 million in cuts to select programs and services, many of which it deemed no longer essential, or were able to be adjusted because of the decrease in New Jersey's foster care population over the past several years, including a repurposing of funding that had previously been needed for Child Health Unit nurses. Prior to the pandemic, DCF had planned to re-invest these savings in prevention services, but COVID-19 required those plans to be suspended. However, in recognition of the impact that the COVID-19 pandemic is having on children, youth and families, Governor Murphy's budget includes a $45 million investment in the Children's System of Care (CSOC), the DCF division that serves children and adolescents with emotional and behavioral health care challenges and their families. Given this investment, the DCF budget reflects an increase from last year's budget.

In the final budget, DCF was able to preserve the State's child protection investigation, foster care, public adoption and guardianship systems; operating costs for its 17 schools; the statewide network of evidence-based home visiting programs; the statewide network of 57 community-based Family Success Centers; the network of School Based Youth Service programs, state-wide hotlines, shelters, and advocacy services for survivors of domestic violence and sexual assault; a suite of housing, shelter, and supportive services for transition-aged youth. Some of the cuts included eliminating cost reimbursement funding mechanisms for Methadone Intensive Outpatient Programs, beds at two emergency shelters, and certain family support services that are available outside of DCF through CSOC, other Medicaid programs, or other state-funded programs.

**APPENDIX A:**
**Glossary of Acronyms Used in the Monitoring Report**

| | | | |
|---|---|---|---|
| **ACEs:** | Adverse Childhood Experiences | **LOM:** | Local Office Manager |
| **AQC:** | Area Quality Coordinators | **MSA:** | Modified Settlement Agreement |
| **CCYC:** | County Councils for Young Children | **NHA:** | Nurtured Heart Approach |
| **CFSR:** | Child and Family Services Review | **OAS:** | Office of Adolescent Services |
| | | **OFV:** | Office of Family Voice |
| **CHU:** | Child Health Unit | **OOQ:** | Office of Quality |
| **CIACC:** | Children's Interagency Coordinating Council | **OPMA:** | Office of Performance Management and Accountability |
| **CP&P:** | Division of Child Protection and Permanency | **ORF:** | Office of Resource Families |
| | | **OFL:** | Office of Resource Licensing |
| **CPL**: | Case Practice Liaisons | **PAP:** | Predict Align Prevent |
| **CPM:** | Case Practice Model | **PIP:** | Performance Improvement Plan |
| **CPS:** | Child Protective Services | | |
| **CQI:** | Continuous Quality Improvement | **PPE:** | Personal Protective Equipment |
| **CSOC:** | Children's System of Care | **PPFs:** | Protective and Promotive Factors |
| **CSSP:** | Center for the Study of Social Policy | **PRSS:** | Peer Recovery Support Services |
| **CWS:** | Child Welfare Services | **QR:** | Qualitative Review(s) |
| **DAsG:** | Deputy Attorneys General | **SACWIS:** | Statewide Automated Child Welfare Information System |
| **DCF:** | Department of Children and Families | **SAMHSA:** | Substance Abuse and Mental Health Services Administration |
| **DOE:** | Department of Education | | |
| **DOW:** | Division on Women | | |
| **FCP:** | Family and Community Partnerships | **SBC:** | Solution Based Casework |
| **FFT-FC:** | Family Functional Therapy – Foster Care | **SEP:** | Sustainability and Exit Plan |
| | | **SCR:** | State Central Registry |
| **FSC:** | Family Success Centers | **SDM:** | Standard Decision Making tool |
| **FTM:** | Family Team Meeting | **SIBS:** | Siblings in Best Placement Settings |
| **HCCM:** | Health Care Case Manager | | |
| **IAIU:** | Institutional Abuse Investigative Unit | **USDA:** | United States Department of Agriculture |
| **ILA:** | Independent Living Assessment | | |
| **LGBTQI:** | Lesbian, Gay, Bisexual, Transgender, Questioning, Intersex | | |
| **KLG:** | Kinship Legal Guardian | | |

**APPENDIX B:**
**Sources of DCF Data and Monitoring Methodology**

Reports that DCF currently publishes on its website include:

- **Commissioner's Monthly Report**[121] – *Current and produced monthly*. This report gives a broad data snapshot of various DCF services. The report includes information from CP&P, Office of Adolescent Services (OAS), Institutional Abuse Investigation Unit (IAIU), CSOC, Family & Community Partnerships and the Division on Women (DOW).

- **Screening and Investigations Report**[122] – *Current and produced monthly*. This report details State Central Registry (SCR) activity, including data regarding calls to the Child Abuse and Neglect Hotline, assignments to CP&P offices and trends in Child Protective Services (CPS) Reports and Child Welfare Services (CWS) Referrals.

- **Workforce Report**[123] – *Last report dated January 2018*. This report provides information regarding the demographics and characteristics of DCP&P workers, as well as a variety of indicators of workforce planning and development, using fiscal year (FY) (July 1 – June 30) data. Going forward, elements of this report will be incorporated into the new comprehensive annual report described above.

- **Children's Interagency Coordinating Council Report**[124] – *Current and produced monthly*. This report details referral and service activity for CSOC. It includes demographic data, referral sources, reasons for and resolutions of calls to CSOC, information on substance use and school attendance, as well as authorized services provided.

---

[121] To see all Commissioner's Monthly Reports, go to: http://www.nj.gov/dcf/childdata/continuous/
[122] To see all Screening and Investigations Reports, go to: http://www.nj.gov/dcf/childdata/protection/screening/
[123] To see DCF's Workforce Report: 2016-2017 Updates, go to http://www.nj.gov/dcf/childdata/exitplan/NJ.DCF.Workforce.Report-FY17.pdf. To see DCF's Workforce: Preliminary Highlights 2014-2015 Report, go to: http://www.state.nj.us/dcf/childdata/orgdev/NJ.DCF.Workforce.Report_2015.pdf
[124] To see all Children's InterAgency Coordinating Council Reports, go to: http://www.nj.gov/dcf/childdata/interagency/

- **New Jersey Youth Resource Spot**[125] – *Ongoing and updated periodically*. This website offers the latest resources, opportunities, news, and events for young people served by DCF. It includes information about the Youth Advisory Network, as well as additional resources available in each county and statewide.

- **DCF Needs Assessment**– *Previously produced annually. Last report dated March 2018*. The SEP requires reports to evaluate the need for additional placements and services to meet the needs of children, youth and their families involved with DCF, with each county assessed at least once every three years. During its multi-year needs assessment process, DCF produced annual reports on its website and reported twice annually to the Monitor.[126] The last report, entitled *DCF Needs Assessment 2018 Report #3: Survey Findings and Synthesis*, updated interim findings to identify the resources needed to serve families with children at risk for entering out-of-home placement and those already in placement.[127] DCF has redesigned its Needs Assessment process, which is incorporated into its continuous quality improvement process, as reported in Section V.O *Needs Assessment*.[128]

The Monitor engaged in the following data verification activities for the period of January to June 2020.

- **Family Team Meeting Data Review -** The Monitor collaborated with DCF to review experiences of 113 children and families to verify all instances in which workers determined that Family Team Meetings (FTMs) were not required because parents were unavailable, missing, or declined the meeting. DCF and the Monitor completed a joint review of all cases of documented exceptions to the FTM requirement in each month from January 1 to June 30, 2020. Further discussion of current performance on these measures is included in Section V.B *Family Team Meetings*.

- **Visits Data Review -** The Monitor collaborated with DCF to review case records of 156 children in which workers documented that caseworker

---

[125] To see New Jersey's Youth Resource Spot, go to: http://www.njyrs.org/
[126] To see the prior CP&P Needs Assessment reports, go to: http://www.nj.gov/dcf/childdata/protection/
[127] To see New Jersey's CP&P Final Needs Assessment 2018 Report #3: Survey Findings and Synthesis, go to: http://www.nj.gov/dcf/childdata/protection/DCF.Needs.Assessment.Phase.IV.Report-March2018.pdf
[128] To see DCF's description of its Needs Assessment process, go to: https://www.nj.gov/dcf/about/divisions/opma/hsac_needs_assessment.html

contacts with parents with a reunification goal (SEP IV.F.28) were not required during February 2020 because a parent was unavailable or there were other circumstances outside of their control that prevented visits from occurring. Findings are discussed in Section V.E *Visits*.

- **Other Monitoring Activities -** Given the COVID-19 pandemic, the Monitor staff were unable to complete site visits in person to discuss the reform efforts with staff and providers on the ground. However, the Monitor engaged in video interviews with groups of staff and other stakeholders across the state, including contracted service providers and legal advocacy organizations and attended DCF's Child Fatality and Near Fatality Review Board (CFNFRB) meetings. Though DCF's ChildStat meetings and Qualitative Reviews (QR) have been suspended during the pandemic, the Monitor has continued to track the progress of DCF through web updates and participation in a virtual conference in May 2020.

**APPENDIX C:**
**Qualitative Review CY 2019 Results**

**Table 6: Qualitative Review: Practice/System Performance Results**
**(January – December 2019)**

| Practice/System Performance Indicators | | # Cases Applicable | # Cases Acceptable | % Acceptable |
|---|---|---|---|---|
| Engagement | Child/Youth | 107 | 100 | 93% |
| | Mother | 128 | 77 | 60% |
| | Father | 104 | 51 | 49% |
| | Resource Family | 118 | 112 | 95% |
| Family Teamwork | Teamwork & Coordination | 145 | 90 | 62% |
| Assessment & Understanding | Child/Youth | 193 | 163 | 84% |
| | Mother | 128 | 59 | 46% |
| | Father | 104 | 34 | 33% |
| | Resource Family | 118 | 107 | 91% |
| Case Planning Process | | 193 | 120 | 62% |
| Plan Implementation | | 193 | 131 | 68% |
| Tracking & Adjusting | | 193 | 141 | 73% |
| Provision of Health Care Services | | 193 | 188 | 97% |
| Resource Availability | | 193 | 157 | 81% |
| Family & Community Connections | Mother | 78 | 63 | 81% |
| | Father | 57 | 34 | 60% |
| | Siblings | 30 | 25 | 83% |
| Successful Transitions | | 85 | 63 | 74% |
| Long Term View | | 193 | 104 | 54% |
| **OVERALL Practice/System Performance** | | **193** | **125** | **65%** |

Source: DCF data

**Table 7: Qualitative Review: Child/Youth and Family Status Results**
**(January – December 2019)**

| Child/Youth & Family Status Indicators | # Cases Applicable | # Cases Acceptable | % Acceptable |
|---|---|---|---|
| Safety at Home | 193 | 193 | 100% |
| Safety in other Settings | 193 | 192 | 99% |
| Stability at Home | 193 | 164 | 85% |
| Stability in School | 109 | 102 | 94% |
| Living Arrangement | 193 | 190 | 98% |
| Family Functioning & Resourcefulness | 183 | 133 | 73% |
| Progress towards Permanency | 193 | 146 | 73% |
| Physical Health of the Child | 193 | 190 | 98% |
| Emotional Well-Being | 193 | 182 | 94% |
| Learning & Development, Under Age 5 | 81 | 76 | 94% |
| Learning & Development, Age 5 & older | 106 | 89 | 84% |
| **OVERALL Child & Family Status** | 193 | 183 | 94% |

Source: DCF data

**APPENDIX D:**
**DCF Organizational Chart**

