July 2021

CHARLIE AND NADINE H. V. MURPHY

PROGRESS OF THE NEW JERSEY
DEPARTMENT OF CHILDREN AND FAMILIES

July 1 – December 30, 2020

**Center *for the*
Study *of*
Social Policy**
Ideas into Action

1575 Eye Street NW, #500
Washington, DC 20005
www.CSSP.org

*Charlie and Nadine H. v. Murphy*

**Progress of the New Jersey Department of Children and Families For the Monitoring Period July 1 – December 31, 2020**

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................... 1

II.  SUMMARY OF PERFORMANCE DURING JULY THROUGH DECEMBER 2020 ....4

III.  CHILD AND FAMILY OUTCOMES AND CASE PRACTICE PERFORMANCE MEASURES ......................................................................................................... 19

IV.  FOUNDATIONAL ELEMENTS.............................................................................. 48

V.  SUSTAINABILITY AND EXIT PLAN PERFORMANCE MEASURES *TO BE ACHIEVED* AND *TO BE MAINTAINED* .............................................................. 49

   A.  INVESTIGATIONS ............................................................................................ 49

   B.  FAMILY TEAM MEETINGS ..............................................................................52

   C.  QUALITY OF CASE AND SERVICE PLANNING ..............................................57

   D.  EDUCATION..................................................................................................... 60

   E.  MAINTAINING CONTACT THROUGH VISITS ................................................. 61

   F.  PLACEMENT .................................................................................................... 68

   G.  MALTREATMENT OF CHILDREN AND YOUTH...............................................74

   H.  TIMELY PERMANENCY...................................................................................79

   I.  CHILD HEALTH UNITS ................................................................................... 84

   J.  OLDER YOUTH................................................................................................ 85

   K.  SERVICES TO SUPPORT TRANSITION ......................................................... 90

   L.  CASELOADS.................................................................................................... 91

   M.  DEPUTY ATTORNEYS GENERAL STAFFING ................................................ 99

   N.  ACCOUNTABILITY THROUGH QUALITATIVE REVIEW AND THE PRODUCTION AND USE OF ACCURATE DATA ............................................100

   O.  NEEDS ASSESSMENT ..................................................................................101

   P.  FISCAL YEAR BUDGET ................................................................................103

APPENDIX A:........................................................................................................105

APPENDIX B:........................................................................................................106

APPENDIX C:........................................................................................................109

## LIST OF TABLES

Table 1: *Charlie and Nadine H.* Child and Family Outcome and Case Practice Performance Measures....................................................................................... 20

Table 2: CP&P Individual Worker Caseload Standards ..................................... 91

Table 3: Number of CP&P Investigations and Secondary Intake Assignments by Month (July – December 2020)............................................................................ 94

Table 4: Percentage of CP&P Investigations Assigned to Non-Caseload Carrying Staff by Month  (July– December 2020) ............................................................ 96

Table 5: Percentage of CP&P Investigations Assigned to Non-Intake  Caseload Carrying Staff by Month  (July – December 2020) ....................................... 96

## LIST OF FIGURES

Figure 1: Number of Children in Placement (2013-2020)...................................12

Figure 2: Percentage of Children in Kinship Placements  (December 2017-December 2020) ......................................................................................................... 13

Figure 3: Percentage of Families Who Had at Least Twice per Month Face-to-Face Contact with Caseworker when the Goal is Reunification  (December 2017 – December 2020)............................................................................................... 64

Figure 4: Percentage of Children Who Visited With their Parents Weekly  (June 2016 – December 2020)........................................................................................ 65

Figure 5: Percentage of Children Who Visited with their Siblings  (June 2016 – December 2020)......................................................................................................67

Figure 6: Percentage of Sibling Groups of Two or Three Children Placed Together (CY 2013 – CY 2020)........................................................................................ 69

Figure 7: Percentage of Sibling Groups of Four or More Children Placed Together (CY 2013 – CY 2020)........................................................................................ 70

Figure 8: Percentage of Children with Two or Fewer Placements  (CY 2013 – CY 2019) ................................................................................................................72

Figure 9: Number of Placements for Children  within 12 Months of Entering Foster Care (CY 2019)..................................................................................................72

Figure 10: Number of Placements for Children  within 13-24 Months of Entering Foster Care (CY 2018).......................................................................................73

Figure 11: Percentage of Children who were Victims of a Substantiated Allegation of Abuse and/or Neglect in Out-of-Home Care  (CY 2013-CY 2020)....................75

Figure 12: Percentage of Children who were Victims of Second Substantiated Allegation within 12 Months of Remaining at Home after First Substantiated Allegation  (CY 2009-CY 2019)........................................................................76

Figure 13: Percentage of Children who were Victims of Substantiated Allegation within 12 Months after Reunification  (CY 2009-CY 2017) ...................................................... 77

Figure 14: Percentage of Children Who Re-Entered Custody  within One Year of Exit (CY 2009 – CY 2018) ................................................................................................................ 78

Figure 15: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 12 Months of Entering Foster Care  (CY 2010 – CY 2019) ....................................................................................................................................... 80

Figure 16: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 24 Months of Entering Foster Care  (CY 2010 – CY 2017) ....................................................................................................................................... 81

Figure 17: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 36 Months of Entering Foster Care  (CY 2010 – CY 2017) ....................................................................................................................................... 82

Figure 18: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 48 Months of Entering Foster Care  (CY 2010 – CY 2016) ....................................................................................................................................... 83

Figure 19: Percentage of Older Youth Exiting Foster Care Without Achieving Permanency with Housing Plan ................................................................................................. 87

Figure 20: Percentage of Older Youth Exiting Foster Care Without Achieving Permanency Employed or Enrolled in Education Programs ................................................... 89

# I.    INTRODUCTION

The Center for the Study of Social Policy (CSSP) was appointed in 2006 by the Honorable Stanley R. Chesler of the United States District Court for the District of New Jersey as Federal Monitor of the class action lawsuit *Charlie and Nadine H. v. Murphy*, aimed at improving outcomes for children, youth and families served through New Jersey's child welfare system. As Monitor, CSSP has been charged with independently assessing New Jersey's compliance with the goals, principles and outcomes of the Court Order entered in 2003; the Modified Settlement Agreement (MSA) entered in July 2006; and the Sustainability and Exit Plan (SEP) entered on November 4, 2015, which supersedes the MSA. This monitoring report includes performance data and measures progress under the SEP for the period July 1 through December 31, 2020, and has been prepared by court-appointed independent Monitor Judith Meltzer, with assistance from Monitor staff Martha L. Raimon, Elissa Gelber, Lisa Mishraky-Javier, and Ali Jawetz.[1] It is presented to U. S. District Judge Chesler, parties to the lawsuit, and the public.

The SEP's requirements pertain to the approximately 3,700 children and youth who are currently placed into foster care and 31,000 families and children served through New Jersey's in-home child protective services. This census has decreased dramatically since the end of 2019, from 4,400 children in foster care and 44,000 families served in-home, which demonstrates a similar trend to the foster care population across the country.

The Monitor's public reports cover six-month periods.[2] The primary sources of information on New Jersey's progress are quantitative and qualitative data supplied by the Department of Children and Families (DCF) and independently validated by the Monitor. DCF provides access to staff and documents to enable the Monitor to verify performance.

In assessing progress, the Monitor first looks to the state's data and validates its accuracy. The Monitor also retains the authority to engage in independent data collection and analysis where needed. In the past several years, DCF has expanded

---

[1] Copies of all Monitoring Reports can be found at: https://cssp.org/our-work/projects/our-projects/class-action-litigation-new-jerseys-department-of-children-and-families/
[2] The exceptions to this time frame were Monitoring Period XIII, which covered July 1, 2012 through March 31, 2013; Monitoring Period XIV, which covered April 1 through December 31, 2013; and Monitoring Period XVII, which covered January 1 through December 31, 2015.

the data available on its public website,[3] as well as on its publicly accessible New Jersey Child Welfare Data Hub,[4] which was developed in collaboration with Rutgers University.[5] During the monitoring period, the Children's System of Care (CSOC) and the Office of Research, Evaluation and Reporting (RER) collaborated with Rutgers to develop the CSOC data dashboard for the Data Hub, which launched in February 2021.[6,7]

Please see Appendix B for a list of other reports DCF publishes on its website, as well as specific activities undertaken by the Monitor to assess DCF's progress this monitoring period.

**Structure of the Report**

Section II provides an overview of the state's accomplishments and challenges during this monitoring period, a time that was especially challenging due to the COVID-19 pandemic. Section III provides summary performance data on each of the outcomes and performance measures required by the SEP. Section IV provides information related to the SEP Foundational Elements.[8] Section V provides more detailed data and discussion of performance on SEP *Outcomes To Be Maintained* and *Outcomes To Be Achieved* in the following areas:

- Investigations of alleged child maltreatment (Section V.A);
- Implementation of DCF's Case Practice Model; including Family Team Meetings, case planning and visits (Sections V.B, V.C & V.E);
- Educational engagement for children in out-of-home care (Section V.D);
- Placement of children in out-of-home settings (Section V.F);
- Rates of maltreatment and re-entry to placement (Section V.G);
- Efforts to achieve permanency for children either through reunification with family, legal guardianship, or adoption (Section V.H);

---

[3] To see DCF's public website, go to: http://www.state.nj.us/dcf/about/
[4] The Data Hub, launched in November 2016, allows users to create customized charts and graphs using New Jersey's child welfare data, and incorporates information from the formerly produced quarterly DCF Demographics Report.
[5] To see the New Jersey Child Welfare Data Hub, go to: https://njchilddata.rutgers.edu/#home
[6] To see the data map reports, go to: https://njchilddata.rutgers.edu/map#
[7] To see the Press Release about the CSOC Data Dashboard, go to: https://www.insidernj.com/press-release/nj-dcf-rutgers-university-launch-new-data-dashboard/
[8] The Foundational Elements requirements of the SEP intentionally recognize the state's accomplishments in early implementation of the MSA. At the Monitor's discretion, based on a concern that a Foundational Element has not been sustained, the Monitor may request additional data. If the data demonstrate a persistent problem, in the Monitor's discretion, the state will propose and implement corrective action (SEP.II).

- Provision of health care services to children and youth (Section V.I);
- Services to older youth (Section V.J);
- Services to support transitions (Section V.K);
- Caseloads (Section V.L);
- Deputy Attorneys General Staffing (Section V.M);
- Accountability through the Qualitative Review and the production and use of accurate data (Section V.N);
- Needs Assessment (Section V.O); and
- Fiscal Year 2020 budget (Section V.P).

## II.  SUMMARY OF PERFORMANCE DURING JULY THROUGH DECEMBER 2020

Much of this report provides specific data as to the state's progress on each of the Sustainability and Exit Plan (SEP) requirements between July and December 2020. It is important to note, however, that this monitoring period, like the one prior, has been defined by the extraordinary challenges imposed by the COVID-19 pandemic, and the state's policy and practice modifications in response to it. Despite multiple new challenges posed by the pandemic, DCF continues to maintain progress already achieved as part of the *Charlie and Nadine H.* lawsuit and has taken additional steps to improve supports and services for the children, youth, and families of New Jersey.

In June 2020, New Jersey Governor Phil Murphy lifted the COVID-19 emergency stay-at-home order that had been in effect since March 9, 2020. In July 2020, the first month of the monitoring period covered in this report, DCF began to resume certain operations, including in-person contact with children and families. Some visits that would have otherwise occurred in Local Offices took place outdoors or in large public places, while supervision, staff meetings, and other administrative functions continued virtually. At the same time, DCF directed providers of some services to resume in-person service delivery, and released a guide for CP&P staff and providers on safe in-person parent-child and sibling visits.[9] In-person contact with caseworkers, parents, and children and the provision of contracted services – including most services provided through the Children's System of Care (CSOC), which serves children and youth with emotional and behavioral health challenges and their families – continued for the remainder of the monitoring period, despite New Jersey suffering a second wave of COVID-19 infections in the latter part of the year.

While skillfully navigating the myriad of changes to operations brought about by the pandemic, DCF focused heavily on sharing essential information with partners through social media, regular provider calls, the DCF website, and communicating with staff through video conferences. The Department also began to build stronger relationships with non-traditional partners, such as the New Jersey Association of Counties, the state Nurses Association, the Academy of Pediatrics, and others to raise awareness about child abuse and prevention, race equity initiatives, domestic violence, and mental health services available to youth in the state.

---

[9] To see New Jersey DCF's July 6, 2020 Guide for Supporting In-Person Visitation during the COVID-19 Pandemic, go to: https://www.nj.gov/dcf/news/COVID19-Guidance.for.CPP.and.Providers.on.Family.Visits.pdf

As previously reported, at the onset of the pandemic in March 2020, DCF had achieved and was sustaining significant progress in serving children, youth, and families pursuant to the *Charlie and Nadine H.* lawsuit. Indeed, the state was on a trajectory toward achievement of the remaining areas of the lawsuit that were unmet. Despite the many challenges that the pandemic continues to present, between July and December 2020, DCF again sustained progress on most of the outcomes already achieved and ended the monitoring period having met 44 of 48 performance measures.[10] DCF also maintained performance with respect to each of the SEP Foundational Elements in such important areas as training, services for domestic violence survivors, and manageable caseloads for workers.

While performance in a few areas has not yet rebounded to pre-pandemic levels, the data contained in this report reflect that DCF maintained similar performance levels as prior to the onset of the pandemic in most areas, including with respect to measures related to Family Team Meetings (FTMs) and visits with family, which had declined in the last monitoring period. This is a significant improvement and is the result of DCF's extensive effort to set up virtual settings for meetings and visits. In calendar year (CY) 2020, performance improved significantly for siblings being placed together (SEP IV.G.33) and for reduced abuse and neglect of children already in foster care placements (SEP III.H.12). In fact, all measures related to placement of children in out-of-home care were maintained or exceeded, as described further in Section V.F *Placement*. However, permanency rates within 12 and 24 months (SEP IV.I.40&41) dropped below their respective standards. Performance on Housing and Employment/Education for Older Youth Exiting to Non-Permanency (SEP

---

[10] These measures include: Institutional Abuse Investigations Unit (IAIU) (III.A.1to); Supervisor/Worker Ratio (III.B.2); IAIU Investigators Caseload (III.B.3); Permanency Workers (Local Offices) Caseload (III.B.4); Permanency Workers Caseload (III.B.5); Timeliness of Current Plans (III.C.6); Adequacy of DAsG Staffing (III.D.7); Child Health Units (III.E.8); Caseworker Contacts with Children – New Placement/Placement Changes (III.F.9); Caseworker Contact with Children in Placement (III.F.10); Educational Needs (III.G.11); Abuse and Neglect of Children in Foster Care (III.H.12); Timeliness of Investigation Completion (60 days) (SEP IV.A.13); Timeliness of Investigation Completion (90 days) (SEP IV.A.14); Quality of Investigations (SEP IV.A.15); Initial Family Team Meeting (SEP IV.B.16); Subsequent FTMs within 12 months (SEP IV.B.17); Subsequent FTMs after 12 months – Reunification Goal (SEP IV.B.18); Subsequent FTMs after 12 months – Other than Reunification Goal (SEP IV.B.19); Needs Assessment (SEP IV.C.21); Initial Case Plans (SEP IV.D.22); Intake Workers (Local Offices) (SEP IV.E.24); Intake Workers (SEP IV.E.25); Adoption Local Office Caseload (SEP IV.E.26); Adoption Workers (SEP IV.E.27); Parent-Child Visits – weekly (SEP IV.F.29); Parent-Child Visits – bi-weekly (SEP IV.F.30); Sibling Visits (SEP IV.F.31); Placing Siblings Together (SEP IV.G.32); Placing Siblings Together for Four or More Children (SEP IV.G.33); Recruitment of Placements for Sibling Groups of Four or More (SEP IV.G.34); Placement Stability for first 12 months in care (SEP IV.G.35); Placement Stability 13-24 Months in Care (SEP IV.G.36); Repeat Maltreatment (In-home) (SEP IV.H.37); Maltreatment Post-Reunification (SEP IV.H.38); Re-entry to Placement (SEP IV.H.39); Permanency within 12 Months (SEP IV.I.40); Permanency Within 24 Months (SEP IV.I.41); Permanency within 36 months (SEP IV.I.42); Permanency within 48 months (SEP IV.I.43); Independent Living Assessments (SEP IV.K.45); Quality of Case Planning and Services (SEP IV.K.46); Housing for Older Youth Exiting to Non-Permanency (SEP IV.K.47); and Employment/Education for Older Youth Exiting to Non-Permanency (SEP IV.K.48).

IV.K.47&48) also declined during 2020. These measures are reported annually and were not included in the mid-year report, so this is the first time the Monitor has reported data on them since the onset of the pandemic. Challenges caused by the COVID-19 pandemic most likely influenced performance.

As specified in Section III of the SEP, when the State's performance falls below the designated outcomes and standards in the SEP and remains below the standard in subsequent review periods, the Monitor will have "discretion to determine if the decline in performance is temporary, insubstantial and/or caused by reasonably unforeseen circumstances…or to redesignate the standard as an *Outcome To Be Achieved*." During this monitoring period, the state's performance on some measures has declined. The Monitor continues to attribute declines in many of these areas to be the "reasonably unforeseen circumstances" brought about by the COVID-19 pandemic, and will not recommend redesignation at this time, as it expects performance to improve as New Jersey and CP&P return to pre-pandemic activities.

Three of the remaining four SEP *Outcomes To Be Achieved* are measured by New Jersey's Qualitative Review (QR) process: Quality of Case Plans (SEP IV.D.23); Quality of Teaming (SEP IV.B.20); and Services to Support Transitions (SEP IV.J.44). The data required for determining performance for these three SEP outcomes have historically been collected and reported annually. Due to the pandemic, QRs were suspended and have not been resumed, and data for these measures are not included in this report. DCF is in the process of redesigning many of its CQI processes to integrate its Solution Based Casework approach with its Case Practice Model. The Monitor has asked DCF to propose alternative ways of measuring performance for those areas previously captured with QR data.[11]

The fourth outstanding *Outcome To Be Achieved* – that workers visit parents twice monthly when a child is in the state's custody with a permanency goal of reunification (SEP IV.F.28) – continues to remain below the SEP's standard, though performance has returned to pre-pandemic levels.

---

[11] For example, DCF participated in the federal Child and Family Services Review (CFSR) during 2020, which measured practice from June 2019-August 2020, and met or exceeded its Performance Improvement Plan (PIP) targets for 7 out of the 8 domains under review. Performance is based on case reviews completed from September-November 2020. The Children's Bureau (CB) determined the state met the PIP measurement goals for Risk and Safety Assessment and Management; Stability of Foster Care Placement; Reunification, Guardianship, Adoption or Other Planned Living Arrangement; Needs and Services of Child, Parents, and Foster Parents; Child and Family Involved in Case Planning; Caseworker Visits with Child; and Caseworker Visits with Parents. The PIP target not yet met is Permanency Goal for Child.

Highlighted below are brief updates on specific areas of practice and some of the new policy, practice, and initiatives underway within DCF as part of its Strategic Plan,[12] and that continue to evolve despite the pandemic.

### Enhancing Child Protection Practice Model to Improve Quality

Between July and December 2020, DCF advanced plans for rollout of Solution Based Casework in New Jersey. Solution Based Casework is an evidence-based child welfare practice model that has been shown to impact quality of case practice outcomes as measured by the federal Child and Family Services Review. In light of the COVID-19 pandemic, DCF worked with the model developer to convert the process for implementation to be virtual during this monitoring period.

### Focus on Race Equity

Between July and December 2020, DCF continued to advance efforts to address racial disproportionality and disparities in the provision of services to New Jersey's children and families. As part of this work, in March 2021, DCF appointed a Director of its new Office of Diversity, Equity, and Inclusion. The Director will coordinate the work of the Department's Race Equity Steering Committee (RESC), develop and implement initiatives that promote equitable outcomes for Black, Latinx, Native American and LGBTQ+ children, youth and families, build the capacity of staff to respond to structural racism, and promote culturally competent policies and practices within DCF and its contracted providers.

During the monitoring period, the Steering Committee made recommendations to the DCF executive leadership regarding where DCF should focus efforts to advance race equity. The Steering Committee also planned a series of Department-wide trainings with national race equity experts, the first of which was held in March 2021. Additionally, DCF continued to be an active member of the Children in Court (CIC) race equity leadership teams established in June 2020 by the Honorable Glenn A. Grant, Acting Administrative Director of the Courts (AOC), part of the Judiciary's commitment to address race equity in New Jersey's child welfare system.

---

[12] For information about New Jersey's Strategic Plan, see: https://www.nj.gov/dcf/about/strategic.html

*Designing a Primary Prevention Model*

DCF continues to build its statewide Primary Prevention Model to increase the availability and accessibility of statewide prevention services with a goal of reducing the number of children, youth, and families that are involved with the agency due to abuse or neglect. Between July and December 2020, DCF continued its work in Camden and Cumberland counties with Predict Align Prevent, a program that uses strategic alignment of community initiatives and programs to design primary prevention models. The team completed Phase I of its data analysis from various municipalities related to child maltreatment, zoning, and infrastructure, and began Phase II, an analysis of local available services.

DCF also made progress to expand its Peer Recovery Support Services (PRSS) to all Local Offices. PRSS is an initiative that provides non-clinical assistance and support to parents and caregivers throughout all stages of substance use disorder recovery and rehabilitation. By December 2020, DCF had hired and trained 34 of 46 PRSS staff positions who, throughout the monitoring period, provided parents and caregivers with a combination of in-person and virtual services and teamed with CP&P to support families' goals. As of December 31, 2020, PRSS had served 187 individuals and received 346 referrals.

*Prioritizing Safety*

DCF continues to partner with Collaborative Safety, LLC, a national organization that helps states implement a "safety science" approach to child welfare to more efficiently reduce the frequency of critical and life-threatening incidences. Between July and December 2020, the Critical Incident Review Unit in DCF's Office of Quality (OOQ) used the Collaborative Safety approach for review of critical incidents, and, with technical assistance from Collaborative Safety, Inc., deployed two teams comprised of staff from all levels of the Department to review and analyze casework decisions in identified cases from a systems perspective.

Between July and December 2020, DCF continued its work to improve staff wellness and create a healing and safe work environment for staff. In addition to twice monthly learning sessions with Alia Innovations, Inc. on self-care strategies, DCF provided guidance and resources on its COVID-19 mindfulness webpage and toolkit, with a goal of supporting staffs' emotional and physical wellness during the pandemic.[13]

---

[13] To see information about DCF's mindfulness work, go to: https://www.nj.gov/dcf/mindfulness.html

To better understand and inform its response to staff's challenges and experiences related to remote work during COVID-19, DCF conducted a staff survey in May 2020 and published the results on its website.[14] During this monitoring period, in response to survey results, DCF provided a series of work-from-home support tools, implemented a flextime program, and organized a staff appreciation week.[15]

### Integrating Family Voice

Between July and December 2020, DCF's Youth Council, part of the Office of Family Voice (OFV), began work related to priorities identified by three of its subcommittees: (1) the *Aging Out and Communications Subcommittee* collaborated with DCF's Office of Information Technology, the Office of Communications, and the Office of Adolescent Services (OAS) to update the design and content of the New Jersey Resource Spot website;[16] (2) the *Resource and Kin Parent Training Subcommittee* participated in and provided feedback to DCF leadership on the Nurtured Heart Approach (NHA) training provided to DCF staff, and worked with DCF's Office of Resource Families (ORF) to provide feedback on DCF's Parent for Information, Development and Education (PRIDE) training curriculum that is provided to New Jersey resource parents; and (3) the *Sibling and Advocacy Subcommittee* worked with the Office of Strategic Development and OAS to research national peer mentoring models, select a model and then develop a Request for Proposals to implement a Peer-to-Peer mentoring program, the first of its kind in New Jersey, which will employ former foster youth as mentors. Additionally, DCF's *Fatherhood Engagement Committee* reconvened virtually in December 2020 and plans to meet bimonthly throughout 2021. A subcommittee of the group, fathers with lived experience, developed and presented recommendations regarding better engaging fathers in planning for their children to the full committee.

### Improving New Jersey's Children's System of Care

Between July and December 2020, DCF continued its work to redesign CSOC. In collaboration with Center for Health Care Strategies (CHCS), CSOC and sixteen stakeholders from across New Jersey formed a short-term task force in December 2019 to design ways to better integrate behavioral and physical health services for children and youth. The task force report was in the process of being finalized when

---

[14] To see the results of the staff survey, go to:
https://www.nj.gov/dcf/news/DCF_WFH_SurveyResults_June2020.pdf.
[15] To see DCF's resource and responses to the survey, go to: https://www.nj.gov/dcf/wfh_resources.html
[16] To see the New Jersey Resource Spot website, go to: https://www.nj.gov/njyrs/

the COVID-19 pandemic interfered. DCF expects to release the task force report and reconvene the task force in Fall 2021.

In September 2019, the federal Substance Abuse and Mental Health Services Administration (SAMHSA) awarded DCF and CSOC a *Promising Path to Success* (PPS) expansion grant for ongoing training in the Nurtured Heart Approach (NHA) and its Six Core Strategies.[17] The Nurtured Heart Approach is a strengths-based behavior management strategy based on positive reinforcement and fair and consistent boundaries for "high intensity" children, particularly those with ADHD, Reactive Attachment Disorder, or Autism Spectrum Disorder. The goal of the grant is to improve engagement with at least 60,000 youth and young adults over the course of the four-year grant period by providing training to community-based partners and staff across multiple DCF divisions and units, including CP&P, CSOC, DCF's Office of Education (OOE) and OOE schools, licensed resource and kinship families,  15 Care Management Organizations (CMOs), 15 Family Support Organizations (FSOs), 15 Mobile Response and Stabilization Services (MRSS) providers, and 21 County-based Children's Interagency Coordinating Councils. During the monitoring period, DCF held a kick-off event for its statewide partners, including CMO, FSO, MRSS, and six schools. DCF will be supporting these schools with coaching and resources throughout the 2020-2021 school year and will identify a second cohort of schools for the 2021-2022 school year.

Between July and December 2020, DCF continued its efforts to address Adverse Childhood Experiences (ACEs)[18] and how they impact children, youth, and families in New Jersey.[19] DCF's training curriculum, called "Connections Matter," which was adapted to a virtual platform between March and June 2020, stresses the importance of fostering healthy connections to develop healthy brains, supportive relationships and thriving communities to help heal from the effects of ACEs. Between September and December 2020, 27 training sessions were held for 609 people, including 47 community providers, 220 DCF staff, 245 Prevent Child Abuse New Jersey staff, and 97 Rutgers University Behavioral Health Care staff.

In June 2020, funded by the New Jersey ACEs Funders Collaborative,[20] a national expert on ACEs joined DCF as an "Executive on Loan" to lead the Office of Resilience

---

[17] To read about the Nurtured Heart Approach, go to: https://childrenssuccessfoundation.com/about-nurtured-heart-approach/

[18] For more about ACEs go to: https://www.nj.gov/dcf/news/publications/aces.html

[19] To see New Jersey's 2021 Statewide Action Plan, go to:
https://www.nj.gov/dcf/documents/NJ.ACEs.Action.Plan.2021.pdf

[20] A partnership among the Burke Foundation, the Nicolson Foundation, the Turrell Fund, and DCF.

(OOR), tasked with developing and implementing a statewide strategy to address the impact of ACEs. Between July and December 2020, OOR conducted multiple trainings statewide on ACEs and met with stakeholders and providers to assess their understanding of ACEs and their need for healing centered and trauma-informed strategies. In February 2021, the New Jersey ACEs Collaborative, DCF and OOR released its Statewide Action Plan to address ACEs, which incorporates the above actions, and outlines detailed strategies to identity, coordinate, and advance programs and services to reduce and prevent ACEs.[21]

### *Increasing Kinship Placement and Maintaining an Adequate Pool of Resource Homes*

As described in its Strategic Plan, DCF recognizes that children fare best when they remain with family and is therefore committed to dramatically increasing kinship placement for children and youth in foster care.[22] During the monitoring period, DCF continued to pursue its ambitious target of placing 60 percent of children who enter care with kin within the first seven days of removal from their homes, and 80 percent placed with kin by the first 30 days. Although some aspects of DCF's resource family pilot in Ocean and Monmouth counties to increase placement with kin and strengthen supports to resource and kin parents were affected by the COVID-19 pandemic – such as in-person caseworker visits with resource parents – the pilot resumed in its original form in August 2020 and is ongoing.

Between October and December 2020, leadership from ORF and the Office of Resource Licensing (ORL) continued a series of presentations to staff about the value of kinship care for children, youth, and families and the supports available for kin placements. To more effectively create a "kin-first" culture, CP&P incorporated lessons from a staff survey of kinship attitudes and perspective, and, in collaboration with the Office of Legal Affairs, adopted additional strategies to support kin placements, including policy and regulatory changes. CP&P is also providing individualized support to workers in how to read, understand, and respond to criminal background histories when they assess kin families.

In November 2020, to better facilitate interstate kinship placements of children and youth in cases that involve children in state custody living in New York City, New York

---

[21] For more information on the Office of Resilience and the State's ACEs Action Plan, see: https://www.nj.gov/dcf/resilience.html
[22] See footnote 12.

State, and New Jersey, DCF announced an agreement allowing each state to initiate temporary emergency placement referrals and, within seven days, complete temporary home assessments, local background checks, and FTM planning. Under the new agreement, which will ease the process and reduce the obstacles for and delays in maintaining kinship connections, the receiving state will coordinate supervision and services and the sending state will be responsible for medical and financial supports or subsidies. Once the emergency placement is complete, a full Interstate Compact on the Placement of Children (ICPC) will be processed.[23] A twelve-month pilot is planned to evaluate the success of the agreement and to make any necessary adjustments to operations.

DCF continues to maintain an adequate pool of placement resource homes and group settings to meet the needs of children in out-of-home care. As of December 31, 2020, 3,820 children ages birth to 21 were in out-of-home placement. This represents a decrease of about 600 children since December 2019; however, the reduced number of children in foster care is consistent with the decline in the foster care census over the last several years (see Figure 1) and is not necessarily an additional drop due to the COVID-19 pandemic.

**Figure 1: Number of Children in Placement (2013-2020)**



Source: DCF data

---

[23] This agreement, effective April 2021, is applicable to the New Jersey counties of Bergen, Essex, Hudson, Middlesex and Union, and the New York counties of Bronx, Kings, New York, Queens and Richmond.

Of all children in out-of-home placement, 3,468 (91%) were placed in family-like settings: 1,880 children (49%) in unrelated resource family homes, and 1,588 children (42%) in kinship homes. Figure 2 shows the percentage of children in kinship placements over the last several monitoring periods. The nine percent of children not residing in family-like settings consisted of 281 children (7%) in group and residential settings facilities, and 71 children (2%) in independent living programs.

**Figure 2: Percentage of Children in Kinship Placements
(December 2017-December 2020)**



Source: DCF Data

Recruitment and licensing of new resource homes were suspended in March 2020 due to the COVID-19 pandemic. Recruitment of unrelated resource homes remained suspended throughout the monitoring period. Despite these challenges, DCF continues to report the availability of enough resource homes to meet needs, although there continue to be challenges with finding homes for sibling groups, adolescents, and children with special medical, developmental, and behavioral health needs. As of December 31, 2020, there were a total of 3,590 licensed resource family homes in the state, with a total bed capacity for 8,152 children. Of the total number of resource family homes, 1,108 (31%) were kin homes and 2,482 (69%) were non-kin homes. As described above, DCF continues to be committed to dramatically increasing the number of kinship homes available in the state.

Although unrelated resource home recruitment remained suspended throughout the monitoring period, licensing operations began again in July 2020. Between July and December 2020, DCF licensed 347 new family homes (both kinship and unrelated); this is compared with 299 newly licensed resource family homes in the previous monitoring period. Of these newly licensed resource family homes, 224 (65%) were kinship homes and 123 (35%) were unrelated foster homes. During the same period, 612 resource family homes were closed; of those closed, 327 (53%) were kinship homes and 285 (47%) were unrelated foster homes. The primary reasons for resource home closures were provider's health or age circumstances (31%), adoption finalization (24%), relative placement no longer needed (21%);[24] kinship legal guardianship finalized (9%).

DCF also continues to focus on recruiting homes for large sibling groups as described further in Section V.F *Placement*.

**Accomplishments and Challenges in Specific Areas of Practice Related to SEP Outcomes**

*Family Team Meetings*

FTMs remain an integral component of DCF's case practice and are an essential process for bringing families, youth, providers, and formal and informal supports together to exchange information, participate in case planning, coordinate and follow up on services, and examine and track progress toward accomplishing case plan goals. FTMs continued to be held during the COVID-19 pandemic, although many occurred virtually. For the purposes of SEP monitoring, virtual FTMs were considered and counted as if they were in-person.[25] Performance on the requirement to hold at least two FTMs in the most recent 12 months for children who have been care for at least two years with a permanency goal other than reunification (SEP IV.B.19) did not meet the standard in any month in this monitoring period. However, the other FTM requirements, which had seen a performance decline in the prior monitoring period due to the onset of the COVID-19 pandemic, improved performance almost to pre-

---

[24] The "relative placement no longer needed" category includes instances where children are reunified and the foster parents (usually a relative or family friend) request to voluntarily close their home. This category can also include other specific instances, such as an interstate change of placement, a court-ordered change of placement, or when a home with an administratively restricted license closes when the children are reunified or leave for another placement.

[25] The Monitor calculated the proportion of in-person and virtual contacts for one of the performance measures related to FTMs. Due to documentation limitations, any estimate of virtual FTMs is likely to be an undercount. See Section B. *Family Team Meetings*.

*Charlie and Nadine H. v. Murphy*
*Progress Report of New Jersey DCF for the Period July – December 2020*
*July 2021*
*Page 14*

pandemic levels this monitoring period. Workers identified some benefits in virtual FTMS; during site visits conducted by Monitor staff, caseworkers reported the benefits of inviting more informal supports to virtual FTMs, and the greater ease of scheduling without having to account for participants' transportation.

*Maintaining Contact with Family Through Visits*

Maintaining bonds and contact through visits between children in foster care and their workers, parents, and siblings, an essential element of successful child welfare practice, continued to be challenging during this monitoring period as a result of the pandemic. In-person visits began again during this monitoring period, though some visits still occurred virtually, in compliance with the federal Children's Bureau guidelines.[26] Performance on most visit measures fell below the standard in the prior monitoring period, but most increased almost to pre-pandemic levels during this monitoring period. Performance with respect to the requirement that workers visit with parents twice monthly when a child is in the state's custody with a permanency goal of reunification (SEP IV.F.28) continues to remain below the SEP's standard as an *Outcome To Be Achieved*, even accounting for exceptions to the visits requirement and the allowance of virtual visits.[27] The requirement that siblings not placed together visit each other at least once monthly (SEP IV.F.31) was also not met in any month, accounting for exceptions.[28]

*Services to Older Youth*

DCF extended its moratorium on case closure for youth in foster care who reached the age of 21 through March 31, 2021, and extended contracted adolescent services for those youth for the same timeframe. This was an important policy decision designed to provide safety and stability for older youth in foster care during this crisis. As of March 2021, approximately 319 youth benefitted from this policy. Most youth who were 22 years-old by December 31, 2020 were transitioned out of CP&P at the end of the year, though a few had their cases remain open due to the existing exception process, including youth who have intellectual or developmental disabilities. Life skills services that had been previously extended for those aging out

---

[26] The Monitor calculated the proportion of virtual and in-person contacts for one of the performance measures related to maintaining contact through visits. The Monitor will work with DCF to provide this information in the following monitoring report.

[27] Valid exceptions are determined using a review of a sample from the universe of all visits in one month. Examples of valid exceptions include: the visit is not required due to a court order, the parent is missing for more than 6 months despite worker efforts to locate, or the parent has moved out of state and an in-person visit is not geographically feasible to arrange.

[28] Examples of valid exceptions include: the visit is not required due to a court order, the child is missing for more than 6 moths despite worker efforts to locate, or the child declines the visit.

of care during the COVID-19 pandemic also ended on December 31, 2020, but transitional living programs were mostly able to continue serving 21-year-olds through individual extension requests.

Between July and December 2020, DCF has continued its work to improve the experiences of older youth in its care through the efforts of OAS. In partnership with the Division of Women, OAS worked on creating safe and protective environments for the LGBTQI community. DCF's Safe Space Liaisons launched a virtual pilot in December 2020 for New Jersey's Juvenile Justice Commission staff of its prior in-person training, *Transgender Training of Trainers: Expanding Content Delivery Skills Towards Highly Impactful Trainings,* conducted by Dr. Eli Green of the Transgender Training Institute, Inc.

As reported previously, DCF was awarded matching funds through Youth Villages, a national non-profit, to implement the evidence-based LifeSet program, an intensive case management and life skills service for older youth in foster care. During the monitoring period, four agencies – Acenda, Care Plus, Catholic Charities Diocese of Metuchen, and Preferred Behavioral Health – were approved to implement the program. Despite the challenges of the pandemic, training began in September 2020, and the agencies began serving young people in October. As of March 2021, LifeSet has served 142 youth. The evaluation of the contract will begin in September 2021.[29]

As part of the federal John H. Chafee Foster Care Program for Successful Transition to Adulthood, DCF continued to move forward on its Chafee Plan strategies.[30] The advisory group met in August and November 2020 and began planning for the implementation of the strategies, and discussed the philosophies that undergird the work, including Youth Thrive, Race Equity, and Healing Centered Engagement.[31]

*Continuous Quality Improvement*

With the onset of COVID-19, DCF suspended many of its Continuous Quality Improvement (CQI) activities in order to focus on handling the emergencies of the pandemic and assessing whether those responses were assisting to ensure child safety. No QRs or ChildStat sessions were held during this monitoring period. However, during this monitoring period, DCF developed new data collection tools to learn about practice in the early months of managing the COVID-19 pandemic. The

---

[29] To learn more about New Jersey's LifeSet program, go to: https://www.nj.gov/dcf/adolescent/lifeset.html
[30] To see New Jersey's 2020-2024 John H. Chafee Foster Care Program for Successful Transition to Adulthood Plan, go to: https://www.nj.gov/dcf/adolescent/NJ-Chafee-Plan-final.pdf
[31] To see meeting agendas and minutes, go to: https://www.nj.gov/dcf/providers/boards/chafee.html

Office of Quality conducted reviews regarding the appropriateness of risk assessments, whether families were contacted timely after intakes were assigned to emergency response teams, and the quality of investigations. Additionally, DCF initiated a standardized survey for providers of purchased services to complete monthly using a web-based tool. More details on DCF's CQI planning process are described in Section V.N, *Accountability Through Qualitative Review and the Production and Use of Accurate Data*.

*Budget*

The budget process for FY2021 was delayed due to the COVID-19 pandemic, resulting in an administrative allocation for the nine-month period from October 1, 2020–June 20, 2021. Although this monitoring period included some funding deferrals, which were imposed on all departments in New Jersey at the start of the pandemic, for the twelve-month period beginning on July 1, 2020, DCF's total state funding in the FY21 final Appropriations Act totals $1.208 billion, which represents an increase of $52.443 million over the FY20 Appropriations Act amount of $1.156 billion. In recognition of the impact that the COVID-19 pandemic is having on children, youth and families, Governor Murphy's budget included a $45 million investment in CSOC, the DCF division that serves children and adolescents with emotional and behavioral health care challenges and their families.

Additionally, during the monitoring period, DCF expended more than $24.92 million in federal COVID-19 funding, including $12.56 million in Coronavirus Relief Fund (CRF) funding, $11.03 million in Federal Medicaid Assistance Percentage (FMAP) funding, and $1.34 million in other Coronavirus Aid, Relief, and Economic Support Act (CARES) funding. DCF utilized these funds to provide additional services and benefits, including enhanced family violence prevention services, financial support for congregate care and mobile response providers, support for vulnerable adolescent populations, Personal Protective Equipment (PPE) and infection control for provider agencies, as well as enhanced support for necessary services within CSOC. More on the budget is described in Section V.P *Budget*.

In the body of the report, we provide specific data and the Monitor's observations and conclusions with respect to each of the requirements of the SEP. Progress towards meeting SEP measures has been predictably slowed by challenges caused by the pandemic. Additional challenges are predicted as New Jersey, like other states around the country, tackles the wide-ranging impacts of COVID-19. In general, however, DCF's flexibility, strong leadership, and focus on minimizing the impact of

the pandemic on the provision of services statewide continues to benefit the children, youth, and families of New Jersey.

## III.   CHILD AND FAMILY OUTCOMES AND CASE PRACTICE PERFORMANCE MEASURES

The child and family outcomes and case practice performance measures include 48 measures and Foundational Elements that assess the state's performance in meeting the requirements of the SEP (see Table 1). These performance measures cover the areas of child safety, permanency, service planning, child well-being and ongoing infrastructure development pertaining to core elements such as appropriate staffing, caseloads, and training.

Many of the measures are assessed through a review of data from NJ SPIRIT[32] and SafeMeasures,[33] and, in some areas, these data continue to be independently validated by the Monitor. Data are also provided through DCF's work with Rutgers University, which assists with data analysis. With few exceptions, performance data provided in this report are as of December 2020.

---

[32] NJ SPIRIT is New Jersey's Statewide Automated Child Welfare Information System (SACWIS), a case management and financial system designed to support the daily work of caseworkers and supervisors within DCF.
[33] SafeMeasures is a data warehouse and analytical tool that allows tracking of critical child welfare indicators by worker, supervisor, Local Office, county and statewide. It is used by different levels of staff to track, monitor and analyze performance and trends in case practice and targeted measures and outcomes.

**Table 1: *Charlie and Nadine H.* Child and Family Outcome and Case Practice Performance Measures
(Summary of Performance as of December 31, 2020)**

| | | Table 1A: To Be Achieved | | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | December 2019 Performance | June 2020 Performance[34] | December 2020 Performance[35] | Requirement Fulfilled (Yes/No)[36] |
| | | *Family Teaming* | | | |
| Quality of Teaming (IV.B.20) | 75% of cases involving out-of-home placements that were assessed as part of the QR process will show evidence of both acceptable team formation and acceptable functioning. The Monitor, in consultation with the parties, shall determine the standards for quality team formation and functioning. | 58% of cases rated acceptable for the QR indicator *teamwork and coordination* (CY 2018). | 62% of cases rated acceptable for the QR indicator *teamwork and coordination* (CY 2019).[37,38] | CY 2020 data not available. QRs suspended during the COVID-19 pandemic. | Unable to Determine[39] |

[34] In some instances where the Monitor did not report mid-year data, the most recent annual data available are included.
[35] In some instances where the Monitor does not have December 2020 data, the most recent data available are included.
[36] "Yes" indicates that, in the Monitor's judgment, based on presently available information, DCF has fulfilled its obligations regarding the SEP standard. "No" indicates that, in the Monitor's judgment, DCF has not fulfilled its obligation regarding the SEP standard.
[37] From January to December 2019, 62% (90 of 145) of applicable cases reviewed for Quality of Teaming were rated acceptable for the *teamwork and coordination* indicator.
[38] All in-home cases were excluded from this measure.
[39] The qualitative review process was suspended in March 2020 and as a result there are no new data for Educational Needs (III.G.11); Quality of Case Plans (SEP IV.D.23); Quality of Teaming (SEP IV.B.20); Services to Support Transitions (SEP IV.J.44), and Quality of Case Planning and Services (SEP IV.K.46).

*Charlie and Nadine H. v. Murphy*
*Progress Report of New Jersey DCF for the Period July-December 2020*
*July 2021*
*Page 20*

| Table 1A: To Be Achieved | | | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **December 2019 Performance** | **June 2020 Performance[34]** | **December 2020 Performance[35]** | **Requirement Fulfilled (Yes/No)[36]** |
| *Case and Service Planning* | | | | | |
| Quality of Case Plans<br><br>(IV.D.23) | 80% of case plans shall be rated acceptable as measured by the QR process. The Monitor, in consultation with the parties, shall determine that standards for quality case planning. | 51% of cases rated acceptable for both QR indicators *child and family planning process* and *tracking and adjusting* (CY 2018). | 58% of cases rated acceptable for both QR indicators *child and family planning process* and *tracking and adjusting* (CY 2019).[40] | CY 2020 data not available. QRs suspended during the COVID-19 pandemic. | Unable to Determine |
| *Visits* | | | | | |
| Caseworker Contacts with Family When Goal is Reunification<br><br>(IV.F.28) | 90% of families will have at least twice-per-month, face-to-face contact with their caseworker when the permanency goal is reunification. | 80% of applicable parents of children in custody with a goal of reunification had at least two face-to-face visits with a caseworker in December. Monthly range during July – December 2019 monitoring period: 80 to 85%. | 46% of applicable parents of children in custody with a goal of reunification had at least two face-to-face visits with a caseworker in June. Monthly range during January – June 2020 monitoring period: 27 to 82%. | 83% of applicable parents of children in custody with a goal of reunification had at least two face-to-face visits with a caseworker in December. Monthly range during July – December 2020 monitoring period: 49 to 83%.[41,42] | No |

---

[40] From January to December 2019, 58% (112 of 193) of applicable cases reviewed were rated acceptable for both the *child and family planning process* and the *tracking and adjusting* indicators; 62% (120 of 193) of cases were rated acceptable for *child and family planning process*; 73% (141 of 193) of cases were rated acceptable for *tracking and adjusting*.

[41] Monthly performance for this measure is as follows: July, 49%; August, 72%; September, 79%; October, 79%; November, 76%; December, 83%. Reported performance accounts for exceptions to the visits requirement.

[42] DCF validated a sample of cases from September 2020 and found that exceptions were appropriately applied and documented in 81% of cases. The Monitor did not independently validate this sample. Therefore, these data reflect exclusions from the universe of instances in which exceptions to the requirement for worker visits with parents were appropriately applied and documented.

| Table 1A: To Be Achieved | | | | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | December 2019 Performance | June 2020 Performance[34] | December 2020 Performance[35] | Requirement Fulfilled (Yes/No)[36] |
| *Services to Support Transition* | | | | | |
| Services to Support Transition<br><br>(IV.J.44) | 80% of cases will be rated acceptable for supporting transitions as measured by the QR. The Monitor, in consultation with the parties, shall determine the standards for quality support for transitions. | 62% of cases rated acceptable for the QR indicator *successful transitions* (CY 2018). | 74% of cases rated acceptable for the QR indicator *successful transitions* (CY 2019).[43] | CY 2020 data not available. QRs suspended during the COVID-19 pandemic. | Unable to Determine |

---

[43] From January to December 2019, 74% (63 of 85) of applicable cases reviewed were rated acceptable for the *successful transitions* indicator.

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | December 2019 Performance | June 2020 Performance[44] | December 2020 Performance[45] | Requirement Maintained (Yes/No)[46] |
| | | *Investigations* | | | |
| Institutional Abuse Investigations Unit (IAIU) (III.A.1) | 80% of IAIU investigations will be completed within 60 days. | 81% of IAIU investigations in December were completed within 60 days. | 85% of IAIU investigations in June were completed within 60 days. | 78% of IAIU investigations in June were completed within 60 days. | Yes[47] |
| Timeliness of Investigation Completion (60 days) (IV.A.13) | 85% of all investigations of alleged child abuse and neglect shall be completed within 60 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. | 83% of all investigations in November were completed within 60 days. Monthly range during June – November 2019 monitoring period: 83 to 87%. | 81% of all investigations in May were completed within 60 days. Monthly range during December 2019 – May 2020 monitoring period: 81 to 93%.[48] | 89% of all investigations in November were completed within 60 days. Monthly range during June – November 2020 monitoring period: 85 to 92%.[49,50] | Yes |

[44] In some instances where the Monitor did not report mid-year data, the most recent annual data available are included.

[45] In some instances where the Monitor does not have December 2020 data, the most recent data available are included.

[46] "Yes" indicates that, in the Monitor's judgment based on presently available information, DCF has fulfilled its obligations regarding the requirement under the SEP. The Monitor has also designated "Yes" for a requirement where DCF has met or is within one percentage point of the SEP standard or there are a small number of cases causing the failure to meet the SEP standard.

[47] The Monitor considers the decline in performance to be temporary and most likely attributable to challenges caused by the COVID-19 pandemic.

[48] Due to the time lag of this measure, the Monitor and DCF have altered the period of review, so December 2019 data are included for this period and June 2020 data will be included in the next monitoring period.

[49] Due to the time lag of this measure, the Monitor and DCF have altered the period of review, so June 2020 data are included for this period and December 2020 data will be included in the next monitoring report.

[50] Monthly performance for this measure is as follows: June, 85%; July, 90%; August, 92%; September, 91%; October, 89%; November, 89%.

*Charlie and Nadine H. v. Murphy*
*Progress Report of New Jersey DCF for the Period July-December 2020*
*July 2021*
*Page 23*

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | December 2019 Performance | June 2020 Performance[44] | December 2020 Performance[45] | Requirement Maintained (Yes/No)[46] |
| Timeliness of Investigation Completion (90 days) (IV.A.14) | 95% of all investigations of alleged child abuse and neglect shall be completed within 90 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. | 95% of all investigations in November were completed within 90 days. Monthly range during June–November 2019 monitoring period: 94 to 95%. | 94% of all investigations in May were completed within 90 days. Monthly range during December 2019–May 2020 monitoring period: 94 to 97%.[51] | 97% of all investigations in November were completed within 90 days. Monthly range during June– November 2020 monitoring period: 96 to 97%.[52,53] | Yes |
| Quality Investigations (IV.A.15) | 85% of investigations shall meet the standards for quality investigations. The Monitor, in consultation with the parties, shall determine appropriate standards for quality investigations. | 91% of investigations met quality standards in a March 2018 review of a statistically significant sample of investigations completed in October 2017. | 91% of investigations met quality standards in a February 2020 review of a statistically significant sample of investigations completed in October 2019. | The next review will be conducted in early 2022 for investigations completed in October 2021.[54] | N/A |

[51] Due to the time lag of this measure, the Monitor and DCF have altered the period of review, so December 2019 data are included for this period and June 2020 data will be included in the next monitoring period.
[52] Due to the time lag of this measure, the Monitor and DCF have altered the period of review, so June 2020 data are included for this period and December 2020 data will be included in the next monitoring report.
[53] Monthly performance for this measure is as follows: June, 96%; July, 97%; August, 97%; September, 97%; October, 96%; November, 97%.
[54] DCF's Investigation Case Record Review is typically conducted every two years.

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | December 2019 Performance | June 2020 Performance[44] | December 2020 Performance[45] | Requirement Maintained (Yes/No)[46] |
| *Family Teaming* | | | | | |
| Initial Family Team Meeting (IV.B.16) | 80% of children newly entering placement shall have a family team meeting before or within 45 days of placement. | 91% of children newly entering placement in December 2019 had a FTM within 45 days. Monthly range during July – December 2019 monitoring period: 81 to 92%. | 64% of children newly entering placement in June 2020 had a FTM within 45 days. Monthly range during January – June 2020 monitoring period: 58 to 94%. | 82% of children newly entering placement in December 2020 had a FTM within 45 days. Monthly range during July – December 2020 monitoring period: 82 to 91%.[55] | Yes |
| Subsequent FTMs within 12 months (IV.B.17) | 80% of children will have three additional FTMs within the first 12 months of the child coming into placement. | 93% of children who entered placement in December 2018 had three or more additional FTMs within the first 12 months. Monthly range during July – December 2019 monitoring period: 81 to 93%. | 72% of children who entered placement in June 2019 had three or more additional FTMs within the first 12 months. Monthly range during January – June 2020 monitoring period: 65 to 93%. | 80% of children who entered placement in December 2019 had three or more additional FTMs within the first 12 months. Monthly range during July – December 2020 monitoring period: 76 to 85%.[56] | Yes |

---

[55] Monthly performance for this measure is as follows: July, 88%; August, 91%; September, 86%; October, 85%; November, 88%; December, 82%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF reviewed all 22 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

[56] Monthly performance for this measure is as follows: July, 76%; August, 80%; September, 83%; October, 78%; November, 85%; December, 80%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF reviewed all 40 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

*Charlie and Nadine H. v. Murphy*
*Progress Report of New Jersey DCF for the Period July-December 2020*
*July 2021*
*Page 25*

| | Table 1B: To Be Maintained | | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **December 2019 Performance** | **June 2020 Performance[44]** | **December 2020 Performance[45]** | **Requirement Maintained (Yes/No)[46]** |
| Subsequent FTMs after 12 months – Reunification Goal (IV.B.18) | After the first 12 months of a child being in care, 90% of those with a goal of reunification will have at least three FTMs each year. | 83% of children who entered placement before December 2018 (but still have a goal of reunification) had three or more additional FTMs in the most recent 12 months. Monthly range during July – December 2019 monitoring period: 48 to 89%. | 74% of children who entered placement before June 2019 (but still have a goal of reunification) had three or more additional FTMs in the most recent 12 months. Monthly range during January – June 2020 monitoring period: 63 to 87%. | 96% of children who entered placement before December 2019 (but still have a goal of reunification) had three or more additional FTMs in the most recent 12 months. Monthly range during July – December 2020 monitoring period: 44 to 97%.[57] | Yes[58] |
| Subsequent FTMs after 12 months – Other than Reunification Goal (IV.B.19) | After the first 12 months of a child being in care, for those children with a goal other than reunification, 90% shall have at least two FTMs each year. | 94% of children who entered placement before December 2018 (and have a goal other than reunification) had two or more FTMs in the most recent 12 months of placement. Monthly range during July – December 2019 monitoring period: 88 to 95%. | 89% of children who entered placement before June 2019 (and have a goal other than reunification) had two or more FTMs in the most recent 12 months of placement. Monthly range during January – June 2020 monitoring period: 81 to 96%. | 88% of children who entered placement before December 2019 (and have a goal other than reunification) had two or more FTMs in the most recent 12 months of placement. Monthly range during July – December 2020 monitoring period: 84 to 88%.[59] | No[60] |

---

[57] Monthly performance for this measure is as follows: July, 68%; August, 44%; September, 83%; October, 97%; November, 85%; December, 96%. Reported performance accounts for valid exceptions to the FTM requirement. The Monitor and DCF jointly reviewed all 10 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

[58] The universe for this measure is small and thus more susceptible to fluctuations. The Monitor considers the decline in performance in some months to be temporary and most likely attributable to challenges caused by the COVID-19 pandemic.

[59] Monthly performance for this measure is as follows: July, 86%; August, 85%; September, 88%; October, 87%; November, 84%; December, 88%. Reported performance accounts for valid exceptions to the FTM requirement. DCF reviewed all 12 cases in which there was documentation of an exception to the FTM requirement and excluded from these data all instances (for each month) in which they determined that an exception was appropriately used.

[60] The Monitor considers the decline in performance to be temporary and most likely attributable to challenges caused by the COVID-19 pandemic.

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | December 2019 Performance | June 2020 Performance[44] | December 2020 Performance[45] | Requirement Maintained (Yes/No)[46] |
| | | *Needs Assessment* | | | |
| Needs Assessment (IV.C.21) | The state shall regularly evaluate the need for additional placements and services to meet the needs of children in custody and their families and to support intact families and prevent the need for out-of-home care. Such needs assessments shall be conducted on an annual, staggered basis that assures that every county is assessed at least once every three years. The state shall develop placements and services consistent with the findings of these needs assessments. | Between July and December 2019, the DCF workgroup finalized tools and established a uniform reporting method for the counties to ensure that biennial reports are standardized. DCF also worked with Rutgers University to design county-based data profiles to provide HSACs with county population data and the most recent administrative data. In November 2019, the first of two groups of New Jersey counties began implementing the revised needs assessment process. | DCF received the first group of New Jersey counties' reports using the new needs assessment process in September and October 2020. The second group of reports are due by the end of 2020. | Both groups of county HSACs (from all 21 counties), with technical assistance from DCF, completed their reports, including results from surveys, focus groups, and key informant interviews. The priorities most identified were housing, behavioral health and mental health services for adults and children, and substance use disorder services. | Yes |

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **December 2019 Performance** | **June 2020 Performance[44]** | **December 2020 Performance[45]** | **Requirement Maintained (Yes/No)[46]** |
| | | *Case and Service Planning* | | | |
| Initial Case Plans<br><br>(IV.D.22) | 95% of initial case plans for children and families shall be completed within 30 days. | 97% of children entering care in December 2019 had case plans developed within 30 days. Monthly range during July – December 2019 monitoring period: 88 to 98%. | 84% of children entering care in June 2020 had case plans developed within 30 days. Monthly range during January – June 2020 monitoring period: 84 to 96%. | 87% of children entering care in December 2020 had case plans developed within 30 days. Monthly range during July – December 2020 monitoring period: 84 to 96%.[61] | Yes[62] |
| Timeliness of Current Plans<br><br>(III.C.6) | 95% of case plans for children and families will be reviewed and modified no less frequently than every six months. | 97% of case plans in December 2019 were reviewed and modified as necessary at least every six months. Monthly range during July – December 2019 monitoring period: 94 to 97%. | 97% of case plans in June 2020 were reviewed and modified as necessary at least every six months. Monthly range during January – June 2020 monitoring period: 92 to 97%. | 97% of case plans in December 2020 were reviewed and modified as necessary at least every six months. Monthly range during July – December 2020 monitoring period: 93 to 97%.[63] | Yes |
| | | *Caseloads* | | | |
| Supervisor/ Worker Ratio (III.B.2) | 95% of offices will have sufficient supervisory staff to maintain a 5 worker to 1 supervisor ratio. | 100% of Local Offices have sufficient supervisory staff. | 100% of Local Offices have sufficient supervisory staff. | 100% of Local Offices have sufficient supervisory staff. | Yes |

---

[61] Monthly performance for this measure is as follows: July, 84%; August, 94%; September, 96%; October, 90%; November, 95%; December, 87%.
[62] The Monitor considers the decline in performance in some months to be temporary and most likely attributable to challenges caused by the COVID-19 pandemic.
[63] Monthly performance on this measure is as follows: July, 93%; August, 95%; September, 95%; October, 97%; November, 95%; December, 97%.

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | December 2019 Performance | June 2020 Performance[44] | December 2020 Performance[45] | Requirement Maintained (Yes/No)[46] |
| IAIU Investigators Caseload (III.B.3) | 95% of IAIU investigators will have (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. | 100% of IAIU investigators met caseload standards. | 100% of IAIU investigators met caseload standards. | 100% of IAIU investigators met caseload standards. | Yes |
| Permanency Workers (Local Offices) Caseload (III.B.4) | 95% of Local Offices will have average caseloads for Permanency workers of (a) no more than 15 families, and (b) no more than 10 children in out-of-home care. | 100% of Local Offices met permanency standards. | 100% of Local Offices met permanency standards. | 100% of Local Offices met permanency standards. | Yes |
| Permanency Workers Caseload (III.B.5) | 95% of Permanency workers will have (a) no more than 15 families, and (b) no more than 10 children in out of home care. | 100% of Permanency workers met caseload standards. | 100% of Permanency workers met caseload standards. | 100% of Permanency workers met caseload standards. [64] | Yes |
| Intake workers (Local Offices) Caseload (IV.E.24) | 95% of Local Offices will have average caseloads for Intake workers of no more than 12 families and no more than eight new case assignments per month. | 98% of Local Offices met intake caseload standards. | 100% of Local Offices met intake caseload standards. | 100% of Local Offices met intake caseload standards. | Yes |

[64] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | December 2019 Performance | June 2020 Performance[44] | December 2020 Performance[45] | Requirement Maintained (Yes/No)[46] |
| Intake workers Caseload (IV.E.25) | 90% of individual Intake workers shall have no more than 12 open cases and no more than eight new case assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. | 94% of Intake workers met caseload standards. | 97% of Intake workers met caseload standards. | 100% of Intake workers met caseload standards.[65] | Yes |
| Adoption Workers (Local Offices) Caseload (IV.E.26) | 95% of Local Offices will have average caseloads for Adoption workers of no more than 15 children per worker. | 100% of Local Offices met adoption standards. | 100% of Local Offices met adoption standards. | 100% of Local Offices met adoption standards. | Yes |
| Adoption Workers Caseload (IV.E.27) | 95% of individual Adoption worker caseloads shall be no more than 15 children per worker. | 98% of Adoption workers met caseload standards. | 99% of Adoption workers met caseload standards. | 99% of Adoption workers met caseload standards.[66] | Yes |

[65] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.
[66] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six-month monitoring period.

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **December 2019 Performance** | **June 2020 Performance[44]** | **December 2020 Performance[45]** | **Requirement Maintained (Yes/No)[46]** |
| *Deputy Attorneys General* | | | | | |
| Adequacy of DAsG Staffing (III.D.7) | The state will maintain adequate DAsG staff positions and keep positions filled. | 128 staff positions were filled with seven staff on leave; 121 (95%) available DAsG. | 133 staff positions were filled with four staff on leave; 129 (97%) available DAsG. | 132 staff positions were filled with one staff on leave; 131 (99%) available DAsG.[67] | Yes |
| *Child Health Units* | | | | | |
| Child Health Units (III.E.8) | The state will continue to maintain its network of Child Health Units, adequately staffed by nurses in each Local Office. | As of December 31, 2019, DCF had 155 Health Care Case Managers and 85 staff assistants. | As of June 30, 2020, DCF had 154 Health Care Case Managers and 86 staff assistants. | As of December 31, 2020, DCF had 124 Health Care Case Managers and 45 staff assistants. | Yes |
| *Visits* | | | | | |
| Caseworker Contacts with Children – New Placement/ Placement Change (III.F.9) | 93% of children shall have at least twice-per-month face-to-face contact with their caseworker within the first two months of placement, with at least one contact in the placement. | 89% of children had two visits per month, one of which was in their placement, during the first two months of an initial or subsequent placement in December 2019. Monthly range during July – December 2019 monitoring period: 89 to 96%. | 82% of children had two visits per month, one of which was in their placement, during the first two months of an initial or subsequent placement in June 2020. Monthly range during January – June 2020 monitoring period: 50 to 92%. | 92% of children had two visits per month, one of which was in their placement, during the first two months of an initial or subsequent placement in December 2020. Monthly range during July – December 2020 monitoring period: 89 to 93%.[68] | Yes[69] |

[67] DCF reported that during this monitoring period select DAsG outside of the DCF Practice Group have dedicated some of their time to DCF matters.
[68] Monthly performance for this measure is as follows: July, 89%; August, 93%; September, 91%; October, 93%; November, 92%; December, 92%.
[69] The Monitor considers the decline in performance in some months to be temporary and most likely attributable to challenges caused by the COVID-19 pandemic.

| | | | Table 1B: To Be Maintained | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | December 2019 Performance | June 2020 Performance[44] | December 2020 Performance[45] | Requirement Maintained (Yes/No)[46] |
| Caseworker Contact with Children in Placement (III.F.10) | During the remainder of the placement, 93% of children shall have at least one caseworker visit per month, in the placement. | 97% of children had at least one caseworker visit in December 2019 in their placement. Monthly range during July – December 2019 monitoring period: 94 to 97%. | 89% of children had at least one caseworker visit in June 2020 in their placement. Monthly range during January – June 2020 monitoring period: 71 to 97%. | 97% of children had at least one caseworker visit in December 2020 in their placement. Monthly range during July – December 2020 monitoring period: 95 to 98%.[70] | Yes |
| Parent-Child Visits – Weekly (IV.F.29) | 60% of children in custody with a return home goal will have an in-person visit with their parent(s) at least weekly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | 79% of applicable children had weekly visits with their parents in December 2019. Monthly range during July – December 2019 monitoring period: 75 to 79%. | 63% of applicable children had weekly visits with their parents in June 2020. Monthly range during January – June 2020 monitoring period: 50 to 79%. | 81% of applicable children had weekly visits with their parents in December 2020. Monthly range during July – December 2020 monitoring period: 60 to 81%.[71] | Yes |

[70] Monthly performance for this measure is as follows: July, 95%; August, 98%; September, 98%; October, 98%; November, 97%; December, 97%.

[71] Monthly performance for this measure is as follows: July, 60%; August, 74%; September, 81%; October, 80%; November, 77%; December, 81%. Reported performance accounts for valid exceptions to this visits requirement.

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **December 2019 Performance** | **June 2020 Performance[44]** | **December 2020 Performance[45]** | **Requirement Maintained (Yes/No)[46]** |
| Parent-Child Visits – Bi-Weekly  (IV.F.30) | 85% of children in custody will have an in-person visit with their parent(s) or legally responsible family member at least every other week, excluding those situations where a court order prohibits or regulates visits or there is supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | 93% of applicable children had bi-weekly visits with their parents in December 2019. Monthly range during July – December 2019 monitoring period: 88 to 93%. | 76% of applicable children had bi-weekly visits with their parents in June 2020. Monthly range during January – June 2020 monitoring period: 56 to 94%. | 94% of applicable children had bi-weekly visits with their parents in December 2020. Monthly range during July – December 2020 monitoring period: 77 to 94%.[72] | Yes |

---

[72] Monthly performance for this measure is as follows: July, 77%; August, 86%; September, 92%; October, 94%; November, 91%; December, 94%. Reported performance accounts for valid exceptions to this visits requirement.

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | December 2019 Performance | June 2020 Performance[44] | December 2020 Performance[45] | Requirement Maintained (Yes/No)[46] |
| Child Visits with Siblings (IV.F.31) | 85% of children in custody who have siblings with whom they are not residing will visit those siblings at least monthly, excluding those situations where a court order prohibits or regulates visits or there is supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. | 86% of children in custody who have siblings with whom they are not residing visited with their siblings in December 2019. Monthly range during July – December 2019 monitoring period: 86 to 87. | 68% of children in custody who have siblings with whom they are not residing visited with their siblings in June 2020. Monthly range during January – June 2020 monitoring period: 61 to 88%. | 83% of children in custody who have siblings with whom they are not residing visited with their siblings in December 2020. Monthly range during July – December 2020 monitoring period: 70 to 83. [73,74] | No[75] |
| | | | Placement | | |
| Placing Siblings Together (IV.G.32) | At least 80% of sibling groups of two or three children entering custody will be placed together. | 77% of sibling groups of two or three children entering custody in CY 2018 were placed together. | 80% of sibling groups of two or three children entering custody in CY 2019 were placed together. | 81% of sibling groups of two or three children entering custody in CY 2020 were placed together. | Yes |

[73] Monthly performance for this measure is as follows: July, 70%; August, 78%; September, 83%; October, 83%; November, 80%; December, 83%. Reported performance accounts for valid exceptions to the visits requirement.
[74] Based on the Monitor and DCF's joint review of a statistically significant sample of cases for children in care in October and November 2018, it was determined that exceptions to this visits requirement were appropriately applied and documented in 60% of cases. The universe of cases utilized for the purposes of calculating performance has been adjusted accordingly.
[75] The Monitor considers the decline in performance to be temporary and most likely attributable to challenges caused by the COVID-19 pandemic.

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | December 2019 Performance | June 2020 Performance[44] | December 2020 Performance[45] | Requirement Maintained (Yes/No)[46] |
| Placing Siblings Together for Four or More Children (IV.G.33) | All children will be placed with at least one other sibling 80% of the time. | 86% of children entering custody in CY 2018 with three or more siblings were placed with at least one other sibling. | 83% of children entering custody in CY 2019 with three or more siblings were placed with at least one other sibling. | 95% of children entering custody in CY 2020 with three or more siblings were placed with at least one other sibling. | Yes |
| Recruitment of Placements for Sibling Groups of Four or More (IV.G.34) | DCF will continue to recruit for resource homes capable of serving sibling groups of four or more. | DCF recruited a total of 16 new SIBs homes in the monitoring period. As of December 2019, DCF had a total of 78 large capacity SIBS homes; 16 homes that can accommodate five or more children and 62 homes that can accommodate four children. | DCF recruited a total of 18 new SIBs homes in the monitoring period. As of June 2020, DCF had a total of 82 large capacity SIBS homes; 19 homes that can accommodate five or more children and 63 homes that can accommodate four children. | DCF suspended recruitment in March 2020 due to COVID-19; as of December 2020, DCF recruited one new SIBs home. DCF had a total of 55 large capacity SIBs homes; 12 homes that can accommodate five or more children and 43 that can accommodate four children. | Yes |
| Placement Stability, First 12 Months in Care (IV.G.35) | At least 84% of children entering out-of-home placement for the first time in a calendar year will have no more than one placement change during the 12 months following their date of entry. | 85% of children who entered out-of-home placement for the first time in CY 2017 had no more than one placement change during the 12 months following their date of entry. | 85% of children who entered out-of-home placement for the first time in CY 2018 had no more than one placement change during the 12 months following their date of entry. | 87% of children who entered out-of-home placement for the first time in CY 2019 had no more than one placement change during the 12 months following their date of entry. | Yes |

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **December 2019 Performance** | **June 2020 Performance[44]** | **December 2020 Performance[45]** | **Requirement Maintained (Yes/No)[46]** |
| Placement Stability, 13 – 24 Months in Care<br><br>(IV.G.36) | At least 88% of these children will have no more than one placement change during the 13-24 months following their date of entry. | 95% of children who entered care in CY 2016 had no more than one placement change during the 13-24 months following their date of entry. | 95% of children who entered care in CY 2017 had no more than one placement change during the 13-24 months following their date of entry. | 96% of children who entered care in CY 2018 had no more than one placement change during the 13-24 months following their date of entry. | Yes |
| | | *Education* | | | |
| Educational Needs<br><br>(III.G.11) | 80% of cases will be rated acceptable as measured by the QR in stability (school) and learning and development. The Monitor, in consultation with the parties, shall determine the standards for school stability and quality learning and development. | 83% of cases rated acceptable for both QR indicators *stability in school* and *learning and development* (CY 2018). | 86% of cases rated acceptable for both QR indicators *stability in school* and *learning and development* (CY 2019).[76,77] | CY 2020 data not available. QRs suspended during the COVID-19 pandemic. | Unable to Determine |

---

[76] From January to December 2019, 86% (63 of 73) of the applicable cases reviewed were rated acceptable on both the *stability in school* and the *learning and development, ages 5 & older* indicators; 91% (74 of 81) were rated acceptable for *stability in school* and 89% (68 of 76) were rated acceptable for *learning and development, ages 5 & older*.
[77] All in-home cases are excluded from this measure.

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **December 2019 Performance** | **June 2020 Performance[44]** | **December 2020 Performance[45]** | **Requirement Maintained (Yes/No)[46]** |
| *Maltreatment* | | | | | |
| Abuse and Neglect of Children in Foster Care (III.H.12) | No more than 0.49% of children will be victims of substantiated abuse or neglect by a resource parent or facility staff member. | 0.27% of children in CY 2018 were victims of substantiated abuse or neglect by a resource parent or facility staff member. | 0.24% of children in CY 2019 were victims of substantiated abuse or neglect by a resource parent of facility staff member. | 0.12% of children in CY 2020 were victims of substantiated abuse or neglect by a resource parent or facility staff member. | Yes |
| Repeat Maltreatment (In-home) (IV.H.37) | No more than 7.2% of children who remain at home after a substantiation of abuse or neglect will have another substantiation within the next 12 months. | 5% of children who remained at home after a substantiation of abuse or neglect in CY 2017 had another substantiation within the next 12 months. | 4.5% of children who remained at home after a substantiation of abuse or neglect in CY 2018 had another substantiation within the next 12 months. | 5.1% of children who remained at home after a substantiation of abuse or neglect in CY 2019 had another substantiation within the next 12 months. | Yes |
| Maltreatment Post-Reunification (IV.H.38) | Of all children who enter foster care in a 12-month period for the first time who are discharged within 24 months to reunification or living with a relative(s), no more than 6.9% will be the victims of abuse or neglect within 12 months of their discharge. | 5.9% of children who entered foster care for the first time in CY 2015 and were discharged within 24 months to reunification or living with relative(s) were the victims of abuse or neglect within 12 months of their discharge. | 6.3% of children who entered foster care for the first time in CY 2016 and were discharged within 24 months to reunification or living with relative(s) were the victims of abuse or neglect within 12 months of their discharge. | 5.1% of children who entered foster care for the first time in CY 2017 and were discharged within 24 months to reunification or living with relative(s) were the victims of abuse or neglect within 12 months of their discharge. | Yes |

| | | **Table 1B: To Be Maintained** | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **December 2019 Performance** | **June 2020 Performance[44]** | **December 2020 Performance[45]** | **Requirement Maintained (Yes/No)[46]** |
| Re-Entry to Placement (IV.H.39) | Of all children who enter foster care in a 12-month period for the first time who are discharged within 12 months to reunification, living with relative(s), or guardianship, no more than 9% will re-enter foster care within 12 months of their discharge. | 12.2% of children who entered foster care for the first time in CY 2016 and were discharged within 12 months to reunification, living with relative(s), or guardianship, re-entered foster care within 12 months of their discharge. | 8.6% of children who entered foster care for the first time in CY 2017 and were discharged within 12 months to reunification, living with relative(s), or guardianship, re-entered foster care within 12 months of their discharge. | 9.8% of children who entered foster care for the first time in CY 2018 and were discharged within 12 months reunification, living with relative(s), or guardianship, re-entered foster care within 12 months of their discharge. | Yes[78] |
| | | **Permanency** | | | |
| Permanency within 12 Months (IV.I.40) | Of all children who enter foster care in a 12-month period, at least 42% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | 41% of children who entered foster care in CY 2017 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | 42% of children who entered foster care in CY 2018 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | 37% of children who entered foster care in CY 2019 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. | No[79] |

[78] The Monitor considers the decline in performance to be temporary and most likely attributable to challenges caused by the COVID-19 pandemic.
[79] The Monitor considers the decline in performance to be temporary and most likely attributable to challenges caused by the COVID-19 pandemic.

| | Table 1B: To Be Maintained | | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **December 2019 Performance** | **June 2020 Performance[44]** | **December 2020 Performance[45]** | **Requirement Maintained (Yes/No)[46]** |
| Permanency Within 24 Months (IV.I.41) | Of all children who enter foster care in a 12-month period, at least 66% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering foster care. | 65% of children who entered foster care in CY 2016 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering foster care. | 67% of children who entered foster care in CY 2017 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering foster care. | 64% of children who entered foster care in CY 2018 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering foster care. | No[80] |
| Permanency Within 36 Months (IV.I.42) | Of all children who enter foster care in a 12-month period, at least 80% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care. | 81% of children who entered foster care in CY 2015 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care. | 82% of children who entered foster care in CY 2016 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care. | 84% of children who entered foster care in CY 2017 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering foster care. | Yes |

---

[80] The Monitor considers the decline in performance to be temporary and most likely attributable to challenges caused by the COVID-19 pandemic.

| | Table 1B: To Be Maintained | | | | |
|---|---|---|---|---|---|
| SEP Measure | Sustainability and Exit Plan Standard | December 2019 Performance | June 2020 Performance[44] | December 2020 Performance[45] | Requirement Maintained (Yes/No)[46] |
| Permanency Within 48 Months (IV.I.43) | Of all children who enter foster care in a 12-month period, at least 86% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care. | 89% of children who entered foster care in CY 2014 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care. | 88% of children who entered foster care in CY 2015 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care. | 89% of children who entered foster care in CY 2016 were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering foster care. | Yes |
| | | | *Older Youth* | | |
| Independent Living Assessments (IV.K.45) | 90% of youth ages 14 to 18 have an Independent Living Assessment. | 93% of applicable children had completed an Independent Living Assessment in December 2019. Monthly range during July – December 2019 monitoring period: 93 to 96%. | 89% of applicable children had completed an Independent Living Assessment in June 2020. Monthly range during January – June 2020 monitoring period: 88 to 93%. | 87% of applicable children had completed an Independent Living Assessment in December 2020. Monthly range during July – December 2020 monitoring period: 86 to 88%.[81] | Yes |

[81] Monthly performance for this measure is as follows: July, 88%; August, 87%; September, 86%; October, 86%; November, 87%; December, 87%.

| Table 1B: To Be Maintained | | | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **December 2019 Performance** | **June 2020 Performance[44]** | **December 2020 Performance[45]** | **Requirement Maintained (Yes/No)[46]** |
| Quality of Case Planning and Services (IV.K.46) | 75% of youth ages 18 to 21 who have not achieved legal permanency shall receive acceptable quality case management and service planning. | 70% of cases rated acceptable for both QR indicators *child (youth)/family status* and *overall practice performance* (CY 2018). | 67% of cases rated acceptable for both QR indicators *child (youth)/family status* and *overall practice performance* (CY 2019).[82] | CY 2020 data not available. QRs suspended during the COVID-19 pandemic. | Unable to Determine |
| Housing (IV.K.47) | 95% of youth exiting care without achieving permanency shall have housing. | 96% of youth exiting care between July and December 2018 without achieving permanency had documentation of a housing plan upon exiting care. | 99% of youth exiting care between January and December 2019 without achieving permanency had documentation of a housing plan upon exiting care. | 92% of youth exiting care between July and December 2020 without achieving permanency had documentation of a housing plan upon exiting care. | No[83] |

---

[82] From January to December 2019, 67% (29 of 43) of the applicable cases reviewed were rated acceptable on both the *overall child (youth)/family status* and the *overall practice performance* indicators; 95% (41 of 43) of cases were rated acceptable for *child (youth)/family status* and 67% (29 of 43) of cases were rated acceptable for *overall practice performance*.

[83] The Monitor considers the decline in performance to be temporary and most likely attributable to challenges caused by the COVID-19 pandemic.

| | | Table 1B: To Be Maintained | | | |
|---|---|---|---|---|---|
| **SEP Measure** | **Sustainability and Exit Plan Standard** | **December 2019 Performance** | **June 2020 Performance[44]** | **December 2020 Performance[45]** | **Requirement Maintained (Yes/No)[46]** |
| Employment/ Education (IV.K.48) | 90% of youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. | 89% of youth exiting care between July and December 2018 without achieving permanency were either employed or enrolled in education or vocational training programs, or there was documented evidence of consistent efforts to help the youth secure employment or training. | 97% of youth exiting care between January and December 2019 without achieving permanency were either employed or enrolled in education or vocational training programs, or there was documented evidence of consistent efforts to help the youth secure employment or training. | 85% of youth exiting care between January and December 2020 without achieving permanency were either employed or enrolled in education or vocational training programs, or there was documented evidence of consistent efforts to help the youth secure employment or training. | No[84] |

---

[84] The Monitor considers the decline in performance to be temporary and most likely attributable to challenges caused by the COVID-19 pandemic.

| Table 1C: Foundational Elements | | | |
|---|---|---|---|
| **SEP Reference** | **Additional SEP Requirements that DCF Must Sustain:** | **Data Source** | **Requirement Maintained as of December 2020 (Yes/No)** |
| **A. Data Transparency** | DCF will continue to maintain a case management information and data collections system that allows for the assessment, tracking, posting or web-based publishing and utilization of key data indicators. | Data provided directly to the Monitor and published by DCF in reports and on its website.[85]<br><br>NJ SPIRIT functionality is routinely assessed by the Monitor's use of NJ SPIRIT data for validation and through use of SafeMeasures, as well as in conducting case inquiries and case record reviews. | Yes |
| **B. Case Practice Model** | Implement and sustain a Case Practice Model<br><br>Quality investigation and assessment<br><br>Safety and risk assessment and risk reassessment<br><br>Engagement with youth and families<br><br>Working with family teams<br><br>Individualized planning and relevant services<br><br>Safe and sustained transition from DCF<br><br>Continuous review and adaptations | QR Data<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings<br><br>Quality of Investigations case record review<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report[86]<br><br>Older Youth Exiting Care to Non-Permanency case record review | Yes— although some activities suspended or postponed during this monitoring period due to COVID-19 |

[85] Please see list of reports in Appendix B to review data sources for this Foundational Element.
[86] The most recent Safe, Healthy, and Connected Annual Report was published in 2019 covering CY 2018. DCF intends to publish a report for 2019 and for 2020.

| | | | |
|---|---|---|---|
| **C. State Central Registry** | Received by the field in a timely manner | Commissioner's Monthly Report<br><br>Monitor site visit with SCR staff<br><br>Screening and Investigations Monthly Report | Yes |
| | Investigation commenced within required response time | | |
| **D. Appropriate Placements** | Appropriate placements of children | Monitor site visits and attendance at QRs, ChildStat, and other meetings<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | Yes— although some activities suspended or postponed during this monitoring period due to COVID-19 |
| | Resource family homes licensed and closed (kinship/non-kinship) | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor | |
| | Number of children in home/out of home demographic data | NJ Rutgers Data Portal | |
| | Placed in a family setting | Commissioner's Monthly Report | |
| | Placement proximity | Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | |
| | No children under 13 years old in shelters | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor | |
| | Children over 13 in shelters no more than 30 days | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor | |
| | No behavioral health placements out of state without approval | Commissioner's Monthly Report | |

| | | | |
|---|---|---|---|
| | Adequate number of resource placements | CP&P Needs Assessment<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | |
| **E. Service Array** | Services for youth ages 18-21, LGBTQI, mental health and domestic violence for birth parents with families involved with the child welfare system | New Jersey Youth Resource Spot[87]<br><br>New Jersey DCF Adolescent Services Website[88]<br><br>Data provided directly to the Monitor<br><br>Attendance at Adolescent Practice Forums<br><br>CP&P Needs Assessment<br><br>Safe, Healthy, and Connected Annual Report<br><br>Older Youth Exiting Care to Non-Permanency case record review | Yes |
| | Preventive home visit programs | Commissioner's Monthly Report<br><br>Safe, Healthy, and Connected Annual Report | |
| | Family Success Centers | Commissioner's Monthly Report<br><br>Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | |

---

[87] New Jersey's Youth Resource Spot can be found at www.NJYRS.org.
[88] DCF's Adolescent Services Website can be found at http://www.nj.gov/dcf/adolescent/.

| | | | |
|---|---|---|---|
| **F. Medical and Behavioral Health Services** | Appropriate medical assessment and treatment | Data provided directly to the Monitor<br><br>Commissioner's Monthly Report<br><br>CIACC Monthly Report<br><br>Safe, Healthy, and Connected Annual Report | Yes |
| | Pre-placement and entry medical assessments | | |
| | Dental examinations | | |
| | Immunizations | | |
| | Follow-up care and treatment | | |
| | Mental health assessment and treatment | | |
| | Behavioral health | | |
| **G. Training** | Pre-service training | Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report | Yes |
| | Case practice model | | |
| | Permanency planning | | |
| | Concurrent planning | | |
| | Adoption | | |
| | Demonstration of competency | | |

| | | | |
|---|---|---|---|
| **H. Flexible Funding** | DCF will continue to make flexible funds available for use by workers in crafting individualized service plans for children, youth and families to meet the needs of children and families, to facilitate family preservation and reunification where appropriate and to ensure that families are able to provide appropriate care for children and to avoid the disruption of otherwise stable and appropriate placements. | Data provided directly to the Monitor<br><br>DCF Online Policy Manual<br><br>Budget Report | Yes |
| **I. Resource Family Care Support Rates** | Family care support rates | DCF Online Policy Manual<br><br>DCF Website[89] | Yes |
| | Independent Living Stipend | New Jersey Youth Resource Spot | |
| **J. Permanency** | Permanency practices | Data provided directly to the Monitor<br><br>Safe, Healthy, and Connected Annual Report<br><br>Monitor site visits and attendance at QRs, ChildStat, and other meetings<br><br>Older Youth Exiting Care to Non-Permanency case record review | Yes— although some activities suspended or postponed during this monitoring period due to COVID-19 |
| | Adoption practices | | |
| **K. Adoption Practice** | 5- and 10-month placement reviews | Adoption Report[90] | Yes |

---

[89] USDA has altered its schedule for producing its Annual Report on costs of raising a child. By agreement, DCF now updates the rates within 30 days of the USDA annual report's release to meet the SEP standards and provides written confirmation to the Monitor.
[90] The most recent Adoption Report was published in 2016. To see the report, go to: https://www.nj.gov/dcf/childdata/exitplan/AdoptionReport2016.pdf

## IV.   FOUNDATIONAL ELEMENTS

The Sustainability and Exit Plan (SEP) identifies a series of core organizational and practice improvements known as the "Foundational Elements" that became the groundwork upon which New Jersey's reform has been built. They include a range of requirements from the 2006 Modified Settlement Agreement (MSA) that were previously met and were codified in the SEP as essential to be maintained and foundational for improved child welfare outcomes and future system improvements. These Foundational Elements remain enforceable in the SEP if performance is not sustained. DCF collects and publishes relevant performance data in these areas.

The Monitor has continued to assess maintenance of Foundational Elements through analysis of DCF's data as well as through participation in Area Director meetings, virtual site visits with Local Offices and service providers, and other DCF presentations and meetings. Given the COVID-19 pandemic, discussions were held virtually with groups of staff and other stakeholders across the state. DCF's ChildStat meetings and Qualitative Reviews (QRs) have been suspended during the pandemic. During this period, the Monitor has continued to meet virtually with DCF leadership to receive updates on the Foundational Elements and DCF's responses to the COVID-19 pandemic. Additionally, the Department had planned to produce the *Safe, Healthy, and Connected Annual Report* in both 2019 and 2020 for public accountability on the Foundational Elements, but plans have been stalled due to the COVID-19 pandemic.

In the Monitor's judgment, *each of the SEP's Foundational Elements has been maintained during this period, which is an important accomplishment given the challenges caused by the COVID-19 pandemic.* Additionally, many have been strengthened through new initiatives and developments, some of which are discussed herein in Section II.

## V. SUSTAINABILITY AND EXIT PLAN PERFORMANCE MEASURES *TO BE ACHIEVED* AND *TO BE MAINTAINED*

This section of the report provides information on the Sustainability and Exit Plan (SEP) requirements that the state is focused on achieving – designated as *Outcomes To Be Achieved* – and those requirements for which the state has satisfied the specified performance targets for at least six months and must sustain – designated as *Outcomes To Be Maintained*.

Pursuant to the SEP, the Monitor has discretion "to determine if the decline is temporary, insubstantial and/or caused by reasonably unforeseen circumstance." During this monitoring period the state's performance on a number of measures has declined. The Monitor continues to attribute declines in many of these areas to be the "reasonably unforeseen circumstances" brought about by the COVID-19 pandemic, and expects performance to improve as New Jersey and CP&P return to pre-pandemic activities.

### A. INVESTIGATIONS

The SEP includes four performance measures related to investigative practice, all of which were designated as *Outcomes To Be Maintained* as of the beginning of the monitoring period: quality of investigations (SEP IV.A.15); timeliness of Institutional Abuse Investigations Unit (IAIU) investigation completion (SEP III.A.1); timeliness of alleged child abuse and neglect investigation completion, within 60 days (SEP IV.A.13); and timeliness of alleged child abuse and neglect investigation completion, within 90 days (SEP IV.A.14). Performance for all four measures during the current monitoring period is discussed below.

**Timeliness of Investigation Completion**

| Quantitative or Qualitative Measure | 13. <u>Timeliness of Investigation Completion</u>: Investigations of alleged child abuse and neglect shall be completed within 60 days. |
|---|---|
| Performance Target | 85% of all abuse/neglect investigations shall be completed within 60 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. |

***Performance as of November 30, 2020.***[91]

In November 2020, there were 3,407 investigations of alleged child abuse and neglect, 3,025 (89%) of which were completed within 60 days. Performance from June to November 2020 ranged from a low of 85 percent to a high of 92 percent.[92] DCF met the SEP performance standard for the timeliness of investigation completion within 60 days.

| Quantitative or Qualitative Measure | 14. Timeliness of Investigation Completion: Investigations of alleged child abuse and neglect shall be completed within 90 days. |
|---|---|
| Performance Target | 95% of all abuse/neglect investigations shall be completed within 90 days. Cases with documented acceptable extensions in accordance with policy are considered compliant. |

***Performance as of November 30, 2020.***[93]

In November 2020, 3,308 (97%) of the 3,407 investigations of child abuse and neglect were completed within 90 days. Performance from June to November 2020 ranged from 96 to 97 percent.[94] DCF continues to meet the SEP performance standard for the timeliness of investigation completion within 90 days.

### Quality of Investigations

| Quantitative or Qualitative Measure | 15. Quality of Investigations: Investigations of alleged child abuse and neglect shall meet standards of quality. |
|---|---|
| Performance Target | 85% of all abuse/neglect investigations shall meet standards of quality. |

---

[91] December 2020 data will be included in the next monitoring report. For certain data elements that have an extended time frame built into the measurement, the Monitor and DCF decided to alter the period for review so six-month monitoring reports can be produced more closely to the end of the monitoring period.

[92] Monthly performance for this measure is as follows: June, 85%; July, 90%; August, 92%; September, 91%; October, 89%; November, 89%.

[93] December 2020 data will be included in the next monitoring report. For certain data elements that have an extended time frame built into the measurement, the Monitor and DCF decided to alter the period for review so six-month monitoring reports can be produced more closely to the end of the monitoring period.

[94] Monthly performance for this measure is as follows: June, 96%; July, 97%; August, 97%; September, 97%; October, 96%; November, 97%

The quality of investigations case record review is typically conducted every two years and is not reassessed in this report. In February 2020, DCF and Monitor staff conducted a case record review of the quality of CP&P's investigative practice. Reviewers examined the quality of practice of a statistically valid random sample of 326 selected Child Protective Services (CPS) investigations assigned to Local Offices between October 1 and 14, 2019, involving 510 alleged child victims.[95] Overall, reviewers found that 296 (91%) of 326 of the investigations were of acceptable quality,[96] exceeding the SEP standard.

---

[95] These results have a ± 5% margin of error with a 95% confidence interval.

[96] Reviewers could select four possible responses to the question regarding the quality of the investigation: "completely," "substantially," "marginally" or "not at all." Investigations determined to be "completely" or "substantially" of quality were considered acceptable for the purpose of this measure.

## B.  FAMILY TEAM MEETINGS

Family Team Meetings (FTMs) bring families, providers, formal and informal supports together to exchange information, participate in case planning, coordinate, and follow up on services, and examine and address challenges. Meetings are intended to be scheduled according to the family's availability to involve as many family members and supports as possible. Workers are trained and coached to hold FTMs at key decision and transition points in the life of a case, such as when a child enters placement, when a child has a change in placement, and/or when there is a need to adjust a case plan to achieve permanency or meet a child's needs. During the monitoring period, some of these meetings were virtual, according to policy set at the onset of the COVID-19 pandemic, but many FTMs were able to occur in person, outdoors, in visitation centers, or in large public places.

The SEP includes five performance measures pertaining to FTMs. As of the beginning of the monitoring period, four measures had been met and designated as *Outcomes To Be Maintained*: the requirements that FTMs be held within 45 days of a child's removal (SEP IV.B.16); that for children in out-of-home placement, at least three additional FTMs after the initial FTM be held within the first 12 months of placement (SEP IV.B.17); that children with the goal of reunification have at least three FTMs each year after the first 12 months of placement (SEP IV.B.18); and that children with a goal other than reunification have at least two FTMs each year after the first 12 months of placement (SEP IV.B.19). The remaining *Outcome To Be Achieved* is Quality of Teaming (SEP IV.B.20). Performance for four measures is discussed below.

### Initial FTMs Held within 45 Days of Entry

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 16. <u>Initial Family Team Meetings:</u> For children newly entering placement, the number/percent who have a family team meeting within 45 days of entry. |
| **Performance Target** | 80% of children newly entering placement shall have a family team meeting before or within 45 days of placement. |

*Performance as of December 31, 2020:*

In December 2020, 74 (82%) out of 90 possible FTMs occurred within 45 days of a

child's removal from home.[97] Performance from July 1 to December 31, 2020 ranged from a low of 82 percent to a high of 91 percent.[98] For this measure, the Monitor and DCF verified monthly data from NJ SPIRIT for the 22 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[99] DCF exceeded the performance standard in each month of the monitoring period.

### FTMs Held within the First 12 Months

| Quantitative or Qualitative Measure | 17. <u>Subsequent Family Team Meetings within 12 Months</u>: For all other children in placement, the number/percent who have three additional FTMs within the first 12 months of the child coming into placement. |
|---|---|
| Performance Target | 80% of children will have three additional FTMs within the first 12 months of the child coming to placement. |

***Performance as of December 31, 2020:[100]***

In December 2020, 67 (80%) of 84 applicable children had three or more FTMs within the first 12 months of entering placement, after the initial FTM. Performance from July 1 to December 31, 2020 ranged from a low of 76 percent to a high of 85 percent.[101] For this measure, the Monitor and DCF verified monthly data from NJ SPIRIT for the 40 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[102] DCF's performance exceeded the SEP standard in all but two months. Thus, the Monitor considers this measure met.

---

[97] Based on preliminary data from DCF, the reported percentage of these completed FTMs that were conducted by video or phone (rather than in-person) ranged from 21% to 48% during the monitoring period. These data may be an undercount of virtual visits due to documentation limitations.

[98] Monthly performance for this measure is as follows: July, 88%; August, 91%; September, 86%; October, 85%; November, 88%; December, 82%. Reported performance accounts for valid exceptions to the FTM requirement.

[99] Based on a review with DCF of all 22 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in December 2020, there were 91 children newly entering placement. The Monitor and DCF determined that in one case, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded that case, making the universe of applicable cases 90 children.

[100] Measure 17 applies to all children who have been in out-of-home placement for 12 months who entered care in the specified month. For example, performance for December 2020 is based upon the 88 children who entered care in December 2019. Compliance is based on whether at least three FTMs were held for these children during the 12-month period they were in care.

[101] Monthly performance for this measure is as follows: July, 76%; August, 80%; September, 83%; October, 78%; November, 85%; December, 80. Reported performance accounts for valid exceptions to the FTM requirement.

[102] Based on a joint review of all 40 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in December 2020, there were 88 children who had been in out-of-home placement for 12 months. The Monitor and DCF determined that in four cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe of applicable cases 84 children.

**FTMs Held After 12 Months in Placement with a Goal of Reunification**

| Quantitative or Qualitative Measure | 18. <u>Subsequent Family Team Meetings after 12 Months:</u> For all children in placement with a goal of reunification, the number/percent who have at least three FTMs each year after the first 12 months of placement. |
|---|---|
| Performance Target | After the first 12 months of a child being in care, 90% of those with a goal of reunification will have at least three FTMs each year. |

*Performance as of December 31, 2020:*[103]

In December 2020, 22 (96%) of 23 applicable children with a permanency goal of reunification had three or more FTMs in the most recent 12 months, if they had been in out-of-home placement for two or more years. Performance from July 1 to December 31, 2020 ranged from a low of 44 percent to a high of 97 percent.[104] For this measure, the Monitor and DCF jointly verified monthly data from NJ SPIRIT for the 12 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[105]

The universe of cases to which this measure applies is small and therefore more susceptible to fluctuations. The Monitor considers this measure to have met the standard this monitoring period since DCF met the standard in two months, remains close to the standard in an additional two months, and the decline in performance in the first two months of the monitoring period the Monitor considers to be temporary and most likely attributable to challenges caused by the COVID-19 pandemic.

---

[103] Measure 18 applies to all children who have been in care for at least 24 months who entered care in the specified month each year and have a goal of reunification. For example, in December 2020, a combined total of 23 children entered care in December 2018, December 2017, December 2016, etc. and were still in placement with a goal of reunification. Compliance is based on whether at least three FTMs were held for these children during their most recent 12 months in care.

[104] Monthly performance for this measure is as follows: July, 68%; August, 44%; September, 83%; October, 97%; November, 85%; December, 96%. Reported performance accounts for valid exceptions to the FTM requirement.

[105] Based on a review of all 10 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in September 2020, there were 20 children who had been in care for at least 24 months who had a goal of reunification. The Monitor determined that in two cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe of applicable cases 18 children.

**FTMs Held After 12 Months in Placement with a Goal Other than Reunification**

| Quantitative or Qualitative Measure | 19. <u>Subsequent Family Team Meetings after 12 Months:</u> For all children in placement with a goal other than reunification, the number/percent who have at least two FTMs each year. |
|---|---|
| Performance Target | After the first 12 months of a child being in care, for those children with a goal other than reunification, 90% shall have at least two FTMs each year. |

*Performance as of December 31, 2020:*[106]

In December 2020, 94 (88%) of 107 applicable children in out-of-home placement with a permanency goal other than reunification had two or more FTMs in the most recent 12 months of those in out-of-home placement for two or more years. Performance from July 1 to December 31, 2020 ranged from a low of 84 percent to a high of 88 percent.[107] For this measure, the Monitor verified monthly data from NJ SPIRIT for the 12 applicable cases to determine whether exceptions to FTM policy were appropriately applied and documented.[108]

DCF did not meet the SEP standard in any month and therefore the Monitor does not consider this measure to be met. Performance is most likely attributable to the challenges of the COVID-19 pandemic, thus the Monitor considers this decline in performance to be temporary. The Monitor will continue to closely track performance.

---

[106] Children eligible for Measure 19 are all children who have been in care for at least 24 months who entered care in the month specified each year and have a goal other than reunification. For example, in December 2020, a combined total of 109 children entered care in December 2018, December 2017, December 2016, etc. and are still in placement with a goal other than reunification. Compliance is based on whether at least two FTMs were held for these children each year in the most recent year after 12 months in care.

[107] Monthly performance for this measure is as follows: July, 86%; August, 85%; September, 88%; October, 87%; November, 84%; December, 88%. Reported performance accounts for valid exceptions to the FTM requirement.

[108] Based on a review of all 12 cases, the Monitor excluded valid exceptions to the FTM requirement from the universe of cases. For example, in December 2020 there were 109 children who had been in care for at least 24 months with a goal other than reunification. The Monitor determined that in two cases, the worker had appropriately determined that the parent declined the FTM or was otherwise unavailable. The Monitor excluded those cases, making the universe of applicable cases 107 children.

**Quality of Teaming**

| Quantitative or Qualitative Measure | 20. Cases involving out-of-home placement show evidence of family teamwork. |
|---|---|
| **Performance Target** | 75% of cases involving out-of-home placements that were assessed as part of the Qualitative Review (QR) process will show evidence of both acceptable team formation and acceptable functioning. The Monitor, in consultation with the parties, shall determine the standards for quality team formation and functioning. |

FTMs are only one of the many ways in which DCF staff engage with families. Effective teaming is much broader than just convening a meeting and relies upon other foundational elements of quality case practice, such as engagement with family members, timely assessments, and quality case planning, all of which are evaluated as part of the state's QR process. Results from the *teamwork and coordination* indicator in the QR are used to assess the quality of collaborative teamwork with children, youth, and families. Information about the QR process and protocol are detailed in Section V.N *Accountability Through Qualitative Review* of this report.

Due to the COVID-19 pandemic, QRs were suspended and therefore there are no new data on this measure. As of the last measurement in CY 2019, 62% of the cases reviewed met the standard.

*Charlie and Nadine H. v. Murphy*
*Progress Report of New Jersey DCF for the Period July-December 2020*
*July 2021*
*Page 56*

## C. QUALITY OF CASE AND SERVICE PLANNING

Timely and meaningful case plans that are developed with the family at the beginning of a case, and throughout a family's involvement with DCF, are the foundation of quality casework and rely on workers' assessment and engagement skills. To enhance those skills and the ways in which DCF engages with families, DCF has taken steps to adopt Solution Based Casework (SBC)™ statewide. SBC is a case management approach to assessment, case planning, and ongoing casework, a strategy that helps staff work with families to develop case plans that are customized, behavior-focused and family centered, consistent with New Jersey's Case Practice Model (CPM). The official launch date of the new approach is June 2021, which will involve changes to policies, protocols, processes, and forms throughout the Division, in particular within the intake and permanency units. Changes to casework activities, such as strengthening FTM preparation, is intended to allow staff to build stronger partnerships with families, conduct more thorough behavior-based assessments and develop action plans that support the objectives developed by the family. Among other steps toward integrating SBC into DCF's CPM, DCF identified SBC Champions in each of its 46 Local Offices who will be responsible for training and coaching staff statewide between July and December 2021.

The SEP includes three measures related to case planning, two of which have been previously met and designated as *Outcomes To Be Maintained*: the requirement that case plans be developed with families within 30 days of placement (SEP IV.D.22) and the requirement that case plans be reviewed and modified every six months (SEP III.C.6). The SEP measure regarding the quality of case planning (SEP IV.D.23) remains an *Outcome To Be Achieved.*  Performance for the two measures is discussed below.

**Timeliness of Case Planning – Initial Case Plans**

| Quantitative or Qualitative Measure | 22. <u>Timeliness of Initial Plans</u>: For children entering care, number/percent of case plans developed within 30 days. |
|---|---|
| **Performance Target** | 95% of case plans for children and families are completed within 30 days. |

*Performance as of December 31, 2020:*

In December 2020, 79 (87%) of 91 initial case plans were completed within 30 days of a child entering placement. Between July and December 2020, the timely

development of initial case plans ranged from a low of 84 percent to a high of 96 percent.[109] The Monitor considers this measure to have met the standard this monitoring period since DCF met or exceeded this measure in two of six months, came close to meeting the standard in an additional month, and the decline in performance in the remaining three months is likely temporary and most likely attributable to challenges caused by the COVID-19 pandemic.

### Timeliness of Case Planning – Every Six Months

| Quantitative or Qualitative Measure | 6.  Case Plans: Case plans for children and families will be reviewed and modified no less frequently than every six months. |
|---|---|
| Performance Target | 95% of case plans for children and families will be reviewed and modified no less frequently than every six months. |

### Performance as of December 31, 2020:

In December 2020, 521 (97%) of 539 case plans had been modified no less frequently than every six months. Performance from July to December 2020 ranged from 93 to 97 percent, similar to the range of performance in the previous monitoring period.[110] DCF met or exceeded the required standard for this measure in five of six months and was close to the SEP standard in the remaining month. The Monitor considers DCF to have met this measure.

### Quality of Case Plans

| Quantitative or Qualitative Measure | 23. Quality of Case Plans: The child's/family's case plan shall be developed with the family and shall be individualized and appropriately address the child's needs for safety, permanency and well-being. The case plan shall provide for the services and interventions needed by the child and family to meet identified goals, including services necessary for children and families to promote children's development and meet their educational, physical and mental health needs. The case plan and services shall be modified to respond to the changing needs of the child and family and the results of prior service efforts. |
|---|---|

---

[109] Monthly performance for this measure is as follows: July, 84%; August, 94%; September, 96%; October, 90%; November, 95%; December, 87%.
[110] Monthly performance on this measure is as follows: July, 93%; August, 95%; September, 95%; October, 97%; November, 95%; December, 97%.

| Performance Target | 80% of case plans rated acceptable as measured by the Qualitative Review (QR). |
|---|---|

DCF policy and the SEP require that families be involved in case planning, that plans are appropriate and individualized to the circumstances of the child or youth and family, and that there is oversight of plan implementation to ensure case goals are met and plans are modified when necessary. Results from two QR indicators, *child and family planning process* and *tracking and adjusting*, are used to assess performance on this measure. Cases rated as acceptable demonstrate that child or youth and family needs are addressed in the case plan, appropriate family members were included in the development of the plan, and interventions are being tracked and adjusted when necessary. Information about the QR process and protocol are detailed in Section V.N *Accountability Through Qualitative Review* of this report.

Due to the COVID-19 pandemic, QRs were suspended and therefore there are no new data on this measure. As of the last measurement in CY 2019, 58% of cases reviewed met the standard.

## D. EDUCATION

| Quantitative or Qualitative Measure | 11. Educational Needs: Children will be enrolled in school and DCF will have taken appropriate actions to ensure that their educational needs are being met. |
|---|---|
| Performance Target | 80% of cases will be rated acceptable as measured by the Qualitative Review (QR) in stability (school) and learning and development. The Monitor, in consultation with the parties, shall determine the standards for school stability and quality learning and development. |

SEP Section III.G.11 requires that "children will be enrolled in school and DCF will have taken appropriate actions to ensure that their educational needs are being met." Results from both the *stability in school* and *learning and development* indicators are used to assess performance on this measure. The QR process and protocol are discussed in detail in Section V.N *Accountability Through Qualitative Review* of this report.

Due to the COVID-19 pandemic, QRs were suspended and therefore there are no new data on this measure. As of the last measurement in CY 2019, 86% of cases reviewed met the standard.

### E.  MAINTAINING CONTACT THROUGH VISITS

Visits provide essential points of connection between children and their parents and siblings and children and parents with DCF workers. Visits enable workers to continually assess for safety and well-being, strengthen family connections, link children and families to needed services and supports and improve prospects for permanency. As in states throughout the country, expectations for how to hold visits continued to be different this period due to safety issues presented by the COVID-19 pandemic. After temporarily suspending in-person visits in March 2020, DCF reinstated in-person family visitation in July 2020, allowing for the relaxation of in-person visitation requirements when deemed medically necessary.

The Department's efforts to preserve regular contacts, even if virtual, have been critical to quality case practice. Given the difficulty of setting up technology for both workers and families in the early months of the COVID-19 pandemic, some challenges with visits continued into the later months of the year as workers struggled to find safe places to arrange in-person visits, and some broadband connection issues remained in scheduling virtual visits.

The SEP includes six performance measures related to visits. As of the beginning of this reporting period, five measures were designated as *Outcomes To Be Maintained*, including caseworker contacts with children newly placed or after a placement change (SEP III.F.9); caseworker contacts with children in ongoing placement (SEP III.F.10); parent-child weekly and bi-weekly visits (SEP IV.F.29 and IV.F.30); and visits with siblings (SEP IV.F.31).

Caseworker contacts with parents when the goal is reunification (SEP IV.F.28) remains an *Outcome To Be Achieved*. Performance for all six measures during the current monitoring period is discussed below.

**Caseworker Visits with Children in Placement**

| Quantitative or Qualitative Measure | 9.  Caseworker Contacts with Children – New Placement/Placement Change: The caseworker shall have at least twice-per-month face to face contact with the children within the first two months of placement, with at least one contact in the placement. |
|---|---|
| **Performance Target** | 93% of children shall have at least twice-per-month face to face contact with their caseworker during the first two months of placement, with at least one contact in the placement. |

*Performance as of December 31, 2020:*

In December 2020, 172 (92%) of the 186 children in a new placement had two visits per month with their caseworkers during their first two months in placement, either in person or virtually, with at least one contact per month in the child's placement. Between July and December 2020, monthly performance ranged from 89 to 93 percent.[111]

DCF performance met the standard in two months and remained close in the other four months of the monitoring period. The Monitor considers the decline in performance temporary and most likely attributable to challenges caused by the COVID-19 pandemic, and therefore considers this measure to be met.

| Quantitative or Qualitative Measure | 10. <u>Caseworker Contacts with Children in Placement:</u> During the remainder of placement, children will have at least one caseworker visit per month, in placement. |
|---|---|
| Performance Target | 93% of children will have at least one caseworker visit per month in placement, for the remainder of placement. |

*Performance as of December 31, 2020:*

In December 2020, 3,222 (97%) of the 3,308 children in an ongoing placement were visited at least once by their caseworker, either in person or virtually. Between July and December 2020, monthly performance ranged from 95 to 98 percent.[112] DCF exceeded the performance standard in each month.

### Caseworker Visits with Parents/Family Members

| Quantitative or Qualitative Measure | 28. <u>Caseworker Visits with Parents/Family Members with Goal of Reunification</u>: The caseworker shall have at least two face-to-face visits per month with the parent(s) or other legally responsible family member of children in custody with a goal of reunification. |
|---|---|
| Final Target | 90% of families will have at least twice-per-month face-to-face contact with their caseworker when the permanency goal is reunification. |

---

[111] Monthly performance for this measure is as follows: July, 89%; August, 93%; September, 91%; October, 93%; November, 92%; December, 92%.
[112] Monthly performance for this measure is as follows: July, 95%; August, 98%; September, 98%; October, 98%; November, 97%; December, 97%.

*Charlie and Nadine H. v. Murphy*
*Progress Report of New Jersey DCF for the Period July-December 2020*
*July 2021*
*Page 62*

*Performance as of December 31, 2020:*

In December 2020, 1,084 (83%) of 1,309 applicable children in custody with a goal of reunification had parents who were visited at least twice during the month by caseworkers, either in person or virtually. Between July and December 2020, a range of 49 to 83 percent of applicable parents or other legally responsible family members were visited at least two times per month by a caseworker.[113] Figure 3 depicts performance on this measure over the course of the past two years. In assessing performance for this measure, the Monitor applied the findings from DCF's review of children for whom case documentation indicated that a worker visit with a parent was not required because the parent was missing or otherwise unavailable.[114]

Even accounting for the allowance of virtual visits, performance was impacted by the COVID-19 pandemic and fell in June 2020. Performance slowly improved throughout the monitoring period and, by December 2020, had rebounded to pre-pandemic levels. However, current performance does not meet the level required by the SEP and remains an *Outcome To Be Achieved.*

---

[113] Monthly performance for this measure is as follows: July, 49%; August, 72%; September, 79%; October, 79%; November, 76%; December, 83%. Reported performance accounts for valid exceptions to the visits requirement.
[114] In an effort to assess the validity of exceptions, DCF reviewed 178 cases from a universe of cases from September 2020 in which worker visits with parents were not held due to a documented exception to the visits requirement. DCF determined that a valid exception was utilized in 144 (81%) of the 178 cases reviewed. During each month of the monitoring period, workers documented an average of approximately 300 exceptions to the visits requirement. As a result, the Monitor excluded 81% of exceptions in each month. For example, in December 2020 there were 1,535 children in custody with a goal of reunification. Data from NJ SPIRIT indicated that there were 280 documented cases that month in which workers documented that parents were missing or otherwise unavailable. Based on the sample, the Monitor excluded from the universe 227 (81%) of the 280 cases in December, making the universe of applicable children 1,308 (1,535-227).



**Figure 3: Percentage of Families Who Had at Least Twice per Month Face-to-Face Contact with Caseworker when the Goal is Reunification (December 2017 – December 2020)**

Source: DCF data

### Visits between Children in Custody and their Parents

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 29. <u>Weekly Visits between Children in Custody and Their Parents</u>: Number/percent of children who have weekly visits with their parents when the permanency goal is reunification unless a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |
| **Final Target** | 60% of children in custody with a return home goal will have an in-person visit with their parent(s) or other legally responsible family member at least weekly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

*Performance as of December 31, 2020:*

In December 2020, an average of 956 (81%) of 1,185 applicable children visited virtually or in person weekly with their parents during the month.[115] Between July and December 2020, a range of 60 to 81 percent of children had a weekly visit with their

---

[115] Based on preliminary data from DCF, the reported percentage of these completed weekly visits that were conducted by video (rather than in-person) ranged from 43% in July to 11% in October. In December 2020, 17% of completed weekly parent-child visits were virtual.

*Charlie and Nadine H. v. Murphy*
*Progress Report of New Jersey DCF for the Period July-December 2020*
*July 2021*
*Page 64*

parents when the permanency goal was reunification.[116] This performance exceeds the SEP standard in each month. Figure 4 shows performance on this measure since 2016.

**Figure 4: Percentage of Children Who Visited with their Parents Weekly (June 2016 – December 2020)**



Source: DCF Data

| Quantitative or Qualitative Measure | 30. Bi-Weekly Visits between Children in Custody and Their Parents: Number/percent of children who have weekly visits with their parents when the permanency goal is reunification unless a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |
|---|---|
| Final Target | 85% of children in custody with a return home goal will have an in-person visit with their parent(s) or other legally responsible family member at least every other week, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

---

[116] Monthly performance for this measure is as follows: July, 60%; August, 74%; September, 81%; October, 80%; November, 77%; December, 81%. Given the results of validation from a prior monitoring period, the Monitor excluded from the universe all cases in which DCF documented an exception to the parent-child visit requirement. For example, in December 2020, there was an average of 1,620 children with a goal of reunification across the four weeks of the month. Data from NJ SPIRIT indicated that in an average of 435 cases that month, the worker had determined that the parent was unavailable for the visit, the child declined the visit, or the visit was not required. Based on these data, the Monitor excluded those cases from the universe, making the universe of applicable children an average of 1,185 in June (1,620-435).

*Performance as of December 31, 2020:*

In December 2020, 1,113 (94%) of 1,185 applicable children had at least two visits, either virtual or in person, with their parents during the month. Between July and December 2020, a monthly range of 77 to 94 percent of children had visits at least twice a month with their parents when their permanency goal was reunification.[117] DCF's performance exceeded the SEP standard in all but one month of the monitoring period. The Monitor considers this measure to be met.

### Visits between Children in Custody and Sibling Placed Apart

| Quantitative or Qualitative Measure | 31. Visits between Children in Custody and Siblings Placed Apart: Number/percent of children in custody, who have siblings with whom they are not residing shall visit with their siblings as appropriate. |
|---|---|
| Final Target | 85% of children in custody who have siblings with whom they are not residing shall visit with those siblings at least monthly, excluding those situations where a court order prohibits or regulates visits or there is a supervisory approval of a decision to cancel a visit because it is physically or psychologically harmful to a child. |

*Performance as of December 31, 2020:*

In December 2020, 831 (83%) of 999 applicable children in placement who had at least one sibling with whom they did not reside had at least one virtual or in person visit with one of their siblings during the month.[118] Between July and December 2020, a range of 70 to 83 percent of children had at least monthly visits, either in person or virtual, with one of their siblings with whom they were not placed.[119]

DCF did not meet the performance standard in any month during this monitoring period. The Monitor considers the decline in performance to be temporary and most

---

[117] Monthly performance for this measure is as follows: July, 77%; August, 86%; September, 92%; October, 94%; November, 91%; December, 94%. Given the results of validation activities from a prior monitoring period, the Monitor excluded from the universe all cases in which DCF documented an exception to the parent-child visit requirement. For example, in December 2020, there were 1,535 children with a goal of reunification. Data from NJ SPIRIT indicated that in 350 cases that month, the worker had determined that the parent was unavailable for the visit, the child declined the visit, or the visit was not required. Based on these data, the Monitor excluded those cases from the universe, making the universe of applicable children 1,185 in December (1,535-350).

[118] Given results of validation activities from a prior monitoring period, the Monitor excluded 60% of the exceptions from each month from the universe. For example, in the month of December 2020, there were 1,087 children in custody with a sibling in care with whom they were not placed. Data from NJ SPIRIT indicated that there were 147 documented cases that month for which the worker had determined the visit was not required or the child was unavailable. Based on these data, the Monitor excluded from the universe 88 (60%) the 147 cases, making the universe of applicable children 999 (1,087-88).

[119] Monthly performance for this measure is as follows: July, 70%; August, 78%; September, 83%; October, 83%; November, 80%; December, 83%. Reported performance accounts for valid exceptions to the visits requirement.

*Charlie and Nadine H. v. Murphy*
*Progress Report of New Jersey DCF for the Period July-December 2020*
*July 2021*
*Page 66*

likely attributable to challenges related to the COVID-19 pandemic. Performance over the last several years is demonstrated in Figure 5.

**Figure 5: Percentage of Children Who Visited with their Siblings (June 2016 – December 2020)**



Source: DCF Data

## F. PLACEMENT

Stable and appropriate placement for children in foster care is critical to safety and well-being, and maintenance of family bonds. DCF's Strategic Plan highlights this through its emphasis and goals for placement of children with kin whenever possible. DCF policy also requires siblings to be placed together whenever possible, and that children experience as few placement changes as possible while in out-of-home placement. There are five performance measures related to placement. As of January 2020, all had been previously met and were designated as *Outcomes To Be Maintained*: sibling placements of two to three children (SEP IV.G.32); sibling placements and recruitment of placements for four or more children (SEP IV.G.33); placement stability for children in care between 13 and 24 months (SEP IV.G.36); and placement stability for children in care 12 months or less (SEP IV.G.35). Each of these measures, except recruitment of placements to accommodate large sibling groups, is assessed through longitudinal cohort data on an annual basis. DCF performance on these measures continued to maintain or exceed SEP standards this year, an impressive achievement given the challenges of the COVID-19 pandemic. Performance for all five measures is discussed below.

**Placing Siblings Together**

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 32. <u>Placing Siblings Together</u>: The percentage of sibling groups of two or three siblings entering custody be placed together. |
| **Performance Target** | At least 80% of sibling groups of two or three children entering placement will be placed together. |

*Performance as of CY 2020:*

In CY 2020, there were 194 sibling groups of two or three children that entered DCF custody at the same time or within 30 days of one another. Of these, 158 (81%) were placed together. As shown in Figure 6, DCF met the SEP standard for this measure for the first time in 2014, but performance had declined in recent years, and now has improved to meet the SEP standard again. DCF reports that this is due, at least in part, to its analysis of barriers to performance and follow-up with Local Office supervisors and managers. DCF continues to meet the SEP standard.

**Figure 6: Percentage of Sibling Groups of Two or Three Children Placed Together (CY 2013 – CY 2020)**



Source: DCF data analyzed by Rutgers University[120]

### Placing Siblings Together for Four of More Children

| Quantitative or Qualitative Measure | 33. <u>Placing Siblings Together for Four or More Children</u>: The percentage of sibling groups of four or more placed together. |
|---|---|
| **Performance Target** | For sibling groups of four or more 80% will be placed with at least one other sibling. |

*Performance as of CY 2020:*

In CY 2020, there were 131 children who were part of sibling groups of four or more children in placement. Of those, 124 (95%) were placed with at least one other sibling. DCF continues to exceed the SEP performance standard in this area, and this year marks a significant increase in siblings being placed together from prior years.

---

[120] DCF transferred the function of analyzing annual outcome measures related to placement, timely permanency, and maltreatment from Hornby Zeller Associates, Inc. to Rutgers University in July 2017.

**Figure 7: Percentage of Sibling Groups of Four or More Children Placed Together (CY 2013 – CY 2020)**



Source: DCF data analyzed by Rutgers University

**Recruitment of Placements for Sibling Groups of Four or More**

| Quantitative or Qualitative Measure | 34. Recruitment of Placements for Sibling Groups of Four or More |
|---|---|
| **Performance Target** | DCF will continue to recruit for resource homes capable of serving sibling groups of four or more. |

**Performance as of December 31, 2020:**

As of December 31, 2020, DCF had a total of 55 large capacity SIBS homes; this is 27 fewer homes than at the end of June 2020 and reflects the fact that as a result of COVID-19, DCF suspended recruitment and retention efforts in mid-March 2020, and they remain suspended for the duration of the monitoring period. Of the 55 large capacity SIBS homes, 34 are kinship and 21 are non-kinship resource homes. Forty-three of the 55 homes can accommodate four children – a decrease of 20 homes

from the previous period – and 12 homes can accommodate five or more children, a decrease of seven homes from the end of June 2020. Between July and December 2020, DCF recruited and licensed one new home that can accommodate five or more children. During the same period, eight homes either closed or left the program.[121]

Given the constraints involved in recruiting and licensing during the pandemic, the Monitor considers DCF to have met the SEP standard for this measure between July and December 2020.

### Stability of Placement

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 35. <u>Stability of Placement</u>: The percentage of children entering out-of-home placement for the first time in a calendar year who have no more than one placement change during the 12 months following their date of entry. |
| **Performance Target** | At least 84% of children entering care for the first time in a calendar year will have no more than one placement change during the 12 months following their date of entry. |

*Performance as of CY 2019 (Most Recent Calendar Year Available):*

The most recent performance data assesses the 1,969 applicable children who entered care for the first time in CY 2019 and aggregates the number of placements each child experienced within one year of entry. As shown in Figure 8, for children entering care in CY 2019, 1,721 (87%) had no more than one placement change (two total placements) during the 12 months from their date of entry. Figure 9 shows the breakdown by number of placements. DCF continued to meet the SEP performance standard for this measure this monitoring period.

---

[121] Of the 8 homes that were removed from the SIBs program, 3 homes closed upon the reunification of the sibling group, and 1 home closed upon finalization of Kinship Legal Guardianship. One home downgraded capacity when 2 siblings moved to another relative's home; one home downgraded capacity upon reunification of a sibling group; 1 home downgraded capacity due to the family's request for the siblings to be removed; and 1 home downgraded their capacity in order to care for smaller groups of children.

**Figure 8: Percentage of Children with Two or Fewer Placements
(CY 2013 – CY 2019)**



**Figure 9: Number of Placements for Children
within 12 Months of Entering Foster Care
(CY 2019)**

Source: DCF data analyzed by Rutgers University

| Quantitative or Qualitative Measure | 36. Stability of Placement: The percentage of children in out-of-home placement who have no more than one placement change during the 13 to 24 months following their date of entry. |
|---|---|
| Performance Target | At least 88% of children in out-of-home placement will have no more than one placement change during the 13 to 24 months following their date of entry. |

**Performance as of CY 2018 (Most Recent Calendar Year Available):**

The most recent performance data assesses the 1,264 applicable children who entered care for the first time in CY 2018 and aggregates the number of placements each child remaining in care experienced in the second year of their out-of-home placement. As shown in Figure 10, for children entering care in CY 2018, 1,213 (96%) children had no more than one placement change (two total placements) during the 13 to 24 months following their date of entry. Eighty-four percent of children did not experience a placement change in their second year of out-of-home placement at all. DCF performance continues to exceed the SEP performance standard.



**Figure 10: Number of Placements for Children within 13-24 Months of Entering Foster Care (CY 2018)**

- 3 Placements 2%
- 4 Placements 2%
- 5+ Placements 0%
- 2 Placements 12%
- 1 Placement 84%

Source: DCF data analyzed by Rutgers University

## G. MALTREATMENT OF CHILDREN AND YOUTH

A fundamental responsibility of DCF is ensuring the long-term safety of children who are receiving or have received services from CP&P. This responsibility includes ensuring the safety of children who are placed in resource family homes and congregate facilities, preventing maltreatment in foster care, and trying to prevent future maltreatment when children remain at home or are returned home after a stay in foster care.

There are four SEP performance measures related to maltreatment of children and youth. As of January 2020, four measures were designated as *Outcomes To Be Maintained*: abuse and neglect of children in foster care (SEP III.H.12); repeat maltreatment for children remaining in their home (SEP IV.H.37); maltreatment post-reunification (SEP IV.H.38); and re-entry to placement (SEP IV.H.39). Each of these measures is assessed through longitudinal cohort data on an annual basis.

Performance on most measures demonstrated continued improvement. Re-entry to Placement, which had met the standard for the first time last year, rose slightly above the limit. Performance for all four measures is discussed below.

### Abuse and Neglect of Children in Foster Care

| Quantitative or Qualitative Measure | 12. <u>Abuse and Neglect of Children in Foster Care</u>: Of all children in foster care, the percentage who are victims of substantiated abuse or neglect by a resource parent or facility staff member. |
|---|---|
| **Final Target** | No more than 0.49% of children will be victims of substantiated abuse or neglect by a resource parent or facility staff member. |

*Performance as of CY 2020:*

In CY 2020, 7 out of 6,057 children (0.12%) were victims of a substantiated allegation of abuse and/or neglect by a resource parent or facility staff member. As shown in Figure 11, performance for this measure continues to exceed the SEP performance standard.

**Figure 11: Percentage of Children who were Victims of a Substantiated Allegation of Abuse and/or Neglect in Out-of-Home Care (CY 2013-CY 2020)**



Source: DCF data analyzed by Rutgers University

**Repeat Maltreatment**

| Quantitative or Qualitative Measure | 37. Repeat Maltreatment (In-Home): Of all children who remain in home after substantiation of abuse or neglect, the percentage who have another substantiation within the next 12 months. |
|---|---|
| **Final Target** | No more than 7.2% of children who remain at home after a substantiation of abuse or neglect will have another substantiation within the next 12 months. |

***Performance as of CY 2019 (Most Recent Calendar Year Available):***

In CY 2019, there were 2,973 children who were victims of a substantiated allegation of abuse and/or neglect who were not placed in out-of-home care but instead served through in-home services. Of the 2,973 children, 151 (5.1%) of these children were the victims of another substantiated allegation of child abuse and/or neglect within 12 months of the initial substantiation. Figure 12 shows performance from CY 2009 to CY 2019. In-home repeat maltreatment rates have continued to sharply decline since CY 2013, and DCF performance continues to exceed the SEP standard.

**Figure 12: Percentage of Children who were Victims of Second Substantiated Allegation within 12 Months of Remaining at Home after First Substantiated Allegation
(CY 2009-CY 2019)**



Source: DCF data analyzed by Rutgers University

| Quantitative or Qualitative Measure | 38. <u>Maltreatment Post-Reunification</u>: Of all children who are reunified during a period, the percentage who are victims of substantiated abuse or neglect within one year after the date of reunification. |
|---|---|
| **Final Target** | Of all children who enter foster care in a 12-month period for the first time who are discharged within 24 months to reunification or living with relative(s), no more than 6.9% will be the victims of substantiated abuse or neglect within 12 months after reunification. |

**Performance of CY 2017 Cohort (Most Recent Entry Cohort Available):**

Of the children who entered care in CY 2017, 1,532 exited DCF custody to reunification with their families. Of those, 78 (5.1%) of these children were victims of a substantiated allegation of abuse and/or neglect within 12 months of their return home. Figure 13 shows performance from CY 2008 to CY 2017. Post-reunification maltreatment rates have dropped since CY 2012, and DCF continues to meet the SEP performance standard.

**Figure 13: Percentage of Children who were Victims of Substantiated Allegation within 12 Months after Reunification (CY 2009-CY 2017)**



Source: DCF data analyzed by Rutgers University

### Re-entry to Placement

| Quantitative or Qualitative Measure | 39. <u>Re-entry to Placement</u>: Of all children who leave custody during a period, except those whose reason for discharge is that they ran away from their placement, the percentage that re-enter custody within one year of the date of exit. |
|---|---|
| Final Target | Of all children who enter foster care in a 12 month period for the first time who are discharged within 12 months to reunification, living with relative(s), or guardianship, no more than 9% will re-enter foster care within 12 months of their discharge. |

***Performance of CY 2018 Cohort (Most Recent Entry Cohort Available):***

Of the children who entered care for the first time in CY 2018, 973 children were discharged to reunification, living with relatives or guardianship. Of those, 95 (9.8%) children re-entered placement within 12 months. As reflected in Figure 14, re-entry rates dropped below nine percent in the prior reporting period, meeting the performance standard for the first time. This year, for the cohort that entered foster care in CY 2018, performance declined slightly, but the Co-Monitor considers the measure to be met. Performance is still a great improvement over earlier years, as

shown in the figure. The Monitor considers this decline in performance to be temporary and/or insubstantial, most likely attributable to the challenges caused by the COVID-19 pandemic.

**Figure 14: Percentage of Children Who Re-Entered Custody within One Year of Exit (CY 2009 – CY 2018)**



Source: DCF data analyzed by Rutgers University.

## H.  TIMELY PERMANENCY

Regardless of age, gender, race or ethnicity, all children need and deserve a safe, nurturing family to protect and guide them. Safe family reunification is the preferred path, but permanency for children can be achieved through multiple avenues, including kindship/guardianship and adoption. There are four SEP measures that focus on permanency for children. As of January 2020, three measures were designated as *Outcomes To Be Maintained* – achieving permanency within 12 months (SEP IV.I.40), 36 months (SEP IV.I.42) and 48 months (SEP IV.I.43). The remaining *Outcome To Be Achieved* – achieving permanency within 24 months (SEP IV.I.41) – has now been met for the first time this year, another notable achievement.

Each of the measures discussed in this section is assessed with longitudinal cohort data on an annual basis. For the outcome measures for permanency within 36 and 48 months, DCF sustained performance above the SEP standard. However, for the outcome measures for permanency within 12 and 24 months, performance declined below the standard this year. Performance for all four measures is discussed below.

**Timely Permanency through Reunification, Adoption or Guardianship**

| Quantitative or Qualitative Measure | 40. <u>Permanency Within 12 months</u>: Of all children who entered foster care in a 12- month period, what percentage were discharged from foster care to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. |
|---|---|
| **Final Target** | Of all children who enter foster care in a 12-month period, at least 42% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 12 months of entering foster care. |

**Performance of CY 2019 Cohort (Most Recent Entry Cohort Available):**

The most recent data available for this measure are for children who entered foster care in CY 2019. Of the 2,301 children who entered foster care in CY 2019, 860 (37%) were discharged to permanency within 12 months of their removal from their home (see Figure 15).

Of those 860 children, 751 of them were reunified with their families; this means that 33 percent of all children who entered foster care in CY 2019 were reunified with family within 12 months. Performance is lower than in prior years, most likely

attributable to the challenges of the COVID-19 pandemic, therefore the Monitor does not consider DCF to have met the standard.

**Figure 15: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 12 Months of Entering Foster Care (CY 2010 – CY 2019)**



Source: DCF data analyzed by Rutgers University.

| Quantitative or Qualitative Measure | 41. Permanency Within 24 months: Of all children who enter foster care in a 12 month period, what percentage were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering care. |
|---|---|
| **Final Target** | Of all children who enter foster care in a 12 month period, at least 66% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 24 months of entering care. |

***Performance of CY 2018 Cohort (Most Recent Entry Cohort Available):***

The most recent data available for this measure are for children who entered foster care in CY 2018. Of the 2,960 children who entered foster care in CY 2018, 1,906 (64%) were discharged to permanency within 24 months of removal from their homes (see Figure 16). Of those 1,906 children, 1,423 of them were reunified with

their families; this means that 48 percent of all children who entered care in CY 2018 were reunified with family within 24 months. After meeting the standard for the first time last year, DCF performance fell below the SEP target for this period, most likely attributable to the challenges of the COVID-19 pandemic.

**Figure 16: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 24 Months of Entering Foster Care (CY 2010 – CY 2018)[122]**



Source: DCF data analyzed by Rutgers University.

| Quantitative or Qualitative Measure | 42. Permanency Within 36 months: Of all children who enter foster care in a 12 month period, what percentage were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering care. |
|---|---|
| Final Target | Of all children who enter foster care in a 12 month period, at least 80% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 36 months of entering care. |

### Performance of CY 2017 Cohort (Most Recent Entry Cohort Available):

The most recent data available for this measure are for children who entered foster care in CY 2017. Of the 3,385 children who entered foster care in CY 2017, 2,857

---

[122] DCF has provided the Monitor with data that includes permanency rates for those in the entry cohort between the ages of 18 and 21. The Monitor has included this data in the figures, which in some cases shows a higher level of performance than has been historically reported.

(84%) were discharged to permanency within 36 months of removal from their homes (see Figure 17). Of those 2,857 children, 1,871 of them were reunified with their families; this means that 55 percent of all children who entered care in CY 2017 were reunified with their families within 36 months. DCF's performance meets the SEP standard again this reporting period.

**Figure 17: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 36 Months of Entering Foster Care (CY 2010 – CY 2017)**



Source: DCF data analyzed by Rutgers University.

| Quantitative or Qualitative Measure | 43. <u>Permanency within 48 months</u>: Of all children who enter foster care in a 12 month period, what percentage were discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering care. |
|---|---|
| **Final Target** | Of all children who enter foster care in a 12 month period, at least 86% will be discharged to permanency (reunification, living with relatives, guardianship or adoption) within 48 months of entering care. |

***Performance of CY 2016 Cohort (Most Recent Entry Cohort Available):***

The most recent data available for this measure are for children who entered foster care in CY 2016. Of the 3,786 children who entered foster care in CY 2016, 3,376 (89%) were discharged to permanency within 48 months of removal from their homes (see Figure 18). Of those 3,376 children, 2,104 of them were reunified with

their families; this means that 56 percent of all children who entered care in CY 2016 were reunified with their families within 48 months. Current performance again exceeds the SEP performance standard.

**Figure 18: Percentage of Children Who Enter Foster Care in a 12 Month Period Who Discharge to Permanency within 48 Months of Entering Foster Care (CY 2010 – CY 2016)**



Source: DCF data analyzed by Rutgers University.

*Charlie and Nadine H. v. Murphy*
*Progress Report of New Jersey DCF for the Period July-December 2020*
*July 2021*
*Page 83*

## I.   CHILD HEALTH UNITS

| Quantitative or Qualitative Measure | 8.   <u>Child Health Units</u>: The State will continue to maintain its network of child health units, adequately staffed by nurses in each Local Office. |
|---|---|
| Performance Target | DCF will maintain adequate staffing levels in Local Offices. |

Early in New Jersey's child welfare reform efforts, DCF developed Child Health Units (CHUs) to facilitate and ensure the timely provision of health care to children in CP&P custody. CHUs are located in each CP&P Local Office and are staffed with Regional Nurse Administrators, Nurse Health Care Case Managers (HCCMs), and staff assistants, based on the projected number of children in out-of-home placement.

Section III.E of the SEP requires the state to "maintain its network of child health units, adequately staffed by nurses in each Local Office." This measure has been previously met and designated as an *Outcome To Be Maintained*. New Jersey's Child Health Units, which provide each child placed in a resource home with a nurse assigned for health care case management, continue to be recognized by staff and external partners as a notable achievement of the state's child welfare reform efforts.

### *Performance as of December 31, 2020:*

On December 31, 2020, DCF employed 124 nurses, of which approximately 124 were available for coverage, and 45 staff assistants, of which approximately 45 were available for coverage. Between July and December 2020, there was an average of 143 nurses available for coverage, for an average ratio of one nurse to every 28 children in out-of-home care, exceeding the standard of one nurse to 50 children in out-of-home care. DCF performance in this area continues to meet the SEP standard.

## J.  OLDER YOUTH

Older youth in foster care often benefit from specialized support to prepare them for their transition to adulthood as they "age out" of the foster care system at age 21, or if they decide to sign themselves out of care beforehand. DCF offers many services to transition-age youth who have not been able to reunify with their families or find another permanent home with relatives or adoptive families. Measures related to older youth reinforce the vital opportunity to build Protective and Promotive Factors (PPFs) and promote healthy development and well-being for this age group.

The SEP includes four measures related to older youth. As of the beginning of the reporting period, all were designated as *Outcomes To Be Maintained* – completion of Independent Living Assessments (SEP IV.K.45); quality of case planning and services (SEP IV.K.46); housing for youth who exit care without achieving permanency (SEP IV.K.47); and education/employment for youth who exit care without achieving permanency (SEP IV.K.48).

Since 2019, performance on housing, education, and employment for older youth has been assessed annually through a specialized case record review. Performance declined on each of these measures this year. Quality of Case Planning and Services for Older Youth has historically been assessed through the QR, and thus there are no new data in this report. Performance for three measures is discussed below.

### Independent Living Assessments

| Quantitative or Qualitative Measure | 45. <u>Independent Living Assessments</u>: Percentage of youth ages 14 and 18 with a completed Independent Living Assessment. |
|---|---|
| **Performance Target** | 90% of youth ages 14 to 18 will have an Independent Living Assessment. |

***Performance as of December 31, 2020:***

In December 2020, there were 545 youth ages 14 to 18 in out-of-home placement for at least six months; 474 (87%) had an Independent Living Assessment (ILA) completed. Monthly performance between July and December 2020 ranged from 86

to 88 percent.[123] DCF performance remained close to the standard in each month of the monitoring period; the Monitor considers this measure to be met.

## Quality of Case Planning and Services

| Quantitative or Qualitative Measure | 46. Quality of Case Planning and Services: DCF shall provide case management and services to youth between the ages 18 and 21 who have not achieved legal permanency. |
|---|---|
| Performance Target | 75% of youth ages 18 to 21 who have not achieved legal permanency shall receive acceptable quality case management and service planning. |

Performance for this measure is collected through Qualitative Reviews (QRs) of the experiences and outcomes of a selection of youth ages 18 to 21. In rating these cases, reviewers use both the standard QR protocol and a list of additional considerations relevant to this population, such as DCF's efforts to plan and support youth who identify as LGBTQI, and those who are victims of domestic violence, are expectant or parenting, or who have developmental disabilities.

Due to the COVID-19 pandemic, QRs were suspended and therefore there are no new data on this measure. As of the last measurement in CY 2019, 67% of cases reviewed met the standard.

## Housing

| Quantitative or Qualitative Measure | 46. Housing: Youth exiting care without achieving permanency shall have housing. |
|---|---|
| Performance Target | 95% of youth exiting care without achieving permanency shall have housing. |

Stable housing is a critical, concrete support that older youth need to thrive as they transition to adulthood. With the help of specialized caseworkers, DCF works to ensure that all older youth exiting foster care have a housing plan in place. In mid-November 2020, through the Coronavirus Relief Fund, DCF began to distribute $2.2 million in direct financial aid to youth transitioning out of New Jersey's foster care system, including for the purpose of supporting housing needs. Approximately 1,200 eligible

---

[123] Monthly performance for this measure is as follows: July, 88%; August, 87%; September, 86%; October, 86%; November, 87%; December, 87%.

young adults ages 18 to 21 received a one-time payment of $1,850 to assist with economic hardships and secure concrete needs during this difficult time.

***Performance as of CY 2020:***

In CY 2020, of the 72 youth for which this measure was applicable,[124] there was documentation of a housing plan for 66 (92%) youth, which is below the SEP standard. This is a decline in performance from prior periods, as shown in Figure 19. Performance did not meet the SEP standard this monitoring period. The Monitor will continue to closely track progress in this area and expects that the decline is most likely attributable in part to the COVID-19 pandemic.



**Figure 19: Percentage of Older Youth Exiting Foster Care Without Achieving Permanency with Housing Plan**



Source: Data collected through Case Record Review by DCF and the Monitor

---

[124] The cases of 6 youth out of the universe of 78 youth exiting care to non-permanency were excluded from performance calculations for this measure because the youth could not be located (3) or were incarcerated (3).

**Employment/Education**

| Quantitative or Qualitative Measure | 47. Employment/Education: Youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. |
|---|---|
| Performance Target | 90% of youth exiting care without achieving permanency shall be employed, enrolled in or have recently completed a training or an educational program or there is documented evidence of consistent efforts to help the youth secure employment or training. |

It is important that older youth exiting foster care have an opportunity to further their education and develop employment skills prior to their transition out of foster care.

***Performance as of CY 2020:***

In CY 2020, of the 66 youth to whom this measure applied,[125] 56 (85%) were either employed or enrolled in education or vocational training programs, or there was documentation of consistent efforts by the caseworker to help youth secure education or employment prior to case closure.[126] Performance did not meet the SEP standard this monitoring period, and represents a significant decrease from prior monitoring periods, as shown in Figure 20.  The Monitor will continue to closely track progress in this area and expects that the decline is most likely attributable in part to the COVID-19 pandemic.

---

[125] The cases of 12 youth out of the universe of 78 exiting care to non-permanency were excluded from performance calculations for this measure because the youth could not be located (3), were incarcerated (3), transferred to another office (1), or moved out of state (5).

[126] The circumstances of 4 additional youth were considered to have met the standard because there was documentation of consistent efforts by the caseworker to help secure education or employment.

**Figure 20: Percentage of Older Youth Exiting Foster Care Without Achieving Permanency Employed or Enrolled in Education Programs**



Source: Data collected through Case Record Review by DCF and the Monitor

## K.  SERVICES TO SUPPORT TRANSITION

| Quantitative or Qualitative Measure | 44. <u>Services to Support Transition</u>: DCF will provide services and supports to families to support and preserve successful transitions. |
|---|---|
| **Performance Target** | 80% of cases will be plans rated acceptable for supporting transitions as measured by the Qualitative Review (QR). |

While involved with DCF, children, youth and families often face transitions, including changes in family relationships, living arrangements, service providers or schools. Some transitions are more critical than others, but all require recognition and planning in order to be successful. DCF uses the Qualitative Review (QR) process to measure case practice that supports families to make successful transitions. Performance on this measure is evaluated using the *successful transitions* indicator. The QR process and protocol are discussed in detail in Section V.N *Accountability Through Qualitative Review* of this report.

Due to the COVID-19 pandemic, QRs were suspended and therefore there is no new data on this measure. As of the last measurement in CY 2019, 74% of cases reviewed met the standard.

## L. CASELOADS

One of the successes of DCF's reform was reducing and now maintaining caseloads at levels where workers can do the work with children, youth, and families that was expected of them. Caseload compliance is measured by assessing caseloads for individual caseworkers in each of the system's functional areas (Intake, Permanency, Adoption, and IAIU) as well as standards for each CP&P Local Office. Table 2 summarizes the SEP's caseload standards for individual workers.

The SEP includes eight performance measures related to caseloads. As of the beginning of the monitoring period, all were designated as *Outcomes To Be Maintained.* These eight measures include Intake office caseloads (SEP IV.E.24); Intake individual worker caseloads (SEP IV.E.25); Adoption office caseloads (SEP IV.E.26); Adoption individual worker caseloads (SEP IV.E.27); Permanency office caseloads (SEP III.B.4); Permanency individual worker caseloads (SEP III.B.5); IAIU investigators individual caseloads (SEP III.B.3); and supervisory/worker ratio (SEP III.B.2). Performance for all eight measures during the current monitoring period is discussed below.

**Table 2: CP&P Individual Worker Caseload Standards**

| Caseworker Function | Responsibility | Individual Caseload Standard (SEP IV.E and III.B) |
|---|---|---|
| Intake | Respond to community concerns regarding child safety and well-being. Specifically, receive referrals from the State Central Registry (SCR) and depending on the nature of the referral, respond between two hours and five days with a visit to the home and begin investigation or assessment. Complete investigation or assessment within 60 days. | Intake workers are to have no more than **12 open cases** at any one time **and** no more than **eight new referrals** assigned in a month. No Intake worker with 12 or more open cases can be given more than **two secondary assignments** per month.[127] |
| Institutional Abuse Investigations Unit (IAIU) | Respond to allegations of child abuse and neglect in settings including correctional facilities, detention facilities, treatment facilities, schools (public or private), residential schools, shelters, hospitals, camps or child care centers that are required to be licensed, resource family homes, and registered family day care homes. | IAIU staff workers are to have no more than **12 open cases** at any one time **and** no more than **eight new referrals** assigned in a month. |

---

[127] Secondary assignments refer to shared cases between Intake and Permanency workers for families who have a case open with a Permanency worker where there are new allegations of abuse or neglect that require investigation.

| Permanency | Provide services to families whose children remain at home under the protective supervision of CP&P and those families whose children are removed from home due to safety concerns. | Permanency workers are to serve no more than **15 families and 10 children in out-of-home care at any one time**. |
| Adoption | Find permanent homes for children who cannot safely return to their parents by preparing children for adoption, developing adoptive resources, and performing the work needed to finalize adoptions. | Adoption workers are to serve no more than **15 children** at any one time. |

Source: DCF

## Intake

The SEP Intake caseload standard is that no worker should have more than eight new case assignments per month, no more than 12 open primary cases at any one time, and no Intake worker with 12 or more open primary cases can be assigned more than two secondary assignments per month. In January 2017, DCF implemented a new methodology for tracking and reporting the SEP Intake caseload standard to more clearly communicate to staff and to streamline monitoring and reporting. DCF's new methodology captures secondary case assignments on the Intake worker's monthly caseload report, which tracks and reports Intake caseloads as follows: no more than eight new assignments per month; no more than 12 cases assigned as primary case assignments at any one time; and no more than 14 cases at any one time, including both primary and secondary case assignments. The methodology for the standard of no more than eight new case assignments per month, including secondary assignments, remains unchanged.

| **Quantitative or Qualitative Measure** | 24. <u>Intake Local Office Caseloads:</u> Local Offices will have an average caseload for Intake workers of (a) no more than 12 families, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |
| **Performance Target** | 95% of Local Offices will have an average caseload of (a) no more than 12 families, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |

**Performance as of December 31, 2020:**

Performance data for July through December 2020 show that 100 percent of Local Offices met the Intake caseload standards. DCF continues to exceed the SEP standard.

| Quantitative or Qualitative Measure | 25. <u>Individual Intake Caseloads</u>: individual Intake workers shall have (a) no more than 12 open cases, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |
|---|---|
| Performance Target | 90% of individual Intake workers shall have (a) no more than 12 open cases, and (b) no more than eight new assignments per month. No Intake worker with 12 or more open cases can be given more than two secondary assignments per month. |

***Performance as of December 31, 2020:***

The state reported an average of 1,101 active Intake workers between July and December 2020. Among those 1,101 active Intake workers, an average of 1,097 (100%) had caseloads that met the standard. Specifically, in December 2020, 1,074 (100%) of 1,076 active Intake workers were following individual worker standards. DCF continues to meet the individual Intake worker caseload standard.

Data by Local Office show that during December 2020, performance ranged from 94 percent to 100 percent, with all Local Offices having all Intake workers in compliance with caseload standards.

DCF deploys Impact Teams (a supervisor and three workers) to a unit or a Local Office in different areas when intakes are unusually high, to assist in maintaining caseload standards by taking on investigation overflow. There are nine Impact Teams, one per Area Office.

***"Shared" Cases between Intake and Permanency Workers***

As described in previous monitoring reports, Intake and Permanency workers sometimes share responsibility for families with open permanency cases when there are new allegations of abuse or neglect. According to DCF procedure, all CPS reports are assigned to Intake workers to investigate and are reflected in caseload reporting as one of the Intake workers' eight new referrals in the month and as one of their 12 open families for that month. However, when circumstances indicate that a family with an already open permanency case is the subject of a new CPS report, the work with the family becomes the shared responsibility of both Intake and Permanency workers until the investigation is completed.

Intake workers are assigned a secondary worker designation in NJ SPIRIT for such cases with families who are already currently assigned a Permanency worker. According to DCF, this arrangement emphasizes the primary role of the Permanency worker in securing placement, facilitating visits, supporting the family to implement the case plan, and coordinating services. It also reflects the Permanency worker's responsibility to provide information to the Intake worker and to link the family to appropriate services and supports identified during the new investigation, thus relieving the Intake worker of the overall case management responsibility for the case. Intake workers continue to be responsible for the work required to complete investigative tasks and to reach and document an investigative finding. Thus, these secondary assignments are counted as one of the Intake worker's eight new referrals assigned in a month and as part of the total 14 open cases per month.

DCF reports that Intake supervisors in CP&P Local Offices are expected to appropriately manage the workload of staff in their units and consider an Intake worker's primary and secondary responsibilities when assigning new referrals. Table 3 provides the reported number of secondary assignments to Intake workers by month for this monitoring period.

**Table 3: Number of CP&P Investigations and Secondary Intake Assignments by Month (July – December 2020)[128]**

| Month | Total Investigations Assigned to Intake Workers for the Month | Secondary Intake Worker Assignments of CPS and CWS Investigations | |
|---|---|---|---|
| July | 4,072 | 402 | 10% |
| August | 3,966 | 303 | 8% |
| September | 4,817 | 334 | 7% |
| October | 4,736 | 295 | 6% |
| November | 3,965 | 283 | 7% |
| December | 3,954 | 281 | 7% |

Source: DCF data

The Monitor reviewed monthly Local Office data on secondary assignments and found that on average, each Intake worker was assigned one secondary case at any given time during the period reviewed. The Monitor also found that an average of 10 percent of Intake workers received two or more secondary case assignments and an

---

[128] Total excludes intakes assigned to Impact, Permanency, Adoption and Advocacy Center workers and includes intakes assigned to workers on leave.

average of two percent of Intake workers received three or more secondary assignments each month during the monitoring period. Specifically, in the month of December 2020, 102 (9%) Intake workers received two or more secondary intake assignments and 24 (2%) Intake workers received three or more secondary intake assignments. To ensure that Intake workload is properly managed, regardless of the combination of primary and secondary assignments, DCF continues to examine the processes used in Local Offices to make secondary assignments, as well as Local Office workflow management practices.

**Assignment of Investigations to Non-Caseload Carrying Staff**

On occasion, to handle the unpredictable flow of referrals for investigations, trained non-caseload carrying staff as well as caseload-carrying staff who are not part of Intake units (non-Intake caseload carrying staff) in Local Offices are assigned to investigations. DCF reports that all staff are required to complete First Responder training prior to being assigned an investigation and non-caseload carrying staff must have been similarly trained and receive supervision by the Intake supervisor. The Monitor's review of DCF's data for the months of July through December 2020 found that an average of one percent of investigations were assigned each month to non-caseload carrying staff, and an average of five percent were assigned to non-Intake caseload carrying staff. The Monitor considers this a temporary increase and anticipates that assignments to non-case carrying staff will return to prior levels in the next monitoring period.

DCF produces a Caseload Report Exception List that documents all instances of intakes identified as assigned to non-caseload carrying workers, and closely monitors the list on an ongoing basis. Table 4 shows the number of investigations assigned to non-caseload carrying staff, and Table 5 shows the number of investigations assigned to non-Intake caseload carrying staff.

**Table 4: Percentage of CP&P Investigations Assigned to Non-Caseload Carrying Staff by Month
(July– December 2020)[129]**

| Month | Total Investigations Received in the Month | Number and Percentage of Investigations Assigned to Non-Case Carrying Staff | |
|---|---|---|---|
| July | 4,351 | 39 | 1% |
| August | 4,239 | 35 | 1% |
| September | 5,063 | 26 | 1% |
| October | 4,946 | 0 | 0% |
| November | 4,182 | 24 | 1% |
| December | 4,121 | 0 | 0% |

Source: DCF data

**Table 5: Percentage of CP&P Investigations Assigned to Non-Intake Caseload Carrying Staff by Month
(July – December 2020)**

| Month | Total Investigations Received in the Month | Number and Percentage of Investigations Assigned to Non- Intake Caseload Carrying Staff[130] | |
|---|---|---|---|
| July | 4,351 | 240 | 6% |
| August | 4,239 | 238 | 6% |
| September | 5,063 | 220 | 4% |
| October | 4,946 | 210 | 4% |
| November | 4,182 | 193 | 5% |
| December | 4,121 | 167 | 4% |

Source: DCF data

**Adoption**

| Quantitative or Qualitative Measure | 26. Adoption Local Office Caseloads: Local offices will have an average caseloads for Adoption workers of no more than 15 children per worker. |
|---|---|

---

[129] Data are provided for investigations assigned within five days of intake receipt date and do not reflect additional assignments to an investigation after the first five days. DCF conducts monthly reviews of assignments to non-caseload carrying staff in NJ SPIRIT and has found that some investigations have been re-assigned to caseload carrying workers after the initial five days. As a result, the reported percentage of investigations assigned to non-caseload carrying staff may be lower than six percent.
[130] This includes Permanency, Adoption, Impact and Advocacy Center caseload carrying workers.

| | |
|---|---|
| **Performance Target** | 95% of Local Offices will have an average caseload of no more than 15 children per Adoption worker. |

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 27. <u>Individual Worker Adoption Caseloads:</u> Individual Adoption worker caseloads shall be no more than 15 children per worker. |
| **Performance Target** | 95% of individual Adoption workers shall have a caseload of no more than 15 children per month. |

**Performance as of December 31, 2020:**

Performance data for July through December 2020 show that 100 percent of Local Offices and 99 percent of individual workers continued to maintain the adoption caseload standard during this period.[131]

## Permanency

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 4. <u>Permanency Local Office Caseloads:</u> Local offices will have an average caseload for Permanency workers of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |
| **Performance Target** | 95% of Local Offices will have an average caseload of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 5. <u>Individual Worker Permanency Caseloads:</u> Individual Permanency worker caseloads shall be (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |
| **Performance Target** | 95% of individual Permanency workers shall have a caseload of (a) no more than 15 families, and (b) no more than 10 children in out-of-home placement per worker. |

---

[131] Reported performance is the average of DCF's performance in meeting individual caseload standards during this six month monitoring period.

*Performance as of December 31, 2020:*

Performance data for July through December 2020 show that 100 percent of Local Offices and 100 percent of individual workers continued to maintain the permanency caseload standard during this period.[132]

### Institutional Abuse Investigation Unit (IAIU)

| Quantitative or Qualitative Measure | 3. Individual Worker IAIU Caseloads: individual IAIU worker caseloads shall be (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. |
|---|---|
| Performance Target | 95% of individual IAIU workers shall have a caseload (a) no more than 12 open cases, and (b) no more than eight new case assignments per month. |

*Performance as of December 31, 2020:*

DCF data show 100 percent of individual workers maintained the IAIU caseload standard for the period of July through December 2020.

### Supervisory Ratio

| Quantitative or Qualitative Measure | 2. Supervisor/Worker Ratio: Local Offices shall have sufficient supervisory staff to maintain a five worker to one supervisor ration. |
|---|---|
| Performance Target | 95% of Local Offices shall have sufficient supervisory staff to maintain a five worker to one supervisor ration. |

*Performance as of December 31, 2020:*

Performance data for July through December 2020 show that 100 percent of CP&P Local Offices had sufficient supervisors to maintain ratios of five workers to one supervisor.

---

[132] Ibid.

## M. DEPUTY ATTORNEYS GENERAL STAFFING

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 7. <u>DAsG Staffing</u>: The State will maintain adequate DAsG staff potions and keep positions filled. |
| **Performance Target** | DCF will maintain adequate staffing levels at the DAsG office. |

***Performance as of December 31, 2020:***

As of December 31, 2020, 132 Deputy Attorneys General (DAsG) staff positions assigned to work with DCF were filled. Of those, one DAG was on full time leave. Thus, there were a total of 131 (99%) available DAsG. DCF reports that in addition to these positions, DAsG outside of the DCF Practice Group have dedicated some of their time to DCF matters. DCF continues to meet the SEP standard for this measure.

## N.  ACCOUNTABILITY THROUGH QUALITATIVE REVIEW AND THE PRODUCTION AND USE OF ACCURATE DATA

The hallmarks of DCF's continuous quality improvement efforts, the Qualitative Reviews (QRs) and ChildStat forums, were suspended in March 2020 due to the COVID-19 pandemic. DCF has continued to conduct targeted reviews to assess the quality of CP&P's work with families, particularly at the start of the crisis while staff were transitioned to work from home, and "impact teams" were responding to most investigations (May – August 2020). The data from these reviews, which were conducted by the Office of Quality, were shared with DCF leadership to help them understand staff's work with children and families in the field, with regard to contact with families after an intake had been assigned, appropriateness of State Central Registry (SCR) calls, quality of investigations, and appropriateness of safety protection plans for families of different risk levels.

Additionally, during the monitoring period, the Department assessed CQI practices to begin planning for potential changes going forward and to determine which practices will most effectively support strong implementation of Solution Based Casework (SBC) in accordance with New Jersey's Case Practice Model.

Until the pandemic, New Jersey's QR process was used to assess the status of children, youth and families, the status of case practice, and system performance in each of the counties. Select QR results were also used to measure performance for several SEP requirements, three of which are designated *Outcomes To Be Achieved*: Quality of Teaming (SEP IV.B.20), Quality of Case Plans (SEP IV.D.23) and Services to Support Transition (SEP IV.J.44); and two of which are designated *Outcomes To Be Maintained*: Educational Needs (SEP III.G.11) and Quality of Case Planning and Services for Older Youth (SEP IV.K.46). As mentioned above, because QRs were suspended in March 2020, there are no new data to report on these measures.

## O. NEEDS ASSESSMENT

| | |
|---|---|
| **Quantitative or Qualitative Measure** | 21. <u>Needs Assessment</u>: The State shall regularly evaluate the needs for additional placements and services to meet the needs of children in custody and their families, and to support intact families and prevent the needs for out-of-home care. Such needs assessments shall be conducted on an annual, staggered basis that assures that every county is assessed at least once every three years. |
| **Final Target** | The State shall develop placements and services consistent with the findings of these needs assessments. |

County Human Service Advisory Councils (HSACs) are charged with gathering information related to local service needs, the impact of those needs on their population, and key barriers to improved service delivery. Previous monitoring reports describe the meta-analysis DCF undertook of previous state needs assessment processes. Going forward, DCF's Needs Assessment process involves HSACs undertaking a county-based needs assessment biennially, which will be incorporated into local county Performance Improvement Plan (PIP) processes (these are distinct from the statewide PIP processes used for the federal Child and Family Services Review). To support implementation, DCF divided counties into two groups, each of which were scheduled to report to DCF every two years.

In 2019, DCF established a workgroup with statewide Human Service Directors (HSDs) that met monthly to outline methodology and develop guidance, focus group protocols, a survey, and a report template for the HSACs to use as they collect data. In 2020, the DCF workgroup finalized these tools and established a uniform reporting method for the counties. DCF also worked with Rutgers University School of Social Work to design county-based data profiles to provide the HSACs with population data and the most recent DCF administrative data. These profiles are intended to help support HSACs in identifying, prioritizing, and addressing county needs, services, and resources, and include such areas as housing, food, health care, behavioral/mental health services for children and adults, employment and career services, services for families caring for a child of a relative/family friend, substance use disorder services, etc.

Between July and December 2020, the two groups of county HSACs – including all 21 counties – with technical assistance from the DCF Office of Quality (OOQ), completed their assessments, which included data collection via surveys, focus groups, and key

*Charlie and Nadine H. v. Murphy*  
*Progress Report of New Jersey DCF for the Period July-December 2020*  
*July 2021*  
*Page 101*

informant interviews, and submitted county-specific summary reports.[133] The priority needs most identified by the counties were housing, behavioral health and mental health services for adults and children, and substance use disorder services. DCF held facilitated feedback sessions with each county, and, with assistance from Rutgers University School of Social Work, expects to release a statewide synthesis of the assessments from the two groups of counties in Fall 2021. It is anticipated that going forward, DCF will use these data to inform decisions regarding resource allocation, programming, CQI activities, etc. Additional information about DCF's needs assessment process, including county needs assessment reports, can be found on DCF's website.[134]

---

[133] The counties in the first group are: Sussex, Burlington, Passaic, Salem, Hudson, Monmouth, Hunterdon, Union, Gloucester, and Essex. The counties in the second group are: Warren, Bergen, Morris, Somerset, Middlesex, Mercer, Ocean, Camden, Atlantic, Cumberland, and Cape May.

[134] To see additional information related to needs to DCF's Needs Assessments, including each county's Needs Assessment, go to: https://www.nj.gov/dcf/about/divisions/opma/hsac_needs_assessment.html

## P.  FISCAL YEAR BUDGET

The budget process for FY2021 was delayed due to the COVID-19 pandemic, resulting in an administrative allocation for the nine-month period from October 1, 2020 – June 20, 2021. On September 29, 2020, Governor Murphy finalized the FY21 budget. For the twelve-month period beginning on July 1, 2020, covering the monitoring period, DCF's total state funding in the FY21 final Appropriations Act totals $1.208 billion, which represents an increase of $52.443 million over the FY20 Appropriations Act amount of $1.156 billion. Although this monitoring period included some funding deferrals, which were imposed on all departments in New Jersey as an early response to the disruptions caused by the pandemic, DCF saw an increase in state funding; in recognition of the impact that the COVID-19 pandemic is having on children, youth and families, Governor Murphy's budget included a $45 million investment in the Children's System of Care (CSOC), the DCF division that serves children and adolescents with emotional and behavioral health care challenges and their families.

Additionally, during the monitoring period, DCF expended more than $24.92 million in federal COVID-19 funding, including $12.56 million in Coronavirus Relief Fund (CRF) funding, $11.03 million in Federal Medicaid Assistance Percentage (FMAP) funding, and $1.34 million in other Coronavirus Aid, Relief, and Economic Support Act (CARES) funding. [135]   DCF utilized these funds to provide additional services and benefits, including enhanced family violence prevention services, financial support for congregate care and mobile response providers, support for vulnerable adolescent populations, Personal Protective Equipment (PPE) and infection control for provider agencies, as well as enhanced support for necessary services within CSOC. Additionally, as reported in Section V.J. *Older Youth*, some of the funds through the CRF were redistributed in the form of direct financial aid to youth transitioning from New Jersey's foster care system to adulthood. Approximately 1,200 eligible young received a one-time payment to address housing and transportation needs and assist with increased debt and unemployment.

In the final budget, DCF was able to preserve important programs such as the statewide network of evidence-based home visiting programs; the statewide network of 57 community-based Family Success Centers; and, with advocacy from stakeholders, the network of School Based Youth Service programs. Some of the

---

[135] To see the text of H.R. 6201 Families First Coronavirus Response Act, go to:
https://www.congress.gov/bill/116th-congress/house-bill/6201/text

cuts included eliminating cost reimbursement funding mechanisms for Methadone Intensive Outpatient Programs, beds at two emergency shelters, and certain family support services that are available outside of DCF through CSOC, other Medicaid programs, or other state-funded programs. DCF leaders and the Monitor believe that the current budget is sufficient to carry out the requirements of the Settlement Agreement.

**APPENDIX A:**
**Glossary of Acronyms Used in the Monitoring Report**

| | | | |
|---|---|---|---|
| **ACEs:** | Adverse Childhood Experiences | **LOM:** | Local Office Manager |
| **AQC:** | Area Quality Coordinators | **MSA:** | Modified Settlement Agreement |
| **CCYC:** | County Councils for Young Children | **NHA:** | Nurtured Heart Approach |
| **CFSR:** | Child and Family Services Review | **OAS:** | Office of Adolescent Services |
| | | **OFV:** | Office of Family Voice |
| **CHU:** | Child Health Unit | **OOQ:** | Office of Quality |
| **CIACC:** | Children's Interagency Coordinating Council | **OPMA:** | Office of Performance Management and Accountability |
| **CP&P:** | Division of Child Protection and Permanency | **ORF:** | Office of Resource Families |
| **CPL**: | Case Practice Liaisons | **OFL:** | Office of Resource Licensing |
| **CPM:** | Case Practice Model | **PAP:** | Predict Align Prevent |
| **CPS:** | Child Protective Services | **PIP:** | Performance Improvement Plan |
| **CQI:** | Continuous Quality Improvement | **PPE:** | Personal Protective Equipment |
| **CSOC:** | Children's System of Care | **PPFs:** | Protective and Promotive Factors |
| **CSSP:** | Center for the Study of Social Policy | **PRSS:** | Peer Recovery Support Services |
| **CWS:** | Child Welfare Services | **QR:** | Qualitative Review(s) |
| **DAsG:** | Deputy Attorneys General | **SACWIS:** | Statewide Automated Child Welfare Information System |
| **DCF:** | Department of Children and Families | **SAMHSA:** | Substance Abuse and Mental Health Services Administration |
| **DOE:** | Department of Education | | |
| **DOW:** | Division on Women | **SBC:** | Solution Based Casework |
| **FCP:** | Family and Community Partnerships | **SEP:** | Sustainability and Exit Plan |
| **FFT-FC:** | Family Functional Therapy – Foster Care | **SCR:** | State Central Registry |
| | | **SDM:** | Standard Decision Making tool |
| **FSC:** | Family Success Centers | **SIBS:** | Siblings in Best Placement Settings |
| **FTM:** | Family Team Meeting | | |
| **HCCM:** | Health Care Case Manager | **USDA:** | United States Department of Agriculture |
| **IAIU:** | Institutional Abuse Investigative Unit | | |
| **ILA:** | Independent Living Assessment | | |
| **LGBTQI:** | Lesbian, Gay, Bisexual, Transgender, Questioning, Intersex | | |
| **KLG:** | Kinship Legal Guardian | | |

**APPENDIX B:**
**Sources of DCF Data and Monitoring Methodology**

Reports that DCF currently publishes on its website include:

- **Commissioner's Monthly Report**[136] – *Current and produced monthly*. This report gives a broad data snapshot of various DCF services. The report includes information from CP&P, Office of Adolescent Services (OAS), Institutional Abuse Investigation Unit (IAIU), CSOC, Family & Community Partnerships and the Division on Women (DOW).

- **Screening and Investigations Report**[137] – *Current and produced monthly*. This report details State Central Registry (SCR) activity, including data regarding calls to the Child Abuse and Neglect Hotline, assignments to CP&P offices and trends in Child Protective Services (CPS) Reports and Child Welfare Services (CWS) Referrals.

- **Workforce Report**[138] – *Last report dated January 2018*. This report provides information regarding the demographics and characteristics of DCP&P workers, as well as a variety of indicators of workforce planning and development, using fiscal year (FY) (July 1 – June 30) data. Going forward, elements of this report will be incorporated into the new comprehensive annual report described above.

- **Children's Interagency Coordinating Council Report**[139] – *Current and produced monthly*. This report details referral and service activity for CSOC. It includes demographic data, referral sources, reasons for and resolutions of calls to CSOC, information on substance use and school attendance, as well as authorized services provided.

---

[136] To see all Commissioner's Monthly Reports, go to: http://www.nj.gov/dcf/childdata/continuous/
[137] To see all Screening and Investigations Reports, go to: http://www.nj.gov/dcf/childdata/protection/screening/
[138] To see DCF's Workforce Report: 2016-2017 Updates, go to http://www.nj.gov/dcf/childdata/exitplan/NJ.DCF.Workforce.Report-FY17.pdf. To see DCF's Workforce: Preliminary Highlights 2014-2015 Report, go to: http://www.state.nj.us/dcf/childdata/orgdev/NJ.DCF.Workforce.Report_2015.pdf
[139] To see all Children's InterAgency Coordinating Council Reports, go to: http://www.nj.gov/dcf/childdata/interagency/

- **New Jersey Youth Resource Spot**[140] – *Ongoing and updated periodically*. This website offers the latest resources, opportunities, news, and events for young people served by DCF. It includes information about the Youth Advisory Network, as well as additional resources available in each county and statewide.

  **DCF Needs Assessment**– *Previously produced annually. Last report dated March 2018*. The SEP requires reports to evaluate the need for additional placements and services to meet the needs of children, youth and their families involved with DCF, with each county assessed at least once every three years. During its multi-year needs assessment process, DCF produced annual reports on its website and reported twice annually to the Monitor.[141] The last report, entitled *DCF Needs Assessment 2018 Report #3: Survey Findings and Synthesis*, updated interim findings to identify the resources needed to serve families with children at risk for entering out-of-home placement and those already in placement.[142] DCF expects to release a statewide synthesis of needs assessments from each of New Jersey's 21 counties in Fall 2021.

The Monitor engaged in the following data verification activities for the period of July to December 2020.

- **Family Team Meeting Data Review -** The Monitor collaborated with DCF to review experiences of 83 children and families to verify all instances in which workers determined that Family Team Meetings (FTMs) were not required because parents were unavailable, missing, or declined the meeting. DCF and the Monitor completed a joint review of all cases of documented exceptions to the FTM requirement in each month from July 1 to December 31, 2020. Further discussion of current performance on these measures is included in Section V.B *Family Team Meetings*.

- **Other Monitoring Activities -** Given the COVID-19 pandemic, the Monitor staff were unable to complete site visits in person to discuss the reform efforts with staff and providers on the ground. However, the Monitor engaged in video interviews with groups of staff and other stakeholders across the state, including contracted service providers and legal advocacy organizations, sat in

---

[140] To see New Jersey's Youth Resource Spot, go to: http://www.njyrs.org/
[141] To see the prior CP&P Needs Assessment reports, go to: http://www.nj.gov/dcf/childdata/protection/
[142] To see New Jersey's CP&P Final Needs Assessment 2018 Report #3: Survey Findings and Synthesis, go to: http://www.nj.gov/dcf/childdata/protection/DCF.Needs.Assessment.Phase.IV.Report-March2018.pdf

on a Youth Council meeting, and attended DCF's Child Fatality and Near Fatality Review Board (CFNFRB) meetings. Though DCF's ChildStat meetings and Qualitative Reviews (QR) have been suspended during the pandemic, the Monitor has continued to track the progress of DCF through web updates and participation in virtual forums.

**APPENDIX C:**
**DCF Organizational Chart**

