PRIVILEGED AND CONFIDENTIAL

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHARLIE AND NADINE H., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MURPHY, et al. <br><br> Defendants. | Civil Action No. 2:99-cv-03678-SRC-CLW |

**EXIT PLAN AND AGREEMENT**

I. Preamble

The *Charlie H.* lawsuit commenced in 1999. The parties have since entered the following Court-ordered agreements: 1) the September 2, 2003 Settlement Agreement (the "SA"), 2) the July 18, 2006 Modified Settlement Agreement (the "MSA"), which superseded the SA, and 3) the November 4, 2015 Second Modified Settlement Agreement, or Sustainability and Exit Plan (the "SEP"), which superseded the MSA. Those agreements have resulted in significant improvements to the New Jersey child welfare system.

The Parties to this lawsuit—Plaintiffs, represented by A Better Childhood ("ABC"); and Defendants, the State of New Jersey and the New Jersey Department of Children and Families ("DCF")—now enter into this Exit Plan and Agreement (the "Agreement") in order to acknowledge Defendants' considerable progress in working toward compliance with the applicable court orders, and to support Defendants' continued efforts to promote better outcomes for children in foster care in New Jersey. The SEP provides that "the United States District Court for the District of New Jersey will have continuing jurisdiction to enforce the terms of [the SEP] . . . until such time as the parties agree to terminate this Agreement." (SEP at 1.) By agreeing to the actions and commitments in the time frames specified herein, the Parties seek to establish a process and timetable for exit from Court oversight under *Charlie H.*

II. Progress of the State of New Jersey

A. Performance that has been consistently maintained at acceptable levels

The parties jointly acknowledge the progress made by the State of New Jersey in accordance with the Sustainability and Exit Plan. The State has:

i. Successfully built and maintained transparent child welfare data system. Data indicators are published monthly to the DCF website and, through partnership

1

PRIVILEGED AND CONFIDENTIAL

      with Rutgers, The State University of New Jersey, on the New Jersey Child Welfare Data Portal.

ii. Successfully developed, implemented and sustained a case practice model.

iii. Successfully built and maintained a State Central Registry.

iv. Maintained a consistent supply of family-based placement settings to appropriately place children and made consistently strong efforts to ensure the most appropriate and least restrictive setting is available to children in need of placement.

v. Continued to provide medical and behavioral health care to children in foster care.

vi. Made consistent improvements in the quality and comprehensiveness of the service array.

vii. Maintained a comprehensive training program for child welfare staff and supervisors

viii. Successfully maintained flexible funding accounts for each Local Office to provide to eligible families.

ix. Continued to adjust the resource family care support rate as needed to keep pace with the USDA estimates for the cost of raising a child in the urban northeast.

x. Continued to advance and maintain strong permanency practice.

xi. Continued to maintain strong adoption practice.

xii. Successfully ensured that at least 80% of IAIU investigations are completed within 60 days for 14 years, since the monitoring period of January to June 2007.

xiii. Successfully maintained supervisor:worker ratios such that 95% of DCPP offices have sufficient staffing to maintain a 5 worker to 1 supervisor ratio since the monitoring period of January to June 2008.

xiv. Successfully maintained acceptable IAIU investigator caseloads such that 95% of IAIU investigators will have (a) no more than 12 open cases, and (b) no more than eight new case assignments per month since the monitoring period of January to June 2008.

xv. Successfully maintained acceptable permanency worker caseloads such that 95% of local offices have average caseloads of (a) no more than 15 families,

PRIVILEGED AND CONFIDENTIAL

    and (b) no more than 10 children in out-of-home care since the monitoring period of July to December 2007.

xvi. Successfully maintained acceptable permanency worker caseloads such that 95% of permanency workers have (a) no more than 15 families, and (b) no more than 10 children in out-of-home care since the monitoring period of January to June 2009.

xvii. Successfully maintained review of case plans such that 95% of case plans for children and families are reviewed and modified no less frequently than every six months since the monitoring period of April to December 2013.

xviii. Successfully maintained acceptable Deputy Attorneys General staffing since the monitoring period of July 2012 to March 2013.

xix. Successfully maintained and adequately staffed Child Health Units in each Local Office since the monitoring period of July to December 2010.

xx. Successfully maintained caseworker contacts with children entering a new placement/placement change such that 93% of children have at least twice per month face to face contact with their caseworker within the first two months of placement, with at least one contact in the placement, since the monitoring period of April to December 2013.

xxi. Successfully maintained caseworker contacts with children throughout their placement such that during the remainder of placements, 93% of children have at least one caseworker visit per month, in the placement since the monitoring period of July to December 2014.

xxii. Successfully met the standard of at least 80% of cases reviewed annually for enrolling children in school and ensuring their educational needs are continually met since the monitoring period of January to June 2014.

xxiii. Successfully maintained low rates of maltreatment of children living in out of home care such that no more than 0.49% of children in placement are victims of substantiated abuse and/or neglect by a resource parent or facility staff member since the monitoring period of January to June 2009.

xxiv. Successfully met performance standards for timeliness of investigation completion such that 85% of all investigations are completed within 60 days since the monitoring period of January to June 2016.

xxv. Consistently met performance standards for timeliness of investigation completion such that 95% of all investigations of abuse and neglect are completed within 90 days since the monitoring period January to June 2015.

PRIVILEGED AND CONFIDENTIAL

xxvi. Successfully met performance standards for quality investigations, since the monitoring period of July to December 2017.

xxvii. Successfully met performance standards for initial FTM completion so that 80% of children newly entering placement have an FTM before or within 45 days of placement since the monitoring period of July to December 2016.

xxviii. Successfully met performance standards for subsequent FTMs such that 80% of children have three additional FTMs within the first 12 months of children entering placement since the monitoring period of January to June 2016.

xxix. Successfully met performance standards for FTMs involving families with a reunification goal such that after the first 12 months in out of home care, 90% of those with a reunification goal have at least three FTMs per year since the monitoring period July to December 2015.

xxx. Successfully met performance standards for families with a goal other than reunification such that after the first 12 months of entering out of home care, 90% of children with a goal other than reunification have at least three FTMs since the monitoring period of July to December 2017.

xxxi. Successfully built a needs assessment process to regularly evaluate the need for additional placement and children in custody and their families and to support stabilization for in-home families since the monitoring period of July to December 2017.

xxxii. Successfully met performance standards for initial case plans for children and families such that 95% of initial case plans are completed within 30 days since the monitoring period of January to June 2016.

xxxiii. Successfully met performance standards for acceptable intake worker caseloads such that 95% of local offices have average caseloads for intake workers of no more than 12 families and no more than 8 new case assignments per month since the monitoring period of January to June 2016.

xxxiv. Successfully met performance standards for acceptable intake worker caseloads such that 90% of individual intake workers have no more than 12 open cases and no more than 8 new case assignments per month since the monitoring period of January to June 2016.

xxxv. Successfully met performance standards for acceptable adoption worker caseloads such that 95% of local offices have average caseloads for adoption workers of no more than 12 adoptive families per worker since the monitoring period of July to December 2015.

xxxvi. Successfully met performance standards for acceptable adoption worker caseloads such that 95% of individual adoption worker caseloads are no more than 12 families per worker since the monitoring period of January to June 2016.

xxxvii. Successfully met the performance standard for parent-child contact such that 60% of children in custody with a return home goal have an in-person visit with their parent or other legally responsible family member at least weekly, unless it is prohibited by the court or it is appropriately deemed to be physically or psychologically harmful to a child since the monitoring period of July to December 2014.

xxxviii. Successfully met the performance standard for in-person parent-child visits such that 85% of children in custody have an in-person visit with their parent or other legally responsible person at least every other week unless it is prohibited by the court or it is appropriately deemed to be physically or psychologically harmful to a child, since the monitoring period of January to June 2015.

xxxix. Successfully met performance standard for sibling visits such that 85% of children in custody who have siblings with whom they are not residing visit at least monthly unless it is prohibited by the court or it is appropriately deemed to be physically or psychologically harmful to a child since the monitoring period of July to December 2018.

xl. Successfully met performance standards for sibling placements such that at least 80% of sibling groups of two or three children entering custody are placed together since the monitoring period of July to December 2014.

xli. Successfully met performance standards for placing sibling groups of four or more entering custody to be placed with at least one other sibling since the monitoring period of January to June 2015.

xlii. Successfully met the performance standard of recruiting resource homes capable of serving sibling groups of four or more since the monitoring period of July to December 2015.

xliii. Successfully met the performance standard for placement stability such that at least 84% of children entering out of home placement for the first time in a calendar year have no more than one placement change in the first 12 months in placement since the monitoring period of July to December 2016.

xliv. Successfully met the performance standard for the aforementioned children such that they have no more than one placement change during the 13-24 months following the date they entered placement since the monitoring period of July to December 2016.

PRIVILEGED AND CONFIDENTIAL

    xlv.    Successfully met the performance standard for maltreatment of children in their own home such that not more than 7.2% of children who remain home after a substantiation of abuse and/or neglect experience repeat maltreatment within the next 12 months since the monitoring period of July to December 2015.

    xlvi.    Successfully met the performance standard for post-reunification maltreatment such that of all children who enter foster care in a 12 month period for the first time who are discharged to reunification or live with relative (s) within 24 months of entering placement do not experience repeat maltreatment within 12 months of their discharge since the monitoring period of July to December 2016.

    xlvii.    Successfully met the performance standard for re-entry such that, of all children who enter placement for the first time in a 12 month period and are discharged within 12 months to reunification, living with relative(s) or KLG, no more than 9% re-enter placement within 12 months of their discharge since the monitoring period of July to December 2019.

    xlviii.    Successfully met the performance standard for permanency such that of all children who enter foster care in a 12 month period, at least 42% are discharged to permanency within the first 12 months of entering care since the monitoring period of July to December 2016.

    xlix.    Successfully met the performance standard for permanency such that of all children who enter foster care in a 12 month period, at least 66% are discharged to permanency within 24 months of entering care since the monitoring period of July to December 2019.

    l.    Successfully met the performance standard for permanency such that of all children who enter foster care in a 12 month period, at least 80% placement are discharged to permanency within 36 months of entering care since the monitoring period of July to December 2017.

    li.    Successfully met the performance standard for permanency such that of all children who enter foster care in a 12 month period, at least 86% are discharged to permanency within 48 months of entering care since the monitoring period of July to December 2017.

    lii.    Successfully met the performance standard for completing independent living assessments such that 90% of youth ages 14 to 18 have an independent living assessment since the monitoring period of January to June 2015.

    liii.    Successfully met the performance standard for completing quality case planning and services for youth/young adults ages 18 to 21 who have not

PRIVILEGED AND CONFIDENTIAL

achieved legal permanency since the monitoring period of July to December 2015.

liv. Successfully met the performance standard for ensuring youth who exit care without achieving permanency have housing since the monitoring period of July to December 2016.

lv. Successfully met the performance standard for older youth employment/education, such that 90% of youth/young adults who exit care without achieving permanency are employed, enrolled in or have recently completed a training or an education program since the monitoring period of July to December 2016.

The parties jointly acknowledge the State's strong performance even in the face of the unprecedented COVID-19 Emergency.

B. Performance that continues to improve
The parties jointly acknowledge the State's efforts to continue to advance solid performance in the following areas:
   i. Caseworker contacts with family when goal is reunification
   ii. Quality of Teaming
   iii. Quality of Case Plans
   iv. Services to Support Transition

C. Performance compared to national benchmarks and averages
The Parties jointly acknowledge that the State's performance compares to national average performance (as reported by the Children's Bureau Child Welfare Outcomes Report, 2018 (published May 2021) as follows:
   i. Children are maltreated less often in NJ: in New Jersey, children are maltreated at a rate of 3.1 per 1,000 compared to a national average of 10.1 per 1,000
   ii. New Jersey's children are less than half as likely to die from maltreatment than in the nation on average: New Jersey's rate of child maltreatment related fatalities is 0.92 per 100,000 compared to a national average of 2.2 per 100,000
   iii. New Jersey's children experience safer foster care placements than in the nation on average: New Jersey's rate of maltreatment of children in state custody is 25% lower than the national average – a rate of 0.3% in New Jersey, compared to 0.4% in the nation on average
   iv. New Jersey successfully reunifies more children with their family of origin than in the nation on average: 61.2% of children leaving foster care exited to their family of origin, compared to 55.9% for the nation on average.
   v. Young children in foster care are more likely to live in family settings in New Jersey: Children under age 12 in New Jersey's foster care system live in group homes or institutions at 1/3 the rate of the national average: 1.3% of children in foster care under 12 in New Jersey are living in a group home or institution, compared to 3.9% for the nation on average.

III.  Oversight provided by the US Department of Health and Human Services

   A. The Parties jointly acknowledge that, during the 22 years since the onset of the Lawsuit, the US Department of Health and Human Services has built a Child and Family Services Review (CFSR) process, authorized by 1994 amendments to the Social Security Act and codified via a final rule published in the Federal Register in 2000. The CFSR enables the Children's Bureau to: (1) Ensure conformity with federal child welfare requirements; (2) Determine what is actually happening to children and families as they are engaged in child welfare services; and (3) Assist states in enhancing their capacity to help children and families achieve positive outcomes.

   B. The CFSR measures the following outcomes:
      a. Safety
         i. Children are, first and foremost, protected from abuse and neglect.
         ii. Children are safely maintained in their homes whenever possible and appropriate.
      b. Permanency
         i. Children have permanency and stability in their living situations.
         ii. The continuity of family relationships and connections is preserved for families.
      c. Family and Child Well-Being
         i. Families have enhanced capacity to provide for their children's needs.
         ii. Children receive appropriate services to meet their educational needs.
         iii. Children receive adequate services to meet their physical and mental health needs.

   C. The reviews also assess the following seven systemic factors that affect outcomes for children and families:
      a. statewide information system
      b. case review system
      c. quality assurance system
      d. staff and provider training
      e. service array and resource development
      f. agency responsiveness to the community
      g. foster and adoptive parent licensing, recruitment, and retention

   D. The Parties jointly acknowledge that the US Department of Health and Human Services has established the Adoption and Foster Care Analysis and Reporting System (AFCARS). State and Tribal Title IV-E agencies are required to report AFCARS case-level information on all children in foster care and children who have been adopted with Title IV-E agency involvement (per §479 of the Social

8

Security Act). Title IV-E agencies are required to submit the AFCARS data twice a year based on two 6-month reporting periods.

E. The Parties jointly acknowledge that the US Department of Health and Human Services publishes annual *Child Welfare Outcomes* reports, as required by section 203(a) of the Adoption and Safe Families Act of 1997 (ASFA), which assesses state performance in operating child protection and child welfare programs under titles IV-B and IV-E. These reports are publicly available via the US Department of Health and Human Services website and customizable by state and year.

## IV. Principles of the Exit Plan and Agreement

The interpretation of the provisions of this Agreement will be guided by the following non-exhaustive list of principles, the majority of which have been incorporated into New Jersey statute as indicated below:

A. Children in out-of-home care should be protected from harm.

1. Foster care should be as temporary an arrangement as possible, with its goal being to provide to children in out-of-home placements a safe, nurturing, and permanent home quickly. (NJSA 9:6B-4(j))

2. If at all possible, children in out-of-home placements should be quickly and safely reunified with their biological families. If this cannot be accomplished, children need to be placed with an adoptive family, or in the permanent legal custody of an appropriate kinship family, in a timely fashion. (NJSA 9:6B-4(b) and (j); NJSA 30:4C-11.1(b),(c) and (d))

3. Families should be provided with the services they need to keep them together whenever possible. Families should be provided with the services they need to allow for safe and speedy reunification whenever possible. (NJSA 9:6B-4(a) and (j); NJSA 30:4C-11.1(b))

4. In making determinations about plans and services, the child's interests are paramount. (NJSA 9:6-8.8(b); NJSA 30:4C-11.1(a))

5. Children in out-of-home placement should be in the least restrictive, most family-like setting appropriate for their needs.( NJSA 9:6B-4(g))

6. Children in out-of-home placement should be placed in settings that promote the continuity of critical relationships: together with their siblings; with capable relatives whenever possible; and in their own communities. (NJSA 9:6B-4(b), (c) and (d); NJSA 30:4C-12.1(a))

9

PRIVILEGED AND CONFIDENTIAL

7. Children in out-of-home placement should have stable placements that meet their needs and should be protected from the harm caused by multiple placement moves. (NJSA 9:6B-4(h))

8. Children in out-of-home placement should have the services necessary to address their medical and psychological needs, including those services needed to address problems arising from the child's removal from their biological family.( NJSA 9:6B-4(k))

9. Children in out-of-home placement must have timely decision-making about where and with whom they will spend their childhood, and timely implementation of whatever decisions have been made. (NJSA 9:6B-4(j); NJSA 30:4C-61.2)

10. Children in out-of-home placement should be protected from abuse and neglect and, to this end, investigations of allegations of abuse and neglect in out-of-home placements should be timely, thorough, and complete. (NJSA 9:6B-4(h))

11. Adolescents in out-of-home placements should be provided with the skills, opportunities, housing, and permanent connections with caring adults they need to successfully make the transition to adulthood.( NJSA 9:6B-4(k), (m) and (n))

12. The State shall make every effort to ensure that all children shall receive equal and appropriate access to services without regard to race, religion, sexual identity, or ethnic origin.

B. Decisions about children in out-of-home placement should be made with meaningful participation of their families and of the youth themselves to the extent they are able to participate. (NJSA 9:6B-4(i))

C. In order to protect children and support families, New Jersey's child welfare system should operate in partnership with the neighborhoods and communities from which children enter care.

D. New Jersey's child welfare system is accountable to the public; to other stakeholders; and to communities throughout the State.

E. Services to children in care and their families should be provided with respect for and understanding of their culture. No child or family should be denied a needed service or placement because of race, ethnicity, or special language needs.

F. New Jersey's child welfare system should have the infrastructure, resources, and policies needed to serve the best interests of the children in its care.

V. <u>Exit from *Charlie H.* Court Oversight</u>

PRIVILEGED AND CONFIDENTIAL

A. Execution of Agreement

   1. By entering into this Agreement the Parties agree that exit from Court oversight under *Charlie H.* shall take place according to the following processes and timetables.

   2. Material deviation from the processes and timetables contained in this Agreement shall constitute breach of the Agreement. *See* Sec. VI., *Compliance and Dispute Resolution.*

B. Remaining Monitoring Period

   1. The Remaining Monitoring Period refers to January 1, 2022 to June 30, 2022.

   2. Scope
      i. The Parties agree that the measures described in II.A., above, have been consistently maintained by the State of New Jersey. During the Remaining Monitoring Period, these measures will be reported on by the State and monitored by CSSP in accordance with Section V of the SEP; all commitments in Section V of the SEP shall remain in full force and effect.
         1. DCF shall continue to publish performance data related to these measures to its public website in the Commissioner's Monthly Report.
         2. DCF shall continue its partnership with Rutgers, the State University of New Jersey, for the maintenance of the New Jersey Child Welfare Data Hub.
         3. CSSP shall produce a publicly available monitoring report for the period.

      ii. In addition to reporting on the measures that have been maintained, the Parties agree that DCF will monitor and publish performance data related to Caseworker Contacts with Parents/Family Members When the Goal Is Reunification (SEP IV.F.28) for the Remaining Monitoring Period. DCF shall continue to publish performance data related to this measure to its public website in the Commissioner's Monthly Report.

      iii. The Parties agree that the State's performance on Quality of Teaming, Quality of Case Plans, and Services to Support Transition will not be measured by a Qualitative Review during January – June 2022.

      iv. The Parties acknowledge that, during the Remaining Monitoring Period, the State will establish a revised and comprehensive qualitative review system. This new system will include collection and review of both qualitative and quantitative data, including review of case records and interviews with families and older youth who have received services

11

PRIVILEGED AND CONFIDENTIAL

from DCPP. The sampling strategy will ensure sufficient measurement of the experiences of older youth and the review protocol will encompass permanency case practice elements including but not limited to engagement, assessment, case planning, teaming, performance supporting quality education of youth in foster care, and investigative practice.

  v. During the Remaining Monitoring Period, CSSP shall monitor, in addition to elements already part of existing monitoring reports:
    1. The State's progress in designing and implementing a revised and comprehensive qualitative review system.
    2. The State's progress in transitioning oversight of DCF data and outcomes to the Staffing and Oversight Review ("SORS") Committee under the New Jersey Task Force on Child Abuse and Neglect ("NJTFCAN").

3. Court oversight continues during the Remaining Monitoring Period. Plaintiffs shall maintain all existing enforcement rights throughout the Remaining Monitoring Period.

4. The State shall provide CSSP with all data and with responses to CSSP's Monitoring Needs Memo to assess performance during the remaining monitoring period according to the scheduled attached as Appendix I. Assuming receipt of data according to the schedule, the Monitor shall issue a written report no later than 90 days following the close of the Remaining Monitoring Period, or by Sept 30, 2022.

C. Fairness Hearing

1. If, by October 30, or 30 days following the issuance of the Monitor's written report for the Remaining Monitoring Period, there are no assertions of material non-compliance that have either been left unresolved through mediation or raised with the Court, the Parties shall jointly petition the Court for an order preliminarily approving the settlement of *Charlie H.* and setting a fairness hearing for on or about December 30, 2022 regarding the exit from *Charlie H.* Court oversight.

2. In the joint petition, the Parties shall request that all objections and requests to be heard be submitted to the Court and counsel for the Parties in writing by November 30, 2022 or at least 30 days before the scheduled fairness hearing.

3. At the Fairness Hearing, contingent on there being no outstanding concerns of material non-compliance with either the performance requirements set forth in the SEP or with Section IV.A. of this Agreement raised to the Court by Plaintiffs, *Charlie H. v. Murphy* shall be dismissed, subject to the conditions set herein.

12

PRIVILEGED AND CONFIDENTIAL

4. Court oversight continues through the Fairness Hearing.

D. Transition Period

1. The Transition Period refers to the 6-month period of time immediately following the dismissal of *Charlie H.*, beginning on December 30, 2022 or the day following the fairness hearing, and ending no later than June 30, 2023. The provisions of this Agreement shall remain legally enforceable between Defendants and Plaintiffs for the period(s) defined.

2. The Center for the Study of Social Policy ("CSSP") shall maintain the ability to review data, upon request. During the Transition Period, CSSP shall assess DCF's performance on the Commitments made in Section VI of this Agreement.

3. DCF shall continue to publish Commissioner's Monthly Reports to its website. CSSP will issue addendum reports describing DCF's progress in carrying out the commitments made in Section VI of this Agreement.

4. Upon dismissal of *Charlie H.*, court oversight of the New Jersey child welfare system pursuant to the SEP will terminate. However, the Court retains jurisdiction over any disputes arising out of this Agreement. Should the Department's performance reports or CSSP's addendum reports identify a serious, systemic decrease in DCF's performance or a failure by DCF to comply with the terms of the Agreement, CSSP may notify Plaintiffs, who retain the right to file a motion seeking to vacate the Court's order ending oversight of the New Jersey child welfare system under the SEP and to restore the Court's full jurisdiction over this action. In any action in federal court to remedy an alleged failure to comply with any terms of this Agreement, Plaintiffs shall have the burden to demonstrate that Defendants have failed to comply with the specific terms of the Agreement and that they are entitled to relief.

E. Final Exit

1. Absent the filing of an enforcement action alleging breach of this Agreement during the Transition Period, this Agreement and all claims arising from this Agreement shall expire on the 90th day immediately following Plaintiffs' receipt of the first report regarding DCF's performance, to be created by the SORS committee or its designee as of April 15, 2023.

2. Court oversight and jurisdiction over this Agreement has terminated.

VI. Defendants' Commitments

13

PRIVILEGED AND CONFIDENTIAL

A. Defendants' Commitments During the Remaining Monitoring Period and Transition Period

   1. In addition to performing as required by the SEP, Defendants shall develop a revised and comprehensive qualitative review system during the Remaining Monitoring Period to measure the quality of case practice in New Jersey's 21 counties. The new review system will serve as a substitute for the Qualitative Review ("QR") previously used by DCF.

   2. Defendants shall develop the revised and comprehensive qualitative review system for review by CSSP and Plaintiffs by June 2022. Case record review tools shall be developed during the Remaining Monitoring Period and implemented during the Transition period; and family interview protocols and procedures will be implemented during the Transition Period.

   3. Defendants' development of the revised and comprehensive qualitative review system shall be subject to monitoring as set forth in the SEP Sec. V. CSSP shall evaluate the sufficiency of the revised and comprehensive qualitative review system as a substitute for the QR and shall issue any related findings in its final report.

   4. Defendants commit to implementing the new revised and comprehensive qualitative review system during the Transition Period.

   5. Defendants shall monitor and report on the SEP measures via the Commissioner's Monthly Report, including annual updates on the Department's performance as measured by the revised and comprehensive qualitative review.

   6. Defendants shall continue contracting with Rutgers University to produce the New Jersey Child Welfare Data Portal.

   7. Defendants shall establish SORS under the NJTFCAN as the entity responsible for reviewing DCF's performance. Defendants shall take all actions including making all good faith efforts to enact proposed legislative changes necessary to ensure SORS is a meaningful body with membership and sufficient independent staffing to carry out its work. Execution of this Agreement is contingent upon the passing of a New Jersey statute establishing SORS as such; in the event that necessary legislative changes are not made prior to Final Exit, the parties agree to meet with CSSP to renegotiate this provision. Defendants shall recommend and support modifications of the charter and responsibilities of SORS so that in addition to reviewing staffing levels of the Division of Child Protection and Permanency ("CP&P") and developing recommendations regarding staffing levels and the most effective methods of recruiting, hiring, and retaining staff within the CP&P, SORS shall review any and all information necessary to

14

PRIVILEGED AND CONFIDENTIAL

review DCF's performance and develop recommendations. Defendants shall furnish such information relevant to DCF's performance and functioning, including but not limited to data on the foundational elements set forth in the SEP, all publicly available reports and dashboards, results from annual CFSR case reviews, the Annual Program and Services Report, and the results of the revised and comprehensive qualitative review.

8. The metrics for ongoing review and the timetable for production and issuance of reports by SORS shall be determined by DCF and SORS leadership, with input from CSSP during the Transition Period.

9. During the Remaining Monitoring Period, Defendants shall create the revised and comprehensive qualitative review, including:
   a. A new record review tool, to be implemented during the Transition Period. A minimum of 690 cases per year shall be reviewed using this tool.
   b. The record review sampling strategy will ensure sufficient measurement of the experiences of older youth. The record review shall include indicators related to, but not limited to, the following issues regarding older youth:
      1. Services to support the transition of older youth;
      2. Educational and employment outcomes for older youth;
      3. Reunification with relatives or adult connections;
      4. Housing and homelessness outcomes for older youth
   c. The record review shall include measures related to educational stability and education for children with disabilities or in residential settings
   d. A new family interview tool, to be implemented during the Transition Period. A minimum of 200 families per year shall be interviewed using this tool.
   e. Revised Continuous Quality Improvement (CQI) practices, to be implemented during the Remaining Monitoring Period
   f. Review of the quality of Investigations, to be completed by August, 2022

10. Defendants shall provide CSSP and Plaintiffs with the opportunity to review draft tools and procedures.

11. Defendants shall continue to provide CSSP access to the data and case records stored on New Jersey Statewide Protective Investigation, Reporting, and Information Tool ("NJ SPIRIT") until the conclusion of the Transition Period.

12. Defendants shall furnish to CSSP the results of the August – September 2020 Child and Family Services Review ("CFSR"), which sampled 65 cases in six counties and employed the Onsite Review Instrument ("OSRI") methodology.

13. Defendants shall embed a representative from CSSP into at least one CP&P Area Office CQI team and at least one CP&P Local Office CQI team.

PRIVILEGED AND CONFIDENTIAL

14. CSSP shall assess and report on the establishment of the SORS Committee and issue any related findings in its public performance reports.

15. By June 30, 2022 Defendants shall take steps to secure legislative support reinforcing DCF's obligation to codify certain elements of the SEP, including but not limited to caseload standards, and "provide the most appropriate and least restrictive placements, allowing children to remain in their own communities, be placed with or maintain contact with siblings and relatives, and have their educational needs met," *see* SEP Sec. II.D; and (2) to modify the mandates related to SORS to ensure it has oversight of DCF as it relates to DCF continuing to meet the Foundational Elements outlined in Sec. II of the SEP and performance metrics established by the State in consultation with CSSP and Plaintiffs. Defendants shall take all reasonable steps available to them to advance these legislative changes and ensure they become law.

## VII. Defendants' Statement of Intent

Defendants agree that they intend to take the following actions immediately following Final Exit from this action, after Court oversight over the New Jersey child welfare system and Court jurisdiction over this Agreement has ended.

A. Defendants commit to continuing to ensure that there is a statutorily mandated committee, such as a reconstituted SORS, responsible for the ongoing review of DCF performance data and outcomes. Defendants will continue to furnish to SORS 1) the information relevant to DCF's performance and functioning and 2) the resources required to carry out SORS' duties.

B. Defendants commit that SORS shall submit an annual public report with its findings and recommendations to the Governor and Legislature, as required by state statute. Defendants additionally commit that SORS shall include findings and recommendations from their review and analysis of DCF's performance and functioning in their annual report to the Governor and Legislature. In addition to providing the annual report directly to the Governor's Office and the Office of Legislative Services, Defendants commit that SORS will provide the report directly to the heads of the Human Services Committee in both houses and the Women and Children Committee in the Assembly.

C. Defendants commit that SORS' annual public report's findings and recommendations shall be reviewed by DCF, including by the Commissioner of DCF, the Deputy Commissioner of Operations, and the Deputy Commissioner of Policy, Legal Affairs, and Compliance.

D. Defendants commit that DCF will implement the new constituent review process, *see* Sec. IV.B.5, by December 31, 2022. Defendants commit that the results will be

16

PRIVILEGED AND CONFIDENTIAL

published on DCF's public website. Defendants additionally commit that DCF will timely address the needs identified by the review.

E. Defendants commit that DCF will implement the Local Office Review Tool, *see* Sec. IV.B.8, by December 31, 2022, and continue to implement the Local Office Review Tool on an annual basis. Defendants commit that the results will be published on DCF's public website. Defendants additionally commit that DCF will timely address the needs identified by the review, including but not limited to requiring Corrective Action Plans for any local office determined to be performing deficiently on any metric contained in the review.

F. Defendants commit that the results of the statewide review of practice related to Investigations, Education, and Older Youth, *see* Sec. IV.B.6, will be published on DCF's public website. Defendants additionally commit that DCF will timely address the needs identified by the review.

G. Defendants commit that DCF will continue to take all reasonable steps to advance the legislation proposed by DCF during the Transition Period. *See* Sec. IV.B.16.

VIII. Compliance and Dispute Resolution

A. If, at the conclusion of the Transition Evaluation Period, Plaintiffs assert that there is material non-compliance on the SEP requirements or the Commitments in Section VI.A. of this Agreement, Plaintiffs may raise the concerns to Defendants.

B. Before seeking to enforce any of the specific terms with the Court, the Parties should engage in good faith efforts for a period of up to 45 days to resolve concerns through mediation by CSSP and a neutral third party, who shall have expertise in child welfare practice, who shall have had no previous involvement with this matter, and who shall be selected by the Defendant.

C. If the parties are unable to reach agreement through negotiation, Plaintiffs will raise the matter to the Court by filing a motion for enforcement on the *Charlie H.* docket.

IX. General Provisions

A. This Agreement shall be governed by and construed and enforced in accordance with applicable federal statutes, federal decisional law, and the laws of the State of New Jersey.

B. The Court will have jurisdiction over any disputes arising out of this Agreement. Plaintiffs' entrance into this Agreement is contingent upon the Court's agreement to retain jurisdiction over any disputes arising out of this Agreement.

C. The dates of the Fairness Hearing and of the Final Settlement and Exit contemplated in this Agreement are subject to change based on the duration of time spent to resolve any

PRIVILEGED AND CONFIDENTIAL

matters of material non-compliance raised by Plaintiffs either to Defendants or to the Court.

D. This Agreement constitutes the entire understanding between the Parties hereto and is intended as the complete and exclusive statement of the agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements and negotiations hereto.

E. The undersigned representatives of the Parties certify that they are fully authorized to enter into and execute the terms and conditions of this Agreement and to make such Agreement fully and legally binding upon and enforceable against every Party on whose behalf they have executed this Agreement. The individuals signing for Defendants are its officials acting within the scope of their authority. The Parties stipulate, agree, and warrant that they will not challenge or contest in any way the capacity or the authority of any Party hereto to make the agreements, covenants, and stipulations herein.

F. In the event that final approval of this Agreement is not obtained or the Agreement is deemed null and void for any reason, the Parties will revert to the positions they occupied prior to the execution of this Agreement and nothing herein shall be deemed to waive any of the Parties' claims, arguments, objections, and/or defenses.

IN WITNESS WHEREOF AND INTENDING TO BE LEGALLY BOUND HEREBY, the parties, by and through their duly authorized representatives, execute this Agreement, intending that it will become effective upon its approval and entry by the Court as provided herein.

_____
Philip D. Murphy, Governor of the State of New Jersey

_____          _____
Christine Norbut Beyer, Commissioner of DCF      Marcia Robinson Lowry, Esq., for Plaintiffs

IT IS SO ORDERED:

_____
Hon. Stanley R. Chesler, U.S.D.J.

DATED: _____, 2022

18